UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. _____

| | |
|---|---|
| ZHIMAN KONG, on behalf of himself individually and all others similarly situated, and on behalf of VIA MIZNER FUNDING, LP, a Florida limited partnership, <br><br>      Plaintiffs, <br><br>                vs. <br><br> NICHOLAS A. MASTROIANNI II; U.S. IMMIGRATION FUND GP-MIZNER, LLC, a Florida limited liability company; and CAMINO INVESTMENTS HOLDINGS LIMITED PARTNERSHIP, a Florida limited partnership, <br><br>      Defendants. | **CLASS ACTION** |

**CLASS-ACTION COMPLAINT
FOR EQUITABLE RELIEF AND DAMAGES**

Plaintiff Zhiman Kong, on behalf of himself individually and on behalf of all other similarly situated members of Via Mizner Funding, LP, a Florida limited partnership (the "**Funding Partnership**"), pursuant to Federal Rule of Civil Procedure ("Rule") 23, and on behalf of the Funding Partnership pursuant to Rule 23.2, alleges as follows upon personal knowledge as to Plaintiff's firsthand experience and on information and belief as to all matters based on investigations by counsel.

## INTRODUCTION

1.       In 1990, Congress enacted the EB-5 Immigrant Investor Program ("**EB-5 Program**") to give foreign investors the opportunity to obtain a Green Card for themselves and their immediate family by investing in a U.S. business that creates jobs for American workers.

2.       Real estate developers use the EB-5 program as a source of funding for their projects because EB-5 funding often comes at a lower interest rate than traditional financing options; EB-5 investors typically have less stringent requirements compared to banks or other traditional lenders; and developers can use EB-5 funds to reduce the amount of their own equity they need to invest in a project.

3.       In the present case, the Funding Partnership used the EB-5 Program to raise between $48,000,000 and $160,000,000 to fund a construction loan (the "**Loan**") to help Defendant Camino Investment Holdings Limited Partnership (the "**Developer**") defray the cost of constructing Via Mizner, a mixed-use real estate project in Boca Raton, Florida (the "**Project**").

4.       To raise the money to fund the Loan, the Funding Partnership offered prospective EB-5 investors up to 360 units of membership in the Funding Partnership for $545,000 per unit ($500,000 in investment capital and a $45,000 administrative fee) in exchange for becoming Limited Partners in the Funding Partnership and 3.5% annual interest on their capital contributions,

- 1 -

which would be repaid when the Loan matured five years after it was distributed to the Developer (the "**Maturity Date**"), subject to two conditions.

5.      First, the Developer had the option of extending the Maturity Date by a maximum of one year, which could be exercised in two six-month increments.

6.      Second, the Limited Partners' capital contributions would not be repaid until the U.S. Customs & Immigration Service ("**USCIS**") had fully adjudicated the Limited Partners' applications for permanent U.S. Citizenship; that is, if that process was not completed by the Maturity Date, the Limited Partners' investment capital would not be returned to them until it was.

7.      Because the construction of the Project was expected to occur in three phases, the Loan was to have also been distributed to the Developer in three phases. Therefore, each EB-5 investor would be designated as a "**Phase I Limited Partner**," a "**Phase II Limited Partner**," or a "**Phase III Limited Partner**," depending on whether their capital investment was used to fund the first, second, or third phase of the Project's construction.

8.      Ultimately, however, the Loan was distributed in two phases, so the Limited Partners were designated as a "**Phase I Limited Partner**" or a "**Phase II/III Limited Partner**," the Loan was referred to as the "**Phase I Loan**" and the "**Phase II/III Loan**," and the Maturity Dates for each was **September 28, 2017**, and **February 29, 2021**, respectively.[1]

9.      On September 28, 2017, the Developer repaid the Phase I Loan to the Funding Partnership, but it was not repaid to the Phase I Limited Partners because USCIS had not fully adjudicated their immigration applications. Thus, on October 16, 2017, Defendant Mastroianni, in his capacity as General Partner, proposed to amend the Funding Partnership's Limited Partnership

---

[1] Of the 278 EB-5 investors who became Limited Partners, 118 were designated as Phase I Limited Partners and 160 were designated as Phase II/III Limited Partners.

Agreement for the purpose of enabling him to **(1)** reinvest the Phase I Limited Partners' investment capital and **(2)** formally establish the two classes of Limited Partners (Phase I Limited Partners and Phase II/III Limited Partners) so they could vote separately from one another (*e.g.,* Phase I Limited Partners could not vote on matters relating to the repayment of the Phase II/III Loan).

10.     On September 25, 2013, Plaintiff became one of the 278 EB-5 investors who paid $545,000 for one unit of membership in the Funding Partnership, and was designated as a Phase II/III Limited Partner. As such, Plaintiff's capital investment was subject to the Maturity Date that applied to the Phase II/III Loan (on or about March 28, 2021).

