

EXHIBIT 1

Offeree: KONG Zhiman                          Number: 0149

Date Issued: September 27, 2013

# CONFIDENTIAL PRIVATE OFFERING

# SUBSCRIPTION DOCUMENTS

## VIA MIZNER FUNDING, LP

## a Florida Limited Partnership

## Up to $160,000,000

## Up to 320 Units of Limited Partnership Interest

## Dated July 20, 2012

### Revision Date August 24, 2012

1

**VIA MIZNER FUNDING, LP**

---

**TABLE OF CONTENTS**

**OF**

**SUBSCRIPTION DOCUMENTS**

<u>Tab</u>      <u>Document</u>

1.      Subscription Instructions

2.      Confidential Offering Memorandum

        List of Exhibits

        A.      Limited Partnership Agreement

        B.      Subscription Agreement

        C.      Charts Summarizing the Immigration and Investment Procedures

        D.      Subscription and Administrative Fee Escrow Agreement

        E.      Escrow Administration Services Agreement

        F.      Loan Commitment

        G.      Area Maps and Aerial Views of Via Mizner

**VIA MIZNER FUNDING, LP**

**SUBSCRIPTION INSTRUCTIONS**

**Step 1          Deposit and Preliminary Information**

If you are interested in making this investment, please do the following:

1. Complete and sign a Pre-Subscription Letter Agreement, Investor Suitability Questionnaire and Acknowledgement; deliver one copy of each signed document by fax or +1 561 799 0061 or by email to subscriptions@vmfunding.com;

2. Provide legible copies of your **passport** and **one** of the following by fax to +1 561 799 0061 or by email to subscriptions@vmfunding.com:
   - Credit Card
   - Student Identification Card
   - Workplace Identification Card
   - Non-US Driver's License

**Step 2          Document Execution**

After the General Partner has confirmed in writing that you may proceed with the investment, please do the following:

| | | |
|---|---|---|
| 1. | Subscription Agreement: | Review carefully, complete and sign. |
| 2. | Subscriber Acknowledgement, IRS Forms W-7 and W-8BEN (attached to the Subscription Agreement) | Review carefully, complete and sign. |
| 3. | Limited Partnership Agreement | Review carefully, complete and sign. |
| 4. | Subscription and Administrative Fee Escrow Agreement, Escrow Administration Services Agreement and Loan Commitment | Review carefully. |

**Step 3          Delivery of Executed Documents and Funds**

After you have signed the documents, please do the following:

1. Deliver one copy of each signed document by email to subscriptions@vmfunding.com;

2. Deliver one original of each signed document by courier to Via Mizner Funding, LP, 1295 U.S. Highway 1, North Palm Beach, FL 33408 USA; and

3. Wire transfer $545,000 to the Escrow Agent as payment of: (a) the $500,000 subscription price for each Unit; and (b) the $45,000 Administrative Fee as follows:

| | |
|---|---|
| To: | SunTrust Bank<br>SWIFT ID: SNTRUS3AXXX<br>ABA 061000104<br>777 Brickell Avenue<br>Miami, FL 33131 USA |
| Credit To: | Acct Name: Wire Clearing IAS Miami<br>Acct No: 9702001850<br>777 Brickell Avenue<br>Miami FL 33131 USA |
| Further Credit To: | [Insert the Investor's Full Name]<br>SunTrust Bank as Escrow Agent for Via Mizner Funding, LP and Florida Regional Center, LLC<br>Subscription Escrow Account #7947539<br>Attn:  Odalys del Oso, Telephone: 305.579.7149 |

3

**VIA MIZNER FUNDING, LP**

**Private Offering of a Maximum of**

**320 Limited Partnership Units**

**US $500,000 Subscription Amount per Limited Partnership Unit**

**Plus US $45,000 of Issue Expenses per Limited Partnership Unit**

**Dated July 20, 2012**

**CONFIDENTIAL OFFERING MEMORANDUM**

This Confidential Memorandum (the "Memorandum") has been prepared solely for, and is being delivered on a confidential basis to, potential investors considering the purchase of units of limited partnership interest (the "Units") in Via Mizner Funding, LP, a Florida limited partnership (the "Partnership"). The offering of Units pursuant to this Memorandum is referred to as the "Offering."

No one is permitted to reproduce, distribute or disclose any part of this Memorandum without the prior written consent of U.S. Immigration Fund GP - Mizner, LLC (the "General Partner"), except that potential investors may disclose this Memorandum to their professional advisers for the sole purpose of assisting them to evaluate possible investments in the Partnership. Therefore, by accepting this Memorandum, all recipients agree they:

    (1)    will keep confidential all information contained herein and not already in the public domain; and

    (2)    will use this Memorandum for the sole purpose of evaluating a possible investment in the Partnership.

The Partnership intends to use the proceeds of the Offering to make a secured loan (the "Loan") to Camino Investments Holdings Limited Partnership, a Florida limited partnership (the "Developer") established to develop, construct, own and operate a mixed-use real estate development known as Via Mizner (the "Project"). The Project is to be constructed in three consecutive phases on land with a total gross surface area of approximately 6.8 acres (2.75 hectares) located on the northeast corner of the intersection of South Federal Highway and Camino Real in Boca Raton, Florida (the "Property").

The Project is expected to include a 118-room luxury hotel, 16,187 ft$^2$ (1,504 m$^2$) of Class "A" office space, 61,000 ft$^2$ (5,667 m$^2$) of retail space, 22,000 ft$^2$ (2,044 m$^2$) of restaurant space, 350 apartments, 100 residential condominium units and over 1,000 parking spaces. Offsite improvements are expected to include the purchase of and renovations to an existing 18-hole golf course and country club. However, the scope, timing and content of the Project, particularly the second and third phases of the Project, have not been finalized and are subject to change at the discretion of the Developer.

The Developer intends to use the proceeds of the Loan to fund a portion of the Project costs. The Developer and its affiliates are not participants in the Offering.

The Loan will be secured by liens over the Property and the Project that are anticipated to be junior to the liens of one or more senior lenders to the Developer (collectively, the "Senior Lenders") that have yet to be identified by the Developer. Although the Developer has held discussions with potential Senior Lenders, it has yet to obtain a financing commitment.

The Partnership was formed to make investments through the United States EB-5 immigrant investor program (the "Pilot Program") of the United States Immigration and Nationality Act (the "Act"), which establishes terms and conditions under which foreign nationals may become eligible to obtain lawful permanent residence in the United States. See U.S.C. §§ 1153(b)(5)(a)(i)-(iii) and (c). Under the Act, all investments made by the Partnership through the Pilot Program must be in one or more qualifying capital

investment projects that are projected to create the required number of jobs in a Targeted Employment Area as part of a regional center, each such investment termed a "Qualifying Investment." See "Pilot Program" section of this Memorandum.

The Partnership is controlled by the General Partner, which is in turn under the control of Nicholas A. Mastroianni II (the "Principal"). See "The Principal" section of this Memorandum and "Conflicts of Interest" section of this Memorandum.

In order to invest in the Pilot Program through the Partnership, a potential investor must meet investor criteria set forth in this Memorandum (see "Potential Investors" section of this Memorandum), follow the subscription procedures required in this Memorandum (see "Subscription Procedures" section of this Memorandum), and complete the required immigration procedures (see "Immigration Procedures" section of this Memorandum). Units will be offered and sold only outside the United States and only to persons who are not "U.S. Persons" within the meaning of Regulation S promulgated under the Securities Act of 1933, as amended (the "Securities Act").

In September 2010, the United States Citizenship and Immigration Service (the "USCIS") approved an application by Florida Regional Center, LLC (the "Regional Center Administrator"), an affiliate of the Partnership, to designate the Florida Regional Center as a USCIS-approved regional center (the "USCIS Approval"). The USCIS Approval authorizes the establishment of capital investment projects within the geographic boundaries of the Florida Regional Center in accordance with the requirements of the Pilot Program.

The USCIS Approval imposes certain conditions on the Regional Center Administrator. If for any reason the Regional Center Administrator fails to comply with these conditions, or if USCIS considers its compliance inadequate, USCIS retains the right to modify or terminate the USCIS Approval, which would have an adverse impact on the Offering and on the status of an investor's ability to complete the required immigration procedures or to maintain his or her visa status. See "Pilot Program" section of this Memorandum.

Potential investors should make their own investigation of the investment described herein. That includes the merits and risks involved and the legality and tax consequences of such an investment. Each potential investor should make his or her own inquiries and consult his or her advisers regarding the Partnership, this Offering and legal, tax and related matters concerning an investment in the Units.

Potential investors receiving this Memorandum have completed an initial Investor Suitability Questionnaire and delivered it to the Partnership, together with other preliminary information. The Partnership will give potential investors the opportunity to ask questions of and receive answers and additional information from it and its representatives concerning the Offering and other relevant matters. None of the Partnership, the Developer or their respective affiliates, officers, directors, members, employees, agents or advisers (the "Via Mizner Parties") is making any representation or warranty to any potential investor regarding the legality of an investment in the Partnership by such potential investor or about the income and other tax consequences to them of such an investment. For answers to those questions, potential investors should consult their personal legal counsel and tax advisers.

This Memorandum was prepared solely for use by potential investors in connection with the Offering. The Via Mizner Parties expressly disclaim any representation or warranty regarding involvement in or responsibility for any forward-looking statements contained in this Memorandum. None of the Via Mizner Parties is acting as investment adviser to potential purchasers in connection with the interests offered in this Memorandum. Potential investors must select other advisers and make their own investment decisions.

Each Unit is offered at a total price of $545,000, being the minimum $500,000 capital investment required pursuant to the Pilot Program (the "Subscription Amount"), plus issue expenses of $45,000 (the "Administrative Fee"). In the event that actual issue expenses, including for example legal, accounting,

printing, escrow and overseas marketing expenses, are more than $45,000 per Unit, the excess will be borne by the Partnership and in the event that such issue expenses are less than such amount, the difference will be paid to the Partnership.

All proceeds from subscriptions to the Offering will be deposited into a non-interest-bearing escrow account opened for the benefit of the Partnership and the Regional Center Administrator with SunTrust Bank as escrow agent (the "Escrow Agent"). The Partnership reserves the right to accept or reject any subscription for any reason or for no reason. Any subscriptions not accepted will be returned without interest or deduction.

Upon the Partnership's acceptance of each subscription, the Escrow Agent will release the full amount of the $45,000 Administrative Fee to the Regional Center Administrator for payment of issue expenses on behalf of the Partnership. Also upon the Partnership's acceptance of each subscription, the Partnership will designate the subscribing investor a "Phase I Subscriber," a "Phase II Subscriber" or a "Phase III Subscriber," in each case corresponding to the first, second or third phase of the Loan to fund a portion of the costs, respectively, of the first, second or third phase of the Project.

Upon submission to USCIS of a Phase I Subscriber's Form I-526 Immigrant Petition by Alien Entrepreneur (an "I-526 Petition") for conditional permanent residence in the United States, the Escrow Agent will release 90% of the $500,000 Subscription Amount to the Partnership and will retain 10% of the $500,000 Subscription Amount in escrow, at which point the Phase I Subscriber will be admitted to the Partnership as a limited partner. Upon final approval of the Phase I Subscriber's I-526 Petition by USCIS, the Escrow Agent will release the balance of the $500,000 Subscription Amount to the Partnership.

Upon final approval by USCIS of an I-526 Petition submitted by a Phase II Subscriber or a Phase III Subscriber, the Escrow Agent will release the full amount of the $500,000 Subscription Amount to the Partnership and the investor will be admitted to the Partnership as a limited partner.

There is no firm commitment by any person to purchase or sell any Units, and there is no assurance that any of the Units will be sold. The Partnership reserves the right to terminate or close the Offering at any time for any reason or for no reason. If the Offering is terminated, the Escrow Agent will return all amounts contained in the escrow account without interest or deduction except for any applicable bank transfer fees. The Partnership will be dissolved and liquidated, and its assets will be distributed to the persons entitled to receive them. Unless terminated by the Partnership, the Offering shall continue until either (a) all of the unsold Units are sold, or until (b) the Partnership closes the Offering. If the Partnership closes the Offering, no further Units will be offered or sold and the actual maximum principal amount of the Loan will be the number of Units sold in the Offering multiplied by the $500,000 Subscription Amount per Unit.

THE UNITS OFFERED HEREBY HAVE NOT BEEN APPROVED OR DISAPPROVED BY ANY:

(1)   SECURITIES REGULATORY AUTHORITY OF ANY STATE;

(2)   BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION; OR

(3)   BY ANY SECURITIES REGULATORY AUTHORITY IN ANY OTHER JURISDICTION,

NOR HAS ANY SUCH AUTHORITY OR COMMISSION PASSED ON THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE UNITS HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OR ANY STATE SECURITIES LAWS OR THE LAWS OF ANY FOREIGN JURISDICTION. THE UNITS WILL BE OFFERED AND SOLD UNDER THE EXEMPTION PROVIDED BY

SECTION 4(a)(2) OF THE SECURITIES ACT AND BY REGULATION S PROMULGATED THEREUNDER AND OTHER EXEMPTIONS OF SIMILAR IMPORT UNDER THE LAWS OF THE UNITED STATES AND OTHER JURISDICTIONS WHERE THE OFFERING WILL BE MADE.

THE PARTNERSHIP WILL NOT BE REGISTERED AS AN INVESTMENT COMPANY UNDER THE INVESTMENT COMPANY ACT OF 1940 (THE "INVESTMENT COMPANY ACT") IN RELIANCE ON ONE OR MORE EXEMPTIONS THEREUNDER. CONSEQUENTLY, INVESTORS WILL NOT BE AFFORDED THE PROTECTIONS OF THE INVESTMENT COMPANY ACT.

THE UNITS ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE, INCLUDING:

(1)     THEY MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT, THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED (THE "EXCHANGE ACT"), THE APPLICABLE STATE SECURITIES LAWS AND THE APPLICABLE LAWS OF ANY OTHER, RELEVANT JURISDICTION PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM;

(2)     SUCH UNITS MAY NOT BE SOLD, TRANSFERRED, ASSIGNED, HEDGED OR HYPOTHECATED, IN WHOLE OR IN PART, EXCEPT AS PROVIDED IN THE PARTNERSHIP AGREEMENT; AND

(3)     THERE IS NO OBLIGATION BY ANY PERSON TO REGISTER THE UNITS UNDER THE SECURITIES ACT, THE EXCHANGE ACT, ANY STATE SECURITIES LAWS OR THE SECURITIES LAWS OF ANY OTHER JURISDICTION.

ACCORDINGLY, POTENTIAL INVESTORS SHOULD BE AWARE THAT:

(1)     THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF AN INVESTMENT IN THE UNITS FOR AN INDEFINITE PERIOD OF TIME;

(2)     THERE WILL BE NO PUBLIC MARKET FOR THE UNITS; AND

(3)     INVESTMENT IN THE UNITS INVOLVES SIGNIFICANT INVESTMENT RISKS, INCLUDING RISKS OF LOSS OF CAPITAL OR THE ENTIRE INVESTMENT.

THE UNITS ARE OFFERED SUBJECT TO PRIOR SALE, AND SUBJECT TO THE RIGHT OF THE PARTNERSHIP TO REJECT ANY SUBSCRIPTION. IN CONSIDERING THE PRIOR PERFORMANCE INFORMATION CONTAINED HEREIN, POTENTIAL INVESTORS SHOULD REMEMBER THAT PAST PERFORMANCE DOES NOT PROVE OR EVEN SUGGEST THAT FUTURE RESULTS WILL BE SIMILAR.

IN ADDITION, THERE CAN BE NO ASSURANCE THAT UNREALIZED INVESTMENTS WILL BE REALIZED AT THE VALUATIONS PROVIDED AS FORWARD-LOOKING STATEMENTS. ACTUAL REALIZED RETURNS WILL DEPEND ON, AMONG OTHER FACTORS:

(1)     FUTURE OPERATING RESULTS;

(2)     THE VALUE OF THE ASSETS;

(3)     MARKET CONDITIONS AT THE TIME OF DISPOSITION;

(4)     ANY RELATED TRANSACTION COSTS; AND

(5)     THE TIMING AND MANNER OF SALE. ALL OF THOSE EVENTS MAY DIFFER FROM THE ASSUMPTIONS ON WHICH THE VALUATIONS CONTAINED HEREIN ARE BASED.

THIS MEMORANDUM IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO:

(1)     THE LIMITED PARTNERSHIP AGREEMENT OF THE PARTNERSHIP (THE "PARTNERSHIP AGREEMENT"), ATTACHED HERETO AS EXHIBIT A;

(2)     THE SUBSCRIPTION AGREEMENT RELATED THERETO (THE "SUBSCRIPTION AGREEMENT"), ATTACHED HERETO AS EXHIBIT B;

(3)     THE SUBSCRIPTION AND ADMINISTRATIVE FEE ESCROW AGREEMENT (THE "ESCROW AGREEMENT"), ATTACHED HERETO AS EXHIBIT D;

(4)     THE ESCROW ADMINISTRATION SERVICES AGREEMENT (THE "ESCROW ADMINISTRATION AGREEMENT"), ATTACHED HERETO AS EXHIBIT E; AND

(5)     THE LOAN COMMITMENT (THE "LOAN COMMITMENT"), ATTACHED HERETO AS EXHIBIT F.

NO PERSON HAS BEEN AUTHORIZED IN CONNECTION WITH THIS OFFERING TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATIONS OTHER THAN AS CONTAINED IN THIS MEMORANDUM. IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE PARTNERSHIP, THE GENERAL PARTNER, THE VIA MIZNER PARTIES OR THE PRINCIPAL.

STATEMENTS IN THIS MEMORANDUM ARE MADE AS OF THE DATE HEREOF UNLESS STATED OTHERWISE HEREIN. NEITHER THE DELIVERY OF THIS MEMORANDUM AT ANY TIME, NOR ANY SALE HEREUNDER, SHALL UNDER ANY CIRCUMSTANCES CREATE AN IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO SUCH DATE.

THIS OFFERING WILL INCLUDE OFFERS OF THE UNITS TO NON-U.S. PERSONS OUTSIDE THE UNITED STATES PURSUANT TO REGULATION S PROMULGATED UNDER THE SECURITIES ACT. THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY ANY SECURITY OTHER THAN THE UNITS OFFERED HEREBY. IT DOES NOT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY SUCH SECURITIES BY ANYONE:

(1)     IN ANY JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED; OR

(2)     IN WHICH THE PERSON MAKING SUCH OFFER OR SOLICITATION IS NOT QUALIFIED TO DO SO, INCLUDING, WITHOUT LIMITATION, ANY FOREIGN JURISDICTION.

THE PARTNERSHIP RESERVES THE RIGHT TO MODIFY ANY OF THE TERMS OF THE OFFERING AND THE UNITS DESCRIBED HEREIN.

CERTAIN INFORMATION CONTAINED HEREIN CONCERNING ECONOMIC TRENDS AND PERFORMANCE IS BASED ON OR DERIVED FROM INFORMATION PROVIDED BY INDEPENDENT THIRD-PARTY SOURCES. THE PARTNERSHIP BELIEVES THAT SUCH INFORMATION IS ACCURATE AND THAT THE SOURCES FROM WHICH IT HAS BEEN OBTAINED ARE RELIABLE. THE PARTNERSHIP CANNOT GUARANTEE THE ACCURACY OF SUCH INFORMATION. THEREFORE, INVESTORS MUST ASSUME SUCH INFORMATION HAS NOT INDEPENDENTLY BEEN VERIFIED. THE SAME IS TRUE FOR THE ASSUMPTIONS ON WHICH SUCH INFORMATION IS BASED.

CERTAIN INFORMATION CONTAINED IN THIS MEMORANDUM CONSTITUTES "FORWARD-LOOKING STATEMENTS." THEY CAN BE IDENTIFIED BY THE USE OF FORWARD-LOOKING TERMINOLOGY, SUCH AS "MAY," "WILL," "SHOULD," "EXPECT," "ANTICIPATE," "TARGET," "PROJECT," "ESTIMATE," "INTEND," "CONTINUE" OR "BELIEVE," OR THE

NEGATIVES THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY.

DUE TO VARIOUS RISKS AND UNCERTAINTIES, ACTUAL EVENTS OR RESULTS OR THE ACTUAL PERFORMANCE OF THE PARTNERSHIP MAY DIFFER MATERIALLY FROM THOSE REFLECTED OR CONTEMPLATED IN SUCH FORWARD-LOOKING STATEMENTS.

THE PARTNERSHIP, THE GENERAL PARTNER, THE VIA MIZNER PARTIES AND THE PRINCIPAL DO NOT PROVIDE ANY TAX ADVICE. ANY TAX STATEMENT HEREIN REGARDING ANY US FEDERAL TAX IS NOT INTENDED OR WRITTEN TO BE USED. ANY SUCH STATEMENTS CANNOT BE USED BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING ANY PENALTIES. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISER. ALL CURRENCIES WITHIN THE MEMORANDUM ARE IN US DOLLARS UNLESS OTHERWISE NOTED.

THERE ARE RISK FACTORS REGARDING INVESTING IN THE PARTNERSHIP SET FORTH AT THE BACK OF THIS MEMORANDUM. ALL POTENTIAL INVESTORS ARE URGED TO CAREFULLY REVIEW THESE RISK FACTORS, WHICH DESCRIBE RISKS REGARDING, AMONG OTHER THINGS:

(1)    GENERAL ECONOMIC CONDITIONS AND LOCAL ECONOMIC CONDITIONS IN THE TARGETED EMPLOYMENT AREA;

(2)    PARTICULAR RISKS RELATED TO THE PARTNERSHIP AND THE PROJECT;

(3)    THE LEVEL OF INVESTMENT RETURNS, WHICH MAY BE BELOW MARKET FOR SIMILAR INVESTMENTS;

(4)    THE RISK THAT SOME OR ALL OF THE INVESTOR'S CAPITAL MAY NOT BE RETURNED; AND

(5)    THE FACT THAT THE UNITS REPRESENT AN ILLIQUID INVESTMENT THAT CANNOT BE TRANSFERRED.

POTENTIAL INVESTORS ARE URGED TO CONSIDER THE RISKS SET FORTH UNDER THE HEADING "RISK FACTORS."

IN ADDITION, THERE CAN BE NO ASSURANCE THAT INVESTORS WILL OBTAIN FINAL IMMIGRATION STATUS UNDER THE ACT OR THAT THE JOBS REQUIRED TO BE CREATED AND MAINTAINED UNDER THE PILOT PROGRAM WILL BE ACHIEVED.

A POTENTIAL INVESTOR'S INVESTMENT IN THE UNITS MUST BE DERIVED WHOLLY FROM HIS OR HER PERSONAL ASSETS AND ARE ENTIRELY AT RISK. THE POTENTIAL INVESTOR MUST ESTABLISH THE SOURCE OF THE MONIES INVESTED SO THAT THE USCIS MAY DETERMINE THAT ALL MONIES PAID IN WERE BOTH LAWFULLY OBTAINED AND INVESTED. FOR FURTHER CERTAINTY, THERE IS NO DIRECT OR INDIRECT LOAN OR OTHER DEBT ARRANGEMENT CONTEMPLATED OR AVAILABLE BETWEEN THE PARTNERSHIP AND ANY POTENTIAL INVESTOR.

## TABLE OF CONTENTS

I.    SUMMARY OF OFFERING TERMS ............................................................................................ 1

II.    POTENTIAL INVESTORS .......................................................................................................... 7

III.    THE PILOT PROGRAM ............................................................................................................. 8

IV.    IMMIGRATION PROCEDURES .............................................................................................. 10

V.    USE OF PROCEEDS ................................................................................................................ 13

VI.    PROJECT PARTICIPANTS ...................................................................................................... 13
LEGAL ENTITIES ............................................................................................................................ 13
THE PRINCIPAL ............................................................................................................................. 13
PROJECT LEGAL ENTITIES AND INDIVIDUALS ................................................................................. 14

VII.    THE PROJECT ....................................................................................................................... 15
THE MARKET: BOCA RATON, FLORIDA ........................................................................................... 16
THE PROPERTY .............................................................................................................................. 16
THE BOCA RATON DOWNTOWN DISTRICT OF REGIONAL IMPACT ..................................................... 17
THE PENN-FLORIDA GROUP OF COMPANIES ................................................................................... 17
THE PROJECT / VIA MIZNER ........................................................................................................... 18
     Subscription Amounts in Escrow ........................................................................................ 20
     I-526 Petitions Filed with USCIS ....................................................................................... 20
     Target Loan Disbursement Amount and Date ..................................................................... 20
     Third-Party Appraisal of Project Prospective Investment Value .......................................... 20
     Residential Components ...................................................................................................... 21
     Office Component ............................................................................................................... 23
     Retail Component ............................................................................................................... 25
     Hotel Component ................................................................................................................ 26
     Restaurant Component ....................................................................................................... 27
     Golf & Country Club Component ........................................................................................ 28
REVENUE AND SALES EVALUATION ................................................................................................. 29
GENERAL CONTRACTOR ................................................................................................................. 30
ARCHITECTS .................................................................................................................................. 31
HOTEL BRANDING AND MANAGEMENT ........................................................................................... 31

VIII.    CONSTRUCTION BUDGET AND DEVELOPMENT SCHEDULE ........................................ 31

IX.    PROJECT FUNDING ............................................................................................................. 33
SENIOR BANK FINANCING .............................................................................................................. 33
DEVELOPER EQUITY ....................................................................................................................... 34
THE PARTNERSHIP'S LOAN TO THE DEVELOPER .............................................................................. 34
SUMMARY OF PROJECTED SOURCES AND USES OF FUNDS ............................................................... 34

X.    LOAN COMMITMENT .......................................................................................................... 35
PURPOSE OF LOAN ......................................................................................................................... 35
NO LOAN AGREEMENT .................................................................................................................... 35
AMOUNT OF LOAN ......................................................................................................................... 35
TERMS OF LOAN ............................................................................................................................ 36
DISBURSEMENT OF LOAN ............................................................................................................... 36
SECURITY ...................................................................................................................................... 37
INTERCREDITOR AGREEMENT ......................................................................................................... 37

XI.    THE PARTNERSHIP ............................................................................................................. 37

MANAGEMENT OF THE PARTNERSHIP ............................................................................ 37
GENERAL PARTNER'S MANAGEMENT FEE .................................................................. 39
CONSULTING AGREEMENT ......................................................................................... 39
MARKETING AND ADMINISTRATION OF THE OFFERING ............................................. 40
SUBSCRIPTION PROCEDURES ..................................................................................... 40
QUALIFYING INVESTMENT ........................................................................................ 43
PREFERRED RETURN ................................................................................................. 44
RETURN OF CAPITAL ................................................................................................. 44

XII.    SUMMARY OF PARTNERSHIP AGREEMENT ................................................... 44
UNITS ARE ALL EQUAL ............................................................................................. 45
PARTNERSHIP PURPOSE ............................................................................................. 45
POWERS OF LIMITED PARTNERS ................................................................................ 45
PARTNERSHIP CAPITAL .............................................................................................. 45
ALLOCATIONS AND DISTRIBUTIONS ........................................................................... 45
PARTNERSHIP EXPENSES ........................................................................................... 46
LIMITED PARTNER DECISIONS .................................................................................... 46
DISSOLUTION ............................................................................................................ 47
INDEMNIFICATION ..................................................................................................... 47
TRANSFERABILITY OF INTERESTS AND WITHDRAWAL ............................................... 47
REPORTS ................................................................................................................... 47
AMENDMENTS ........................................................................................................... 47

XIII.   RISK FACTORS .................................................................................................... 48
RISKS RELATING TO REAL ESTATE AND FINANCING OF REAL ESTATE ....................... 48
RISKS RELATED TO THE OFFERING AND THE UNITS ................................................... 50
RISKS RELATED TO THE REGIONAL CENTER DESIGNATION AND LAWFUL PERMANENT RESIDENCY
PROCESS ................................................................................................................... 53
RISKS RELATED TO PROJECT PERFORMANCE AND MANAGEMENT ............................... 55
LEGAL, TAX AND REGULATORY RISKS ...................................................................... 56

XIV.   CONFLICTS OF INTEREST .................................................................................. 57
RELATED PARTIES ..................................................................................................... 58
DIVERSE MEMBERSHIP .............................................................................................. 58
MANAGEMENT OF THE PARTNERSHIP ........................................................................ 58
LACK OF SEPARATE REPRESENTATION ...................................................................... 58
MARKETING REPRESENTATIVES ................................................................................ 59

XV.    INCOME TAX CONSIDERATIONS ...................................................................... 59

XVI.   TAX AND LEGAL ASPECTS ................................................................................ 59

XVII.  RESTRICTIONS ON TRANSFERABILITY .......................................................... 59

## I.  SUMMARY OF OFFERING TERMS

The following is a summary of certain information contained in this Memorandum, and is qualified in its entirety by reference to the more detailed discussions contained elsewhere in this Memorandum, as well as to the Exhibits hereto (all of which are incorporated fully herein by this reference). In the case of any conflict between the summary, below, and the more detailed discussions within the Memorandum, the more detailed discussions shall control. Similarly, this Memorandum, its exhibits, and certain other documents related thereto have been initially written in the English language; in the event of any conflict between the original English version and any translations into other languages, the original English version shall control.

| | |
|---|---|
| **Partnership** | Via Mizner Funding, LP is a Florida limited partnership established on July 11, 2012, with its principal place of business located at 1295 U.S. Highway 1, North Palm Beach, FL 33408. The Partnership is under the control of the General Partner and, ultimately, under the control of the Principal. The Partnership was established to make the Loan to the Developer to partially fund the development, construction, ownership and operation of the Project, all through the sale of Units in this Offering. |
| **General Partner** | The General Partner of the Partnership is U.S. Immigration Fund GP - Mizner, LLC, a Florida limited liability company established on July 11, 2012, with its principal place of business located at 1295 U.S. Highway 1, North Palm Beach, FL 33408. The General Partner is under the ultimate control of the Principal. |
| **Limited Partners** | The Limited Partners of the Partnership comprise all of the investors who have purchased Units in this Offering. |
| **Pilot Program** | The Partnership will extend the Loan to partially fund Project costs through the private sale of Units intended to qualify under the EB-5 immigrant investor program, known as the Pilot Program, of the United States Immigration and Nationality Act. Foreign nationals may become eligible to obtain lawful permanent resident status in the United States through Qualifying Investments in one or more capital investment opportunities projected to create a number of jobs in a Targeted Employment Area as part of a USCIS-designated regional center. |
| **Florida Regional Center** | The Florida Regional Center comprises Palm Beach County, Florida, within which the Targeted Employment Area containing the Project is located. In September 2010, USCIS designated the Florida Regional Center as a regional center under the Pilot Program. |
| **Regional Center Administrator** | The Regional Center Administrator is Florida Regional Center, LLC, a Florida limited liability company established on July 16, 2010, with its principal place of business located at 11770 U.S. Highway 1, Suite 301, Palm Beach Gardens, FL 33408. The Regional Center Administrator is under the ultimate control of the Principal, Nicholas A. Mastroianni II, and Richard L. Yellen, Esq. |
| **Principal** | The Principal is Nicholas A. Mastroianni II. The Principal controls the |

|  | Regional Center Administrator. The Principal also controls the General Partner, which in turn controls the Partnership. |
|---|---|
| **Property** | The Property comprises three contiguous parcels of land with a total gross surface area of approximately 6.8 acres (2.75 hectares) located on the northeast corner of the intersection of South Federal Highway and Camino Real in Boca Raton, Florida. |
| **Project** | The Project is Via Mizner, a mixed-use real estate development project to be constructed on the Property and expected to comprise a luxury hotel, Class "A" office space, retail space, restaurant space, apartments, residential condominium units and parking spaces. Offsite improvements are expected to include the purchase of and renovations to an existing 18-hole golf course and country club. It is anticipated that the Project will be constructed in three consecutive phases. However, the scope, timing and content of the Project, particularly its second and third phases, have not been finalized and are subject to change at the discretion of the Developer. |
| **Developer** | The Developer is Camino Investments Holdings Limited Partnership, a Florida limited partnership established on September 21, 2005, with its principal place of business located at 1515 North Federal Highway, Suite 306, Boca Raton, Florida, 33432. The Developer was established to develop, construct, own and operate the Project. The Developer has entered into a Consulting Agreement with the General Partner and the Regional Center Administrator dated as of June 28, 2012. The Developer is under the ultimate control of third parties unrelated to the Regional Center Administrator, the Partnership, the General Partner or the Principal. The Developer and its affiliates are not participants in the Offering. |
| **Consulting Agreement** | The Consulting Agreement, dated as of June 28, 2012 among the Developer, the General Partner and the Regional Center Administrator, sets forth the terms and conditions under which the General Partner and the Regional Center Administrator will seek approval of the Project for purposes of the Pilot Program, administer the Project under the Pilot Program on behalf of the Developer, and conduct the Offering and make the Loan to the Developer to partially fund the Project. |
| **Consulting Fee** | The Consulting Fee is a fee payable by the Developer to the General Partner under the Consulting Agreement for services rendered to the Developer equal to five percent per annum of the total principal amount outstanding under the Loan. |
| **Management Fee** | The Management Fee is a fee payable by the Partnership to the General Partner for services rendered to the Partnership equal to three percent per annum of the total principal amount outstanding under the Loan from time to time, cumulative but not compounded, determined on the basis of a 365/366 day year for the actual number of days in the period for which the Management Fee is being determined. |

| | |
|---|---|
| **Subscription Amount** | The Subscription Amount for one Unit is $500,000, the minimum investment required for each investor under the Pilot Program for Qualifying Investments within a Targeted Employment Area. |
| **Administrative Fee** | The Administrative Fee is $45,000 to reimburse the Partnership for Offering expenses, including legal, accounting, printer, escrow and overseas marketing expenses. Investors will pay the $45,000 Administrative Fee together with the $500,000 Subscription Amount, for a total of $545,000. |
| **Use of Proceeds** | The proceeds from the Offering will be used to fund the Loan to the Developer to finance a portion of the development, construction and operation costs of the Project. |
| **Loan** | The Loan by the Partnership to the Developer is anticipated to be in a maximum principal amount of up to $160.0 million and to be secured by liens over the Property and the Project that are anticipated to be junior to the liens of the Senior Lenders. Disbursements of Loan proceeds are anticipated to fund a portion of the construction costs of each of the three phases of the Project. The actual principal amount of the Loan will depend on the number of Units sold in the Offering and on the actual amount of Loan proceeds disbursed. The Loan Commitment is attached to this Memorandum as <u>Exhibit F</u>. |
| **Escrow of Subscription Amount and Administrative Fee** | All subscription proceeds will be held in a non-interest bearing escrow account with the Escrow Agent and will be released or returned in accordance with the Escrow Agreement. |
| **Escrow Agent** | The Escrow Agent is SunTrust Bank. The Escrow Agent's rights and responsibilities are set out in the Subscription and Administrative Fee Escrow Agreement among the Escrow Agent, the Partnership, the Regional Center Administrator, and the Administrative Agent (the "<u>Escrow Agreement</u>") attached as <u>Exhibit D</u>. |
| **Administrative Agent** | The Administrative Agent is NES Financial Corp., a California corporation. The Administrative Agent's rights and responsibilities are set out in the Escrow Administration Services Agreement between the Administrative Agent and the Regional Center Administrator (the "<u>Escrow Administration Agreement</u>") attached as <u>Exhibit E</u>. |
| **Phase I Subscribers, Phase II Subscribers and Phase III Subscribers** | Upon the Partnership's acceptance of each subscription, the Partnership will designate the subscribing investor a "<u>Phase I Subscriber</u>," a "<u>Phase II Subscriber</u>" or a "<u>Phase III Subscriber</u>," in each case corresponding to the first, second or third phase of the Loan to fund a portion of the costs, respectively, of the first, second or third phase of the Project. The Partnership may change an investor's designation at any time by delivering written notice to the investor notifying the investor of the change. |
| **Release of Subscription Amounts from Escrow** | Upon submission to USCIS of a Phase I Subscriber's I-526 Petition, the Escrow Agent will release 90% of the $500,000 Subscription Amount |

| | |
|---|---|
| **(Phase I Subscribers)** | to the Partnership and will retain the remaining 10% in escrow, at which point the Phase I Subscriber will be issued a Unit and admitted to the Partnership as a limited partner. The Escrow Agent will release the balance of the $500,000 Subscription Amount to the Partnership no later than upon final approval of the Phase I Subscriber's I-526 Petition by USCIS. |
| **Release of Subscription Amounts from Escrow (Phase II Subscribers and Phase III Subscribers)** | Upon final approval by USCIS of an I-526 Petition submitted by a Phase II Subscriber or a Phase III Subscriber, the Escrow Agent will release the full amount of the $500,000 Subscription Amount to the Partnership and the investor will be issued a Unit and admitted to the Partnership as a limited partner. |
| **Release of Administrative Fee from Escrow (All Subscribers)** | Upon acceptance of a potential investor's subscription by the Partnership, the Escrow Agent will release the full amount of the $45,000 Administrative Fee to the Regional Center Administrator for payment of issue expenses on behalf of the Partnership. |
| **Return of Subscription Amount** | Subscription Amounts will be returned only as set forth in this Memorandum. In particular, if a Phase I Subscriber's I-526 Petition is not approved by USCIS and all rights of appeal are exhausted then, subject to certain exceptions, the investor will withdraw and be dissociated from the Partnership, and the Partnership will refund or cause to be refunded the withdrawing investor's $500,000 Subscription Amount. |
| **Return of Administrative Fee** | Administrative Fees will be returned only as set forth in this Memorandum. In particular, if a Phase I Subscriber's I-526 Petition is not approved by USCIS and all rights of appeal are exhausted then, subject to certain exceptions, the Partnership will cause the Regional Center Administrator to refund the Phase I Subscriber's Administrative Fee, less $10,000 to cover certain unrecoverable Offering expenses. |
| **Senior Lenders** | The Senior Lenders are anticipated to be one or more financial institutions which agree to loan up to approximately $160.5 million to the Developer as the Senior Loans. It is anticipated that the Developer will be obligated to repay the Senior Loans before repaying the Loan, and that the Senior Lenders' mortgages and security interests in the Property and the Project will rank prior to the Partnership's mortgage and security interest. Although the Developer has identified potential Senior Lenders, it has yet to obtain a financing commitment. |
| **Investor Qualification** | This Offering is made pursuant to an exemption from registration provided by Section 4(a)(2) of the Securities Act and/or Regulation S promulgated thereunder, and exemptions available under applicable state securities laws and regulations. Among other things, persons desiring to invest in the Units will be required to represent and warrant to the Partnership that they: |
| | (1)     are not "U.S. persons," as defined in Regulation S; and |
| | (2)     qualify regarding other matters described in the |

Subscription Agreement attached as <u>Exhibit B</u>.

**Capital Accounts**

The General Partner will maintain a capital account on behalf of each Limited Partner in the books and records of the Partnership. It will be credited with the amount of the Limited Partner's Subscription Amount following release to the Partnership from escrow. The capital account will be debited with the amount of any distributions as provided in the Partnership Agreement attached as <u>Exhibit A</u>.

**Partnership Decisions**

All management and other powers relating to day-to-day control of the Partnership will be held and exercised by the General Partner, to the maximum extent permitted by law. Limited Partners will have involvement in management of the Partnership, including voting rights, as described in the Partnership Agreement.

**Transfer Restrictions**

Except as expressly provided for in the Partnership Agreement, no Limited Partner will be permitted to withdraw from the Partnership or to withdraw any portion of his or her capital account. Other than when a person becomes entitled to a Unit by operation of law, a Unit issued to a Limited Partner is non-transferable.

**Allocation of Profits and Losses**

Profits and losses of the Partnership shall be allocated to the Limited Partners as provided in the Partnership Agreement, except as otherwise required by the Internal Revenue Code.

**Preferred Return**

Each holder of a Unit will be allocated and entitled to receive a cumulative, uncompounded Preferred Return equal to 0.5% per annum of the $500,000 Subscription Amount. The Preferred Return will accrue and may be paid quarterly at the discretion of the General Partner.

**Interim Distributions**

The General Partner may cause the Partnership to make quarterly distributions from net cash flow of the Partnership to the extent the Partnership has received distributions from the Developer for this purpose. All interim distributions will be at the discretion of the General Partner. Any interim distributions shall be paid:

    (1)    first, to the General Partner to the extent, if any, of its unpaid Management Fee;

    (2)    second, to the Limited Partners in proportion to, and to the extent of, the Limited Partners' unpaid Preferred Return ; and

    (3)    finally, the balance, if any, to the General Partner.

**Sale or Refinancing Distributions**

If Project is refinanced or sold, which will not occur prior to the removal of conditions to permanent residence of all immigrant investor Limited Partners, the Partnership intends to distribute its portion of any proceeds:

    (1)    first, to pay and discharge all the Partnership's debts and liabilities to third parties;

    (2)    second, to pay and discharge all the Partnership's debts

and liabilities to the General Partner and the Limited Partners including, without limitation, to pay the General Partner's unpaid Management Fee

(3)    third, to establish reserves deemed commercially reasonable by the General Partner;

(4)    fourth, to the Limited Partners in proportion to, and to the extent of, the Limited Partners' unpaid Preferred Return;

(5)    fifth, to the General Partner in respect of its unreturned capital contributions until its unrecovered capital contributions have been reduced to zero;

(6)    sixth, to the Limited Partners' in proportion to, and to the extent of, their unrecovered capital contributions; and

(7)    finally, the balance to the General Partner.

**Commissions and Fees**

The Partnership may pay commissions or other fees to one or more immigration consultants, brokers, investment advisers, or other parties in connection with the sale of Units pursuant to this Offering. Any such commissions or other fees paid to any party in connection with the sale of Units pursuant to this Offering shall be paid:

(1)    only if and to the extent permitted by applicable law, including U.S. securities laws; and

(2)    from proceeds of the Administrative Fees and other Partnership funds, but excluding the proceeds of any Limited Partner's Subscription Amount.

**Tax Risks**

An investment in Units involves substantial tax risks. The Partnership has not obtained a legal opinion or ruling from any tax authority regarding any tax aspects of the Project, the Partnership, or its business. Any tax discussion contained in this Memorandum is not tax advice to potential investors. Each potential investor is advised to consult with his or her own tax adviser regarding the tax consequences of investing in the Partnership.

**Risk Factors**

All potential investors are urged to read Section XIII for a complete discussion of risk factors. The most significant risks include the following:

(1)    there is no guarantee an investor will receive either a return of or on his or her investment; and

(2)    there is no guarantee that any person will be granted conditional or permanent residency in the United States as a result of a purchase of Units.

Each potential investor must evaluate and accept the risk that he or she, or his or her family members, may not be granted residency in the United States after making an investment in Units and being admitted

as a Limited Partner.

| | |
|---|---|
| **Financial Reports** | Limited Partners will receive annual financial statements on Schedule K-l reflecting their allocable share of the Partnership's profits and losses. |
| **Criteria for Investors** | In order to invest in the Partnership, a potential investor must: |

        (1)    meet criteria set forth in this Memorandum (see "Potential Investors" section of this Memorandum);

        (2)    follow the subscription procedures required in this Memorandum (see "Subscription Procedures" section of this Memorandum); and

        (3)    complete the required immigration procedures (see "Immigration Procedures" section of this Memorandum).

| | |
|---|---|
| **Immigration Process** | Even though the Partnership's marketing representatives may recommend immigration counsel to potential investors, each potential investor is responsible for retaining his or her own immigration legal counsel and for paying legal fees and expenses pursuant to the immigration process. The Partnership Agreement, the Subscription Agreement and a diagram of the visa application and investment processes are attached to this Memorandum as <u>Exhibits A, B and C</u>, respectively. |
| **Indemnification** | Neither the General Partner nor its affiliates will be liable to the Partnership or the Limited Partners for any act or omission performed or omitted by them, unless the acts or omissions were negligent or more culpable. The Partnership will indemnify and hold harmless the General Partner and its affiliates for any loss or damage incurred by them on behalf of the Partnership or in furtherance of its business, or arising out of or in connection with the Partnership, except for losses incurred by the General Partner or its affiliates arising from their own negligence or more culpable acts or omissions. |

THIS MEMORANDUM, ITS EXHIBITS, AND CERTAIN OTHER DOCUMENTS RELATED THERETO HAVE BEEN INITIALLY WRITTEN IN THE ENGLISH LANGUAGE; IN THE EVENT OF ANY CONFLICT BETWEEN THE ORIGINAL ENGLISH VERSION AND ANY TRANSLATIONS INTO OTHER LANGUAGES, THE ORIGINAL ENGLISH VERSION SHALL CONTROL.

## II.  POTENTIAL INVESTORS

The Units will be offered and sold without registration under the Securities Act or any state securities laws or the laws of any foreign jurisdiction only outside the United States, in reliance upon Section 4(a)(2) of the Securities Act and Regulation S promulgated by under the Securities Act, only to natural persons who are not "U.S. Persons" within the meaning of Regulation S and who are also "Accredited Investors" (defined below) (collectively, the "<u>Investor Criteria</u>"). The Units will not be offered or sold: (i) within the United States, (ii) to legal entities, organizations or associations, (iii) to "U.S. Persons" within the meaning of Regulation S or (iv) to persons who are not Accredited Investors. Any person wishing to

buy a Unit will be required to demonstrate that he or she satisfies the Investor Criteria. In addition, any person wishing to buy a Unit will be required to certify that he or she will only resell the Units either pursuant to the registration requirements under the Securities Act or pursuant to an exemption from such registration requirements.

This Memorandum does not constitute an offer to sell to, or a solicitation of an offer to buy from, any person in any jurisdiction to whom such an offer or solicitation would be unlawful.

For the purposes of this Memorandum, "Accredited Investor" means any person who comes within any of the following categories, or whom the General Partner reasonably believes comes within any of the following categories, at the time of the sale of a Unit to that person:

    (1)    any natural person whose individual net worth, or joint net worth with that person's spouse, at the time of his or her purchase exceeds $1.0 million, excluding the value of that person's primary residence; or

    (2)    any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year.

## III.   THE PILOT PROGRAM

The Pilot Program and the Act provide for an EB-5 employment-based preference immigrant visa category for immigrants seeking to enter the United States to engage or invest in a commercial enterprise that will benefit the U.S. economy and create at least ten full-time jobs. Pursuant to the Act, up to 10,000 EB-5 immigrant visas are allocated each year for qualified immigrant investors, who ordinarily must invest at least $1.0 million in a qualifying business.

However, investors may qualify under the Pilot Program through an investment of a reduced threshold amount of $500,000 in a capital investment opportunity located in a state-designated high unemployment urban area or a qualifying rural area as defined by the Act (a "Targeted Employment Area"). Up to 3,000 EB-5 immigrant visas are allocated each year for qualified immigrant investors who invest in a project offered by a USCIS-designated regional center.

In September 2010, USCIS issued the USCIS Approval, approving the Regional Center Administrator's application to designate the "Florida Regional Center" as a USCIS-approved regional center under the Pilot Program. See Exhibit G attached to this Memorandum for maps of the Florida Regional Center, the Targeted Employment Area designated by the State of Florida and the Project.

The USCIS Approval provides that the Florida Regional Center will engage in financing, construction and development of mixed-use projects and will focus investments into new commercial enterprises in the following target industry economic clusters:

    (1)    Hospitality

    (2)    Retail

    (3)    Restaurant

    (4)    Office Space

    (5)    Marina

    (6)    Entertainment

The USCIS Approval means that USCIS recognizes the Regional Center Administrator as a designated participant in the Pilot Program. As such, the Regional Center Administrator is authorized to review and

evaluate potential capital investment opportunities located within a Targeted Employment Area of the Florida Regional Center and to determine their suitability for participation in the Pilot Program. Although the Regional Center Administrator has approved the Loan and the Project for participation in the Pilot Program, the USCIS Approval does not constitute a USCIS endorsement of the Offering, the Loan or the Project. USCIS reserves the right to refuse to approve I-526 Petitions of investors in the Offering if USCIS determines that the Loan and the Project do not appear suitable for participation in the Pilot Program.

An advantage of the USCIS Approval is that fulfillment of the required job creation criteria under the Pilot Program may be direct or indirect. The Principal commissioned Dr. Michael K. Evans to measure the economic impact of the Project, including its potential to create the number of direct and indirect jobs required under the Pilot Program. Using IMPLAN, a software package and database for estimating local economic impacts available from Minnesota IMPLAN Group, Inc., a model recognized and accepted by USCIS, Dr. Evans determined that the Project would result in an estimated increase of 3,741 permanent jobs within the Florida Regional Center, including jobs resulting from Project construction activity. This represents approximately 12.47 permanent jobs for each Unit in the Offering, more than the minimum number of ten direct and indirect jobs required to be created for each Unit under the Pilot Program.

Based upon Dr. Evans's IMPLAN job creation assessment and the USCIS Approval, the Partnership believes the purchase of a Unit by a qualified investor will constitute a Qualifying Investment under the Pilot Program. Therefore, as described in this Memorandum, the threshold investment for potential investors required would be $500,000 under the Act, plus the $45,000 Administrative Fee. See "Immigration Procedures" section of this Memorandum for a summary of immigration procedures in connection with the Pilot Program.

Under the Pilot Program, the potential investor is required to be an "active participant" in the management of the commercial enterprise. However, participation in connection with the activities of a limited partnership is subject to limitations set out in the relevant legislation. Notwithstanding such limitations, limited partnerships have been recognized as appropriate investment vehicles under the Pilot Program. See "Limited Partner Decisions" section of this Memorandum.

The USCIS Approval imposes certain conditions on the Regional Center Administrator intended to ensure that the Florida Regional Center continues to meet the statutory requirements of the Pilot Program. In particular, the Regional Center Administrator is required to maintain records, data and information and to prepare and deliver a written report to USCIS on or before December 29 of each calendar year regarding, among other things:

- investment activities under the Regional Center Administrator's sponsorship;

- activities of the Partnership in carrying out the Offering and activities of the Developer carrying out the development, construction and operation of the Project;

- compliance with subscription and immigration procedures by individual investors; and

- direct and indirect job creation statistics.

If, based on this report or other evidence, USCIS determines that the Regional Center Administrator no longer serves the purpose of promoting economic growth, improved regional productivity, job creation and increased domestic capital investment, USCIS retains the right to modify or terminate the USCIS Approval, which would have an adverse impact on the Offering and on the status of an investor's ability to complete the required immigration procedures or to maintain his or her visa status. If for any reason the Regional Center Administrator is unable to fulfill the role described in this Memorandum, the Principal

will designate another USCIS-approved regional center administrator to act in place of the Regional Center Administrator.

The Regional Center Administrator also is required to notify USCIS and to obtain an amendment to the USCIS Approval if there is a material change to the information upon which the USCIS Approval was based. The Partnership believes that USCIS will not require an amendment to the USCIS Approval unless there has been a material change to the information previously provided. However, it is unclear what types of changes USCIS would consider material for this purpose. The Project could be delayed if the Regional Center Administrator were to request an amendment to the USCIS Approval. In addition, there can be no assurance USCIS would approve any requested amendment. Failure to obtain a needed amendment could have a material adverse impact on the Project, the Offering and the status of an investor's ability to complete the required immigration procedures or to maintain his or her visa status.

## IV.  IMMIGRATION PROCEDURES

A diagram summarizing the immigration procedures is attached to this Memorandum as Exhibit C. To qualify for residency, an investor must file an I-526 Petition at the designated USCIS center. Tax returns and substantial documentation evidencing that a potential investor's funds intended for investment in the Partnership were derived from lawful sources must be included with the I-526 Petition. Such evidence may include information concerning real estate transactions, business income, proceeds from the sale of a business, employment income, investments, bank accounts and dealings, licenses or similar evidence. If investment funds are derived from a loan, gift or inheritance, an appropriate affidavit and/or other evidence will be required to be filed.

Following completion of the Subscription Procedures (see "Subscription Procedures" section of this Memorandum), the General Partner will send documentation regarding the Partnership and the Project to potential investors for their immigration attorneys to use in connection with preparation of the I-526 Petition. Within 30 days after receipt of this documentation, potential investors are required to send their I-526 Petitions to the General Partner for review prior to filing with USCIS. Potential investors may not file their I-526 Petitions with USCIS unless and until the General Partner confirms in writing that they may do so. The purpose of the review is to facilitate the administration of the Partnership under the Pilot Program. The Via Mizner Parties are not responsible for any errors or omissions in any I-526 Petition, the contents of which are each potential investor's sole responsibility.

Following approval of an investor's I-526 Petition, the investor must apply for lawful permanent resident status. Lawful permanent resident status may be applied for by the investor (who must be over the age of 18), together with his or her spouse and children who are under the age of 21, upon approval of the I-526 Petition, assuming there is no quota backlog and the family promptly pursues the process.

If the investor (or derivative beneficiary family member) will be outside of the United States, he or she must file an immigrant visa application and interview request at the appropriate U.S. Consulate (or, if in Taiwan, at the A.I.T.). If the investor (or derivative beneficiary family member) will be in the United States, he or she must file an adjustment of status application at the appropriate office of the USCIS. The Consular interview process, or the USCIS adjustment of status process, as applicable (the "Lawful Permanent Residency Process"), is designed to enable the U.S. Government to determine whether a person is entitled to lawful permanent residency in the United States. As part of the Lawful Permanent Residency Process, the investor (or derivative beneficiary family member) is subjected to medical, police, security and immigration history checks. Upon approval, the investor (or derivative beneficiary family member) is granted conditional permanent resident status.

Persons outside the United States applying for permanent residency must demonstrate that they are admissible to the United States according to Section 212 of the Act. Section 212 sets forth various grounds of inadmissibility, which may prevent an otherwise eligible applicant from receiving an

immigrant visa or entering the United States. Foreign persons precluded from entering the United States include:

(1)     persons who are determined to have a communicable disease of public health significance;

(2)     persons who are found to have, or have had, a physical or mental disorder, and behavior associated with the disorder which poses, or may pose, a threat to the property, safety, or welfare of the alien or of others, or have had a physical or mental disorder and a history of behavior associated with the disorder, which behavior has posed a threat to the property, safety, or welfare of the immigrant alien or others, and which behavior is likely to recur or to lead to other harmful behavior;

(3)     persons who have been convicted of a crime involving moral turpitude (other than a purely political offense), or persons who admit having committed the essential elements of such a crime;

(4)     persons who have been convicted of any law or regulation relating to a controlled substance, admitted to having committed or admits committing acts which constitute the essential elements of same;

(5)     persons who are convicted of multiple crimes (other than purely political offenses) regardless of whether the conviction was in a single trial or whether the offenses arose from a single scheme of misconduct and regardless of whether such offenses involved moral turpitude, persons who are known, or for whom there is reason to believe, are, or have been, traffickers in controlled substances;

(6)     persons engaged in prostitution or commercialized vice;

(7)     persons who have committed in the United States certain serious criminal offenses, regardless of whether such offense was not prosecuted as a result of diplomatic immunity;

(8)     persons excludable on grounds related to national security, related grounds, or terrorist activities;

(9)     persons determined to be excludable by the Secretary of State of the United States on grounds related to foreign policy;

(10)    persons who are or have been a member of a totalitarian party, or persons who have participated in Nazi persecutions or genocide;

(11)    persons who are likely to become a public charge at any time after entry;

(12)    persons who were previously deported or excluded and deported from the United States;

(13)    persons who by fraud or willfully misrepresenting a material fact seek to procure (or have procured) a visa, other documentation or entry into the United States or other benefit under the Act;

(14)    persons who have at any time assisted or aided any other alien to enter or try to enter the United States in violation of law;

(15)    certain aliens who have departed the United States to avoid or evade U.S. military service or training;

(16)    persons who are practicing polygamists; and

(17)    persons who were unlawfully present in the United States for periods in excess of 180 days.

Persons applying inside the United States must demonstrate that they are eligible for adjustment of status to United States permanent resident according to Section 237 of the Act. Section 237 identifies individuals who may be ineligible to adjust their status to that of lawful permanent resident, including:

(1)     persons who at the time of entry or adjustment of status were inadmissible under Section 212 of the Act, summarized above;

(2)     persons present in the United States in violation of the Act or any other law of the United States;

(3)     persons admitted as a nonimmigrant who has failed to maintain the nonimmigrant status in which the individual was admitted, or to comply with the conditions of any such status;

(4)     persons who knowingly encouraged, induced, assisted, abetted, or aided any other individual to enter or to try to enter the United States in violation of law;

(5)     persons convicted of one or more enumerated crimes after admission to the United States;

(6)     persons who are or at any time after admission have been drug abusers or addicts;

(7)     persons who after admission are enjoined under a protection order issued by a court and whom the court determines has engaged in conduct that violates the portion of a protection order that involves protection against credible threats of violence, repeated harassment, or bodily injury to the person or persons for whom the protection order was issued;

(8)     persons who falsely represent themselves to be citizens of the United States for any purpose or benefit under any federal or state law;

(9)     persons engaged at any time in (i) any activity to violate any law of the United States relating to espionage or sabotage or to violate or evade any law prohibiting the export from the United States of goods, technology, or sensitive information, (ii) any other criminal activity which endangers public safety or national security, or (iii) any activity a purpose of which is the opposition to, or the control or overthrow of, the Government of the United States by force, violence, or other unlawful means;

(10)    persons whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States

(11)    persons who participated in the commission of severe violations of religious freedom;

(12)    persons engaged in the recruitment or use of child soldiers;

(13)    persons who, within five years after the date of admission, have become a public charge from causes not affirmatively shown to have arisen since admission; and

(14)    persons voting in violation of federal, state or local rules.

Each potential investor should review the substantive inadmissibility and eligibility grounds (set forth in part above) with competent counsel to determine whether there may be a basis for denying lawful permanent resident status to the potential investor (or derivative beneficiary family member) notwithstanding eligibility for immigration based on an investment in the Partnership.

An immigrant visa granting permanent resident status under the Act is conditioned upon the investor demonstrating his or her compliance with the requirements of the Pilot Program within two years following approval of the I-526 Petition. Investors who have been granted conditional permanent resident status must file a Form I-829 Petition by Entrepreneur to Remove Conditions ("I-829 Petition") within 90 days prior to the second anniversary of conditional permanent resident status being granted. The primary

purpose of the I-829 Petition is to ensure that investors submit evidence establishing that they have successfully met the requirements of the Pilot Program, including the creation and maintenance of the requisite number of direct and indirect jobs by the end of the 21-month period. Except in rare cases, investors who fail to file this petition in a timely manner will automatically lose their permanent resident status.

The General Partner will send documentation regarding the Partnership and the Project to investors for their immigration attorneys to use in connection with preparation of the I-829 Petition. Within 30 days after receipt of this documentation, investors are required to send their I-829 Petitions to the General Partner for review prior to filing with USCIS. Investors may not file their I-829 Petitions with USCIS unless and until the General Partner confirms in writing that they may do so. The purpose of the review is to facilitate the administration of the Partnership under the Pilot Program, and the Via Mizner Parties are not responsible for any errors or omissions to any I-829 Petition, the contents of which are the sole responsibility of the investor.

There can be no assurance that an I-526 Petition will be approved, that the potential investor will successfully complete the Lawful Permanent Residency Process, or that upon the approval thereof that the conditions attaching thereto will be removed through an I-829 Petition.

The foregoing description of the immigration procedures in connection with the Pilot Program is a summary description and each potential investor must seek advice from his or her immigration attorney to understand these procedures fully.

## V.  USE OF PROCEEDS

The proceeds from the Offering will be used to fund the Loan to the Developer to finance the development, construction and operation of the Project.

## VI.  PROJECT PARTICIPANTS

### Legal Entities

The following legal entities are participants in the Project:

***Via Mizner Funding, LP (the "Partnership").*** The Partnership is a newly formed Florida limited partnership and the issuer of the Units. Using proceeds from the sale of Units in the Offering, the Partnership will extend the Loan to the Developer to finance a portion of the Project costs. Through the General Partner, the Partnership is under the ultimate control of the Principal. Investors in Units are the limited partners in the Partnership. The rights and obligations of the partners in the Partnership are set out in the Partnership Agreement. See "Summary of Partnership Agreement" section of this Memorandum.

***U.S. Immigration Fund GP - Mizner, LLC (the "General Partner").*** The General Partner is a newly formed Florida limited liability company that will serve as general partner of the Partnership. The General Partner is owned and controlled by the Principal.

***Florida Regional Center, LLC ("Regional Center Administrator")***. The Regional Center Administrator is a Florida limited liability company that will administer the Florida Regional Center designated by USCIS under the Pilot Program. The Regional Center Administrator is indirectly owned and controlled by the Principal.

### The Principal

The Partnership, the General Partner, the Regional Center Administrator are under the ultimate control of the following individual (the "Principal"):

***Nicholas A. Mastroianni II.*** Mr. Mastroianni is founder, principal owner and manager of Allied Capital and Development of South Florida, LLC, a Palm Beach Gardens-based real estate development company founded in 2004. As the head of this organization, he has negotiated the purchase of thousands of acres of property and has led the design of several projects, both residential and commercial. The projects include single-family subdivisions, multi-family townhomes, multistory condominiums, apartment complexes and mixed-use retail and commercial sites. Mr. Mastroianni is a past Executive Vice President of the Rhode Island Chapter of the Association of Builders and Contractors and is a current member of the Association of General Contractors, the Association of Builders and Contractors and the Police Athletic League. Mr. Mastroianni resides in Jupiter, Florida.

**Project Legal Entities and Individuals**

The Project is under the control of the following legal entities and individuals, who are not participants in the Offering:

***Camino Investments Holdings Limited Partnership (the "Developer")***. The Developer is a Florida limited liability company specifically created to develop, construct, own and operate the Project. The Developer will be the borrower under the Loan and will fund Project costs through Loan disbursements and other resources, including one or more anticipated senior secured loan facilities (collectively, the "Senior Loans") and equity to be provided by the owners of the Developer and third parties. The Developer, the General Partner and the Regional Center Administrator have entered into the Consulting Agreement, which contains terms and conditions under which the General Partner and the Regional Center Administrator will, among other things, conduct the Offering and make the Loan to the Developer to partially fund the Project. The Developer is part of the Penn-Florida group of companies (the "Penn Florida Group") and is unaffiliated with the Partnership, the General Partner, the Regional Center Administrator or the Principal.

***Mark A. Gensheimer***. Mr. Gensheimer is the Founder, President and Chief Executive Officer of the Penn-Florida Group, a Florida based full service real estate development group of companies based in Boca Raton, Florida. Mr. Gensheimer's expertise includes real estate development, capitalization, acquisition and disposition.  Mr. Gensheimer's development experience includes office properties, retail centers, industrial/flex projects, medical buildings, apartments, as well as residential and golf course development.  The Penn-Florida Group engages in real estate development, asset management and brokerage activities with a portfolio that includes millions of square feet of existing commercial and residential properties, as well as land for future development. The Developer is under the ultimate control of Mr. Gensheimer.

***David K. Warne***. Mr. Warne serves as the key contact for the Penn-Florida Group's project debt and equity requirements, as well as oversees the institutional investor communication for the organization. Mr. Warne has over 22 years of experience in real estate finance and has directed project funding for over $30 billion in real estate value across all property classes on behalf of Wachovia Bank, Ocwen Asset Corporation and SunTrust Banks. Most recently, he was the Senior Real Estate Banking Executive for Wachovia in the South Florida market managing a 12-person lending team and a $2.75 billion property portfolio. Mr. Warne graduated from the University of Pittsburgh with a degree in Economics, and received his Master of Business Administration in Finance from the University of Miami.

***Armand Grossman***. Mr. Grossman is a real estate development executive, formerly with Ameritrend, a real estate development consulting firm, Comreal, a Miami-based sales commercial sales and leasing company and Consolidated Capital, Inc. Mr. Grossman was also with General Development Corporation as the Director of Primary Housing.  He has written, having written number of publications and articles on the role of the higher education institution within local and regional economies, and he has appeared on local and national TV and addressed numerous symposiums and conferences on the subject.  He

formerly served on the Board of Trustees of the Florida Atlantic University and several other boards of the University, Bank Atlantic's Board of Advisors, and as co-chair of the Boca Raton Community Hospital major charity, the Heart Ball.  Mr. Grossman holds an undergraduate degree and MBA from Florida Atlantic University as well as Law degree from Cleveland-Marshall Law School. Mr. Grossman is currently founder and president of the AMG collection in Pompano Beach and is former president of Clarity Education, Inc. and the American Heritage Financial Institute. Mr. Grossman and his wife reside in Boca Raton.

***Marc Hopin.*** Mr. Hopin has over 20 years of experience in the real estate industry overseeing accounting operations, financial reporting, human resource management and IT management in Fortune 500 companies, as well as entrepreneurial ventures. Beginning his career in the Northeast, Mr. Hopin has worked for Price Waterhouse, Merrill Lynch, and Gimelstob Companies. Mr. Hopin received his Bachelor of Science degree in Accounting, Computer Management and Quantitative Methods, and graduated with honors from Fordham University. He is a Certified Public Accountant and a Licensed Real Estate Broker in the state of Florida. Additionally, Mr. Hopin is the Chairman of the School Advisory Council at Florida Atlantic University where he has served in this role since 2004.

***Bruce G. Sirof***. Mr. Sirof is responsible for all activities within the operating groups of the Penn-Florida group of companies. He had over 30 years of real estate experience prior to joining Penn-Florida in 2001. Mr. Sirof was a partner and managing director at Jones Lang Wootton Realty Advisors in New York where he was Portfolio Manager for institutional client portfolios as well as Chief Operating Officer of Jones Lang Wootton Asset Management Group from 1988 to 2000. From 1985 to 1988, Mr. Sirof was Executive Vice-President and Chief Operating Officer of Integrated Resources Inc. National Property Management Division. Mr. Sirof was a Senior Vice-President of Asset Management at Schoder Real Estate Associates where he managed co-mingled overseas pension trust accounts.

## VII.  THE PROJECT

The Developer, which will be the borrower under the Partnership's Loan, was established to develop, construct, own and operate the Project, Via Mizner, a mixed-use real estate development project to be constructed on the Property. The Property comprises three contiguous parcels of land with a total gross surface area of approximately 6.8 acres (2.75 hectares) located on the northeast corner of the intersection of South Federal Highway and Camino Real in Boca Raton, Florida. The Project will be constructed in three consecutive phases and is expected to include a luxury hotel, Class "A" office space, retail space, restaurant space, apartments, residential condominium units and parking spaces.

Offsite improvements are expected to include the purchase of and renovations to an existing 18-hole golf course and country club facility, the Via Mizner Golf & Country Club, located approximately three miles from the Property. The Developer intends to purchase and renovate the golf course and club facility during Phase II of the Project. The Developer intends to sell club memberships during and after construction and to make the golf, tennis, and banquet amenities of the facility available for hotel guests and residential tenants of Via Mizner upon completion of the Project.

The scope, timing and content of the Project, particularly its second and third phases, have not been finalized and are subject to change at the discretion of the Developer.

See Exhibit G to this Memorandum for an aerial photo and map of the Project and the Property. No assurance can be given that all or any portion of the Project will be successfully developed or that the final development will have the elements set forth in this Memorandum.

**The Market: Boca Raton, Florida**

Boca Raton, Florida is located in the southeastern corner of Palm Beach County, Florida, between Fort Lauderdale and West Palm Beach. Boca Raton was founded in 1925 and quickly became known for its semi-tropical weather and broad, sandy beaches. Initially, the city was popular with wealthy individuals seeking to escape the cold winters of the northeastern United States. In 2010, the population was approximately 84,000. However, the majority of the people under the postal address of Boca Raton, about 200,000 in total, are not actually within Boca Raton's municipal boundaries. As a business center, the city's daytime population increases significantly.

Boca Raton is an affluent community within Palm Beach County. The City of Boca Raton strictly enforces zoning, landscaping and sign codes in order to maintain a high quality of life. For example, there are no new or used car sales operations within the city of Boca Raton. All commercial buildings must met strict design criteria.

Boca Raton is just north of Fort Lauderdale-Hollywood International Airport and Port Everglades, the second busiest cruise port in the world. Interstate 95, the Florida Turnpike, Tri-County Commuter Rail, and two major railroads cut through the city in a north-south direction. Miami International Airport and the Port of Miami are less than fifty miles away, providing further opportunities for Boca Raton residents and companies to have access to the global marketplace. The region is served by a substantial post-secondary educational infrastructure, including Florida Atlantic University, Florida International University, the University of Miami, a number of smaller private universities and colleges, and a community college system. Boca Raton is part of the South Florida metropolitan area, which encompasses a three-county area of the southeastern part of Florida and is home to more than 5.4 million people.

**The Property**

The Property comprises three contiguous parcels of land with a total gross surface area of approximately 6.8 acres (2.75 hectares) located on the northeast corner of the intersection of South Federal Highway and Camino Real in Boca Raton, Florida. Three existing office buildings totaling approximately 78,000 square feet (7,246 square meters) currently occupy a portion of the Property. These buildings were constructed between 1955 and 1987 and will be demolished as part of the Project.

In 2007, the Developer acquired the Property and later that year obtained site plan approval from the City of Baca Raton to develop approximately 900,000 square feet (83,613 square meters) of new commercial space, as well as an additional approximately 400,000 square feet (37,161 square meters) of parking space. In early 2012, the Developer obtained approval from the City of Boca Raton to amend the 2007 site plan to provide for Phase I of the Project on the Property, consisting of a mixed-use building approximately 140 feet (43 meters) in height. The building is approved to comprise 350 residential apartment units, 27,723 ft$^2$ (2,576 m$^2$) of office space and 6,542 ft$^2$ (608 m$^2$) of retail space.

The Property is currently encumbered by a first priority mortgage in favor of Principal Commercial Acceptance, LLC to secure a loan previously extended to the Developer and used to finance a portion of the acquisition costs of the Property. The principal amount outstanding under the loan is approximately $32.5 million. It is anticipated that the Developer will refinance this loan with proceeds of the Senior Loans.

The Developer has obtained and maintains all necessary development rights required to construct Phase I of the Project. The Developer has not yet obtained site plan approval from the City of Boca Raton to construct Phase II or Phase III of the Project. Although the Partnership believes these approvals will be

obtained, there is no assurance that the City of Boca Raton will grant these approvals to the Developer in a timely manner or at all. In the course of seeking these approvals, the scope, timing and content of the Project could change.

**The Boca Raton Downtown District of Regional Impact**

The Property is zoned "DDRI" which refers to Boca Raton's Downtown District of Regional Impact ("DDRI"). The purpose of the DDRI is to ensure there are adequate infrastructure facilities for all new development within the downtown Boca Raton area. Recently, Boca Raton undertook a program to revitalize its downtown area to create a livelier area that would attract more visitors and residents to the area. For example, the City spent more than $5 million dollars over the last 12 months changing traffic patterns, adding pedestrian walkways, and updating the public spaces to improve the walkability and integration of the Property with the adjacent Palmetto Park Road establishments, Mizner Park, and Royal Palm Place. The DDRI zoning designation permits a variety of commercial, residential and mixed-use development, including the development contemplated by the Project. The Partnership believes the Project will be well positioned to take advantage of the city's improvements to the downtown area.

**The Penn-Florida Group of Companies**

The Developer is part of the Penn-Florida group of companies (the "Penn-Florida Group"), a real estate owner and developer with its primary offices in Boca Raton, Florida and Orlando, Florida. The Penn-Florida Group's expertise includes planning, zoning, acquisition, development, design, construction, brokerage, property management and capitalization of both commercial and residential real estate. The Penn-Florida Group has completed the following real estate development projects, among others:

| Project | Location | Area | |
|---------|----------|------|---|
| RETAIL | | | |
| Glades Centre | Boca Raton, FL | 17,000 ft$^2$ | 1,579 m$^2$ |
| The Lakes | Weston, FL | 105,000 ft$^2$ | 9,755 m$^2$ |
| Gardens Center | Palm Beach Gardens, FL | 21,000 ft$^2$ | 1,951 m$^2$ |
| Lakes Square | West Palm Beach, FL | 44,000 ft$^2$ | 4,088 m$^2$ |
| Mizner Square | Boca Raton, FL | 20,042 ft$^2$ | 1,862 m$^2$ |
| The Shoppes of Parkland | Parkland, FL | 156,542 ft$^2$ | 14,543 m$^2$ |
| The Avenues Mall | Jacksonville, FL | 1,100,000 ft$^2$ | 102,193 m$^2$ |
| Philadelphia Stock Exchange Building | Philadelphia, PA | 450,000 ft$^2$ | 41,806 m$^2$ |
| OFFICE | | | |
| 101 Renaissance Centre | Boca Raton, FL | 35,000 ft$^2$ | 3,252 m$^2$ |
| 11800 Building | St. Petersburg, FL | 53,000 ft$^2$ | 4,924 m$^2$ |
| Atrium Financial Center | Boca Raton, FL | 133,000 ft$^2$ | 12,356 m$^2$ |
| Baypoint Commerce Center | St. Petersburg, FL | 698,527 ft$^2$ | 64,895 m$^2$ |
| Carter & Thomas Law Offices | Boca Raton, FL | 7,500 ft$^2$ | 697 m$^2$ |
| Charter Building | Delray Beach, FL | 55,000 ft$^2$ | 5,110 m$^2$ |
| Citadel I | Orlando, FL | 142,000 ft$^2$ | 13,192 m$^2$ |

| | | | |
|---|---|---|---|
| Citadel II | Orlando, FL | 142,000 ft$^2$ | 13,192 m$^2$ |
| Crystal Corporate Center | Boca Raton, FL | 128,000 ft$^2$ | 11,892 m$^2$ |
| Eastpointe | East Tampa, FL | 81,805 ft$^2$ | 7,600 m$^2$ |
| Lakeview Center | East Tampa FL | 180,000 ft$^2$ | 16,723 m$^2$ |
| M&I Bank Building | Tampa, FL | 300,000 ft$^2$ | 27,871 m$^2$ |
| One City Centre | Boca Raton, FL | 35,000 ft$^2$ | 3,252 m$^2$ |
| Sunport Center | Orlando, FL | 165,000 ft$^2$ | 15,329 m$^2$ |

RESIDENTIAL/HOSPITALITY/GOLF/RESORT

| | | |
|---|---|---|
| 375 Royal Palm | Boca Raton, FL | 160 Units |
| Bermuda Estates | Sarasota, FL | 220 Units |
| Boca Grove Plantation | Boca Raton, FL | Golf & Country Club |
| Fox Chase Apartments | Fox Chase, PA | 60 Units |
| Grand Bay Luxury Condominiums | Long Boat Key, FL | 470 Units |
| Grand Oaks Golf Course | Fort Lauderdale, FL | Golf & Country Club |
| Mission Hills North | Rancho Mirage, CA | Golf & Country Club |
| Parec Plumtree Assoc. | Washington Township, NJ | Golf & Country Club |
| Penalisa Country Club | Penalisa, Columbia | Golf & Country Club |
| River Hills Golf & Country Club | Branson, FL | Golf & Country Club |
| Royal Palm Golf & Country Club | Boca Raton, FL | Golf & Country Club |
| The Floridian | Palm City, FL | Golf & Country Club |
| The Wolverine | Traverse City, MD | Golf & Country Club |
| Santa Lucia River Club & Lodge | Port St. Lucie, FL | Golf & Country Club |
| Via Mizner Golf & Country Club | Boca Raton, FL | Golf & Country Club |

**The Project / Via Mizner**

The Project, Via Mizner, is a mixed-use real estate development project to be constructed in three phases on the Property, approximately 6.8 acres (2.75 hectares) of land located on the northeast corner of the intersection of South Federal Highway and Camino Real in Boca Raton, Florida. The Project is expected to include a luxury hotel, Class "A" office space, retail space, restaurant space, apartments, residential condominium units and parking spaces. Offsite improvements are expected to include the purchase of and renovations to an existing 18-hole golf course and country club. However, the scope, timing and content of the Project, particularly its second and third phases of the Project, have not been finalized and are subject to change at the discretion of the Developer.

Location

- The northeast corner of the intersection of South Federal Highway and Camino Real in Boca Raton, Florida

- The golf course and country club is the Via Mizner Golf & Country Club, located at 6200 Boca Del Mar Drive, Boca Raton, Florida.

<u>Land</u>

- Approximately 6.8 acres (2.75 hectares)
- Golf course and country club: approximately 124.5 acres (50.4 hectares)

<u>Phase I</u>

- **Residential Tower** (including apartments, commercial offices and parking) consisting of approximately 425,000 ft$^2$ (39,484 m$^2$) and 350 units; average per unit of approximately 1,024 ft$^2$ (95 m$^2$)

  <u>Expected Interior Finishes</u>:
  - Ceramic tile flooring in the kitchen, hallways, bathrooms, and entryways
  - Full-size washer / dryer in every apartment home
  - 9 foot (2.74 meter) ceilings and crown molding
  - Plush wall-to-wall carpet in living room and bedrooms
  - Kitchens will feature granite countertops and a stainless steel appliance package that includes energy-efficient refrigerator, electric range / self-cleaning oven, microwave, dishwasher and garbage disposal.
  - Cultured marble vanities in bathrooms
  - Hurricane resistant windows and doors

  <u>Amenities to include</u>:
  - 24-hour security with controlled access to residential floors
  - Floor-to-ceiling windows with unencumbered Golf, Intracoastal, and Ocean views
  - Heated resort-style pool and spa located on the 5th floor amenity level overlooking the Boca Raton Resort and golf course
  - Non-smoking building
  - Clubhouse with full gourmet kitchen and media center. Clubhouse also available for private parties.
  - State of the art fitness center with cardio and weight training exercise equipment,
  - Secure Wi-Fi in all amenity areas.

- **Office** space consisting of approximately 16,187 ft$^2$ (1,504 m$^2$), of which financial institutions are expected to occupy a total of approximately 12,880 ft$^2$ (1,197 m$^2$) on the ground floor.

- **Retail** space consisting of approximately 16,000 ft$^2$ (1,486 m$^2$)

- **Parking** for 624 vehicles, a total of approximately 249,600 ft$^2$ (23,189 m$^2$)

<u>Phase II</u>

- **Hotel** space consisting of a luxury hotel with approximately 118 rooms and a total of approximately 155,000 ft$^2$ (14,400 m$^2$)

- **Retail** space consisting of approximately 26,000 ft$^2$ (2,415 m$^2$)

- **Parking** for 371 vehicles, a total of approximately 124,313 ft$^2$ (11,549 m$^2$)

- **Golf & Country Club** the purchase of and renovations to an existing 18-hole course located at the Via Mizner Golf & Country Club, 6200 Boca Del Mar Drive, Boca Raton, Florida 33433.

Phase III

- **Condominium Tower** consisting of approximately 299,000 ft$^2$ (27,778 m$^2$) and 100 units; average per unit of approximately 2,600 ft$^2$ (242 m$^2$)

- **Restaurant** space consisting of approximately 22,000 ft$^2$ (2,044 m$^2$)

- **Parking** for 288 vehicles, a total of approximately 108,000 ft$^2$ (10,034 m$^2$)

Anticipated Funding Sources:

- Phase I

| | |
|---|---:|
| Disbursements under Phase I of the Loan to the Developer: | $48,000,000 |
| Disbursements under Senior Loans: | $60,000,000 |
| Developer Equity: | $24,393,436 |
| TOTAL | $132,393,436 |

- Phase II

| | |
|---|---:|
| Disbursements under Phase II of the Loan to the Developer: | $52,000,000 |
| Disbursements under Senior Loans: | $40,000,000 |
| Developer Equity: | $19,598,283 |
| TOTAL | $111,598,283 |

- Phase III

| | |
|---|---:|
| Disbursements under Phase III of the Loan to the Developer: | $44,000,000 |
| Disbursements under Senior Loans: | $60,500,000 |
| Developer Equity: | $25,432,435 |
| TOTAL | $129,932,435 |

Partnership's Loan to the Developer: Anticipated Funding Schedule (subject to change):

| Initial Subscription Period | Subscription Amounts in Escrow | I-526 Petitions Filed with USCIS | Target Loan Disbursement Amount and Date |
|---|---|---|---|
| Aug 11-27, 2012 | Sept 30, 2012 | Oct 30, 2012 | $12.0 million Nov 5, 2012 |
| Sept 10-30, 2012 | Oct 30, 2012 | Dec 15, 2012 | $36.0 million Feb 25, 2013 |
| Sept 10-30, 2012 | Dec 10, 2012 | Jan 30, 2013 | $52.0 million June 1, 2013 |
| Nov 28, 2012 | Feb 15, 2013 | March 15, 2013 | $44.0 million May 25, 2013 |

**Third-Party Appraisal of Project Prospective Investment Value**

The Partnership commissioned Callaway & Price, Inc., a Florida real estate appraisal and consulting firm, to perform an investigation and analysis of the future investment value of the Property. A draft of the Callaway & Price, Inc. report (the "Investment Value Appraisal") dated July 16, 2012 assesses the future value of the Property as of December 31, 2015 as if the Project were completed in a timely and

professional manner in accordance with the Developer's preliminary plans and specifications, and as if the Project were operating at stabilized occupancy.

The "investment value" of property means the value of a property interest to a particular investor or class of investors based on the investor's specific requirements. "Investment value" is not to be considered market value. Market value is based on market conditions including market rents, market expenses, market occupancies and market overall rates. "Investment value" is based on assumptions provided by the Partnership relating to events that have not yet occurred or that are not necessarily typical of the market.

A significant assumption provided by the Partnership is the capitalization rate, or "cap rate" to be used for purposes of the Investment Value Appraisal. Capitalization rates are an indirect measure of how fast an investment will pay for itself.

In real estate investment, real property is often valued according to projected capitalization rates used as investment criteria. This is done by algebraic manipulation of the formula below:

Capital Cost (asset price) = Net Operating Income/ Capitalization Rate

The Partnership has assumed a capitalization rate of seven percent and a stabilization date of December 15, 2015 for purposes of the Investment Value Appraisal.

Other key assumptions and the results of the Investment Value Appraisal for each component of the Project are presented below.

**Residential Components**

Phase I of the Project includes construction of an approximately 425,000 ft$^2$ (39,484 m$^2$) 350-unit residential tower, anticipated to commence in 2013. Phase III of the Project includes construction of an approximately 299,000 ft$^2$ (27,778 m$^2$) 100-unit condominium tower, anticipated to commence by the end of 2014. According to a 2011 analysis commissioned by the Penn-Florida Group and prepared by CB Richard Ellis (the "CBRE Report"), the Boca Raton residential rental market is in the midst of a strong rebound, with rising occupancies and fewer concessions. Overall occupancies in existing rental apartments are now at 94%+ levels and are forecast to continue to strengthen over the next five years. Although rental rates in Palm Beach County have declined over the past few years, improving economic conditions and a lack of new construction positions the multifamily market for growth over the next few years. According to the CBRE Report, Palm Beach County is forecast to outpace the US average in job growth over the next five years helping to support the underlying multi-unit housing dynamics.

According to the CBRE Report, there have not been any new residential rental apartments constructed in Boca Raton since 2003. As a result, tenant demand and market feasibility for rental apartments in the downtown corridor are now quite favorable and for the first time in many years, market rental rates support new high-rise, apartment construction in the regional area. The Property is one of the few sites in downtown Boca Raton with an existing site plan approval supporting residential development.

Phase I: Apartment Component (Investment Value Appraisal)

- Key Partnership Assumptions:

  - 350 apartment units and 358,300 ft$^2$ (33,287 m$^2$)

  - Average unit size 1,024 ft$^2$ (95 m$^2$)

  - Average monthly rent of $2,332 per unit, or $2.28 per ft$^2$ ($24.54 per m$^2$)

  - Stabilized occupancy of 94%

  - Expense ratio of 37.42%

## Prospective Investment Value - Phase I Apartments Component (2015 valuation date)

**Potential Gross Income:**

*Rental Income*

| Unit Type | Size | # of Units | | Projected Monthly Rent | PSF | Annual | Pro Forma |
|---|---|---|---|---|---|---|---|
| Studio | 676 | 11 | @ | $1,691 | $2.50 | $223,212 | |
| 1BR/1BA | 826 | 144 | @ | $1,899 | $2.30 | $3,281,472 | |
| 1BR/1BA + Den | 949 | 7 | @ | $2,230 | $2.35 | $187,320 | |
| 1BR/1.5BA | 847 | 10 | @ | $1,991 | $2.35 | $238,920 | |
| 1BR/1.5BA + Den | 1,034 | 15 | @ | $2,377 | $2.30 | $427,860 | |
| 2BR/2BA | 1,174 | 107 | @ | $2,465 | $2.10 | $3,165,060 | |
| 2BR/2.5BA | 1,253 | 36 | @ | $2,380 | $1.90 | $1,028,160 | |
| 2BR/2.5BA + Den | 1,471 | 1 | @ | $2,648 | $1.80 | $31,776 | |
| 3BR/2BA | 1,349 | 2 | @ | $2,496 | $1.85 | $59,904 | |
| 3BR/2.5BA | 1,583 | 7 | @ | $2,770 | $1.75 | $232,680 | |
| 3BR/3BA | 1,544 | 10 | @ | $2,701 | $1.75 | $324,120 | |
| | | | | | | | |
| Totals/Averages | | 350 | | $2,332 | | | $9,200,484 |
| | | | | | | | |
| **Additional/Misc. Income** | | (Utility Reimbursement, Other) | | | | | $900,000 |
| | | | | | | | |
| **Total Potential Gross Income** | | | | | | | **$10,100,484** |
| | | | | | | | |
| **Less Vacancy and Collection Loss** | | | | 6% | | | ($606,029) |
| | | | | | | | |
| **Effective Gross Income** | | | | | | | **$9,494,455** |

**Less Expenses:**

| | | Total | Per unit Expense | | | |
|---|---|---|---|---|---|---|
| Operating Expenses | | $1,600,000 | $4,571 | | | |
| Real Estate Taxes | | $1,330,000 | $3,800 | | | |
| Insurance | | $315,000 | $900 | | | |
| Capital Reserves | | $70,000 | $200 | | | |
| Management | 2.5% | $237,361 | $678 | | | |
| | | | | | | |
| **Total Expenses** | | $3,552,361 | $10,150 | 37.42% | | **($3,552,361)** |
| | | | | | | |
| **NET OPERATING INCOME** | | | | | | **$5,942,094** |

Phase III: Condominium Component (Investment Value Appraisal)

- Key Partnership Assumptions:

  - 100 condominium units

  - Average unit size 2,621 ft$^2$ (243.5 m$^2$)

  - Average selling price $2,080,970 per unit, or $793.96 per ft$^2$ ($8,546.19 per m$^2$)

  - 100% of condominium units sold

**Total Aggregate Retail Value:**                                $208,097,000

**Less Expenses**

| | | |
|---|---|---|
| Sales Commissions | 3.00% | ($6,242,910) |
| Entrepreneurial Incentive | 0.00% | 0 |
| Miscellaneous | 0.50% | ($1,040,485) |
| **Total Expenses** | 3.50% | ($7,283,395) |

33

**Prospective Investment Value Estimate:**                                    $200,813,605

**Office Component**

Phase I of the Project also includes construction of approximately 16,187 ft$^2$ (1,504 m$^2$) of Class "A" office space, also anticipated to commence in 2013. According to the CBRE Report, the Palm Beach County office market comprises approximately 26.5 million square feet (2.462 million square meters) of multi-tenant office space segmented into eight distinct submarkets. Although the Palm Beach office market showed a vacancy rate of 20% through the third quarter of 2011, the forecast shows declining vacancy rates over the next five years to approximately 15.5% by 2014. According to the CBRE Report, Palm Beach County continues to be an attractive place to relocate for businesses and employees, which should contribute to declining vacancies. Many biotech companies are expected to move into the Palm Beach office market, choosing to locate near the Scripps Research Institute.

According to the CBRE Report, the Boca Raton office market consists of approximately 11.4 million square feet (1.06 million square meters) and represents the largest office sector in Palm Beach County, almost 70% larger than the second largest submarket, West Palm Beach. Boca Raton had a third quarter 2011 vacancy rate of 26.4% and an average lease rate of $17.00 per square foot ($182.99 per square meter). Class A office space has performed better, with an average lease rate of $23.90 per square foot ($257.26 per square meter) and a vacancy rate of 23.9% in the third quarter of 2011. According to the CBRE Report, direct vacancy in the Boca Raton office market decreased from 22.3% in the second quarter of 2010 to 19.4% in the second quarter of 2011, with a 6.2% decrease year-over-year occurring within Boca Raton's central business district to a vacancy rate of 16%.

Cushman & Wakefield's *Marketbeat Office Snapshot* (Q4-2011) found a 17.9% overall vacancy rate in the Boca Raton office market and an average Class A rental rate of $33.33 per square foot ($358.76 per square meter). In the Federal Highway corridor, where the Project will be located, the overall vacancy rate was 21.1% in 2010 and Class A rental rate averaged $29.73 per square foot ($320.01 per square meter).

Leasing activity for the second quarter of 2011 was 302,157 ft$^2$ (28,071 m$^2$), down from 398,154 ft$^2$ (36,990 m$^2$) during the first quarter of 2011. Out of the 112 leases signed, 60 were for Class "B" properties totaling 154,369 ft$^2$ (14,341 m$^2$).

The CBRE Report further indicated that tenants are cashing in on low rental rates, free rent and shorter terms while landlords secure cash flow. However, now that the past four quarters have posted positive overall net absorption, rental rates will likely experience an increase.

Cushman & Wakefield's *2Q-11 Market Beat, Palm Beach County Office Report* identified a connection between high unemployment and a lack of demand for office space in Palm Beach County. "An overall lack of new growth, tenant interest in restructuring existing lease terms and reducing real estate expenses keep the market moving at a slow pace." However, anecdotal evidence suggests that market conditions are improving. Garda World Security Corp. has announced plans to move their U.S. headquarters to Boca Raton, and Life's Abundance intention to build a headquarters and distribution facility in nearby Jupiter, Florida. Although Palm Beach is feeling the country's economic slowdown, the Partnership believes the region is positioned for long-term growth and strong international business.

According to Cushman & Wakefield's *4Q-11 Market Beat, Palm Beach County Office Report*, "The Palm Beach office market, while some way from full health, has solid foundation for recovery. With leases already in place and a significant number of tenants out in the market, 2012 is expected to see gradual

34

signs of improvement. Market fundamentals are improving for Palm Beach office market with positive annual absorption, an increase in sale transactions, and number of leases signed."

Marcus & Millichap, in its *Office Research Market Update* (Third Quarter 2011) reflected guarded optimism for the state of the Palm Beach County office market: "A deliberate pace of job growth remains sufficient to push down the vacancy rate further in Palm Beach County this year, though property owners will not gain traction raising rents significantly for several more quarters. The addition of 3,000 office-using jobs since the beginning of 2010 continues to drive a modest recovery in the county, with specific property classes and submarkets outperforming. Lower rents, for example, will continue to encourage tenants to upgrade, sparking additional reductions in Class A vacancy over the remainder of 2011."

This report also indicated that the middle of the market continues to recover. Areas of interest included Boca Raton and other locations offering easy access to Interstate 95. The annual office forecast in this report showed:

(1)   Vacancy: The vacancy rate in Palm Beach County was expected to decrease 50 basis points in 2011 to 20.4 percent on net absorption of 165,000 ft$^2$ (15,329 m$^2$). This would be the first year of positive net absorption in three years. The vacancy rate spiked 170 basis points in 2010.

(2)   Rents: Asking rents were expected to recede 0.7 percent in 2011 to $28.12 per square foot, following a 2.5 percent decline in 2010. Effective rents remain on track to decline 0.8 percent this year to $22.23 per square foot after posting a 4.1 percent decline last year.




Phase I: Office Component (Investment Value Appraisal)

- Key Partnership Assumptions:

  - Bank: 12,880 ft$^2$ (1,197 m$^2$) @ monthly rent of $47.00 per ft$^2$ ($505.91 per m$^2$) net

  - Other office: 3,307 ft$^2$ (307 m$^2$) @ monthly rent of $35.00 per ft$^2$ ($376.74 per m$^2$) net

  - Retail: 35,000 ft$^2$ (3,252 m$^2$) @ monthly rent of $40.00 per ft$^2$ ($430.56 per m$^2$) net

  - Stabilized occupancy of 100%

  - No operating expenses

**Potential Gross Monthly Income:**

| | | | | |
|---|---|---|---|---|
| Bank | 12,880 ft$^2$ | x $47.00 per ft$^2$ | = | $605,360 |
| Office | 3,307 ft$^2$ | x $35.00 per ft$^2$ | = | $115,745 |

| Retail | 35,000 ft$^2$ | x $40.00 per ft$^2$ | = | $1,400,000 |
|---|---|---|---|---|
| | 51,187 ft$^2$ | | | $2,121,105 |

| **Less Vacancy & Collection Loss** | 0% | 0 |
|---|---|---|

| **Effective Gross Income:** | $2,121,105 |
|---|---|

| **Less Operating Expenses:** | 0 |
|---|---|

| **Net Operating Income:** | $2,121,105 |
|---|---|

**Retail Component**

The Partnership expects a sustainable recovery in retail property performance to take place in Palm Beach County during 2013, as employers continue to add workers, generating additional retail sales and supporting new space demand. Marcus and Millichap Research Services anticipates the following trends in Palm Beach County in 2012:

(1)     Employment is expected to increase by three percent, or 15,000 jobs, in 2012, following an increase of 7,900 jobs in 2011.

(2)     Average countywide rents rose modestly in 2011, while the rate of rent decreases at many well-located properties slowed. Nonetheless, average effective rents remain at least 10 percent less than their pre-recession peak and vacancy will have to drop much lower to realize those levels again.

(3)     Minimal new retail construction is underway in Palm Beach County. Although developers are expected to complete approximately 400,000 ft$^2$ (37,161 m$^2$) of new retail construction in Palm Beach County in 2012, a single project accounts for 258,000 ft$^2$ (23,969 m$^2$) of this total. A total of 152,000 ft$^2$ (14,121 m$^2$) of new retail construction was completed in the same area in 2011.

(4)     The retail vacancy rate is expected to reach 10.1% in 2012, down from 10.3% in 2011.

(5)     Asking rents are expected to increase 0.8% to $20.96 per square foot ($225.61 per square meter) and effective rents are expected to increase 1.1% to $18.12 per square foot ($195.04 per square meter).

Colwell Banker Richard Ellis, in its Fourth Quarter 2011 *Market View - Palm Beach County Retail* showed the Boca Raton sub-market with a 94.8% retail occupancy rate, average net-net-net asking rental rates of $24.79 per square foot ($266.84 per square meter).



25

The above two charts indicate that with improving employment in the Palm Beach County, Florida area, retail sales have improved.  This has had a modest positive impact on asking rents and vacancy trends.

Phase II: Retail Component (Investment Value Appraisal)

- Key Partnership Assumptions:
  - Retail: 26,000 ft$^2$ (2,415 m$^2$) @ monthly rent of $40.00 per ft$^2$ ($430.56 per m$^2$) net
  - Stabilized occupancy of 100%
  - No operating expenses

**Potential Gross Monthly Income:**

| | | | |
|---|---|---|---|
| Retail | 26,000 ft$^2$ | x $40.00 per ft$^2$  = | $1,040,000 |
| **Less Vacancy & Collection Loss** | | 0% | 0 |
| **Effective Gross Income:** | | | $1,040,000 |
| **Less Operating Expenses:** | | | 0 |
| **Net Operating Income:** | | | $1,040,000 |

**Hotel Component**

The Developer has not yet undertaken a market study in connection with the proposed hotel.

Phase II: Hotel Component (Investment Value Appraisal)

- Key Partnership Assumptions:
  - 118 keys
  - Average daily rate of $579.00 per room
  - Revenue available per room (RevPar) of $405.30
  - Stabilized occupancy of 70%
  - Expense ratio of 75.59%

Prospective Investment Value - Luxury Hotel Component (2015 valuation date)
**without consideration of the Ocean Amenity**

|  |  |  |
|---|---|---|
| # Units Available |  | 43,070 |
| # Units Occupied |  | 30,149 |
| % Occupancy |  | 70.00% |
| A. D. R. |  | $579.00 |
| RevPAR |  | $405.30 |

| **Consolidated Revenue** | as a % of |  |
|---|---|---|
| **Departmental Revenues** | Dept. Rev. |  |
| Rooms | 51.70% | $17,456,271 |
| Food & Beverage | 36.55% | $12,341,500 |
| Other | 11.75% | 3,965,500 |
| **Total Revenue:** |  | $33,763,271 |
|  | as a % of |  |
| **Departmental Expenses** | Dept. Rev. |  |
| Rooms | 20.87% | 3,643,100 |
| Food & Beverage | 76.00% | 9,379,600 |
| Other | 57.99% | 2,299,700 |
| **Total Departmental Expense:** |  | $15,322,400 |
|  |  |  |
| ***Departmental Profit*** |  | $18,440,871 |
|  |  |  |
| **Undistributed Expenses** |  |  |
| Administrative & General | 9.70% | 3,275,037 |
| Sales & Marketing | 5.30% | 1,789,453 |
| Property Operations & Maintenance | 3.10% | 1,046,661 |
| Utilities | 1.30% | 438,923 |
| **Total Undistributed Expenses:** |  | $6,550,075 |
| ***Gross Operating Profit*** |  | **$11,890,796** |
| *as a % of Gross Revenues* |  | 35.22% |
| **Fixed Expenses** |  |  |
| Real Estate Tax | 2.21% | 747,400 |
| Insurance | 1.61% | 544,300 |
| FF&E Reserve | 3.99% | 1,346,200 |
| Management Fee @ | 3.00% | 1,012,898 |
| **Total Fixed Expenses:** |  | $3,650,798 |
| ***Total - All Expenses*** | **75.59%** | **$25,523,273** |
|  |  |  |
| ***Net Operating Income*** |  | ***$8,239,998*** |

**Restaurant Component**

The Developer has not yet undertaken a market study in connection with the proposed restaurant space.

Phase III: Restaurant Component (Investment Value Appraisal)

- Key Partnership Assumptions:

  - Restaurant: 22,000 ft$^2$ (2,044 m$^2$) @ monthly rent of $40.00 per ft$^2$ ($430.56 per m$^2$) net

  - Stabilized occupancy of 100%

  - No operating expenses

**Potential Gross Monthly Income:**

| | | | | |
|---|---|---|---|---|
| Retail | 22,000 ft$^2$ | x $40.00 per ft$^2$ | = | $880,000 |

**Less Vacancy & Collection Loss**       0%       0

**Effective Gross Income:**       $880,000

**Less Operating Expenses:**       0

**Net Operating Income:**       $880,000

**Golf & Country Club Component**

Phase II of the Project also includes the purchase of and renovations to an existing 18-hole golf course and country club located approximately three miles west of the Property within a separate residential community bordered by West Palmetto Park Road, South Military Trail, West Camino Real and Powerline Road. The golf course and country club originally opened as the Boca Del Mar Country Club in 1972. In March 2011, PNC Bank filed a foreclosure action against the Boca Del Mar Country Club, which was then acquired by the Penn-Florida Group and renamed the Via Mizner Golf & Country Club. The Developer intends to purchase the Via Mizner Golf & Country Club from the Penn-Florida Group in using proceeds of the Senior Loans. The purchase will be a related party transaction and there can be no assurance that the purchase price will reflect the fair market value of the property. The Developer anticipates it will engage Jack Nicklaus to redesign the 18-hole golf course. Along with the renovated golf course, the Developer anticipates fully renovating the existing clubhouse. The Developer intends to sell memberships to the Via Mizner Golf & Country Club, which will become a private, members-only country club.

The Developer has not undertaken a market study in connection with the proposed renovation of the golf course and country club.

Phase II: Golf & Country Club Component (Investment Value Appraisal)

- Key Partnership Assumptions:

  - 83 memberships sold @ $50,000 per membership

  - Sale of golf and country club on or before Dec 31, 2015 for gross sale price of $14,772,243

| | | | |
|---|---|---|---|
| **Aggregate Retail Values:** | 83 memberships @ $50,000 | | $4,150,000 |
| **Club Sale:** | | | $14,772,243 |
| **Total Aggregate Retail Values:** | | | $18,922,243 |

**Less Expenses**

| | | |
|---|---|---|
| Sales Commissions | 3.00% | ($567,667) |
| Entrepreneurial Incentive | 0.00% | 0 |
| Miscellaneous | 0.50% | ($94,611) |
| **Total Expenses** | 3.50% | ($662,279) |

**Prospective Investment Value Estimate:**       $18,259,964

**Revenue and Sales Evaluation**

Based in part on the findings of the Investment Valuation Report and assuming continued improvement in the general economic outlook for Palm Beach County, Florida, the Partnership has developed the following preliminary estimates of potential revenue and sales potential for each phase of the Project. In developing these estimates, the Partnership generally used more favorable assumptions than those contained in the Investment Valuation Appraisal.

Phase I. Based on average monthly rent of similar class apartments in Boca Raton of $2,332 and an occupancy rate of 94% after four years of stabilization, and assuming a capitalization rate of seven percent, total annual revenues for all rented apartments and adjustments would be approximately $10,975,414. Overall expenses are projected to be approximately $3,552,361, leaving net operating income ("NOI") of approximately $7,423,053.

| Apartments | Amount |
| --- | --- |
| NOI | $ 7,423,053 |
| CAP Rate | 7.00% |
| Estimated Market Value | $ 106,043,610 |
| % Selling Costs | 3.00% |
| Amount Selling Costs | $ 3,181,290 |
| Revenue from Sale | $ 102,862,320 |
| Revenue from Rent | $ 7,423,053 |
| Total Sales Value | $ 110,285,373 |

| Office & Retail | Amount |
| --- | --- |
| NOI | $ 2,121,105 |
| CAP Rate | 7.00% |
| Estimated Market Value | $ 30,301,150 |
| % Selling Costs | 2.00% |
| Amount Selling Costs | $ 606,030 |
| Revenue from Sale | $ 29,695,120 |
| Revenue from Rent | $ 2,121,105 |
| Total Sales Value | $ 31,816,225 |

| Phase I Total Forecast Sales Value | $ 142,101,575 |
| --- | --- |

Phase II. Based on an average daily rate for similar class hotels in Boca Raton of $579, and an occupancy rate of 70% after three years of stabilization, and assuming a capitalization rate of seven percent, total annual revenues for a 118-room hotel, including ancillary purchases of food and beverages and other services, would be approximately $33,763,271. Overall expenses are projected to be approximately $25,523,273, leaving net operating income of $8,239,998.

| Hotel | Amount |
| --- | --- |
| NOI | $ 8,239,998 |
| CAP Rate | 7.00% |
| Estimated Market Value | $ 117,714,250 |
| % Selling Costs | 1.00% |
| Amount Selling Costs | $ 1,117,714 |
| Revenue from Sale | $ 116,596,536 |
| Revenue from Rent | $ 8,239,998 |

| | |
|---|---|
| Total Sales Value | $ 124,836,534 |

**Retail & Golf**

| | |
|---|---|
| NOI | $ 1,040,000 |
| CAP Rate | 7.00% |
| Estimated Market Value | $ 14,857,142 |
| % Selling Costs | 2.00% |
| Amount Selling Costs | $ 297,142 |
| Revenue from Sale | $ 14,560,000 |
| Revenue from Rent | $ 1,040,000 |
| Total Sales Value | $ 33,900,000 |
| **Phase II Total Forecast Sales Value** | **$ 158,756,534** |

Phase III. Based on a monthly restaurant rental rate of $40.00 per square foot, annual net operating income is forecast to be approximately $880,000. Based on an average condominium unit size of 2,621 $ft^2$ (243.5 $m^2$) and an average sale price of $794 per $ft^2$ ($8,546 per $m^2$), the total sales value of the condominium tower is forecast to be approximately $208,107,000.

**Condominium & Restaurant**

| | |
|---|---|
| Estimated Market Value | $ 208,107,000 |
| % Selling Costs | 2.00% |
| Amount Selling Costs | $ 4,179,740 |
| Revenue from Sale | $ 204,807,260 |
| **Phase III Total Forecast Sales Value** | **$ 204,807,260** |
| **Total Forecast Sales Value Phases I, II and III** | **$ 505,665,369** |

**General Contractor**

The Developer anticipates that it will engage Moss & Associates, LLC ("Moss"), a privately held real estate construction company, to act as general contractor for one or more phases of the Project. However, no agreement or understanding exists between the Developer and Moss to act as general contractor in connection with the construction of the Project, and the Developer reserves the right to engage a different firm to provide general contracting services for the Project. The Partnership believes Moss to be ranked, in terms of annual revenues, among the top 100 building contractors in the United States and the seventh largest in Florida. Moss has provided a letter to the Partnership from Travelers Casualty and Surety Company of America ("Travelers") stating that Moss is "a highly regarded and valued bonded client" of Travelers and that Travelers anticipates "no difficulty responding to any bonding requirements" of the Project should moss ultimately be selected as general contractor. Moss has informed the Partnership that it has more than 160 employees, bonding capacity in excess of $750.0 million and annual revenues in excess of $650.0 million. In addition, Moss has advised the Partnership that it has extensive experience in the following types of real property developments:

- Major landmark mixed-use developments and luxury high-rise residential facilities

- Hotels, resorts, casinos, and entertainment venues
- Commercial office buildings
- Government centers
- Educational facilities
- Healthcare centers
- Biomedical and life science complexes
- Retail structures
- Criminal justice and correctional facilities

No guarantees or representations are being made as to whether the Developer will ultimately enter into an agreement with Moss relating to services as general contractor for construction of the Project.

**Architects**

The Developer anticipates that it will retain Vander Ploeg & Associates, Inc. ("VPA") as architects in connection with one or more phases of the Project. However, no agreement or understanding exists between the Developer and VPA to act as Project architects, and the Developer reserves the right to engage a different firm to provide architectural services for the Project. VPA has informed the Partnership that it has extensive experience in planning, building design, construction and entrepreneurial real estate development, spanning a variety of building types and architectural themes for both the public and private sectors. VPA states that it has designed over 300 retail centers, over 7 million sq. ft. of office buildings, and numerous other specialty buildings such as golf course clubhouses, banks, adaptive re-use of existing buildings, the Mizner Park and Amphitheatre in Boca Raton, as well as corporate headquarter buildings, condominiums and hotels.

No guarantees or representations are being made as to whether the Developer will ultimately enter into an agreement with VPA relating to architectural services for the Project.

**Hotel Branding and Management**

The Developer has held discussions and negotiations with owners and licensees of several four- and five-star hotel brands, although no decision has been made regarding which of these brands, if any, will be selected for the hotel component of the Project. The Developer has also held discussions and negotiations with several hotel management companies, although no decision had been regarding selection of a manager for the hotel.

**VIII.  CONSTRUCTION BUDGET AND DEVELOPMENT SCHEDULE**

The following is a general construction budget for the Project. Budgeted amounts are subject to change as a result of factors arising during the construction process.

**Development Proforma - By Phase**

| Cost | Phase I | Phase II | Phase III | Totals |
|---|---|---|---|---|
| **Land Cost** | **$30,027,210** | **$20,603,853** | **$26,240,000** | **$76,871,063** |
| | | | | |
| **Hard Costs** | | | | |
| Building/Site Costs | $57,112,863 | $47,425,720 | $63,490,000 | $168,028,583 |
| FF & E | | $5,664,000 | $350,000 | $6,014,000 |
| Tenant Relocation | $875,000 | $250,000 | | $1,125,000 |
| Tenant Improvements | $2,438,475 | $1,950,000 | $1,650,000 | $6,038,475 |
| Permitting | $6,989,916 | $4,926,034 | $6,939,743 | $18,855,693 |
| Construction Management | $10,834,318 | $9,288,658 | $11,928,447 | $32,051,423 |
| Misc. Hard Costs | $3,912,529 | $3,192,021 | $4,200,409 | $11,304,959 |
| | | | | |
| **Total Hard Costs** | **$82,163,101** | **$72,696,433** | **$88,558,599** | **$243,418,133** |
| | | | | |
| **Soft Costs** | | | | |
| Architecture/Engineering | $1,875,000 | $1,396,192 | $1,888,200 | $5,159,392 |
| Insurance | $452,503 | $372,318 | $503,520 | $1,328,341 |
| R/E Taxes | $884,716 | $559,061 | $12,197 | $1,455,974 |
| Marketing / Lease Up | $525,424 | $2,289,450 | $10,554,150 | $13,369,024 |
| Legal | $653,037 | $391,649 | $576,410 | $1,621,096 |
| Financing | $2,520,849 | $2,020,587 | $2,017,811 | $6,559,247 |
| Interest | $11,673,958 | $6,196,960 | $5,936,096 | $23,807,014 |
| Contingency | $371,710 | $274,465 | $446,541 | $1,092,716 |
| **Total Soft Costs** | **$18,957,197** | **$13,500,682** | **$21,934,925** | **$54,392,804** |
| | | | | |
| **Total Costs** | **$131,147,508** | **$106,800,968** | **$136,733,524** | **$374,682,000** |

The following is a general development schedule for the Project. This development schedule is subject to change.



VIA MIZNER
Development Schedule

## IX.  PROJECT FUNDING

The Partnership expects the Developer will fund the development, construction and initial operating costs of the Project from the sources described below. However, there can be no assurance that funds from these sources will be available in the amounts and at the times anticipated by the Partnership, if at all. In that event, the Developer will be required to seek alternative sources of funding, reduce Project costs, postpone or cancel construction of some or all of the Project, or a combination of the foregoing.

**Senior Bank Financing**

The Partnership will use the proceeds of the Offering to fund the Loan to the Developer, which the Developer will use to pay a portion of the construction costs of the Project. The Developer anticipates that additional Project financing will come from one or more financial institutions yet to be identified (the "Senior Lenders"). The Developer believes the Senior Lenders will agree to loan approximately $160.5 million to the Developer, although the total amount could be up to $173.5 million (the "Senior Loans"). It is anticipated that the Developer's obligation to repay all principal and accrued interest under the Senior Loans will have priority over any right of the Partnership to receive payments of principal or accrued interest under the Loan, including payments or other distributions to enable the Partnership to pay the Preferred Return or to return an investor's investment in the Partnership.

Although the Developer has held discussions with potential Senior Lenders, it has yet to obtain a financing commitment. Accordingly, the terms and conditions, if any, under which the Senior Loans would become available to the Developer are unknown. There can be no assurance that the Senior Loans will be available to the Developer on reasonable terms or at all.

**Developer Equity**

The Penn-Florida Group has made or will make capital contributions to the Developer with an aggregate value of approximately $70.182 million (the "Developer Equity"), of which approximately $27.9 million are or will be cash capital contributions and the remaining $42.282 million are or will be non-cash capital contributions.

The non-cash component of the Developer Equity consists primarily of the Property acquired by the Developer with funding from the Penn-Florida Group and other sources. The Penn-Florida Group has advised the Partnership that it believes the $49.282 million valuation of the non-cash component of the Developer Equity is reasonable under the circumstances; however, the Partnership is not aware of any independent appraisal to support this valuation. For this reason, there can be no assurance that Penn-Florida's valuation reflects a fair market value of the Property. If the non-cash component of the Developer Equity is valued significantly above its fair market value, this could have an adverse impact on the Developer's ability to obtain the Senior Loans and complete the Project.

**The Partnership's Loan to the Developer**

The Partnership anticipates that it will use the proceeds of the Offering to make the Loan to the Developer in the amount of up to $160.0 million, representing the gross proceeds from the sale of 320 Units.

Assuming the Developer obtains the full $160.5 million in anticipated proceeds from the Senior Loans and the full anticipated amount of Developer Equity, the Partnership expects the Project to be fully funded once the Partnership has sold 288 Units and the Partnership has disbursed a total of $144.0 million in Offering proceeds under the Loan. Although the Partnership anticipates that the maximum amount of the Loan will be $144.0 million, it reserves the right to sell up to 320 Units and to disburse up to $160.0 million in Offering proceeds under the Loan. However, the actual total principal amount of the Partnership's Loan to the Developer will depend on the number of Units sold in the Offering and the anticipated number of jobs to be created from the Project.

**Summary of Projected Sources and Uses of Funds**

The following is a summary of projected sources and uses of funds, assuming the Partnership sells 288 Units in the Offering for a total of $144.0 million in subscription proceeds:

| Sources of Funds | Amount (millions) | Percentage |
|---|---|---|
| Partnership's Loan (EB-5 Offering Proceeds) (1) | $ 144,000,000 | 38% |
| Senior Loans (2) | $ 160,500,000 | 43% |
| Developer Equity (3) | $ 70,182,000 | 19% |
| Total Sources of Funds | $ 374,682,000 | 100% |

| Uses of Funds | Amount (millions) | Percentage |
|---|---|---|
| Land Costs | $ 76,871,063 | 20% |
| Project Hard Costs | $ 243,418,133 | 65% |
| Project Soft Costs | $ 54,392,804 | 15% |
| Total Uses of Funds | $ 374,682,000 | 100% |

Notes:

    (1)    The Partnership's Loan may be increased to up to $160.0 million depending on the number of Units sold in the Offering and the anticipated number of jobs to be created from the Project.

    (2)    The Senior Loans are anticipated to rank prior to the Partnership's Loan. The Developer anticipates it will obtain Senior Loan commitments of up to $173.5 million

    (3)    Both the Senior Loans and the Partnership's Loan are anticipated to rank prior to the Developer Equity.

## X.   LOAN COMMITMENT

### Purpose of Loan

The Partnership has entered into a loan commitment dated as of July 21, 2012 (the "Loan Commitment") with the Developer. The Loan Commitment is attached to this Memorandum as Exhibit F. The Partnership anticipates that it will enter into one or more binding loan agreements with the Developer; however, no loan agreement currently exists between the Partnership and the Developer. The proceeds of the Loan will be used by the Developer to partially fund the development, construction, ownership and operating costs of the Project, Via Mizner, a mixed-use real estate development project to be constructed in three phases on the Property, approximately 6.8 acres (2.75 hectares) of land located on the northeast corner of the intersection of South Federal Highway and Camino Real in Boca Raton, Florida. The Project is expected to include a luxury hotel, Class "A" office space, retail space, restaurant space, apartments, residential condominium units and parking spaces. Offsite improvements are expected to include the purchase of and renovations to an existing 18-hole golf course and country club. However, the scope, timing and content of the Project, particularly the second and third phases of the Project, have not been finalized and are subject to change at the discretion of the Developer.

### No Loan Agreement

The Loan Commitment is the only agreement that currently exists between the Partnership and the Developer relating to the Loan. No binding loan agreement exists, and each party's obligations under the Loan Commitment are subject to a number of conditions. As a result, there can be no assurance that the Partnership and the Developer will enter into any binding loan agreement or, if they do, that the terms and conditions contained any such loan agreement will be consistent with the Loan Commitment. No Loan proceeds will be disbursed except on the basis of a binding loan agreement secured by recorded and perfected security interests in the Project and the Property.

### Amount of Loan

The Loan Commitment anticipates that the initial maximum principal amount of the Loan will be $144.0 million, which may be increased up to $160.0 million. The actual principal amount of the Loan will depend on the number of Units sold pursuant to the Offering and the anticipated number of jobs to be created from the Project. The minimum principal amount of the Loan is anticipated to be $48.0 million, and the maximum principal amount of the Loan will be no more than the number of Units actually sold pursuant to this Offering multiplied by the $500,000 per Unit Subscription Amount.

If for any reason the maximum principal amount of the Loan is less than $144.0 million, the Developer reserves the right to seek funding from alternative sources, provided that the payment and priority rights associated with any additional indebtedness will be subordinated to the payment and priority rights of the Loan.

**Terms of Loan**

The Loan Commitment provides that interest will accrue on the outstanding principal amount of the Loan at a fixed rate equal to 3.5% per annum. Depending on the number of Units sold in the Offering and the number of jobs to be created by the Project, the Loan will be divided into three phases corresponding to the three phases of the Project:

- Under Phase I of the Loan, the Partnership anticipates that it will disburse a total principal amount of $48.0 million, representing the Subscription Amounts of 96 investors, to fund a portion of Phase I of the Project;

- Under Phase II of the Loan, the Partnership anticipates that it will disburse a total principal amount of $52.0 million, representing the Subscription Amounts of 104 investors, to fund a portion of Phase II of the Project;

- Under Phase III of the Loan, the Partnership anticipates that it will disburse a total principal amount of $44.0 million, representing the Subscription Amounts of 88 investors, to fund a portion of Phase III of the Project; and

- At its sole discretion, the Partnership may disburse up to an additional $16.0 million, representing the Subscription Amounts of 32 investors, to fund additional Project costs.

All principal and accrued interest under each phase of the Loan will become due and payable five years from the date of the first disbursement under that phase, or upon earlier sale or refinancing of the Project; provided that the Loan will not mature prior to final adjudication of all I-829 Petitions filed by investors in the Offering. In addition, the Developer will have the option to extend the maturity date of each phase of the Loan for up to one additional year by giving at least 90 days' prior written notice to the Partnership. The Developer will not have any right to extend the maturity of any phase of the Loan if it is in material default under any loan agreement on the notice date or on the initial maturity date. It is the Developer's intention to repay each phase of the Loan at maturity with the proceeds of long-term financing or from other sources.  See "Return of Capital" section of this Memorandum. The Developer may not prepay any phase of the Loan.

**Disbursement of Loan**

The Loan will be disbursed by the Partnership to the Developer in accordance with an agreed development and funding schedule for the Project to be set forth in one or more binding loan agreements to be negotiated between the Developer and the Partnership. Although no agreed development or funding schedule currently exists, the Partnership anticipates that Loan proceeds will be disbursed to fund each of the Project's three phases and that the Developer will not begin construction of a new phase until the previous phase is substantially complete.

Provided that the Developer complies with its obligations under all applicable Loan and security agreements, the Partnership anticipates that each phase of the Loan will be disbursed in the following tranches:

- Phase I: an initial tranche of approximately $12.0 million, followed by three subsequent tranches of approximately $12.0 million each;

- Phase II: four tranches of approximately $10.0 million each, followed by one subsequent tranche of approximately $12.0 million; and

- Phase III: four tranches of approximately $11.0 million each.

The Partnership, at its sole discretion, may disburse an additional $16.0 million to fund the Project. The Partnership will be under no obligation to make disbursements under the Loan if the Developer is in

breach of any of its obligations to the Partnership, in which case the Partnership will have the option to cease making additional Loan disbursements. In that event, the Partnership anticipates that it will sell only that number of Units required to fund actual disbursements under the Loan, after which it will close the Offering.

The Loan Commitment also provides that, upon each disbursement of Loan proceeds, the Developer will make a prepayment equal to one year of interest on such disbursement. Thereafter, the Developer will make interest payments on a quarterly basis, in arrears, until the Loan is repaid in full.

The Consulting Agreement among the Developer, the Regional Center Administrator and the General Partner requires the Developer to pay an "origination fee" to the General Partner equal to one percent of the maximum Loan amount, payable upon the initial disbursement under the Loan.

### Security

The Loan Commitment contemplates that the Developer's obligations under the Loan will be secured by the following (collectively, the "Security"):

- a mortgage lien on the real property and improvements comprising the Property and the Project, which will rank second only to one of the mortgage liens securing the Senior Loans;

- a lien on all fixtures, chattels, building material and all personal property of Developer necessary to the maintenance or operation of the Property and the Project, which will rank second only to one of the liens securing the Senior Loans;

- a conditional assignment of contracts, leases, rents, profits, permits, deposits, approvals, licenses, warranties and other agreements in connection with the Property and the Project, which will rank second only to one of the liens securing the Senior Loans; and

- a pledge of 100% of the membership interests in the Developer.

### Intercreditor Agreement

The Partnership anticipates that the Senior Loans will have superior rights with respect to payments and security in comparison to the Partnership's Loan. The terms of the relationship with respect to payments and security among the Senior Lenders and the Partnership, as the principal secured creditors of the Developer, are anticipated to be set forth in a written intercreditor agreement among the Partnership, the Senior Lender and the Developer. The specific terms of the intercreditor agreement will be determined through negotiations among the Senior Lenders, the Partnership and the Developer, but such agreement will likely cover matters relating to rights and obligations for payment, subordination, priority and default. If required by the Senior Lenders, the intercreditor agreement may also include provisions requiring the Partnership to alter the terms of the Loan, including the Loan's maturity date, upon written notice from the Senior Lender or upon the occurrence of certain circumstances.

## XI.   THE PARTNERSHIP

### Management of the Partnership

The General Partner of the Partnership is U.S. Immigration Fund GP - Mizner, LLC, a Florida limited liability company indirectly owned and controlled by the Principal.

The General Partner will conduct the day-to-day management of the Partnership. Under the laws of Florida, in order to maintain their limited liability, limited partners of a limited partnership may not take an active role in the management or control of the limited partnership. However, the approval of the Partnership's Limited Partners is required in connection with certain matters. See "Limited Partner

Decisions" section of this Memorandum. The duties of the General Partner, which are set out more fully in the Partnership Agreement, include the following:

(1)     Expend the capital and income of the Partnership in furtherance of the business of the Partnership;

(2)     Negotiate, enter into on behalf of the Partnership, and supervise the performance of contracts or agreements with lenders, architects, engineers, surveyors, attorneys, accountants, managers, lobbyists, contractors, subcontractors, and other persons whose services, labor, or materials may be necessary or appropriate in furtherance of the purposes of the Partnership;

(3)     Perform any and all acts necessary or appropriate to acquire, expand, improve, maintain, repair, operate, and manage the Partnership's business;

(4)     Take and hold real property and personal property of the Partnership in the Partnership name or in the name of a nominee or trustee for the benefit of the Partnership;

(5)     Execute and deliver, on behalf of and in the name of the Partnership, or in the name of a nominee of the Partnership, deeds, bills of sales, deeds of trust, mortgages, notes, leases, ground leases, subleases, licenses, rental agreements, occupancy agreements, and/or use agreements of or with respect to all or a portion of the Property and the Project, and any and all other instruments necessary or incidental to the conduct of the Partnership's business;

(6)     Control and manage the Partnership's assets and arrange for construction, repair, financing, refinancing, collections, disbursements, maintenance, leasing, and other matters necessary or desirable in connection with the development and construction of the Project and the operation of the Partnership's business;

(7)     Employ and/or dismiss from employment, retain, or otherwise secure the services of employees, independent contractors, agents, and other personnel necessary to carry out the purpose of the Partnership;

(8)     Delegate all or any of its rights and duties, and in furtherance of any such delegation, appoint, employ, or contract with any persons the General Partner may, in its sole discretion, deem necessary or desirable;

(9)     Ask for, collect, and receive any rents, issues, and profits or income from the Partnership's business, and disburse Partnership funds for Partnership purposes to those persons entitled to receive them;

(10)    Purchase contracts of liability, casualty, or other insurance for the protection of the assets and business of the Partnership or the partners, or for any purpose deemed by the General Partner to be convenient or beneficial to the Partnership;

(11)    Pay all taxes, licenses, or assessments of whatever kind or nature imposed upon or against the Partnership, and for such purposes make such returns and do all other such acts or things as may be deemed necessary and advisable by the Partnership;

(12)    Establish, maintain, and supervise the deposit of any cash or securities of the Partnership in accounts in the name of the Partnership, and invest them in the discretion of the General Partner;

(13)    Institute, prosecute, defend, settle, compromise, and dismiss lawsuits or other judicial or administrative proceedings brought on behalf of, or against, the Partnership or the partners in connection with activities arising out of, connected with, or incidental to the

Partnership Agreement and the affairs of the Partnership, and engage counsel or others in connection therewith;

(14) Take any action necessary or appropriate for the continuation of the Partnership's valid existence as a limited partnership under the laws of the State of Florida;

(15) Release, compromise, assign or transfer any claims, rights or benefits of the Partnership;

(16) Pay, extend, renew, confess, modify, adjust, submit to arbitration, prosecute, defend or compromise, upon such terms as they may determine and upon such evidence as the General Partner may deem sufficient, any obligation, suit, liability, cause of action or claim, including taxes, either in favor of or against the Partnership;

(17) Negotiate, execute, deliver, consent to, or approve any contract, document, request or instrument in connection with the Partnership's business;

(18) Borrow money on behalf of the Partnership from banks, insurance companies, or any other lending institutions in accordance with the Partnership's purposes; and, in connection therewith, issue notes, debentures and other debt securities and hypothecate the assets of the Partnership to secure repayment of such funds;

(19) Amend the Partnership Agreement or the certificate of limited partnership of the Partnership;

(20) Admit a Limited Partner or admit a General Partner; and

(21) Compromise a partner's obligation to make required capital contributions (in excess of the Subscription Amount) or request a partner to return an improper distribution.

Any successful performance of the General Partner or its affiliates in prior businesses is not necessarily indicative of future results.

**General Partner's Management Fee**

For its services rendered to the Partnership, the General Partner will be entitled to receive a fee (the "Management Fee") equal to three percent per annum of the total principal amount outstanding under the Loan from time to time, cumulative but not compounded, determined on the basis of a 365/366 day year for the actual number of days in the period for which the Management Fee is being determined. The Loan Commitment provides that, upon each disbursement of Loan proceeds, the Developer will make a prepayment equal to one year of interest on the disbursement. From this interest prepayment, the General Partner will be entitled to receive an amount equal to three percent of the disbursement as a prepayment of the Management Fee.

**Consulting Agreement**

The Consulting Agreement among the Developer, the General Partner and the Regional Center Administrator, sets forth the terms and conditions under which the General Partner and the Regional Center Administrator will seek approval of the Project for purposes of the Pilot Program, administer the Project under the Pilot Program on behalf of the Developer, and conduct the Offering and make the Loan to the Developer to fund a portion of the Project costs. Among other things, the Consulting Agreement provides that it will terminate automatically if USCIS terminates the USCIS Approval. In addition, the Developer may terminate the Consulting Agreement thirty business days following notice of a material breach by either the General Partner or the Regional Center Administrator, unless the breach is resolved during the 30-business-day period. A material breach includes failure to comply with any applicable law or regulation relating to the Offering and failure to disburse Loan proceeds in strict accordance with the disbursement schedule to be agreed between the Partnership and the Developer. Termination of the

Consulting Agreement is not anticipated to affect the Loan or the Partnership's ability to complete the Offering.

For its services under the Consulting Agreement, the General Partner is entitled to receive the Consulting Fee, which is a fee payable by the Developer equal to five percent per annum of the total principal amount outstanding under the Loan. The Consulting Agreement provides that, upon each disbursement of Loan proceeds, the Developer will pay an amount equal to five percent of the disbursement as an advance payment of the Consulting Fee.  Thereafter, forty percent of the Consulting Fee will be payable quarterly in arrears on a current basis and the remaining sixty percent will accrue and become payable at the Loan's maturity date.

**Marketing and Administration of the Offering**

The Partnership anticipates that all potential investors will be non-U.S. Persons residing outside the United States. The Partnership has entered into contractual relationships with several firms to act as marketing representatives to provide the Partnership with advice and assistance in connection with its efforts to identify non-U.S. Persons interested to acquire Units in the Offering. In general, the Partnership has agreed to pay a fee to each marketing representative for each non-U.S. Person identified by the marketing representative who ultimately purchases a Unit in the Offering. Each marketing representative retained by the Partnership is required to represent and warrant to the Partnership that it will carry out its activities in compliance with the requirements of the Securities Act, including Regulation S thereunder, and in compliance with the requirements of all applicable non-U.S. laws and regulations.

**Subscription Procedures**

Potential investors wishing to subscribe for Units in the Partnership are required to comply with the following procedures (the "Subscription Procedures"):

**Step 1**          **Deposit and Preliminary Information**
Each potential investor interested in purchasing a Unit must do the following:
1. Complete and sign a Pre-Subscription Letter Agreement, Investor Suitability Questionnaire and Acknowledgement; deliver one copy of each signed document by fax to +1 561 799 0061 or by email to subscriptions@vmfunding.com;
2. Provide legible copies of his or her **passport** and **one** of the following by fax to +1 561 799 0061 or by email to subscriptions@vmfunding.com:
    - Credit Card
    - Student Identification Card
    - Workplace Identification Card
    - Non-US Driver's License

**Step 2**          **Document Execution**
After the General Partner has confirmed in writing that the potential investor may proceed with the investment, please do the following:

| | | |
|---|---|---|
| 1. | Subscription Agreement: | Review carefully, complete and sign. |
| 2. | Accredited Investor Questionnaire, IRS Forms W-7 and W-8BEN (attached to the Subscription Agreement) | Review carefully, complete and sign. |
| 3. | Limited Partnership Agreement | Review carefully, complete and sign. |
| 4. | Subscription and Administrative Fee Escrow Agreement, Escrow | Review carefully. |

Administration Services Agreement
and Loan Commitment

**Step 3**            **Delivery of Executed Documents and Funds**

After the potential investor has signed the documents, he or she must do the following:

1. Deliver one copy of each signed document by email to subscriptions@vmfunding.com;

2. Deliver one original of each signed document by courier to Via Mizner Funding, LP, 1295 U.S. Highway 1, North Palm Beach, FL 33408 USA; and

3. Wire transfer $545,000 to the Escrow Agent as payment of: (a) the $500,000 subscription price for each Unit; and (b) the $45,000 Administrative Fee using the wire transfer instructions provided at the beginning of this Memorandum.

The Subscription Agreement, the form of which is attached as <u>Exhibit B</u> to this Memorandum, includes among other things an undertaking by the potential investor to:

- diligently file and prosecute his or her I-526 Petition;

- provide the General Partner with a copy of the Form I-797 notice approving his or her I-526 Petition upon receipt from USCIS;

- complete the Lawful Permanent Residency Process;

- provide to the General Partner such information as the General Partner may require confirming that the funds to be invested were lawfully obtained, together with such other documents as the General Partner may reasonably require; and

- diligently file and prosecute his or her I-829 Petition within 21 to 24 months after the date that his or her I-526 Petition was approved.

The Partnership has sole and absolute discretion to accept or reject each Subscription Agreement and the funds delivered to the Escrow Agent. If the Partnership rejects a Subscription Agreement, the Partnership and the Regional Center Administrator will direct the Escrow Agent to return all funds delivered by the potential investor to escrow. If the Partnership accepts a Subscription Agreement, it will execute and deliver to the Subscriber an copy of the Subscription Agreement, which will designate the Subscriber as a "<u>Phase I Subscriber</u>," a "<u>Phase II Subscriber</u>" or a "<u>Phase III Subscriber</u>," in each case corresponding to the first, second or third phase of the Loan to fund a portion of the costs, respectively, of the first, second or third phase of the Project. The Partnership may change the Subscriber's designation at any time by delivering written notice to the Subscriber notifying the Subscriber of the change.

The Subscription Agreement, together with the Escrow Agreement with the Escrow Agent, provide for the release of the potential investor's $500,000 Subscription Amount and $45,000 Administrative Fee upon written direction from the Partnership and the Regional Center Administrator. The Partnership and the Regional Center Administrator will direct the Escrow Agent to release a potential investor's $45,000 Administrative Fee to the Regional Center Administrator upon acceptance of the potential investor's Subscription Agreement.

<u>Phase I Subscribers</u>

The Partnership and the Regional Center Administrator will direct the Escrow Agent to release 90% of a Phase I Subscriber's $500,000 Subscription Amount, or $450,000, to the Partnership upon satisfaction of the "Subscription Procedures" and submission of the Phase I Subscriber's I-526 Petition to USCIS, as evidenced by official notice from USCIS confirming receipt. The Escrow Agent will retain the remaining

10% of the Phase I Subscriber's Subscription Amount (the "Holdback Amount") in a holdback subaccount within the escrow (the "Holdback Subaccount"). Upon the Partnership's receipt of $450,000 representing 90% of the Phase I Subscriber's $500,000 Subscription Amount, the General Partner will issue a Unit to the Phase I Subscriber and will admit the Phase I Subscriber as a Limited Partner in the Partnership.

In the event that Phase I Subscriber's I-526 Petition is not approved by USCIS and all rights of appeal are exhausted, the Phase I Subscriber (the "Withdrawing Investor") will be required to withdraw and dissociate from the Partnership. If it has sufficient funds available to do so, the Partnership will refund 90% of the Withdrawing Investor's Subscription Amount, or 100% of the Withdrawing Investor's Subscription Amount if the Withdrawing Investor's Holdback Amount was previously released to the Partnership.

If the Partnership is unable to refund the Withdrawing Investor's Subscription Amount as a result of there being insufficient funds available to the Partnership, the Partnership and the Regional Center Administrator will instruct the Escrow Agent to either:

(1)    return the Withdrawing Investor's Holdback Amount to the Withdrawing Investor (if the Holdback Amount was not previously released to the Partnership) and release $450,000 to the Partnership from the Holdback Subaccount, representing the Holdback Amounts of nine Phase I Subscribers; or

(2)    release $500,000 to the Partnership from the Holdback Subaccount (if the Withdrawing Investor's Holdback Amount was previously released to the Partnership), representing the Holdback Amounts of ten Phase I Subscribers.

If the Escrow Agent is unable to release $450,000 or $500,000, as the case may be, from the Holdback Account to the Partnership due to there being insufficient funds in the Holdback Subaccount, then the Withdrawing Investor's Subscription Amount will not be returned and the Withdrawing Investor will be required to wait an indefinite period of time until sufficient funds become available to the Partnership to enable it to return the Withdrawing Investor's Subscription Amount.

If more than one Phase I Subscriber is entitled to the return of his or her Subscription Amount, then, in each such case the Partnership shall be obligated to return first the Subscription Amount of the Phase I Subscriber whose appeal rights were exhausted first. Upon full return or refund of a Phase I Subscriber's Subscription Amount, (i) such Phase I Subscriber shall be deemed to have withdrawn and been dissociated from the Partnership and (ii) the Subscription Agreement shall terminate except for the provisions of Section 9 (Confidentiality) and Section 10 (Indemnification).

The Partnership shall not be obligated to refund the $500,000 Subscription Amount of any investor who (i) delivers a written request to remain a Limited Partner in the Partnership after becoming entitled to return of his or her Subscription Amount, (ii) withdraws his or her I-526 Petition after filing and prior to adjudication by USCIS or (iii) in the opinion of the General Partner acting reasonably, fails to actively seek USCIS approval of his or her I-526 Petition. In any of these cases, the investor will not be deemed to have withdrawn or been dissociated from the Partnership.

In the event that a Phase I Subscriber's I-526 Petition is not approved by USCIS and all rights of appeal are exhausted, the Regional Center Administrator will become obligated to refund the $45,000 Administrative Fee of the Phase I Subscriber, less $10,000 to cover certain unrecoverable Offering expenses.

The Regional Center Administrator will have no obligation to refund any portion of the $45,000 Administrative Fee of any investor (i) who requests to remain a Limited Partner in the Partnership after becoming entitled to return of his or her Subscription Amount, (ii) who withdraws his or her I-526 Petition after filing and prior to adjudication by USCIS, (iii) who, in the opinion of the General Partner

acting reasonably, fails to actively seek I-526 Petition approval or (iv) whose I-526 Petition was not approved for reasons including the investor's fraud and/or misrepresentation in connection with the I-526 Petition.

Any funds returned to an investor shall be without interest or deduction and shall be sent via wire transfer to the account from which the investor's funds originated.

Phase II Subscribers and Phase III Subscribers

The Partnership and the Regional Center Administrator will direct the Escrow Agent to release to the Partnership the full amount of the $500,000 Subscription Amount deposited in escrow by a Phase II Subscriber or a Phase III Subscriber upon satisfaction of the "Subscription Procedures" and approval by USCIS of the I-526 Petition submitted by the Phase II Subscriber or the Phase III Subscriber, in each case as evidenced by official notice from USCIS confirming approval. Upon the Partnership's receipt of the investor's $500,000 Subscription Amount from escrow, the General Partner will issue a Unit to the investor and will admit the investor as a Limited Partner in the Partnership.

No Units will be offered for sale after the earlier of (i) the maximum number of Units being subscribed for under this Memorandum or (ii) December 31, 2013, unless extended by the General Partner with notice to the potential investors. The Partnership Agreement sets forth the rights of the Limited Partners. No interest on escrowed subscription proceeds will be payable to Limited Partners or the Partnership. If for any reason the USCIS, any other governmental authority or applicable law prevents funds from being returned to a potential investor, the potential investor shall have no claim against the Escrow Agent, the Partnership, the Via Mizner Parties or the Principal.

In the event an investor's application for conditional permanent resident status or I-829 Petition is denied, the Administrative Fee will not be refunded to the investor and the investor's US$500,000 Subscription Amount will remain invested in the Partnership and part of the Partnership's Loan to the Developer.

**Qualifying Investment**

The Partnership believes utilizing subscription proceeds from the sale of Units to make disbursements to the Developer under the Loan to fund a portion of the development, construction, ownership and operating costs of the Project will be a Qualifying Investment under the Pilot Program for the following reasons:

(1)     The Loan disbursements will be made based upon the USCIS Approval of the Florida Regional Center designation and on the status of the Project as a capital investment opportunity within a Targeted Employment Area of the Florida Regional Center, thus potentially meeting the minimum job creation requirements of the Pilot Program and entitling immigrant investors to make use of the $500,000 Subscription Amount threshold;

(2)     The Loan disbursements will be funded from the proceeds of the sale of Units, by which each immigrant investor will meet the $500,000 Subscription Amount threshold; and

(3)     The maximum total Loan amount resulting from the sale of Units will be $160.0 million, with the actual total dependent on the number of Units sold and the number of jobs anticipated to be created from the Project.

The term "Qualifying Investment" refers solely to the type of at-risk investments that will be made by investors through the Partnership. A potential investor's capital contribution must be derived wholly from his or her personal assets and be entirely at risk.

**Preferred Return**

As a Limited Partner in the Partnership, each owner of a Unit will be allocated and entitled to receive a cumulative, uncompounded Preferred Return equal to 0.5% per annum of his or her $500,000 Subscription Amount. The Preferred Return will accrue and may be paid quarterly at the discretion of the General Partner. Any other interim distributions will also be at the discretion of the General Partner.

**Return of Capital**

An investment in the Units of the Partnership will fund a portion of the development, construction, ownership and operating costs of the Project through the Partnership's Loan to the Developer. A Unit represents a limited partnership interest in the Partnership, and under no circumstances will an investment in Units represent or result in an ownership interest in the Loan or the Developer. In order to ensure that the capital invested by each Limited Partner as an immigrant investor remains fully at risk for the period of time required under the Pilot Program, the Partnership Agreement specifically prohibits the Partnership from returning any portion of an investor's $500,000 Subscription Amount prior to adjudication of the investor's I-829 Petition.

It is anticipated that the Project will have been completed and successfully in operation for at least one year by the maturity date of the Loan. In that event and subject to then-current market conditions, the Developer intends to:

  (1)  refinance the Project with an institutional lender; or

  (2)  sell all or a portion of the Project.

It is anticipated that the proceeds of any refinancing or sale will be applied first to pay all principal and accrued interest under the Senior Loans, together with certain other debts of the Developer that become due and payable as a result of the refinancing or sale. Thereafter, the refinancing or sale proceeds will be used by the Developer to pay all principal and accrued interest under the Loan. Pursuant to the Partnership Agreement, General Partner is obligated to distribute Loan repayments resulting from the refinancing or sale of the Project in accordance with the terms of the Partnership Agreement.

When a Limited Partner has received the full amount of his or her Preferred Return and has been returned the full amount of his or her $500,000 Subscription Amount per Unit, the Limited Partner will automatically be dissociated from the Partnership and will no longer be a Limited Partner in the Partnership.

There can be no assurance the Developer will be able to refinance or sell the Project by any particular date or at all, or that the proceeds of any refinancing or sale will be sufficient to enable the Limited Partners to receive the full amount of their Preferred Return and the full amount of their $500,000 Subscription Amount. The Partnership is entirely dependent on receipt of distributions from the Developer in order to make these payments to the Limited Partners. Further, an investment in the Units of the Partnership is not guaranteed by any third party and is not secured by any Project assets or other property. Accordingly, there is no assurance that a Limited Partner's capital investment will be repaid, either partially or in full, by any particular date or at all. For this reason, an investor's capital contribution to the Partnership is entirely at risk. See "Allocations and Distributions" section of this Memorandum.

## XII.  SUMMARY OF PARTNERSHIP AGREEMENT

The Partnership has been formed to extend the Loan to the Developer to fund a portion of the development, construction, ownership and operating costs of Via Mizner, the Project described in this Memorandum, and is governed by the terms of the Partnership Agreement, attached to this Memorandum as <u>Exhibit A</u>. The partners in the Partnership (the "<u>Partners</u>") consist of the General Partner and

purchasers of Units in the Offering, who are Limited Partners admitted to the Partnership under the terms of the Partnership Agreement.

The following information is presented as a summary of principal terms only and is qualified in its entirety by reference to the Partnership Agreement.

**Units are all Equal**

All Units will be of the same class and no Unit will have any priority over any other Unit of the same series. The Limited Partners will vote on all matters requiring the approval of Limited Partners.

**Partnership Purpose**

The Partnership has been formed as a commercial for-profit entity to engage in any lawful purpose permitted under the Florida Revised Uniform Limited Partnership Act, including without limitation (i) purchasing or otherwise acquiring mortgages and other liens on an interests in real estate, (ii) extending the Loan to the Developer for the purpose of developing, constructing and operating the Project within the Targeted Employment Area, (iii) making offers and sales of Units to qualified Persons under the Pilot Program and (iv) all activities ancillary to the foregoing. The Partnership also has the power to do and to perform any and all things necessary for, incidental to or connected with carrying on the activities of the Partnership.

**Powers of Limited Partners**

No Limited Partner, in his or her capacity as a Limited Partner, shall: (i) execute any document that binds, or purports to bind, the Partnership or any Partner; (ii) participate in the conduct, management or control of the Partnership business; (iii) undertake any obligation or responsibility on behalf of the Partnership; or (iv) bring any action for partition or sale in respect of any or all of the assets or property of the Partnership. Subject to the foregoing, Limited Partners have all the rights and powers set out under the Florida Revised Uniform Limited Partnership Act.

**Partnership Capital**

Each Limited Partner is required to make a capital contribution equal to $500,000, the Subscription Amount required under the Pilot Program and the purchase price of one Unit. The capital of the Partnership consists of the aggregate capital contributions to the Partnership by the Partners. No Partner has the right to withdraw any amount or receive any distribution from the Partnership, except as expressly provided in the Partnership Agreement. No interest shall be paid to any Partner on any capital contribution.

**Allocations and Distributions**

Allocations of net income and loss, as determined for federal income tax purposes, shall be allocated among the Partners, and accordingly, will be credited or debited to their respective capital accounts in accordance with applicable U.S. Treasury regulations.

Each Limited Partner will be allocated the Preferred Return on a quarterly basis. The General Partner has the right, but not the obligation, to cause the Partnership to make quarterly distributions of net cash flow in respect of any accrued and unpaid Preferred Return. No distribution of Preferred Return may cause any Limited Partner's capital account balance to fall below the $500,000 Subscription Amount required under the Pilot Program.

Except for any distributions of Preferred Return, no Limited Partner may receive distributions from the Partnership until the date such Limited Partner's conditions to permanent resident status, if any, have been removed. Subject to the foregoing, distributable proceeds realized from the Partnership's business will be distributed by the General Partner, net of any required tax withholdings, as follows:

(1)     first, to pay and discharge all the Partnership's debts and liabilities to third parties;

(2)     second, to pay and discharge all the Partnership's debts and liabilities to the General Partner and the Limited Partners including, without limitation, to pay the General Partner's unpaid Management Fee;

(3)     third, to establish reserves deemed commercially reasonable by the General Partner;

(4)     fourth, to the Limited Partners in proportion to, and to the extent of, the Limited Partners' unpaid Preferred Return;

(5)     fifth, to the General Partner in respect of its unreturned capital contributions until its unrecovered capital contributions have been reduced to zero;

(6)     sixth, to the Limited Partners' in proportion to, and to the extent of, their unrecovered capital contributions; and

(7)     finally, the balance to the General Partner.

When a Limited Partner has received the full amount of his or her Preferred Return and has been returned the full amount of his or her $500,000 Subscription Amount per Unit, the Limited Partner will automatically be dissociated from the Partnership and will no longer be a Limited Partner in the Partnership.

**Partnership Expenses**

The General Partner shall be responsible for all third party Offering expenses, including legal, accounting, printing, escrow and overseas marketing expenses, incurred in connection with the offering of Units. Certain of these expenses will be paid from the Administrative Fee. The Partnership will also pay all other expenses of the Partnership, including (i) all expenses of lawyers, accountants, custodians, professional advisers and service providers retained by the Partnership in connection with the operation of the business, tax compliance, reporting to the Limited Partners, and other similar operational expenses; (ii) insurance of the Partnership; (iii) all taxes, fees or other similar charges levied against the Partnership; (iv) all expenses incurred in connection with the fulfillment of statutory or other compliance requirements and in connection with reporting to or communicating with Limited Partners and convening any meeting of Limited Partners; and (v) the Management Fee payable by the Partnership to the General Partner.

**Limited Partner Decisions**

The Limited Partners have the right to vote on matters expressly reserved for their approval or consent under the Partnership Agreement. Each Limited Partner has the right to one vote for each Unit held by that Limited Partner. Approval or consent requires the affirmative vote of Limited Partners holding a majority of outstanding Units. Except as expressly provided to the contrary in the Partnership Agreement, for any matter requiring the approval or consent of the Limited Partners, the approval or consent will be conveyed in writing to the General Partner normally within ten days after the approval or consent was requested. Failure to respond within the required time period will constitute a vote consistent with the General Partner's recommendation with respect to the proposal. Upon receipt of actual and or deemed approval or consent of the Limited Partners, the General Partner will be authorized and empowered to implement the requested action without further authorization of the Limited Partners.

**Dissolution**

The Partnership will continue until it is dissolved, with dissolution taking place upon the first to occur of the following:

(1)     Following adjudication of all Limited Partner I-829 Petitions, the sale or other disposition of all or substantially all of the Partnership's assets; unless the Partnership, as part of the consideration for any such sale or other disposition, acquires a note, in which case, in the discretion of the General Partner, the Partnership shall not be dissolved until it sells its entire interest in such note or collects in full all monies due under such note, so that the only remaining significant asset of the Partnership is cash;

(2)     Following adjudication of all Limited Partner I-829 Petitions, the decision of the General Partner, with the consent of the Limited Partners, to dissolve, wind up and liquidate the Partnership;

(3)     The happening of any other event that makes it unlawful, impossible, or impractical to carry on the business of the Partnership;

(4)     The termination by legal action of the Partnership's authority to transact business; or

(5)     The happening of any event that causes dissolution of a Florida limited partnership under the Florida Revised Uniform Limited Partnership Act.

**Indemnification**

The Partnership will indemnify and hold harmless the General Partner and their respective directors, officers, members, partners and employees, from and against liabilities arising in connection with the Partnership to the fullest extent permitted by law.

**Transferability of Interests and Withdrawal**

Except as expressly provided for in the Partnership Agreement, no Limited Partner will be permitted to withdraw from the Partnership or to withdraw any portion of his or her capital account. Other than when a person becomes entitled to a Unit by operation of law, a Unit issued to a Limited Partner is non-transferable.

**Reports**

The Partnership will send to each Limited Partner after the end of each fiscal year of the Partnership an accounting report including a balance sheet and statements of income, changes in Partner equity and cash flows, prepared in accordance with generally accepted accounting principles, plus a schedule and summary description of the investments owned by the Partnership at year-end and a statement for each Limited Partner of its capital account and tax information necessary for completion of its tax returns.

**Amendments**

The Partnership Agreement may be amended from time to time by the General Partner with the consent of the Limited Partners. The Partnership Agreement may also be amended by the General Partner to correct ambiguities or inconsistencies provided the proposed amendment does not adversely affect the interest of any Limited Partner or to incorporate provisions, which in the written opinion of counsel to the Partnership are for the protection of Limited Partners.

## XIII.  RISK FACTORS

**An investment in the Partnership has elements of risk different from and/or greater than those associated with other investments. The higher degree of risk makes an investment in the Partnership suitable only for investors (i) who have a continuing level of annual income and a substantial net worth, (ii) who can afford to bear those risks, (iii) who have previously made investments of the nature and risk level of an investment in the Partnership, and (iv) who have no need for liquidity from these investments. Each investor should consider carefully the risk factors associated with this investment, including, without limitation, the following, and should consult his or her own legal, tax, and financial advisers with respect thereto. Investors unable or unwilling to assume the following risks, among others, must not invest in the Partnership.**

**Risks Relating to Real Estate and Financing of Real Estate**

*Investment in the Partnership is subject to general real estate risks.*

The Partnership will be subject to risks generally incident to the financing and development of real estate, including the following:

  (1)  changes in general economic or local conditions;

  (2)  changes in supply of or demand for similar or competing properties in an area;

  (3)  bankruptcies, financial difficulties or defaults by vendors, contractors and others;

  (4)  changes in tax, real estate, environmental and zoning laws;

  (5)  periods of high interest rates and tight money supply; and

  (6)  general overbuilding or excess supply in the market area.

For these and other reasons, no assurance can be given that the Partnership will be profitable or that it will produce the targeted financial returns.

*The Partnership will rely on third parties to complete and operate the Project.*

The Partnership will rely on the Developer to construct and manage the Project. The success of the Project and thus the repayment of investments in the Partnership are beyond the control of the Partnership and the General Partner. The Developer, in turn, will rely on various other third-party contractors, subcontractors, and suppliers for the completion of the Project. The Developer has yet to enter into binding agreements with critical third party contractors, including a general contractor and a hotel operator and management company. The ability of the Developer and the third party contractors, subcontractors and suppliers to complete the construction and development of the Project will be subject to typical construction and development risks, as well as acts of war, work stoppages, interruptions in transportation systems, and other force majeure events. Adverse changes in the operations and financial condition of the Developer, which may have a material adverse effect on the Project, are beyond the control of the General Partner. Further, no assurances can be given that the completed Project will generate revenues in accordance with the Developer's projections.

*No binding loan agreement exists between the Partnership and the Developer, and the Developer is therefore not obligated to borrow money from the Partnership.*

The Loan Commitment is the only agreement that currently exists between the Partnership and the Developer relating to the Loan. No binding loan agreement exists, and each party's obligations under the Loan Commitment are subject to a number of conditions. As a result, there can be no assurance that the Partnership and the Developer will enter into any binding loan agreement or, if they do, that the terms and conditions contained any such loan agreement will be consistent with the Loan Commitment.

***The Developer has not obtained commitments from any of the Senior Lenders, and the Project is therefore not fully funded.***

Although the Developer has identified financial institutions to act as Senior Lenders, it has not obtained any binding commitment to extend the Senior Loans. The terms and conditions, if any, under which the Senior Loans would become available to the Developer are unknown. There can be no assurance that the Senior Loans will be available to the Developer on reasonable terms or at all. If the Developer is unable to obtain the Senior Loans, the Project will not be fully funded which will have an adverse impact on the Developer's ability to complete the Project and repay of the Partnership's Loan.

***The rights of the Partnership under the Loan are anticipated to be subordinated to the rights of the Senior Lenders and other third parties.***

The investment contemplated by the Partnership is the Loan to the Developer to help fund a portion of the Project's costs. There is no guarantee that the Developer will repay all or any part of the Loan, either at maturity or ever, and the Loan is not guaranteed by any third party. The Partnership's rights to receive payments under the Loan will be subordinated to the Developer's obligations to pay all outstanding principal and interest under the Senior Loans, as well as to pay property taxes and other assessments levied by governmental authorities. In addition, in certain situations the laws of Florida and other jurisdictions entitle third party contractors, subcontractors, and suppliers who provide goods and services to the Project to assert rights to receive payment from the Developer that are superior to the rights of the Partnership under the Loan.

***There can be no assurance that the Developer will have sufficient funds to complete the Project and, in particular, the availability of the Senior Loans are subject to action by third parties over which the Developer and the Partnership have no control.***

The Developer has estimated the total amount of funds required to complete the Project and has also estimated the amount of financing that may be obtained based upon assumptions it deems reasonable. However, there can be no assurance that the Developer's estimates are accurate. In particular, the Developer's estimates assume a total of approximately $124.3 million in proceeds from the Senior Loans will all be available to fund the Project. However, the availability of these funds depends on further action by third parties, including the Senior Lenders, over which the Developer and the Partnership have no control. If any of the Developer's estimates or assumptions is inaccurate, additional funds will be required to complete the Project. There can be no assurance that additional funds will be available on reasonable terms, if at all. If adequate additional funds are not available on reasonable terms, completion of the Project and repayment of the Partnership's investment will be adversely affected.

***If the Developer lacks sufficient funds to complete and operate the Project, the position of investors in the Partnership will be adversely affected.***

Unforeseen circumstances may make it necessary for the Developer to finance the construction and operation of the Project through additional borrowing, which may rank senior in terms of payment and priority to the Partnership's investment in the Developer and otherwise adversely affect the Partnership's position as a secured lender to the Developer. In addition, to the extent cash flow from the Project is not sufficient to fund these additional debt obligations, the Developer may be required to obtain cash from other sources. Unless the Project generates such cash, the Developer might be required to raise additional equity investment or to borrow additional funds, and there can be no assurance that additional funds will be available on favorable terms, if at all. In that event, the Developer may be required to sell the Project on disadvantageous terms, or security agreements or guarantees securing any of the Developer's debt may be foreclosed and the Project sold by priority lenders to repay the debts owing them. This would have a materially adverse effect on the Partnership and its investors.

***The Developer and Partnership may be subject to environmental liability.***

Investing in businesses operated on real property involves risks relating to hazardous and toxic contamination of such property or adjacent property, including subsurface and underground water contamination. Such contamination could have a detrimental effect on the Partnership, and can result from the actions of tenants, contractors, patrons, visitors, and other parties, including adjacent property owners, over whom the Partnership could exercise little or no control. The Developer could be required to participate financially in the clean up or other abatement of such contamination, which could cause the Partnership to suffer a loss of some or all of the capital invested in the Project as well as the loss of any potential profits from the Project. Under certain circumstances, courts have held that a lender is responsible for the environmental clean-up obligations of its borrower imposed by applicable federal statutes. In the event such circumstances arise, a court might find that the Partnership is liable for such obligations.

***The Developer may face delays in obtaining, or be unable to obtain, required permits.***

The Developer has yet to obtain all required approvals to begin construction of the Project. If the Developer is unable to obtain these approvals, the Partnership may be required to terminate the Offering and refund all funds potential investors have delivered to escrow. In addition, prior to securing final certificates of occupancy for each phase of the Project, certain building and safety, handicapped, and other permits may need to be obtained or extended. Additionally, existing public health, fire and safety, liquor, and other licenses may also need to be obtained or extended. While the Partnership believes that the Developer should face no impediments to obtaining any necessary permits and licenses or obtaining any consents or approvals, no assurance can be made that they will be obtained or extended.

***The successful completion and operation of the Project depends heavily on economic, political, environmental and other factors over which the Partnership has no control.***

The Developer's ability to successfully complete and operate the Project depends in large part on its ability to obtain and utilize equipment, materiel and services in a timely and efficient manner. In particular, the Project is susceptible to natural and man-made disasters, including war, terrorism, hurricanes, earthquakes, fires, floods, environmental disasters, power loss, political or economic instability, disruptions to the financial markets, vandalism and other similar disruptive problems, any of which could adversely affect the Project and jeopardize repayment of Partnership's investment. The Developer's insurance policies may not adequately compensate it for any losses that may occur due to any resulting damages or interruptions. Among other things, such problems could result in reduced investor confidence, substantial volatility in securities markets and a decline in real estate and related hotel occupancy rates, leasing and financing. In addition, general economic conditions may affect the Partnership's activities. Interest rates, general levels of economic activity, the price of securities and participation by other investors in the financial markets may affect the value of investments made by the Partnership or considered for prospective investment.

**Risks Related to the Offering and the Units**

***An investment in the Partnership requires a long-term commitment with no certainty of return.***

The Project will not generate current income and will not be able to repay the Loan for a number of years, if at all. The Partnership will not provide investors in Units with any return of capital until such time as the Developer has repaid some or all of the Loan. It is anticipated that the Developer must repay the Senior Loans in full prior to making any repayment under the Loan. The Partnership generally will not be able to sell its rights under the Loan. There are no assurances, obligations or guarantees that the Partnership will ever have positive cash flows, make any cash distributions or realize any return on investments in Units. The Limited Partners of the Partnership should be aware that if the Project is not successful in its business, their entire investment in the Partnership may become worthless.

*The availability and timing of cash distributions is uncertain.*

The Partnership does not expect to make any significant distributions to Limited Partners until the Project is fully constructed and favorable occupancy and lease rates are achieved and consistently maintained. Further, the Partnership bears all expenses incurred by its operations, which are deducted from cash funds available for distributions. In addition, the General Partner, in its discretion, may retain any portion of such funds as reserves for working capital.

*Potential investors in Units must deliver the subscription price of their investment prior to acceptance of their subscriptions by the General Partner.*

Each potential investor is required to deliver the $500,000 Subscription Amount, together with his or her $45,000 Administrative Fee, into escrow before the General Partner has accepted his or her subscription. The General Partner may reject a subscription for any reason or for no reason in the exercise of its sole discretion. Further, the General Partner may decide to terminate or close the Offering at any time in the exercise of its sole discretion.

*Ninety percent of each Phase I Subscriber's investment will be released from escrow prior to adjudication of the Phase I Subscriber's I-526 Petition.*

The Partnership and the Regional Center Administrator will instruct the Escrow Agent to release each investor's $45,000 Administrative Fee from escrow upon receipt, and to release 90% of each Phase I Subscriber's $500,000 Subscription Amount upon submission of the Phase I Subscriber's I-526 Petition to USCIS. The Partnership and the Regional Center Administrator also have the right to instruct the Escrow Agent to release the remaining 10% of each Phase I Subscriber's Subscription Amount if necessary to replace funds payable to a Withdrawing Investor. These disbursements from escrow are likely to occur many months prior to adjudication of the Phase I Subscriber's I-526 Petition. During this time, the Administrative Fee will be applied to costs of the Offering and the released portion of the Subscription Amount will become part of the Loan to the Developer. In both cases the benefits and protections of a third party escrow will not be available. Although the Partnership has an obligation to return the Subscription Amount of any Phase I Subscriber whose I-526 Petition is not ultimately approved by USCIS, the Partnership has not established any reserves to fund this obligation, and there are no assurances that the Partnership will have the resources to meet this obligation, either when the obligation arises or at any time thereafter. Therefore, if a Phase I Subscriber's I-526 Petition is ultimately denied, there is a risk that the Phase I Subscriber may not receive a return of his or her capital contribution if there are not adequate funds available from the Holdback Subaccount, or if the Developer is unable to or otherwise refuses to return the Subscription Amount. In that event, the Phase I Subscriber will be dependent on the Partnership to identify a substitute investor to take the place of the Withdrawing Investor. There are no assurances that a substitute investor will be found. If a substitute investor is not found, the Phase I Subscriber must maintain his or her investment in the Partnership.

*There are restrictions on transfer of Units and withdrawal of capital, and no public or other market for the Units exists or will exist.*

The Partnership Agreement imposes restrictions on the transfer, sale, gift or pledge of the Units. Further, the Units have not been and will not be registered under the Securities Act or the securities laws of any jurisdiction, including any foreign jurisdiction, and are being offered in reliance upon an exemption from registration under Section 4(a)(2) of the Securities Act, including Regulation S promulgated under the Securities Act, each of which impose additional restrictions on transfer. The right of Limited Partners to sell, transfer, pledge or otherwise dispose of the Units will be limited by the Securities Act, the Exchange Act and state securities laws. There is no current trading market for the Units, and it is not anticipated that any such market will develop. Limited Partners have no right to withdraw capital from the Partnership. Consequently, holders of Units may not be able to liquidate their investments prior to the end of the Partnership's term.

***There are no firm commitments to purchase Units.***

No commitment has been extended by anyone to purchase all, or any portion, of the Units being offered. The Partnership can give no assurance that the maximum number of Units will be sold, or that any number of Units will be sold. As a result, there can be no assurance that the Partnership will raise sufficient funds in the Offering to carry out its business plan as currently proposed, or that the net proceeds from the initial subscriptions for Units will be in an amount sufficient to enable the Partnership or the Developer to continue operations in any meaningful manner. In the event insufficient subscriptions are received and accepted by the Partnership, the General Partner will be in breach of its obligations to the Developer under the Consulting Agreement, and the Developer may not be able to carry out the Project. In that event, the Partnership and the Developer would be forced to curtail or cease their activities, which would likely result in the loss to investors of all or a substantial portion of their investments.

***The Units will not be registered under the Securities Act.***

The Partnership does not intend to register the Units with the Securities and Exchange Commission. The Partnership will rely upon an exemption from registration under Section 4(a)(2) of the Securities Act and Regulation S promulgated under the Securities Act. In order for the Partnership to be entitled to rely on these exemptions from the registration requirements of the Securities Act, the Offering must comply with certain requirements, including the requirement that offers and sales be made to exclusively outside the United States to non-U.S. Persons and that no directed selling efforts take place in connection with the Offering. In order to benefit from the safe harbor provided by Rule 903 of Regulation S, offers and sales made prior to a one-year distribution compliance period must not be made to or for the benefit of a U.S. Person and in accordance with the following conditions:

(1)     the purchaser must certify he or she is either a non-U.S. Person and is not acquiring Units for the account of benefit of any U.S. Person or that he or she is a U.S. Person acquiring Units in an exempt transaction;

(2)     the purchaser must agree (a) that any resale will either be in accordance with Regulation S, after registration, or under a registration exemption, and (b) that the purchaser will not engage in any hedging transaction in respect of Units, except in compliance with the Securities Act; and

(3)     the Units will contain an appropriate restrictive legend.

Under the terms of the Partnership Agreement, the Partnership is required to refuse to recognize or register any transfer of Units issued under the exemption provided by Regulation S that is not made in accordance with Regulation S, after registration or under a registration exemption. If the Offering does not comply with all of the applicable requirements for an exemption from the registration requirements of the Securities Act, regardless of whether or not the Partnership was aware of any such failure to comply, then the Offering will not be entitled to the applicable exemption. In that event, among other things, the General Partner would have the obligation to either register the Units or terminate the Offering, which would have a material adverse effect on the Partnership and the Project and could subject the Principal to potential civil or criminal liability.

***The Partnership, the General Partner and the Principal will not be licensed as brokers or dealers under the Exchange Act.***

A further requirement of the U.S. federal securities laws is that no person involved in the Offering, including the General Partner and the Partnership, may engage in activities requiring such person to be licensed as a broker or dealer under state or federal securities laws without having first obtained such a license. The Partnership has taken steps to assure itself that intermediaries involved in the Offering outside the United States are properly licensed in their home jurisdictions and are not conducting any

directed selling efforts or other activities that may condition a market for Units in the United States. The Partnership, the General Partner and the Principal have neither sought nor obtained such a license. If such a license is ultimately required, this would have a material adverse effect on the Partnership and the Project and could subject the Principal to potential civil or criminal liability.

***The Units will not be registered or qualified under the securities laws of any other jurisdiction.***

The Units have not been registered or qualified for public distribution under the securities laws of any jurisdiction. The Units will be offered without registration and without the filing of a prospectus in reliance upon exemptions available under applicable law. Each potential investor resident outside the United States must be, and will be required to represent that he or she is entitled to acquire Units in reliance upon an exemption from the registration or prospectus requirements of applicable securities laws of the potential investor's jurisdiction of residence. Failure to register or qualify Units in any jurisdiction where registration or qualification is required could have a material adverse effect on the Partnership and the Project and could subject the Principal to potential civil or criminal liability in that jurisdiction.

***The Partnership will not be registered as an "investment company," and investors in the Units will not receive the protections afforded by the Investment Company Act of 1940.***

The Partnership will not be registered as an "investment company" under the Investment Company Act. Accordingly, Limited Partners will not receive the protections afforded by the Investment Company Act to investors in a registered investment company. Although the Partnership intends to conduct its business so as not to be deemed an investment company under the Investment Company Act, there can be no assurance that the Partnership will not be held to be in violation of the Investment Company Act and required to either register the Partnership as an investment company or terminate the Offering, which would have a material adverse effect on the Partnership and the Project and could subject the Principal to potential civil or criminal liability.

***The General Partner and the Principal will not be registered as "investment advisers" under the Investment Advisers Act of 1940.***

The General Partner and the Principal will not be registered as "investment advisers" under the Investment Advisers Act of 1940. Accordingly, Limited Partners will not receive the protections afforded by the Investment Advisers Act of 1940. Although the General Partner intends to conduct its business so that neither it nor the Principal is deemed an investment adviser, there can be no assurance that the General Partner and the Principal will not be held to be in violation of the Investment Adviser Act of 1940 and required to either register as investment advisers or terminate the Offering, which would have a material adverse effect on the Partnership and the Project and could subject the Principal to potential civil or criminal liability.

**Risks Related to the Regional Center Designation and Lawful Permanent Residency Process**

***The Regional Center Administrator must meet certain conditions in order to maintain USCIS approval of the Florida Regional Center designation and to maintain the Loan and the Project as a Qualifying Investment under the Pilot Program.***

The USCIS Approval requires the Regional Center Administrator to monitor the development of the Project, to meet USCIS recordkeeping and reporting requirements and to notify USCIS in the event of certain changes within the Florida Regional Center or the Project. If for any reason the Regional Center Administrator fails to comply with these conditions, or if USCIS considers its compliance inadequate, USCIS retains the right to modify or terminate the USCIS Approval, which would cause an automatic termination of the Consulting Agreement, and would have an adverse impact on the Offering and an investor's ability to complete the required immigration procedures or to maintain his or her visa status. In

addition, a USCIS adjudicator recently took the position that the USCIS Approval does not authorize the Regional Center Administrator to consider jobs created from construction activity for purposes of determining whether a project within the Florida Regional Center meets the requirements of the Pilot Program. A failure by the Regional Center Administrator to obtain a favorable resolution to this position would have an adverse impact on the Offering and an investor's ability to complete the required immigration procedures or to maintain his or her visa status.

***If the information upon which the USCIS Approval was based changes, the Regional Center Administrator may be required to obtain an amendment to the USCIS Approval.***

The Regional Center Administrator is required to notify USCIS and to obtain an amendment to the USCIS Approval if there is a change to the information upon which the USCIS Approval was based. The Partnership believes that USCIS will not require an amendment to the USCIS Approval unless there has been a material change to the information previously provided. However, it is unclear what types of changes USCIS would consider material for this purpose. Failure to obtain a needed amendment could have an adverse impact on the Project, the Offering and an investor's ability to complete the required immigration procedures or to maintain his or her visa status.

***Approval of an investor's I-526 Petition or application for permanent resident status are not guaranteed.***

Investors in the Offering who have subscribed for Units with the intention of applying for approval of an I-526 Petition under the Pilot Program should be aware of certain risk factors involving the Pilot Program and its administration. There can be no assurance that a potential investor's I-526 Petition will be approved, that an investor will successfully complete the Lawful Permanent Residency Process, or that upon the approval thereof that the conditions attached to the approval will be removed. In addition, there can be no assurance that the number of jobs estimated under the IMPLAN model will actually be created. Subject to certain limitations, the Partnership intends to return the $500,000 subscription of an investor whose I-526 Petitions has been denied and, subject to certain limitations, the Regional Center Administrator intends to return $30,000 of the $45,000 Administrative Fee. However, the Partnership and the Regional Center Administrators have not established any reserves to fund their respective obligations, and there are no assurances that they will have the resources to meet them, either when the obligation arises or at any time thereafter. Though the Partnership intends to replace returned subscriptions with the proceeds of subscriptions of other investors, there is no assurance that the Partnership will be able to do so, which may result in a failure to raise desirable or adequate amounts of capital needed to fund the Loan and the Project.

***There are a limited number of EB-5 immigrant visas available under the Pilot Program, and certain requirements of the Pilot Program are subject to varying interpretation.***

Under the Pilot Program the USCIS has allocated a maximum of 3,000 immigrant visas in each U.S. government fiscal year of October 1 through September 30, and there can be no assurance that one of these visas will be available to an investor or an investor's qualifying family member in any particular fiscal year or at all. Further, USCIS reserves the right to deny any I-526 Petition or I-829 Petition if USCIS deems a "material change" to have occurred with respect to the Qualifying Investment underlying the I-526 Petition or I-829 Petition. The Pilot Program does not define "material change," and there can be no assurance that USCIS will not consider any particular change to the Offering or the Qualifying Investment to be material.

***The authority granted to USCIS to operate the Pilot Program could expire prior to completion of the Offering and prior to removal of conditions to an investor's lawful permanent residency.***

The authority granted to USCIS to operate the Pilot Program will expire on September 30, 2012 unless the United States Congress passes legislation to extend the Pilot Program that is then subsequently signed into law by the President. Although the failure to extend the Pilot Program would not affect the ability of investors with approved I-526 Petitions who have completed the Lawful Permanent Residency Process to subsequently file their I-829 Petitions, the expiration of the Pilot Program prior to completion of the Offering could have an adverse impact on the Project and on the number of jobs created by the Project.

***An Investor may not withdraw from the Partnership if he or she fails to complete the Lawful Permanent Residency Process following I-526 Petition approval.***

Following I-526 Petition approval, an investor, his or her spouse and qualifying children must timely complete the Lawful Permanent Residency Process. An investor may fail to complete the Lawful Permanent Residency Process notwithstanding I-526 Petition approval. In that event, the investor's $500,000 Subscription Amount remain invested in the Partnership and part of the Partnership's Loan to the Developer, and the investor's $45,000 Administrative Fee would be nonrefundable.

**Risks Related to Project Performance and Management**

***The Regional Center Administrator, the Partnership, the General Partner and the Developer are each newly formed legal entities, which makes it difficult to evaluate their business and prospects.***

The Partnership, the General Partner and the Developer are each newly formed entities with no history of operations. As a consequence of being newly formed, these entities have no revenues or financial results upon which a potential investor can determine their ability to assess the financial feasibility of an investment in Units or the Project. The Partnership's activities to date have been limited to the Offering. The interest payments under the Loan along with the repayment of principal under the Loan will be its sole source of its revenue.

***The Partnership's only business activity will be to extend the Loan to the Developer to fund a portion of the costs of the Project.***

The Partnership expects to participate in one business activity, the Loan to the Developer to fund a portion of the Project's costs. As a consequence, the aggregate return of the Partnership will be entirely dependent on the performance of the Project.

***The success of the Project is dependent on key personnel.***

The success of the Project and therefore the repayment of each investor's investment in the Partnership depend in substantial part upon the skill and expertise of the key personnel of the Penn-Florida Group and the other individuals employed to assist them. There can be no assurance that these key personnel or such other individuals will continue to be associated with the Project. The loss of the services of one or more of these key personnel or such other individuals could have a material adverse effect on the Project.

***The Regional Center Administrator, the Partnership and the General Partner are related entities under the ultimate control of the Principal, and the Principal may engage in similar or competing business activities.***

The Regional Center Administrator, the Partnership and the General Partner are under the sole ultimate control of the Principal. The Principal is not required to devote full time efforts to the Partnership and is free to engage in other business activities, including activities that may be competitive with the business of the Partnership. Any fees, compensation or other amounts payable from such business activities will inure solely to the benefit of the Principal. Further, the General Partner, which is owned and controlled by the Principal, will effectively control all matters relating to the Partnership and its business. Except as expressly provided in the Partnership Agreement, the Limited Partners will not have the right to participate in the management of the Partnership or its business.

***The Partnership and the Developer will operate in an uncertain and highly competitive marketplace.***

The Partnership will compete with a significant number of similar investment opportunities under the Pilot Program, and the Developer will compete with a significant number of high-quality development projects for funding and prospective business. As a result, there can be no assurance that the Partnership will attract the desired number of investors or that it will acquire sufficient funds to make the anticipated Loan to the Developer. In addition, there can be no assurance that the Developer will be able to attract the additional funding required to successfully construct the Project or, if it does, that the Project will be commercially successful.

***The Partnership's creditors will have recourse to Partnership assets.***

The Partnership's assets, including any investments made by the Partnership and any capital held by the Partnership, are available to satisfy all liabilities and other obligations of the Partnership. If the Partnership itself becomes subject to a liability, parties seeking to have the liability satisfied may have recourse to the Partnership's assets generally and not be limited to any particular asset, such as the asset giving rise to the liability.

***Uninsured losses may adversely affect the Partnership.***

Certain risks in connection with the Project are either uninsurable or not fully insurable at commercially reasonable rates. The occurrence of one or more of these risks could have a detrimental effect on the Partnership. Examples of uninsurable or partially uninsurable losses are those arising from hurricane, flood, earthquake, environmental disaster, war and act of nature, among others. Should such an uninsurable loss occur, the Partnership could suffer a loss of some or all of its capital.

***The Limited Partners may lose their investment in the event of the Developer's bankruptcy.***

The Developer may become the subject of voluntary or involuntary bankruptcy proceedings under applicable bankruptcy laws. Certain risks faced in bankruptcy cases that must be factored into the investment decision include, for example, the potential total loss of the Partnership's Loan to the Developer and, consequently, the potential total loss of the Limited Partners' investment in the Partnership. Upon confirmation of a plan of reorganization under applicable bankruptcy laws, or as a result of a liquidation proceeding, the Partnership could suffer a loss of all or a part of the value of the Loan.  A bankruptcy filing may adversely and permanently affect the Developer and the Project. The Developer could lose market position and key employees, and the liquidation value of the Developer may not equal the liquidation value that was believed to exist prior to the making of the initial investment.

**Legal, tax and regulatory risks**

***There are general tax risks of which each potential investor should be aware.***

There are tax risks associated with the acquisition, holding and disposition of the Units. In addition, federal, state and local tax laws and rules relating to the Partnership and its activities are complex. Potential investors in the Units are strongly urged to review the Partnership Agreement and to consult their own professional advisers in this regard.

***The Partnership's tax status for federal income tax purposes could change.***

The Partnership intends to be taxed as a partnership for federal income tax purposes. If, as the result of changes in the law or the manner in which the Partnership is operated, the Internal Revenue Service were to successfully take the position that the Partnership should be treated for tax purposes as a corporation rather than a partnership, Partnership income could be taxed at the Partnership level at corporate tax rates and Partnership distributions, if any, could be treated as dividends, among other consequences.

*Limited Partners may have taxable income without distributions.*

Income, gains, losses, deductions and credits from the Partnership will be allocated among the Limited Partners for U.S. federal income tax purposes in accordance with the Partnership Agreement, and Limited Partners will be required to report such income, gains, losses, deductions and credits on their own income tax returns whether or not they receive distributions of cash from the Partnership. It is possible that in a given year a Limited Partner will be allocated income or gain that will be subject to tax in an amount in excess of the amount of cash (if any) distributed by the Partnership to the Limited Partner, thus requiring the Limited Partner to use funds from other sources to pay any tax liability arising from such allocation. If the Partnership incurs losses, Limited Partners will not be able to deduct such losses if they exceed such Limited Partners' tax basis in their Units. In addition, the Internal Revenue Code imposes various limitations on the ability of certain persons to use losses and deductions arising from investments in entities such as the Partnership, including limitations relating to "passive losses," amounts "at risk" and "investment interest."

*Special tax rules may apply to tax exempt and foreign persons.*

Ownership of Units in the Partnership may result in adverse income tax consequences to tax exempt and foreign persons. Accordingly, tax exempt and foreign persons are strongly urged to consult their own professional advisers with respect to an investment in the Partnership.

*Certain risks are associated with forward-looking statements.*

This Memorandum or the other materials furnished to potential investors by the Partnership relating to the Project or an investment in the Units (the "Materials") may contain certain forward-looking statements regarding the plans and objectives of the Partnership, including plans and objectives relating to the Project. The forward-looking statements included herein are based on current expectations that involve numerous risks and uncertainties. Assumptions relating to the statements involve judgments with respect to, among other things, future political, economic, competitive and market conditions, all of which are difficult or impossible to predict accurately and many of which are beyond the control of the Partnership or the General Partner, or any of their respective affiliates. The assumptions underlying the forward-looking statements may in retrospect turn out to have been unreasonable and inaccurate. Therefore, there can be no assurance that any forward-looking statements included in the Materials will prove to be accurate. In light of the significant uncertainties inherent in the forward-looking statements included herein, the inclusion of such information should not be regarded as a representation by the Partnership or any other person or entity that the objectives and plans of the Partnership will be achieved.

*Changes in applicable law may occur during the course of an investment in the Partnership.*

The Partnership must comply with various legal requirements, including requirements imposed by United States and foreign immigration laws, anti-money laundering laws, securities laws, commodities laws, tax laws and pension laws. Should any of those laws change over the life of the Partnership, the legal requirements to which the Partnership and the Limited Partners may be subject could differ materially from current requirements.

**The foregoing list of risk factors does not purport to be a complete enumeration or explanation of the risks involved in an investment in the Partnership. Potential investors should read the entire Memorandum and consult their own counsel and advisers before deciding to invest in the Partnership**.

## XIV.   CONFLICTS OF INTEREST

The following discussion enumerates certain conflicts of interest and potential conflicts of interest among the General Partner, its affiliates, the Principal, the Developer, the Regional Center Administrator, the

Partnership and the Limited Partners. Such conflicts will have to be resolved through the exercise of the General Partner's judgment consistent with its fiduciary responsibility to the Limited Partners.

**Related Parties**

The Regional Center Administrator, the Partnership and the General Partner are all under the ultimate control of the Principal, Nicholas A. Mastroianni II. The General Partner, which is owned and controlled by the Principal, will effectively control all matters relating to the Partnership and its business, including the Partnership's rights and obligations as lender of the Loan to the Developer.

In addition, the USCIS Approval obligates the Regional Center Administrator to supervise the manner in which the Partnership and the Developer perform their respective obligations under the Pilot Program and to provide information regarding their performance to USCIS at least annually. Conflicts of interest may arise for the Principal in carrying out these responsibilities.

Further, the General Partner is entitled, under the terms of the Consulting Agreement and the Partnership Agreement, to a number of annual fees calculated as a percentage of the outstanding principal amount of the Loan: (a) the 5% Consulting Fee and the 1% Origination Fee, payable in each case by the Developer, and (b) the 3% Management Fee payable by the Partnership. Therefore, the effective cost of the Loan to the Developer is 8.5% percent per annum plus 1% of the maximum Loan amount payable to the General Partner as an origination fee upon the initial disbursement under the Loan. From this 8.5% per annum, a total of 8% will be payable to the General Partner and 0.5% will be payable to the Limited Partners as the Preferred Return, even though the Limited Partners will provide 100% of the investment capital to enable the Partnership to extend the Loan. This disproportionate allocation of risks and benefits between the General Partner and the Limited Partners may create conflicts of interest that adversely affect the ability of the General Partner and the Principal to act in the best interests of the Partnership in conducting the Offering and in extending and administering the Loan.

**Diverse Membership**

The Limited Partners of the Partnership may include persons in various jurisdictions. As a result, conflicts of interest may arise in connection with decisions made by the General Partner that may be more beneficial for one Limited Partner than for another. In making decisions appropriate for the Partnership the General Partner will consider the business objectives of the Partnership as a whole, not the objectives of any Limited Partner individually.

**Management of the Partnership**

It is expected that the Principal will continue to be fully engaged in his separate business endeavors, including investments in real estate or any other similar related matters, whether in competition with the Partnership or not. The Partnership Agreement permits partners and their affiliates to engage in activities that are competitive with the Partnership or otherwise and without incurring any obligation to offer any interest in such activities to the Partnership or any other Partners. Regardless, conflicts of interest may arise for the Principal in allocating his time, services or functions among the Regional Center Administrator, the Partnership, the General Partner and his other professional commitments.

**Lack of Separate Representation**

The same legal counsel, accountants, and other professional advisers may represent the Principal, the Regional Center Administrator, the Partnership, the General Partner and their respective affiliates. Certain potential investors may also seek legal representation from immigration attorneys who have represented

or advised the above individuals and entities and who may do so in the future. Any potential investors seeking representation from any of these immigration attorneys will be required to execute a waiver of conflict of interest prior to engaging legal representation.

**Marketing Representatives**

Third parties retained outside the United States to identify potential investors (collectively, the "Marketing Representatives") will receive a placement fee from the Partnership that is generally based upon the amount of Units subscribed for by investors. The Marketing Representatives also seek to do business with and earn fees or commissions from the Partnership or its affiliates, as well as with other third parties participating in the Pilot Program that may have similar or different objectives as the Partnership. Accordingly, the participation of Marketing Representatives in the Offering may be influenced by their interest in these current or future fees and commissions, including differentials in the fees that are offered by other third parties for which Marketing Representatives act. Potential investors should consider these potential conflicts in making their investment decisions.

## XV.   INCOME TAX CONSIDERATIONS

An investor is responsible for obtaining his or her own tax advice with respect to the federal, state and local income and other possible tax consequences of his or her investment in the Units, and no tax advice will be provided hereunder or at any time in the future. However, as a general rule, a lawful permanent resident of the United States will be taxed on all of his or her worldwide income and will be required to file a United States income tax return. In addition, if a foreign citizen is not a resident of the United States but has United States source income he or she generally will be subject to taxation in the United States on such income, and such income may be subject to withholding and/or reporting on a United States income tax return.

## XVI.   TAX AND LEGAL ASPECTS

Potential investors of the Units should not construe the contents of this Memorandum or any prior or subsequent communications from the Regional Center Administrator, the Partnership, the General Partner or any of their respective agents or representatives, as legal, tax, and/or investment advice. No representations are made as to the federal, state, or local income tax consequences resulting from an investment in the Units. No assurances are given that any deductions or other income tax advantages that may be contemplated will be available. Each potential investor should consult his or her own legal counsel, accountant, and/or other professional adviser as to legal, tax, investment, accounting, securities and/or related matters concerning an investment in the Partnership, and each potential investor is responsible for all fees or charges of any such adviser.

## XVII.   RESTRICTIONS ON TRANSFERABILITY

The Units being offered hereby have not been registered under the Securities Act or the securities laws of any jurisdiction, including any foreign jurisdictions, and are being offered in reliance upon an exemption from registration under the Securities Act, as amended including Section 4(a)(2) of the Securities Act and Regulation D and/or Regulation S promulgated under the Securities Act. The right of subscribers to sell, transfer, hedge, pledge or otherwise dispose of the Units will be limited by the Securities Act and state securities laws. The Partnership Agreement also restricts the ability of the Limited Partners to transfer their Units. See "Transferability of Interests and Withdrawal" section of this Memorandum.

**NOTICE TO RESIDENTS OF ARGENTINA**

The Units shall not be publicly offered in Argentina. Therefore, this Memorandum has not been approved by the Comisión Nacional de Valores. This offer does not constitute a public offering of securities within the scope of the Argentine Federal Law n°17.811. This Memorandum and other offering materials relating to the offer of the Units are being supplied only to those investors who have expressly requested it. They are strictly confidential and may not be distributed to any person or entity other than the recipients hereof.

**NOTICE TO RESIDENTS OF AUSTRALIA**

Investment in the Units is available only to sophisticated investors and/or professional investors as these terms are defined in section 708 of the Corporations Act. This Memorandum can only be used by investors receiving it (electronically or otherwise) in Australia. This Memorandum is not an offer or invitation in any place in which, or to any person to whom, it would not be lawful to make that offer or invitation. The distribution of this Memorandum outside Australia may be restricted by the laws of places where it is distributed and therefore persons into whose possession this Memorandum comes should seek advice on and observe those restrictions. The Partnership is not registered as a managed investment scheme in Australia and this Memorandum will not be lodged with the Australian Securities and Investments Commission (AISC).

**NOTICE TO RESIDENTS OF AUSTRIA**

The Units may only be offered in the Republic of Austria in compliance with the provisions of the Austrian Capital Market Act and the Austrian Investment Funds Act and any other laws applicable in the Republic of Austria governing the offer and sale of the Units in the Republic of Austria. The Units are not registered or otherwise authorized for public offer under the Capital Market Act or the Investment Funds Act or any other relevant securities legislation in Austria. The recipients of this Memorandum and other selling material in respect to the Units have been individually selected and are targeted exclusively on the basis of a private placement. Accordingly, the Units may not be, and are not being, offered or advertised publicly or offered similarly under either the Capital Market Act or the Investment Funds Act or any other relevant securities legislation in Austria. This offer may not be made to any persons other than the recipients to whom this Memorandum is personally addressed.

**NOTICE TO RESIDENTS OF BAHRAIN**

All applications for investment should be received, and any allotments should be made, in each case from outside Bahrain. This Memorandum has been prepared for private information purposes of intended investors only who will be high net worth individuals and institutions. The Partnership represents and warrants that it has not made and will not make any invitation to the public in the Kingdom of Bahrain and that this Memorandum will not be issued, passed to, or made available to the public generally. The Bahrain Monetary Agency ("BMA") has not reviewed, nor has it approved, this Memorandum or the marketing of the Units in the Kingdom of Bahrain. Accordingly, the Units may not be offered or sold in Bahrain or to residents thereof except as permitted by Bahrain law. The BMA is not responsible for the performance of the Partnership.

**NOTICE TO RESIDENTS OF BELGIUM**

This Memorandum relates to a private placement and does not constitute an offer or solicitation to the public in Belgium to subscribe for or acquire the Units. The Partnership has not been and will not be registered with the Belgian Banking, Finance and Insurance Commission (Commissie voor het Bank-,

Financie- en Assurantiewezen / Commission bancaire, financière et des assurances (CBFA)) as a foreign collective investment institution under Article 4, 2°of the Belgian law of July 20, 2004 relating to certain forms of collective management of investment portfolios. The offering in Belgium has not been and will not be notified to the CBFA. This Memorandum has not been and will not be approved by the CBFA. The Units may therefore not be offered, sold, transferred or delivered in or from Belgium as part of their initial distribution or at any time thereafter, whether directly or indirectly, except to (i) eligible qualified investors referred to in Article 3.2(a) of Directive 2003/71/EC of November 4, 2003 (the "Prospectus Directive") or (ii) investors wishing to acquire Units for a total consideration of at least EUR€50,000 (or its equivalent in foreign currencies) per transaction, as specified in Article 3.2(c) of the Prospectus Directive. This Memorandum has been issued to the intended recipient for personal use only and exclusively for the purposes of the offering. Therefore, it may not be used for any other purpose or passed on to any other person in Belgium.

This Memorandum has been issued to the intended recipient for personal use only and exclusively for the purposes of the offering. Therefore, it may not be used for any other purpose nor passed on to any other person in Belgium.

**NOTICE TO RESIDENTS OF CANADA**

**Purchase and Resale Restrictions**

The Units are being offered on a private placement basis in reliance upon prospectus and registration exemptions under applicable securities legislation in each of the provinces of Canada. Resale of the Units offered hereby will be subject to restrictions under applicable securities legislation, which will vary depending upon the relevant jurisdiction. Generally, the Units may be resold only pursuant to an exemption from the prospectus and registration requirements of applicable securities legislation, pursuant to an exemption order granted by appropriate securities regulatory authorities or after the expiry of a hold period following the date on which the Partnership becomes a reporting issuer under applicable securities legislation. It is not anticipated that the Partnership will become a reporting issuer. In addition, Limited Partners reselling the Units may have reporting and other obligations. Accordingly, Limited Partners are advised to seek legal advice with respect to such restrictions and obligations. Resale of Units is also restricted under the terms of the Partnership Agreement. Accordingly, each potential investor must be prepared to bear the economic risk of the investment for an indefinite period.

Each purchaser of Units will be required to deliver to the Partnership a subscription agreement in which such purchaser will represent to the General Partner and the Partnership that such purchaser is entitled under applicable provincial securities laws to purchase such Units without the benefit of a prospectus qualified under such securities laws.

**Rights of Action for Damages or Rescission**

Securities legislation in certain of the provinces of Canada provides certain purchasers with, or requires certain purchasers to be provided with, in addition to any other rights they may have at law, a right of action for rescission or damages or both, against the Partnership, and in certain cases, other persons, where this Memorandum and any amendment to it and, in certain cases, advertising and sales literature used in connection therewith, contains a misrepresentation. Where used herein, the term "misrepresentation" means an untrue statement of a material fact or an omission to state a material fact that is required to be stated or that is necessary to make any statement not misleading or false in light of the circumstances in which it was made, and the expression "material fact" means a fact that significantly affects or would reasonably be expected to have a significant effect on the market price or value of the Units. These remedies or notice with respect thereto must be exercised or delivered, as the case may be,

by the purchaser within the time limits prescribed by applicable securities legislation. The following is a summary of the rights of rescission or damages, or both, available to purchasers under the securities legislation of certain of the provinces of Canada. Each purchaser should refer to the provisions of applicable securities legislation for the particulars of these rights or consult with a legal adviser.

**Ontario**

The rights of action for rescission or damages described herein is conferred by section 130.1 of the Securities Act (Ontario). In the event that this Memorandum, together with any amendments hereto, delivered to an Ontario purchaser contains a misrepresentation, a purchaser will, as provided below, have a right of action against the Partnership for damages, or for rescission, if still the owner of the Units, without regard to whether the purchaser relied on the misrepresentation, in which case, if the purchaser elects to exercise the right of rescission, the purchaser will have no right of action for damages against the Partnership provided that, among other limitations: in the case of an action for rescission, the purchaser must give notice to the defendant not more than 180 days after the date of the transaction that gave rise to the cause of action, that the purchaser is exercising such right; in the case of any action, other than an action for rescission, no action shall be commenced more than the earlier of (i) 180 days after the purchaser first had knowledge of the facts giving rise to the cause of action, or (ii) three years after the date of the transaction that gave rise to the cause of action; the Partnership will not be liable if it proves that the purchaser purchased the Units with knowledge of the misrepresentation; in the case of an action for damages, the Partnership will not be liable for all or any portion of the damages that the Partnership proves do not represent the depreciation in value of the interests as a result of the misrepresentation relied upon; and in no case will the amount recoverable in any action exceed the price at which the Units were offered.

The securities legislation in Ontario does not extend the above-mentioned statutory rights of action for damages or rescission to an Ontario purchaser that is: (a) a "Canadian financial institution" or a "Schedule III bank" (each as defined in NI 45-106); (b) the Business Development Bank of Canada; or (c) a subsidiary of any person referred to in (a) or (b) above, if the person owns all the voting securities of the subsidiary, except the voting securities required by law to be owned by the directors of that subsidiary.

**New Brunswick**

Pursuant to section 150 of the Securities Act (New Brunswick), in the event this Memorandum, together with any amendments hereto, or any information relating to the offering, delivered to a New Brunswick purchaser contains a misrepresentation and it was a misrepresentation at the time of purchase, the purchaser will be deemed to have relied upon the misrepresentation and will, as provided below, have a right of action against the Partnership for damages, or while still owner of the Units, for rescission, in which case, if the purchaser elects to exercise the right of rescission, the purchaser will have no right of action for damages against the Partnership provided that, among other limitations: in the case of an action for rescission, the purchaser must give notice to the defendant not more than 180 days after the date of the transaction that gave rise to the cause of action; in the case of any action, other than an action for rescission, no action shall be commenced more than the earlier of (i) one year after the purchaser first had knowledge of the facts giving rise to the cause of action, and (ii) six years after the date of the transaction that gave rise to the cause of action; the Partnership shall not be liable where it is not receiving any proceeds from the distribution of the securities being distributed and the misrepresentation was not based on information provided by the Partnership unless the misrepresentation (i) was based on information that was previously publicly disclosed by the Partnership, (ii) was a misrepresentation at the time of its previous public disclosure, and (iii) was not subsequently publicly corrected or superseded by the Partnership before the completion of the distribution of the securities being distributed; in an action

for damages, the Partnership will not be liable for all or any portion of the damages that it proves do not represent the depreciation in value of the Units as a result of the misrepresentation relied upon; in an action for damages or rescission, the Partnership will not be liable if it proves that the purchaser purchased the Units with knowledge of the misrepresentation; and in no case will the amount recoverable in any action exceed the price at which the Units were offered.

**General**

The rights discussed above are in addition to and without derogation from any other rights or remedies available at law to the purchaser and are intended to correspond to the provisions of the relevant securities legislation and are subject to the defenses contained therein. The foregoing summaries are subject to the express provisions of the applicable securities legislation in each of the foregoing provinces and the regulations, rules and policy statements thereunder and reference is made thereto for the complete text of such provisions.

**Enforcement of Legal Rights**

All of the Partnership's, General Partner's and their affiliate's directors and officers will be located outside of Canada and, as a result, it may not be possible for Canadian purchasers to effect service of process within Canada upon the Partnership or such persons. All or a substantial portion of the assets of the Partnership or such persons may be located outside of Canada and, as a result, it may not be possible to satisfy a judgment against the Partnership or such persons in Canada or to enforce a judgment obtained in Canadian courts against the Partnership or such persons outside of Canada.

**NOTICE TO RESIDENTS OF DENMARK**

This Memorandum does not constitute a prospectus under any Danish laws or regulations and has not been filed with or approved by the Danish Financial Supervisory Authority as this Memorandum has not been prepared in the context of either (i) a public offering of securities in Denmark within the meaning of the Danish Securities Trading Act no. 479/2006 as amended from time to time or any Executive Orders issued in connection thereto or (ii) an offering of a collective investment scheme comprised by the Danish Investment Association Act no. 55/2006 as amended from time to time or any Executive Orders issued in connection thereto. This Memorandum will only be offered directly or indirectly to Danish "qualified investors" as defined in Section 2 of Executive Order no. 306/2005.

**NOTICE TO RESIDENTS OF FRANCE**

French residents are hereby advised that this Memorandum has not been submitted to the French Autorité des Marchés Financiers for approval. Accordingly, the marketing of Units of the Partnership and the distribution of this Memorandum is restricted in France.

In particular, no direct or indirect offer to purchase the Units has been, or shall be, made to the public in France, and neither this Memorandum nor any other material relating to purchase or transfer of the Units may be distributed or caused to be distributed to the public in France. Any subsequent transfer of the Units will be subject to applicable restrictions relating to public offers of securities in France.

All such offers to purchase or transfer the Units have been and shall only be made in France to (i) qualified investors (investisseurs qualifiés), (ii) a restricted circle of investors (cercle restreint d'investisseurs), acting for their own account, and/or (iii) persons carrying out the activity of portfolio management on behalf of third parties (gestion de portefeuille pour compte de tiers), all as defined in,

and in accordance with, Articles D. 411-1, D. 411-2, D. 734-1, D. 744-1, D. 754-1 and D. 764-1 of the French Monetary and Financial Code.

Units may only be offered to the public in France in accordance with Articles L. 411-1, L. 411-2, L. 412-1 and L. 621-8 et seq. of the French Monetary and Financial Code (formerly, Articles 6 and 7 of Ordinance No. 67-833 of 28th September 1967, as amended).

This Memorandum and other offering materials relating to the offer of Units are strictly confidential and may not be distributed to any person or entity other than the recipients hereof.

**NOTICE TO RESIDENTS OF GERMANY**

The offered Units may only be distributed or acquired within the Federal Republic of Germany ("Germany") in accordance with the German Investment Act (Investmentgesetz – "INVG"), the German Sales Prospectus Act (Wertpapier-Verkaufsprospekt-Gesetz – "VERKPROSPG"), the German Securities Prospectus Act (Wertpapierprospektgesetz – "WPPG") and any other laws and regulations applicable in Germany governing the issue, offering, distribution and sale of the offered Units.

The distribution of the offered Units has not been notified, and the offered Units are not registered or authorized for public distribution in Germany. This Memorandum has not been filed or deposited with the Federal Financial Supervisory Authority (Bundesanstalt für Finanzdienstleistungsaufsicht – "Bafin"). Therefore, the offered Units must not be distributed (i) by way of a public offer, public advertisement or in any similar manner within the meaning of Section 2 (11) of the INVG or (ii) by way of public offering within the meaning of Section 8f of the VERKPROSPG or (iii) by way of public offering within the meaning of Section 2 no. 4 of the WPPG, nor shall this Memorandum constitute such public offer, public advertisement or similar offer. No German prospectus within the meaning of the INVG, the VERKPROSPG or the WPPG has been or will be prepared, published or otherwise provided.

This Memorandum shall only be addressed to recipients to whom this Memorandum is personally addressed and does not constitute an offer or advertisement to the public, nor may it be supplied to the public in Germany or used in connection with any offer for subscription of the offered Units to Germany.

The offered Units may fall within the scope of the German Investment Tax Act (Investmentsteuergesetz - "INVSTG"). Therefore, it cannot be excluded that German investors may be faced with taxes pursuant to the INVSTG. Please note that it is not contemplated to provide or issue certain information designated in the INVSTG.

All prospective German investors are urged to seek independent tax advice. This Memorandum does not contain any tax advice or explain the possible tax consequences of an investment.

This Memorandum and other offering materials relating to the offer of Units are strictly confidential and may not be distributed to any person or entity other than the recipients hereof.

**NOTICE TO RESIDENTS OF GREECE**

The Partnership has not been approved by the Greek Capital Market Commission for distribution in Greece. This Memorandum and the information contained herein do not and shall not be deemed to constitute an invitation to the public in Greece to purchase the Partnership. The Partnership may not be distributed, offered or in any way sold in Greece except as permitted by Greek Law. The Partnership does not have a guaranteed performance and past returns do not guarantee future ones.

**NOTICE TO RESIDENTS OF HONG KONG**

No person may offer or sell in Hong Kong, by means of any document, any Units other than (a) to "professional investors" as defined in the Securities and Futures ordinance (cap. 571) and the Securities Futures (Professional Investors) Rules of Hong Kong; or (b) in other circumstances which do not result in the document being a "prospectus" as defined in the Companies Ordinance (cap. 32) of Hong Kong or which do not constitute an offer to the public within the meaning of that ordinance.

No person may issue, or have in its possession for the purposes of issue, whether in Hong Kong or elsewhere, any advertisement, invitation or document relating to the Units, which is directed at, or the contents of which are likely to be accessed or read by, the public in Hong Kong (except if permitted to do so under the securities laws of Hong Kong) other than with respect to Units which are or are intended to be disposed of only to persons outside Hong Kong or only to "professional investors" as defined in the Securities and Futures Ordinance (cap. 571) and the Securities Futures (Professional Investors) Rules of Hong Kong.

The contents of this Memorandum have not been reviewed by any regulatory authority in Hong Kong. The recipient of this Memorandum is advised to exercise caution in relation to the offer. If The recipient of this Memorandum is in any doubt about any of the contents of this Memorandum, such recipient should obtain independent professional advice.

This Memorandum is delivered only to the recipient solely for the purpose of evaluating a possible investment in the Partnership and may not be used, copied, reproduced or distributed in whole or in part, to any other person (other than professional advisers of the potential investor receiving this document who are subject to confidentiality obligations). Subscriptions will not be accepted from any person other than the person to whom this Memorandum has been delivered.

This Memorandum may not be used, copied, reproduced or distributed in whole or in part by the recipient to any other person.

**NOTICE TO RESIDENTS OF ITALY**

The Units to be offered pursuant to this Memorandum have neither been nor will be registered under the relevant securities laws of Italy.

This Memorandum does not constitute nor intend to be an offer to sell or a solicitation of any offer to buy the Units in the Italian jurisdiction. Accordingly, where directed to an Italian resident, this Memorandum is for information purposes only. Pursuant to this Memorandum, the Units may not be offered and any circular, advertisement or other document or offering material relating to such Units may not be published, distributed or made available in the Republic of Italy or to any Italian resident investor in circumstances which would be in breach of relevant Italian laws and regulations.

**NOTICE TO RESIDENTS OF JAPAN**

The Units have not been and will not be registered under the Securities and Exchange Law of Japan ("SEL"), and the Units may not be offered or sold, directly or indirectly, in Japan or to, or for the benefit of, any resident of Japan (including Japanese corporations) or to others for re-offering or resale, directly or indirectly, in Japan or to any resident of Japan, except in compliance with the private placement directed solely to Qualified Institutional Investors (as defined under SEL) or otherwise except in compliance with the SEL and other applicable laws and regulations of Japan. In particular, Investors in Japan may transfer the Units only to other Qualified Institutional Investors (a "Transferee") and should

notify any Transferee in writing upon or prior to any transfer that (i) such Units may only be transferred to Qualified Institutional Investors and (ii) any Qualified Institutional Investors to whom the Units are subsequently transferred are subject to such condition. In this paragraph, "a resident/residents of Japan" shall have the meaning as defined under the Foreign Exchange and Foreign Trade Law of Japan.

This Memorandum is confidential and is intended solely for the use of its recipient. Any duplication or redistribution of this Memorandum is prohibited. The recipient of this Memorandum, by accepting delivery thereof, agrees to return it and all related documents to the General Partner if the recipient elects not to purchase any of the Units offered hereby or if requested earlier by the General Partner. Neither return of the principal amount nor distribution of profit is guaranteed. This investment in the Units involves certain risks of deficit caused by fluctuation of interest rates, currency and other market factors, or the credit risk of the counter-parties or relevant parties thereof. Please read the terms of the investment carefully, in particular, those relating to limitations on the period in which rights relating to such investment can be exercised.

**NOTICE TO RESIDENTS OF KUWAIT**

The offer of Units is aimed at institutions and sophisticated, high net worth individuals only, this Memorandum is being sent at the written request of the investor, no public offering of the Units is being made in Kuwait, no mass-media means of contact are being used and the transaction will be concluded outside Kuwait.

**NOTICE TO RESIDENTS OF LUXEMBOURG**

The Units may not be offered or sold in the Grand-Duchy of Luxembourg, except for Units which are offered in circumstances that do not require the approval of a prospectus by the Luxembourg financial regulatory authority in accordance with the Law of July 12, 2005 on prospectuses for securities. The Units are offered to a limited number of investors or to sophisticated investors, in all cases under circumstances designed to preclude a distribution that would be other than a private placement. This Memorandum may not be reproduced or used for any purpose, nor be furnished to any other person other than those to whom copies have been sent.

**NOTICE TO RESIDENTS OF MEXICO**

The Units have not been and will not be registered with the Securities Section of the National Registry of Securities (Registro Nacional de Valores) maintained by the National Banking and Securities Commission of Mexico (Comisión Nacional Bancaria y de Valores). This offer does not constitute a public offer or exchange under the Mexican Securities Act (Ley del Mercado de Valores).

**NOTICE TO RESIDENTS OF NEW ZEALAND**

The New Zealand Securities Act 1978 prohibits offers of securities being made to the public in New Zealand in the absence of a registered prospectus and investment statement. Exceptions to this arise whether an offer is made to persons who are not the public. In particular, persons whose principal business is the investment of money or who in the course of and for the purposes of their business, habitually invest money are not members of the public. In addition, persons who are each required to pay a minimum subscription price of at least NZ$500,000 for securities before the allotment of those securities are not members of the public.

The offer of Units in New Zealand is restricted to persons who are not members of the public for the purposes of the New Zealand Securities Act 1978 or in other circumstances where there is no contravention of the New Zealand Securities Act 1978.

**NOTICE TO RESIDENTS OF OMAN**

This Memorandum is being sent at the request of the investor in Oman and should not be distributed to any person in Oman other than its intended recipient without the prior consent of the Capital Market Authority.

**NOTICE TO RESIDENTS OF SAUDI ARABIA**

The Units may only be offered and sold in the Kingdom of Saudi Arabia in accordance with Article 4 of the Investment Funds Regulations issued on 24 December 2006 (the "Regulations"). Article 4(b)(4) of the Regulations states that, if investment fund units are offered to no more than 200 offerees in the Kingdom of Saudi Arabia and the minimum amount payable per offeree is not less than Saudi Riyals 1 million or an equivalent amount in another currency, such offer of investment fund units shall be deemed a private placement for purposes of the Regulations. Investors are informed that Article 4(g) of the Regulations places restrictions on secondary market activity with respect to such investment fund units.

**NOTICE TO RESIDENTS OF SPAIN**

The Offer in Spain of the Units is not subject to the Spanish Securities Market Law 24/1988, of July 28, nor to Royal Decree 1310/2005, of November 4, on securities admission to trade on secondary official markets, public offerings or subscriptions and prospectus required to such effects. Consequently, this offer has not been and will not be verified or registered with the Spanish Securities Market Commission (Comisión Nacional del Mercado de Valores, the "CNMV"). No marketing or publicity activities will be carried out in Spain and, therefore, no action, whether direct or indirect, which could be considered as a marketing or promotional activity (including the provision of any documentation and/or advertising materials to any third party) may be taken. The recipient hereof will be liable for any such action and neither the Partnership nor its agents will assume any liability in this respect. The Partnership is not subject to the laws of Spain and hence the legal, tax and economic concepts used may be different to Spanish concepts. For this reason, potential investors should obtain appropriate advice before making any investment in the Partnership.

**NOTICE TO RESIDENTS OF SWEDEN**

This Institutional Entitlements Offer in Sweden is directed to a limited number of investors who receive this Memorandum directly from the issuers and who may not disclose the information herein to any third party. This Memorandum has not been nor will it be registered with or approved by Finansinspektionen (the Swedish Financial Supervisory Authority) and is not intended to and shall not be deemed to constitute a prospectus within the meaning of the Swedish Financial Instruments Trading Act (Sw. Lag (1991:980) om handel med finansiella instrument) ("FITA"). Accordingly, this Memorandum may not be made available, nor may the Units offered hereunder be marketed and offered for sale in Sweden, other than under circumstances which are deemed neither to require a prospectus under FITA nor to constitute fund operations in Sweden under the Swedish Investment Funds Act (2004:46).

Past performance is not a guarantee of a particular return in the future. The money invested in the Partnership can increase or decrease in value, and there is no guarantee that all of the capital invested will be repaid.

**NOTICE TO RESIDENTS OF SWITZERLAND**

The Swiss Federal Banking Commission has not authorized the sale of the Units for public distribution in or from Switzerland. Accordingly, the Units may not be publicly offered or distributed in or from Switzerland, and neither this Memorandum nor any other offering materials relating to any of the Units may be publicly distributed in connection with any such offering or distribution. The Partnership has not been approved by the Federal Banking Commission as a foreign collective investment scheme pursuant to Article 120 of the Swiss Collective Investment Scheme Act of June 23, 2006 (the "CISA"). Accordingly, the Units in the Partnership may not be publicly offered in or from Switzerland and neither this Memorandum or any other offering materials relating to the Units in the Partnership may be distributed in connection with any such public offering. Units may only be offered and this Memorandum may only be distributed in or from Switzerland to "Qualified Investors" (as defined in the CISA and its implementing ordinance) and to a limited number of other offerees without any public offering. The Memorandum is for the recipient only and may not in any way be forwarded to any other person or to the public in Switzerland. Any use in this Memorandum of the terms "fund" or "investment", or terms with similar meanings, should not be interpreted to imply that the Swiss Federal Banking Commission has reviewed or given their approval

**NOTICE TO RESIDENTS OF UNITED KINGDOM**

This Memorandum may only be communicated or caused to be communicated in the UK to persons authorized to carry on a regulated activity ("Authorized Persons") under the Financial Services and Markets Act 2000, as amended ("FSMA") or to persons otherwise having professional experience in matters relating to investments and qualifying as investment professionals under Article 19 of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005, as amended, or to persons qualifying as high net worth persons under Article 49 of that Order, or to any other person to whom this Memorandum may otherwise lawfully be communicated or caused to be communicated.

In addition, insofar as the Units would be regarded in the UK as interest in a collective investment scheme, this Memorandum may only be communicated or caused to be communicated in the UK by authorized persons to: (1) persons qualifying as investment professionals under Article 14 of the Financial Services and Markets Act 2000 (Promotion of Collective Investment Schemes) (Exemptions) Order 2001; (2) to persons qualifying as high net worth persons under Article 22 of that Order; (3) to persons who are classified as intermediate customers or market counterparties in accordance with the conduct of business rules of the UK Financial Services Authority; or (4) to any other person to whom this Memorandum may otherwise lawfully be communicated or caused to be communicated (all such persons together being referred to as "relevant persons"). This Memorandum must not be acted on or relied on by persons who are not relevant persons. Any investment or investment activity to which this Memorandum relates is available only to relevant persons and will be engaged in only with relevant persons. Any person who is not a relevant person should not act or rely on this Memorandum or any of its contents. This Memorandum must not be distributed, published, reproduced or disclosed (in whole or in part) by recipients to any other person.

**LIST OF EXHIBITS**

A LIMITED PARTNERSHIP AGREEMENT

B SUBSCRIPTION AGREEMENT

C CHARTS SUMMARIZING IMMIGRATION AND INVESTMENT PROCEDURES

D SUBSCRIPTION AND ADMINISTRATION FEE ESCROW AGREEMENT

E ESCROW ADMINISTRATION SERVICES AGREEMENT

F LOAN COMMITMENT

G AREA MAPS AND AERIAL VIEWS OF VIA MIZNER

Exhibit to Offering Memorandum for Via Mizner Funding, LP

## **EXHIBIT A**

## **LIMITED PARTNERSHIP AGREEMENT**

[See Attached]

**THIS AGREEMENT HAS BEEN INITIALLY WRITTEN IN THE ENGLISH LANGUAGE; IN THE EVENT OF ANY CONFLICT BETWEEN THE ORIGINAL ENGLISH VERSION AND ANY TRANSLATIONS INTO OTHER LANGUAGES, THE ORIGINAL ENGLISH VERSION SHALL CONTROL**

VIA MIZNER FUNDING, LP

LIMITED PARTNERSHIP AGREEMENT

July 20, 2012

*EXECUTION*

## TABLE OF CONTENTS

1   ORGANIZATION OF THE PARTNERSHIP ................................................................ 1

2   CAPITAL CONTRIBUTIONS; PARTNERSHIP LOANS ....................................... 3

3   DISTRIBUTIONS ................................................................................................. 4

4   ALLOCATIONS .................................................................................................... 6

5   ACCOUNTING AND RECORDS ........................................................................ 10

6   MANAGEMENT ................................................................................................. 12

7   REPRESENTATIONS AND WARRANTIES .................................................... 16

8   TRANSFER RESTRICTIONS ............................................................................ 16

9   LIMITATION OF LIABILITY; INDEMNIFICATION ..................................... 17

10   DISSOLUTION AND WINDING UP ............................................................... 21

11   MISCELLANEOUS ........................................................................................... 23

**THIS AGREEMENT HAS BEEN INITIALLY WRITTEN IN THE ENGLISH LANGUAGE; IN THE EVENT OF ANY CONFLICT BETWEEN THE ORIGINAL ENGLISH VERSION AND ANY TRANSLATIONS INTO OTHER LANGUAGES, THE ORIGINAL ENGLISH VERSION SHALL CONTROL**

**VIA MIZNER FUNDING, LP**

**LIMITED PARTNERSHIP AGREEMENT**

THIS LIMITED PARTNERSHIP AGREEMENT (this "Agreement") of Via Mizner Funding, LP (the "**Partnership**") is made as of July 20, 2012, among **U.S. Immigration Fund GP - Mizner, LLC**, a Florida limited liability company, as the sole General Partner and Florida Regional Center, LLC (the "**Initial Limited Partner**") and the Persons whose names and addresses are listed on **Exhibit A** attached hereto as the Limited Partners, as **Exhibit A** may be updated from time to time in accordance with the terms of this Agreement.

**RECITALS:**

(A) The Partnership has been formed in order to extend the Loan to Camino Investments Holdings Limited Partnership (the "**Developer**"), which in turn has been formed to own the Property and carry out the Project.

(B) The Partnership intends to sell Units to investors and to admit as Limited Partners those investors whose subscriptions are accepted by the General Partner. Upon the admittance of the first Limited Partner, the Unit of the Initial Limited Partner will be cancelled.

(C) The General Partner and the Initial Limited Partner now wish to enter into this Agreement to organize the Partnership and set out the terms applicable to the relationship among the Partners and the conduct of the Partnership.

**AGREEMENT:**

NOW THEREFORE in consideration of the respective covenants and agreements of the parties herein contained and for other good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged), the parties agree with each other as follows:

**1   ORGANIZATION OF THE PARTNERSHIP**

1.1   Interpretation. **Exhibit B** attached hereto sets forth certain definitions and rules of interpretation applicable to this Agreement. Any capitalized term not otherwise defined in **Exhibit B** shall have the meaning set forth elsewhere in this Agreement.

1.2   Formation; Admission of New Limited Partners. The Partnership was organized between the Initial Limited Partner and the General Partner under the provisions of the Act. Upon admission to the Partnership of any other Limited Partner, the Initial Limited Partner shall be deemed to have withdrawn as a Partner, the Initial Limited Partner's Capital Contribution shall be refunded and the

Partnership Interest of the Initial Limited Partner shall be cancelled. The Partnership Interest of each Limited Partner shall be represented by Units issued to Persons who shall be admitted to the Partnership upon receipt of their respective Minimum Capital Contributions and acceptance of their respective counterpart signature pages by the General Partner, each of which shall be effective as of the date of such acceptance, and all of which shall deemed incorporated by reference into **Exhibit A** attached hereto. The General Partner may admit such additional Limited Partners and issue such additional corresponding Units, each without limit, in its sole discretion. The General Partner is authorized to update **Exhibit A** accordingly. Except as expressly provided otherwise in this Agreement, the rights and liabilities of the Partners shall be as provided in the Act.

1.3     <u>Name</u>. The Partnership shall carry on its activities under the name "Via Mizner Funding, LP" or such other name, in accordance with applicable law, as the General Partner may determine from time to time. The General Partner shall notify each Limited Partner of any change in the name under which the Partnership carries on its activities within 10 Business Days of such change.

1.4     <u>Registered Office and Principal Address</u>. The principal address of the Partnership shall be located at 1295 U.S. Highway 1, North Palm Beach, FL 33408, facsimile: +1 561 799 0061 or at such other location, in accordance with applicable law, as the General Partner may determine from time to time. The General Partner shall notify each Limited Partner of any change in the principal address of the Partnership within 10 Business Days of such change.

1.5     <u>Annual Report</u>. As required by law, the General Partner shall cause the Partnership to file an annual report with the Department of State each calendar year, on the form provided by the Department of State. The General Partner shall cause the Partnership to maintain at its principal office a copy of the three most recent annual reports filed by the Partnership with the Department of State.

1.6     <u>Names and Addresses of the Partners</u>. The names and addresses of the General and Limited Partners are set forth in **Exhibit A**, which exhibit shall be updated from time to time by the General Partner.

1.7     <u>Partnership Purpose</u>. The Partnership has been formed as a commercial for-profit entity to engage in any lawful purpose permitted under the Act, including without limitation (i) purchasing or otherwise acquiring mortgages and other liens on an interests in real estate, (ii) extending the Loan to the Developer for the purpose of developing, constructing and operating the Project within the Targeted Employment Area, (iii) making offers and sales of Units to qualified Persons under the Pilot Program and (iv) all activities ancillary to the foregoing. The Partnership shall have the power to do and to perform any and all things necessary for, incidental to or connected with carrying on the activities of the Partnership.

1.8     <u>Fiscal Year</u>. The fiscal year of the Partnership (the "**Fiscal Year**) shall be the calendar year. The Fiscal Year shall include any partial calendar year at the beginning and end of the Term.

1.9     <u>Term</u>. The Partnership term (the "**Term**") commenced on the date stated in the Certificate of Limited Partnership filed in the Department of State in accordance with the Act, and shall continue until the winding up and liquidation of the Partnership and its business is completed following a Liquidating Event, as provided in <u>Section 10.1</u>.

1.10   <u>Organizational Declarations and Other Filings</u>. If requested by the General Partner, the Limited Partners shall promptly execute all declarations, certificates and other documents consistent with the terms of this Agreement necessary for the General Partner, acting reasonably, to accomplish all

filing, recording, publishing and other acts as may be appropriate to comply with all requirements for: (i) the formation and operation of a limited partnership under the laws of the State of Florida; (ii) if the General Partner deems it advisable, acting reasonably, the operation of the Partnership as an entity or partnership in which the Limited Partners have limited liability, in all jurisdictions where the Partnership proposes to operate or in which Limited Partners have addresses of record in the Partnership records; and (iii) all other filings which the General Partner determines are required or advisable to be made by the Partnership.

1.11    Independent Activities; Affiliate Transactions.

1.11.1  To the extent permitted by applicable law, the General Partner (acting on its own behalf) and each Limited Partner (acting on its own behalf) may engage or hold interests in other business ventures of every kind and description for its own account. Neither the Partnership nor any of the Partners shall have any rights by virtue of this Agreement in such business ventures or to the income or profits derived from such ventures.

1.11.2  The General Partner may employ, or otherwise deal with on behalf of the Partnership, any Partner, including the General Partner, or any Affiliate of such Partner, to sell or purchase goods or perform services, including management services, accounting services, brokerage services, and other real-estate related services, for the Partnership, or to make loans to the Partnership; provided, that any contract between the Partnership and the General Partner or any Affiliate of the General Partner must be on terms which are fair and reasonable to the Partnership, determined in accordance with customary rates of local professionals or other providers of comparable services. The Partnership and any Partners as such shall not have any right in or to any income or profits derived by the General Partner or any such Affiliate from any such contract.

**2    CAPITAL CONTRIBUTIONS; PARTNERSHIP LOANS**

2.1    Partners' Capital Contributions. The Partners have made the Capital Contributions set forth on **Exhibit A**. Except as provided in this Agreement, the Partners shall not be obligated to make contributions or advances, or to lend any money to the Partnership. The General Partner shall not be liable to any Unit Holder for repayment of the Unit Holder's Capital Contribution.

2.2    Additional Funds. If at any time during the Term, the General Partner determines in its reasonable business judgment that additional funds are required by the Partnership for or in respect of its business or any of its obligations, expenses, costs, liabilities or expenditures, the General Partner may, but in no event shall be obligated to:

2.2.1   Cause the Partnership to borrow such required additional funds from commercial lenders, or any other Persons; provided, that any such loan shall be without recourse against the Limited Partners and may be without recourse to the General Partner; or

2.2.2   If the required additional funds cannot be borrowed, or if the terms of a loan by the General Partner are at least as favorable to the Partnership as a loan that has been offered by an unaffiliated lender, the General Partner or its designee may make loans to the Partnership, payable on such terms as the General Partner shall determine in its reasonable business judgment, including, taking a lien against Partnership property.

2.3    Limited Liability of Limited Partners. Except as otherwise expressly provided under this Agreement or the Act, the Limited Partners shall be liable only to make their Capital Contributions pursuant to Section 2.1, and shall not be required to lend any other funds to the Partnership or, after

such Capital Contributions have been paid, to make any other additional capital contributions to the Partnership. Except as otherwise provided under this Agreement or by law, no Limited Partner shall be liable for the debts, liabilities, contracts or any other obligations of the Partnership, even though the Limited Partner participates in the management, control and/or operations of the Partnership. Unless otherwise expressly provided in this Agreement or the Act, the General Partner shall not have any personal liability for the repayment of any Capital Contributions of the Limited Partners.

2.4     No Interest on Capital. Except as otherwise expressly provided in this Agreement, no General Partner or Unit Holder shall receive any interest, salary, or drawing with respect to its Capital Contributions, its Capital Account, for services rendered on behalf of the Partnership, or otherwise in its capacity as a General Partner or Unit Holder.

2.5     Withdrawal and Return of Capital. Except as otherwise provided in this Agreement, no General Partner or Unit Holder shall have the right to demand or receive a return of any portion of its Capital Contribution from the Partnership before the end of the Term. Under circumstances requiring a return of any Capital Contributions, no Partner shall have the right to receive property other than cash, except as may be specifically provided in this Agreement.

2.6     Mandatory Withdrawal and Dissociation of a Limited Partner. In the event that a Limited Partner's I-526 Petition is not approved by USCIS and all rights of appeal have been exhausted, the Partnership shall be obligated to return or cause the return of the Subscription Amount of such Limited Partner (the "**Withdrawing Investor**") as of the date that the Partnership has adequate funds available for this purpose. Return of the Subscription Amount shall be without interest or deduction. Any funds returned to the Withdrawing Investor shall be sent via wire transfer to the account from which the Withdrawing Investor's funds originated. If more than one Withdrawing Investor is entitled to the return of his or her Subscription Amount, then, in each such case the Partnership shall be obligated to return first the Subscription Amount of the Withdrawing Investor whose appeal rights were exhausted first. Upon full return or refund of a Withdrawing Investor's Subscription Amount, (i) such Withdrawing Investor shall be deemed to have withdrawn and been dissociated from the Partnership and (ii) the Subscription Agreement between the Partnership and such Withdrawing Investor shall terminate except for the provisions of Section 9 (Confidentiality) and Section 10 (Indemnification).

2.7     Limitation. Notwithstanding Section 2.6, the Partnership shall not be obligated to refund the Subscription Amount of any Limited Partner who (i) delivers a written request to remain a Limited Partner in the Partnership after becoming a Withdrawing Investor, (ii) withdraws his or her I-526 Petition after filing and prior to adjudication by USCIS or (iii) in the opinion of the General Partner acting reasonably, fails to actively seek USCIS approval of his or her I-526 Petition. A Limited Partner whose Subscription Amount is not returned under this Section 2.7 shall not be deemed to have withdrawn or been dissociated from the Partnership.

**3       DISTRIBUTIONS**

3.1     Distributions in General. From time to time, the General Partner shall determine the amount, if any, of Net Cash Flow. The General Partner shall have the right, but not the obligation, to cause the Partnership to distribute such Net Cash Flow on a quarterly basis. Any distribution of Net Cash Flow shall be made to the General Partner and the Unit Holders in accordance with Section 3.2. The Partnership will distribute Net Cash Proceeds from Sales or Refinancing to the General Partner and Unit Holders in accordance with Section 3.3. Distributions from Net Cash Flow are not

expected to begin until at least 12 months from the date the first Limited Partner is admitted to the Partnership.

3.2     Distribution of Net Cash Flow. Subject to Section 3.1, Net Cash Flow shall be distributed to the General Partner and Unit Holders as follows:

3.2.1   First, to the General Partner to the extent, if any, of its unpaid Management Fee;

3.2.2   Next, to the Unit Holders pro rata in accordance with their respective Partnership Interests, to the extent of their unpaid Preferred Return accrued as of the last day of the calendar quarter immediately preceding the date of such distribution; and

3.2.3   Then, the balance to the General Partner.

3.3     Distribution of Net Cash Proceeds from Sales or Refinancing. Subject to Section 3.1 and Section 10, Net Cash Proceeds from Sales or Refinancing shall be distributed as follows:

3.3.1   First, to payment of all Partnership debts and liabilities due and payable to creditors other than the General Partner and Unit Holders;

3.3.2   Next, to payment of all Partnership debts and liabilities due and payable to the General Partner and Unit Holders including, without limitation, to payment of the General Partner's unpaid Management Fee;

3.3.3   Next, to fund reasonable reserves of the Partnership as determined by the General Partner;

3.3.4   Next, to the Limited Partners pro rata in accordance with their respective Partnership Interests, to the extent of their unpaid Preferred Return;

3.3.5   Next to the General Partner to the extent of its Unrecovered Capital Contributions until its Unrecovered Capital Contributions have been reduced to zero;

3.3.6   Next, to the Limited Partners pro rata in accordance with their respective Partnership Interests, to the extent of their Unrecovered Capital Contributions until the Unrecovered Capital Contributions of all Limited Partners have been reduced to zero; and

3.3.7   Then, the balance to the General Partner.

3.4     Amounts Withheld. Unless treated as a Tax Payment Loan (defined below), any amount paid by the Partnership for or with respect to any General Partner or Unit Holder (or its predecessor-in-interest) on account of any withholding tax or other tax payable with respect to the income, profits, or distributions of the Partnership pursuant to the Code, the Regulations, or any state or local statute, regulation, or ordinance requiring such payment (each and any, a "**Withholding Tax Act**") shall be treated as a distribution to such Person for all purposes of this Agreement, consistent with the character or source of the income, profits, or cash which give rise to the payment or withholding obligation. To the extent that the amount required to be remitted by the Partnership under the Withholding Tax Act exceeds the amount then otherwise distributable to such Person (or its successor-in-interest), the excess shall constitute a loan from the Partnership to such Person (a "**Tax Payment Loan**"), which shall be payable upon demand and shall bear interest, from the date that the Partnership makes the payment to the relevant taxing authority, at the Prime Rate plus one percent (1%), compounded monthly. So long as any Tax Payment Loan or the interest thereon

-5-

88

remains unpaid, the Partnership shall make future distributions due to such Person (or its successor-in-interest) by applying the amount of any such distribution first to the payment of any unpaid interest and then to the repayment of the principal of all Tax Payment Loans to such Person (or its predecessor-in-interest). The General Partner shall have the authority to take all actions necessary to enable the Partnership to comply with the provisions of any Withholding Tax Act applicable to the Partnership and to carry out the provisions of this Section 3.4. Nothing in this Section 3.4 shall create any obligation on the General Partner to advance funds to the Partnership or to cause the Partnership to borrow funds from third parties in order to make any payments on account of any liability of the Partnership under a Withholding Tax Act.

3.5     Limitations on Distributions. The Partnership may not make a distribution to a Partner if, after giving effect to such distribution:

3.5.1   The distribution would be in violation of this Agreement;

3.5.2   The Partnership would not be able to pay its debts as they become due in the ordinary course of the Partnership's activities;

3.5.3   The Partnership's total assets would be less than the sum of its total liabilities plus the amount that would be needed, if the Partnership were to be dissolved, wound up, and terminated at the time of the distribution, to satisfy the preferential rights of Partners upon dissolution, winding up and termination whose preferential rights are superior to those of Persons receiving the distribution; or

3.5.4   Prior to adjudication of a Limited Partner's I-829 Petition by Entrepreneur to Remove Conditions ("**I-829 Petition**"), the distribution would cause such Limited Partner's Unrecovered Capital Contribution to be less than the Subscription Amount.

## 4     ALLOCATIONS

4.1     Intent of Allocations; Cash Savings Provision. The Partners intend the following allocation provisions to produce final Capital Account balances of the General Partner and Unit Holders that will permit liquidating distributions that are made in accordance with final Capital Account balances to be identical to the distributions required under Section 10.3 and Section 3, which will control the amount of distributions irrespective of the final Capital Account balances. To the extent that the tax allocation provisions of this Section 4 would fail to produce such final Capital Account balances, then (a) such provisions shall be amended by the General Partner to the extent necessary to produce such result and (b) taxable income and taxable loss of the Partnership for prior open years (or items of gross income and deduction or loss for such years) shall be reallocated as permitted by law by the General Partner among the General Partner and Unit Holders to the extent it is not possible to achieve such result with allocations of items of income (including gross income) deduction and loss for the current and future Allocation Periods. This Section 4.1 shall control notwithstanding any reallocation or adjustment of taxable income, taxable loss, or items thereof by the Internal Revenue Service or any taxing authority. The General Partner may amend this Agreement without the consent of the Unit Holders, as it reasonably considers advisable in consultation with the Partnership's professional tax advisers, to make the allocations and adjustments described in this Section 4.1. To the extent that the allocations and adjustments described in this Section 4.1 result in a reduction in the distributions that the General Partner or any Unit Holder will receive, when compared to the amount of the distributions that Person would receive if all such distributions were made in accordance with Section 10.3 and Section 3, then the Partnership may make a guaranteed payment (within the meaning of Code Section 707(c)) to that

Person (at such time as that Person would otherwise receive the distributions that have been reduced) or take such other action as may be reasonably determined by the General Partner to offset such reduction.

4.2     Definitions.

4.2.1   "Partially Adjusted Capital Account" means, with respect to any General Partner or Unit Holder as of the close of business on the last day of any Allocation Period (an "**Adjustment Date**"), the Capital Account of such Person as of the beginning of the period ending on such Adjustment Date, after giving effect to all allocations of items of income, gain, loss, or deduction not included in Profits and Losses and all Capital Contributions and distributions during such Allocation Period (but before giving effect to any allocations of Profits and Losses for such Allocation Period under Section 4.3), increased by (i) such Person's share of Partnership Minimum Gain, as determined under Regulations Section 1.704-2(d), as of the end of such Allocation Period, and (ii) such Person's share of Partner Nonrecourse Debt Minimum Gain, as determined under Regulations Section 1.704-2(i), as of the end of such Allocation Period.

4.2.2   "Target Capital Account" means, with respect to any General Partner or Unit Holder as of any Adjustment Date, an amount (which may be either a positive or a deficit balance) equal to the amount such Person would receive as a distribution if all assets of the Partnership as of such Adjustment Date were sold for cash equal to the Gross Asset Value of such assets, all Partnership liabilities were satisfied to the extent required by then terms, and the net proceeds were distributed under Section 10.3 as if they were Liquidation Proceeds.

4.3     Allocation of Profits and Losses. After application of Sections 4.4 and 4.5, Profits and Losses for each Allocation Period shall be allocated among the General Partner and Unit Holders so as to reduce, proportionately, in the case of any Profits, the excess (if any) of their respective Target Capital Accounts over their respective Partially Adjusted Capital Accounts as of the Adjustment Date and, in the case of Losses, the excess (if any) of their respective Partially Adjusted Capital Accounts over their respective Target Capital Accounts as of the Adjustment Date. No portion of Profits for any Allocation Period shall be allocated to a General Partner or Unit Holder whose Partially Adjusted Capital Account is greater than its Target Capital Account on the Adjustment Date, and no portion of Losses for any Allocation Period shall be allocated to a General Partner or Unit Holder whose Target Capital Account is greater than or equal to its Partially Adjusted Capital Account as of such Adjustment Date.

4.4     Special Allocations. The following special allocations will be made in the following order and priority before allocations of Profits and Losses:

4.4.1   Partnership Minimum Gain Chargeback. If there is a net decrease in Partnership Minimum Gain during any Allocation Period, before any other allocation under this Agreement, each General Partner and Unit Holder will be specially allocated items of Partnership income and gain for that Allocation Period (and, if necessary, subsequent Allocation Periods) in proportion to, and to the extent of, an amount equal to such Person's share of the net decrease in Partnership Minimum Gain during such year determined in accordance with Regulations Section 1.704-2(g)(2). The items to be allocated will be determined in accordance with Regulations Section 1.704-(g). This Section 4.4.1 is intended to comply with the Partnership Minimum Gain chargeback requirements of the Regulations, will be interpreted consistently with the Regulations, and will be subject to all exceptions provided therein.

4.4.2    <u>Partner Nonrecourse Debt Minimum Gain Chargeback</u>. Notwithstanding any other provision of this <u>Section 4.4</u> (other than <u>Section 4.4.1</u>, which shall be applied first), if there is a net decrease in Partner Nonrecourse Debt Minimum Gain with respect to a Partner Nonrecourse Debt during any Allocation Period, any General Partner or Unit Holder with a share of such Partner Nonrecourse Debt Minimum Gain (determined under Regulations Section 1.704-2(i)(5)) as of the beginning of the Allocation Period will be specially allocated items of Partnership income and gain for that Allocation Period (and, if necessary, subsequent Allocation Periods) in an amount equal to such Person's share of the net decrease in the Partner Nonrecourse Debt Minimum Gain during such year determined in accordance with Regulations Section 1.704-2(g)(2). The items to be so allocated will be determined in accordance with Regulations Section 1.704-2(g). This <u>Section 4.4.2</u> is intended to comply with the Partner Nonrecourse Debt Minimum Gain chargeback requirements of the Regulations, will be interpreted consistently with the Regulations, and will be subject to all exceptions provided therein.

4.4.3    <u>Qualified Income Offset</u>. A General Partner or Unit Holder who unexpectedly receives any adjustment, allocation or distribution described in Regulations Sections 1.704-l(b)(2)(ii)(d)(4), (5) or (6) will be specially allocated items of Partnership income and gain in an amount and manner sufficient to eliminate, to the extent required by the Regulations, such Person's Adjusted Capital Account Deficit, if any, as quickly as possible. This <u>Section 4.4.3</u> is intended to qualify and be construed as a "qualified income offset" within the meaning of Regulation § 1.704-l(6)(2)(ii)(d), will be interpreted consistently with the Regulations, and will be subject to all exceptions provided therein.

4.4.4    <u>Gross Income Allocation</u>. If any General Partner or Unit Holder has a Capital Account deficit at the end of any Allocation Period, which is in excess of the sum of the amounts such Person is obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.704-2(g)(l) and 1.704-2(i)(5), then such Person shall be specially allocated items of Partnership income and gain in the amount of such excess as quickly as possible, provided, that an allocation under this <u>Section 4.4.4</u> shall be made only if and to the extent that such Person would have a Capital Account deficit in excess of such sum after all other allocations provided for in this Section 4 have been made as if <u>Section 4.4.3</u> and this <u>Section 4.4.4</u> were not in this Agreement.

4.4.5    <u>Nonrecourse Deductions</u>. Nonrecourse Deductions for any Allocation Period will be allocated, to the extent allowable by law, among the General Partner and Unit Holders pro rata in accordance with their respective Partnership Interests.

4.4.6    <u>Partner Nonrecourse Deductions</u>. Notwithstanding anything to the contrary in this Agreement, any Partner Nonrecourse Deductions for any Allocation Period will be allocated to the General Partner or Unit Holder who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which the Partner Nonrecourse Deductions are attributable in accordance with Regulations Section 1.704- 2(i).

4.4.7    <u>Code Section 754 Adjustments</u>. To the extent an adjustment to the adjusted tax basis of any Partnership asset under Code Section 734(b) or 743(b) is required to be taken into account in determining Capital Accounts under Regulations Section 1.704-1 (b)(2)(iv)(m), the amount of the adjustment to the Capital Accounts will be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis), and the gain or loss will be specially allocated, to the extent permitted by law, solely to the General Partner, or otherwise, among the General Partner and Unit Holders in a manner consistent with the manner in which their Capital Accounts are required to be adjusted under Regulations Section 1.704-1 (b)(2)(iv)(m).

4.5     Other Special Allocations. After making the special allocations in Section 4.4 for the Allocation Period, and prior to making the allocations of Profits and Losses in Section 4.3 for such Allocation Period, the following special allocations shall be made:

4.5.1     If the Partnership has Profits for such Allocation Period (determined prior to giving effect to this Section 4.5.1) and the balance of any General Partner or Unit Holder's Partially Adjusted Capital Account is greater than the balance of its Target Capital Account (after making the allocations required by Section 4.4), then each such Person shall be specially allocated items of Partnership deduction or loss (to the extent available) equal to the difference between its Partially Adjusted Capital Account and its Target Capital Account (or, if there are insufficient items of Partnership deduction or loss to eliminate the aggregate difference for all such Persons, then those items shall be allocated among them in proportion to then shares of the aggregate difference).

4.5.2     If the Partnership has Losses for any Allocation Period (determined prior to giving effect to this Section 4.5.2) and the balance of any General Partner or Unit Holder's Partially Adjusted Capital Account is less than the balance of its Target Capital Account (after making the allocations required by Section 4.4), then each such Person shall be specially allocated items of Partnership income or gain for such Allocation Period (to the extent available) equal to the difference between its Partially Adjusted Capital Account and its Target Capital Account.

4.5.3     If the Partnership has neither Profits nor Losses for any Allocation Period (determined prior to giving effect to this Section 4.5.3) and the balance of any General Partner or Unit Holder's Partially Adjusted Capital Account differs from the balance of its Target Capital Account (after making the allocations required by Section 4.4), then each such Person shall be specially allocated items of Partnership deduction or loss or income or gain, as the case may be, for such Allocation Period (to the extent such items are available) to eliminate the difference between its Partially Adjusted Capital Account and its Target Capital Account; provided, that no General Partner or Unit Holder shall be allocated any Losses or items in the nature of deduction or loss under Section 4.5.2 or this Section 4.5.3 to the extent that such allocation would cause such Person to have (or increase) an Adjusted Capital Account Deficit; and allocations of Losses that otherwise would be made such a Person shall be made to the General Partner and Unit Holders to the extent not inconsistent with this proviso.

4.6     Tax Allocations: Code Section 704(c). For federal, state, and local income tax purposes, Partnership income, gain, loss, deduction, or expense (or any item thereof) for each Allocation Period shall be allocated to and among the General Partner and Unit Holders to reflect the allocations made pursuant to the provisions of this Section 4.6 for such Allocation Period. In accordance with Code Section 704(c) and the Regulations, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company, solely for tax purposes, will be allocated, to the extent permitted by law, solely to the General Partner, or otherwise, among the General Partner and Unit Holders as required by law to take account of any variation between the adjusted basis to the Partnership of the property for federal and income tax purposes and the initial Gross Asset Value of the property. If the Gross Asset Value of any Partnership asset is adjusted as provided in the definition of Gross Asset Value, then subsequent allocations of income, gain, loss and deduction with respect to that asset will take account of any variation between the adjusted basis of the asset for federal income tax purposes and its Gross Asset Value in the same manner as required under Code Section 704(c) and the Regulations. Any elections or other decisions relating to allocations under this Section 4.6 will be made in any manner that the General Partner determines reasonably reflects the purpose and intention of this Agreement. Allocations under this Section 4.6 are solely for purposes of federal, state and local taxes and will not affect, or in any way be taken into account in computing, any General Partner or Unit Holder's Capital Account or

share of Profits, Losses or other items or distributions under any provision of this Agreement. The General Partner and the other Unit Holders shall be bound by this <u>Section 4.6</u> in reporting their shares of Partnership income, gain, loss, deduction or expense (or any item thereof) for tax purposes.

**5    ACCOUNTING AND RECORDS**

5.1    <u>Books and Records</u>. The Partnership shall maintain at its principal place of business separate books of account for the Partnership, which shall show a true and accurate record of all costs and expenses incurred, all charges made, all credits made and received, and all income derived in connection with the operation of the Partnership's business. The Partnership's books of account shall be maintained on the cash or accrual basis, as determined by the General Partner from time to time, in accordance with GAAP. In addition, the Partnership shall maintain at its principal place of business all "Required Information" as defined by the Act.

5.2    <u>Reports</u>. The General Partner shall be responsible for the preparation of financial reports of the Partnership and the coordination of financial matters of the Partnership with the Partnership's accountants and other professionals. Within one hundred eighty days after the end of each Fiscal Year, the General Partner shall cause each Limited Partner to be furnished with a copy of the balance sheet of the Partnership as of the last day of the Fiscal Year.

5.3    <u>Information to Limited Partners</u>. Prior each Limited Partner's admission to the Partnership, the Partnership shall provide such Limited Partner or its designated immigration counsel with copies of the following:

5.3.1    The USCIS letter of designation of the Florida Regional Center;

5.3.2    A current business plan for the Project;

5.3.3    The approved IMPLAN Reports which, taken together, conclude that the investments to be made by the Partnership from the Capital Contributions of Limited Partners, including the Capital Contributions of such Limited Partner, will generate full-time employment positions, either directly or indirectly, for not fewer than ten (10) U.S. workers per Limited Partner whose Capital Contributions have been so applied;

5.3.4    If claiming investment for no less than $500,000, but less than $1 million, by electing to restrict the investment by the Partnership of its Capital Contribution to investments located within the Targeted Employment Area, documented evidence that the location of the Partnership's investment of such Limited Partner's Capital Contribution is fully located within the Targeted Employment Area; and

5.3.5    This Agreement, including the Exhibits hereto, evidencing that, upon making a Capital Contribution of at least the Subscription Amount (i) such Capital Contribution will be "at risk;" and (ii) the Limited Partner shall be admitted to the Partnership as a Limited Partner.

5.4    <u>Tax Returns</u>. The General Partner, as Tax Matters Partner, shall cause all income and other tax returns of the Partnership to be prepared and filed in a timely manner. The General Partner shall furnish to each General Partner and Unit Holder the necessary tax information (with respect to the Partnership) for the preparation of United States federal income tax returns on an annual basis.

5.5    <u>Tax and Accounting Decisions</u>. The General Partner, as Tax Matters Partner, shall make all tax and accounting decisions and elections, whether for book or tax purposes, and in this regard shall be entitled to rely upon advice of the Partnership's accountants and other professionals.

5.6    <u>Special Basis Adjustment</u>. In connection with any Permitted Transfer, the General Partner may in the exercise of its sole discretion cause the Partnership, at the written request of the Transferor or the Transferee, on behalf of the Partnership and at the time and in the manner provided in Regulations Section 1.754-l(b), to make an election to adjust the basis of the Partnership's property in the manner provided in Sections 734(b) and 743(b) of the Code, and such Transferee shall pay all costs incurred by the Partnership in connection therewith, including a reasonable sum as attorneys' and accountants' fees.

5.7    <u>Tax Matters Partner</u>. By joining this Agreement, each Limited Partner appoints and designates the General Partner as Tax Matters Partner of the Partnership, as provided in Regulations under Code Section 6231 and any similar provisions under any other state or local or non-U.S. laws, and agrees that upon the request of the General Partner it will execute, certify, acknowledge, swear to, file and record at the appropriate public offices such documents as may be necessary or appropriate to evidence such consent.

5.7.1    Any action taken by the General Partner in connection with audits of the Partnership under the Code will, to the extent permitted by law, be binding upon the Unit Holders. To the extent permitted by law no Unit Holder may treat any Partnership item inconsistently on such Unit Holder's income tax return with the treatment of the item on the Partnership's tax return and may not independently act with respect to tax audits or tax litigation affecting the Partnership, unless previously authorized to do so in writing by the General Partner, which authorization may be withheld in the discretion of the General Partner.

5.7.2    As Tax Matters Partner, the General Partner may cause the Partnership to make all elections required or permitted to be made by the Partnership under the Code (including an election under Section 754 or Section 743(e) of the Code and the safe harbor election provided for by the Proposed Revenue Procedure included in Notice 2005-43, or any similar election provided in a final revenue procedure relating to the compensatory transfer of partnership interests (the latter election, a "**Safe Harbor Election**")) and not otherwise expressly provided for in this Agreement, in the manner that the General Partner determines will be most advantageous to all Partners. The Partnership and each Unit Holder will comply with all requirements of the Proposed Revenue Procedure included in Notice 2005-43, or any similar final revenue procedure relating to the compensatory transfer of partnership interests, if a Safe Harbor Election is made. The General Partner may make any required changes to the maintenance of the General Partner's and other Limited Partners' Capital Accounts and the allocations of items of income, gain, deduction and loss as may be required in any final regulations issued in connection with such Revenue Procedure. The General Partner shall be reimbursed for all reasonable and customary expenses incurred by it on behalf of the Partnership in its capacity of Tax Matters Partner.

5.8    <u>Financial Accounts</u>. The General Partner shall have fiduciary responsibility for the safekeeping and use of all funds and assets of the Partnership, whether or not in its immediate possession or control. The funds of the Partnership shall not be commingled with the funds of any other Person and the General Partner shall not employ, or permit any other Person to employ, such funds in any manner except for the benefit of the Partnership. The funds of the Partnership shall be maintained with such financial institutions as are approved by the General Partner.

5.9   <u>Audits</u>. The General Partner shall have the authority to obtain an audit of the books and records of the Partnership, if the General Partner deems such audit to be necessary or prudent. The cost of such audit shall be borne by the Partnership.

## 6   MANAGEMENT

6.1   <u>Day-to-Day Management by General Partner</u>. The General Partner shall conduct the affairs of the Partnership in the best interests of the Partners. Subject to the limitations and restrictions set forth in this Agreement, the General Partner shall have the sole and exclusive right and authority to manage and control the business of the Partnership and shall have all of the rights and powers which may be possessed by a general partner under the Act, including the right and authority to make all decisions affecting the operation of the Partnership's business. In particular, to the fullest extent allowable by law, the General Partner, in its discretion, shall have the full right, power and authority, from time to time and at any time, on behalf of the Partnership to:

6.1.1   Expend the capital and income of the Partnership in furtherance of the business of the Partnership;

6.1.2   Negotiate, enter into on behalf of the Partnership, and supervise the performance of contracts or agreements with lenders, architects, engineers, surveyors, attorneys, accountants, managers, lobbyists, contractors, subcontractors, and other Persons whose services, labor, or materials may be necessary or appropriate in furtherance of the purposes of the Partnership;

6.1.3   Perform any and all acts necessary or appropriate to acquire, expand, improve, maintain, repair, operate, and manage the Partnership's business;

6.1.4   Take and hold real property and personal property of the Partnership in the Partnership name or in the name of a nominee or trustee for the benefit of the Partnership;

6.1.5   Execute and deliver, on behalf of and in the name of the Partnership, or in the name of a nominee of the Partnership, deeds, bills of sales, deeds of trust, mortgages, notes, leases, ground leases, subleases, licenses, rental agreements, occupancy agreements, and/or use agreements of or with respect to all or a portion of the Partnership's assets, and any and all other instruments necessary or incidental to the conduct of the Partnership's business;

6.1.6   Control and manage the Partnership's assets and arrange for construction, repair, financing, refinancing, collections, disbursements, maintenance, leasing, and other matters necessary or desirable in connection with the Partnership's responsibilities under the Operating Agreement and the operation of the Partnership's business;

6.1.7   Obtain in the name of the Partnership or in the name and on behalf of the Developer any governmental, zoning and utility approvals, consents, permits, or certifications which may be necessary or advisable in connection with the development and construction of the Project and the operation of the Partnership's business;

6.1.8   Employ and/or dismiss from employment, retain, or otherwise secure the services of employees, independent contractors, agents, and other personnel necessary to carry out the purpose of the Partnership, including the hiring of Persons employed by the General Partner or its Affiliates, on such terms and for such compensation as the General Partner may determine in its reasonable judgment, subject to <u>Section 1.11.2</u>;

6.1.9   Delegate all or any of its rights and duties hereunder, and in furtherance of any such delegation, appoint, employ, or contract with any Persons the General Partner may, in its sole discretion, deem necessary or desirable, including Affiliates of the General Partner or any Limited Partner; such Persons may, under the supervision of the General Partner, perform any of the following or other acts or services for the Partnership as the General Partner may approve or permit: act as managers, consultants, correspondents, brokers, architects, contractors, subcontractors, engineers, escrow agents, or in any other capacity deemed by the General Partner necessary or desirable; investigate, select, and conduct relations with Persons acting in such capacities and pay appropriate fees to, and enter into appropriate contracts with, or employ, or retain any of them to render services in connection with the Partnership's business; and perform or assist in the performance of administrative or managerial functions necessary in the management of the Partnership, all subject to Section 1.11.2;

6.1.10   Ask for, collect, and receive any rents, issues, and profits or income from the Partnership's business, and disburse Partnership funds for Partnership purposes to those Persons entitled to receive them;

6.1.11   Purchase contracts of liability, casualty, or other insurance for the protection of the assets and business of the Partnership or the Partners, or for any purpose deemed by the General Partner to be convenient or beneficial to the Partnership;

6.1.12   Pay all taxes, licenses, or assessments of whatever kind or nature imposed upon or against the Partnership, and for such purposes make such returns and do all other such acts or things as may be deemed necessary and advisable by the Partnership;

6.1.13   Establish, maintain, and supervise the deposit of any cash or securities of the Partnership in accounts in the name of the Partnership, and invest them in the discretion of the General Partner;

6.1.14   Institute, prosecute, defend, settle, compromise, and dismiss lawsuits or other judicial or administrative proceedings brought on behalf of, or against, the Partnership or the Partners in connection with activities arising out of, connected with, or incidental to this Agreement and the affairs of the Partnership, and engage counsel or others in connection therewith;

6.1.15   Take any action necessary or appropriate for the continuation of the Partnership's valid existence as a limited partnership under the laws of the State of Florida;

6.1.16   Release, compromise, assign or transfer any claims, rights or benefits of the Partnership;

6.1.17   Pay, extend, renew, confess, modify, adjust, submit to arbitration, prosecute, defend or compromise, upon such terms as they may determine and upon such evidence as the General Partner may deem sufficient, any obligation, suit, liability, cause of action or claim, including taxes, either in favor of or against the Partnership;

6.1.18   Negotiate, execute, deliver, consent to, or approve any contract, document, request or instrument in connection with the Partnership's business;

6.1.19   Borrow money on behalf of the Partnership from banks, insurance companies, or any other lending institutions in accordance with the Partnership's purposes; and, in connection therewith, issue notes, debentures and other debt securities and hypothecate the assets of the Partnership to secure repayment of such funds;

6.1.20   Amend the Agreement or the certificate of limited partnership of the Partnership, including any statement changing the status of the Partnership to a limited liability partnership;

6.1.21   Admit a Limited Partner and/or admit a General Partner; and

6.1.22   Require a Unit Holder to return an improper distribution.

6.2   <u>General Partner's Activities</u>. The General Partner shall devote so much of its time and effort to the Partnership's business as it deems to be necessary and advisable for the proper management and supervision of the Partnership's business, but the General Partner shall have no obligation to manage the Partnership as its sole and exclusive business. The General Partner and/or any of its Affiliates may have other businesses and may engage in activities other than those relating to the Partnership, regardless of whether such businesses may be competitive with the business of the Partnership to the fullest extent permitted by the Act. Nothing in this Agreement shall create in the Partnership or any Limited Partner any right, title or interest in or to such independent ventures of the General Partner and/or any of its Affiliates, or in the income or proceeds derived therefrom, or create any other obligations or liabilities on the part of the General Partner to the Partnership or to the Limited Partners by reason thereof.

6.3   <u>General Partner's Duties</u>. The General Partner's administrative duties shall include bookkeeping, record keeping, and preparation and filing of tax returns and tax elections, as may be required or advisable from time to time. In addition, the General Partner shall timely file all other forms, documents or writings with respect to the business and operations of the Partnership that shall be required by any governmental agency or authority having apparent jurisdiction to require such forms, documents or other writings. The General Partner may employ attorneys, accountants and other agents to perform all such duties. To the extent that services are provided to the Partnership directly by the General Partner or its Affiliates, the Partnership shall pay reasonable compensation therefor subject to <u>Section 1.11.2</u>.

6.4   <u>Management and Control of Partnership</u>. Except as otherwise expressly provided under this Agreement or as specifically provided for under the non-waivable provisions of the Act or any law:

6.4.1   The Limited Partners shall not participate in the conduct, management or control of the Partnership business and shall have no right or authority to act for or bind the Partnership, which powers shall be vested solely and exclusively in the General Partner;

6.4.2   The Limited Partners shall have the right to vote only on the matters expressly reserved for their approval or consent under this Agreement, and Limited Partners shall not have the right to vote on any other matters of any nature; and

6.4.3   In any circumstances requiring the approval or consent of the Limited Partners as specified in this Agreement, such approval or consent shall, except as expressly provided to the contrary in this Agreement, be conveyed in writing to the General Partner not later than ten days after such approval or consent is requested by the General Partner; provided, that the General Partner may require a response within a shorter time, but not less than five days; provided further, that a failure to respond in any such time period shall constitute a vote which is consistent with the General Partner's recommendation with respect to the proposal and; provided further, that if the General Partner receives the actual and/or deemed approval or consent of the Limited Partners to such action, the General Partner shall be authorized and empowered to implement such action without further authorization of the Limited Partners.

6.5 <u>Role of the Limited Partners</u>. Except as otherwise expressly provided under this Agreement or as specifically provided for under the non-waivable provisions of the Act or any law, no Limited Partner shall participate in or have any control over the Partnership's business or any authority or right to act for or bind the Partnership.

6.6 <u>Compensation to the General Partner and its Affiliates</u>. The General Partner and any of its Affiliates shall be entitled to receive reasonable compensation for services rendered by or on behalf of the Partnership, subject to <u>Section 1.11.2</u>. Without limiting the generality of the foregoing, the General Partner shall be entitled to receive the Management Fee, payable as follows:

6.6.1 An amount equal to three percent of each Loan disbursement shall be paid to the General Partner as a prepayment of the Management Fee upon receipt from the Developer of any prepayment of interest required under the Loan; and

6.6.2 Otherwise, as provided in <u>Section 3.2</u> and <u>Section 3.3</u>, above.

6.7 <u>Reimbursement of Expenses</u>. If the General Partner advances the payment of expenses on behalf of the Partnership, the General Partner shall reimburse itself for such expenses from the funds of the Partnership. Such expenses shall include, but are not limited to, (a) expenses incurred in connection with the organization of the Partnership, including legal and accounting fees for the preparation of this Agreement and the materials provided to Limited Partners in connection with the purchase of Units, (b) compensation for goods, services and materials used for or by the Partnership, and (c) all other reasonable out-of-pocket expenses that are incurred by the General Partner for or on behalf of the Partnership in connection with the Partnership's business; provided, that Operating Expenses and any other monies payable under this <u>Section 6.7</u>, and amounts, if any, required to create reasonable reserves, with respect to a Limited Partner, shall be paid first from income of the Partnership allocable to such Limited Partner's Capital Account and, to the extent such income is insufficient to pay the full amount due, thereafter from such Limited Partner's Capital Account, but only to the extent of the excess, if any, of such Limited Partner's Capital Contributions over the Subscription Amount of such Limited Partner. Any amount that may not be timely payable as a result of this <u>Section 6.7</u> shall be treated and subject to the same terms and conditions as a loan made by the General Partner under <u>Section 2.2</u>.

6.8 <u>Right to Rely on Authority of General Partner</u>. No Person dealing with the General Partner shall be required to determine its authority to make any undertaking on behalf of the Partnership, or to determine any fact or circumstance bearing upon the existence of its authority. Every contract, agreement, lease, promissory note, deed, mortgage and other instrument or document executed by the General Partner on behalf of the Partnership shall be conclusive evidence in favor of any and every Person relying on it that:

6.8.1 At the time of the execution or delivery, the Partnership was in good standing;

6.8.2 Such instrument or document was duly executed in accordance with this Agreement and is binding upon the Partnership and all of the respective Partners (provided, that no liability of the Limited Partners may be created thereby); and

6.8.3 The General Partner was duly authorized and empowered to execute and deliver every such instrument or document for and on behalf of the Partnership.

## 7    REPRESENTATIONS AND WARRANTIES

7.1    <u>Representations and Warranties of the General Partner</u>. As of the date of this Agreement, the General Partner represents and warrants to each of the Limited Partners that the General Partner is a duly organized and validly existing limited liability company in good standing under the laws of the State of Florida, with full power and authority to enter into and perform its obligations under this Agreement; and that this Agreement constitutes the legal, valid, and binding obligation of the General Partner.

7.2    <u>Representations and Warranties of the Limited Partners</u>. As of the date of this Agreement, each Limited Partner hereby represents and warrants to each of the other Partners that:

7.2.1    The Limited Partner has the authority to execute and deliver this Agreement and perform its obligations under this Agreement, and this Agreement constitutes the legal, valid, and binding obligation of such Limited Partner;

7.2.2    Such Limited Partner is acquiring each Unit for such Limited Partner's own account for investment only and not for the purpose of, or with a view to, the resale or distribution of all any part thereof, nor with a view to selling or otherwise distributing such Unit or any part thereof at any particular time or under any pre-determined circumstances;

7.2.3    Such Limited Partner is a sophisticated investor, able and accustomed to evaluating and accessing financial matters, and that such Limited Partner has a sufficient net worth so that such Limited Partner does not anticipate a need for the funds to be invested, such Limited Partner understands investment in Units to be a speculative and illiquid investment;

7.2.4    Such Limited Partner is a bona-fide resident of the jurisdiction referenced in his or her signature page to this Agreement; and

7.2.5    Such Limited Partner has been given access to all information regarding the Partnership that such Limited Partner considers necessary or relevant to his or her investment decision.

## 8    TRANSFER RESTRICTIONS

8.1    <u>Restrictions on Transfers by Unit Holders</u>. Until such time as a Unit Holder's I-829 Petition has been adjudicated and then except in accordance with this <u>Section 8</u> and with the prior written consent of the General Partner (a "**Permitted Transfer**", and such permitted transferee, a "**Permitted Transferee**"), no Unit Holder may Transfer all or any portion of any Unit held by such Unit Holder. Any Transfer or attempted Transfer by any Unit Holder in violation of the preceding sentence shall be null and void and of no force or effect whatsoever.

8.1.1    The securities represented by Units have not been registered under the Securities Act of 1933, as amended, and may not be Transferred in the absence of an effective registration statement under the Securities Act of 1933, as amended, or an opinion of counsel satisfactory to the General Partner that such registration is not required. Without limiting the generality of the foregoing, hedging transactions involving such securities may not be conducted unless in compliance with such requirements.

8.1.2    In addition to all other remedies available at law or in equity for a breach of this Agreement, each Partner acknowledges the reasonableness of the restrictions on Transfer imposed by this

Agreement in view of the Partnership's purposes and the relationship of the Partners. Accordingly, the restrictions on Transfer contained herein shall be specifically enforceable.

8.1.3   Each Unit Holder hereby further agrees to indemnify, defend, and hold the Partnership and each Partner (and each Partner's successors and assigns) wholly and completely harmless from and against any cost, liability, or damage (including attorneys' fees and costs) incurred by any of such indemnified Persons as a result of a Transfer or an attempted Transfer in violation of this Agreement and efforts to enforce the indemnity granted hereby.

8.2   Permitted Transfers.

8.2.1   A Permitted Transferee shall become a Limited Partner on the first day of the calendar month following his or her acceptance into the Partnership by the General Partner in accordance with Section 8.1. Each Limited Partner hereby consents to the admission of Permitted Transferees as Limited Partners pursuant to the terms and conditions of this Agreement.

8.2.2   The rights of a Transferee who is not admitted as a Limited Partner shall be limited to those of an assignee of the Transferred Units under the Act. The Transferee shall not be a Partner and shall not have the right to inspect the Partnership's books, act for or bind the Partnership, or otherwise interfere in its operations. Any allocations and distributions to which the Transferee is entitled by law shall be subject to offset (without limiting any other legal or equitable rights of the Partnership) to satisfy any debts, obligations, or liabilities for damages that the Transferor or Transferee may have to the Partnership.

8.3   General Partner's Interest. Upon a Transfer of the General Partner's entire Partnership Interest, the General Partner shall be deemed to have dissociated from the Partnership and the Transferee shall become successor general partner hereunder. Such Transfer shall be effective only after giving at least thirty (30) days' prior written notice to the Limited Partners, or as otherwise provided under the Act. The rights of a Transferee of less than the General Partner's entire Partnership Interest shall be limited to those of an assignee under the Act.

8.4   Transferor/Transferee Allocations and Distributions. If a Transfer occurs during any Allocation Period, then Profits, Losses, each item thereof, and all other items attributable to the Transferred Interest for such Allocation Period shall be divided and allocated between the Transferor and the Transferee by taking into account their varying Partnership Interests during the period in accordance with Code Section 706(d), using any conventions permitted by law and selected by the General Partner. Solely for purposes of making such allocations and distributions, the Partnership shall recognize a Permitted Transfer, and amend its records accordingly, not later than the end of the calendar month in which the General Partner accepts such Transfer in accordance with Section 8.1.

## 9   LIMITATION OF LIABILITY; INDEMNIFICATION

9.1   Limitation of Liability; Indemnification.

9.1.1   To the extent permitted by law, none of the General Partner, nor any of its direct and indirect officers, directors, agents, stockholders, members, managers, employees or partners, or any other Person who serves at the request of the General Partner on behalf of the Partnership as an officer, director, member, manger, partner, employee or agent of any other entity, (each, an "**Indemnified Party**") shall be liable to the Partnership or to any Unit Holder for (i) any act or omission taken or suffered by any Indemnified Party in connection with the conduct of the affairs of the

-17-

Partnership or otherwise in connection with this Agreement or the matters contemplated herein, unless it is determined in each case by any court or governmental body of competent jurisdiction in a final judgment or admitted by such Indemnified Party in a settlement of any lawsuit (other than in the context of a temporary, preliminary or similar injunction) that such act or omission resulted from fraud, bad, faith, willful misconduct, gross negligence, a material violation of applicable U.S. federal securities laws or a willful and material breach of this Agreement, which breach shall not have been cured within thirty days after such breach, in each case, on the part of such Indemnified Party, and except that nothing herein shall constitute a waiver or limitation of any rights which a Limited Partner or the Partnership may have under applicable securities laws or other laws and which may not be waived, (ii) any mistake, negligence, dishonesty or bad faith of any broker, advisor or other agent of the Partnership selected by the General Partner with reasonable care, or (iii) any act or omission taken or suffered in good faith by an Indemnified Party pursuant to a contract or transaction under Section 1.11.2. This Section 9.1.1 shall not affect the General Partner's obligation to correct any distributions under Section 3, or allocations under Section 4, if such distributions or allocations were not made in accordance with this Agreement.

9.1.2   The General Partner shall not be liable to the Partnership or to any Unit Holder for breach of fiduciary duty for its good faith reliance on the provisions of this Agreement. The provisions of this Agreement, to the extent that they expand, restrict or eliminate the duties and liabilities of the General Partner otherwise existing at law or in equity, or otherwise, are agreed by the Partners to modify to those duties and liabilities of the General Partner to that extent.

9.1.3   The General Partner may consult with legal counsel and accountants selected by the General Partner and any act or omission suffered or taken by the General Partner on behalf of the Partnership or in furtherance of the interests of the Partnership in good faith and in reasonable reliance upon and in accordance with the advice of such legal counsel or accountants shall be fully justified, and the General Partner shall be fully protected in so acting or omitting to act, provided, that such legal counsel or accountants were selected with reasonable care.

9.1.4   To the fullest extent permitted by law, the Partnership shall indemnify, defend, and hold harmless each of the Indemnified Parties from and against all claims, liabilities, damages, losses, costs and expenses (including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and reasonable expenses of investigating or defending against any claim or alleged claim) of any nature whatsoever, known or unknown, liquated or unliquidated, that are incurred by any Indemnified Party and/or to which such Indemnified Party may be subject by reason of its activities on behalf of the Partnership or in furtherance of the interest of the Partnership or otherwise arising out of or in connection with the affairs of the Partnership, including the performance by such Indemnified Party of any of the General Partner's duties or responsibilities under this Agreement, or otherwise in connection with the matters contemplated by this Agreement; provided, that: (i) an Indemnified Party shall be entitled to indemnification under this Section 9.1.4 only to the extent that such Indemnified Party's conduct did not constitute (as determined in each case by any court or government body or competent jurisdiction or admitted by such Indemnified Party in a settlement of any lawsuit (other than in the context of a temporary, preliminary or similar injunction)) fraud, bad faith, willful misconduct, gross negligence, a material violation of applicable U.S. federal securities laws or a willful and material breach of this Agreement, which breach shall not have been cured within thirty days after such breach; (ii) nothing in this Agreement shall constitute a waiver or limitation of any rights which a Unit Holder or the Partnership may have under applicable securities laws or other laws and which may not be waived; and (iii) the Partnership's obligations under this Section 9.1.4 shall not apply with respect to (A) economic losses or tax obligations incurred by any Indemnified Party as a result of such Indemnified Party's ownership of a

Partnership Interest or (B) expenses of the Partnership that an Indemnified Party has agreed to bear. Except to the extent that a General Partner or Unit Holder is obligated to return any amounts distributed to it (or its predecessor-in-interest) in order to fund any deficiency in the Partnership's indemnity obligations as provided in <u>Section 9.2</u>, the satisfaction of any obligation of indemnity or defense under this <u>Section 9.1.4</u> shall be from and limited to Partnership assets, no such Person shall have any obligation to make Capital Contributions to fund its share of any indemnification obligations under this <u>Section 9.1.4</u>, and no such Person shall have any personal liability on account thereof.

9.1.5    Expenses reasonably incurred by an Indemnified Party in defense or settlement of any claim that may be subject to a right of indemnification, whether granted under this Agreement or otherwise, shall be advanced by the Partnership prior to the final disposition thereof upon receipt of an undertaking by or on behalf of the Indemnified Party to repay such amount to the extent that it shall be determined ultimately that such Indemnified Party is not entitled to be indemnified. No advances shall be made by the Partnership under this <u>Section 9.1.5</u> without prior written approval of the General Partner.

9.1.6    The right of any Indemnified Party to the indemnification provided in this <u>Section 9.1</u> or elsewhere in this Agreement shall be cumulative of, and in addition to, any and all rights to which such Indemnified Party may otherwise be entitled by contract or as a matter of law or equity and shall extend to such Indemnified Party's successors, assigns and legal representatives.

9.1.7    Any Indemnified Party shall be deemed to be a creditor of the Partnership and shall be entitled to enforce the obligations of Unit Holders to return distributions pursuant to <u>Section 9.2</u> and the Act following the termination of the Partnership.

9.1.8    Each General Partner and each Unit Holder shall indemnify, defend, and hold harmless each other Partner against any taxes (including withholding taxes) imposed upon the income of or distributions to such General Partner or Unit Holder, as well as interest, penalties or additions to tax with respect thereto and additional losses, claims, damages or liabilities arising therefrom or incidental thereto. Each General Partner and Unit Holder hereby further agrees to reimburse the Partnership on demand for the amount of any properly distributed to such Person (or its predecessor-in-interest) in excess of the amounts distributable to such Person under <u>Section 10.3</u> and <u>Section 3</u>.

9.1.9    The General Partner may, in its sole discretion cause the Partnership to purchase, at the Partnership's expense, insurance to insure the General Partner or any other Indemnified Party against liability for any breach or alleged breach of their responsibilities under this Agreement or otherwise in connection with the Partnership or the General Partner.

9.1.10   The provisions of this <u>Section 9.1</u> shall survive for a period of four years from the date of dissolution of the Partnership, provided, that, if at the end of such period, there are any proceedings then pending or any other liability (whether contingent or otherwise) or claim then outstanding, the General Partner shall so notify the Unit Holders at such time, and the provisions of this <u>Section 9.1</u> shall thereafter survive in accordance with the notice provisions set forth in <u>Section 9.2.1</u>.

9.1.11   The foregoing provisions of this <u>Section 9.1</u> shall continue to afford protection to each Indemnified Party regardless of whether such Indemnified Party remains in the position or capacity pursuant to which such Indemnified Party became entitled to indemnification under this <u>Section 9.1</u> and regardless of any subsequent amendment to this Agreement, and no amendment

to this Agreement shall reduce or restrict the extent to which these indemnification provisions apply to actions taken or omissions made prior to the date of such amendment.

9.2     Return of Distributions.

9.2.1    Notwithstanding anything else contained in this Agreement, if any indemnity obligation or other liability arises under Section 9.1 or otherwise and the amount of reserves, if any, specifically identified by the General Partner with respect to such obligations or liability is less than the amount of such obligation or liability (a "**Section 9.2 Liability**"), the General Partner may require the General Partner and Unit Holders to make a contribution to the Partnership, at any time or from time to time, whether before or after dissolution and termination of the Partnership or before or after such Person's withdrawal from the Partnership, of all or any portion of the amount of the distributions previously made by the Partnership to such Person (or its predecessor-in- interest); provided, that no such Person shall at any time be required to contribute under this Section 9.2 any amount that was distributed to such Person (or its predecessor-in- interest) more than two (2) years prior to such time (except that if, at the end of such period, there are any proceedings then pending, or any other liability (whether contingent or otherwise) or claim then outstanding, the General Partner shall so notify the Unit Holders at such time (which notice shall include a brief description of each such proceedings (and of the liabilities asserted in such proceeding) or of such liabilities and claims) and the obligation of the General Partner and the Unit Holders to contribute under this Section 9.2 shall survive with respect to each such proceeding, liability, or claim set forth in such notice (or any related proceeding, liability, or claim based upon the same or a similar claim) until the date that such proceeding, liability, or claim is ultimately resolved and satisfied).

9.2.2    In the case of any required contribution to fund a Section 9.2 Liability, each General Partner and Unit Holder will make a contribution to the Partnership in such amounts as shall result in each General Partner and Unit Holder retaining cumulative distributions from the Partnership (net of any prior returns of distributions under this Section 9.2) equal to the cumulative amount that would have been distributed to such Person (or its predecessor-in-interest) had the amount of distributions previously made been reduced by the amount of such Section 9.2 Liability, as equitably determined by the General Partner (but taking into account the actual timing of the relevant prior distributions and such contributions for purposes of recalculating the Preferred Return).

9.2.3    Upon any determination (at any time and from time to time) by the General Partner that a Section 9.2 Liability will be or has been incurred for which a Capital Contribution will be required pursuant to this Section 9.2, the General Partner will promptly provide written notification thereof to each Unit Holder. Such notification shall include a reasonable description of such Section 9.2 Liability, the amount of the required contribution by each Person, and the date by which contribution or payment must be made. Prior to the contribution deadline, each such Person will deliver to the General Partner (or the Person or Persons specified by the General Partner) the amount of the required contribution. If a Person makes a contribution pursuant to this Section 9.2 with respect to a distribution previously received by that Person (or its predecessor-in- interest), the distribution will be treated as if it had not been made for purposes of thereafter applying Section 3 (other than for purposes of computing the Preferred Return, which shall be computed based on actual contributions made and distributions received).

## 10   DISSOLUTION AND WINDING UP

10.1   <u>Liquidating Events</u>. The Partnership shall dissolve and commence winding up and liquidation upon the first to occur of the following events (each a "**Liquidating Event**"):

10.1.1   The sale or other disposition (which shall not be consummated until after the adjudication of all Limited Partner I-829 Petitions) of all or substantially all of (i) the Partnership's assets, (ii) the Developer's assets or (iii) the Project, unless the Partnership, as part of the consideration for any such sale or other disposition, acquires a note, in which case, in the discretion of the General Partner, the Partnership shall not be dissolved until it sells its entire interest in such note or collects in full all monies due under such note, so that the only remaining significant asset of the Partnership is cash;

10.1.2   The decision of the General Partner, with the consent of the Limited Partners, both occurring after the adjudication of all Limited Partner I-829 Petitions, to dissolve, wind up and liquidate the Partnership;

10.1.3   The happening of any other event that makes it unlawful, impossible, or impractical to carry on the business of the Partnership;

10.1.4   The termination by legal action of the Partnership's authority to transact business; provided, that the automatic suspension of such authority by operation of law or action of the Department of State shall not cause a dissolution under this subsection until such time, if any, as reinstatement of such authority would be barred by the Act; or

10.1.5   The happening of any event that causes dissolution of a Florida limited partnership under the Act.

10.2   <u>Limitation</u>. Notwithstanding the provisions of <u>Section 10.1</u>:

10.2.1   If the Liquidating Event is the dissociation of a general partner, then the Partnership shall not be dissolved if (A) at the time of such event, there is at least one remaining general partner, or (B) there is no other general partner, but, within 90 days after such event, the Limited Partners agree in writing to continue the Partnership and to the appointment of a substitute general partner. If the Limited Partners agree to continue the Partnership, then a substitute General Partner shall be elected by the Limited Partners and such Person shall take all necessary action to continue the Partnership. Such election shall be accomplished in the following manner: (i) promptly after the agreement to continue, any one or more of the Limited Partners may nominate a Person for the election as the substitute General Partner; (ii) such nominee shall not become the General Partner unless elected by Limited Partners holding a majority of the Units; and (iii) if that nominee is not elected, then as soon as practicable any one or more of the Limited Partners may nominate another substitute General Partner, and such procedure shall continue until a substitute General Partner is elected. If a substitute General Partner is nominated and elected timely, then it shall succeed to all of the powers, privileges and obligations the former General Partner held in the Partnership except for the Partnership Interest of the former General Partner. If a Person ceases to be a General Partner under the terms of this Agreement or the Act, such Person's Partnership Interest shall be converted to that of an assignee, but shall be entitled to the same share of distributions and allocations to which it was entitled prior to the conversion.

10.2.2   If the Liquidating Event is the dissociation of the last remaining Limited Partner, then the Partnership shall not be dissolved if the General Partner admits at least one Limited Partner to the Partnership within 90 days after such event. For the avoidance of doubt, the General Partner may

admit at least one additional Limited Partner to the Partnership at any time prior to the dissociation of what, but for the admission of such additional Limited Partner, would have been the last remaining Limited Partner.

10.3 <u>Winding Up</u>. Upon the occurrence of a Liquidating Event, the Partnership shall continue solely for the purposes of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors and Partners. No Partner shall take any action that is inconsistent with, or not necessary to or appropriate for, winding up the Partnership's business and affairs. The General Partner shall be responsible for overseeing the winding up and liquidation of the Partnership and shall take full account of the Partnership's liabilities and assets, the Partnership's assets shall be liquidated as promptly as is consistent with obtaining the fair market value thereof, and the Liquidation Proceeds shall be applied and distributed in the order of priority set forth in <u>Section 3.3</u>.

10.4 <u>Alternate Form of Liquidating Distributions</u>. In the discretion of the General Partner, a pro rata portion of the distributions that would otherwise be made to the General Partner and Unit Holders pursuant to <u>Section 10.3</u> may be:

10.4.1 Distributed to a trust established for the benefit of the General Partner and Unit Holders solely for the purposes of liquidating Partnership assets, collecting amounts owed to the Partnership, and paying any contingent or unforeseen liabilities or obligations of the Partnership or of the General Partner arising out of or in connection with the Partnership; and the assets of any such trust shall be distributed to the General Partner and Unit Holders from time to time, in the reasonable discretion of the General Partner, in the same proportions as the amount distributed to such trust by the Partnership would otherwise have been distributed to them pursuant to <u>Section 10.3</u>; or

10.4.2 Withheld to provide a reasonable reserve for Partnership liabilities (contingent or otherwise) and to allow for the collection of the unrealized portion of any installment obligations owed to the Partnership, provided, that such withheld amount shall be distributed to the General Partner and Unit Holders as soon as practicable.

10.5 <u>Deemed Distribution and Liquidation</u>. If the Partnership is liquidated within the meaning of Regulations Section 1.704-1 (b)(2)(ii)(g), but no Liquidating Event has occurred, the Partnership shall not be liquidated, the Partnership's liabilities shall not be paid or discharged, and the Partnership's affairs shall not be wound up. Instead, solely for federal income tax purposes, the Partnership shall be deemed to have contributed all Partnership property and liabilities to a new limited partnership in exchange for an interest in such new limited partnership and, immediately thereafter, the Partnership will be deemed to liquidate by distributing interests in the new limited partnership to the Partners.

10.6 <u>Rights of Partners; No Obligation to Restore Deficit Capital Account Balance</u>. Except as otherwise provided in this Agreement, each General Partner and Unit Holder shall look solely to the assets of the Partnership for the return of its Capital Contributions and shall have no right or power to demand or receive property other than cash from the Partnership. Except as otherwise provided in this Agreement, no General Partner or Unit Holder shall have priority over any other General Partner or Unit Holder as to the return of its Capital Contributions, distributions, or allocations. If a General Partner or Unit Holder has a deficit balance in its Capital Account (after giving effect to all contributions, distributions and allocations for all taxable years, including the taxable year during which such liquidation occurs), then such General Partner or Unit Holder shall have no obligation to make any contribution to the capital of the Partnership with respect to such deficit, and such

deficit shall not be considered a debt owed to the Partnership or to any other Person for any purpose whatsoever.

## 11  MISCELLANEOUS

11.1 <u>Waiver of Partition</u>. No Partner shall, either directly or indirectly, take any action to require partition or appraisement of the Partnership or of any of its assets or properties or compel the sale of any Partnership property, and notwithstanding any provisions of applicable law to the contrary, each Partner (and its legal representatives, successors, or assigns) hereby irrevocably waives any and all rights to maintain any action for partition or to compel any sale with respect to its Partnership Interest, or with respect to any assets or properties of the Partnership, unless otherwise expressly provided in this Agreement.

11.2 <u>Dissociation of Limited Partner</u>. A Limited Partner may not withdraw or dissociate from the Partnership prior to the dissolution and winding up of the Partnership in accordance with <u>Section 10</u>; provided, however, that upon return of a Withdrawing Investor's Subscription Amount in accordance with <u>Section 2.6</u> or reduction of a Limited Partner's Unrecovered Capital Contribution to zero in accordance with <u>Section 3.3.7</u> or otherwise, such Limited Partner shall be deemed to have dissociated from the Partnership under §620.1601(2)(b) of the Act.

11.3 <u>Notices</u>. Any notice, payment, demand, or communication required or permitted to be given by any provision of this Agreement shall be in writing and shall be deemed to have been delivered, given, and received for all purposes (a) if delivered personally to the Person to whom it is directed or (b) if sent by confirmed facsimile transmission or by registered or certified mail, postage and charges prepaid, addressed as follows: if to the Partnership, at the address set forth in <u>Section 1.4</u>, or to such other address as the General Partner may from time to time specify by notice to the Limited Partners; and if to a Limited Partner, to the address set forth in **Exhibit A** or such other address as it shall supply for such purpose to the General Partner by a notice meeting the requirements of this <u>Section 11.3</u>.

11.4 <u>Amendment</u>. This Agreement may be amended in writing by the General Partner with the consent of the Limited Partners. This Agreement may also be amended in writing by the General Partner without prior notice to or consent from any Limited Partner (provided, that the General Partner shall notify the Limited Partners of the full details of any such amendment within 20 Business Day of the effective date of such amendment):

11.4.1 for the purpose of adding to the Agreement (or amending existing provisions) any provisions which, in the written opinion of counsel to the Partnership, are for the protection of the Limited Partners, and

11.4.2 to cure any ambiguity or to correct or supplement any provisions which, in the written opinion of counsel to the Partnership, are defective or inconsistent with any other provision of the Agreement, provided that, in the written opinion of such counsel, the cure, correction or supplemental provision does not and will not adversely affect the interests of any Limited Partner. Notwithstanding any provision of this Agreement, no amendment to this Agreement shall be effective without the prior written approval of the General Partner and, in the event that the proposed amendment will, or is likely to, cause a Limited Partner to suffer an adverse economic effect, the written consent of such Limited Partner.

11.5 <u>Binding Effect</u>. Except as otherwise provided in this Agreement, and subject to the restrictions on Transfer of Units, every covenant, term, and provision of this Agreement shall be binding upon and

inure to the benefit of the Partners and their respective heirs, legatees, legal representatives, successors, transferees, and assigns. Subject to the terms and conditions of this Agreement, any Person succeeding to a General Partner's or Unit Holder's Partnership Interest shall also succeed to all of such General Partner's or Unit Holder's rights and obligations.

11.6   Time. Time is of the essence with respect to this Agreement.

11.7   Severability. To the extent that any provision of this Agreement may be deemed or determined to be invalid or unenforceable for any reason, such invalidity or unenforceability will not impair or affect any other provision, and that provision to the extent possible and this Agreement will be interpreted so as to most fully give effect to its terms and still be valid and enforceable.

11.8   Incorporation by Reference. Every exhibit, schedule, and other appendix attached to this Agreement and referred to herein is hereby incorporated in this Agreement by reference.

11.9   Further Assurances. Each Partner agrees to perform all further acts and execute, acknowledge, and deliver any additional instruments and documents which may be reasonably necessary, appropriate, or desirable to carry out the provisions of this Agreement.

11.10  Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and, all of which when taken together, shall be deemed to constitute one and the same instrument. Counterparts delivered by facsimile shall in all cases be deemed originals. It shall not be necessary in making proof of this Agreement to produce more than one counterpart.

11.11  Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Florida and the federal laws of the United States applicable therein (excluding any conflict of laws rule or principle that might refer such construction to the laws of another jurisdiction).

11.12  No Third-Party Rights. Except for Section 9, the provisions of this Agreement are for the exclusive benefit of the Partnership and the Partners and no other party (including without limitation, any creditor of the Partnership or any Partner, and, except to the extent required by non-waivable provisions of the Act, any Unit Holder who has not been admitted as a Partner) shall have any right or claim against the Partnership or any Partner by reason of those provisions or be entitled to enforce any of those provision against the Partnership or any Partner.

11.13  Integration. This Agreement and any other documents executed by the Partners and/or their Affiliates contemporaneously with the execution of this Agreement is the entire agreement between the parties with respect to the subject hereof and supersede any prior agreement or understanding between the Partners. Except as otherwise provided in this Agreement, no alteration, modification, amendment, restatement or interpretation hereof shall be binding unless in writing and signed by the Partners.

11.14  Remedies. Each Partner acknowledges and agrees that the remedy at law for any breach of any of the terms of this Agreement would be inadequate, and agrees and consents that temporary and permanent injunctive and other equitable relief may be granted in any proceeding which may be brought to enforce any provision of this Agreement, including within such other equitable relief, specific performance, without the necessity of proof of actual damage or inadequacy of any legal remedy. Any right or remedy provided for in this Agreement shall be cumulative of any other right, power, or remedy provided for by law or in equity.

11.15 <u>No Waiver</u>. One or more waivers of a breach of any provision of this Agreement by any Person shall not be construed as a waiver of a subsequent breach of the same or any other provisions, nor shall any delay or omission by a Partner to seek a remedy for any breach of this Agreement or to exercise the rights accruing to such Partner by reason of a breach by another Person be deemed a waiver by the Partner of its remedies and rights with respect to such breach.

11.16 <u>Additional Partners</u>. Each Limited Partner and any additional or successor Limited Partner shall become a signatory hereof by signing a counterpart of this Agreement and such other instrument or instruments and in such manner as the General Partner may determine. By so signing, each Limited Partner shall be deemed to have adopted and to have agreed to be bound by all of the provisions of this Agreement.

11.17 <u>Power of Attorney</u>. Each Partner, other than the General Partner, hereby makes, constitutes and appoints the General Partner its true and lawful attorney for it and in its name, place and stead and for its use and benefit, to sign, execute, certify, acknowledge, file and record any instruments necessary or appropriate for the Partnership or Partners in any jurisdiction. The foregoing grant of authority shall be irrevocable and shall constitute a power coupled with an interest, except that each Partner may revoke this power by an instrument in writing executed and delivered to the General Partner after (a) the dissolution and winding-up of the Partnership, or (b) following the Permitted Transfer of such Partner's entire Partnership Interest and admission of the Transferee as a Partner.

11.18 <u>Jurisdiction and Venue</u>. The parties acknowledge that a substantial portion of negotiations, anticipated performance and execution of this Agreement occurred or shall occur in Palm Beach County, Florida, and that, therefore, each of the parties irrevocably and unconditionally (a) agrees that any suit, action or legal proceeding arising out of or relating to this Agreement shall be brought in the federal or state courts seated in Palm Beach County, Florida; (b) consents to the jurisdiction of such court in any such suit, action or proceeding; and (c) waives any objection which it may have to the laying of venue of any such suit, action or proceeding in such court.

11.19 <u>Enforcement Costs</u>. If any legal action or other proceeding is brought for the enforcement of this Agreement, or because of an alleged dispute, breach, default or misrepresentation in connection with any provisions of this Agreement, each party shall pay its own fees of attorneys, paralegals, and legal assistants, court costs and all expenses even if not taxable as court costs (including, without limitation, all such fees, costs and expenses incident to appeals), together with any sales tax thereon, incurred in that action or proceeding.

11.20 <u>Confidentiality</u>. Each Limited Partner will maintain the confidentiality of information which is, to the knowledge of such Limited Partner, non-public information furnished by the General Partner regarding the General Partner and the Partnership received by such Limited Partner pursuant to this Agreement in accordance with such procedures as it applies generally to information of this kind (including procedures relating to information sharing with Affiliates), except (1) to the extent that such information is or becomes generally available to the public other than as a result of disclosure of a Partner, (2) to the extent such information was made or becomes available to a Partner on a non-confidential basis from a source which is not known to the Partner to be subject to any confidentiality obligation with respect to such information, (3) as otherwise required by governmental regulatory agencies, self-regulating bodies, law, legal process (including oral examination), or litigation in which such Limited Partner is a defendant, plaintiff or other named party and (4) as such Limited Partner furnishes to its Affiliates or advisors; provided that such Limited Partner shall be liable to the Partnership and the General Partner for any such Affiliate's or advisor's failure to comply with the terms of this <u>Section 11.20</u>.

11.21 <u>Additional Documents and Acts</u>. In connection with this Agreement, each Limited Partner agrees to execute and deliver such additional documents and instruments, and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions and conditions of this Agreement, and all such transactions.

[*Signature Pages to Follow*]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first-mentioned above.

**GENERAL PARTNER:**                          **INITIAL LIMITED PARTNER:**

**U.S. IMMIGRATION FUND GP -**                **FLORIDA REGIONAL CENTER, LLC**
**MIZNER, LLC**


By_____              _____
Name:                                    Name:
Title:

**Limited Partner Signature Page**

**(To be attached to and made part of the Limited Partnership Agreement of
Via Mizner Funding, LP)**

The undersigned hereby acknowledges that the undersigned has received a copy of the Limited Partnership Agreement of VIA MIZNER FUNDING, LP (the "**Partnership**") dated as of July 20, 2012 (the "**Agreement**").

The undersigned hereby execute(s) the Agreement as a Limited Partner by adoption of this Signature Page and consents to be bound by all of the terms and conditions of the Agreement as a Limited Partner having the number of Units subscribed for by the undersigned as set forth below upon acceptance of the Subscription Agreement of the undersigned by the General Partner of the Partnership as provided therein. By executing this document, the undersigned hereby confirms those representations set forth in the Agreement and the Subscription Agreement.

**LIMITED PARTNER:**

_____
[Signature]

_____
[Print or Type Name]

_____
[Street Address]

_____
[City, Mailing Code, Country]

_____
[Telephone No.]

_____
[Facsimile No.]

_____
[Private E-mail Address]

UNITS PURCHASED: 1

SUBSCRIPTION AMOUNT: US$500,000

Date:_____

**ACCEPTED:**

U.S. IMMIGRATION FUND GP -
MIZNER, LLC

By_____
Name:
Title: Authorized Representative

Date: _____

**SCHEDULE OF EXHIBITS**

EXHIBIT A    -    Schedule of Partners and Partnership Interests

EXHIBIT B    -    Definitions and Interpretation

EXHIBIT C    -    Certificate of Limited Partnership

**EXHIBIT A**

**SCHEDULE OF PARTNERS AND PARTNERSHIP INTERESTS**

**(to be updated by the General Partner upon admission of each new Limited Partner)**

| Name | Units | Capital Contribution |
|------|-------|----------------------|
| **GENERAL PARTNER:** | | |
| U.S. IMMIGRATION FUND GP - MIZNER, LLC | N/A | Upon Formation $100 |
| **LIMITED PARTNERS:** | | |
| Initial Limited Partner | N/A | Upon formation $100 |
| See attached signature pages of Limited Partners for respective Partnership Interests and Capital Contributions. | Up to 320 | Per Unit Subscription Amount    $500,000<br><br>Maximum $160,000,000 |
| TOTAL (Less General Partner and Initial Limited Partner Contributions): | | Up to $160,000,000 |

**EXHIBIT B**

**DEFINITIONS AND INTERPRETATION**

1. <u>Definitions</u>. For the purposes of this Agreement (including the Recitals hereto), the following terms shall have the respective meanings set out below and grammatical variations of such terms shall have corresponding meanings:

   1.1. "**Accountants**" means such firm of certified public accountants as the General Partner shall retain on behalf of the Partnership.

   1.2. "**Act**" means the Florida Revised Uniform Limited Partnership Act.

   1.3. "**Adjusted Capital Account**" means, with respect to any General Partner or other Unit Holder, such Person's Capital Account as of the end of any Fiscal Year, after giving effect to the following adjustments: (i) Credit to the Capital Account the sum of (1) any amount that the Person is obligated to restore to its Capital Account under the provisions of this Agreement, plus (2) any amount the Person is deemed to be obligated to restore to its Capital Account under Sections 1.704-l(b)(2)(ii)(c) of the Regulations, and the penultimate sentence of Sections 1.704-2(g)(l) and 1.704-2(i)(5) of the Regulations; and (ii) Debit to the Capital Account the items described in Sections 1.704-l(b)(2)(ii)(d)(4), (5), and (6) of the Regulations.

   1.4. "**Adjusted Capital Account Deficit**" means, with respect to any General Partner or other Unit Holder, the deficit balance, if any, in that Person's Adjusted Capital Account.

   1.5. "**Affiliate**" means, with respect to any Person, (a) any Person directly or indirectly controlling, controlled by or under common control with such Person, (b) any Person owning or controlling ten percent or more of the outstanding voting interests of such Person, (c) any officer, director, member (if such Person is a member-managed entity), manager (if such Person is a manager-managed entity), or general partner of such Person, (d) any Person who is an officer, director, member (if such Person is a member-managed entity), manager (if such Person is a manager-managed entity), general partner, trustee, or holder of ten percent or more of the voting interests of any Person described in clauses (a) through (c) of this sentence; or (e) any Person who is related by marriage to, or is an ancestor or descendant of, such Person. The terms "controls", "controlled by" and "under common control with" mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of an entity or individual, whether through the ownership of voting securities, by contract, or otherwise.

   1.6. "**Agreement**" means this Limited Partnership Agreement, as amended from time to time.

   1.7. "**Allocation Period**" means any period for which Profits and Losses and other items of Partnership income, gain, loss or deduction are required to be allocated among the Partners for federal income tax purposes.

   1.8. "**Business Day**" means a day other than a Saturday, a Sunday or a statutory holiday in the State of Florida.

1.9. "**Capital Account**" means, with respect to any General Partner or other Unit Holder, the Capital Account maintained for such Person in accordance with the following provisions:

1.9.1. Each such Person's Capital Account shall be credited with such Person's Capital Contributions (as and when such Capital Contributions are made), such Person's distributive share of Profits and any items in the nature of income or gain that are specially allocated to such Person under Section 4, and the amount of any Partnership liabilities assumed by such Person or which are secured by any property distributed to such Person;

1.9.2. Each such Person's Capital Account shall be debited with the amount of cash and the Gross Asset Value of any property distributed to such Person under any provision of this Agreement, such Person's distributive share of Losses and any items in the nature of expenses or losses that are specially allocated to such Person under Section 4, and the amount of any liabilities of such Person assumed by the Partnership or which are secured by any property contributed by such Person to the Partnership;

1.9.3. If any Partnership Interest is transferred in accordance with this Agreement, then the Transferee shall succeed to (i) the Capital Account applicable to the Transferor to the extent it relates to the Transferred Interest; (ii) if the Transferred Interest includes a General Partner's Partnership Interest, all other accounts maintained with respect that Partnership Interest; and (iii) if the Partnership Interest includes any Units, all other accounts maintained with respect those Units;

1.9.4. In determining the amount of any liability for purposes of Sections 1.9.1 and 1.9.2, there shall be taken into account Code Section 752(c) and the applicable Regulations; and

1.9.5. The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Regulations. If the General Partner shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including debits or credits relating to liabilities that are secured by contributed or distributed property or that are assumed by the Partnership or the General Partner or any of the Unit Holders), are computed in order to comply with such Regulations, the General Partner may make such modification, provided, that it is not likely to have a material effect on the amount distributable to any General Partner or other Unit Holder under Section 10 upon the dissolution of the Partnership. The General Partner also shall (i) make any adjustments that are necessary or appropriate to maintain equality between the Capital Accounts of the Partners and the amount of Partnership capital reflected on the Partnership's balance sheet, as computed for book purposes, in accordance with Regulations Section 1.704- l(b)(2)(iv)(g), and (ii) make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Regulations Section 1.704-1(b).

1.10. "**Capital Contribution**" means, in respect of each Partner at any time, the amount of money and the agreed fair market value of any property other than money contributed by a Partner to the Partnership pursuant to Section 2.1.

1.11. "**Code**" means the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of succeeding law).

1.12.    "**Debt Service**" means, for any Allocation Period, the total amount of all required payments of interest and principal (excluding interest that is advanced and paid from loan proceeds and balloon principal payments required to be made at maturity) that are payable by the Partnership during such period under any loan secured by the Partnership's assets, or any other loan to the Partnership, whether secured or unsecured.

1.13.    "**Depreciation**" means, for each Allocation Period, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such period, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such period, then Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such period bears to such beginning adjusted tax basis; provided, that if the federal income tax depreciation, amortization, or other cost recovery deduction for such period is zero, then Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the General Partner.

1.14.    "**Florida Regional Center**" means the area in Palm Beach County, Florida, for which Florida Regional Center, LLC has obtained designation from USCIS as a "Regional Center," pursuant to Section 610 of the U.S. Appropriations Act and the Immigration Act. The Florida Regional Center includes the Property within its boundaries.

1.15.    "**GAAP**" means accounting principles generally accepted in the United States applicable to commercial real estate consistently applied, as recommended in the handbook of the governing professional organization.

1.16.    "**General Partner**" means U.S. Immigration Fund GP - Mizner, LLC and any successor general partner of the Partnership.

1.17.    "**Gross Asset Value**" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

1.17.1.  The initial Gross Asset Value of any asset contributed by a Partner to the Partnership shall be the agreed gross fair market value of such asset, as determined by the General Partner and the contributing Partner;

1.17.2.  The Gross Asset Values of all Partnership assets shall be adjusted to equal their respective gross fair market values, as determined by the General Partner, as of the following times: (i) the acquisition of an additional Partnership Interest in the Partnership by any new or existing Partner in exchange for more than a de minimis Capital Contribution; (ii) the distribution by the Partnership to a Partner of more than a de minimis amount of Partnership property in consideration for a Partnership Interest; and (iii) the liquidation of the Partnership within the meaning of Regulations Section 1.704-1 (b)(2)(ii)(g); provided, that adjustments pursuant to clauses (i) and (ii) above shall be made only if the General Partner reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Partners in the Partnership;

1.17.3.  The Gross Asset Value of any Partnership asset distributed to any Partner shall be the gross fair market value of such asset on the date of distribution as determined by the distributee Partner and the General Partner, provided, that if the distributee is the General

Partner, the determination of the fair market value of the distributed asset shall require the consent of the Limited Partners;

1.17.4.   The Gross Asset Value of the Partnership assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts under Regulations Section 1.704- l(b)(2)(iv)(m) and Section 5.5; provided, that Gross Asset Values shall not be adjusted pursuant to this paragraph (d) to the extent the General Partner determines that an adjustment under Section 1.21.2 above is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this Section 1.21.4; and

1.17.5.   If the Gross Asset Value has been determined or adjusted pursuant this Agreement, such Gross Asset Value shall thereafter be reduced by any Depreciation taken into account with respect to such asset in computing Profits and Losses.

1.18.   "**Immigration Act**" means 8 U.S.C. §1101, *et seq.*, together with regulations published at 8 C.F.R. § 1.1, *et seq.*, as the same may be amended from time to time.

1.19.   "**Limited Partner**" means each Unit Holder admitted to the Partnership as a Limited Partner in accordance with this Agreement.

1.20.   "**Liquidation Proceeds**" means all of the cash and other property held by the Partnership at the time of the happening of an event causing dissolution of the Partnership, and all cash and property received by the Partnership thereafter, irrespective of whether such cash was or otherwise would have been considered Net Cash Flow or New Cash Proceeds from Sales or Refinancing.

1.21.   "**Management Fee**" means a management fee for services rendered by the General Partner to the Partnership equal to three percent per annum of the total principal amount outstanding under the Loan from time to time, cumulative but not compounded, determined on the basis of a 365/366 day year for the actual number of days in the period for which the Management Fee is being determined.

1.22.   "**Net Cash Flow**" means, for any Allocation Period, the amount by which Net Operating Income exceeds Debt Service (including interest and principal payments) on loans to the Partnership.

1.23.   "**Net Cash Proceeds From Sales or Refinancing**" means the net cash proceeds of the Partnership from the sale (other than in the ordinary course of its business), financing, refinancing, exchange or other disposition by the Developer of all or a portion of the Project, and all principal and interest payments with respect to any note or other obligation received by the Developer in connection with the sale or other disposition of all or any portion of the Project.

1.24.   "**Net Operating Income**" means, for any Allocation Period, the amount by which Operating Revenues exceed Operating Expenses for such Allocation Period.

1.25.   "**Nonrecourse Deductions**" has the meaning set forth in Regulations Section 1.704-2(b)(1). The amount of Nonrecourse Deductions for an Allocation Period equals the excess, if any, of the net increase, if any, in the amount of Partnership Minimum Gain

during that Allocation Period over the aggregate amount of any distributions during that Allocation Period of proceeds of a Nonrecourse Liability that are allocable to an increase in Partnership Minimum Gain, determined according to the provisions of Regulations Section 1.704-2(c).

1.26.  "**Nonrecourse Liability**" has the meaning set forth in Regulations Section 1.704-2(b)(3).

1.27.  "**Operating Expenses**" means, with respect to the Partnership and for any Allocation Period, the current obligations of the Partnership for such Allocation Period, determined in accordance with GAAP for (a) operating expenses of the Project, including fees paid under this Agreement, (b) capital expenditures not paid for from reserves, loans, or Capital Contributions, and (c) increases in reserves for working capital, operating deficits and capital items, established by the General Partner; but specifically excluding items paid from reserves, proceeds from the sale or refinancing of all or any portion of the Project, and Capital Contributions. Operating Expenses shall include the fees paid to any property manager but shall not include Debt Service nor any non-cash expenses such as Depreciation or amortization.

1.28.  "**Operating Revenues**" means, with respect to the Partnership and any for Allocation Period, the gross revenues arising from the ownership and operation of the Project during such Allocation Period, including proceeds of any business interruption insurance and decreases in reserves, but specifically excluding proceeds from the sale or refinancing of all or any portion of the Project and Capital Contributions.

1.29.  "**Partners**" means the General Partner and each of the Limited Partners, where no distinction is required by the context in which the term is used; and "Partner" means any one of the Partners.

1.30.  "**Partnership**" means the limited partnership formed under the name "Via Mizner Funding, LP" and registered as a limited partnership pursuant to the Act.

1.31.  "**Partner Nonrecourse Debt**" has the meaning set forth in Regulations Section 1.704-2(b)(4).

1.32.  "**Partner Nonrecourse Debt Minimum Gain**" means an amount, with respect to each Partner Nonrecourse Debt, equal to the Partnership Minimum Gain that would result if such Partner Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Regulations Section 1.704-2(i)(3).

1.33.  "**Partner Nonrecourse Deductions**" has the meaning set forth in Regulations Section 1.704-2(i)(2). The amount of Partner Nonrecourse Deductions with respect to a Partner Nonrecourse Debt for an Allocation Period equals the excess, if any, of the net increase, if any, in the amount of Partner Nonrecourse Debt Minimum Gain attributable to such Partner Nonrecourse Debt during that Allocation Period over the aggregate amount of any distributions during that Allocation Period to the Partner that bears the economic risk of loss for such Partner Nonrecourse Debt and are allocable to an increase in Partner Nonrecourse Debt Minimum Gain attributable to such Partner Nonrecourse Debt, determined in accordance with Regulations Section 1.704-2(i)(2).

1.34.  "**Partnership Interest**" means the interest of a Partner in the Partnership and its rights in the capital, profits, losses, gains, distributions or other economic interests of any type in

or from the Partnership including such Partner's right: (a) to allocations of items of income, gain, loss, deduction, and credit of the Partnership; (b) to distributions of Net Cash Flow, Net Proceeds from Sale or Refinancing, and liquidation proceeds; (c) to inspect the books and records of the Partnership; and (d) if a General Partner, to manage the Partnership, all as provided in this Agreement and, to the extent not inconsistent with this Agreement or the Act.

1.35.    "**Partnership Minimum Gain**" has the meaning set forth in Regulations Sections 1.704-2(d)(1).

1.36.    "**Partnership Nonrecourse Debt**" has the meaning set forth in Regulations Section 1.704-2(b)(3).

1.37.    "**Person**" shall be broadly construed and means, without limitation, any individual, partnership, limited partnership, corporation, limited liability company, unincorporated organization or association, trust (including the trustees thereof, in their capacity as such), government (or agency or political subdivision thereof) or other legal or business entity or enterprise.

1.38.    "**Pilot Program**" means the EB-5 immigrant investment program established pursuant to the Immigration Act.

1.39.    "**Preferred Return**" means, with respect to each Limited Partner, a sum equal to one-half of one percent of the average daily balance of such Limited Partner's Unrecovered Capital Contribution during the period to which the Preferred Return relates, cumulative but not compounded, determined on the basis of a 365/366 day year, as the case may be, for the actual number of days in the period for which the Preferred Return is being determined.

1.40.    "**Prime Rate**" means the prime rate announced as such from time to time by Citibank, N.A., or its successor. Any interest payable under this Agreement with reference to the Prime Rate shall be adjusted on a daily basis, based upon the Prime Rate in effect from time to time, and shall be calculated on the basis of 365/366 day year, as the case may be, for the actual number of days in the period.

1.41.    "**Profits**" and "**Losses**" means, for each Allocation Period, an amount equal to the Partnership's taxable income or loss for such period, determined in accordance with Code Section 703(a)(for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

1.41.1.    Any income of the Partnership that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses shall be added to such taxable income or loss;

1.41.2.    Any expenditures of the Partnership described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-l(b)(2)(iv)(7), and not otherwise taken into account in computing Profits or Losses pursuant to this definition, shall be subtracted from such taxable income or loss;

1.41.3.  If the Gross Asset Value of any Partnership asset is adjusted in accordance with paragraph (b) or (c) of the definition of Gross Asset Value, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

1.41.4.  Gain or loss resulting from any disposition of any Partnership asset with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of such asset, notwithstanding that the adjusted tax basis of such asset differs from its Gross Asset Value;

1.41.5.  In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, Depreciation for such Allocation Period shall be computed in accordance with the definition of Depreciation;

1.41.6.  To the extent an adjustment to the adjusted tax basis of any Partnership asset that was made under Internal Revenue Code Section 734(b) or Internal Revenue Code Section 743(b) is required, under Regulations Section 1.704-l(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts, as a result of a distribution other than in complete liquidation of the Partnership Interest of a General Partner or other Unit Holder, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from a disposition of the asset and shall be taken into account for purposes of computing Profits and Losses; and

1.41.7.  Notwithstanding any other provision of this definition of Profits and Losses, any items which are specially allocated pursuant to Section 4 shall not be taken into account in computing Profits or Losses.

1.42.  "**Project**" means the development, construction and operation on the Property of the first phase of an estimated $375.0 million mixed use real estate development known as Via Mizner.

1.43.  "**Property**" means approximately 6.8 acres of real property located on the northeast corner of the intersection of South Federal Highway and East Camino Real in Boca Raton, Florida.

1.44.  "**Regulations**" means the United States income tax regulations, including Treasury Regulations and Temporary Regulations, promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

1.45.  "**Subscription Agreement**" means a subscription agreement between the Partnership and a Limited Partner pursuant to which the Limited Partner subscribes for Units in a form acceptable to the General Partner.

1.46.  "**Subscription Amount**" means the minimum amount of money necessary for a Limited Partner at the time he or she is admitted to the Partnership to meet the investment requirement of the Pilot Program, currently US$500,000.

1.47.  "**Targeted Employment Area**" means the high unemployment area within the Florida Regional Center, as designated pursuant to the Immigration Act.

1.48. "**Tax Matters Partner**" means the General Partner, as provided in Regulations under Code Section 6231.

1.49. "**Transfer**" means, as a noun, any voluntary or involuntary transfer, sale, pledge, hypothecation, or other disposition, that conveys any portion of a Partnership Interest to any Person other than the present owner, including a disposition by will or intestacy, a distribution from a trust, the filing of a petition, whether voluntary or involuntary, in bankruptcy or any other proceeding for relief from debt, a disposition effected by property settlement agreement or decree of divorce, and the imposition of a charging order on the Partnership Interest; and means, as a verb, to make a Transfer, either voluntarily or involuntarily.

1.50. "**Transferee**" means a Person who obtains an economic interest in a Partnership Interest, or who obtains the rights and powers of a Unit Holder, from a Transferor, including the estate of a deceased Unit Holder, the successor-in-interest to a Unit Holder that has dissolved, liquidated or terminated, the estate of a bankrupt Unit Holder and a distributee from a trust.

1.51. "**Transferor**" means a Person who makes a Transfer.

1.52. "**Unit**" means a unit of Partnership Interest in the Partnership held by a Limited Partner (other than the Initial Limited Partner) or a Unit Holder and issued by the Partnership upon admission of a Limited Partner to the Partnership following receipt from such Limited Partner of the Subscription Amount.

1.53. "**Unit Holder**" means a Person who owns one or more Units, whether or not such Person has been admitted to the Partnership as a Partner.

1.54. "**Unrecovered Capital Contribution**" means an amount equal to the excess, if any, of the Capital Contribution made by a Unit Holder (or that Unit Holder's predecessor in interest) over the aggregate amount of distributions under Section 3.3.5 received by that Unit Holder (or that Unit Holder's predecessor in interest), determined as of the date required under this Agreement.

1.55. "**USCIS**" means United States Citizenship and Immigration Services, an agency of the Department of Homeland Security of the United States of America.

2. **Interpretation Not Affected by Headings, etc**. The division of this Agreement into Sections and the insertion of headings are for reference purposes only and shall not affect the interpretation of this Agreement. Unless otherwise indicated, any reference in this Agreement to a Section refers to the specified Section of this Agreement.

3. **Construction**. Every covenant, term, and provision of this Agreement shall be construed simply according to its fair meaning and not strictly for or against any such Partner. This Agreement shall be interpreted without regard to any presumption or rule requiring construction against the party causing this Agreement to be drafted. Further, words such as "herein," "hereinafter," "hereof," "hereto," and "hereunder" refer to this Agreement as a whole, unless the context otherwise requires; and the term "including", when following any statement, will not be construed to limit such statement to the specific items or matters as provided immediately following the term "including" (whether or not non-limiting language such as "without limitation" or "but not limited to" or words of similar import

-B-8-

are also used), but rather will be deemed to refer to all items or matters that could reasonably fall within the broader scope of the statement.

4. **Number and Gender**. In this Agreement, words importing the singular number include the plural and vice versa and words importing any gender include all genders and the neutral gender.

5. **Date for Any Action**. If any date on which any action is required to be taken under this Agreement is not a Business Day, that action shall be required to be taken on the next immediately following Business Day.

6. **Approval or Consent of Limited Partners or Unit Holders**. Unless otherwise stated in this Agreement or provided by law, approval or consent of the Limited Partners or the Unit Holders shall mean approval or consent of the holders of a majority of the Units held by all Limited Partners or Unit Holders, as the case may be.

7. **Accounting Terms**. In this Agreement, accounting terms that are not defined herein shall be construed in accordance with GAAP.

8. **Currency**. In this Agreement, all dollar amounts are expressed in United States dollars.

**EXHIBIT C**

**CERTIFICATE OF LLIMITED PARTNERSHIP**

[See Attached]

# *Certified Copy*

I certify the attached is a true and correct copy of the Certificate of Limited Partnership of VIA MIZNER FUNDING, LP, a Limited Partnership organized under the laws of the state of Florida, filed electronically on July 11, 2012, as shown by the records of this office.

I further certify that this is an electronically transmitted certificate authorized by section 15.16, Florida Statutes, and authenticated by the code noted below.

The document number of this limited partnership is A12000000401.

Authentication Code: 120712085750-700237331687#1

Given under my hand and the
Great Seal of the State of Florida
at Tallahassee, the Capital, this the
Twelfth day of July, 2012



Ken Detzner
Secretary of State

Exhibit to Offering Memorandum for Via Mizner Funding, LP

**<u>EXHIBIT B</u>**

**<u>SUBSCRIPTION AGREEMENT</u>**

[See Attached]

**THIS AGREEMENT HAS BEEN INITIALLY WRITTEN IN THE ENGLISH LANGUAGE; IN THE EVENT OF ANY CONFLICT BETWEEN THE ORIGINAL ENGLISH VERSION AND ANY TRANSLATIONS INTO OTHER LANGUAGES, THE ORIGINAL ENGLISH VERSION SHALL CONTROL**

**VIA MIZNER FUNDING, LP**

**SUBSCRIPTION AGREEMENT**

**THE SECURITIES OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER THE SECURITIES LAWS OF ANY STATE OR FOREIGN JURISDICTION AND ARE BEING OFFERED PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT AND EXEMPTIONS FROM REGISTRATION PROVIDED BY THE SECURITIES LAWS OF SUCH STATE OR FOREIGN JURISDICTION. THE SECURITIES OFFERED HEREBY ARE HIGHLY SPECULATIVE AND INVOLVE SIGNIFICANT RISKS AND SHOULD NOT BE PURCHASED BY ANYONE WHO CANNOT AFFORD THE LOSS OF THE INVESTOR'S ENTIRE INVESTMENT.**

This Subscription Agreement (this "**Agreement**") is entered into as of the date set forth on the signature page hereto, between Via Mizner Funding, LP, a Florida limited partnership (the "**Partnership**"), and the undersigned (the "**Subscriber**").

**BACKGROUND**

A.    The Partnership has been formed in order to extend the Loan to Camino Investments Holdings Limited Partnership (the "**Developer**"), the owner of approximately 6.8 acres of real property located on the northeast corner of the intersection of South Federal Highway and East Camino Real in Boca Raton, Florida (the "**Property**"), which intends to develop, construct and operate on the Property, and on an offsite golf and country club, an estimated $375.0 million mixed use real estate development known as Via Mizner (the "**Project**").

B.    The Developer intends to construct the Project in three consecutive phases: (i) a 350-unit residential tower with related office, retail and parking space, together with offsite golf and country club renovation and construction work (collectively, "**Phase I**"), (ii) a 118-room hotel with related retail and parking space (collectively, "**Phase II**") and (iii) a 100-unit condominium tower with related restaurant and parking space (collectively, "**Phase III**").

C.    The Partnership's affairs are managed by its general partner, U. S. Immigration Fund GP - Mizner, LLC (the "**General Partner**").

D.    In order to extend a loan to the Developer secured by an interest in the Property and the Project (the "**Loan**") to fund a portion of the costs relating to each phase of the Project, the Partnership has offered, or will offer, units of limited partnership interest (the "**Units**") in the Partnership to potential investors (the "**Offering**"), as described in a Confidential Offering Memorandum dated July 20, 2012 provided by the Partnership to the Subscriber (the "**Offering Memorandum**").

E.      Pursuant to the Offering Memorandum, the Partnership will offer Units for an initial period ending on December 31, 2013 (the "**Offering Period**"). The Partnership may extend the Offering Period in its sole and absolute discretion. Upon expiration of the Offering Period, the Offering will terminate.

F.      Florida Regional Center, LLC, an affiliate of the Partnership (the "**Regional Center Administrator**"), has obtained from U.S. Citizenship and Immigration Services ("**USCIS**") designation of an area in Palm Beach County, Florida, that includes the Property as a regional center (the "**Regional Center**") pursuant to Section 610 of the U.S. Appropriations Act and the Immigration and Nationality Act, 8 U.S.C. 1101, et seq., as amended (the "**Act**").

G.      The Project and the Offering are intended to be a capital investment opportunity under the United States EB-5 immigrant investor program (the "**Pilot Program**") authorized under the Act, pursuant to which qualified individuals who invest a minimum of $500,000 in capital investment opportunities within a regional center may submit Form I-526 Immigrant Petition by Alien Entrepreneur (the "**I-526 Petition**") to USCIS seeking to attain lawful permanent residence in the United States.

H.      The Partnership and the Regional Center Administrator have appointed SunTrust Bank, a Georgia Banking corporation, as escrow agent (the "**Escrow Agent**") pursuant to the terms of a Subscription and Administrative Fee Escrow Agreement dated as of July 20, 2012 (the "**Escrow Agreement**").

I.      The summary set forth in paragraphs (A) through (H) above is qualified in its entirety by reference to the Offering Memorandum, the Partnership Agreement, the Escrow Agreement and this Agreement (collectively, the "**Offering Documents**").

J.      The Subscriber desires to subscribe to the Offering and become a limited partner in the Partnership (a "**Limited Partner**"), and the Partnership desires to consider the Subscriber for admission as a Limited Partner under the terms and subject to the conditions set forth in the Offering Documents.

## TERMS OF AGREEMENT

**NOW, THEREFORE**, in consideration of the mutual covenants contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1    **Subscription.** The Subscriber, intending to be legally bound, hereby irrevocably agrees to purchase from the Partnership, the number of Units set forth on the signature page hereof, at a subscription price of $500,000 per Unit (the "**Subscription Amount**"), plus a $45,000 fee per Unit to compensate the Partnership for Offering expenses (the "**Administrative Fee**"). All funds are expressed and paid in U.S. Dollars.

2    **Payment.** For each Unit subscribed, the Subscriber herewith tenders payment of $545,000, representing the Subscription Amount and the Administrative Fee, by wire transfer. The Subscription Amount and the Administrative Fee shall be delivered to the Escrow Agent, subject to release in the manner and in accordance with the conditions set forth in the Offering Documents.

2

3     **Acceptance of Subscription and Release from Escrow.**

3.1    <u>Acceptance at Partnership's Discretion</u>. The Partnership in its sole and absolute discretion may accept this Agreement and the funds delivered to the Escrow Agent only by executing the signature page hereof and delivering a counterpart to the Subscriber.

3.1.1    <u>Rejection of this Agreement</u>. If the Partnership rejects this Agreement, the Partnership and the Regional Center Administrator will direct the Escrow Agent to return all funds delivered into escrow by the Subscriber. Any return of funds pursuant to this Section 3.1 shall be without interest or deduction. Any funds returned to the Subscriber shall be sent via wire transfer to the account from which the Subscriber's funds originated.

3.1.2    <u>Acceptance of this Agreement</u>. The Partnership shall have no obligation hereunder until the Partnership shall execute and deliver to the Subscriber an executed copy of this Agreement, which shall designate the Subscriber as a "**Phase I Subscriber**," a "**Phase II Subscriber**" or a "**Phase III Subscriber,**" in each case corresponding to an anticipated Loan disbursement to fund a portion of the costs of Phase I, Phase II or Phase III of the Project, as the case may be. The Partnership may change the Subscriber's designation at any time by delivering written notice to the Subscriber notifying the Subscriber of the change. Upon acceptance of this Agreement, at the joint instruction of the Partnership and the Regional Center Administrator, the Escrow Agent will release the Administrative Fee to the Regional Center Administrator.

3.2    Closing Procedure.

3.2.1    <u>Phase I Subscribers</u>. After the Partnership has executed and delivered this Agreement, the Partnership will provide notice to the Subscriber to submit an I-526 Petition to USCIS. The Partnership shall have the right, but not the obligation, to provide such notice simultaneously to one or more groups of Phase I Subscribers corresponding to anticipated disbursements under the Loan. The closing of the sale of the number of Units set forth on the signature page hereof will occur, if at all, following submission of the Subscriber's I-526 Petition to USCIS and satisfaction of all other conditions described in the Offering Documents. Following submission of the Subscriber's I-526 Petition to USCIS, evidenced by official notice from USCIS confirming receipt, at the joint instruction of the Partnership and the Regional Center Administrator, the Escrow Agent will release 90% of the Phase I Subscriber's Subscription Amount to the Partnership, and the Escrow Agent will retain the remaining 10% of the Phase I Subscriber's Subscription Amount (the "**Holdback Amount**") in a holdback subaccount within the escrow (the "**Holdback Subaccount**"). Upon such release, the Subscriber will be accepted as a Limited Partner in the Partnership. Upon approval of the Subscriber's I-526 Petition, at the joint instruction of the Partnership and the Regional Center Administrator, the Escrow Agent will release the Subscriber's Holdback Amount to the Partnership.

3.2.2    <u>Phase II Subscribers</u>. After the Partnership has executed and delivered this Agreement, the Partnership will provide notice to the Subscriber to submit an I-526 Petition to USCIS. The Partnership shall have the right, but not the obligation, to provide such notice simultaneously to one or more groups of Phase II Subscribers corresponding to anticipated disbursements under the Loan. The closing of the sale of the number of Units set forth on the signature page hereof will occur, if at all, upon approval of the Subscriber's I-526 Petition by USCIS and satisfaction of all other conditions described in the Offering Documents. Upon closing, at the joint instruction of the Partnership and the Regional Center Administrator, the Escrow Agent will release 100% of the

3

Subscription Amount to the Partnership and the Subscriber will be accepted as a Limited Partner in the Partnership.

3.2.3    <u>Phase III Subscribers</u>. After the Partnership has executed and delivered this Agreement, the Partnership will provide notice to the Subscriber to submit an I-526 Petition to USCIS. The Partnership shall have the right, but not the obligation, to provide such notice simultaneously to one or more groups of Phase III Subscribers corresponding to anticipated disbursements under the Loan. The closing of the sale of the number of Units set forth on the signature page hereof will occur, if at all, upon approval of the Subscriber's I-526 Petition by USCIS and satisfaction of all other conditions described in the Offering Documents. Upon closing, at the joint instruction of the Partnership and the Regional Center Administrator, the Escrow Agent will release 100% of the Subscription Amount to the Partnership and the Subscriber will be accepted as a Limited Partner in the Partnership.

## 4    Termination of Agreement After Closing.

4.1    <u>Event Triggering Termination of Agreement After Closing</u>. In the event that a Phase I Subscriber's I-526 Petition is not approved by USCIS and all rights of appeal have been exhausted, the Subscription Amount of such Subscriber (the "**Withdrawing Investor**") shall be returned in accordance with this Section 4.1.

4.1.1    <u>Refund from Available Partnership Funds</u>. If it has sufficient funds available to do so, the Partnership shall refund 90% of the Withdrawing Investor's Subscription Amount, or 100% of the Withdrawing Investor's Subscription Amount if the Withdrawing Investor's Holdback Amount was previously released to the Partnership.

4.1.2    <u>Procedure in the Event of Insufficient Partnership Funds</u>. If the Partnership is unable to refund the Withdrawing Investor's Subscription Amount as a result of there being insufficient funds available to the Partnership, then, at the joint instruction of the Partnership and the Regional Center Administrator, the Escrow Agent will, subject to the availability of such funds in escrow:

4.1.2.1    if the Withdrawing Investor's Holdback Amount was not previously released to the Partnership, return the Withdrawing Investor's Holdback Amount to the Withdrawing Investor and  release $450,000 to the Partnership from the Holdback Subaccount, representing the Holdback Amounts of nine Phase I Subscribers; or

4.1.2.2    if the Withdrawing Investor's Holdback Amount was previously released to the Partnership, release $500,000 to the Partnership from the Holdback Subaccount, representing the Holdback Amounts of ten Phase I Subscribers.

4.1.3    <u>Consequence of Insufficient Funds</u>. If the Escrow Agent is unable to comply with a joint instruction given under Section 4.1.2 as a result of there being insufficient funds available in the Holdback Account, then the Withdrawing Investor's Subscription Amount will not be returned until sufficient funds become available to the Partnership to enable it to return the Withdrawing Investor's Subscription Amount.

4.1.4    <u>Terms of Refund</u>. If more than one Withdrawing Investor is entitled to the return of his or her Subscription Amount, then, in each such case the Partnership shall be obligated to return first the Subscription Amount of the Withdrawing Investor whose appeal rights were exhausted first. Return of the Subscription Amount pursuant to this Section 4 shall be without interest or

4

deduction. Any funds returned to the Subscriber shall be sent via wire transfer to the account from which the Subscriber's funds originated. Upon full return or refund of the Withdrawing Investor's Subscription Amount, (i) the Withdrawing Investor shall be deemed to have withdrawn and been dissociated from the Partnership and (ii) this Agreement shall terminate except for the provisions of Section 9 (Confidentiality) and Section 10 (Indemnification).

4.2   <u>Limitation</u>. The Partnership shall not be obligated to refund the Subscription Amount of any Subscriber who (i) delivers a written request to remain a Limited Partner in the Partnership after becoming a Withdrawing Investor, (ii) withdraws his or her I-526 Petition after filing and prior to adjudication by USCIS or (iii) in the opinion of the General Partner acting reasonably, fails to actively seek USCIS approval of his or her I-526 Petition. A Subscriber whose Subscription Amount is not returned under this Section 4.2 shall not be deemed to have withdrawn or been dissociated from the Partnership.

4.3   <u>Obligation to Return Administrative Fee of Withdrawing Investor</u>. The Partnership shall cause the Regional Center Administrator to refund the Administrative Fee of a Withdrawing Investor, less $10,000 to cover certain unrecoverable Offering expenses. Notwithstanding the foregoing, neither the Partnership nor the Regional Center Administrator shall have any obligation to refund any portion of a Subscriber's Administrative Fee (i) if the Partnership is not obligated to refund such Subscriber's Subscription Amount under Section 4.2 or (ii) if such Subscriber's I-526 Petition was not approved for reasons including such Member's fraud and/or misrepresentation in connection with the I-526 Petition. Return of the Administrative Fee shall be with out interest or deduction. Any funds returned to the Subscriber shall be sent via wire transfer to the account from which the Subscriber's funds originated.

5   **Default.** The Subscriber's failure to pay the Subscription Amount or the Administrative Fee in the manner and at the time set forth herein, or to observe, perform, or comply with any of the terms, representations, warranties or covenants set forth herein and applicable to the Subscriber, shall be a default under this Agreement, and upon the occurrence of any default, the Partnership may exercise any and all rights, remedies and powers to cancel, terminate or revoke this subscription and to exercise any other right or privilege available to it under applicable law.

6   **Representations, Warranties, Covenants and Acknowledgements of Subscriber**. The Offering is intended to be exempt from registration under the Securities Act of 1933, as amended (the "**Securities Act**"), pursuant to Section 4(a)(2) of the Securities Act and the provisions of Regulation S promulgated thereunder ("**Regulation S**"). In furtherance thereof and as a material inducement for the Partnership to enter into this Agreement and to accept the Subscriber's subscription, the Subscriber hereby represents, warrants, covenants and acknowledges to the Partnership as follows:

6.1   <u>Legal Competence</u>. The Subscriber is at least 18 years of age and a bona fide resident and domiciliary of the country set forth on the signature page hereof ("**Country of Residence**") and has no present intention of becoming a resident of any other country other than the United States.

6.2   <u>Pilot Program Compliance</u>. The Subscriber complies with, and will continue to comply with, all Pilot Program requirements, terms and conditions and knows of no material facts that may result in the Subscriber's failure to meet the minimum requirements for permanent residency in the United States.

6.3   <u>No Health Impairment</u>. The Subscriber is in good health and is aware of no health impairment that may result in the Subscriber's failure to meet minimum health requirements stipulated under the Act.

6.4   <u>No Criminal Offense</u>. The Subscriber has not been convicted of any criminal or other offense that may result in the Subscriber's failure to meet the minimum conditions of permanent residency in the United States.

6.5   <u>Independent Advice</u>. The Subscriber has had the opportunity to consult with competent and independent advisers of the Subscriber's choice with respect to the suitability of the investment based on the Subscriber's individual circumstances and is making an investment in Units solely on the basis of those consultants and the Subscriber's own analysis of the Partnership. Subscriber represents and warrants that Subscriber is aware of no grounds of exclusion that would preclude the issuance of a conditional resident visa to either Subscriber or Subscriber's accompanying family members. Subscriber has not relied upon the Partnership, the General Partner or its affiliates for any financial or any other legal advice (including immigration advice) in connection with Subscriber's decision to participate in the Pilot Program as described in the Offering Documents. The Partnership and the General Partner, including their managers, officers, employees, representatives and agents, have not made any statement, promise or representation to the Subscriber regarding the likelihood of the Subscriber receiving conditional or unconditional permanent residency in the United States.

6.6   <u>USCIS Discretion</u>. USCIS has sole and absolute discretion with respect to the granting of conditional and unconditional permanent residency in the United States under the Pilot Program and may deny an I-526 Petition or a Form I-829 Petition by Entrepreneur to Remove Conditions ("**I-829 Petition**") for any reason or for no reason. In the event the Subscriber's I-526 Petition or I-829 Petition is not approved for any reason, the Subscriber shall have no claim against the Partnership, the Developer or their respective affiliates, officers, directors, members, employees, agents or advisers (the "**Via Mizner Parties**").

6.7   <u>U.S. Consulate Discretion</u>. The U.S. consulates abroad have sole and absolute discretion with respect to the granting of an immigrant visa.

6.8   <u>Subscriber Responsibilities</u>. The Subscriber is subscribing hereunder as principal and not on behalf of any other person. The Subscriber is solely responsible for (i) filing the I-526 Petition, (ii) providing the General Partner with a copy of Form I-797 notice approving his or her I-526 Petition upon receipt from USCIS (iii) applying for conditional permanent residence in the United States, (iv) filing the I-829 Petition and (v) the costs and expenses relating thereto including, without limitation, fees and expenses of retaining immigration counsel or immigration brokers. The Partnership has no obligation to assist or incur any cost on behalf of the Subscriber in connection with the I-526 Petition, application for conditional permanent residence in the United States or the I-829 Petition, other than to provide information and copies of documents that are in the Partnership's possession or can be obtained by the Partnership as a nominal expense and that are required by USCIS in connection with the foregoing.

6.9   <u>Sophisticated Investor</u>. The Subscriber is a sophisticated investor by virtue of Subscriber's education, training and numerous prior investments made on Subscriber's own behalf or through entities which Subscriber controls. The Subscriber is knowledgeable and experienced in financial and business matters and is capable of evaluating the merits and risks of an investment in the Units and has the capacity to protect Subscriber's own interests in connection with the purchase of the

Units, either alone or in conjunction with Subscriber's professional advisers, who are unaffiliated with and who are not compensated, directly or indirectly, by the Partnership or any affiliate of the Partnership. All information which the Subscriber has provided to the Partnership concerning Subscriber and Subscriber's financial position is correct and complete including, without limitation, the information set forth on the Investor Suitability Questionnaire previously provided to the Partnership and executed by the Subscriber, and IRS Forms W-7 and W-8BEN attached hereto as <u>Exhibit A</u> and executed by the Subscriber in connection herewith.

6.10   <u>Risk Assumption</u>. Subscriber has received and reviewed the Offering Documents. The Subscriber assumes full responsibility for making an investment in the Units and has received full independent advice regarding the risks associated with this investment. The Subscriber acknowledges that (i) the Partnership is a newly-formed limited partnership for the purpose of making the Loan to the Developer, which proposes to carry out the Project, with all the attendant business and financial risks of a newly-formed partnership, (ii) the investment in the Partnership contemplated herein is a speculative investment and involves substantial risks, including the potential loss of the Subscriber's entire investment. The Subscriber is able to hold the Units for an indefinite period of time and can bear the economic risk of Subscriber's investment in the Partnership, including the loss of the Subscriber's entire investment in the Units.

6.11   <u>Access to Information</u>. The Subscriber acknowledges the receipt of a copy of the Offering Documents. The Subscriber reads and understands English or has had the Offering Documents translated by a competent translator into a language the Subscriber understands. The Subscriber has fully read all the Offering Documents, including this Agreement, which describe certain material information concerning the Partnership and has carefully reviewed them and understands the information contained therein. The Subscriber acknowledges that the Offering Documents do not purport to contain all the information that would be contained in a registration statement under the Securities Act. The Partnership has agreed to make, and has made, available to the Subscriber prior to any acquisition of the Units all information necessary to enable the Subscriber to evaluate the risks and merits of an investment in the Partnership. The Subscriber has received all information which Subscriber has requested regarding the Partnership and its current and proposed business and operations, and the Subscriber has been given reasonable opportunity to speak and meet with representatives of the Partnership for the purpose of asking questions of, and receiving answers from, such representatives concerning the foregoing and an investment in the Partnership, and the Partnership has responded to all such questions and inquiries to the satisfaction of the Subscriber. Notwithstanding the foregoing, the Subscriber has not relied upon any representation or other information other than as contained in the Offering Documents.

6.12   <u>Estimates</u>. The Subscriber acknowledges that any estimations of, among other things, commercial viability of the Partnership's business, anticipated expenses and other applications of proceeds of this Offering included in the Offering Documents were prepared by the Partnership in good faith but that such estimates are preliminary and subject to change and that the attainment of such estimations are not guaranteed by the Partnership.

6.13   <u>No Directed Selling Efforts</u>. To the best knowledge of the Subscriber, neither the Partnership nor any other person has conducted or directed selling efforts including, without limitation, (i) any activity undertaken for the purpose of, or that could reasonably be expected to have the effect of, conditioning the market in the United States for the Units, (ii) mailing of printed material to persons residing in the United States, (iii) holding of promotional seminars in the United States, or (iv) the placing of advertising with radio or television stations broadcasting in the United States or in publications with a general circulation in the United States.

6.14    No Commissions by Subscriber Actions. The Subscriber has taken no action that would give rise to a claim by any person for brokerage commissions, finders fees or the like relating to this Agreement or the transactions contemplated hereby.

6.15    Purchase for Own Account. The Units the Subscriber is acquiring are being acquired for the Subscriber's own account for investment only and not with a view to sale or resale or other distribution of the Units. The Subscriber will not make any offer, sale, transfer or other disposition of the Units, including any hedging transaction (i) in violation of the Securities Act, the Securities Exchange Act of 1934, or any other applicable securities laws of any jurisdiction including, without limitation, the securities laws of the Country of Residence (collectively, the "**Securities Laws**"), or (ii) in violation of any offer, sale, resale or other distribution restriction contained in the Offering Documents. Furthermore, prior to any disposition of a Unit, or any portion thereof, by the Subscriber, the Subscriber shall provide the Partnership with an opinion of counsel in form and substance acceptable to the Partnership in its sole discretion, confirming that any such proposed sale is in compliance with the Securities Laws or an exemption therefrom.

6.16    Certification Regarding U.S. Person Status. The Subscriber is not a U.S. Person (as defined in the Offering Memorandum) and is not acquiring Units for the account of benefit of any U.S. Person.

6.17    Restricted Securities. The Subscriber understands and acknowledges that the Units have not been registered pursuant to the provisions of any of the Securities Laws and that the purchase of Units is taking place in a transaction not involving a public offering. The Subscriber understands that Subscriber has no right to request, and the Partnership is under no obligation to register, the Units under any of the Securities Laws. The Units will be deemed "restricted securities" as defined under Rule 144 of the Securities Act and subject to the resale limitations contained in the following section. If the Partnership becomes subject to reporting requirements under any Securities Laws, the Subscriber will provide such information, documents and materials, within five days after receipt of a request from the Partnership, as may reasonably be required to comply with such reporting requirements.

6.18    Certificates; Legends. The Subscriber understands that the Units may not be represented by certificates. In the event the Partnership does issue certificates evidencing the Units, such certificates will bear any legend required by the Securities Laws or any other applicable laws, including, without limitation, a legend in substantially the following form:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE PARTNERSHIP THAT SUCH REGISTRATION IS NOT REQUIRED; AND THAT HEDGING TRANSACTIONS INVOLVING THOSE SECURITIES MAY NOT BE CONDUCTED UNLESS IN COMPLIANCE WITH THE ACT. THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE ALSO SUBJECT TO ADDITIONAL RESTRICTIONS ON TRANSFERS, REPURCHASE OPTIONS AND OTHER AGREEMENTS SET FORTH IN THAT CERTAIN LIMITED PARTNERSHIP AGREEMENT DATED EFFECTIVE AS OF JULY [•], 2012 AMONG U. S. IMMIGRATION FUND - MIZNER, LLC, AS GENERAL PARTNER, AND CERTAIN PERSONS, AS LIMITED PARTNERS, A COPY OF WHICH IS ON FILE AND MAY BE OBTAINED FROM THE PRINCIPAL PLACE OF BUSINESS OF THE PARTNERSHIP."

6.19  <u>Accuracy of Disclosures</u>. All of the information supplied by the Subscriber to the Partnership in connection with the acquisition of the Units (including, without limitation, the information set forth in the Investor Suitability Questionnaire), and the representations of the Subscriber contained in this Agreement, are true and complete, and do not contain any statement which, at the time and in light of the circumstances under which they were made, were false or misleading with respect to any material fact, and do not omit to state any material fact required to be stated in order to make the statements made not false or misleading.

6.20  <u>Validity; Binding Effect</u>. The Subscriber has the full power and authority to execute and deliver this Agreement and the Offering Documents to be executed and delivered by the Subscriber and to perform Subscriber's obligations hereunder and thereunder. The Subscriber has taken all actions required by law to authorize Subscriber's execution and delivery of this Agreement and the Offering Documents to be executed and delivered by the Subscriber and to perform all transactions contemplated hereunder and thereunder. This Agreement and the other Offering Documents are valid and binding agreements of the Subscriber and are enforceable against the Subscriber in accordance with their terms. Without limiting the generality of the foregoing, the Escrow Agreement constitutes a valid and binding agreement and obligation of the Subscriber enforceable against the Subscriber in accordance with its terms to the same extent as if the Subscriber were a signatory thereto, and the Subscriber hereby authorizes and empowers the Partnership and the Regional Center Administrator, acting together, to deal with the Subscription Amount and Administrative Fee on the Subscriber's behalf in accordance with the terms of the Escrow Agreement and the other Offering Documents. Neither the execution nor delivery of this Agreement or the Offering Documents nor the performance of any transactions contemplated hereunder or thereunder conflict with or constitute a default under any instruments governing the Subscriber, any law, rule, regulation or order, or any agreement to which the Subscriber is a party or by which the Subscriber is bound.

6.21  <u>Tax Matters</u>. The Subscriber acknowledges that no assurance is or has been made regarding any tax advantages that may accrue to an investor in the Units, and that existing tax laws and regulations could be modified in the future, thus denying the Subscriber all or a portion of the tax benefits that may currently be available under existing tax laws and regulations. The Subscriber acknowledges that an investment in the Units, as well as sale or other disposition of the Units, may result in tax consequences under federal, state or other tax laws in the United States or the Country of Residence. The Subscriber has made such independent inquiries as the Subscriber deems necessary to evaluate properly an investment in the Units, including consultation with a personal tax adviser, to determine whether such investment is appropriate. The Subscriber acknowledges that it is the Subscriber's sole responsibility to file timely tax returns or any tax election relating to the Subscriber's investment, sale or other disposition of the Units.

6.22  <u>No Scheme to Evade Registration</u>. The Subscriber's purchase of the Units is not a transaction, or any element of a series of transactions, that is part of a plan or scheme to evade the registration requirements of the Securities Laws. The Subscriber has complied with all applicable laws in connection with the Subscriber's purchase of the Units including, without limitation, obtaining any required consents from any governmental authority in the Country of Residence or elsewhere, and observing any other applicable legal formality.

6.23  <u>Survival of Representations, Warranties, Covenants and Acknowledgements</u>. The Subscriber makes the representations, warranties, covenants and acknowledgments set forth in this Section 6 with the intent that they be relied upon by the Via Mizner Parties in determining the Subscriber's suitability as a limited partner in the Partnership, and the Subscriber hereby agrees that all such

representations, warranties, covenants and acknowledgments shall survive the consummation of the transactions contemplated by this Agreement.

6.24   <u>Joint and Several Undertaking</u>. If more than one person is executing this Agreement, each representation, warranty, covenant and acknowledgment set forth in this Section 6 by or on behalf of the Subscriber shall be a joint and several representation, warranty, covenant or acknowledgment of such person.

6.25   <u>Acknowledgements</u>. Subscriber hereby certifies that he/she has read and understands the terms of the Subscription and Processing Fee Escrow Agreement. Subscriber understands that while Subscriber's funds will initially be deposited into an escrow account, once the escrow account has reached a balance of $5,450,000.00 dollars, the Subscriber's funds may be released to the Partnerhsip's operating account for use in funding the Loan for the Project upon the filing of the Subscriber's I-526 Petition in accordance with the terms of the Subscription Agreement and the Escrow Agreement. It is therefore possible that Subscriber's funds will be released to the Partnership's operating account prior to receiving his/her I-526 approval. In the event of a denial of the I-526 Petition after the funds have been released to the Partnership's operating account, it will be the responsibility of the Partnership, not the Escrow Agent or the Administrative Agent, to return the capital contribution to the Subscriber as soon as possible. However, the Partnership may not have the funds immediately available to do so, but will return the capital contribution as quickly as possible. Subscriber will look only to the Partnership for recovery of these funds and not to the Escrow Agent or the Administrative Agent, and Subscriber holds the Escrow Agent and the Administrative Agent harmless from any and all actions, causes of action, losses, damages, claims and/or demands whatsoever, in any manner related to the Escrow Agent's release of the Subscriber's funds in accordance with the terms of the Subscription Agreement and Escrow Agreement if the Subscriber's funds had been released prior to the decision on the Subscriber's I-526 Petition since such funds would be in the possession and control of the Partnership. The Subscriber shall execute and deliver an acknowledgement in the form attached hereto as <u>Exhibit B</u>. The Subscriber further acknowledges that the Partnership and the Regional Center Administrator are affiliated with each other in the manner described in the Offering Memorandum and may not deal with each other on an arm's length basis.

7      **Immigration Undertakings.** Following notice from the General Partner, the Subscriber shall: (i) diligently file and prosecute the I-526 Petition, complete all related procedures and provide the General Partner with a copy of the I-797 notice approving his or her I-526 Petition upon receipt from USCIS; (ii) provide to the General Partner such information as the General Partner may require confirming that the funds to be invested by the Subscriber were lawfully obtained, together with such other documents as the General Partner may reasonably require (which requirement may be met by providing a letter addressed to it from a recognized and qualified firm of accountants licensed to practice in Country of Residence, in form, substance and from a firm of accountants or other professionals acceptable to the General Partner); (iii) provide to the Regional Center Administrator copies of the investor's passport and such other documentation that the Regional Center Administrator or the General Partner deem appropriate; and (iv) diligently file and prosecute the I-829 Petition within 21 to 24 months after the date that conditional permanent resident status is obtained.

8      **Obligation to Qualify.** The rights of the Subscriber to purchase the Units under this Agreement is expressly conditioned upon the exemption from all registration or qualification requirements under the Securities Laws. The Partnership shall not be required to register or qualify this transaction under the Securities Laws and, should such registration or qualification become necessary, the Partnership

shall have the unconditional right to terminate this Agreement and rescind any sale of Units hereunder, all without further obligation or liability.

9    **Confidentiality.** The Subscriber acknowledges and agrees that any information or data acquired from or about the Partnership not otherwise in the public domain, was received in confidence. The Subscriber agrees not to divulge, communicate or disclose, except as may be required by law or for the performance of this Agreement, or use to the detriment of the Partnership or for the benefit of any other person or persons, or misuse in any way, any confidential information of the Partnership, including any business secrets of the Partnership. The existence of and the terms and disclosures of the Offering Documents shall be considered confidential information.

10    **Indemnification.** The Subscriber shall defend, indemnify and hold harmless the Via Mizner Parties who were or are a party to, or are threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of, or arising from any actual or alleged misrepresentation or misstatement of facts, or omission to represent or state facts, made by the Subscriber to the Partnership concerning the Subscriber or Subscriber's financial position, in connection with the offering and sale of the Units, against losses, liabilities and expenses actually incurred by a Via Mizner Party (including without limitation attorneys' fees, judgments, fines and amounts paid in settlement) in connection with such action, suit or proceeding.

11    <u>**Miscellaneous.**</u>

11.1    <u>Entire Agreement</u>. This Agreement (including any other Exhibits and Schedules attached hereto) contains the entire understanding of the parties in respect of its subject matter and supersedes all prior agreements and understandings (oral or written) between or among the parties with respect to such subject matter

11.2    <u>Notices</u>. Any notice, request or other document required or permitted to be given under this Agreement shall be in writing and shall be deemed given to a party (a) upon delivery if delivered by hand, (b) three days after the date of deposit in the U.S. Mail, postage prepaid, if mailed by certified or registered mail, or (c) on the next business day, if delivered by confirmed facsimile or sent by prepaid overnight courier service, in each case, addressed in the case of the Subscriber to the address set forth on the signature page hereto and in the case of the Partnership to:

Via Mizner Funding, LP
c/o U. S. Immigration Fund GP - Mizner, LLC
1295 U.S. Highway 1
North Palm Beach, FL 33408
Attention: Managing Member
Facsimile: 561-799-0061

Any party may change the address to which notices shall be sent by delivering a written notice to the other parties in accordance with the terms of this Section.

11.3    <u>Modification</u>. This Agreement shall not be modified, discharged or terminated except by an instrument in writing signed by the party against whom any waiver, change, discharge or termination is sought.

11.4 <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which shall be an original but all of which together shall constitute one and the same instrument. Counterparts delivered by facsimile shall in all cases be deemed an original.

11.5 <u>Survival of Representations, Warranties, Covenants, and Agreements</u>. The representations, warranties, covenants, acknowledgments and agreements of the Subscriber contained herein shall survive the completion of the sale of the Units. In the event the Offering is terminated, the Partnership does not accept Subscriber's subscription or this Agreement terminates under Section 4, above, then in each such case <u>Section 9</u> (Confidentiality) and <u>Section 10</u> (Indemnification) shall nonetheless survive.

11.6 <u>Binding Effect</u>. Except as otherwise provided herein, this Agreement shall be binding upon and inure to the benefit of the parties and their heirs, successors and permitted assigns.

11.7 <u>Assignability</u>. This Agreement is not transferable or assignable by the Subscriber. Any purported transfer or assignment by the Subscriber in violation of the terms hereof shall be null and void.

11.8 <u>Applicable Law</u>. This Agreement shall be construed in accordance with the laws of the State of Florida applicable to contracts executed and to be wholly performed within such State. Each party hereby irrevocably and unconditionally consents and submits to the exclusive jurisdiction of the courts of the State of Florida sitting in Palm Beach County, Florida and of the United States District Court for the Southern District of Florida for any actions, suits or proceedings arising out of or relating to this Agreement and the transactions contemplated hereby and each party agrees not to commence any action, suit or proceeding relating thereto except in such courts. Each party further agrees that any service of process, summons, notice or document by U.S. registered mail to its address set forth herein shall be effective service of process for any action, suit or proceeding brought against it in any such court. Each party irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement or the transactions contemplated hereby in such courts, and irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

11.9 <u>No Waiver</u>. The failure or delay of any party to enforce any provision of this Agreement shall in no way affect the right of such party to enforce the same or any other provision of this Agreement. The waiver by any party of any breach of any provision of this Agreement shall not be construed as a waiver by such party of any succeeding breach of such provision or a waiver by such party of a breach of any other provision. The granting of any consent or approval by any party in any one instance shall not be construed as to waive or limit the need for such consent or approval in any other or subsequent instance.

11.10 <u>Severability</u>. If any term or provision of this Agreement shall be determined by a court of competent jurisdiction to be illegal, invalid or unenforceable for any reason, the remaining provisions of this Agreement shall remain enforceable and the invalid, illegal or unenforceable provision shall be modified to the minimum extent possible so as to be enforceable and shall be enforced.

*[Signature pages to follow]*

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the day and year written below.

**SUBSCRIPTION:**

Number of Units subscribed for:                    _____

**Total Amount:**
Number of Units x (Subscription Amount $500,000
+ Administrative Fee $45,000):                    $_____

**SUBSCRIBER:**

_____          _____
Signature                                                Street Address

_____          _____
Print or Type Name of Subscriber                    City

_____          _____
Date                                                     State or Country

                                                          Telephone: _____

                                                          Facsimile: _____

                                                          Email: _____

13

**PARTNERSHIP:**

**VIA MIZNER FUNDING, LP**
  **By U. S. Immigration Fund GP - Mizner, LLC, its**
  **General Partner**


By: _____
Name:
Its:


**ACCEPTED SUBSCRIPTION:**

ACCEPTED AS OF _____, 20___, AS TO THE ABOVE SUBSCRIBED UNIT(S) UNLESS OTHERWISE INDICATED BELOW:


Number of Units Accepted: _____


Total Amount Accepted: $_____


**Subscriber's Designation** (select one only):
☐ Phase I Subscriber
☐ Phase II Subscriber
☐ Phase III Subscriber

_____

14

## SCHEDULE OF EXHIBITS

Exhibit A              IRS Forms W-7 and W-8BEN

Exhibit B              Subscriber Acknowledgement

140

**EXHIBIT A**

**Internal Revenue Service Form W-7**
**Internal Revenue Service Form W-8BEN**

[See Attached]

Form **W-7**
(Rev. January 2010)
Department of the Treasury
Internal Revenue Service

## Application for IRS Individual Taxpayer Identification Number

▶ See instructions.
▶ For use by individuals who are not U.S. citizens or permanent residents.

OMB No. 1545-0074

*An IRS individual taxpayer identification number (ITIN) is for federal tax purposes only.*

**FOR IRS USE ONLY**

**Before you begin:**
• **Do not submit** this form if you have, or are eligible to get, a U.S. social security number (SSN).
• Getting an ITIN does not change your immigration status or your right to work in the United States and does not make you eligible for the earned income credit.

**Reason you are submitting Form W-7.** Read the instructions for the box you check. **Caution:** If you check box **b, c, d, e, f,** or **g, you must file a tax return with Form W-7** unless you meet one of the exceptions (see instructions).

- **a** ☐ Nonresident alien required to get ITIN to claim tax treaty benefit
- **b** ☐ Nonresident alien filing a U.S. tax return
- **c** ☐ U.S. resident alien **(based on days present in the United States)** filing a U.S. tax return
- **d** ☐ Dependent of U.S. citizen/resident alien ⎤ Enter name and SSN/ITIN of U.S. citizen/resident alien (see instructions) ▶ ................
- **e** ☐ Spouse of U.S. citizen/resident alien ⎦ ........................................................
- **f** ☐ Nonresident alien student, professor, or researcher filing a U.S. tax return or claiming an exception
- **g** ☐ Dependent/spouse of a nonresident alien holding a U.S. visa
- **h** ☐ Other (see instructions) ▶ ........................................................

Additional information for **a** and **f:** Enter treaty country ▶ _____ and treaty article number ▶ _____

| **Name** (see instructions) | **1a** First name | Middle name | Last name |
|---|---|---|---|
| Name at birth if different  .  ▶ | **1b** First name | Middle name | Last name |

| **Applicant's mailing address** | **2** Street address, apartment number, or rural route number. **If you have a P.O. box, see page 4.** |
|---|---|
| | City or town, state or province, and country. Include ZIP code or postal code where appropriate. |

| **Foreign (non-U.S.) address** (if different from above) (see instructions) | **3** Street address, apartment number, or rural route number. **Do not use a P.O. box number.** |
|---|---|
| | City or town, state or province, and country. Include ZIP code or postal code where appropriate. |

| **Birth information** | **4** Date of birth (month / day / year)  /  /  | Country of birth | City and state or province (optional) | **5** ☐ Male ☐ Female |
|---|---|---|---|---|

| **Other information** | **6a** Country(ies) of citizenship | **6b** Foreign tax I.D. number (if any) | **6c** Type of U.S. visa (if any), number, and expiration date |
|---|---|---|---|

**6d** Identification document(s) submitted (see instructions)  ☐ Passport  ☐ Driver's license/State I.D.
☐ USCIS documentation  ☐ Other ......................
Issued by: _____ No.: _____ Exp. date: / /    Entry date in United States / /

**6e** Have you previously received a U.S. temporary taxpayer identification number (TIN) or employer identification number (EIN)?
☐ **No/Do not know.** Skip line 6f.
☐ **Yes.** Complete line 6f. If more than one, list on a sheet and attach to this form (see instructions).

**6f** Enter: TIN or EIN ▶ _____ and Name under which it was issued ▶ _____

**6g** Name of college/university or company (see instructions) ......................
City and state _____ Length of stay _____

**Sign Here**

Under penalties of perjury, I (applicant/delegate/acceptance agent) declare that I have examined this application, including accompanying documentation and statements, and to the best of my knowledge and belief, it is true, correct, and complete. I authorize the IRS to disclose to my acceptance agent returns or return information necessary to resolve matters regarding the assignment of my IRS individual taxpayer identification number, including any previously assigned taxpayer identifying number.

Keep a copy for your records.

| ▶ Signature of applicant (if delegate, see instructions) | Date (month / day / year) | Phone number |
|---|---|---|
| ▶ Name of delegate, if applicable (type or print) | Delegate's relationship to applicant | ☐ Parent ☐ Court-appointed guardian ☐ Power of Attorney |

**Acceptance Agent's Use ONLY**

| ▶ Signature | Date (month / day / year) / / | Phone ( ) / Fax ( ) |
|---|---|---|
| ▶ Name and title (type or print) | Name of company | EIN / Office Code |

**For Paperwork Reduction Act Notice, see page 5.**    Cat. No. 10229L    Form **W-7** (Rev. 1-2010)

A-2

Form **W-8BEN**
(Rev. February 2006)
Department of the Treasury
Internal Revenue Service

## Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding

▶ Section references are to the Internal Revenue Code.   ▶ See separate instructions.
▶ Give this form to the withholding agent or payer. Do not send to the IRS.

OMB No. 1545-1621

**Do not use this form for:**                                                                 Instead, use Form:

- A U.S. citizen or other U.S. person, including a resident alien individual  .  .  .  .  .  .  .  .  .  .  .  . W-9
- A person claiming that income is effectively connected with the conduct
  of a trade or business in the United States  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  . W-8ECI
- A foreign partnership, a foreign simple trust, or a foreign grantor trust (see instructions for exceptions)  .  .  .  .  .  . W-8ECI or W-8IMY
- A foreign government, international organization, foreign central bank of issue, foreign tax-exempt organization,
  foreign private foundation, or government of a U.S. possession that received effectively connected income or that is
  claiming the applicability of section(s) 115(2), 501(c), 892, 895, or 1443(b) (see instructions)  .  .  .  .  .  . W-8ECI or W-8EXP
  **Note:** *These entities should use Form W-8BEN if they are claiming treaty benefits or are providing the form only to claim they are a foreign person exempt from backup withholding.*
- A person acting as an intermediary  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  . W-8IMY
  **Note:** *See instructions for additional exceptions.*

### Part I   Identification of Beneficial Owner (See instructions.)

| | |
|---|---|
| **1** Name of individual or organization that is the beneficial owner | **2** Country of incorporation or organization |

**3** Type of beneficial owner:  ☐ Individual  ☐ Corporation  ☐ Disregarded entity  ☐ Partnership  ☐ Simple trust
☐ Grantor trust  ☐ Complex trust  ☐ Estate  ☐ Government  ☐ International organization
☐ Central bank of issue  ☐ Tax-exempt organization  ☐ Private foundation

**4** Permanent residence address (street, apt. or suite no., or rural route). **Do not use a P.O. box or in-care-of address.**

| | |
|---|---|
| City or town, state or province. Include postal code where appropriate. (see instructions) | Country (do not abbreviate) |

**5** Mailing address (if different from above)

| | |
|---|---|
| City or town, state or province. Include postal code where appropriate. (see instructions) | Country (do not abbreviate) |

**6** U.S. taxpayer identification number, if required (see instructions)  ☐ SSN or ITIN  ☐ EIN      **7** Foreign tax identifying number, if any (optional)

**8** Reference number(s) (see instructions)

### Part II   Claim of Tax Treaty Benefits (if applicable)

**9** I certify that (check all that apply):

**a** ☐ The beneficial owner is a resident of ...................................within the meaning of the income tax treaty between the United States and that country.

**b** ☐ If required, the U.S. taxpayer identification number is stated on line 6 (see instructions).

**c** ☐ The beneficial owner is not an individual, derives the item (or items) of income for which the treaty benefits are claimed, and, if applicable, meets the requirements of the treaty provision dealing with limitation on benefits (see instructions).

**d** ☐ The beneficial owner is not an individual, is claiming treaty benefits for dividends received from a foreign corporation or interest from a U.S. trade or business of a foreign corporation, and meets qualified resident status (see instructions).

**e** ☐ The beneficial owner is related to the person obligated to pay the income within the meaning of section 267(b) or 707(b), and will file Form 8833 if the amount subject to withholding received during a calendar year exceeds, in the aggregate, $500,000.

**10** **Special rates and conditions** (if applicable—see instructions): The beneficial owner is claiming the provisions of Article .............. of the treaty identified on line 9a above to claim a ............... % rate of withholding on (specify type of income): ............................. .

Explain the reasons the beneficial owner meets the terms of the treaty article: ..........................................................

### Part III   Notional Principal Contracts

**11** ☐ I have provided or will provide a statement that identifies those notional principal contracts from which the income is **not** effectively connected with the conduct of a trade or business in the United States. I agree to update this statement as required.

### Part IV   Certification

Under penalties of perjury, I declare that I have examined the information on this form and to the best of my knowledge and belief it is true, correct, and complete. I further certify under penalties of perjury that:
**1** I am the beneficial owner (or am authorized to sign for the beneficial owner) of all the income to which this form relates,
**2** The beneficial owner is not a U.S. person,
**3** The income to which this form relates is (a) not effectively connected with the conduct of a trade or business in the United States, (b) effectively connected but is not subject to tax under an income tax treaty, or (c) the partner's share of a partnership's effectively connected income, **and**
**4** For broker transactions or barter exchanges, the beneficial owner is an exempt foreign person as defined in the instructions.
Furthermore, I authorize this form to be provided to any withholding agent that has control, receipt, or custody of the income of which I am the beneficial owner or any withholding agent that can disburse or make payments of the income of which I am the beneficial owner.

**Sign Here**

| ▶ ............................................................ | ............................... | ............................... |
|---|---|---|
| Signature of beneficial owner (or individual authorized to sign for beneficial owner) | Date (MM-DD-YYYY) | Capacity in which acting |

**For Paperwork Reduction Act Notice, see separate instructions.**      Cat. No. 25047Z      Form **W-8BEN** (Rev. 2-2006)

♻ *Printed on Recycled Paper*

A-3

**EXHIBIT B**

**ACKNOWLEDGEMENT OF RECEIPT OF**

**SUBSCRIPTION ESCROW AGREEMENT**

Subscriber hereby certifies that he/she has read and understands the terms of the Subscription and Processing Fee Escrow Agreement. Subscriber understands that while Subscriber's funds will initially be deposited into an escrow account, once the escrow account has reached a balance of $5,450,000.00 dollars, the Subscriber's funds may be released to **Via Mizner Funding, LP's** operating account (hereinafter referred to as "LP") for use in funding the loan for the Project upon the filing of the Subscriber's I-526 petition in accordance with the terms of the Subscription and the Escrow Agreements. It is therefore possible that Subscriber's Funds will be released to the LP's operating account prior to receiving his/her I-526 approval.

In the event of a denial of the I-526 petition after the funds have been released to the LP's operating account, it will be the responsibility of the LP, not the Escrow Agent or the Administrative Agent, to return the capital contribution to the Limited Partner as soon as possible. However, the LP may not have the funds immediately available to do so, but will return the capital contribution as quickly as possible. Subscriber will look only to the LP, for recovery of these funds and not to the Escrow Agent or the Administrative Agent, and Subscriber holds the Escrow Agent and the Administrative Agent harmless from any and all actions, causes of action, losses, damages, claims and/or demands whatsoever, in any manner related to the Escrow Agent's release of the Subscriber's funds in accordance with the terms of the Subscription and Escrow Agreements if the Subscriber's funds had been released prior to the decision on the Subscriber's I-526 petition since such funds would be in the possession and control of the LP.

**SUBSCRIBER:**

_____
Signature

_____
Print or Type Name of Subscriber

_____
Date

Exhibit to Offering Memorandum for Via Mizner Funding, LP

## **EXHIBIT C**

## **CHARTS SUMMARIZING IMMIGRATION AND INVESTMENT PROCEDURES**

[See Attached]

## **Immigration Procedures**

This overview is for general informational purposes only and shall not be construed as legal advice. Prospective investors must consult a qualified immigration attorney prior to commencing the procedures set forth below.

> Your immigration attorney submits your I-526 Petition to USCIS.

> Upon approval of your I-526 Petition, you may apply for Lawful Permanent Residence via Consular Processing (if you are outside the United States) or Adjustment of Status (if you are in the United States with valid non-immigrant status). Adjustment of Status is not available in some instances, such as when you entered the United States pursuant to the Visa Waiver Program.

| **Consular Processing** | **Adjustment of Status** |
|---|---|
| Approval of your I-526 Petition is forwarded to the National Visa Center (NVC) for processing. The NVC will contact you with information, forms and documentary requirements for completion prior to the scheduling of a visa interview at the U.S. Consulate. | You must submit an I-485 application to USCIS. Your immigration attorney will assist with the required forms and documentary evidence. Separate applications must be submitted for each qualifying family member (spouse and children under 21). |
| Once the NVC notifies you that an interview has been scheduled, you will undergo a medical examination, the results of which must be presented at the interview. Review U.S. Consulate interview guidelines and ensure that all necessary original documents will be available at the time of the interview. | While your I-485 application is pending, you may obtain employment and travel authorization from USCIS. Subject to few exceptions, you must receive advance permission to return to the United States if you travel outside the United States. Failure to do so will constitute abandonment of your I-485 application. |
| Conditional residence is usually granted at the time of interview. Following visa approval, you and your qualifying family members must enter the United States in order to receive a Lawful Permanent Residence card. You will proceed to Phase 3 below at the appropriate time. | Upon approval of your I-485 application, you will receive a Welcome Notice, and shortly thereafter, a Lawful Permanent Residence card as evidence of your status as conditional residents of the United States. You will proceed to Phase 3 below at the appropriate time. |

**Investment Procedures**

**PHASE 1: SUBSCRIPTION**

If you are a foreign citizen residing outside the United States and are interested in evaluating this investment opportunity, you will be asked to complete and sign an Investor Suitability Questionnaire and provide legible copies of certain identification documents.

If the General Partner confirms that you may proceed, you will be issued a set of confidential offering documents to evaluate the investment opportunity with your legal and financial advisers.

If you decide to proceed with the investment and if the General Partner confirms your eligibility to proceed, you will complete and sign the Subscription Agreement, the Accredited Investor Questionnaire and the Limited Partnership Agreement.

You will deliver all completed and signed documents to the General Partner. You will deliver the $500,000 Subscription Amount, together with the $45,000 Administrative Fee to the Escrow Agent. Upon receipt, the Escrow Agent will release your $45,000 Administrative Fee to the Regional Center Administrator.

When you have completed the above steps, you will proceed to Phase 2 below.

**PHASE 2: I-526 PETITION**

You will provide contact information for your immigration attorney to the General Partner. The General Partner will provide your immigration attorney with documentation to support your I-526 Petition.

You and your immigration attorney must prepare your I-526 Petition within 30 days of receiving this documentation and send it to the Regional Center Administrator for review. You may proceed with submission of your I-526 Petition only after the Regional Center Administrator confirms in writing that you may do so.

If your I-526 Petition is approved, your immigration attorney will forward to the General Partner and the Escrow Agent a copy of your Form I-797 Approval Notice.

You will proceed with the process of obtaining lawful permanent residence in the United States via consular processing or an adjustment of status application. You will proceed to Phase 3 below at the appropriate time.

**PHASE 3: I-829 PETITION**

Within 90 days prior to the end of the second year (21-24 months) following approval of your I-526 Petition, the General Partner will provide you and your immigration attorney with impact study results containing actual job creation numbers.

You and your immigration attorney must prepare your I-829 Petition within 30 days of receiving this documentation and send it to the General Partner for review. You may proceed with submission of your I-829 Petition only after the General Partner confirms in writing that you may do so.

If your I-829 Petition is approved, USCIS removes the conditions of your lawful permanent residence in the United States. You continue to be a Limited Partner and will receive distributions from your investment in the Partnership in accordance with the Partnership Agreement.

If your I-829 Petition is denied, you continue to be a Limited Partner and will receive distributions from your investment in the Partnership in accordance with the Partnership Agreement.

Exhibit to Offering Memorandum for Via Mizner Funding, LP

## **EXHIBIT D**

## **SUBSCRIPTION AND ADMINISTRATION FEE ESCROW AGREEMENT**

[See Attached]

**SUBSCRIPTION AND ADMINISTRATIVE FEE ESCROW AGREEMENT**

This Subscription and Administrative Fee Escrow Agreement (the "**Agreement**") effective as of July 20, 2012, by and among **Florida Regional Center, LLC** ("**Subscriber Representative**"), **Via Mizner Funding, LP**, a Florida limited partnership (the "**Partnership**"), **NES Financial Corp.**, a California corporation ("**Administrative Agent**") and **SUNTRUST BANK,** a Georgia banking corporation ( the "**Escrow Agent**") (collectively the "**Parties**").

**W I T N E S S E T H :**

**WHEREAS,** the Partnership proposes to offer for sale (the "**Offering**") individual units of limited partnership interest in the Partnership (the "**Units**"), at a subscription purchase price of Five Hundred Thousand Dollars ($500,000.00) per Unit ("**Subscription Proceeds**"), plus payment of an administrative fee in the amount of Forty-five Thousand Dollars ($45,000.00) ("**Administrative Fee**") payable in cash pursuant to subscription agreements ("**Subscription Agreements**"); and

**WHEREAS**, the Units in the Partnership are proposed to be offered for sale to investors (the "**Subscribers**") under the terms of the EB-5 visa program administered by the U.S. Citizenship and Immigration Service ("**USCIS**"), an agency of the United States government;

**WHEREAS**, in each Subscription Agreement the Subscriber shall be designated a "**Phase I Subscriber**," a "**Phase II Subscriber**" or a "**Phase III Subscriber**,"

**NOW THEREFORE,** in consideration of the mutual covenants and agreements contained herein and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

1. <u>Deposits in Escrow.</u>

(a) The Partnership shall deposit or cause to be deposited with the Escrow Agent, to be held in escrow under the terms of this Agreement, all Subscription Proceeds and Administrative Fees received from Subscribers (collectively the "**Escrow Funds**"). The Escrow Agent shall have no responsibility for the Escrow Funds until such proceeds are actually received, clear through normal banking channels and constitute collected funds. The Escrow Agent shall have no duty to collect or seek to compel payment of any Escrow Funds, except to place such proceeds or instruments representing such proceeds for deposit and payment through customary banking channels. Checks for Escrow Funds furnished by Subscribers shall be made payable to: "SunTrust Bank, as Escrow Agent for Subscriber Representative for Via Mizner Funding, LP."

(b) The Partnership shall deliver to the Escrow Agent, in a form acceptable to the Escrow Agent, schedules disclosing the name, address and Tax Identification Number of each of the Subscribers, the number of Units subscribed for by each Subscriber, the amount of Subscription Proceeds and Administrative Fees received from each Subscriber, and such other information as will enable the Escrow Agent to attribute to a particular Subscriber all Escrow Funds received by the Escrow Agent.

(c) From time to time, the Partnership and the Subscriber Representative shall direct the Escrow Agent in writing to disburse all or a portion of the Escrow Funds or to take or refrain from taking an action pursuant to this Agreement (each, a "**Written Direction**"). In regard to any Written Direction to disburse all or a portion of the Escrow Funds as provided for herein, such Written Direction shall be in the form attached hereto as Exhibit "C."

151

2.      Rejection or Withdrawal of Subscription Agreement.

(a)      Any Subscription Agreement may be rejected by the Partnership.   The Partnership and the Subscriber Representative shall promptly provide the Escrow Agent with a Written Direction in the event of any such rejection.  Upon the receipt of such Written Direction, the Escrow Agent shall return to the Subscriber signing the rejected Subscription Agreement the Subscription Proceeds tendered by such Subscriber, without interest or deduction except for any applicable wire transfer fees; provided such Subscriber's Subscription Proceeds constitute collected funds, and distribute the Administrative Fee according to the Written Direction.

(b)      In the event the Escrow Agent receives a Written Direction from the Partnership and the Subscriber Representative that a Subscription Agreement has been withdrawn by a Subscriber, the Escrow Agent shall return to such Subscriber who signed the withdrawn Subscription Agreement the Subscription Agreement (if then in the Escrow Agent's possession) and the Subscription Proceeds tendered therewith, without interest or deduction except for any applicable wire transfer fees.   The Administrative Fee will be distributed according to the Written Direction.

3.      Disbursements.

(a)      No disbursements of Escrow Funds shall occur prior to such time as (i) the Escrow Agent has received a Written Direction from the Partnership and the Subscriber Representative that the Partnership has accepted the Subscription Agreements of at least ten Subscribers and (ii) the Escrow Agent has received aggregate Escrow Funds of at least $5.45 million into the Escrow Account. If the Partnership does not accept at least ten Units in the Offering, representing aggregate Subscription Proceeds of at least $5.0 million, then the Partnership will terminate the Offering and all Escrow Funds will be returned to Subscribers.

(b)      At such time as the Escrow Agent has received a Written Direction from the Partnership and the Subscriber Representative that a Subscriber's Subscription Agreement has been accepted by the Partnership, the Escrow Agent shall, subject to receipt of such funds, disburse the Subscriber's Administrative Fee in accordance with the Written Direction.

(c)      At such time as the Escrow Agent has received a Written Direction from the Partnership and the Subscriber Representative that a Phase I Subscriber's Form I-526 Immigration Petition has been filed with the USCIS, the Escrow Agent shall, subject to the receipt of such funds, release 90% of the Phase I Subscriber's Subscription Proceeds to the Partnership in accordance with the Written Direction, and the Escrow Agent shall retain the remaining 10% of the Phase I Subscriber's Subscription Proceeds (the "**Holdback Amount**") in a holdback subaccount within the Escrow Account (the "**Holdback Subaccount**").

(d)      At such time as the Escrow Agent has received a Written Direction from the Partnership and the Subscriber Representative that a Phase I Subscriber's Form I-526 Immigration Petition has been approved by the USCIS, the Escrow Agent shall, subject to the availability of such funds and if not previously released to the Partnership under this Section 3, release the Phase I Subscriber's Holdback Amount to the Partnership in accordance with the Written Direction.

(e)      At such time as the Escrow Agent has received a Written Direction from the Partnership and the Subscriber Representative that (i) a Phase I Subscriber's Form I-526 Immigration Petition has been denied by the USCIS and all rights of appeal have been exhausted and (ii) the Partnership is unable to return to the Phase I Subscriber 90% of the Phase I Subscriber's Subscription Proceeds (where the Phase I Subscriber's Holdback Amount was not previously released to the Partnership under this Section 3), the Escrow Agent shall, subject to the availability of such funds, (A) return the Phase I Subscriber's Holdback Amount to the Phase I Subscriber, and (B) release $450,000 to

the Partnership from the Holdback Subaccount, representing the Holdback Amounts of nine Phase I Subscribers, all in accordance with the Written Direction.

(f)      At such time as the Escrow Agent has received a Written Direction from the Partnership and the Subscriber Representative that (i) a Phase I Subscriber's Form I-526 Immigration Petition has been denied by the USCIS and all rights of appeal have been exhausted and (ii) the Partnership is unable to return to the Phase I Subscriber 100% of the Phase I Subscriber's Subscription Proceeds (where the Phase I Subscriber's Holdback Amount was previously released to the Partnership under this Section 3), the Escrow Agent shall, subject to the availability of such funds, release $500,000 to the Partnership from the Holdback Subaccount, representing the Holdback Amounts of ten Phase I Subscribers, all in accordance with the Written Direction.

(g)      At such time as the Escrow Agent has received a Written Direction from the Partnership and the Subscriber Representative that, (i) notwithstanding that a Phase I Subscriber's Form I-526 Immigration Petition has been denied by the USCIS and all rights of appeal have been exhausted, the Phase I Subscriber has  delivered a written request to remain a Limited Partner in the Partnership, (ii) Phase I Subscriber has withdrawn his or her I-526 Immigration Petition after filing and prior to adjudication by USCIS or (iii) in the opinion of the General Partner acting reasonably, Phase I Subscriber has failed to actively seek USCIS approval of his or her I-526 Immigration Petition, then the Escrow Agent shall, subject to the availability of such funds and if not previously disbursed to the Partnership under this Section 3, release the Phase I Subscriber's Holdback Amount to the Partnership in accordance with the Written Direction.

(h)      At such time as the Escrow Agent has received a Written Direction from the Partnership and the Subscriber Representative that a Phase II Subscriber's Form I-526 Immigration Petition or a Phase III Subscriber's Form I-526 Immigration Petition has been approved by the USCIS, the Escrow Agent shall, subject to the receipt of such funds, release the Subscriber's Subscription Proceeds to the Partnership in accordance with the Written Direction.

(i)      All Escrow Funds returned to Subscribers pursuant to this Agreement shall be without interest or deduction, via wire transfer to the account from which each Subscriber's funds originated.

(j)      At such time as all Subscribers' Form I-526 Immigration Petitions have been adjudicated by the USCIS and all Escrow Funds disbursed in accordance with a Written Direction, this Agreement (except as otherwise provided herein) shall terminate.

(k)      The Partnership shall provide a copy of this Agreement to each Subscriber.

4.      <u>Investment of Subscription Proceeds.</u>

The Parties further covenant, warrant and agree that the Escrow Agent shall invest all Escrow Funds, at the Written Direction of the Partnership and the Subscriber Representative, in a SunTrust Bank non-interest-bearing demand deposit account.

5.      <u>Escrow Administration.</u>

All taxes in respect of any earnings on the Escrow Funds shall be the obligation of the Subscriber to the extent of its pro rata share thereof, which pro rata shares will be in the same proportion of the amounts deposited by each into the Escrow Account.  The Subscriber Representative, as agent for the Subscribers and tax owner of record of the Escrow Funds, shall furnish the Escrow Agent with a completed Form W-9 for the Partnership.  The Subscriber Representative, on behalf of itself and the Subscribers, have agreed pursuant to a separate agreement that the Administrative Agent shall perform

the sub-accounting services necessary for maintaining proper ownership records with respect to the Escrow Funds and shall issue IRS Form 1099s to the Subscribers with respect to their earnings, if any, on the Escrow Funds. The Administrative Agent and the Subscriber Representative understand that, if such tax reporting documentation is not so certified to the Escrow Agent, the Escrow Agent may be required by the Internal Revenue Code of 1986, as amended, to withhold a portion of any interest or other income earned on the investment of monies or other property held by the Escrow Agent pursuant to this Agreement. The Parties shall provide to Escrow Agent such information as Escrow Agent may reasonably require to enable Escrow Agent to comply with its obligations under the USA PATRIOT Act. Escrow Agent shall not credit any amount of interest or investment proceeds earned on the Escrow Funds, or make any payment of all or a portion of the Escrow Funds, to any person unless and until such person has provided to Escrow Agent such documents as Escrow Agent may require to enable Escrow Agent to comply with its obligations under such Act.

6. <u>Duties of Escrow Agent; Indemnification</u>.

(a) The Escrow Agent undertakes to perform only such duties as are expressly set forth herein and no additional duties or obligations shall be implied hereunder. In performing its duties under this Agreement, or upon the claimed failure to perform any of its duties hereunder, the Escrow Agent shall not be liable to anyone for any damages, losses or expenses which may be incurred as a result of the Escrow Agent's so acting or failing to so act; provided, however, that the Escrow Agent shall not be relieved from liability for damages arising from the Escrow Agent's proven gross negligence or willful misconduct. The Escrow Agent shall in no event incur any liability with respect to (i) any action taken or omitted to be taken in good faith upon advice of legal counsel, which may be counsel to any Party hereto, given with respect to any question relating to the duties and responsibilities of the Escrow Agent hereunder, or (ii) any action taken or omitted to be taken in reliance upon any instrument delivered to the Escrow Agent and believed by it to be genuine and to have been signed or presented by the proper party or parties.

(b) The Partnership warrants to and agrees with the Escrow Agent that there is no security interest in the Escrow Funds or any part of the Escrow Funds; no financing statement under the Uniform Commercial Code of any jurisdiction is on file in any jurisdiction claiming a security interest in or describing, whether specifically or generally, the Escrow Funds or any part of the Escrow Funds; and the Escrow Agent shall have no responsibility at any time to ascertain whether or not any security interest exists in the Escrow Funds or any part of the Escrow Funds or to file any financing statement under the Uniform Commercial Code of any jurisdiction with respect to the Escrow Funds or any part thereof.

(c) As an additional consideration for and as an inducement for the Escrow Agent to serve as escrow agent hereunder, it is understood and agreed that, in the event of any disagreement resulting in adverse claims and demands being made in connection with or for any money or other property involved in or affected by this Agreement, the Escrow Agent shall be entitled, at the option of the Escrow Agent, to refuse to comply with the demands of any parties so long as such disagreement shall continue. In such event, the Escrow Agent may elect not to make any delivery or other disposition of the Escrow Funds or any part of such Escrow Funds. Anything herein to the contrary notwithstanding, the Escrow Agent shall not be or become liable to such parties or any of them for the failure of the Escrow Agent to comply with the conflicting or adverse demands of such parties. The Escrow Agent shall be entitled to continue to refrain and refuse to deliver or otherwise dispose of the Escrow Funds or any part thereof or to otherwise act hereunder, as stated above, until and until:

(i) the rights of such parties have been finally settled or duly adjudicated in a court having jurisdiction of the parties and the Escrow Funds and the Escrow Agent, has received written instructions as to disbursement thereof; or

(ii)     the parties have reached an agreement resolving their differences and have notified the Escrow Agent in writing of such agreement and have provided the Escrow Agent with indemnity satisfactory to the Escrow Agent against any liability, claims or damages resulting from compliance by the Escrow Agent with such agreement.

In the event of a disagreement as described above, the Escrow Agent shall have the right, in addition to the rights described above and at the option of Escrow Agent, to tender into the registry or custody of any court having jurisdiction, all money and property comprising the Escrow Funds and may take such other legal action as may be appropriate or necessary, in the opinion of Escrow Agent or its legal counsel.  Upon such tender, the Escrow Agent shall be discharged from all further duties under this Agreement; provided, however, that the filing of any such legal proceedings shall not deprive the Escrow Agent of its compensation hereunder earned prior to such filing and discharge of the Escrow Agent of its duties hereunder.

(d)     The Partnership agrees that in the event any controversy arises under or in connection with this Agreement or the Escrow Funds or the Escrow Agent is made a party to or intervenes in any litigation pertaining to this Agreement or the Escrow Funds, to pay to the Escrow Agent reasonable compensation for its extraordinary services and to reimburse the Escrow Agent for all costs and expenses, including legal fees and expenses, associated with such controversy or litigation.  As security for all fees and expenses of Escrow Agent hereunder and any and all losses, claims, damages, liabilities and expenses incurred by the Escrow Agent in connection with its acceptance of appointment hereunder or with the performance of its obligations under this Agreement and to secure the obligation of the Partnership to indemnify the Escrow Agent as set forth herein, the Escrow Agent is hereby granted a security interest in and a lien upon the Escrow Funds, which security interest and lien shall be prior to all other security interests, liens or claims against the Escrow Funds or any part thereof.

(e)     The Escrow Agent may resign at any time from its obligations under this Agreement by providing written notice to the Partnership.  Such resignation shall be effective on the date set forth in such written notice, which shall be no earlier than thirty (30) days after such written notice has been given. In the event no successor escrow agent has been appointed on or prior to the date such resignation is to become effective, the Escrow Agent shall be entitled to tender into the custody of any court of competent jurisdiction all assets then held by it hereunder and shall thereupon be relieved of all further duties and obligations under this Agreement; provided however, the Escrow Agent shall be entitled to its compensation earned prior thereto.  The Escrow Agent shall have no responsibility for the appointment of a successor escrow agent hereunder.

(f)     The Escrow Agent shall have no obligation to take any legal action in connection with this Agreement or its enforcement, or to appear in, prosecute or defend any action or legal proceeding which would or might involve the Escrow Agent in any cost, expense, loss or liability unless security and indemnity satisfactory to the Escrow Agent, shall be furnished.

(g)     The Partnership and the Subscriber Representative jointly and severally agree to indemnify the Escrow Agent and each of its officers, directors, employees and agents and to save the Escrow Agent and each of its officers, directors, employees and agents harmless from and against any and all Claims (as hereunder defined) and Losses (as hereinafter defined) which may be incurred by the Escrow Agent or any of such officers, directors, employees or agents as a result of Claims asserted against Escrow Agent or any of such officers, directors, employees or agents directly or indirectly as a result of or in connection with Escrow Agent's serving in the capacity of escrow agent under this Agreement.  For the purposes hereof, the term "**Claims**" shall mean all claims, lawsuits, causes of action or other legal actions and proceedings of whatever nature brought against (whether by way of direct action, counterclaim, cross action or interpleader) the Escrow Agent or any such officer, director, employee or agent, even if groundless, false or fraudulent, so long as the claim, lawsuit, cause of action or other legal action or proceeding is alleged or determined, directly or indirectly, to arise out of, result from,

relate to or be based upon, in whole or in part: (a) the acts or omissions of the Partnership, or (b) the appointment of the Escrow Agent as escrow agent under this Agreement, or (c) the performance by the Escrow Agent of its powers and duties under this Agreement.  The term "**Losses**" shall mean all losses, costs, damages, expenses, judgments and liabilities of whatever nature (including but not limited to attorneys', accountants' and other professionals' fees, litigation and court costs and expenses and amounts paid in settlement), directly or indirectly resulting from, arising out of or relating to one or more Claims.  Upon the written request of the Escrow Agent or any such officer, director, employee or agent (each referred to hereinafter as an  "**Indemnified Party**"), the Partnership and the Subscriber Representative agree to assume the investigation and defense of any Claim, including the employment of counsel acceptable to the applicable Indemnified Party and the payment of all expenses related thereto and, notwithstanding any such assumption, the Indemnified Party shall have the right, and the Partnership and the Subscriber Representative agree to pay the costs and expense thereof, to employ separate counsel with respect to any such Claim and to participate in the investigation and defense thereof in the event that such Indemnified Party shall have been advised by legal counsel that there may be one or more legal defenses available to such Indemnified Party which are different from or additional to those available to the Partnership or the Subscriber Representative. The Partnership and the Subscriber Representative hereby agree that the indemnifications and protections afforded Escrow Agent and the other Indemnified Parties in this section shall survive the termination of this Agreement and any resignation or removal of the Escrow Agent.

(h)     The Partnership acknowledges that the Escrow Agent is serving as escrow agent for the limited purposes set forth herein and represents, covenants and warrants to the Escrow Agent that no statement or representation, whether oral or in writing, has been or will be made to any Subscriber to the effect that the Escrow Agent has investigated the desirability or advisability of investment in the Units or approved, endorsed or passed upon the merits of such investment or is otherwise involved in any manner with the transactions contemplated hereby, other than as Escrow Agent under this Agreement.  It is further agreed that the Partnership shall not use or permit the use of the name "SunTrust," "SunTrust Bank," "SunTrust Banks, Inc." or any variation thereof in any sales presentation, placement or offering memorandum or literature pertaining directly or indirectly to the Offering except strictly in the context of the duties of the Escrow Agent as escrow agent under this Agreement.  Any breach or violation of the paragraph shall be grounds for immediate termination of this Agreement by the Escrow Agent.

(i)     The Escrow Agent shall have no duty or responsibility for determining whether the Units or the offer and sale thereof conform to the requirements of applicable Federal or state securities laws, including but not limited to the Securities Act of 1933 or the Securities Exchange Act of 1934.  The Partnership represents and warrants to the Escrow Agent that the Units and the Offering will comply in all respects with applicable Federal and state securities laws and further represents and warrants that the Partnership has obtained and acted upon the advice of legal counsel with respect to such compliance with applicable Federal and state securities laws.  The Partnership acknowledges that the Escrow Agent has not participated in the preparation or review of any sales or offering material relating to the Offering or the Units.   In addition to any other indemnities provided for in this Agreement, the Partnership agrees to indemnify and hold harmless the Escrow Agent and each of its officers, directors, agents and employees from and against all claims, liabilities, losses and damages (including attorneys' fees) incurred by the Escrow Agent or such persons and which directly or indirectly result from any violation or alleged violation of any Federal or state securities laws.

7.     <u>Notices</u>.

Any notices, elections, demands, requests and responses thereto permitted or required to be given under this Agreement shall be in writing, signed by or on behalf of the Party giving the same, and addressed to each other Party at the address of such other Party set forth below or at such other address as such other Party may designate in writing in accordance herewith.  Any such notice, election,

demand, request or response shall be addressed as follows and shall be deemed to have been delivered upon receipt by the addressee thereof:

    (a)    If to the Partnership:

        Via Mizner Funding, LP
        c/o U.S. Immigration Fund GP - Mizner, LLC
        1295 U.S. Highway One
        North Palm Beach, FL 33408
        Attention: Managing Member
        Phone: 561-799-0050
        Facsimile: 561-799-0061
        Email: sandy@viamiznerfunding.com

    (b)    If to the Subscriber Representative:

        Florida Regional Center, LLC
        11770 US Highway One, Suite 301
        Palm Beach Gardens, FL 33408
        Attention: Chief Financial Officer
        Phone: 561-799-0050
        Facsimile: 561-799-0061
        Email: david@flregionalcenter.com

    (c)    If to the Administrative Agent:

        NES Financial Corp.
        50 W. San Fernando Street
        Suite 300
        San Jose, CA 95113
        Attn:  Kelly E. Alton, General Counsel
        Phone:  800-339-1031
        Fax:  866-704-1031
        Email:  kalton@nesf.com

    (d)    If to the Escrow Agent:

        SunTrust Bank
        Escrow Services
        Mail Code Fl-Miami-1020
        777 Brickell Avenue,
        Miami, Fl 33131-2803 919 E Main Street, 7th Floor
        Richmond, VA 23219
        Attn: Odalys del OsoMatt Ward
        Tel. 305-579-7149
        Tel. 800-841-1786
        Fax 305-579-7167
        e-mail odalys.delosos@suntrust.com

    8.    <u>Successors and Assigns; Amendment</u>.

    The rights created by this Agreement shall inure to the benefit of and the obligations created hereby shall be binding upon the successors and assigns of the Parties; provided, however, that

neither this Agreement nor any rights or obligations hereunder may be assigned by any Party hereto without the express written consent of each other Party hereto. This Agreement may not be amended without the written consent of all Parties in writing.

9.   <u>Construction</u>.

This Agreement shall be construed and enforced according to the laws of the State of California.

10.   <u>Counterparts</u>.

This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. Delivery of executed signature pages by facsimile or electronic transmission will constitute effective and binding execution and delivery of this Agreement and have the same effect as the delivery of an original executed counterpart. This Agreement shall become effective when each Party to this Agreement shall have received a counterpart of this Agreement signed by each other Party hereto.

11.   <u>Term</u>.

This Agreement shall terminate and the Escrow Agent shall be discharged of all responsibilities hereunder at such time as the Escrow Agent shall have disbursed all Escrow Funds in accordance with the provisions of this Agreement; provided, however, that the provisions of Sections 6(g) and 6(i) hereof shall survive any termination of this Agreement and any resignation or removal of the Escrow Agent.

*[Signature page to follow]*

**IN WITNESS WHEREOF,** the Parties hereto have executed this Agreement on the day and year first above written.

"PARTNERSHIP"

**Via Mizner Funding, LP**

By U.S. Immigration Fund GP - Mizner, LLC, its General Partner


By: _____
Name:
Title:

"SUBSCRIBER REPRESENTATIVE"

**Florida Regional Center, LLC**


By: _____
Name:
Title:

"ADMINISTRATIVE AGENT"

**NES Financial Corp.**


By: _____
Name:
Title:

"ESCROW AGENT"

**SUNTRUST BANK**


By: _____
Name:
Title:

**EXHIBIT A-1**

**Certificate of Incumbency**

(List of Authorized Representatives)

Client Name:   **Via Mizner Funding, LP**

As an Authorized Officer of the above referenced entity, I hereby certify that the each person listed below is an authorized signor for such entity, and that the title and signature appearing beside each name is true and correct.

| <u>Name</u> | <u>Title</u> | <u>Signature</u> | <u>Contact Number</u> |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

IN WITNESS WHEREOF, this certificate has been executed by a duly authorized officer by:

By:_____         Date_____

Title: _____

A-1

**EXHIBIT A-2**

**Certificate of Incumbency**

(List of Authorized Representatives)

Client Name:    **Florida Regional Center, LLC**

As an Authorized Officer of the above referenced entity, I hereby certify that the each person listed below is an authorized signor for such entity, and that the title and signature appearing beside each name is true and correct.

| **Name** | **Title** | **Signature** | **Contact Number** |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

IN WITNESS WHEREOF, this certificate has been executed by a duly authorized officer by:

By:_____        Date_____

Title: _____

A-2

**EXHIBIT B**

**SunTrust Bank, as Escrow Agent**

**Via Mizner Funding, LP / NES Financial Corp**

**<u>Schedule of Fees & Expenses</u>**

<u>**Acceptance/Legal Review Fee:**</u>    **$1,500.00** – one time only payable at the time of signing the escrow agreement

The Legal Review Fee includes review of all related documents and accepting the appointment of Escrow Agent on behalf of SunTrust Bank.  The fee also includes setting up the required account(s) and accounting records, document filing, and coordinating the receipt of funds/assets for deposit to the Escrow Account.  This is a one-time fee payable upon execution of the Escrow Agreement.  <u>As soon as SunTrust Bank's attorney begins to review the escrow agreement, the legal review fee is subject to payment regardless if the parties decide to appoint a different escrow agent or a decision is made that the escrow agreement is not needed.</u>

<u>**Administration Fee:**</u>    **$2,500** – payable at the time of signing the escrow agreement and on the anniversary date thereafter, if applicable

The Administration Fee includes providing routine and standard services of an Escrow Agent.  The fee includes administering the escrow account, performing investment transactions, processing cash transactions (including wires and check processing), disbursing funds in accordance with the Agreement (note any pricing considerations below), and providing trust account statements to applicable parties for a twelve (12) month period.  If the account remains open beyond the twelve (12) month term, the parties will be invoiced each year on the anniversary date of the execution of the Escrow Agreement.  Additional fees will be billed for processing claim notices and/or objections.  Extraordinary expenses, including legal counsel fees, will be billed as out-of-pocket.  The Administration Fee is due upon execution of the Escrow Agreement. **This Administrative Fee will be waived if the Escrow Account funds within 180 days and maintains a balance in excess of $500,000 for the escrow term.  If the Escrow Account does not fund within 180 days and/or does not maintain a balance in excess of $500,000 for the escrow term, the Administrative Fee becomes applicable.**

<u>**Out-of-Pocket Expenses:**</u>    **At Cost**

Out-of-pocket expenses such as, but not limited to, postage, courier, overnight mail, insurance, money wire transfer, long distance telephone charges, facsimile, stationery, travel, legal (out-of-pocket to counsel) or accounting, will be billed at cost.

**Note:  This fee schedule is based on the assumption that the escrowed funds will be invested in the SunTrust Non-Interest Deposit Option.  If for any reason, the escrowed funds shall be returned to each Subscriber, a $50 wire fee will be charged for any wire in excess of 4 per calendar month.**

SunTrust Bank
Jon Fox
407-237-5240
jon.fox@suntrust.com

**Exhibit C**

**Form of Written Direction**

**Via Mizner Funding, LP**

[DATE]

SunTrust Bank
Escrow Services
919 E Main Street, 7th Floor
Richmond, VA 23219
Attention: Steve Miles

      Re:     Subscriber Name _____

Reference is made to the Subscription and Administrative Fee Escrow Agreement, dated as of July 20, 2012 ("**Escrow Agreement**"), by and among the Subscriber Representative, the Partnership, the Administrative Agent, and the Escrow Agent. Capitalized terms not otherwise defined have the meanings provided in the Escrow Agreement.

The above-referenced Subscriber is a party to a Subscription Agreement, pursuant to which the following Escrow Funds have previously been delivered into the Escrow Account:

| | |
|---|---|
| Administrative Fee: | $45,000 |
| Subscription Proceeds: | $500,000 |

The Partnership has accepted the Subscription Agreements of at least ten Subscribers in the Offering and the Escrow Agent has received aggregate Escrow Funds of at least $5.45 million into the Escrow Account. The Subscriber Representative and the Partnership hereby direct release of amounts designated above using the instructions set forth below. Release is directed for the following reason [select one only]:

☐    1.    The Subscriber's Subscription Agreement has been accepted by the Partnership. The Administrative Fee designated above to be released to the Subscriber Representative.

☐    2.    The Subscriber's Subscription Agreement has been withdrawn by the Subscriber prior to acceptance by the Partnership. All Escrow Funds designated above to be returned to the Subscriber.

☐    3.    The Subscriber's Subscription Agreement has been rejected by the Partnership. All Escrow Funds designated above to be returned to the Subscriber.

☐    4.    The Subscriber is a Phase I Subscriber whose I-526 Petition has been filed with the USCIS. Ninety percent of the Subscription Proceeds designated above to be released to the Partnership and 10% of the Subscription Proceeds designated above to be retained in the Holdback Subaccount as the Subscriber's Holdback Amount.

☐    5.    The Subscriber is a Phase I Subscriber whose I-526 Petition has been approved by the USCIS. If not previously released, the Subscriber's Holdback Amount to be released to the Partnership.

☐    6.    The Subscriber is a Phase I Subscriber whose I-526 Petition has been denied by the USCIS and all rights of appeal have been exhausted. The Partnership is unable to return to the Phase I Subscriber 90% of the Phase I Subscriber's Subscription Proceeds (where the Phase I

163

Subscriber's Holdback Amount was not previously released to the Partnership). Subject to the availability of funds, (A) the Subscriber's Holdback Amount to be returned to the Subscriber from the Holdback Subaccount and (B) $450,000, representing the Holdback Amounts of nine Phase I Subscribers listed below to be released to the Partnership from the Holdback Subaccount.

☐ 7. The Subscriber is a Phase I Subscriber whose I-526 Petition has been denied by the USCIS and all rights of appeal have been exhausted. The Partnership is unable to return to the Phase I Subscriber 100% of the Phase I Subscriber's Subscription Proceeds (where the Phase I Subscriber's Holdback Amount was previously released to the Partnership). Subject to the availability of funds, $500,000, representing the Holdback Amounts of ten Phase I Subscribers listed below to be released to the Partnership from the Holdback Subaccount.

☐ 8. The Subscriber is a Phase I Subscriber (i) whose Form I-526 Petition has been denied by the USCIS and all rights of appeal have been exhausted; however, the Phase I Subscriber has delivered a written request to remain a Limited Partner in the Partnership, (ii) who has withdrawn his or her I-526 Immigration Petition after filing and prior to adjudication by USCIS or (iii) who, in the opinion of the General Partner acting reasonably, failed to actively seek USCIS approval of his or her I-526 Immigration Petition. Subject to the availability of funds and if not previously released, the Subscriber's Holdback Amount to be released to the Partnership from the Holdback Subaccount.

☐ 9. The Subscriber is a Phase II Subscriber or a Phase III Subscriber whose I-526 Petition has been approved by the USCIS. The Subscription Proceeds designated above to be released to the Partnership.

The Subscriber Representative and the Partnership further direct release of the following Subscribers' Holdback Amounts [insert names of Subscribers; complete only if Direction 6 or 7 is selected above]:

1. _____
2. _____
3. _____
4. _____
5. _____
6. _____
7. _____
8. _____
9. _____
10. _____ [Direction 7 only]

The Subscriber Representative and the Partnership further direct the released funds be delivered as follows [select one only]:

☐ In the form of a check drawn on the Escrow Account and payable to the order of the recipient, by FedEx express delivery to the recipient's address set forth in the Escrow

Agreement.

☐ By wire transfer as follows [INSERT PARTNERSHIP, SUBSCRIBER REPRESENTATIVE AND/OR SUBSCRIBER WIRE TRANSFER INSTRUCTIONS AS APPROPRIATE]:

_____

_____

_____

_____

_____

_____

Sincerely,

_____

Subscriber Representative Authorized Representative

_____

Partnership Authorized Representative

C-3

Exhibit to Offering Memorandum for Via Mizner Funding, LP

## EXHIBIT E

## ESCROW ADMINISTRATION SERVICES AGREEMENT

[See Attached]

*DRAFT*

## ESCROW ADMINISTRATION SERVICES AGREEMENT

This Escrow Administration Services Agreement ("**Agreement**") is made effective as of July 20, 2012 (the "**Effective Date**") by and between **Florida Regional Center, LLC**, a Florida limited liability company ("**Subscriber Representative**"), and **NES Financial Corp.**, a California corporation ("**Administrative Agent**"). The Subscriber Representative and Administrative Agent may be referred to hereinafter individually as a "**Party**" or collectively as the "**Parties**".

<u>RECITALS</u>

A.      The Subscriber Representative and the Administrative Agent have or will enter into an escrow agreement with SunTrust Bank which provides for the appointment of SunTrust Bank ("**Bank**") as escrow agent and for the escrow agent to accept, hold, invest and disburse funds deposited with it and the earnings thereon in accordance with the terms of the escrow agreement for an escrow that will hold both the subscription proceeds for an offering of interests in Via Mizner Funding, LP pursuant to the U.S. Citizenship and Immigration Service EB-5 visa program and the associated processing fees for such offering ("**Escrow Agreement**"); and

B.      The Subscriber Representative as agent for the subscribers of the offering of interests in Via Mizner Funding, LP ("**Subscribers**") and tax owner of record of the escrow funds needs sub-accounting and other administrative services of the type offered by Administrative Agent to handle its duties under the Escrow Agreement.

Now, therefore, for good and valuable consideration, the sufficiency of which is hereby acknowledged, the Parties, for themselves, their successors and assigns, hereby agree as follows:

<u>AGREEMENT</u>

1.      <u>Escrow Administration Services</u>.   The Administrative Agent will provide subaccounts and sub-accounting to Subscriber Representative for each Subscriber, IRS Form 1099 reporting, reconciliation and interest computations, and a 24/7 customer portal for each Subscriber in connection with the escrow funds to be held pursuant to the Escrow Agreement, and other services as set forth on Schedule A hereto (the "**Escrow Administration Services**"). The Administrative Agent will charge Subscriber Representative a fee for the Escrow Administration Services.  The fees will be billed as follows: $500.00 acceptance fee due at the time of signing the Proposal and $200.00 per Subscriber for the first 10 Subscribers which will be invoiced monthly as each Subaccount is opened.

2.      <u>Confidentiality Obligations of the Administrative Agent</u>.   The Administrative Agent may receive or gain access to information from the Bank or from or for the Subscribers or Subscriber Representative that includes nonpublic information about the Subscribers or Subscriber Representative ("**Confidential Information**").  This may include (without limitation) information that is marked "confidential" and/or "proprietary" and information that the Administrative Agent should reasonably know is confidential. It does not include information that the Administrative Agent can demonstrate: (a) is or becomes a matter of public knowledge through no fault of the Administrative Agent; (b) has been identified in writing by the Subscriber Representative as not being confidential; (c) was rightfully in the possession of the

<span style="color:red">167</span>

Administrative Agent or was known to the Administrative Agent prior to its receipt from or for the Bank or the Subscriber Representative; or (d) is lawfully obtained by the Administrative Agent from any third party who did not obtain the information directly or indirectly from the Administrative Agent.   Consistent with Subscriber Representative's obligations to preserve Subscribers' confidentiality, the Administrative Agent agrees that it will not, without the prior written consent of the Subscriber Representative, disclose or describe the Confidential Information to any third party, directly or indirectly, under any circumstances or by any means. The Administrative Agent will not use, copy, transmit, reproduce, summarize or quote any of Confidential Information except as necessary to carry out the purposes of this Agreement.   The obligations of confidentiality hereunder shall survive the expiration or termination of this Agreement.

3. <u>Confidentiality Obligations of the Subscriber Representative</u>.   The Subscriber Representative may receive or gain access to information from or for the Administrative Agent that includes nonpublic information about the Administrative Agent, its customers, or their respective clients, accounts, plans, technology, systems, and/or policies ("**Confidential Information**").   This may include (without limitation) information that is marked "confidential" and/or "proprietary" and information that Subscriber Representative should reasonably know is confidential.   It does not include information that the Subscriber Representative can demonstrate: (a) is or becomes a matter of public knowledge through no fault of the Subscriber Representative; (b) has been identified in writing by the Administrative Agent as not being confidential; (c) was rightfully in the possession of Subscriber Representative or was known to the Subscriber Representative prior to its receipt from or for the Administrative Agent; or (d) is lawfully obtained by the Subscriber Representative from any third party who did not obtain the information directly or indirectly from the Administrative Agent.   The Subscriber Representative will not, without the prior written consent of the Administrative Agent, disclose or describe the Confidential Information to any third party, directly or indirectly, under any circumstances or by any means.   If the Subscriber Representative is required by law or legal process to disclose any Confidential Information, the Subscriber Representative shall provide the Administrative Agent with prompt written notice of each such request so that the Administrative Agent may seek an appropriate protective order or confidential treatment.

At the direction of the Administrative Agent, the Subscriber Representative will destroy or return to the Administrative Agent all Confidential Information (in every form and format).   Unless otherwise required by law, the Subscriber Representative will thereafter purge the Confidential Information from all systems under its control so that it is not readable or retrievable.   The Subscriber Representative acknowledges that the Confidential Information contains trade secrets and other proprietary information, and that any disclosure or use of the Confidential Information other than as expressly permitted by this Agreement will cause irreparable harm to the Administrative Agent.   Therefore, without limitation of any other remedy, upon any breach of this Section, the Administrative Agent may obtain equitable relief to prevent the disclosure of any Confidential Information and/or to obtain its return to the Administrative Agent.   The obligations of confidentiality hereunder shall survive the expiration or termination of this Agreement.

4. <u>Security</u>.   Specifically, and not by way of limitation, the Administrative Agent shall: (a) maintain Confidential Information in physically and electronically secure media and facilities, subject to commercially reasonable security procedures; (b) not use, nor permit its employees, agents, subcontractors or affiliates to use, such Confidential Information for any purpose whatsoever except strictly in connection with performance of its contractual duties to the Subscriber Representative; (c) neither use, nor permit use of, such data for any sales or

marketing purposes; (d) make and enforce policies and procedures in hiring, training, supervision and monitoring of its staff, agents and subcontractors in proper handling and protection of Confidential Information, including, at a minimum and not by way of limitation, written agreements for confidentiality to be signed personally by all such parties, training, and provision for disciplinary action where appropriate; and (e) not copy, nor permit copying of, the Confidential Information, in any manner, or in any medium, whatsoever, and return all such data immediately upon completion of the task for which it was received, or with Subscriber Representative's prior written approval, certify destruction of such data in writing.

The Administrative Agent agrees that it has and will continue to perform background and reference checks on employees, agents, consultants and sub-contractors who perform Escrow Administration Services or have access to Confidential Information.   No person whose background check reveals a conviction for any criminal offense involving dishonesty or a breach of trust or money laundering, or who has agreed to enter into a pretrial diversion or similar program in connection with a prosecution for such an offense shall be assigned to Subscriber Representative's projects or be provided with access to Confidential Information.   The Administrative Agent shall take appropriate measures to ensure that its employees, agents and subcontractors who perform Escrow Administration Services are competent to do so, that they abide by commonly accepted standards of business ethics, and that they do not breach any section of this Agreement.

5.     <u>Indemnity</u>.  The Subscriber Representative shall, to the fullest extent permitted by law, indemnify and hold harmless the Administrative Agent and each director, officer, employee, attorney, agent, shareholder, manager, partner or affiliate of the Administrative Agent (collectively, the "**Administrative Agent Indemnified Parties**") against any and all actions, claims (whether or not valid), losses, damages, liabilities, costs or expenses of any kind or nature whatsoever (including without limitation reasonable attorneys' fees, costs and expenses) incurred or suffered by or asserted against the Administrative Agent Indemnified Parties from and after the date hereof without their fraud, bad faith or willful misconduct, as a result of or arising from or in any way relating to any claim, demand, suit, action, or proceeding (including any inquiry or investigation) by any person, incurred while acting as the Administrative Agent or arising out of or in connection with the acceptance or administration of the Administrative Agent's duties hereunder, and to reimburse the Administrative Agent for all its reasonable third party expenses, including among other things, reasonable counsel fees and court costs incurred by reason of its positions or actions taken pursuant to this Agreement.   The obligations of the Subscriber Representative under this Section shall survive any termination of this Agreement.

6.     <u>Notices</u>.   Any notices, elections, demands, requests, and responses thereto permitted or required to be given under this Agreement shall be in writing, signed by or on behalf of the party giving the same, and addressed to the other party at the address of such other party set forth below or at such other address as such other party may designate in writing in accordance herewith.  Any such notice, election, demand, request or response shall be addressed as follows and shall be deemed to have been delivered upon receipt by the addressee hereof:

If to the Subscriber Representative:

Florida Regional Center, LLC
11770 US Highway One, Suite 301
Palm Beach Gardens, FL 33408
Attention: Chief Financial Officer

*Execution*

Phone: 561-799-0050
Facsimile: 561-799-0061
Email: david@flregionalcenter.com

If to the Administrative Agent:

NES Financial Corp.
50 W. San Fernando Street
Suite 300
San Jose, CA 95113
Attn:  Kelly E. Alton, General Counsel
Phone:  800-339-1031
Fax:  866-704-1031
Email:  kalton@nesf.com

7.   <u>Generally</u>.

(a)   <u>Governing Law</u>.  This Agreement shall be construed and interpreted in accordance with the internal laws of the State of California without giving effect to the conflict of laws principles thereof.

(b)   <u>Entire Agreement</u>.  This Agreement, together with the Escrow Agreement, constitutes the entire agreement between the Parties relating to the administration of the escrow.

(c)   <u>Construction</u>.  Capitalized terms used herein but not otherwise defined herein shall have the meanings assigned to such terms in the Escrow Agreement.  To the extent of any inconsistency between the Escrow Agreement and this Agreement, the terms of this Agreement shall prevail.

(d)   <u>Amendment or Waiver</u>.  This Agreement may be changed, waived, discharged or terminated only by a writing signed by the Administrative Agent and the Subscriber Representative.  No delay or omission by any party in exercising any right with respect hereto shall operate as a waiver.  A waiver on any one occasion shall not be construed as a bar to, or waiver of, any right or remedy on any future occasion.

(e)   <u>Severability</u>.  To the extent any provision of this Agreement is prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

(f)   <u>Binding Effect</u>.  All of the terms of this Agreement, as amended from time to time, shall be binding upon, inure to the benefit of, and be enforceable by, the respective successors and the assigns of each of the Parties hereto.

(g)   <u>Execution in Counterparts</u>.  This Agreement may be executed in electronic form or by facsimile transmission and in two or more counterparts, which when so executed shall constitute one and the same agreement or direction.

*Execution*

       (h)    <u>Termination.</u>  Upon the disbursement of all escrow funds held pursuant to the Escrow Agreement, this Agreement shall terminate.

This Agreement is effective as of the Effective Date.

**Administrative Agent:**                **Subscriber Representative:**

NES Financial Corp.                  Florida Regional Center, LLC, a Florida
a California corporation              limited liability company

By: _____        By: _____

Name: _____      Name: _____

Title: _____       Title: _____

*Execution*

Schedule "A" to Escrow Administration Services Agreement

| Services: | **Escrow Administration Services** |
|---|---|
| **Customer:** | **Subscriber Representative** |
| **NESF (Administrative Agent) responsibilities:** | |
| - Subaccounting infrastructure* | X |
| - Form 1099 generation | X |
| - 24/7 customer portal | X |
| - Audit trail | X |
| - Reconciliation | X |
| - Interest computations | X |
| - Privacy requirements | X |
| - KYC (OFAC screening) | X |
| - Disbursement package | X |
| - Deposit tracking | X |

| *Subaccounting infrastructure | NESF provides the subaccounting infrastructure that supports the following: |
|---|---|
| | • Master account tied to a bank account titled for use as an escrow account |
| | • Unlimited subaccounts under the master account |
| | • Each subaccount has 24/7 online access for account balance and transaction information |
| | • Interest accrued to the master account is automatically distributed on a pro rata basis to each subaccount |
| | • Documents and information can be attached to each subaccount.  For example, legal documents, canceled checks or completed wires |
| | • Daily reconciliation of each subaccount to the master account |
| | • KYC of each subaccount is limited to OFAC screening |
| | • Account statement for each subaccount that provides a complete financial record |
| | • Disbursement package preparation supports both checks and wires.  It includes subaccount balance verification. |

Exhibit to Offering Memorandum for Via Mizner Funding, LP

## **EXHIBIT F**

## **LOAN COMMITMENT**

[See Attached]

***FORM OF LOAN COMMITMENT***
**Via Mizner Funding, LP**
**1295 U.S. Highway One, Third Floor**
**North Palm Beach, FL 33048**

July 21, 2012

Mr. Mark A. Gensheimer
Camino Investments Holdings Limited Partnership
1515 North Federal Highway, Suite 306
Boca Raton, Florida 33432

Re:     **Loan Commitment**

Dear Mr. Gensheimer

This letter will confirm the interest of the **Via Mizner Funding**, LP, a Florida limited partnership (the "Lender") in making a commercial loan for the purposes set forth herein and in accordance with and subject to the terms and conditions contained in this letter. The Loan (defined below) is being made pursuant to and in accordance with the guidelines and regulations of the United States Citizens Immigration Services ("USCIS") and the United States Immigration Investor Program commonly known as the "EB-5 Pilot Program." Unless otherwise defined herein, all capitalized terms used in this Letter shall have the same meaning ascribed to them in the Consulting Agreement dated June  28, 2012 ("Consulting Agreement") between the Borrower (defined below) and U.S. Immigration Fund GP – Mizner, LLC ("Consultant") and in the Business Plan being submitted to the USCIS for the Project which is a material component to the I-526 template.

Lender hereby covenants and agrees that in the event the Lender is successful in raising the Minimum Loan Amount (defined below) pursuant to the Consulting Agreement, and provided that Borrower has satisfied all of the conditions to funding contained in a definitive Loan Agreement, Lender agrees to make, and Borrower agrees to accept, the Loan.

The terms of the proposed Loan are as follows:

***Borrower****:* Camino Investments Holdings Limited Partnership, a Florida limited partnership with a business address at 1515 North Federal Highway, Suite 306, Boca Raton, Florida.

***The Loan:***  Lender will make secured, subordinated loans (collectively, the "Loans") to the Borrower in the minimum amount of Forty-Eight Million ($48,000,000.00) Dollars (the "Minimum Loan Amount") but not more than One Hundred Sixty Million ($160,000,000.00) Dollars (the "Maximum Amount"), to be funded in three (3) phases in accordance with the development schedule for the Project.  The loans shall be disbursed in accordance with the "Funding Schedule" attached hereto as Exhibit 1.

***Loan Documentation:***  The Borrower shall execute and deliver to Lender to evidence the Loan

and as security for the Loan, such documents that Lender shall reasonably require in order to perfect its security interest in and to the Collateral (defined below), which shall include, but shall not be limited to, the following:

(i)     One or more promissory notes in the Principal Amount of the Loans.

(ii)    One or more definitive loan agreements in form and substance satisfactory to Lender.

(iii)   A mortgage lien on the Property and all improvements located thereon and a security interest in all personal property located on the Property and owned by Owner (collectively, the "Collateral"), in each case senior to all other liens and encumbrances on the Collateral, except for the first mortgage lien and security interest granted in favor of up to three (3) financial institutions (the "Senior Lenders") who will be providing up to a maximum of $173,500,000.00, in secured financing to the Borrower for the three (3) phases of the Project.

(iv)    A collateral assignment of 100% of the membership interests in the Borrower.

(iv)    Any and all consents from third parties to authorize Borrower to enter into the Loan, and such other instruments or documents reasonably requested by Lender to evidence the Loan and to perfect its security for the Loan (collectively, the "Loan Documents").

(v)     An inter-creditor agreement among the Borrower, the Senior Lender and the Lender on such terms and conditions as are acceptable to Lender in its reasonable judgment ("Inter-creditor Agreement").

(vi)    A title commitment and a title insurance policy acceptable to Lender issued by a AAA rated company, with all costs to be borne by Borrower.

*Origination Fee:*  Borrower shall pay an Origination Fee equal to one (1.0%) percent multiplied by the Principal Amount funded on each of the Closings of the Loan.

*Interest*:  Annual interest on the Loan will be three and one-half (3.5%) percent**.**  At Closing of the Loan, an advance payment equal to one (1) year of Interest shall be paid to Lender. Beginning on the first anniversary of the Closing of the Loan, Interest payments shall be made on a quarterly basis, in arrears until such time as the Loans are paid in full.

*Repayment Terms:* The Principal Amount plus all accrued interest and fees, if any, shall be fully paid from cash from operations and/or the sale or refinancing of the Project, but not later than five (5) years from the date the last I-526 Petition has been filed with USCIS subject to a one (1) year extension (the "Maturity Date"), but in no event earlier than the final approval and removal of all conditions for all I-829 petitions filed by Qualified Investors under the EB-5 Pilot Program regulations and laws.

*Prepayment:* The Loan may not be paid early pursuant to EB-5 Pilot Program regulations.

*Use of Proceeds:*  The proceeds of the Loan shall be used exclusively for the development and

construction of the three (3) phases of the Project on the Property, as more specifically described in Borrower's development plan delivered to Lender.

***Anticipated Closing Date:*** It is presently anticipated that the closing of the Loans ("Closing") will occur, and the Loan Documents for the Loan will be executed and delivered, and funding shall occur on or before November 5, 2012 ("Initial Closing Date"). It is anticipated that there will be up to four (4) separate Closings with multiple draws of the Loan based on Borrower's satisfaction of the conditions to funding under the Loan Agreement. Each of those Closings shall be scheduled according to a development timetable and Loan Funding Schedule to be agreed upon between the Parties.

***Conditions Precedent:*** The following conditions precedent shall be fully satisfied prior to the Closing of the Loan:

1. Financial statements from the Borrower and the landowner of the Property have been provided as requested and accepted by the Lender.

2. Borrower's lenders, if any, ("Senior Lenders") have issued conditional commitment letter(s) to fund the senior portion of the debt in accordance with the phasing outlined in the Development Schedule. The allowable condition is that the second mortgage lender has deposited at least 75% of the funds required for each phase of construction into the designated escrow account set up specifically to fund this transaction, and has provided evidence from the institution in which the funds are held to verify this fact.

3. The Senior Lender, if any, shall have consented to the Loan and agreed to the form and content of the Loan Documents. The Inter-creditor Agreement shall provide, among other things, that the Senior Lender shall notify Lender of a default under the Senior Loans and a reasonable opportunity to cure any monetary default unless otherwise waived by Lender in its sole discretion;

3. All proceeds of the Loans shall be used for development and construction of the Project;

4. Under the terms of the Loans, Borrower is required to pay at Closing certain fees and Interest as provided herein; and

4. Borrower shall be current on all fees, expenses, and other payments due and owing to Consultant and its affiliates pursuant to the Consulting Agreement and the payment of all amounts due to Consultant at closing of the Loan are paid at the Closing.

5. Borrower shall have received final governmental approvals for the completion of construction of the phase of work for which Borrower requests funding, including, without limitation, final site plan approval and building permits.

6. Loan documents acceptable to Lender and Lender's counsel are fully executed by

Borrower and any affiliated or related entities, as required by Lender, and delivered by the parties.   In addition, the Loan Documents shall contain the following terms and conditions:

     a. Except as otherwise provided, until such time as the Loans are fully paid, the Borrower shall be prohibited from entering into any third party loans without the prior written consent if Lender.

     b. Once each of the Qualified Investor's funds are deposited in escrow with the Lender, upon filing with USCIS of the I-526 petitions for each Qualified Investor, and upon satisfaction of the conditions set forth in the Offering Materials, ninety (90%) percent of the Investor's funds (excluding the Administrative Fee payable by the Qualified Investors) for phase one of the Project shall be made available to Borrower pursuant to the Loan Documents. Funds will be released in increments of Ten Million ($10,000,000.00) Dollar amounts until 100% of the Principal Amount of the Loan are disbursed to Borrower.

***Draw Schedule for Funding;*** The following conditions precedent shall be fully satisfied prior to the Closing of the Loan:

     a. An AIA draw schedule must be provided in acceptable form to Lender and Lender's counsel and must be fully accepted and agreed to by the lender and the Borrower prior to the release of any proceeds of the Loan. The draw schedule shall be detailed by trade and must also include general conditions, development fee, contingencies, performance and payment bonds, builders risk insurance, general liability insurance, and all other costs that are necessary to protect the Lender and complete the Project.

     b. Lender must be named as an additional insured by specific endorsement by the insurance carrier, not agent, as well as certificate holder with limits to be agreed upon by the Parties.

***Cancellation:*** Lender shall have the right to cancel this Commitment Letter in the event that there has been a breach of any of the material terms and conditions of the Consulting Agreement, including the payment of all sums required thereunder, or there has been a misstatement of material with respect to information provided by Borrower and any affiliated or related party of Borrower and incorporated into the Offering Materials. Upon the happening of either of the events described above, Lender shall have the right to cancel and rescind this Loan Commitment on ten (10) days' notice to Borrower.

***Expiration Date:*** This Agreement supersedes any and all prior negotiations, understandings, arrangements or agreements, written or oral, between the parties hereto and/or their affiliates or related entities with respect to the specific subject matter hereof.

If the foregoing meets with your approval, please countersign this letter and return it to the undersigned prior to July 21, 2012.

Very truly yours,
Via Mizner Funding, LP
By: U.S. Immigration Fund GP – Mizner, LLC
By:  Florida 400 Investments, LLC

By: _____
Name: Nicholas A. Mastroianni, II
 Title: Managing Member

**Accepted and Agreed
as of the date set forth above**:

Camino Investments Holdings Limited Partnership,
a Florida Limited Partnership

By:_____
 Name:  Mark Gensheimer
Title:     General Partner

EXHIBIT 1


# <u>Via Mizner Loan Funding Schedule</u>

**Offering Materials for the securities offering in the foreign market are to be completed on or before July 27, 2012.**

| <u>Foreign Market</u> | <u>Money in Escrow</u> | <u>File I-526</u> | <u>Target Funding Amounts and Dates</u> |
|---|---|---|---|
| **Phase 1:** | | | |
| 8/11-27/2012 | 9/30/12 | 10/30/12 | $12Million - 11/05/12 |
| 9/10-30/2012 | 10/30/201 | 12/15/2012 | $36 Million - 02/25/2013 |
| | | | |
| **Phase 2:** | | | |
| 9/10–30/2012 | 11/30/2012 | 01/30/2013 | $52 Million – 6/01/2013 (First funding) |
| | | | |
| **Phase 3:** | | | |
| 11/28/2012 | 02/15/2013 | 3/15/2013 | <u>$44 Million</u> - 5/25/2013 |
| TOTAL FUNDING | | | **$144 Million** |

For Phase 1 of the Project, ninety (90%) percent of the funds shall be released from Escrow upon I-526 Petition filing. The 10% Holdback on those funds shall be released on the approval of the I-526 Petitions associated with those funds. All funds for Phases 2 and 3 shall be released from Escrow upon I-526 Petition Approval and satisfaction of all loan conditions.

**The proposed Target Funding Amounts and Dates are dependent on strict adherence to the dates by which the Offering Materials are complete, translated into the foreign language and ready for presentation to foreign investors by the foreign finders. Failure to meet any of the dates for completion of the Offering Materials and presentations in the foreign markets will result in a material change to the Target Funding Amounts and Dates.**

Exhibit to Offering Memorandum for Via Mizner Funding, LP

## EXHIBIT G

## AREA MAPS AND AERIAL VIEW OF THE PROJECT



| Palm Beach County Seal | Palm Beach County's location within the state of Florida | Florida's location within the United States |



**Map of Targeted Employment Area Within the Florida Regional Center**

The Project will be located in Census Tract 75.03 in Palm Beach County, which, when combined with contiguous Census Tracts 64.1, 64.02, 68.01, 68.02, 69.06, 69.07, 73.01, 73.02, and 75.01 forms a Targeted Employment Area with an average unemployment rate for 2011 of 13.5%.



**Aerial Views of Via Mizner**