11.     USCIS granted Plaintiff's I-829 Petition on December 10, 2019. Plaintiff is informed and believes that USCIS has adjudicated all the I-829 Petitions that were submitted by each of the other eligible Phase II/III Limited Partners.

12.     To date, however, the Developer has failed to repay the Phase II/III Loan. Instead, the Developer received several improper extensions of the Maturity Date that went well beyond the one-year maximum described in the offering documents. Initially, the Maturity Date was extended from March 28, 2021, to September 28, 2021.

13.     It was extended yet again—by more than two additional years. In a letter dated March 25, 2024, Mastroianni advised the Phase II/III Limited Partners that the Maturity Date had been extended to December 31, 2023. In the same letter, Mastroianni disclosed that he had caused the Funding Partnership to enter into a forbearance agreement with the Developer, which effectively extended the Maturity Date to February 29, 2024. Mastroianni went on to explain that the Developer was served with a notice of default when it breached the forbearance agreement. Mastroianni had failed to take any action on the default, however, because the Funding Partnership lacked the funds needed to pursue litigation.

14.     Until receiving Mastroianni's letter of March 25, 2024, Plaintiff was unaware that Mastroianni had permitted the Developer to extend the Maturity Date beyond the one-year maximum allowable extension, much less that Mastroianni had entered into a forbearance agreement on behalf of the Funding Partnership, without seeking the Limited Partners' consent. And when Plaintiff made a recent inquiry about the Developer's extensions of the Maturity Date and when he could expect repayment of his capital investment and the interest it has accrued, Plaintiff was advised that there is no money to repay the Phase II/III Limited Partners.

15.     As alleged in more detail below, Defendants have engaged in breaches of contract and breaches of fiduciary duty. Accordingly, Plaintiff brings this action on behalf of himself and all other Phase II/III Limited Partners pursuant to Rule 23, and on behalf of the Funding Partnership pursuant to Rule 23.2.

## PARTIES

### PLAINTIFFS

16.     Plaintiff Zhiman Kong is an individual participant in the EB-5 Program who is a member of the Funding Partnership designated as a Phase II/III Limited Partner. Plaintiff Kong was born in mainland China, has been employed as a teacher and a corporate financial planner, and now resides in El Monte, California.

### DEFENDANTS

17.     Defendant U.S. Immigration Fund GP-Mizner, LLC (the "**General Partner**") is a Florida Limited Liability Company ("LLC") that serves as the General Partner of Via Mizner Funding, LLC (the Funding Partnership) and whose principal place of business is Tequesta, Florida. The General Partner is managed by Defendant Mastroianni.

- 4 -

18.     Defendant Nicholas A. Mastroianni II ("**Mastroianni**") is an individual who resides in Palm Beach County, Florida, and who controls the General Partner as its Managing Member and Chief Executive Officer; the Funding Partnership as its General Partner; Florida Regional Center, LLC (the "**Regional Center**"), as its managing member; and U.S. Immigration Fund, LLC ("**USIF**") as its Chief Executive Officer.[2]

19.     Defendant Camino Investments Holdings Limited Partnership (the "**Developer**") is a Florida LLC whose principal place of business is Boca Raton, Florida.

## JURISDICTION AND VENUE

20.     **JURISDICTION**.   This Court has jurisdiction over the claims asserted herein on behalf of a class pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). Jurisdiction under CAFA is proper because (a) the amount in controversy exceeds five million dollars ($5,000,000), exclusive of interest and costs; (b) the proposed class includes more than 100 members, more than one of whom resides in a state other than Florida; and (c) Defendants have purposely availed themselves of the privilege of conducting business within the State of Florida, in which the individual Defendants are citizens, in which the entity Defendants have their principal place of business, and in which Defendants engaged in unlawful conduct alleged in this Complaint.

21.     **VENUE**. Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. 1391(b)(2) because most of the acts and omissions giving rise to the claims asserted herein occurred and continue to occur in this District, and where a substantial part of the property that is the subject of this action is situated.

---

[2] The Regional Center solicits foreign investors for participation in the EB-5 Program to fund real estate development projects and works with investors through the EB-5 immigration process. USIF operates the Regional Center (as well as other USCIS-designated Regional Centers in other locations) and provides services relating to real estate development, financing, and banking. Both entities were involved in the events underlying this action, but they are not parties to this action.

## GENERAL ALLEGATIONS

### A.    THE EB-5 PROGRAM

22.    To provide an incentive for foreign investment to benefit the American economy by creating or preserving American jobs, Congress created the EB-5 Program, by which immigrant investors could become permanent residents of the United States in exchange for investing at least $500,000 in a U.S. business that used the funds in a manner that creates or maintains at least 10 full-time American jobs. *See, e.g.,* 8 U.S.C. § 1153(b)(5).[3]

23.    At the outset of the application process, participants in the EB-5 Program submit a Form I-526 Immigration Petition by Alien Entrepreneur ("**I-526 Petition**"). *See* 6 USCIS Policy Manual ("**USCIS Policy Manual**"), Part G, Ch. 4 (Apr. 2020).  If the I-526 Petition is approved by USCIS, EB-5 Program participants receive conditional permanent residence status, which permits them to reside and travel within the U.S. while their application is pending. *Id.* EB-5 Program participants' capital contributions must also remain invested during the "sustainment period," which is two years after their I-526 Petition is approved. *Id.*, Ch. 5 & n. 4.

24.    EB-5 Program participants may then seek permanent U.S. residency status by submitting a Form I-829 Petition by Entrepreneur to Remove Conditions ("**I-829 Petition**"). *See id.,* Ch. 5. If the USCIS approves the I-829 Petition, those participants and their immediate family members are granted permanent immigrant visas (*i.e.,* Green Cards). *Id.*

---

[3] Congress has since enacted the EB-5 Reform and Integrity Act of 2022, which (among other things) increased the capital requirement from $500,000 to $800,000 in targeted employment areas or infrastructure projects and $1,050,000 for all other projects. *See* 8 U.S.C. § 1153(b)(5)(A), (C)(i)-(ii).

**B.** **RAISING FUNDS FOR A LOAN TO THE DEVELOPER OF THE VIA MIZNER PROJECT FROM FOREIGN INVESTORS WHO PARTICIPATED IN THE EB-5 PROGRAM**

25.     On July 11, 2012, the Funding Partnership was formed for the purpose of raising up to $160 million in EB-5 funding for Via Mizner, a mixed-use real estate development composed of a 118-room luxury hotel, 350 apartments, 100 residential condominium units, Class A office space, retail space, and restaurant space in Boca Raton, Florida (*i.e.*, the Project). The Project would be constructed in three consecutive phases by the Developer.

26.     On July 20, 2012, the Funding Partnership published Offering Documents[4] that described an opportunity for foreign investors (most, if not all, of whom spoke English as a second language, if at all) to obtain permanent residence in the United States via the EB-5 Program by investing in the Funding Partnership, which, in turn, would use the proceeds from the Offering to fund a construction loan for the Developer (*i.e.,* the Loan).[5]

27.     The Offering involved the sale of up to 320 units of membership in the Funding Partnership for $545,000 (*i.e.,* a $500,000 capital investment, as required by the EB-5 Program, plus a $45,000 administration fee) per unit.

---

[4] The Offering Documents are composed of Subscription Instructions and a Confidential Private Placement Memorandum, to which the following exhibits are attached: **(a)** the Via Mizner Funding Limited Partnership Agreement; **(b)** the Via Mizner Funding Subscription Agreement; **(c)** Charts Summarizing the Immigration and Investment Procedures; **(d)** a Subscription and Administrative Fee Escrow Agreement; **(e)** an Escrow Administration Services Agreement; **(f)** a Loan Commitment; and **(g)** Area Maps and Aerial Views of the Project. A true and correct copy of the Offering Documents is attached to this Complaint as **Exhibit 1**. (Pagination, which appears in red typeface on the bottom right page of Exhibit 1, has been added for ease of reference.)

[5] The Loan was expected to be disbursed to the Developer in accordance with the three-phase development schedule for the Project (*i.e.,* Phase I, Phase II, and Phase III). *See* Ex. 1 at 6, 174, 179.

28.     To obtain a unit of membership in the Funding Partnership, each EB-5 investor was required to **(a)** fax or email signed copies of the Subscription Agreement (including the Subscription Acknowledgment and IRS forms attached thereto), the Limited Partnership Agreement, and the Subscription and Administrative Fee Escrow Agreement to the General Partner, and **(b)** wire the $545,000 payment to the escrow agent. *See id.* at 3, 147.

29.     Upon receipt of those funds, the escrow agent released the $45,000 administrative fee to the Regional Center and retained the $500,000 capital investment in escrow until the subscribing investor's I-526 Petition was submitted to USCIS (at which point 90% of the capital investment would be released to the Funding Partnership and the remaining 10% would be released when the USCIS approved the I-526 Petition). *Id.* at 6.

30.     After the Funding Partnership approved their proposed investments, each EB-5 investor became a Limited Partner in the Funding Partnership. *See id*. The General Partner then designated each Limited Partner as a "Phase I Subscriber," a "Phase II Subscriber," or a "Phase III Subscriber," depending on whether a given Limited Partner's capital contribution was expected to be disbursed from the Loan to help defray the cost of the first, second, or third phase of the Project's construction, respectively. *Id.*

31.     Ultimately, the offering resulted in the sale of 278 units of membership in the Funding Partnership, which raised a total of $139 million in investment capital for the Loan to the Developer and $12,510,000 in administrative fees for the Regional Center. Of the 278 Limited Partners, 118 were designated as Phase I Subscribers and 160 were designated as Phase II/III Subscribers. Ex. 2 at 14.[6]

---

[6] Attached hereto as **Exhibit 2** is a true and correct copy of documents comprising a proposal to amend the Funding Partnership's Limited Partnership Agreement (the "Proposal") in October 2017: **(a)** two transmittal letters to the Phase I and Phase II/III Limited Partners; **(b)** a Limited

32.     After the Funding Partnership received the proceeds from the sale of its membership units, it would fund the Loan in an amount no less than $48 million and no more than $160 million, which the Developer was to use for the exclusive purpose of developing and constructing the Project. Ex. 1 at 175-76. In exchange, the Developer would pay a 1% origination fee based on the principal amount disbursed in connection with each Phase of the Loan, plus annual interest at a rate of 3.5%. *Id.* at 175.

33.     The Developer was to repay the principal and all accrued interest five years from the dates corresponding with the first disbursement of Loan funding for each of the three phases of the Project's construction (*i.e.,* the Maturity Date), subject to two exceptions. *See id.* at 47.

34.     First, repayment would not occur on the Maturity Date if USCIS had yet to adjudicate the Limited Partners' I-829 Petitions. *See id.* at 47, 55, 149, 175. According to the Offering Documents, returning the Limited Partners' capital before their I-829 Petitions were adjudicated would violate the EB-5 Program's requirement that EB-5 investors' capital remain fully "at risk" until their I-829 Petitions are adjudicated. *Id.* at 55.

35.     Second, repayment would not occur on the Maturity Date if the Developer exercised its right to extend the Maturity Date for up to one year (subject to the Developer giving

---

Partner Consent Letter; **(c)** a legal memorandum from I.A. Donoso Associates, LLC to the Regional Center regarding "Immigration Risks Associated with Repayment of Capital Contribution Before the Final Adjudication of an Investor's I-829 Petition"; **(d)** a consent letter to the Limited Partners dated October 16, 2017, from Mastroianni in his capacity as Chief Executive Officer of the Regional Center; **(e)** a Consent Solicitation Statement from Mastroianni in his capacity as the Funding Partnership's General Partner (which includes a detailed description of the "Modification Proposal," which is also referenced in the Limited Partner Consent Letter and the Regional Center's consent letter); and **(f)** the proposed Amended and Restated Limited Partnership Agreement (which is appended to the Consent Solicitation Statement as Exhibit A). Like Exhibit 1, pagination appears in red typeface on the bottom right page of Exhibit 2 for ease of reference.

written notice to the Funding Partnership at least 90 days before exercising that right, and subject to the Developer not materially breaching the Loan agreement). *See id.* at 47.[7]

C.    **MASTROIANNI PROPOSES TO AMEND THE LIMITED PARTNERSHIP AGREEMENT**

36.    On October 16, 2017—approximately five years and four months from the date the Offering Documents were published—Defendant Mastroianni, in his capacity as the Funding Partnership's "Authorized Signatory," distributed two different transmittal letters to the Limited Partners: one transmittal letter to the Phase I Subscribers and another transmittal letter to the Phase II and Phase III Subscribers, which Mastroianni addressed as "Phase I Limited Partners" and "Phase II/III Limited Partners," respectively. Ex. 2 at 1-2.

37.    In the transmittal letter to the Phase I Limited Partners, Mastroianni announced that "[t]he Phase I EB-5 Loan was paid off by the Developer on September 29, 2017 and the Phase II/III EB-5 Loan is set to be repaid by February 28, 2021 (subject to developer extension options)." Ex. 2 at 1.

38.    Mastroianni went on to explain that the Funding Partnership had retained those funds until USCIS adjudicated the Phase I Limited Partners' I-829 Petitions and, therefore, proposed that the Phase I Limited Partners' investment capital be reinvested. According to Mastroianni,

> USCIS's policy relative to capital investments under the EB-5 Program requires that each Limited partner's capital investment be sustained in the Company and remain "at risk" until final adjudication of the Limited Partner's I-829 Petition. As such, the Managing Member believes that the proposed reinvestment will help to establish that your qualifying investment is sustained in the Company per USCIS

---

[7] As discussed below, the Maturity Date of the Loan disbursement that was funded by Phase I Subscriber's capital was **September 29, 2017**, and the Maturity Date of the Loan disbursement that was funded by Phase II and Phase III Subscriber's capital was **February 28, 2021**, but was later extended.

guidelines. Please see the enclosed legal opinion from expert immigration counsel which confirms this analysis.

*Id.*[8]

39.     Whatever may have been said at the time the Offering Documents were published in mid-2012 regarding USCIS policy prohibiting the return of the Limited Partners' capital investments until their I-829 Petitions were adjudicated, there was no longer any good-faith basis for making that assertion in connection with the proposal Mastroianni articulated in his October 16, 2017, transmittal letters and the documents that accompanied them (collectively, the "**Proposal**").

40.     As the Regional Center's counsel explained in its legal memorandum, USCIS had clarified its Policy Manual in June 2017 for the purpose of clarifying that EB-5 investors' capital contributions need only be sustained "at risk" until the end of the two-year "sustainment period" that follows the approval of an I-526 Petition:

> *Recently, USCIS clarified its policy guidance on the critical question of the length of time that EB-5 investments are subject to the at-risk requirement*. In the revised version of its EB-5 Policy Manual, dated June 14, 2017 (the "June 14, 2017 Policy Manual"), USCIS states that an EB-5 Investor is required to maintain the Capital Contribution invested in the NCE and at risk from the date of the original investment of the Capital Contribution *until the end of the 2-year conditional Green Card status. This period of time is referred to as the "Sustainment Period" for the EB-5 Investor's Capital Contribution*.
>
> The June 14, 2017 Policy Manual provides that, *after the end of the Sustainment Period, it is permissible for the NCE to return the Capital Contribution to EB-5 Investors even before USCIS has decided the EB-5 Investor's Form I-829 Petition. USCIS expressly states in a footnote that "[a]n investor does not need to maintain his or her investment beyond the sustainment period*."

---

[8] Unlike the transmittal letter addressed to the Phase II/III Limited Partners, the transmittal letter to the Phase I Limited Partners uses the terms "the Company," "Managing Member," and "Operating Agreement" as apparent references to the Funding Partnership, its General Partner, and its Limited Partnership Agreement, respectively. *See, e.g., id.* at 11 (first paragraph).

Ex. 2 at 8 (emphasis added) (quoting 6 USCIS Policy Manual, Part G, Ch. 5 & n. 4); *see also* 8 C.F.R. § 216.6(c)(1)(iii) ("The alien will be considered to have sustained the actions required for removal of conditions if he or she has, in good faith, substantially met the capital investment requirement of the statute and continuously maintained his or her capital investment over the two years of conditional residence").

41.     In the transmittal letter to the Phase II/III Limited Partners, Mastroianni reiterated that the Developer had repaid the Phase I Limited Partners' capital investment (without explaining that only the Funding Partnership had been repaid, not the Limited Partners who provided the capital) and that the Phase II/III Limited Partners would be repaid by February 28, 2021, subject to the Developer exercising its options to extend the Maturity Date. *See* Ex. 2 at 2.

**D.     THE DEVELOPER DEFAULTS ON ITS LOAN OBLIGATIONS**

42.     In an email message dated March 23, 2021, the Regional Center notified the Limited Partners that the Developer had extended the Maturity Date by six months, to September 28, 2021.[9]

43.     On October 21, 2021, three weeks after the extended Maturity Date had passed without repayment by the Developer, Mastroianni advised the Limited Partners by letter[10] that the Developer had missed deadlines, incurred unexpected costs, and had failed to persuade its senior lender "to extend the term or increase the amount of the senior loan[.]" Ex. 4 at 1.

---

[9] A true and correct copy of the Regional Center's email message is attached hereto as **Exhibit 3**.

[10] A true and correct copy of the October 26, 2021, letter is attached hereto as **Exhibit 4**.

44.     Nonetheless, Mastroianni added that the Developer had refinanced the Project, asserting that it was in the best interest of the Funding Partnership and the Limited Partners

> *to approve the replacement senior financing and the resultant modifications to the EB-5 mezzanine loan*. The manager believes that this course of action is most likely to result in the return of the EB-5 investment and on the fastest timeline *compared to the pursuit of legal remedies (particularly considering the Company does not have the financial wherewithal to pursue such remedies*).

*Id.* at 1-2 (emphasis added).

45.     The Limited Partners were neither provided with a copy of the modified "EB-5 mezzanine loan" agreement to which Mastroianni referred in his letter, nor were they offered an opportunity to vote on the modifications that had been made to the Loan agreement. As Mastroianni later confirmed, however, the modified Loan agreement permitted the Developer to extend the Maturity Date well beyond the maximum one-year extension described in the Offering Documents without the Limited Partners' knowledge or consent. *See* Ex. 1 at 47.

46.     In a letter dated March 25, 2024,[11] Mastroianni advised the Phase II/III Limited Partners that the Maturity Date had been extended to December 31, 2023. Ex. 5 at 1. Moreover, Mastroianni had caused the Funding Partnership to enter into a forbearance agreement with the Developer, which gave the Developer until February 29, 2024 to repay the Loan. *Id.* Once again, the Limited Partners were given no opportunity to vote on the additional extensions of the Maturity Date or on the forbearance agreement.

47.     In the same letter, Mastroianni announced that the Developer was "in default under the loan agreement because of the [Developer's] failure to repay the outstanding principal balance and all other amounts due and owing under the loan documents on or before December 31, 2023

---

[11] A true and correct copy of Mastroianni's letter of March 25, 2024, is attached hereto as **Exhibit 5**.

(the current maturity date of the loan)." *Id.* Mastroianni also revealed that the Funding Partnership had served the Developer with a notice of default because the Developer had also defaulted on the forbearance agreement, adding that "the Developer does not presently have the capital to repay the loan, but informs us that advanced third-party negotiations are ongoing which, if successful, would result in repayment of the loan in full." *Id.*

48.     Until he received Mastroianni's letter of March 25, 2024, Plaintiff was unaware of the events described in that letter. Plaintiff is also unaware of any other Limited Partner who was made aware of these developments or given an opportunity to vote on extending the Maturity Date.

49.     USCIS granted Plaintiff's I-829 Petition on December 10, 2019. Plaintiff is informed and believes that each of the other eligible Phase II/III Limited Partners have had their I-829 Petitions adjudicated.

50.     Plaintiff recently contacted USIF (one of the companies Mastroianni controls and uses to assist with EB-5 projects, including the Project at issue in the present case) to inquire about the status of the Phase II/III Loan and when the Developer would repay it. USIF advised Plaintiff that there is no money to repay the Phase II/III Limited Partners.

**VEIL-PIERCING ALLEGATIONS**

51.     As the founder and President of USIF, founder and CEO of the Regional Center, and the founder and Managing Member of the Funding Partnership's General Partner, Mastroianni has used this status to dominate and control those entities to such an extent that these entities' independent existence was, and is, non-existent and Mastroianni was, and is, their alter egos. Mastroianni commingled these entities' assets and used their limited liability status as mere instrumentalities for personal benefit and for other improper and misleading purposes, such as frustrating creditors (*e.g.,* the Limited Partners) to the detriment of and injury to the Funding

Partnership and the Limited Partners.

## CLASS ACTION ALLEGATIONS

52.     Plaintiff brings this lawsuit as a class action on behalf of himself and all other persons similarly situated pursuant to Federal Rule of Civil Procedure ("Rule") 23(a), Rule 23 (b)(2), and Rule 23(b)(3), and on behalf of the Funding Partnership pursuant to Rule 23.2.

53.     The class is defined as follows: All persons who invested in the Funding Partnership and were designated as Phase II/III Limited Partners (the "**Class**"). Excluded from the Class are Defendants, their affiliates, subsidiaries, agents, board members, directors, officers, and/or employees; the Court and its staff; and any Limited Partner who has entered into a valid agreement to settle, waive, or otherwise resolve their claims against Defendants.

54.     Plaintiff reserves the right to modify or amend the definitions of the proposed Class before the Court determines whether class certification is appropriate.

55.     The Class satisfies the requirements of Rule 23(a), Rule 23(b)(2), Rule 23(b)(3), as well as Rule 23.2.

56.     NUMEROSITY. The Class consists of approximately 160 geographically dispersed individual Limited Partners. The Class is sufficiently numerous to warrant certification. Joinder of the class members is not practicable. The disposition of the claims of the Class members in a single action will provide substantial benefits to all parties and to the Court.

57.     ASCERTAINABILITY. The individual Class members are ascertainable, as the names and addresses of all Class members can be identified in the business records maintained by the Developer and the General Partner. Notice of this action can thus be provided to all members of the proposed Class.

58.     **TYPICALITY**. Plaintiffs were investors in the Funding Partnership at the time of the wrongdoing alleged herein. Plaintiff's claims are typical of the claims of all proposed Class members as all Limited Partners are similarly affected by Defendants' wrongful conduct as complained of herein.

59.     **ADEQUACY**. Plaintiff is committed to prosecuting the action, will fairly and adequately protect the interests of the members of the proposed Class, and have retained competent counsel who are experienced in class-action and derivative litigation, including cases pertaining to breaches of fiduciary duty, breaches of contract, and other claims like those alleged herein. Plaintiff has no interests antagonistic to or in conflict with other members of the proposed Class.

60.     **COMMONALITY AND PREDOMINANCE**. Common questions of law and fact exist as to all members of the proposed Class and predominate over any questions solely affecting individual members of the proposed Class. The questions of law and fact common to the Class include, but are not limited to, the following:

a.      Whether Mastroianni and the General Partner breached their fiduciary duties to the proposed Class;

b.      Whether Mastroianni and the General Partner breached the Limited Partnership Agreement; and

c.      Whether Mastroianni and the General Partner violated the Florida Revised Uniform Limited Partnership Act of 2005.

61.     **SUPERIORITY**. The Class may be certified under Rules 23(b)(3), 23(c)(4), and 23.2. Questions of law or fact common to proposed Class members predominate over any questions affecting only individual members. Class treatment of such common questions of law and fact is a superior method to piecemeal litigation because class treatment will conserve the resources of

the courts and will promote efficiency of adjudication. Class treatment will also avoid the substantial risk of inconsistent factual and legal determinations on the many issues in this lawsuit. There will be no unusual difficulty in the management of this action as a Class action.

### CLAIMS FOR RELIEF

#### COUNT I
#### BREACH OF FIDUCIARY DUTY

62.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above in paragraphs 1 through 15 and paragraphs 22 through 50 as though fully set forth herein.

63.     This Count is brought on behalf of Plaintiff, the other Phase II/III Limited Partners, and the Funding Partnership against Mastroianni and the General Partner.

64.     Defendants are fiduciaries of the Funding Partnership and they owed a duty to conduct its business loyally, faithfully, carefully, diligently, and prudently.

65.     In blatant disregard for his fiduciary duties and for the conflicts of interests resulting from his role as the Managing Member of the General Partner, Mastroianni breached his fiduciary duties to the Funding Partnership by, *inter alia*, engaging in the following conduct:

    a.     allowing the Developer to extend the Maturity Date far beyond the one-year maximum described in the Offering Documents;

    b.     assisting the Developer's refinancing efforts notwithstanding the representations in the Offering Documents that refinancing before the Limited Partners' I-829 Petitions were adjudicated would result in preventing the Developer from extending the Maturity Date;

    c.     after providing material assistance to refinance the Project, allowing the Developer to repeatedly exercise options to extend the Maturity Date;

d.      negotiating and entering into a forbearance agreement with the Developer on behalf of the Funding Partnership;

e.      failing to make reasonable efforts to collect the Loan principal and accrued interest owed by the Developer, and refusing to seek relief through litigation even after serving a notice of default on the Developer;

f.      failing to inform the Limited Partners of events that could have, and did have, a material effect on their interests and those of the Funding Partnership; and

g.      failing to provide the Limited Partners with opportunities to vote on matters that could have, and did have, a material effect on their interests and those of the Funding Partnership.

66.     Defendants' conduct and inaction contravened their duty to promote the interests of the Limited Partners and the Funding Partnership, and could not have been a good-faith exercise of disinterested business judgment.

67.     As a direct and proximate result of Defendants' conduct and inaction, the Limited Partners and the Funding Partnership have been damaged in amounts that will be proved at trial.

68.     In conducting themselves as alleged herein, Defendants acted reprehensibly, in blatant violation of the law and public policy. Moreover, Defendants acted willfully, with the intent to vex and injure the Limited Partners and the Funding Partnership with a conscious disregard of their fiduciary duties, which entitles the Limited Partners and the Funding Partnership to an award of punitive and exemplary damages.

### COUNT II
### BREACH OF CONTRACT—LOAN AGREEMENT

69.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above in paragraphs 1 through 15 and paragraphs 22 through 50 as though fully set forth herein.

70.     This Count is brought on behalf of the Funding Partnership against the Developer.

71.     On or about July 21, 2012, the Funding Partnership and the Developer agreed to the terms of a Loan Commitment.

72.     Based on the terms of the Loan Commitment, the Funding Partnership and the Developer entered into a binding loan agreement by which the Funding Partnership used the Limited Partners' capital contributions to provide the Developer with a construction loan secured by recorded and perfected security interests in the Project and the real property on which it is situated, the proceeds of which would be disbursed to the Developer in tranches that corresponded with phases of the Project's construction and repaid in full to the Funding Partnership, together with 3.5% annual interest, on the Maturity Date, subject to the Developer exercising a right to extend the Maturity Date (the "**Loan Agreement**").

73.     The Funding Partnership did all, or substantially all, of the significant things that the Loan Agreement required it to do.

74.     All conditions required for the Funding Partnership's performance occurred when it deposited the proceeds from the sale of units of membership in the Funding Partnership, the aggregate amount of which was $139,000,000, into the escrow account for the purpose of funding the Loan to the Developer.

75.     Plaintiff is informed and believes that the Developer repaid the portion of the Loan pertaining to the Phase I Limited Partners' capital contributions (amounting to $59,000,000) on or about September 29, 2017.

76.     Notwithstanding multiple extensions of the Maturity Date and a forbearance agreement that extended the duty to repay the portion of the Loan pertaining to the Phase II/III Limited Partners' capital contributions by February 28, 2021, which was extended to December

- 19 -

30, 2023, and extended again to February 29, 2024, by way of a forbearance agreement, the Developer breached its obligations under the Loan Agreement and the forbearance agreement by failing to repay the Loan principal and all accrued interest.

77.     As a proximate result of the Developer's breaches of contract, the Funding Partnership has been damaged in an amount equal to the $80,000,000 it borrowed plus accrued interest.

COUNT III<br>BREACH OF CONTRACT—SUBSCRIPTION AGREEMENT AND LOAN AGREEMENT

78.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above in paragraphs 1 through 15 and paragraphs 22 through 50 as though fully set forth herein.

79.     This Count is brought on behalf of Plaintiff and the Other Phase II/III Limited Partners against the General Partner.

80.     In or before February 2016, Plaintiff and the other Phase II/III each entered into the Subscription Agreement and the Limited Partnership Agreement (which was amended in or about October 2017).

81.     The Phase II/III Limited Partners did all, or substantially all, of the significant things that the Subscription Agreement and the Limited Partnership Agreements required them to do.

82.     All conditions required for the Phase II/III Limited Partners' performance occurred when they deposited the proceeds of their purchases of units of membership in the Funding Partnership, the aggregate amount of which was $80,000,000, into escrow for the purpose of funding the Loan to the Developer.

- 20 -

83.     The Phase II/III Limited Partners were to be repaid the principal amount of their capital contributions, plus accrued interest, by the Maturity Date, subject to valid extensions of the Maturity Date by the Developer, but in no event later than February 29, 2024.

84.     Due to the actions and inactions of Mastroianni and the General Partner, the Funding Partnership has defaulted on the Subscription Agreement and the Loan Agreement.

85.     As a proximate result of the Funding Partnership's default (through no fault of its own), Plaintiff and the other Phase II/III Limited have been damaged in an amount equal to the $80.000,000, plus applicable interest.

### COUNT IV
### ACCOUNTING

86.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above in paragraphs 1 through 15 and paragraphs 22 through 50 as though fully set forth herein.

87.     This Count is brought on behalf of Plaintiff, the other Phase II/III Limited Partners, and the Funding Partnership against Defendants Mastroianni and the General Partner.

88.      Plaintiff seeks an equitable accounting of the accounts, assets, and liabilities of the Funding Partnership.

89.     Mastroianni, as Managing Member of the General Partner, has engaged in self-dealing and has mismanaged the business and affairs of the Funding Partnership in the manner alleged herein, thereby placing the Funding Partnership's assets at undue risk.

90.     Plaintiff does not have an adequate remedy at law because Defendants have control over the accounts, records, and assets of the Funding Partnership. Moreover, as stated in the Amended and Restated Limited Partnership Agreement,

> [e]ach Partner acknowledges and agrees that the remedy at law for any breach of any of the terms of this Agreement would be inadequate, and agrees and consents that temporary and permanent injunctive and other equitable relief may be granted

in any proceeding which may be brought to enforce any provision of this Agreement, including within such other equitable relief, specific performance, without the necessity of proof of actual damage or inadequacy of any legal remedy. Any right or remedy provided for in this Agreement shall be cumulative of any other right, power, or remedy provided for by law or in equity.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself, the Phase II/III Limited Partners, and the Funding Partnership, demand judgment against Defendants as follows:

(1)     declaring this action to be a proper class action maintainable pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(2), 23(b)(3), and 23.2, and declaring Plaintiff and his counsel to be representatives of and counsel for the proposed Class;

(2)     awarding compensatory and punitive damages for Defendants' breaches of fiduciary duty, as alleged in Count I;

(3)     awarding compensatory damages for Defendants' breaches of contract, as alleged in Count II;

(4)     awarding compensatory damages for Defendants' breaches of contract, as alleged in Count III;

(5)     an accounting of the Funding Partnership's assets, as alleged in Count IV;

(6)     awarding Plaintiff and members of the proposed Class attorney fees and costs pursuant to the common fund doctrine and the substantial benefit doctrine;

(7)     awarding the Plaintiff and the proposed Class prejudgment interest at the maximum rate allowable by law; and

(8)     awarding such other and further relief the Court deems just, proper and equitable.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff, on behalf of himself and the proposed Class, hereby requests a jury trial for any and all Counts for which a trial by jury is permitted by law.

Dated: January 28, 2025

Respectfully submitted,

by /s/ *Jonathan M. Stein*

Jonathan M Stein (Fla. Bar No. 9784)
**STEINLAW FLORIDA, PLLC**
825 Corporate Boulevard Northwest
Suite 110
Boca Raton, FL 33431
T: 561-834-2699
E: jon@steinlawflorida.com

Jeffrey L. Fazio (jlf@fazmiclaw.com)
*Pro Hac Vice* application pending
Dina E. Micheletti (dem@fazmiclaw.com)
*Pro Hac Vice* application pending
**FAZIO | MICHELETTI LLP**
1111 Broadway, Suite 400
Oakland, CA 94607
T: 925-543-2555

Yi Yao
*Pro Hac Vice* application pending
Yumeng Jiang
*Pro Hac Vice* application pending
**DEHENG LAW OFFICES, P.C.**
Silicon Valley Office
7901 Stoneridge Drive, Suite 208
Pleasanton, CA 94588
T: 925-399-5856
E: yyao@dehengsv.com

*Attorneys for Plaintiff Zhiman Kong*
*and the Proposed Class*