

EXHIBIT 2

DocuSign Envelope ID: D82C1BA3-9A2E-474E-8556-63CCF7A684F9

**VIA MIZNER FUNDING, LP**

**c/o Florida Regional Center, LLC**
**115 Front Street**
**Suite 300**
**Jupiter, Florida 33477**

**October 16, 2017**

Dear Phase I Limited Partner:

We are writing to update you on the Via Mizner Project and to offer you the opportunity to benefit from a significantly increased return on your capital contribution while you await the approval of your I-829 Petition. The Phase I EB-5 Loan was paid off by the Developer on September 29, 2017 and the Phase II/III EB-5 Loan is set to be repaid by February 28, 2021 (subject to developer extension options). Via Mizner Funding, LP has retained these funds in compliance with the terms of the Company's operating agreement (and USCIS guidelines) which prohibits the Company from distributing the proceeds from the repayment of the Phase I EB-5 Loan made by the Company until Limited partners have received adjudication of their I-829 Petitions.

Enclosed is a "Limited Partner Consent Letter" requesting that you authorize the Managing Member to reinvest your capital contribution and a Consent Solicitation Statement describing important information about the new investment opportunity. We encourage you to read the Limited Partner Consent Letter and Consent Solicitation Statement in full and inform us of your decision *no later than October 31, 2017.*

If you select "I Consent", going forward, you would earn a preferred return of 2% per year on your capital contribution and your capital contribution would be repaid following the repayment of the final, new Target Investment(s) (subject to the adjudication of your I-829 Petition). This represents up to an 400% increase over your current annual returns under the Project.

If you do not grant your consent, you will not have the opportunity to benefit from increased returns generated from such Target Investments. As a result, your invested capital will remain with the Company and invested with a registered investment advisor until distributed to you *without earning any additional returns until the adjudication of your I-829 Petition*.

Moreover, the Managing Member believes that USCIS's policy relative to capital investments under the EB-5 Program requires that each Limited partner's capital investment be sustained in the Company and remain "at risk" until final adjudication of the Limited Partner's I-829 Petition. As such, the Managing Member believes that the proposed reinvestment will help to establish that your qualifying investment is sustained in the Company per USCIS guidelines. Please the enclosed legal opinion from expert immigration counsel which confirms this analysis.

Capitalized terms used herein and not defined shall have the meanings ascribed to them in the attached "Consent Solicitation Statement."

Sincerely,

**VIA MIZNER FUNDING, LP,**

By: _____
Name: Nicholas A, Mastroianni, II
Its: Authorized Signatory

1

**VIA MIZNER FUNDING, LP**

**c/o Florida Regional Center, LLC**
**115 Front Street**
**Suite 300**
**Jupiter, Florida 33477**

**October 16, 2017**

Dear Phase II and Phase III Limited Partners:

We are writing to update you on the Via Mizner Project. The Phase I EB-5 Loan was paid off by the Developer on September 29, 2017 and the Phase II/III EB-5 Loan is set to be repaid by February 28, 2021 (subject to the developer's extension options).  We are happy to announce this Phase I repayment and adjudication of all I-526 Petitions (277 approvals). We believe this demonstrates the success of the project from an immigration and economic standpoint. We look forward to the Developer achieving the same results for the Phase II/III Loan in which your capital contribution was allocated.

Enclosed is a "Limited Partner Consent Letter" requesting that you authorize the Managing Member to allow Phase II/III Limited Partners to vote separately from Phase I Limited Partners and continue to have the same participation until such time as information is additional information is provided upon the repayment of the Phase II/Phase III EB-5 loan and a Consent Solicitation Statement. We encourage you to read the Limited Partner Consent Letter and Consent Solicitation Statement in full and inform us of your decision *no later than October 31, 2017*.

If you select "I Consent", going forward, you and your fellow Phase II/III Limited Partners will have the ability to vote as a class when matters are submitted to the partnership and will be able to vote separately from the Phase I Limited Partners as to any decisions upon the repayment of the Phase II/Phase III loan.

If you do not grant your consent, the partnership will continue to vote as a whole on all matters and you and your fellow Phase II/Phase III Limited Partners and the decisions about the Phase II/Phase III loan repayment, for example, will also include the votes of Phase I Limited Partners.

The General Partner recommends that you select "I Consent."

Capitalized terms used herein and not defined shall have the meanings ascribed to them in the attached "Consent Solicitation Statement."

Sincerely,

**VIA MIZNER FUNDING, LP,**

By: _____
Name: Nicholas A, Mastroianni, II
Its: Authorized Signatory

2

## VIA MIZNER FUNDING, LP

### c/o Florida Regional Center, LLC
### 115 Front Street, Suite 300
### Jupiter, Florida 33477

### Limited Partner Consent Letter

**This Limited Partner Consent Letter is being sent to you in connection with the Consent Solicitation Statement (as defined below) and the English language version shall control.**

This Limited Partner Consent Letter is being delivered to you in connection with the solicitation of consents of the limited partners (the "Investors") in Via Mizner Funding, LP (the "Partnership") to the Reinvestment Proposal (the "Reinvestment Proposal"). Your invested capital was either designated towards the funding of a loan to the Developer in the principal amount of $59,000,000 to finance the first phase of the Project (the "Phase I EB-5 Loan") or a loan to the Developer in the principal amount of $80,000,000 to finance the second and third phases of construction of the Project (the "Phase II/III EB-5 Loan"), of which $57,000,000 was funded and $23,000,000 is to be funded in the near term. Limited Partners whose invested capital was designated towards the funding the Phase I EB-5 Loan are referred to as the "Phase I Limited Partners" and Limited Partners whose invested capital was designated towards the funding of the Phase II/III EB-5 Loan are referred to as the "Phase II/III Limited Partners."

U.S. Immigration Fund GP – Mizner, LLC, the general partner of the Partnership (the "General Partner"), is soliciting the consents to the Modification Proposal upon the terms and subject to the conditions set forth in the accompanying consent solicitation statement (as the same may be amended or supplemented from time to time, the "Consent Solicitation Statement"). Capitalized terms not defined herein shall have the meanings ascribed to such terms in the Consent Solicitation Statement.

The General Partner seeks the consent of Limited Partners to amend and restate the Partnership Agreement to provide for:

- The creation of a limited partner class structure that will contractually classify Limited Partners and segregate their invested capital according to the phases of the EB-5 Project's construction for which their invested capital was designated or re-designated for funding upon or after their contribution was made.

- With respect to Phase I Limited Partners:

  o The Partnership to operate as a discretionary commercial real estate debt fund with respect to the reinvestment of the proceeds received from the repayment of the Phase I EB-5 Loan into one or more commercial real estate mortgage loans, mezzanine loans, preferred equity investments and/or joint venture interests ("Target Investments"); and

  o The Partnership to pay current distributions equal to two percent (2%) per annum payable from the current interest or preferred or other return earned on the capital reinvested in the Target Investments.

- With respect to Phase II/III Limited Partners and the proceeds received from the repayment of the Phase II/III EB-5 Loan:

  o The Partnership to continue to operate, and Phase II/III Limited Partners to continue to participate in current and liquidating distributions, in accordance with the existing terms of the Partnership Agreement (the proposal to amend and restate the Partnership Agreement is hereinafter referred to as the "Modification Proposal")."

DocuSign Envelope ID: D82C1BA3-9A2F-47AE-8556-62CCF7A694F9

We are requesting your consent to the Modification Proposal as more fully described in the Consent Solicitation Statement.

Approval of the Modification Proposal requires the consent of Limited Partners holding at least a majority of the outstanding Units.

**After carefully reviewing this Limited Partner Consent Letter and the Consent Solicitation Statement, we ask you to complete and return this Limited Partner Consent Letter at your earliest convenience.** If we have not received your completed Limited Partner Consent Letter by **5:00 p.m., New York City time on October 31, 2017** (unless such date and time is extended), **you will be deemed to have consented to the Modification Proposal**.

If the required majority consent is not received by the Partnership the limited partner class structure and associated segregation of capital will not be implemented and the Partnership will retain the Phase I EB-5 Loan repayment proceeds. In order to preserve capital, the General Partner will thereafter invest the proceeds through a registered investment adviser in investment grade investments that are intended to comply with USCIS guidelines without adjustment to the current distributions payable to the Limited Partners.

Please note that by completing and returning this Limited Partner Consent Letter, unless you advise the General Partner otherwise, you will deemed to affirm that you are an "accredited investor"[1] within the meaning of Rule 501(a) of Regulation D under the Securities Act of 1933, as amended.

[Signature Page Follows]

---

[1] To qualify as an "accredited investor," you must satisfy either of the following criteria:

- Limited Partner has an individual net worth  (or joint net worth with such person's spouse) that exceeds $1,000,000; or
- Limited Partner had an individual income in excess of $200,000 in each of the two most recent years and who reasonably expects to have an individual income in excess of $200,000 in the current year or who had joint income  in excess of $300,000 in each of the two most recent years and who reasonably expects to have joint income in excess of $300,000 in the current year.

For purposes of satisfying the above criteria, "net worth" excludes, as of the date hereof, as an asset the primary residence of such person and excludes as a liability related indebtedness secured by the primary residence outstanding on the date hereof up to the estimated fair market value of the primary residence except that the amount of such indebtedness outstanding on the date hereof that exceeds the amount outstanding 60 days before the date hereof, other than as a result of the acquisition of the primary residence and the amount of such indebtedness that exceeds the fair market value of the primary residence shall be included as a liability.

For purposes of satisfying the above criteria, "individual income" means adjusted gross income as reported for Federal income tax purposes, less any income attributable to a spouse or to property owned by a spouse, increased by the following amounts (but not including any amounts attributable to a spouse or to property owned by a spouse): (i) the amount of any interest income received which is tax-exempt under Section 103 of the Internal Revenue Code of 1986 (the "Code"), (ii) the amount of losses claimed as a limited partner in a limited partnership (as reported on Schedule E of Form 1040), (iii) any deduction claimed for depletion under Section 611 et seq. of the Code, and (iv) any amount by which income from long-term capital gains has been reduced in arriving at adjusted gross income pursuant to the provisions of Section 1202 of the Code prior to its repeal by the Tax Reform Act of 1986.

For purposes of satisfying the above criteria, "joint income" means adjusted gross income as reported for Federal income tax purposes, including any income attributable to a spouse or to property owned by a spouse, increased by the following amounts (including any amounts attributable to a spouse or to property owned by a spouse): (i) the amount of any interest income received which is tax-exempt under Section 103 of the Code, (ii) the amount of losses claimed as a limited partner in a limited partnership (as reported on Schedule E of Form 1040), (iii) any deduction claimed for depletion under Section 611 et seq. of the Code, and (iv) any amount by which income from long-term capital gains has been reduced in arriving at adjusted gross income pursuant to the provisions of Section 1202 of the Code prior to its repeal by the Tax Reform Act of 1986.

4

The undersigned hereby indicates its voluntary consent to the Modification Proposal (*please check one*):

☐ I Consent ☒ I Do **NOT** Consent

_____
*(Please Type or Print Name of Investor)*

By: _____
Signature

_____
*(Please Type or Print Name of Signatory)*

Date: _____

---

*Please return this Investor Consent Letter via email, fax or mail as soon as possible, and in any event* ***no later than October 31, 2017****, to:*

**Florida Regional Center, LLC**
**Email: InvestorRelations@FLRegionalCenter.com**
**Fax Number: +001.561.799.0061**
**Address: 115 Front Street, Suite 300**
**Jupiter, Florida 33477**

*You do not need to return an originally signed copy. Scanned and faxed documents are fine.*

---



Confidential Information

# Memorandum

To:     Florida Regional Center, LLC

From:   I.A. Donoso & Associates, LLC

Re:     Immigration Risks Associated with Repayment of Capital Contribution Before the
        Final Adjudication of an Investor's I-829 Petition

Date:   September 14, 2017

Florida Regional Center, LLC ("Regional Center") has asked our law firm to prepare an analysis of the potential immigration law risks to EB-5 Investors (as defined below) under the EB-5 Immigrant Investor Visa Program under Section 203(b)(5) of the Immigration and Nationality Act ("EB-5 Program") who are repaid all or part of the capital investment amount before the final adjudication of their Form I-829 Petition by Entrepreneur to Remove Conditions ("Form I-829 Petition").

For the reasons, and subject to the limitations, set out below, I conclude that repayment by the NCE (as defined below) of an investor's Capital Contribution (as defined below) prior to the final adjudication of such EB-5 Investor's Form I-829 Petition increases risks to the success of the immigration process of such EB-5 Investors. Repayment of the Capital Contribution prior to the adjudication of the Form I-829 Petition increases the immigration law risks of EB-5 Investors: (1) in subsequent immigration proceedings to contest a denial, (2) if there are any evidentiary issues concerning job creation, or (3) if the United States Citizenship and Immigration Services ("USCIS") hereafter exercises its discretion to change or reinterpret its guidance, which may occur at any time, as shown by the latest policy memorandum.

4800 Montgomery Lane
Suite 640
Bethesda MD 20814
(301) 276-0653

www.donosolaw.com



Confidential Information

## 1. Background Facts

### (a) EB-5 Program

The EB-5 Program offers foreign investors ("EB-5 Investors") a process by which they can obtain lawful permanent resident ("Green Card") status in the U.S. for themselves and their spouse and unmarried children under age 21. The EB-5 Program requires EB-5 Investors to make an investment of lawful capital in a new commercial enterprise in the United States ("NCE") of at least US$500,000 in high unemployment areas or rural areas, or US$1,000,000 anywhere in the U.S. ("Capital Contribution"). EB-5 Investors are also required to pay, in addition to the Capital Contribution, any syndication or administrative fees charged by the NCE. The Capital Contribution invested in the NCE must directly or indirectly create at least 10 new full-time positions for each EB-5 Investor.

EB-5 Investors obtain Green Card status through a 3-step process. First, EB-5 Investors file Form I-526 Immigrant Petition for Alien Investor ("Form I-526 Petition") with USCIS to obtain 2-year conditional Green Card status. Second, EB-5 Investors and their family are given an appointment at a U.S. Consulate to obtain their 2-year conditional Green Card (or obtain this through Adjustment of Status in the U.S.). Third, EB-5 Investors are required to file a Form I-829 Petition in the 90 days prior to the expiry of the 2-year conditional Green Card status.

### (b) EB-5 Waiting List

The popularity of the EB-5 Program has grown significantly in the last 10 years. EB-5 Investors filed approximately 1,000 new EB-5 visa petitions in 2008. The number of new EB-5 visa petitions increased to approximately 6,000 new EB-5 visas in 2010. By 2014, over 10,000 new EB-5 visa petitions were being filed each year. There are approximately 10,000 new EB-5 visas available under the EB-5 Program each federal fiscal year.

Since 2010, EB-5 Investors born in the People's Republic of China ("PRC") have compromised over 80% of all applicants in the EB-5 Program. In May 2015, the popularity of the EB-5 Program among PRC applicants caused the first-ever waiting list for EB-5 visas for investors born in the PRC. The waiting list is based on the date on which the EB-5 Investor filed the Form I-526 Petition – known as the "priority date".

The waiting list means that EB-5 Investors born in the PRC who have received USCIS approval of their Form I-526 Petition must nevertheless wait until their priority date becomes available before being allowed to obtain their 2-year conditional Green Card at the U.S. Consulate or through Adjustment of Status in the U.S. At present, the waiting list for EB-5 visas for investors born in the PRC is approximately 5 years, and estimates indicate that the waiting list could increase to 7 to 10 years. At present, no country other than the PRC is subject to a waiting list for EB-5 visas.

Confidential Information

## 2. Analysis

### (a) Sustaining EB-5 Investments At-Risk

Under current law and policies of USCIS, every EB-5 Investor is required to maintain his or her Capital Contribution in the NCE "at risk", meaning that the investment is subject to a risk or profit or loss. The at-risk requirement of EB-5 investments is generally set out in the USCIS regulations at 8 C.F.R. § 204.6(j)(2). The at-risk requirement was interpreted in the USCIS binding precedent decision of *Matter of Izummi*, 22 I&N Dec.169 (1998), which held that the "at risk" requirement prohibited an NCE from guaranteeing repayment of the Capital Contribution to EB-5 Investors, or guaranteeing a return-on-investment (e.g., accrual of interest) to EB-5 Investors. USCIS rules nevertheless permit NCE to distribute profits to EB-5 Investors, so long as they are the result of at-risk business operations.

Recently, USCIS clarified its policy guidance on the critical question of the length of time that EB-5 investments are subject to the at-risk requirement. In the revised version of its EB-5 Policy Manual, dated June 14, 2017 (the "June 14, 2017 Policy Manual"), USCIS states that an EB-5 Investor is required to maintain the Capital Contribution invested in the NCE and at risk from the date of the original investment of the Capital Contribution until the end of the 2-year conditional Green Card status. This period of time is referred to as the "Sustainment Period" for the EB-5 Investor's Capital Contribution.

The June 14, 2017 Policy Manual provides that, after the end of the Sustainment Period, it is permissible for the NCE to return the Capital Contribution to EB-5 Investors even before USCIS has decided the EB-5 Investor's Form I-829 Petition. USCIS expressly states in a footnote that "[a]n investor does not need to maintain his or her investment beyond the sustainment period."

### (a) Description of Risks

The first risk that arises from new USCIS interpretation in the June 14, 2017 Policy Manual is that it authorizes the EB-5 investor to be repaid their Capital Contribution without knowing the final USCIS decision on their Form I-829 Petition to remove the conditional basis of their lawful permanent resident status. Once the NCE repays the Capital Contribution to an EB-5 investor, there is a break in the EB-5 Investor's sustainment of the investment. Thus, if an EB-5 Investor's Form I-829 Petition is denied after repayment of the Capital Contribution, it is possible that the EB-5 Investor will not be able to prove the sustainment of the investment before an Immigration Court in removal proceedings. Pursuant to USCIS guidance, an EB-5 Investor has an opportunity to renew the Form I-829 Petition before an Immigration Court to defend removal from the U.S. *See* 8 CFR



DocuSign Envelope ID: D82C1BA36A2E-47CE-8556-63CCE7A691E9

Confidential Information

§216.6(d)(2).  In Immigration Court proceedings, the EB-5 Investor is given a chance to present their petition from the beginning, and provide new evidence including expert witnesses. The burden of proof is on the government and proceedings are adversarial.  If, however, the EB-5 Investor is no longer sustaining the investment in the NEC, it is unclear whether the guidance from the June 14, 2017 Policy Manual is sufficient to given EB-5 Investors the ability to renew Form I-829 Petition in Immigration Court. Partly, this risk is caused by the fact that the June 14, 2017 Policy Manual does not state how its new interpretation of the Sustainment Period will impact later immigration proceedings.

The second risk we detect if the EB-5 Investor is repaid the Capital Contribution before the Form I-829 is adjudicated concerns the job creation requirement of the EB-5 Program. Repayment by the NEC of the EB-5 Investor's Capital Contribution could cause certain problems for later immigration proceedings if the Form I-829 Petition is denied because of a short-fall in job creation.  Upon repayment of the Capital Contribution to the EB-5 Investor, the break in sustainment of the investment means that the Capital Contribution cannot be counted for any future job creation that may be required to overcome a short-fall in job creation.  This problem could extend through the rest of the pool of EB-5 Investors in the NCE because repayment of the Capital Contribution of one EB-5 Investor could prejudice job creation for all EB-5 Investors in the NCE if all of their capital is required to create the required additional new jobs.

The third risk we believe is relevant is the possibility that USCIS may change its guidance in the June 14, 2017 Policy Manual.  USCIS has discretion to change its interpretation of the Immigration and Nationality Act and its own regulations (*see* the Supreme Court decision in *Chevron U.S.A. Inc. v. Natural Resource Defense Council*, 467 U.S. 837 (1984)) and its own policies (*see* the Supreme Court decision in *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944).  USCIS has made such changes in the past. For example, in 2015, USCIS unexpectedly changed its interpretation of the word "capital" as defined in the regulations at 8 C.F.R. Section 204.6(e).  More recently, in 2017, USCIS unexpectedly changed its interpretation of the path of funds used to transfer money out of the PRC.  It is possible that USCIS could change its interpretation of the Sustainment Period in the future.  The June 14, 2017 Policy Manual is a document that USCIS has sole authority to amend, in conformity with the controlling regulations and the cases of *Chevron* and *Skidmore*.  Thus, it is possible that USCIS may re-interpret or change its own guidance regarding the Sustainment Period.  If this occurs, EB-5 Investors who have been repaid their Capital Contribution may be in unable to establish compliance with a new interpretation of the Sustainment Period.



DocuSign Envelope ID: D82C1BA36A2F-47CE-8556-63CCE7A691E9

Confidential Information

### 3. Conclusion & Scope of Analysis

The analysis set out in this Memorandum is based on our research and analysis of applicable U.S. immigration law and the policies and practice of USCIS. Subject to any inadvertent error, we believe it to be accurate and seeks to describe potential risks from a novel set of facts relating to the EB-5 Program. It is limited to immigration law analysis and is not business advice or commercial advice. Each investor should analyze their own facts and circumstances.

Sincerely,

I.A. Donoso & Associates, LLC

By: Ignacio Donoso
Title: Managing Attorney

DocuSign Envelope ID: D82C1BA336A2E-47FE-8556-63CCE7A694E9

**VIA MIZNER FUNDING, LP**

**c/o Florida Regional Center, LLC**
**115 Front Street**
**Suite 300**
**Jupiter, Florida 33477**

_____

October 16, 2017

**To the Limited Partners of Via Mizner Funding, LP:**

U.S. Immigration Fund GP – Mizner, LLC (the "<u>General Partner</u>") is hereby requesting the limited partners ("<u>Limited Partners</u>") of Via Mizner Funding, LP (the "<u>Partnership</u>") to consent to a proposal to amend and restate the limited partnership agreement, dated as of July 20, 2012, among the General Partner and the Limited Partners party thereto (the "<u>Partnership Agreement</u>"). The General Partner is requesting the consent of all Limited Partners, including those whose invested capital was designated towards the funding of (a) the Phase I EB-5 Loan (as defined below) (the "<u>Phase I Limited Partners</u>") and (b) the Phase II/III EB-5 Loan (as defined below) (the "<u>Phase II/III Limited Partners</u>").

The amended and restated partnership agreement of the Partnership (the "<u>Amended and Restated Partnership Agreement</u>") will provide for:

- The creation of a limited partner class structure that will contractually classify Limited Partners and segregate their invested capital according to the phases of the EB-5 Project's construction for which their invested capital was designated or re-designated for funding upon or after their contribution was made.

- With respect to Phase I Limited Partners:

  o The Partnership to operate as a discretionary commercial real estate debt fund with respect to the reinvestment of the proceeds received from the repayment of the Phase I EB-5 Loan into one or more commercial real estate mortgage loans, mezzanine loans, preferred equity investments and/or joint venture interests ("<u>Target Investments</u>"); and

  o The Partnership to pay current distributions equal to two percent (2%) per annum payable from the current interest or preferred or other return earned on the capital reinvested in the Target Investments.

- With respect to Phase II/III Limited Partners and the proceeds received from the repayment of the Phase II/III EB-5 Loan:

  o The Partnership to continue to operate, and Phase II/III Limited Partners to continue to participate in current and liquidating distributions, in accordance with the existing terms of the Partnership Agreement (the proposal to amend and restate the Partnership Agreement is hereinafter referred to as the "<u>Modification Proposal</u>")."

A copy of the Amended and Restated Partnership Agreement that would implement the Modification Proposal is attached as <u>Exhibit A</u> to the accompanying Consent Solicitation Statement.

The Partnership raised a total of $139,000,000 in proceeds from all of you pursuant to its offering of units (the "<u>Units</u>") of partnership interests conducted pursuant to its confidential private placement memorandum, dated April 16, 2012.  The offering proceeds are being used to make two loans totaling $139,000,000 (the "<u>EB-5 Loans</u>") to Camino Investments Holdings Limited Partnership (the "<u>Developer</u>") to finance a portion of the construction and development costs incurred in connection with the development of Via Mizner commercial real estate development on 6.8 acres of real property owned by the Developer and located at the northeast corner of the intersection of South Federal Highway and East Camino Real in Boca Raton, Florida (the "<u>EB-5 Project</u>"). The Partnership funded an EB-5 Loan in the principal amount of $59,000,000 for the first phase of construction (the "<u>Phase I EB-5 Loan</u>"). The Partnership also funded $57,000,000, and expects to fund in the near term the $23,000,000 balance, of an EB-5 Loan for the second and third phases of construction (the "<u>Phase II/III EB-5 Loan</u>").

The EB-5 Loans are intended to be made as qualifying investments under the United States EB-5 immigrant investor program (the "EB-5 Program") and are intended to allow each of you to apply for lawful permanent resident status in the United States under the provisions of the United States Immigration and Nationality Act, as amended (the "Immigration Act"). Giving effect to certain re-designations made by the General Partner to allow later admitted Limited Partners to benefit from the construction of earlier phases of the project, the Partnership designated the invested capital of 118 Phase I Limited Partners towards the funding of the Phase I EB-5 Loan and the invested capital of 160 Phase II/III Limited Partners towards the funding of the Phase II/III EB-5 Loan.

The Phase I EB-5 Loan was repaid, in full, by the Borrower on September 29, 2017.  The terms of the Partnership Agreement prohibit the distribution of the proceeds received from the repayment of the EB-5 Loans until each of the Limited Partners has received approval of his or her I-829 Petition by the United States Citizenship and Immigration Services. Accordingly, the Partnership will retain the $59,000,000 in Phase I EB-5 Loan repayment proceeds received from the Developer. Upon the approval of the Modification Proposal, the Partnership proposes to reinvest the proceeds received upon the repayment of Phase I EB-5 Loan into one or more Target Investments as determined by the General Partner in its discretion.

Approval of the Modification Proposal requires the consent of Limited Partners holding at least a majority of the outstanding Units. We invite you to consent or deny consent to the Modification Proposal (as described in the accompanying Consent Solicitation Statement) by October 31, 2017. If we have not received your completed Limited Partner Consent Letter by 5:00 p.m., New York City time on October 31, 2017 (unless such date and time is extended), you will be deemed to have consented to the Modification Proposal.

If the required majority consent is not received by the Partnership the limited partner class structure and associated segregation of capital will not be implemented and the Partnership will retain the Phase I EB-5 Loan repayment proceeds. In order to preserve capital, the General Partner will thereafter invest the proceeds through a registered investment adviser in investment grade investments that are intended to comply with USCIS guidelines without adjustment to the current distributions payable to the Limited Partners.

This notice and the accompanying Consent Solicitation Statement are first being electronically mailed to the Limited Partners on or about October 16, 2017.

By:  Florida Regional Center, LLC

Nicholas A. Mastroianni, II
Chief Executive Officer

**CONSENT SOLICITATION STATEMENT**

**VIA MIZNER FUNDING, LP**
**c/o Florida Regional Center, LLC**
**115 Front Street**
**Suite 300**
**Jupiter, Florida 33477**

**October 16, 2017**

U.S. Immigration Fund GP – Mizner, LLC (the "General Partner") hereby solicits the consents (the "Consents") of the limited partners (the "Limited Partners") in Via Mizner Funding, LP (the "Partnership") to the Modification Proposal (as defined below) upon the terms and subject to the conditions set forth in this Consent Solicitation Statement (as the same may be amended or supplemented from time to time, the "Consent Solicitation Statement") and in the accompanying Consent Letter (the "Consent Letter"). The General Partner is requesting the consent of all Limited Partners, including those whose invested capital was designated towards the funding of (a) the Phase I EB-5 Loan (as defined below) (the "Phase I Limited Partners") and (b) the Phase II/III EB-5 Loan (as defined below) (the "Phase II/III Limited Partners").

The General Partner has developed a proposal to amend and restate the limited partnership agreement, dated as of July 20, 2012, among the General Partner and the Limited Partners party thereto (the "Partnership Agreement"). The amended and restated partnership agreement of the Partnership (the "Amended and Restated Partnership Agreement") will provide for:

- The creation of a limited partner class structure that will contractually classify Limited Partners and segregate their invested capital according to the phases of the EB-5 Project's construction for which their invested capital was designated or re-designated for funding upon or after their contribution was made.

- With respect to Phase I Limited Partners:

  o The Partnership to operate as a discretionary commercial real estate debt fund with respect to the reinvestment of the proceeds received from the repayment of the Phase I EB-5 Loan into one or more commercial real estate mortgage loans, mezzanine loans, preferred equity investments and/or joint venture interests ("Target Investments"); and

  o The Partnership to pay current distributions equal to two percent (2%) per annum payable from the current interest or preferred or other return earned on the capital reinvested in the Target Investments.

- With respect to Phase II/III Limited Partners and the proceeds received from the repayment of the Phase II/III EB-5 Loan:

  o The Partnership to continue to operate, and Phase II/III Limited Partners to continue to participate in current and liquidating distributions, in accordance with the existing terms of the Partnership Agreement (the proposal to amend and restate the Partnership Agreement is hereinafter referred to as the "Modification Proposal)."

A copy of the Amended and Restated Partnership Agreement that would implement the Modification Proposal is attached hereto as Exhibit A.

The Partnership raised a total of $139,000,000 in proceeds from all of you pursuant to its offering of units (the "Units") of partnership interests conducted pursuant to its confidential private placement memorandum, dated April 16, 2012. The offering proceeds are being used to make two loans totaling $139,000,000 (the "EB-5 Loans") to Camino Investments Holdings Limited Partnership (the "Developer") to finance a portion of the construction and development costs incurred in connection with the development of Via Mizner commercial real estate development on 6.8 acres of real property owned by the Developer and located at the northeast corner of the intersection of South Federal Highway and East Camino Real in Boca Raton, Florida (the "EB-5 Project"). The Partnership funded an EB-5 Loan in the principal amount of $59,000,000 for the first phase of construction (the "Phase I EB-5 Loan"). The Partnership also funded $57,000,000, and expects to fund in the near term the $23,000,000 balance, of an EB-5 Loan

for the second and third phases of construction (the "Phase II/III EB-5 Loan"). The EB-5 Loans are intended to be made as qualifying investments under the United States EB-5 immigrant investor program (the "EB-5 Program") and were intended to allow each of you to apply for lawful permanent resident status in the United States under the provisions of the United States Immigration and Nationality Act, as amended (the "Immigration Act"). Giving effect to certain re-designations made by the General Partner to allow later admitted Limited Partners to benefit from the construction of earlier phases of the project, the Partnership designated the invested capital of 118 Phase I Limited Partners towards the funding of the Phase I EB-5 Loan and the invested capital of 160 Phase II/III Limited Partners towards the funding of the Phase II/III EB-5 Loan.

The EB-5 Loans are intended to be made as qualifying investments under the United States EB-5 immigrant investor program (the "EB-5 Program") and are intended to allow each of you to apply for lawful permanent resident status in the United States under the provisions of the United States Immigration and Nationality Act, as amended (the "Immigration Act"). Giving effect to certain re-designations made by the General Partner to allow later admitted Limited Partners to benefit from the construction of earlier phases of the project, the Partnership designated the invested capital of 118 Phase I Limited Partners towards the funding of the Phase I EB-5 Loan and the invested capital of 160 Phase II/III Limited Partners towards the funding of the Phase II/III EB-5 Loan.

The Phase I EB-5 Loan was repaid, in full, by the Borrower on September 29, 2017. The terms of the Partnership Agreement prohibit the distribution of the proceeds received from the repayment of the EB-5 Loans until each of the Limited Partners has received approval of his or her I-829 Petition by the United States Citizenship and Immigration Services. Accordingly, the Partnership will retain the $59,000,000 in Phase I EB-5 Loan repayment proceeds received from the Developer. Upon the approval of the Modification Proposal, the Partnership proposes to reinvest the proceeds received upon the repayment of Phase I EB-5 Loan into one or more Target Investments as determined by the General Partner in its discretion.

The General Partner recommends the Modification Proposal and urges you to grant your Consent so that the Phase I EB-5 Loan repayment proceeds can be reinvested in one or more new Target Investment and Phase I Limited Partners can participate in current distributions equal to two percent (2%) per annum of the interest or preferred or other return earned on the capital invested in such investments. Unless Limited Partners grant the required Consents, the limited partner class structure and associated segregation of capital will not be implemented and the Partnership will retain the EB-5 Loans repayment proceeds. Phase I Limited Partners will also not have the opportunity to benefit from the distributions payable from the returns earned on new Target Investments as described herein. As a result, and the Partnership will retain the Phase I EB-5 Loan repayment proceeds and in order to preserve capital, the General Partner will thereafter invest the proceeds through a registered investment adviser in investment grade investments that are intended to comply with USCIS guidelines. Thus, until it is returned following the adjudication of all Limited Partners' I-829 petitions, the Phase I Limited Partners' invested capital will remain held by the Partnership without adjustment to the current distributions payable to the Phase I Limited Partners.

The General Partner believes that USCIS's policy relating to capital investments under the EB-5 Program requires that each Limited Partner's capital investment be sustained in the Partnership and remain at-risk until final adjudication of the Limited Partner's I-829 petition. As such, the General Partner believes that the reinvestment of the capital into Target Investments following the approval of the Modification Proposal will help to establish that each Limited Partner's qualifying investment is sustained in the Partnership and remains at-risk.

**Approval of the Modification Proposal requires the consent of Limited Partners holding at least a majority of the outstanding Units.**

**The solicitation of Consents will expire at 5:00 p.m., New York City time on October 31, 2017 (such date and time as may be extended or earlier terminated). The Partnership reserves the right to terminate or extend the Consent Solicitation in its sole discretion. If a Limited Partner does not submit its signed consent letter by 5:00 p.m., New York City time on October 31, 2017 (unless such date and time is extended), the Limited Partner will be deemed to have consented to the Modification Proposal.**

Questions concerning this Consent Solicitation Statement may be addressed to the Partnership in writing at c/o Florida Regional Center, LLC, 115 Front Street, Suite 300, Jupiter, Florida 33477; email: USIFInvestors@usifund.com.

LEGAL_US_E # 130011651.7

We will pay the expenses of soliciting Consents and others for forwarding solicitation materials to beneficial owners of shares. In addition to the use of the mails, some of our directors, officers and regular employees, without extra compensation, may solicit Consents by telephone, fax, e-mail and in person.

These solicitation materials will be first mailed or otherwise delivered to the Limited Partners beginning on approximately October 16, 2017.

iii

DocuSign Envelope ID: D82C1BA336A2F-47FE-8556-63CCE7A691E9

**IMPORTANT NOTICES**

This Consent Solicitation Statement is being provided to each Limited Partner to solicit Consents to the Modification Proposal. Limited Partners are urged to read and consider carefully the information contained in this Consent Solicitation Statement and the related Consent Letter before giving their Consents to the Modification Proposal.

The purpose of this Consent Solicitation Statement is to furnish Limited Partners with certain information regarding the Partnership's request for Consents and certain of the risks attendant thereto. All of the information contained in this Consent Solicitation Statement is based on information available to the General Partner and the Partnership as of the date hereof and believed by them to be accurate.

Following approval of the Modification Proposal, consenting Limited Partners will continue to own a speculative investment in the Units that involves a high degree of risk. Limited Partners should carefully consider the information set forth herein under "Risk Factors." Consenting Limited Partners must be prepared to bear the economic risk of their investment for an indefinite period and be able to withstand a total loss of their investment.

The Units are restricted securities under the Securities Act of 1933, as amended (the "<u>Securities Act</u>") and applicable state securities laws. Accordingly, the Units may not be sold, transferred or hypothecated in the absence of an effective registration statement under the Securities Act and applicable state securities laws or an opinion of counsel acceptable to the Partnership and its counsel that such registration is not required.

Additionally, the transfer of Units is restricted under the Amended and Restated Limited Agreement. Accordingly, Limited Partners will be required to hold the Units indefinitely.

Neither the delivery of this Consent Solicitation Statement nor ongoing requests for Consents hereunder shall under any circumstances create an implication that there have been no changes in the affairs of the Partnership since the date hereof or that the information herein is correct as of any time subsequent to the date of this Consent Solicitation Statement. This Consent Solicitation Statement supersedes and replaces any and all information delivered or made available by or on behalf of the Partnership prior to the date hereof.

With respect to the Units or this Consent Solicitation Statement, only the General Partner and the Partnership have been authorized to make any representations or give any information other than those contained herein; and, if given by the General Partner and the Partnership, such representations and information are not to be relied upon unless given in a written communication furnished by the General Partner and the Partnership. No soliciting literature or advertising in any form should be relied upon in connection with this offering except for this Consent Solicitation Statement, and any other written information furnished by the General Partner and the Partnership in response to a Limited Partner's request. No other broker, dealer, agent, salesperson or other person has been authorized to give any information or to make any representation (whether oral or written) not contained in this Consent Solicitation Statement, and, if given or made, such information or representation must not be relied upon as having been authorized by the General Partner or the Partnership.

The General Partner or the Partnership, upon written request, will make available to a Limited Partner and his or her advisors all documents relating to this Consent Solicitation Statement and any additional information regarding the Partnership and this Consent Solicitation Statement to the extent General Partner or the Partnership possesses such information or can acquire it without unreasonable effort or expense. Requests for such documents or information should be made in writing to the Partnership at c/o Florida Regional Center, LLC, 115 Front Street, Suite 300, Jupiter, Florida 33477; email: USIFInvestors@usifund.com.

Recipients of this Consent Solicitation Statement and the related Consent Letter should not construe the contents hereof or thereof as legal, business or tax advice. A Limited Partner should consult its own attorney, business advisor and tax advisor as to legal, business, tax and related matters concerning the Consent Solicitation Statement.

LEGAL_US_E # 130011651.7

**FORWARD-LOOKING STATEMENTS - IMPORTANT FACTORS AND ASSOCIATED RISKS**

This Consent Solicitation Statement contains certain forward-looking statements within the meaning of Section 27A of the Securities Act and Section 21E of the Securities Exchange Act of 1934, as amended, and the Partnership intends that such forward-looking statements be subject to the safe harbors created thereby. These forward-looking statements include the plans and objectives of management for future operations, including plans and objectives relating to the future economic performance of the Partnership. The forward-looking statements and associated risks set forth in this Consent Solicitation Statement include or relate to the successful investment into Target Investments.

The forward-looking statements included herein are based on current expectations that involve a number of risks and uncertainties. These forward-looking statements are based on various assumptions regarding the Partnership and its proposed operations. Such assumptions involve judgments with respect to, among other things, future economic, competitive and market conditions and future business decisions, all of which are difficult or impossible to predict accurately and many of which are beyond the control of the Partnership and the General Partner.

Although the Partnership believes that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate and, therefore, there can be no assurance that the results contemplated in forward-looking information will be realized. In light of the significant uncertainties inherent in the forward-looking statements included herein, the inclusion of such information should not be regarded as a representation by the Partnership, the General Partner, or their respective officers, directors, members, managers, employees or agents that the objectives or plans of the Partnership will be achieved.

The words "estimate," "plan," "intend," "expect," "proposed," and similar expressions are intended to identify forward-looking statements. These forward-looking statements involve and are subject to known and unknown risks, uncertainties and other factors which could cause the actual results, performance (financial or operating) or achievements of the Partnership to differ materially from the outcomes, expressed or implied, by such forward-looking statements or the projections set forth herein. Potential purchasers are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date hereof. The Partnership and the General Partner specifically disclaim any obligation to release any revisions to these forward-looking statements to reflect events or circumstances after the date hereof or to reflect the occurrence of unanticipated events.

# TABLE OF CONTENTS

**Page**

THE MODIFICATION PROPOSAL ................................................................................1

U.S. IMMIGRATION FUND, LLC TEAM ...............................................................4

RISK FACTORS ...........................................................................................................5

TAX MATTERS ..........................................................................................................13

CONSENT PROCEDURE ...........................................................................................20

EXHIBITS

Exhibit A – Amended and Restated Partnership Agreement

LEGAL_US_E # 130011651.7

# THE MODIFICATION PROPOSAL

**Overview**

The Phase I EB-5 Loan was repaid, in full, by the Borrower on Septmber 29, 2017.    Unless reinvested following approval of the Modification Proposal, the Partnership will retain the $59,000,000 repayment proceeds in accordance with the terms of the Partnership Agreement. The General Partner believes that implementation of the Modification Proposal provides a superior alternative to the mere retention of the loan repayment proceeds by the Partnership given that reinvestment of the loan repayment proceeds into Target Investments will provide Limited Partners with an opportunity to earn enhanced current returns from their investment in the Partnership and will reduce the Limited Partners' risk associated with qualifying for lawful permanent resident status in the United States under the EB-5 Program.

The implementation of the limited partner class structure and associated segregation of invested capital will allow the Phase I Limited Partners and Phase II/III Limited Partners to be treated differently in accordance with the nature of their underlying investment. The proceeds from the repayment of the Phase I EB-5 Loan will be allocated to the Phase I Limited Partners for reinvestment in Target Investments and such limited partners will benefit from enhanced current returns as contemplated by the Modification Proposal. The Phase II/III Limited Partners will continue to participate in distributions in accordance with the terms established in the original Partnership Agreement and the proceeds from the repayment of the Phase II/III EB-5 Loan will be allocated to them.

**Class Structure**

The Amended and Restated Partnership Agreement will implement a limited partner class structure under which there will be two classes of limited partners, the Phase I Limited Partners and the Phase II/III Limited Partners. The class structure will contractually classify Limited Partners and segregate their invested capital according to the phases of the EB-5 Project's construction for which their invested capital was designated or re-designated for funding upon or after their contribution was made. The Partnership will have 118 Phase I Limited Partners and 160 Phase II/III Limited Partners upon effectiveness of the Amended and Restated Partnership Agreement. Each class of limited partner will vote separately as a class on future amendments to the Partnership that would adversely affect the rights, preferences and privileges of such class. The Amended and Restated Partnership Agreement will also contain provisions that segregate invested capital and set forth distribution provisions according to the funding of the Phase I EB-5 Loan and Phase II/III EB-5 Loan and treatment of the repayments proceeds thereof as discussed below.

**Target Investments**

 Upon approval of the Modification Proposal, the Amended and Restated Partnership Agreement will authorize the Partnership to invest Phase I EB-5 Loan repayment proceeds in Target Investments as determined in the discretion of the General Partner. The Target Investments in which the Partnership may invest include the following:

- *Mortgage Loans*:  These investments include senior and junior mortgage loans secured by commercial real estate and may finance construction or redevelopment, provide interim or bridge financing or provide replacement financing. They pay current interest and have a specified maturity date. As mortgage loans, these investments will be collateralized by a recorded mortgage. In the event of default, the Partnership's remedy includes foreclosing on the property.

- *Mezzanine Loans*:  These investments take the form of collateralized loans that are subordinate to first lien mortgage loans on commercial real estate properties.  These property-specific loans are generally secured by a pledge of ownership interests in an entity that directly or indirectly owns the entire equity interest in the property owning entity. They pay current interest and have a specified maturity date. In the event of default, the Partnership's remedy includes foreclosing on the pledged equity interest and assuming indirect ownership of the property, subject to any senior debt encumbering the property

- *Preferred Equity Interests*: These investments take the form of a preferred equity interest in the property owning entity or in its direct or indirect controlling equity owner. They pay a current preferred or other return akin to an interest payment and have a specified repayment date akin a maturity date on a loan. In the event of default, the Partnership's remedy includes, conditionally or

1

unconditionally, taking control over the property owning entity, or its direct or indirect controlling equity owner.

- ***Joint Venture Interests***: These investments take the form of a joint venture equity interest in the property owning entity or in its direct or indirect controlling equity owner subordinate to more senior capital in the underlying property's capital structure and generally do not earn a specified current preferred or other return or require repayment on a specified repayment date; rather the returns realized will vary based on the performance of the underlying property and any appreciation in the value of the property when sold.

The General Partner expects that the Target Investments will generally be relatively short-term in duration (typically 3 to 5 years), with extension options as deemed appropriate and generally provide for a balloon payment of principal at maturity. The General Partner will have the discretion to make one or more Target Investments without the consent or approval of the Phase I Limited Partners. The General Partner's authority to invest the Partnership's capital will cease upon the later of the fourth anniversary of the effective date of the Amended and Restated Partnership Agreement, subject to two one year extensions in the discretion or the General Partner, or the date upon which the General Partner receives notice of the final adjudication of the I-829 Petitions of all Phase I Limited Partners.

 The Amended and Restated Partnership Agreement will allow the Partnership invest in Target Investments that finance commercial restate projects in which affiliates of the General Partner and its controlling owner,  Nicholas A. Mastroianni, II, have equity ownership and other interests. The Partnership will be able to co-invest in Target Investments with other investment vehicles sponsored under the EB-5 Program by U.S. Immigration Fund, LLC, an affiliate of the General Partner principally owned by Mr. Mastroianni; provided that, the terms of such co-investment provide for returns and repayments to be made on a pro rata basis among the co-investors. See RISK FACTORS—RISKS RELATED TO THE MODIFICATION PROPOSAL— 6.  The Partnership may be subject to certain other potential conflicts of interest.

The General Partner may receive significant origination and other fees and other compensation from developers in connection with the origination of Target Investments. These fees will retained by the General Partner.

The General Partner intends to structure its interest in the Partnership so that an affiliate of Vivian Ding, the operator of the authorized immigration agency utilized by the Partnership in connection with the offering of Units (the "Co-Owner"), participates in the distributions made to the General Partner pursuant to Amended and Restated Partnership Agreement. The level of participation will be determined at the time of investment but is expected to represent no less than 50% of the net distribution payable to the General Partner.

In connection with the structuring of investments to be made by the Partnership, the General Partner may negotiate for investment terms that allow all or a portion of the investment to be structured as common equity and/or preferred equity in an entity that directly or indirectly owns the property owning entity in a manner that may provide for the grant of a carried interest to either the Partnership (or its subsidiary) or an affiliate of the General Partner. If the Partnership receives the carried interest, the economic returns from it will be specially allocated to an affiliate of the General Partner. In addition, such equity investments may be structured in a way that depreciation deductions from the property or other tax benefits are allocated to an affiliate of the General Partner or to the Partnership (or its subsidiary), in which case such depreciation deductions or other tax benefits will be allocated solely to the affiliate of the General Partner.

Under the terms of the original Partnership Agreement, the General Partner may not reinvest the cash received upon repayment of the Phase I EB-5 Loan. Thus, the Partnership Agreement must be amended to provide for the authority to reinvest the loan payment proceeds. If the Modification Proposal is not approved, the Partnership will hold the loan repayment proceeds in investment grade investments, which may not be considered an at-risk investment under the EB-5 Program. The General Partner believes that there is a significant risk to the Limited Partners qualifying for lawful permanent resident status in the United States under the program if the capital invested by the Limited Partners is not invested in an at-risk investment such as the Target Investments contemplated by the Modification Proposal. As such, the General Partner believes that the reinvestment of the capital into Target Investments following the approval of the Modification Proposal will help to establish that each Phase I Limited Partner's qualifying investment is sustained in the Partnership and remains at-risk.

LEGAL_US_E # 130011651.7

DocuSign Envelope ID: D82C1BA336A2E-47CE-8556-63CCE7A691E9

**Allocation of Invested Capital and Distributions**

Upon approval of the Modification Proposal, the Amended and Restated Partnership Agreement will be amended to provide for the capital invested to fund the Phase I EB-5 Loan to be allocated to the Phase I Limited Partners. The distribution provisions relating to the allocation and timing of distributions of interest and preferred or other return or realization proceeds derived from any Target Investments will be made on a class basis. The modifications will provide for the Phase I Limited Partners to receive current distributions equal to two percent (2%) per annum of the interest or preferred or other return earned on the capital invested on the capital invested in the Target Investments. The amount of interest or preferred or other return in excess of the portion allocated to the Phase I Limited Partners will be allocated for distribution to the General Partner. For example, if the Partnership earns six percent (6%) per annum of interest on a mortgage loan, the Phase I Limited Partners will be allocated 2% and the General Partner will be allocated 4%.

The Amended and Restated Partnership Agreement will be amended to provide for the capital invested to fund the Phase II/III EB-5 Loan to be allocated to the Phase II/III Limited Partners. The substance of distribution provisions with respect to the Phase II/III Limited Partners will remain unchanged, except that the provisions relating to the allocation and timing of interest and realization proceeds derived from the Phase II/III EB-5 Loan will be made on a class basis.

**Purpose of this Consent Solicitation Statement**

You are receiving this Consent Solicitation Statement because you are Limited Partner in the Partnership. In order for the limited partner class structure and associated segregation of invested capital to be implemented and for the Partnership to proceed to reinvest the Phase I EB-5 Loan repayment proceeds in Target Investments, the Partnership must obtain the required Consent of Limited Partners. Upon receipt of actual or deemed Consents from the holders of a majority of the Units held by all Limited Partners, the Amended and Restated Partnership Agreement will be in legal force and effect to implement the limited partner class structure and segregation of invested capital and the General Partner will thereafter be authorized to reinvest the cash received upon repayment of the Phase I EB-5 Loan into one or more Target Investments.

LEGAL_US_E # 130011651.7

DocuSign Envelope ID: D82C1BA336A2F47E-8556-63CCE7A691E9

# U.S. IMMIGRATION FUND, LLC TEAM

The General Partner will draw on the resources of the U.S. Immigration Fund, LLC ("USIF") in connection with the identifying and underwriting Target Investments. USIF is an experienced commercial real estate lender and investor. Since its inception in 2009, USIF has successfully has underwritten and originated nearly $3.0 billion of mortgage loan, mezzanine loan and preferred equity investments to finance 25 development projects in New York, New Jersey, Florida and California. The key members of management of the Manager and the USIF are:

### Nicholas A. Mastroianni, II – Founder and Manager

Mr. Mastroianni is the founder of U.S. Immigration Fund, LLC and the Florida Regional Center, LLC. He also serves as the manager of the Florida Regional Center, LLC.

Mr. Mastroianni is the Manager of Allied Capital and Development of South Florida, LLC, a Jupiter-based real estate development company, founded in 2004, and the Manager of Florida Regional Center, LLC, an approved USCIS regional center since September 2010. He has been recognized for his commitment to excellence in construction by the Association of Builders and Contractors (ABC), and was awarded the prestigious Excellence in Construction Award in 1998; served as Executive Vice President of the Rhode Island Chapter of the ABC and has been a member of the Association of General Contractors. His business memberships include the Association of General Contractors, the Association of Builders and Contractors, and the Police Athletic League.

### Brian Friedman, CPA – Chief Financial Officer

Mr. Friedman is the Chief Financial Officer of U.S. Immigration Fund, LLC, the Florida Regional Center, LLC and the General Partner.

Mr. Friedman is a Certified Public Accountant and has spent over 25 years working in the construction industry. Mr. Friedman serves as Treasurer of the Construction Financial Management Association and was a State Board Member and past local President of the American Subcontractors Association. He is a member of the American Institute of Certified Public Accountants and the Florida Institute of Certified Public Accountants.

From 1986 through 2012, Mr. Freidman served as the chief financial officer, chief operating officer, and in other financial and operating positions for various construction-related companies. He also served as a staff auditor at KPMG and a staff accountant at Deloitte & Touche. Mr. Freidman received Bachelor of Science in Accounting from the University of Florida in 1986.

### Nicholas A. Mastroianni, III – President

Mr. Mastroianni is the President of U.S. Immigration Fund, LLC, the Florida Regional Center, LLC and the General Partner. Mr. Mastroianni has a Bachelor's Degree in Business Administration from Northwood College. He is a member of the International Council of Shopping Centers.

### Mark Giresi – Chief Operating Officer

Mr. Giresi is the Chief Operating Officer of USIF, the Florida Regional Center, LLC and the General Partner. Mr. Giresi is a licensed attorney in the State of New Jersey. He has served in a variety of legal and executive positions, including serving as the Senior Vice President and General Counsel of Burger King Corporation, Executive Vice President, Retail Operations for Limited Brands, Inc., and Chief Operating Officer and General Counsel of NXT Nutritionals Holdings, Inc. Mr. Giresi received a Bachelor of Science in Accounting from Villanova University and Juris Doctor of Law from Seton Hall Law School.

### Ashley Flucas – General Counsel

Ms. Flucas is General Counsel of USIF, the Florida Regional Center, LLC and the General Partner. Ms. Flucas previously worked in the Capital Markets practice of Davis Polk & Wardwell LLP in London, U.K. where she served as underwriters' and/or issuer's counsel in connection with international equity and debt offerings in Europe, Africa and Asia. Ms. Flucas has also served as an associate in the Corporate and Securities Group of Greenberg Traurig. Ms. Flucas received a Bachelor of Arts in Political Science from Duke University and a Juris Doctorate from Harvard Law School.

LEGAL_US_E # 130011651.7

DocuSign Envelope ID: D82C1BA336A2F-47AE-8556-63CCE7A691E9

## RISK FACTORS

IMPLEMENTATION OF THE MODIFICATION PROPOSAL INVOLVES A HIGH DEGREE OF RISK. IN ADDITION TO ALL OTHER INFORMATION SET FORTH ELSEWHERE IN THIS CONSENT SOLICITATION STATEMENT, INCLUDING THE EXHIBITS HERETO, A LIMITED PARTNER SHOULD CAREFULLY CONSIDER THE FOLLOWING RISKS, AND SHOULD CONSULT HIS OR HER OWN LEGAL, TAX, REAL ESTATE AND FINANCIAL ADVISORS WITH RESPECT THERETO, BEFORE MAKING A DECISION TO CONSENT TO THE MODIFICATION PROPOSAL. THE ORDER IN WHICH THE FOLLOWING RISKS ARE PRESENTED DOES NOT CORRELATE TO THE MAGNITUDE OF THE RISKS DESCRIBED. THE FACT THAT THE FOLLOWING RISK FACTORS ARE ENUMERATED IN NO WAY IMPLIES THAT THESE ARE THE ONLY RISK FACTORS ASSOCIATED WITH THIS INVESTMENT AND ARE MERELY ILLUSTRATIVE OF THE TYPES OF RISKS INVOLVED IN THIS TYPE OF INVESTMENT.

### A. RISKS RELATED TO THE MODIFICATION PROPOSAL

1. **The Modification Proposal will result in a contractual segregation of invested capital, but all assets of the Partnership will remain available to satisfy the claims of creditor or judgment creditors.** The segregation of the invested capital according to the designation and investment in the EB-5 Loans does not affect the rights of creditors. As a result, all of the assets of the Partnership are available to satisfy claims of creditors and judgment creditors.

2. **The success of the Partnership reinvestments will be dependent on the availability of, and the degree of competition for, attractive investments.** The Partnership's reinvestment results will be dependent upon the availability of, as well as the General Partner's ability to identify, consummate, manage and realize, appropriate commercial real estate debt investment opportunities.  It may take considerable time for the Partnership to identify and consummate appropriate investments.  In general, the availability of desirable commercial real estate debt investment opportunities will be affected by the level and volatility of interest rates, by conditions in the financial markets and general economic conditions.  No assurance can be given that the General Partner will be successful in identifying, underwriting and then consummating reinvestments or that such investments, once consummated, will perform as intended.

3. **Limited Partners will bear a significant financial risk**. If the required majority of Limited Partners consent to the Modification Proposal, the Phase I Limited Partners' invested capital in the Partnership will be reinvested in Target Investments that finance currently unidentified commercial real estate developments that will subject to repayment risk. The decision to invest will be made by the General Partner in its discretion without notice to the Phase I Limited Partners.

4. **The Partnership will be dependent on the General Partner and USIF and its key personnel.** The ability of the General Partner to successfully reinvestment the Partnership's capital into Target Investment currently depends on the USIF's organization and its professionals' ability to identify, structure and manage investments.  The General Partner will be relying to a substantial extent on the experience, relationships and expertise of USIF's key personnel. There can be no assurance that these individuals will remain in the employ of USIF, or otherwise continue to be able to carry on their current duties throughout the Partnership's term.  The loss of the services of USIF's organization, or any of such individuals, could have a material adverse effect on the Partnership's operations.

5. **Phase I Limited Partners will not participate in the management of the Partnership.** Limited Partners will not have an opportunity to evaluate or approve specific investments prior to voting on the Modification Proposal.  Decisions with respect to the Partnership's management will continue to be made exclusively by the General Partner.  The Limited Partners have no right or power to take part in the Partnership's management, other than by voting on certain matters as provided in the Amended and Restated Partnership Agreement.  In addition, the Limited Partners will not receive the detailed financial information issued by the developers of the project financed by the Partnership's investments which will be available to the General Partner.

6. **Conflicts of interest associated with investments in different levels of the capital structure**. Partnership reinvestment may involve a financing of a development project for which affiliates of USIF and the General Partner serve as manager of an investment vehicle that has provided financing to the project and as

DocuSign Envelope ID: D82C1BA336A2F-47CE-8556-63CCE7A691E9

a result, such affiliate may manage an investment made at a different level of the project's capital structure and such investment may be senior to and have rights and interests different from, the investment made by the Partnership. The interests of the affiliate may conflict with the interests of the General Partner and such conflict of interests may be heightened in the event of a default or restructuring of the Partnership or the affiliate's investment. The resolution of any such conflict of interests will involve considerations in which the Partnership and the affiliate are not necessarily aligned. While the General Partner and the affiliate will seek to resolve any such conflict in a fair and equitable manner as determined in their discretion, any decision of the affiliate to exercise remedies as lender or work out or restructure the affiliate's investment will not be subject to approval by the Phase I Limited Partners, and there can be no assurance that any conflict will be resolved in favor of the Partnership and the Phase I Limited Partners.

7. **The Partnership may be subject to certain other potential conflicts of interest.** In the future, there may arise instances where the interests of the General Partner, USIF and their affiliates conflict with the interests of the Partnership and/or the Phase I Limited Partners. USIF engages other commercial real estate finance and investment activities, including under the EB-5 Program, which are independent from, and may from time to time conflict with, the Partnership. These activities may involve investment objectives and policies similar to those of the Partnership and may compete with the Partnership for investment opportunities. To the extent the Partnership co-invests with other EB-5 Program investment vehicles sponsored by USIF, affiliates of USIF will serve as the general partner or manager of such vehicles and will responsible for the decisions with co-investment. It is possible that Partnership's and its co-investor's interests with respect to the co-investment may not be continually aligned and to the extent there are conflicts of interest, the Partnership with be relying on the General Partner to manage such conflict of interest in the best interests of the Partnership, which could be detrimental to the interests of a co-investor. Conflicts of interest may also arise if the Partnership finances project in which an affiliate of the General Partner serves as developer or has an ownership interest. While such affiliate and the Phase I Limited Partners are aligned with each other with respect to the ultimate success of the underlying project, the affiliate and the Phase I Limited Partners would have interests in the project that are different, and in certain circumstances, a conflict of interest could arise. For example, if the affiliate does not satisfy its obligations under the terms of the investment, its interest may conflict with the interests of the Partnership and the Phase I Limited Partners. In such circumstances, the Phase I Limited Partners will rely on the General Partner to act on behalf of the Partnership in respect of the investment. Therefore, if such a conflict should arise, the Partnership will rely on the General Partner to manage such conflict of interest in the best interests of the Partnership, which could be detrimental to the interests of the General Partner's affiliate that has received the Partnership's investment. There can be no assurance that any conflict will be resolved in favor of the Partnership and the Phase I Limited Partners.

8. **The key personnel of USIF relied upon by the General Partner devote time to other matters.** The General Partner expects the USIF's key personnel to be actively involved in the management of the Partnership. However, certain of USIF's key personnel may have conflicts in allocating their time and services among the Partnership and other investment vehicles and ventures. Thus, while it is anticipated that USIF's key personnel will devote as much time to the Partnership as the General Partner deems appropriate, certain of USIF's key personnel may have to devote a substantial amount of time to matters other than the Partnership.

9. **The General Partner may pursue transactions that provide its affiliates with economic and tax benefits not shared with the Limited Partners**. The General Partner may be incentivized to pursue reinvestment opportunities that provide the ability of an affiliate to obtain a carried interest from which the affiliate can profit from the appreciation in the project, as well as tax benefits from the allocated depreciation deductions that can be used to offset taxable income. The General Partner is not obligated to share these benefits with the Partnership or any Limited Partner. The General Partner may favor such reinvestment opportunities to the exclusion of other investment opportunities that may be more favorable to the Partnership in terms of financial stability of the developer and repayment risks.

10. **Diversification through reinvestment may not be achieved for the Partnership**. The Partnership may invest its capital in one Target Investment and thus the reinvestment of Partnership's capital will not necessarily provide Phase I Limited Partners with diversification. Even if the Partnership invests in

6

multiple investments, it may not be diversified in its investments both geographically and by property type. An undiversified portfolio is subject to increased risk.

11. **The Partnership's investments may be illiquid.** Real estate debt investments are relatively illiquid. Such illiquidity may limit the Partnership's ability to liquidate in response to changes in economic and other conditions. Illiquidity may result from the absence of an established market for investments as well as the legal or contractual restrictions on their resale. In addition, illiquidity may result from the decline in value of a property securing one of the Partnership's investments. There can be no assurances that the fair market value of any of the real property serving as security will not decrease in the future, leaving the Partnership's investment under collateralized or not collateralized at all.

12. **Distributions by the Partnership are not guaranteed**. Payment of distributions to Phase I Limited Partners and the amounts thereof will be dependent upon returns received by the Partnership through its reinvestment in Target Investments. No assurances can be given that the Partnership will successfully reinvest and generate the interest and preferred or other return to pay any distributions to the Phase I Limited Partners. Furthermore, no assurance can be provided that the Phase I Limited Partners receive a return of any or all of their capital contribution to the Partnership that is reinvested in Target Investments.

13. **The investment period established by the Amended and Restated Partnership Agreement will allow the General Partner to make investments that may mature years after the final adjudication of all Phase I Limited Partners' I-829 petitions.** The Phase I Limited Partners will not receive a complete return of capital until all Target Investments have been realized. Certain Target Investments may not mature until years after the final adjudication of all Phase I Limited Partners' I-829 petitions and capital will only be returned as Target Investment mature.

**B. SPECIAL RISKS ASSOCIATED WITH TARGET INVESTMENTS**

1. **Real Estate Risks.** Real estate historically has experienced significant fluctuations and cycles in value that may result in impairment of real estate-related investments. The performance of the Partnership's investments will depend on many factors beyond the control of the Partnership. The ultimate performance of the Partnership's investments will be subject to the varying degrees of risk generally incident to the ownership and operation of the underlying real property. The ultimate performance of the Partnership's investment in the underlying real property depends upon the real property owner's ability to operate the real property in a manner sufficient to maintain or increase revenues in excess of operating expenses and debt service or, in the case of real property leased to a single lessee, the ability of the lessee to make rental payments. Revenues may be adversely affected by changes in national or international economic conditions; changes in local market conditions due to changes in general or local economic conditions and neighborhood characteristics; the financial condition of tenants, buyers and sellers of properties; competition from other properties offering the same or similar services; changes in interest rates and in the availability, cost and terms of mortgage funds; the impact of present or future environmental legislation and compliance with environmental laws; the ongoing need for capital improvements (particularly in older structures); changes in real estate tax rates and other operating expenses; adverse changes in governmental rules and fiscal policies; civil unrest; acts of God, including earthquakes, hurricanes and other natural disasters; acts of war; acts of terrorism (any of which may result in uninsured losses); adverse changes in zoning laws; and other factors that are beyond the control of the real property owners and the Partnership. In the event that any of the properties underlying the Partnership's investments experience any of the foregoing events or occurrences, the value of and return on such investments would be negatively impacted. Hospitality properties may also be affected by adverse changes in general or local economic conditions, excessive hotel openings resulting in an over-supply; relative appeal of particular types of facilities to patrons, customers, and vendors; reduction in the cost of operating competing businesses; and decreases in employment, reducing the demand for hospitality.

2. **Zoning Approvals**. Phase I Limited Partners will be exposed to the risk that required zoning approvals will not be obtained in accordance with underwriting expectations. There are no assurances that a project's business plan may not have to be modified accordingly, or that additional or modified zoning approvals need to be obtained.

DocuSign Envelope ID: D82C1BA336A25-47EE-8556-63CCE7A694E9

3. **Timing of Completion is Uncertain**. Phase I Limited Partners will be exposed to the risk that time schedules for the completion of projects financed with Target Investments will be missed. There are no assurances that time schedules can be met, and if the timing for the completion of development is delayed by any significant degree, then the cost of development may increase and the receipt of repayment proceeds could be delayed.

4. **Cost Overruns can impair the Target Investments**. Target Investments will be subject to the risk of cost overruns. Such cost overruns may be encountered as a result of numerous factors, including not only the delay in the development process, but also the failure of certain contracted parties to complete their work in accordance with the contracted amount, necessitating the substitution of subcontractors and potential increases in pricing. Furthermore, unforeseen issues may be encountered that otherwise require an increase in the development budget that have not otherwise been reserved for in the contingency fund. Cost overruns could impair the project and reduce and eliminate the developer's equity in the project, impairing the ability of the Partnership to be repaid in full.

5. **Investments may be subject to the risks of leverage**. The developer may obtain first mortgage financing on its project financed by the Partnership that is superior to the Partnership investment. There is a risk that debt to total book capitalization ratio underwritten by the General Partner may be exceeded. If the construction or operations of the project deviate in any material adverse respect from those projected, the project may not have sufficient cash flow to service the required indebtedness. If the project cannot do so, regardless of the cause, the Partnership may face a risk of foreclosure on the property or the ownership interest in the property owner by the senior lenders, a result that if the developer otherwise does not have sufficient assets may lead to a loss of the Partnership's entire investment in a Target Investment that are in the form of a junior mezzanine loan or preferred equity interest subordinate to the senior loans encumbering the property which would risk of a loss of all or part of the Phase I Limited Partners' investment in the Partnership.

6. **Subordinated Debt Risk**. The Partnership's investments may be subordinate to the senior indebtedness encumbering the project. The Partnership's remedies with respect thereto, including the ability to foreclose on the collateral securing such investments, will be subject to the rights of the senior lenders and, in many cases, contractual inter-creditor provisions. A default under the senior indebtedness could otherwise result in a foreclosure of the mortgage lien securing such senior indebtedness and cause the Partnership's subordinate investment to have no economic value.

7. **There are increased risks involved with construction lending activities**. The Partnership's Target Investments may provide construction financing, which generally is considered to involve a higher degree of risk than other types of lending due to a variety of factors. These factors include the dependency on successful completion of a new development project and the difficulties in estimating construction costs. If the developer falls short of it estimates, the developer may need to pursue additional financing. The terms of such additional financing, if it can be procured, may be better or worse for the developer than the terms of the Partnership's Target Investments, and may result in subsequent lenders or investors having superior rights to those of the Partnership. There can be no assurance that the developer will be able to close on any additional financing in a timely manner or at economically feasible financial terms and if it is unable to do so, the developer may be unable to repay the principal due the Partnership in connection with the Target Investment, which could result in a substantial, or total, loss of the Phase I Limited Partners' investment in the Partnership.

8. **The bankruptcy or insolvency of a developer could impair the Partnership's ability to secure the repayment or return of the capital invested in a Target Investment**. There can be no assurance that the developer that receives financing from the Partnership will not become insolvent and, possibly, the subject of voluntary or involuntary bankruptcy proceedings under the federal bankruptcy code. Under the federal bankruptcy code, a bankruptcy court may reduce the rate of interest applicable to a bankrupt estate's debts and/or decrease or stretch out debt servicing payments. Additionally, the trustee of a bankrupt estate, or the estate itself, as debtor-in-possession, has certain special powers to avoid, subordinate or disallow debts. In certain circumstances, the equity and creditors' claims may be subordinated to financing obtained by a debtor-in-possession subsequent to its bankruptcy. Such bankruptcy event may result in a complete loss of the Partnership's Target Investment.

DocuSign Envelope ID: D82C1BA336A2F-47CE-8556-63CCE7A691E9

9.  **Projects will be subject to insurance risks.** Developers may not be able to obtain and maintain sufficient insurance on their development projects and as a result, no assurance can be given that sufficient insurance can be obtained in the event of a catastrophic loss to a particular property.

10. **Projects financed by the Partnership may be subject to technical risks and technology risks**. The projects may be subject to technical risks, including design errors, defects in construction and materials, mechanical breakdown, failure to perform according to design specifications and other unanticipated events, which adversely affect operations, health, safety and other equipment and/or plant facilities. While the project are expected to be insured and it is expected that third parties will bear much of this risk, there can be no assurance that any or all such risk can be mitigated or that such parties, if present, will perform their obligations. With respect to hotels, the failure of systems point-of-sale processing, management of supply chains, collection of cash, payment of obligations and other process to operate effectively, problems with maintenance, upgrading or transitioning to replacement systems, or a breach in security of these systems could be harmful and cause delays in customer service and reduce efficiency in operations. Any such failure, problems, or breach in security may require additional capital investments which may have the effect of increasing operating expenses and decreasing the profits and impairing the ability of the developer to repay Partnership.

## C. OTHER RISKS RELATED TO OWNERSHIP OF THE UNITS FOLLOWING IMPLEMENTATION OF THE MODIFICATION PROPOSAL

1.  **The Amended and Restated Partnership Agreement has not been negotiated at arm's length.** The General Partner has developed the Modification Proposal and has established the terms of the Amended and Restated Partnership Agreement, which were not the result of negotiated on an arm's-length basis. The proposed participation in the interest or preferred return earned on Partnership reinvestments were determined by the General Partner and are not based on a prevailing market survey or other independent criteria.  In addition, legal counsel for the Partnership and the General Partner has not acted as counsel for or represented the interests of the Limited Partners in connection with the Modification Proposal. Limited Partners should consult with their own legal counsel with respect to the decision to consent to the Modification Proposal.

2.  **The Amended and Restated Partnership Agreement will continue to limit transferability of the Units**. Pursuant to the Amended and Restated Partnership Agreement, the Units will not readily transferable and no transfer of Units may be made unless, among other things, the transferor delivers to the General Partner an opinion of counsel satisfactory to the Partnership that the transfer will not create adverse tax consequences and would not violate federal or state securities laws. Obtaining such an opinion on securities laws would generally require for its basis that the Units be registered under such laws or that an exemption from registration exists and there can be no assurance that an exemption will be available.

3.  **There will be no public market for the Units and the Units will remain subject to significant restrictions on transferability.** There is no public market for the Units and no such market is expected to develop in the future. The sale of the Units is being made without registration under the Securities Act and applicable state securities laws in reliance upon various exemptions under the Securities Act, including the "private offering" exemption of Section 4(a)(2) and Regulation D and Regulation S promulgated under the Securities Act and available exemptions under applicable state securities laws. Such Federal and state securities laws severely restrict the transferability of the Units offered hereby. Accordingly, an investment in the Units will be highly illiquid. The Units are considered "restricted securities" under the Securities Act and applicable state securities laws and cannot be resold or otherwise transferred unless they are registered under the Securities Act and any applicable state securities laws or are transferred in a transaction exempt from such registration requirements. Consequently, a holder of the Units may not be able to liquidate his or her investment and each Limited Partner's ability to control the timing of the liquidation of his or her investment in the Partnership will be restricted. Limited Partners should be prepared to hold their Units indefinitely. In addition, a Limited Partner should be able to withstand a total loss of his or her investment in the Partnership.

LEGAL_US_E # 130011651.7

4. **There are important factors related to Forward-Looking Statements and Associated Risks**. This Consent Solicitation Statement contains certain forward-looking statements within the meaning of Section 27A of the Securities Act and Section 21E of the Securities Exchange Act of 1934, as amended, and the Partnership and the General Partner intend that such forward-looking statements be subject to the safe harbors created thereby. These forward-looking statements include the plans and objectives of management for future operations, including plans and objectives relating to reinvestment activities and the performance of Target Investments. The forward-looking statements included herein are based on current expectations that involve a number of risks and uncertainties. Assumptions relating to the foregoing involve judgments with respect to, among other things, future economic, competitive and market conditions and future business decisions, all of which are difficult or impossible to predict accurately and many of which are beyond the control of the Partnership and the General Partner. There can be no assurance that the results contemplated in forward-looking information will be realized.

5. **Returns to Phase I Limited Partners**. There can be no guaranty that the Partnership will receive the interest or preferred or other return payable on Target Investments originated by the Partnership or that the Partnership will be repaid its principal at maturity. The distribution of the portion of interest or preferred return allocated to the Phase I Limited Partners and the ultimate return of the Phase I Limited Partners' capital contributions will be directly dependent upon the performance of the underlying project and the financial condition of the developer. The developer will be required to use available cash from operations, sell assets or refinance the senior and mezzanine indebtedness to pay current repay the principal. There are no assurances that the same can be accomplished, especially, if there is a fallback in the credit markets where refinancing may become unavailable to return the capital invested by the Partnership.

6. **The Partnership is subject to the risk that it could be deemed to be an investment company under the Investment Company Act of 1940.** The Investment Company Act of 1940, as amended (the "1940 Act") provides that any company that is deemed to be an "investment company" must register with the SEC as an investment company and comply with extensive regulations imposed under the 1940 Act. It is not practical for the Partnership to register as an investment company or to comply with these regulations. Accordingly, if the Partnership were deemed to be an investment company, the Partnership would be dissolved. The Partnership intends to avoid registration as an investment company pursuant to the exemption under Section 3(c)(5)(C) of the 1940 Act, which is available for entities primarily engaged in the business of purchasing or otherwise acquiring mortgages and other liens on and interests in real estate. The exemption generally applies if at least 55% of a company's assets are comprised of qualifying assets and at least 80% of its assets are comprised of qualifying assets and real estate-related assets. For these purposes, based on SEC guidance, qualifying assets generally include mortgage loans and other assets that are the functional equivalent of mortgage loans, as well as other interests in real estate. Any such failure to qualify for such exemption could have a material adverse effect on the Partnership.

7. **The General Partner is not Subject to Regulatory Oversight**. The General Partner is not registered as an investment adviser under the Investment Advisers Act of 1940 (the "Advisers Act"), in reliance upon the exemption from registration set forth in Section 203(b)(3) of the Advisers Act. In consequence, the General Partner generally is not subject to the restrictions contained in the Advisers Act, although the General Partner may become subject to such restrictions in the future.

8. **Legal Considerations**. LEGAL COUNSEL TO THE PARTNERSHIP AND THE GENERAL PARTNER WILL NOT BE ENGAGED TO PROTECT THE INTERESTS OF THE LIMITED PARTNERS AND SHOULD NEVER BE VIEWED AS REPRESENTING ANY LIMITED PARTNER. LIMITED PARTNERS SHOULD CONSULT WITH AND RELY UPON THEIR OWN COUNSEL CONCERNING A DECISION TO CONSENT TO THE MODIFICATION PROPOSAL, INCLUDING, WITHOUT LIMITATION, TAX AND CURRENCY EXCHANGE CONSEQUENCES TO THEM AND OTHER ISSUES RELATING TO ANY INVESTMENT IN THE PARTNERSHIP. THIS CONSENT SOLICITATION STATEMENT IS WRITTEN IN THE ENGLISH LANGUAGE ONLY. WHICH LANGUAGE SHALL BE CONTROLLING IN ALL RESPECTS. ANY VERSION OF THIS CONSENT SOLICITATION STATEMENT IN ANY LANGUAGE OTHER THAN ENGLISH IS NOT AUTHORIZED.

LEGAL_US_E # 130011651.7

DocuSign Envelope ID: D82C1BA336A2F-47AE-8556-63CCE7A691E9

**D. TAX RISKS.**

1. **There are various federal income tax risks associated with an investment in the Units**. Some, but not all, of the various risks associated with the federal income tax aspects of the Modification Proposal of which Limited Partners should be aware are set forth below under the caption TAX MATTERS. The effect of certain tax consequences on a Limited Partner will depend, in part, on the particular individual tax situation of the Limited Partner. No attempt is made herein to discuss or evaluate the state or local tax effects on any Limited Partner. Each Limited Partner is urged to consult the Limited Partner's own tax advisor concerning the effects of federal, state and local income tax laws on an investment in the Units and on the Limited Partner's individual tax situation following implementation of the Modification Proposal. Neither the General Partner nor its affiliates nor counsel for the Partnership has provided any tax (or other legal) advice to any holder of the Units or Limited Partner. The following discussion is not tax advice. This summary does not discuss the impact of various proposals to amend the Code which could change certain of the tax consequences of an investment in the Partnership.

2. **There are risks related to the status of the Partnership for federal income tax purposes**. The Partnership has been organized as a limited partnership under the laws of the State of Florida. The Partnership will not apply for a ruling from the Internal Revenue Service (the "IRS") that it will be treated as a partnership for federal income tax purposes, but intends to file its tax returns as a partnership for federal and state income tax purposes. Limited Partners should recognize that many of the advantages and economic benefits of an investment in the Units depend upon the classification of the Partnership as a partnership (rather than as an association taxable as a corporation) for federal income tax purposes. Classification as a corporation would require the Partnership to pay a corporate level tax on its income which would reduce cash available to fund distributions to the Limited Partners, prevent the flow-through of tax benefits, if any, for use on Limited Partners' personal tax returns, and could require that distributions be treated as dividends, which together could materially reduce the yield from an investment in the Partnership. In addition, such a change in a Partnership's tax status during the life of the Partnership could be treated by the IRS as a taxable event, in which event the Limited Partners could have tax liability without receiving a cash distribution from the Partnership to enable them to pay such tax liability.

   The discussion herein assumes that the Partnership will at all times be treated as a partnership for federal income tax purposes. The continued treatment of the Partnership as a partnership is dependent on present law and regulations, which are subject to change, possibly with retroactive effect.

3. **Limited Partners may have possible federal income tax liability in excess of cash distributions**. Each Limited Partner will be taxed on the Limited Partner's allocable share of the Partnership's taxable income, regardless of whether the Partnership distributes cash to the Limited Partners. Limited Partners should be aware that the federal income tax on a Limited Partner's allocable share of the Partnership's taxable income may exceed distributions to such Limited Partner. Separately from a Limited Partner's allocable share of the Partnership's taxable income, a Limited Partner's allocable share of the Partnership's cash distributions is subject to federal income taxation only to the extent the amount of such distribution exceeds a Limited Partner's tax basis in its partnership interest at the time of the distribution. Additionally, distributions, which exceed the amount for which a Limited Partner is considered "at-risk" with respect to the activity, could cause a recapture of previous losses, if any. There is a risk that a Limited Partner may not have sufficient basis or amounts "at-risk" to prevent allocated amounts from being taxable. The deductibility of various Partnership expenses allocable to certain Limited Partners may be subject to various limits for U.S. federal income tax purposes. It is possible that losses of the Partnership or of a particular activity of the Partnership or of a particular activity of the Partnership could exceed income in a given year. Any such losses may be passive losses, which may subject Limited Partners to limits on deductions for losses. Additionally, the deductibility of capital losses is also subject to limitations. Limited Partners should consult their own tax advisers regarding potential limitations on the deductibility of their allocable share of items of losses and expenses of the Partnership. Each Limited Partner will be required to report on his or her own U.S. federal income tax return his or her share of the Partnership's income, gains, losses, deductions and credits for the taxable year of the Limited Partner, whether or not cash or other property is distributed to that Limited Partner.

DocuSign Envelope ID: D82C1BA336A2F-47*E-8556-63CCE7A691E9

4.  **Information Reporting to Limited Partners by the Partnership**. The Partnership will file an information return on IRS Form 1065 and will provide information on Schedule K-1 to each Limited Partner following the close of the Partnership's taxable year. Delivery of this information by the Partnership will be subject to delay in the event of the late receipt of any necessary tax information from an entity in which the Partnership holds an interest. It is therefore likely that, in any taxable year, Limited Partner will need to apply for extensions of time to file their tax returns.

5.  **Tax auditing procedures will be under control of the General Partner**. Any audit of items of income, gain, loss or credits of the Partnership will be administered at the Partnership level.  The decisions made by the General Partner with respect to such matters will be made in good faith consistent with the General Partner's fiduciary duties to both the Partnership and to the Limited Partners, but may have an adverse effect upon the tax liabilities of the Limited Partners.

6.  **Changes in federal and state income tax laws and policies may adversely affect Limited Partners**. There can be no assurance that U.S. federal and state income tax laws and IRS administrative policies respecting the income tax consequences described in this Consent Solicitation Statement will not be changed in a manner which adversely affects the interests of the Limited Partners.

IN VIEW OF THE FOREGOING, IT IS ABSOLUTELY NECESSARY THAT EACH AND EVERY LIMITED PARTNER CONSULT WITH THE LIMITED PARTNER'S OWN ATTORNEYS, ACCOUNTANTS AND OTHER PROFESSIONAL ADVISORS AS TO THE LEGAL, TAX, ACCOUNTING AND OTHER CONSEQUENCES OF CONSENTING TO THE MODIFICATION PROPOSAL**.**

LEGAL_US_E # 130011651.7

DocuSign Envelope ID: D82C1BA336A2F-474E-8556-63CCE7A691E9

# TAX MATTERS

**General**

The following summary is a general discussion of certain federal income tax consequences of a decision to consent to the Modification Proposal. This summary is based on the Internal Revenue Code of 1986, as amended (the "Code"), applicable Treasury regulations thereunder, administrative rulings, practice and procedures and judicial authority as of the date hereof. All of the foregoing are subject to change, and any such change could affect the continuing accuracy of this summary. The discussion of the tax consequences of the investment in Target Investments is intended to relate to Phase I Limited Partners and thus references to Limited Partners in this respect should be read as references to Phase I Limited Partners. This summary does not discuss all aspects of federal income taxation that may be relevant to a particular Limited Partner in light of such Limited Partner's specific circumstances or to certain types of Limited Partners subject to special treatment under the federal income tax laws, nor does it discuss any state, local, foreign or other tax laws. EACH LIMITED PARTNER SHOULD CONSULT HIS OR HER OWN NON-U.S. AND U.S. TAX ADVISOR AS TO THE PARTICULAR TAX CONSEQUENCES OF INVESTING IN, OWNING AND DISPOSING OF THE UNITS FOLLOWING IMPLEMENTATION OF THE MODIFICATION PROPOSAL CONTEMPLATED BY THIS CONSENT SOLICITATION STATEMENT IN LIGHT OF BECOMING A LAWFUL PERMANENT RESIDENT OF THE UNITED STATES AND ALL OTHER TAX CONSEQUENCES IN CONNECTION WITH REINVESTMENT IN TARGET INVESTMENTS.

**THE FOLLOWING DISCUSSION IS NOT TAX ADVICE. LIMITED PARTNERS ARE STRONGLY URGED TO CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE TAX CONSEQUENCES OF THE PARTNERSHIP INVESTMENT IN TARGET INVESTMENTS.**

By consenting to the Modification Proposal, the Partnership will be authorized to reinvest in Target Investments. Upon such reinvestment, Limited Partners will be indirectly invested in Target Investments. No tax ruling will be requested from the Internal Revenue Service (the "IRS") or any other taxing authority with respect to any of the income, estate or other tax consequences related to the Modification in Target Investments. Therefore, a material risk exists that, upon audit, certain items of deduction may be disallowed in whole or in part or required to be capitalized by the underlying entity. It will be the responsibility of each Limited Partner to prepare and file all appropriate tax returns that he or she may be required to file as a result of his or her interests in the Target Investments. EACH LIMITED PARTNER IS STRONGLY URGED TO CONSULT WITH HIS OR HER OWN TAX ADVISOR AND COUNSEL WITH RESPECT TO ALL TAX ASPECTS OF A DECISION TO CONSENT TO THE MODIFICATION PROPOSAL.

*United States Tax Status*

In most cases it is expected that the Partnership will treat the reinvestment in Target Investments as the ownership of a debt instrument on which interest income is earned and would be taxable at ordinary income rates. However, it is possible that some particular investments of the Partnership will be treated for tax purposes as either common or preferred equity interests in an entity (which may own property or the equity of an entity that owns property). By consenting to the Modification Proposal, Limited Partners agree to file the tax returns consistent with the reporting position of the Partnership as determined by the General Partner. There is no assurance that the IRS will agree with that position and not successfully challenge it. Except where otherwise noted with respect to equity interests, the remainder of this discussion assumes the Target Investments will be treated as investments in debt instruments for tax purposes.

This summary also does not discuss all of the tax consequences that may be relevant to a particular Limited Partner or to certain Limited Partner subject to special treatment under the federal income tax laws, including financial institutions, insurance companies, tax-exempt investors or non-U.S. investors. Moreover, this summary does not address the U.S. federal estate and gift tax or alternative minimum tax consequences of the acquisition, ownership, disposition or withdrawal of an investment in Target Investments or entity interests.

*Certain Considerations for U.S. Limited Partner*

The following discussion summarizes certain significant U.S. federal income tax consequences to an Limited Partner who: (a) is, with respect to the United States, a citizen or resident individual, a domestic corporation, an estate, the income of which is subject to U.S. federal income taxation regardless of its source, or a

LEGAL_US_E # 130011651.7

DocuSign Envelope ID: D82C1BA336A2E-47AE-8556-63CCE7A691E9

trust for which a court in the United States is able to exercise primary supervision over its administration and one or more U.S. persons have the authority to control all substantial decisions, as such terms are defined for U.S. federal income tax purposes and (b) is not tax-exempt.

*Taxation of Income, Gain and Loss from Target Investments*

Target Investments generally will be treated as the ownership of debt instruments for U.S. federal income tax purposes.  This is the tax treatment currently applicable to the Partnership's investments.  Both periodic current interest income and payments upon maturity of the debt instruments that are classified as attributable to the use of the Partnership's money by the borrower when received by the Partnership with respect to such debt instruments will be taxable ordinary income.  The Partnership will allocate all of its taxable income to the Limited Partners in accordance with each of their respective interests in the Partnership, as specified in the Partnership Agreement.  Some Target Investments may have original issue discount, which constitutes taxable income to the Partnership, and thus will be allocated to the Limited Partners on the annual IRS Form K-1 along with interest paid in cash.  The presence of original issue discount on Target Investments may result in more taxable income being allocated to the Limited Partners than cash distributed by the Partnership to them.  The amount of original issue discount on Target Investments, if any, cannot be predicted at this time. The acquisition of Target Investments by the Partnership may also include the requirement to accrue market discount or bond premium.  The Partnership will notify Limited Partners of any such amounts each taxable year.  Limited Partners should consult their own tax advisors regarding the impact on their individual tax situations of these items that may be associated with Target Investments.

Target Investments will be treated as capital assets in the hands of the Partnership.  If, prior to its full repayment by the borrower, a Target Investment treated as a debt instrument is sold or disposed of (such as through a restructuring of the Target Investment treated as a significant modification under the U.S. tax rules), the Partnership could realize gain or loss on such capital transaction.  Any such gain or loss would be allocated to the Limited Partners in accordance with their respective interests in the Partnership on the annual IRS Form K-1.

*Taxation of Income, Gain and Loss from Investments in Equity Interests*

Underlying entities classified as partnerships will not be liable for U.S. federal income taxes, but each Limited Partner will be required to report his or her allocable share (whether or not distributed) of the income, gains, losses, deductions and credits of the entities.  It is possible that the Limited Partners could incur income tax liabilities without receiving from the Partnership, the underlying entity or the intermediate entities sufficient cash distributions with which to pay such tax liabilities.  Each Limited Partner is required to take into account in computing his or her federal income tax liability, and to report separately on his or her own federal income tax return, his or her indirect distributive share of the underlying entity's income, gain, loss, deductibility and credit for any taxable year of the Partnership.

Pursuant to an underlying entity's partnership or operating agreement, items of the entity's taxable income, gain, loss, deduction and credit will be allocated so as to take into account the varying interests of its partners or members.  The partnership or operating agreement will contain provisions intended to comply substantially with IRS regulations describing partnership allocations that will be treated as having "substantial economic effect," and hence be respected, for U.S. federal tax purposes.  However, the application of these regulations may be uncertain, and there can be no assurance that the allocations of income, deduction, loss and gain for tax purposes made pursuant to the partnership or operating agreement will be respected by the IRS, if reviewed.  It is possible that the IRS could challenge the Partnership's or the underlying entity's allocations as not being in compliance with such Treasury regulations.  Any resulting reallocation of tax items may have adverse tax and financial consequences to a Limited Partner.

In cases where the Partnership's reinvestment is intended to be made into an equity interest of an entity, such as a preferred equity investment, however, no assurances can be given that the IRS will not treat a preferred equity investment as indebtedness of the entity owed to the Partnership. In such cases, the U.S. federal tax consequences to a Limited Partner would generally be as described above under "Taxation of Income, Gain and Loss from Target Investments". Limited Partners are urged to consult their own tax advisors regarding the consequences of the preferred equity investments being characterized as indebtedness for U.S. federal income tax purposes.

LEGAL_US_E # 130011651.7

*Adjusted Tax Basis*

An Limited Partner's adjusted tax basis in its interest is, in general, equal to the amount of cash and the adjusted tax basis of the Limited Partner in property contributed by the Limited Partner to the entity, increased by the Limited Partner's proportionate share of income and any liabilities of the entity and decreased by the Limited Partner's proportionate share of cash distributions, losses and any reductions in such liabilities. It is not expected that the Partnership's anticipated investments in Target Investments as contemplated by the Modification Proposal will itself alter the tax basis of a Limited Partner, but further tax basis adjustments are likely to occur during the course of the investment in Target Investments and any associated equity investments.

*Taxation of Non-U.S. Upper-Tier Partners in Equity Interests in Real Property*

The business of underlying entities in which the Partnership reinvests in the form of equity interests may constitute a U.S. trade or business. In that event, Non-U.S. upper-tier partners who are non-U.S. citizens or residents ("Non-U.S. Partners") may be considered engaged in a U.S. trade or business. Non-U.S. Partners generally will be subject to U.S. federal income tax on their distributive share of the taxable income of the entity that is deemed to be "effectively connected" with a U.S. trade or business (within the meaning of U.S. tax law) as if they were U.S. citizens or residents, *i.e.*, at normal graduated income tax rates applicable to U.S. citizens, regardless of whether the entity makes any cash distributions. Generally Non-U.S. Partners who invest in equity interests will be required to file a U.S. federal income tax return with respect to their distributable share of the underlying entity's income that is effectively connected to a trade or business carried on by the entity, or its subsidiaries, in the Unites States. Income and gain from any such U.S. investments, including a portion of gain on the sale or redemption of the investment in the entities, are likely to be treated as effectively connected with the conduct of a U.S. trade or business and thus be subject to U.S. federal income tax, regardless of whether the entity makes any cash distributions. Generally, the entity would be required to withhold at the highest applicable tax rate (or, if applicable, in certain circumstances, a lower capital gains tax rate with respect to non-corporate, Non-U.S. Partners) from effectively connected income allocable to Non-U.S. Partner. In addition, such Non-U.S. Partners would individually be required to file U.S. federal income tax returns. Any such Non-U.S. Partners that are non-U.S. corporations may also be subject to a 30% U.S. federal branch profits tax on their share of certain effectively connected earnings and profits, although the tax rate may be reduced under applicable tax treaties.

If the underlying entity generates any U.S. source, "fixed or determinable, annual or periodic" gains, profits or income, such as interest, dividends or rents, that is not effectively connected with a U.S. trade or business, a Non-U.S. Partner's allocable share of such income (whether or not distributed) will be subject to U.S. withholding tax at a rate of 30%, unless reduced or eliminated by an applicable exception or tax treaty.

In addition, regardless of whether the activities of the entity constitute a U.S. trade or business, Non-U.S. Partners will be taxable on any gain derived from the disposition of a "U.S. real property interest" as if such gain were effectively connected income. This tax is imposed under the Foreign Investment in Real Property Tax Act, also known as FIRPTA. U.S. real property interests include interests in U.S. real estate and certain U.S. corporations that hold predominantly U.S. real estate investments and will include real property, buildings and certain other improvements in development projects. Generally, the entity holding such real property interests will be required to withhold at the highest applicable federal tax rate (or, if applicable, in certain circumstances, a lower capital gains tax rate with respect to non-corporate, Non-U.S. Partners) on any gain attributable to dispositions of U.S. real property interests. The 30% branch profits tax may also apply to corporate non-U.S. investors. In addition, a purchaser may be required to withhold 10% of the purchase price upon a sale of an interest in the entity if, among other requirements, the entity's gross assets consist of at least 50% U.S. real property interests.

The entities in which the Partnership reinvests in the form of equity interests may be deemed to be engaged in a U.S. trade or business. In such event, a Non-U.S. Partner's share of the entity's income and gains may be deemed "effectively connected" with such a U.S. trade or business of the entity (including operating income from entity) and will be subject to tax at normal graduated U.S. federal income tax rates. A Non-U.S. Partner generally will be required to file a U.S. federal income tax return with respect to the Non-U.S. Partner's share of effectively connected income. If the entity is deemed to be engaged in a U.S. trade or business, then the entity will be required to withhold U.S. federal income tax with respect to the Non-U.S. Partner's share of the entity's income that is effectively connected income.

DocuSign Envelope ID: D82C1BA336A2E-47CE-8556-63CCE7A691E9

It is anticipated that upon the acceptance of a Limited Partner's I-526 Petition and the issuance of a temporary resident visa, such Limited Partner may become a U.S. taxpayer and therefore would no longer be subject to the tax treatment afforded non-resident persons.

*Investment Interest and Passive Activity Limitations*

There are limits on the deduction of "investment interest" expense (*i.e.*, "interest for indebtedness properly allocable to property held for investment"). In general, investment interest will be deductible only to the extent of the taxpayer's "net investment income." For this purpose net investment income will generally include net income from the Target Investments or associated equity investments and other income from property held for investment (other than income treated as passive business income). However, long-term capital gain is excluded from the definition of net investment income unless the taxpayer makes a special election to treat such gain as ordinary income rather than long-term capital gain. Interest which is not deductible in the year incurred because of the investment interest limitation may be carried forward and deducted in a future year in which the taxpayer has sufficient investment income. The Partnership will report to each Limited Partner his or her distributive share of the investment interest expense, and each Limited Partner must determine separately the extent to which such expense is deductible on his or her tax return.

Non-corporate indirect partners in the entities (and certain closely held, personal service and S corporations) are subject to limitations on using losses from passive business activities to offset active business income, compensation income, and portfolio income (*e.g.*, interest, dividends, capital gains from portfolio investment, royalties, *etc.*). The entity's distributive share of income or losses generally may be treated as passive activity income or losses. Accordingly, a Limited Partner will be subject to the passive activity loss limitations on the use of any allowable entity's losses and allocable expenses.

*Deductibility of Investment Expenditures and Certain Other Expenditures*

Investment expenses of an individual, trust or estate are deductible only to the extent they exceed 2% of the taxpayer's adjusted gross income for the particular taxable year. In addition, the Code further restricts the ability of individuals with an adjusted gross income in excess of a specified amount to deduct such investment expenses. Moreover, such investment expenses are miscellaneous itemized deductions which are not deductible by a non-corporate taxpayer in calculating such taxpayer's alternative minimum tax liability.

These limitations on deductibility may apply to a Limited Partner's share of the trade or business expenses of the Partnership. The Partnership may make an allocation of its expenses among its various activities. There can be no assurance that any of its expenses will be considered trade or business expenses, nor can there be any assurance that the IRS will agree with any allocation made by the Partnership.

The consequences of these limitations will vary depending upon the particular tax situation of each taxpayer. Accordingly, Limited Partners should consult their own tax advisors with respect to the application of these limitations and on the deductibility of their share of items of loss and expense of the Partnership.

*Application of Basis and "At Risk" Limitations on Deductions*

The amount of any loss of the Partnership that a Limited Partner is entitled to deduct on such Limited Partner's income tax return is limited to such Limited Partner's adjusted tax basis in his or her underlying interest as of the end of the Partnership's taxable year in which such loss is incurred. Generally, a Limited Partner's adjusted tax basis for such Limited Partner's Units is equal to the amount paid for such Units, increased by the sum of (i) such Limited Partner's share of the Partnership's liabilities, as determined for federal income tax purposes, and (ii) such Limited Partner's resulting distributive share of the Partnership's realized income and gains, and decreased (but not below zero) by the sum of (a) distributions (including decreases in such Limited Partner's indirect share of Partnership liabilities) made by the Partnership indirectly to such Limited Partner and (b) such Limited Partner's indirect distributive share of the Partnership's losses and expenses.

A Limited Partner that is subject to the at risk limitations (generally, non-corporate taxpayers and closely held corporations) may not deduct losses of the Partnership to the extent that they exceed the amount such Limited Partner has "at risk" with respect to such Limited Partner's Units at the end of the year. The amount that a Limited

16

DocuSign Envelope ID: D82C1BA336A2E-47AE-8556-63CCE7A691E9

Partner has at risk will generally be the same as such Limited Partner's adjusted basis as described above, except that it will generally not include any amount attributable to liabilities of the Partnership (other than certain loans secured by real property) or any amount borrowed by the Limited Partner on a non-recourse basis.

Losses denied under the basis or at risk limitations are suspended and may be carried forward in subsequent taxable years, subject to these and other applicable limitations.

*Certain U.S. Tax Considerations for Foreign Investors*

The U.S. federal income tax treatment of a non-resident alien investing as a Limited Partner in the Partnership and indirectly in Target Investments or equity interests is complex and will vary depending on the circumstances and activities of such Limited Partner and the Partnership and its underlying investments. Each non-U.S. Limited Partner is urged to consult with his or her own tax advisor regarding the U.S. federal, state, local and foreign income, estate and other tax consequences of the Partnership's reinvestment in Target Investments or equity interests. The following discussion assumes that a non-U.S. Limited Partner is not subject to U.S. federal income taxes as a result of such limited partner's presence or activities in the United States other than as a Limited Partner in the Partnership.

*Withholding*

A Non-U.S. Partner will generally be subject to U.S. federal withholding taxes at the rate of thirty percent (30%) (or such lower rate provided by an applicable tax treaty) on his or her share of the Partnership's income from dividends, interest (other than interest which constitutes portfolio interest within the meaning of the Code) and certain other income. Unless a Non-U.S. Partner Investor meets certain exception requirements, the Non-U.S. Member will also be subject to withholding on imputed interest and original issue discount. Depending on the specific Target Investment, the Partnership may earn a significant amount of income from these sources.

*Backup Withholding*

Backup withholding of U.S. tax, currently at a rate of 28%, may apply to distributions or portions thereof by the Partnership payable to a Limited Partner who fail to provide the Partnership with certain identifying information, such as a Limited Partner's taxpayer identification number. A Limited Partner who is a U.S. citizen or resident may comply with these identification procedures by providing the Partnership with a duly executed IRS Form W-9, Request for Taxpayer Identification Number and Certification. Non-U.S. Partners may comply by providing the Partnership with a duly executed IRS Form W-8BEN or other appropriate IRS Form W-8.

*Foreign Account Tax Compliance Act*

Complex U.S. regulatory provisions, commonly referred to as the Foreign Account Tax Compliance Act (or "FATCA"), impose increased certification requirements and information reporting with respect to certain foreign financial and investment entities. All Limited Partners will be required to provide any information requested by the Partnership in order to comply with such requirements. In the event of noncompliance with the certification requirements, a 30% withholding tax could be imposed on or with respect to certain payments including interest, dividends and, commencing January 1, 2019, gross proceeds from the disposition of an equity interest or other capital asset. Limited Partners should consult their own tax advisors regarding the applicability of the FATCA rules in light of their particular circumstances.

*Estate Tax*

Additionally, each Non-U.S. Member is subject to U.S. estate tax on his or her interest in the Partnership. Limited Partners are urged to seek advice from their own estate tax professionals based on their individual circumstances.

The United States charges income and estate tax on all U.S. citizens and permanent residents based on worldwide income. Treaties and various exemptions eliminate some but not all of the risk of double taxation. Each state in the United States has its own separate income tax system. The large majority of states raise revenue through state income tax. Limited Partners should consider the tax effects of becoming a U.S. resident before consenting to

LEGAL_US_E # 130011651.7

the Modification Proposal. Foreign persons (non-U.S. persons) that become permanent residents of the United States generally are subject to U.S. federal income tax on their worldwide income in the same manner as a U.S. citizen. Prior to consenting to the Modification Proposal, a Limited Partner who is not a U.S. person should consult with his or her U.S. and non-U.S. tax advisors with regard to the consequences of becoming a lawful permanent resident of the United States.

This Consent Solicitation Statement does not address all of the U.S. federal income tax consequences to the Limited Partners of the Partnership's reinvestment in Target Investments and associated preferred and common equity interests, and does not address any of the state or local tax consequences of such investments to any Limited Partner, or all of the U.S. or foreign tax consequences of such an investment to any Limited Partner who is not a United States person. Each Limited Partner is advised to consult his or her own tax counsel as to the U.S. federal income tax consequences of the Modification Proposal and the Partnership's reinvestment in Target Investments and as to applicable state, local and foreign taxes. Special considerations may apply to the Limited Partners who are not U.S. citizens or residents and such Limited Partners are advised to consult his or her own tax advisors with regard to the U.S. federal, state, local and foreign tax consequences of the Modification Proposal.

*State and Local Taxes*

Limited Partners should consider the potential state and local tax consequences of the Modification Proposal and indirectly investing in Target Investments and associated preferred and common equity interests. In addition to being taxed in its own state or locality of residence, a Limited Partner may be subject to tax return filing obligations and income, franchise and other taxes in jurisdictions in which the Partnership is deemed to operate. Limited Partners should consult their tax advisers regarding the state and local tax consequences of the Modification Proposal and the Partnership's reinvestment in Target Investments and associated preferred and common equity interests.

*Disposition of the Units and other Equity Interests*

There are tax consequences associated with the transfer, assignment or disposition of the Units in the Partnership. Generally, a Limited Partner who is a U.S. citizen or resident will recognize capital gain or loss on the sale, redemption, exchange or other taxable disposition of Target Investments and associated preferred and common equity interests, excluding amounts attributable to interest (which will be recognized as ordinary interest income) to the extent the U.S. Limited Partner has not previously included the accrued interest income. Individuals may qualify for taxation on long-term capital gains (those realized on investments held for more than one year) at preferential federal tax rates. The deductibility of capital losses may be subject to limitation. The consequences of the limitations will vary depending on the tax situation of each taxpayer. Accordingly, each Limited Partner should consult his or her own tax advisors with respect to these limitations.

Any gain from the sale or disposition of equity investments by a Non-U.S. Partner, whether through a sale by the Partnership or a disposition of the Limited Partner's Partnership interests may be treated as a gain or loss effectively connected with a trade or business in the United States and may be subject to federal net income tax. Many of the rules applicable to capital gain or loss for U.S. Partners would apply to Non-U.S. Partners in such case. However, the FIRPTA rules discussed above also would generally apply to non-U.S. Partners. Accordingly, each Non-U.S. Partner should consult his or her own tax advisors with respect to the sale or disposition of an equity interest.

*Possible IRS Challenges; Tax Audits.*

Limited Partners should be aware that the IRS may challenge the Partnership's treatment of items of income, gain loss, deduction and credit, or its characterization of its transactions, and that any such challenge, if successful, could result in the imposition of additional taxes, penalties and interest charges. The managers of underlying partnerships or limited liability company entities in which the Partnership has invested in preferred or common equity interests will have the authority to decide to report the items on tax returns and such reporting decisions are binding on the members who must file their individual tax returns consistently with such tax positions. In the event the income tax returns of the entity are audited by the IRS, the tax treatment of the income and deductions generally is determined at the entity level in a single proceeding rather than by individual audits of its

members.  If the IRS audits the relevant tax returns, however, an audit of its members' own tax returns may result. The "Tax Matters Partner" or partnership representative of an underlying partnership has considerable authority to make decisions affecting the tax treatment and procedural rights of all its partners and indirectly the Limited Partners.  In addition, the Tax Matters Partner has the authority to bind its partners to settlement agreements and the right on behalf of all partners to extend the statute of limitations relating to the partners' tax liabilities with respect to items, which will indirectly bind the Limited Partners. Under rules recently announced by the IRS, the foregoing procedures will change starting in 2018, with the result that tax liabilities of a partnership may be settled and paid at the partnership rather than member level. The legal and accounting costs incurred in connection with any audit of the Partnership's tax returns will be paid for by the Partnership, but each Limited Partner will bear the cost of audits of his or her own return.

*Possible Legislative or Other Action Affecting Tax Aspects*

The foregoing discussion is only a summary and is based upon existing U.S. federal income tax law. Limited Partners should recognize that the U.S. federal income tax treatment of the Limited Partners' interest in the Partnership and the Partnership's reinvestment in Target Investments or equity investments may be modified at any time by legislative, judicial or administrative action.  Any such changes may have retroactive effect with respect to existing transactions and investments and may affect the accuracy of statements made above.  The rules dealing with U.S. federal income taxation are continually under review by persons involved in the legislative process and by the IRS and the Treasury Department, frequently resulting in revisions of the Code, Treasury regulations and revised interpretations of established tax law concepts as well as statutory changes.  Revisions in U.S. federal, state and foreign tax laws and interpretations thereof could adversely affect the tax aspects of the Partnership's reinvestment in Target Investments or associated equity interests.  There can be no assurance that legislation will not be enacted that has an unfavorable effect on a Limited Partner or its interest in the Partnership.

**Limited Partners are urged to consult their own tax advisors regarding the federal, state and local income tax consequences of the Modification Proposal.**

DocuSign Envelope ID: D82C1BA336A2F-47FE-8556-63CCE7A691E9

## CONSENT PROCEDURE

The General Partner has approved the Modification Proposal and urges you to grant your Consent so that the EB-5 Loan repayment proceeds can be invested in Target Investments.  Each Limited Partner is requested to sign and return the accompanying Consent Letter to the Partnership by email or facsimile transmission as soon as practicable at the following email address and fax number:

Email: USIFInvestors@usifund.com
Fax Number: +001.561.799.0061

Unless you grant your Consent, you will not have the opportunity to benefit from the reinvestments in Target Investments and experience the returns generated from such investments and the reduction of the risks you confront under the EB-5 Program.

**Approval of the Modification Proposal requires the consent of Limited Partners holding at least a majority of the outstanding Units. The solicitation of Consents will expire at 5:00 p.m., New York City time on October 31, 2017 (such date and time as may be extended or earlier terminated).  The Partnership reserves the right to terminate or extend the solicitation of Consents in its sole discretion. If a Limited Partner does not submit its signed consent letter by 5:00 p.m., New York City time on October 31, 2017 (unless such date and time is extended), the Limited Partner will be deemed to have consented to the Modification Proposal.**

Questions concerning this Consent Solicitation Statement or the Modification Proposal may be addressed to the Partnership in writing at c/o Florida Regional Center, LLC, 115 Front Street, Suite 300, Jupiter, Florida 33477; email: USIFInvestors@usifund.com.

*In accordance with the consent procedures the Partnership has established for purposes of this solicitation of Consents, if we do not receive a response from a Limited Partner within 10 business days of such Limited Partner's receipt of this Consent Solicitation Statement, we will send a notice (a "Reminder Notice") to such Limited Partner once again inviting such Limited Partner to consent or deny consent to the Modification Proposal.*

*If such Limited Partner fails to respond to such Reminder Notice (in the manner specified in, and within 3 business days of its receipt of, such Reminder Notice) by providing its consent to the Modification Proposal, such Limited Partner will be deemed to have denied consent to the Modification Proposal.*

*If the required majority consent is not received by the Partnership the limited partner class structure and associated segregation of capital will not be implemented and the Partnership will retain the EB-5 Loans repayment proceeds and the General Partner will thereafter through a registered investment adviser invest in investment grade investments that comply with USCIS guidelines in order to preserve capital without adjustment to the current distributions payable to the Limited Partners.*

LEGAL_US_E # 130011651.7

**Exhibit A**

**Amended and Restated Partnership Agreement**

LEGAL_US_E # 130011651.8

DocuSign Envelope ID: D82C1BA396A2F-47FE-8556-63CCE7A694E9

**THIS AGREEMENT HAS BEEN INITIALLY WRITTEN IN THE ENGLISH LANGUAGE; IN THE EVENT OF ANY CONFLICT BETWEEN THE ORIGINAL ENGLISH VERSION AND ANY TRANSLATIONS INTO OTHER LANGUAGES, THE ORIGINAL ENGLISH VERSION SHALL CONTROL**

**VIA MIZNER FUNDING, LP**

**AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT**

October 16, 2017

# TABLE OF CONTENTS

| | | |
|---|---|---|
| 1 | ORGANIZATION OF THE PARTNERSHIP | 2 |
| 2 | CAPITAL CONTRIBUTIONS; PARTNERSHIP LOANS | 4 |
| 3 | DISTRIBUTIONS | 5 |
| 4 | ALLOCATIONS | 8 |
| 5 | ACCOUNTING AND RECORDS | 12 |
| 6 | MANAGEMENT | 13 |
| 7 | REPRESENTATIONS AND WARRANTIES | 18 |
| 8 | TRANSFER RESTRICTIONS | 19 |
| 9 | LIMITATION OF LIABILITY; INDEMNIFICATION | 20 |
| 10 | DISSOLUTION AND WINDING UP | 23 |
| 11 | ARBITRATION | 25 |
| 12 | MISCELLANEOUS | 26 |

LEGAL_US_E # 130074023.7

DocuSign Envelope ID: D82C1BA336A2E-47CE-8556-63CCE7A691E9

**THIS AGREEMENT HAS BEEN INITIALLY WRITTEN IN THE ENGLISH LANGUAGE; IN THE EVENT OF ANY CONFLICT BETWEEN THE ORIGINAL ENGLISH VERSION AND ANY TRANSLATIONS INTO OTHER LANGUAGES, THE ORIGINAL ENGLISH VERSION SHALL CONTROL**

**VIA MIZNER FUNDING, LP**

**AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT**

THIS AMENDED AND LIMITED PARTNERSHIP AGREEMENT (this "Agreement") of Via Mizner Funding, LP (the "**Partnership**") is made as of [_____ __, 2017], among U.S. Immigration Fund GP – Mizner, LLC, a Florida limited liability company, as the sole General Partner (the "**General Partner**") and each Person who from time to time is admitted as a Limited Partner in accordance with the terms of this Agreement (hereinafter individually referred to as a "**Limited Partner**" and collectively referred to as the "**Limited Partners**"). The names and addresses are listed on **Exhibit A** attached hereto as the Limited Partners, as **Exhibit A** shall be updated from time to time in accordance with the terms of this Agreement. See **Exhibit B** for definitions of terms used in this Agreement.

## RECITALS:

(A) The Partnership was formed in 2012 and has been governed by that certain Limited Partnership Agreement, dated as of July 20, 2012, among the General Partner, Florida Regional Center, LLC (the "**Initial Limited Partner**") and the Limited Partners party thereto (the "**Prior Agreement**").

(B) The Partnership has been formed in order to extend the EB-5 Loans to Camino Investments Holdings Limited Partnership (the "**Developer**"), which in turn has been formed to own the Property and develop and operate the Project. The Partnership previously sold Units to investors pursuant to subscriptions accepted by the General Partner and whereupon such investors were admitted to the Partnership as Limited Partners.

(C) Pursuant to the terms of the Prior Agreement, the Unit of the Initial Limited Partner has been cancelled and he is no longer a limited partner in the Partnership.

(D) The General Partner and the Limited Partners now desire to amend and restate the Prior Agreement pursuant to Section 11.4 thereof.

(E) The invested capital of Limited Partners admitted prior to the date hereof was segregated and designated by the General Partner towards the funding of two separate EB-5 Loans.

(F) The General Partner and the Limited Partners wish to classify Limited Partners and segregate their invested capital according to the phases of the Project's construction for which their invested capital was previously designated towards the funding of the EB-5 Loans.

(G) This Agreement is being entered into to set forth the terms applicable to the relationship between the Partners and the conduct of the activities of the Partnership.

DocuSign Envelope ID: D82C1BA336A2F-47CE-8556-63CCE7A691E9

## AGREEMENT:

NOW THEREFORE in consideration of the respective covenants and agreements of the parties herein contained and for other good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged), the parties agree with each other as follows:

## 1      ORGANIZATION OF THE PARTNERSHIP

1.1      Interpretation.  **Exhibit B** attached hereto sets forth certain definitions of terms and rules of interpretation that shall be used for purposes of this Agreement.  Any capitalized term not otherwise defined in **Exhibit B** shall have the meaning set forth elsewhere in this Agreement.

1.2      Formation; Admission of New Limited Partners.  The Partnership was organized between the Initial Limited Partner and the General Partner under the provisions of the Act.  The Partnership Interest of each Limited Partner shall be represented by Units issued to Persons who shall be admitted to the Partnership upon receipt of their respective Minimum Capital Contributions and acceptance of their respective counterpart signature pages by the General Partner, each of which shall be effective as of the date of such acceptance, and all of which shall deemed incorporated by reference into **Exhibit A** attached hereto.  The Limited Partners shall be classified for purposes of this Agreement as either Phase I Limited Partners or Phase II/III/III Limited Partners as provided in Section 2.1.  Except as expressly provided otherwise in this Agreement, the rights and liabilities of the Partners shall be as provided in the Act.

1.3      Name.  The Partnership shall carry on its activities under the name "Via Mizner Funding, LP" or such other name, in accordance with applicable law, as the General Partner may determine from time to time.  The General Partner shall notify each Limited Partner of any change in the name under which the Partnership carries on its activities within 10 Business Days of such change.

1.4      Registered Office and Principal Address.  The principal address of the Partnership shall be located at 115 Front Street Suite 300 Jupiter, Florida 33477 or at such other location, in accordance with applicable law, as the General Partner may determine from time to time.  The General Partner shall notify each Limited Partner of any change in the principal address of the Partnership within 10 Business Days of such change.

1.5      Annual Report.  As required by law, the General Partner shall cause the Partnership to file an annual report with the Department of State each calendar year, on the form provided by the Department of State.  The General Partner shall cause the Partnership to maintain at its principal office copies of the recent annual reports filed by the Partnership with the Department of State as required by law.

1.6      Names and Addresses of the Partners.  The names and addresses of the General and Limited Partners are set forth in **Exhibit A**, which exhibit shall be updated from time to time by the General Partner.

1.7      Partnership Purpose.  The Partnership has been formed as a commercial for-profit entity to engage in any lawful purpose permitted under the Act, including without limitation (i) purchasing or otherwise acquiring mortgages and other liens on a interests in real estate, (ii) extending the Loan to the Developer for the purpose of developing, constructing and operating the Project within the Targeted Employment Area, (iii) making offers and sales of Units to qualified Persons under the Pilot Program, (iv) all activities ancillary to the foregoing (v) and following repayment of the Phase I EB-5 Loan, investing in Phase I Target Investments.  The Partnership shall have

the power to do and to perform any and all things necessary for, incidental to or connected with carrying on the activities of the Partnership.

1.8     Fiscal Year.  The fiscal year of the Partnership (the "**Fiscal Year**") shall be the calendar year. The Fiscal Year shall include any partial calendar year at the beginning and end of the Term.

1.9     Term.  The Partnership term (the "**Term**") commenced on the date stated in the Certificate of Limited Partnership filed in the Department of State in accordance with the Act, and shall continue until the winding up and liquidation of the Partnership and its business is completed following a Liquidating Event, as provided in Section 10.1.

1.10    Organizational Declarations and Other Filings.  If requested by the General Partner, the Limited Partners shall promptly execute all declarations, certificates and other documents consistent with the terms of this Agreement necessary for the General Partner, acting reasonably, to accomplish all filing, recording, publishing and other acts as may be appropriate to comply with all requirements for:  (i) the formation and operation of a limited partnership under the laws of the State of Florida; (ii) if the General Partner deems it advisable, acting reasonably, the operation of the Partnership as an entity or partnership in which the Limited Partners have limited liability, in all jurisdictions where the Partnership proposes to operate or in which Limited Partners have addresses of record in the Partnership records; and (iii) all other filings which the General Partner determines are required or advisable to be made by the Partnership.

1.11    Independent Activities; Affiliate Transactions.

1.11.1    To the extent permitted by applicable law, the General Partner (acting on its own behalf), each Limited Partner (acting on its own behalf) and any of their Affiliates may engage or hold interests in other business ventures of every kind and description for its own account.  Neither the Partnership nor any of the Partners shall have any rights by virtue of this Agreement in such business ventures or to the income or profits derived from such ventures.

1.11.2    The General Partner may employ, or otherwise deal with on behalf of the Partnership, any Partner, including the General Partner, or any Affiliate of such Partner, to sell or purchase goods or perform services, including management services, accounting services, brokerage services, and other real-estate related services, for the Partnership, or to make loans to the Partnership; provided, that any contract between the Partnership and the General Partner or any Affiliate of the General Partner must be on terms which are fair and reasonable to the Partnership, determined in accordance with customary rates of local professionals or other providers of comparable services.  The Partnership and any Partners as such shall not have any right in or to any income or profits derived by the General Partner or any such Affiliate from any such contract.

1.11.3    Nothing in this Agreement shall (i) prevent any Affiliates of the General Partner, and their officers, directors and employees, from sponsoring, managing or rendering services of any kind to other pooled investment vehicles and accounts, including pooled investment vehicles and/or accounts with investment objectives, strategies and policies substantially similar or identical to, or overlap with, those of the Partnership, (ii) in any way bind or restrict any Affiliates of the General Partner, and their officers, directors or employees, from originating or acquiring investments for such Affiliates' pooled investment vehicles and/or accounts that qualify as Phase I Target Investments without any obligation to the Partnership and the Limited Partners, or (iii) prevent any Affiliates of the General Partner, and their officers, directors or employees, from receiving fees or other compensation or profits from such

activities described in this <u>Section 1.11.3</u> which shall be for such Affiliates' sole benefit. The Partners acknowledge that (a) the General Partner and its Affiliates may from time-to-time receive fees, compensation and tax and other benefits from borrowers, developers and property owners and/or their Affiliates in connection with the origination or acquisition of Phase I Target Investments, including without limitation origination fees, servicing fees and administrative fees and allocation of depreciation, and while such fees, compensation and tax and other benefits may give rise to conflicts of interest, neither the Partnership nor the Limited Partners will be entitled to or receive the benefit of any such fees and compensation and (b) the terms and conditions of the governing agreements of other pooled investment vehicles and/or accounts sponsored, managed or serviced by Affiliates of the General Partner, and their officers, directors and employees  (including with respect to the economic, reporting, and other rights afforded to the investors) may be materially different from the terms and conditions of this Agreement, and neither the Partnership nor the Limited Partners (in such capacity) shall have the right to receive the benefit of any such different terms applicable to investors in such other pooled investment vehicles and/or accounts as a result of an investment in the Partnership or otherwise.

**2      CAPITAL CONTRIBUTIONS; PARTNERSHIP LOANS**

2.1     <u>Partners' Capital Contributions; Classification of Limited Partners</u>.

2.1.1      The Partners have made the Capital Contributions set forth on **Exhibit A**.  Except as provided in this Agreement, the Partners shall not be obligated to make contributions or advances, or to lend any money to the Partnership.  The General Partner shall not be liable to any Unit Holder for repayment of the Unit Holder's Capital Contribution.

2.1.2      The Limited Partners shall be classified into either Phase I Limited Partners or Phase II/III/III Limited Partners and Exhibit A shall list the names of the Limited Partners according to the class into which they have been classified.

2.2     <u>Additional Funds</u>.  If at any time during the Term, the General Partner determines in its reasonable business judgment that additional funds are required by the Partnership for or in respect of its business or any of its obligations, expenses, costs, liabilities or expenditures (excluding for purposes of making or financing investments in Phase I Target Investments), the General Partner may, but in no event shall be obligated to:

2.2.1      Cause the Partnership to borrow such required additional funds from commercial lenders, or any other Persons; provided, that any such loan shall be without recourse against the Limited Partners and may be without recourse to the General Partner; or

2.2.2      If the required additional funds cannot be borrowed, or if the terms of a loan by the General Partner are at least as favorable to the Partnership as a loan that has been offered by an unaffiliated lender, the General Partner or an affiliate of the General Partner may make loans to the Partnership, payable on such terms as the General Partner shall determine in its reasonable business judgment, including, taking a lien against Partnership property.

2.3     <u>Limited Liability of Limited Partners</u>.  Except as otherwise expressly provided under this Agreement or the Act, the Limited Partners shall be liable only to make their Capital Contributions pursuant to <u>Section 2.1</u>, and shall not be required to lend any other funds to the Partnership or, after such Capital Contributions have been paid, to make any other additional capital contributions to the Partnership.  Except as otherwise provided under this Agreement or

DocuSign Envelope ID: D82C1BA336A2E-47-4E-8556-63CCE7A691E9

by law, no Limited Partner shall be liable for the debts, liabilities, contracts or any other obligations of the Partnership, even though the Limited Partner participates in the management, control and/or operations of the Partnership.  Unless otherwise expressly provided in this Agreement or the Act, the General Partner shall not have any personal liability for the repayment of any Capital Contributions of the Limited Partners.

2.4     <u>No Interest on Capital</u>.  Except as otherwise expressly provided in this Agreement, no General Partner or Unit Holder shall receive any interest, salary, or drawing with respect to its Capital Contributions, its Capital Account, for services rendered on behalf of the Partnership, or otherwise in its capacity as a General Partner or Unit Holder.

2.5     <u>Withdrawal and Return of Capital</u>.  Except as otherwise provided in this Agreement, no General Partner or Unit Holder shall have the right to demand or receive a return of any portion of its Capital Contribution from the Partnership before the end of the Term.  Under circumstances requiring a return of any Capital Contributions, no Partner shall have the right to receive property other than cash, except as may be specifically provided in this Agreement.

2.6     <u>Mandatory Withdrawal and Dissociation of a Limited Partner</u>.  In the event that a Limited Partner's I-526 Petition is not approved by USCIS and all rights of appeal have been exhausted, the Partnership shall be obligated to return or cause the return of the Subscription Amount of such Limited Partner (the "**Withdrawing Investor**") as of the date that the Partnership has adequate funds available for this purpose.  Return of the Subscription Amount shall be without interest or deduction.  Any funds returned to the Withdrawing Investor shall be sent via wire transfer to the account from which the Withdrawing Investor's funds originated.  If more than one Withdrawing Investor is entitled to the return of his or her Subscription Amount, then, in each such case the Partnership shall be obligated to return first the Subscription Amount of the Withdrawing Investor whose appeal rights were exhausted first.  Upon full return or refund of a Withdrawing Investor's Subscription Amount, (i) such Withdrawing Investor shall be deemed to have withdrawn and been dissociated from the Partnership and (ii) the Subscription Agreement between the Partnership and such Withdrawing Investor shall terminate except for the provisions of Section 9 (Confidentiality) and Section 10 (Indemnification).

2.7     <u>Limitation</u>.  Notwithstanding Section 2.6, the Partnership shall not be obligated to refund the Subscription Amount of any Limited Partner who (i) delivers a written request to remain a Limited Partner in the Partnership after becoming a Withdrawing Investor, (ii) withdraws his or her I-526 Petition after filing and prior to adjudication by USCIS or (iii) in the opinion of the General Partner acting reasonably, fails to actively seek USCIS approval of his or her I-526 Petition.  A Limited Partner whose Subscription Amount is not returned under this Section 2.7 shall not be deemed to have withdrawn or been dissociated from the Partnership.

**3       DISTRIBUTIONS**

3.1     <u>Phase I Distributions in General</u>.  From time to time prior to the I-829 Trigger Date, the General Partner shall to the extent any of Phase I Available Cash cause the Partnership to distribute such Phase I Available Cash on a quarterly basis to the General Partner and the Phase I Unit Holders in accordance with <u>Section 3.2</u>.  Following the Phase I I-829 Trigger Date, the General Partner shall to the extent any of Phase I Available Cash cause the Partnership to distribute such Phase I Available Cash on a quarterly basis or at such other time as it determines in its discretion to the General Partner and Phase I Unit Holders in accordance with <u>Section 3.3</u>.

DocuSign Envelope ID: D82C1BA336A2E-47AE-8556-63CCE7A691E9

3.2     <u>Distribution of Phase I Available Cash Prior to the Phase I I-829 Trigger Date</u>. Subject to <u>Section 3.1</u>, Phase I Available Cash shall be distributed to the General Partner and Phase I Unit Holders as follows:

3.2.1     First, to the Phase I Unit Holders pro rata in accordance with their respective Partnership Class Percentage, to the extent of their unpaid Phase I Allocated LP Return accrued as of the last day of the calendar quarter immediately preceding the date of such distribution;

3.2.2     Second, to the General Partner to the extent, if any, of its unpaid Phase I Management Fee accrued as of the last day of the calendar quarter immediately preceding the date of such distribution; and

3.2.3     Then, the balance to the General Partner.

3.3     <u>Distribution of Phase I Available Cash Following the Phase I I-829 Trigger Date</u>.  Subject to <u>Section 3.1</u> and <u>Section 10</u>, Phase I Available Cash shall be distributed as follows:

3.3.1     First, to payment of the portion of Partnership debts and liabilities allocated to Phase I Unit Holders due and payable to creditors other than the General Partner and Unit Holders;

3.3.2     Next, to payment of the portion of Partnership debts and liabilities allocated to Phase I Unit Holders due and payable to the General Partner and Unit Holders excluding the payment of the General Partner's Phase I unpaid Phase I Management Fee;

3.3.3     Next, to fund reasonable reserves of the Partnership allocated to Phase I Unit Holders as determined by the General Partner;

3.3.4     Next, to the Phase I Limited Partners pro rata in accordance with their respective Partnership Class Percentage, to the extent of their unpaid Phase I Allocated LP Return;

3.3.5     Next, to the General Partner, to the extent of its unpaid Phase I Management Fee;

3.3.6     Next, to the Phase I Limited Partners pro rata in accordance with their respective Partnership Class Percentage, to the extent of their Unrecovered Capital Contributions until the Unrecovered Capital Contributions of all Phase I Limited Partners have been reduced to zero;

3.3.7     Next to the General Partner to the extent of its Unrecovered Capital Contributions until its Unrecovered Capital Contributions have been reduced to zero; and

3.3.8     Then, the balance to the General Partner.

3.4     <u>Phase II/III/III Distributions in General</u>.  From time to time prior to the Phase II/III/III I-829 Trigger Date, the General Partner shall to the extent any of Phase II/III/III Available Cash cause the Partnership to distribute such Phase II/III/III Available Cash on a quarterly basis to the General Partner and the Phase II/III/III Unit Holders in accordance with <u>Section 3.5</u>.  Following the Phase II/III/III I-829 Trigger Date, the General Partner shall to the extent any of Phase II/III/III Available Cash cause the Partnership to distribute such Phase II/III/III Available Cash on a quarterly basis or at such other time as it determines in its discretion to the General Partner and Phase II/III/III Unit Holders in accordance with <u>Section 3.6</u>.

LEGAL_US_E # 130074023.7

3.5     <u>Distributions of Phase II/III Available Cash Prior to the Phase II/III Trigger Date</u>.  Subject to <u>Section 3.4</u>, Phase II/III Available Cash shall be distributed to the General Partner and Phase II/III Unit Holders as follows:

3.5.1     First, to the General Partner to the extent, if any, of its unpaid Phase II/III Management Fee accrued as of the last day of the calendar quarter immediately preceding the date of such distribution;

3.5.2     Next, to the Phase II/III Unit Holders pro rata in accordance with their respective Partnership Class Percentage, to the extent of their unpaid Phase II/III Preferred Return accrued as of the last day of the calendar quarter immediately preceding the date of such distribution; and

3.5.3     Then, the balance to the General Partner.

3.6     <u>Distributions of Phase II/III Available Cash.  Following the Phase II/III I-829 Trigger Date</u>.  Subject to <u>Section 3.4</u> and <u>Section 10</u>, Phase II/III Available Cash shall be distributed as follows:

3.6.1     First, to payment of all Partnership debts and liabilities allocated to Phase II/III Unit Holders due and payable to creditors other than the General Partner and Unit Holders;

3.6.2     Next, to payment of all Partnership debts and liabilities allocated to Phase II/III Unit Holders due and payable to the General Partner and Phase II/III Unit Holders including, without limitation, to payment of the General Partner's unpaid Phase II/III Management Fee;

3.6.3     Next, to fund reasonable reserves of the Partnership allocated to Phase II/III Unit Holders as determined by the General Partner;

3.6.4     Next, to the Phase II/III Unit Holders pro rata in accordance with their respective Partnership Class Percentage, to the extent of their unpaid Phase II/III Unit Holders Preferred Return; and

3.6.5     Next, to the Phase II/III Unit Holders Limited Partners pro rata in accordance with their respective Partnership Class Percentage, to the extent of their Unrecovered Capital Contributions until the Unrecovered Capital Contributions of all Limited Partners have been reduced to zero;

3.6.6     Next, to the General Partner to the extent of its Unrecovered Capital Contributions until its Unrecovered Capital Contributions have been reduced to zero;

3.6.7     Then, the balance to the General Partner.

3.7     <u>Amounts Withheld</u>.  Unless treated as a Tax Payment Loan (defined below), any amount paid by the Partnership for or with respect to any General Partner or Unit Holder (or its predecessor-in-interest) on account of any withholding tax or other tax payable with respect to the income, gains, profits, or distributions of the Partnership pursuant to the Code, the Regulations, or any state or local statute, regulation, or ordinance requiring such payment (each and any, a "**Withholding Tax Act**") shall be treated as a distribution to such Person for all purposes of this Agreement, consistent with the character or source of the income, profits, or cash which give rise to the payment or withholding obligation.  To the extent that the amount required to be remitted by the Partnership under the Withholding Tax Act exceeds the amount then otherwise distributable to such Person (or its successor-in-interest), the excess shall constitute a loan from the Partnership to such Person (a "**Tax Payment Loan**"), which shall be payable upon demand and shall bear

interest, from the date that the Partnership makes the payment to the relevant taxing authority, at the Prime Rate plus one percent (1%), compounded monthly. So long as any Tax Payment Loan or the interest thereon remains unpaid, the Partnership shall make future distributions due to such Person (or its successor- in-interest) by applying the amount of any such distribution first to the payment of any unpaid interest and then to the repayment of the principal of all Tax Payment Loans to such Person (or its predecessor-in-interest). The General Partner shall have the authority to take all actions necessary to enable the Partnership to comply with the provisions of any Withholding Tax Act applicable to the Partnership and to carry out the provisions of this Section 3.4. Nothing in this Section 3.4 shall create any obligation on the General Partner to advance funds to the Partnership or to or on behalf of any Limited Partner or Unit Holder or to cause the Partnership to borrow funds from third parties in order to make any payments on account of any liability of the Partnership under a Withholding Tax Act.

3.8     <u>Limitations on Distributions</u>.  The Partnership may not make a distribution to a Partner if, after giving effect to such distribution:

3.8.1     The distribution would be in violation of this Agreement;

3.8.2     The Partnership would not be able to pay its debts as they become due in the ordinary course of the Partnership's activities; or

3.8.3     The Partnership's total assets would be less than the sum of its total liabilities plus the amount that would be needed, if the Partnership were to be dissolved, wound up, and terminated at the time of the distribution, to satisfy the preferential rights of Partners upon dissolution, winding up and termination whose preferential rights are superior to those of Persons receiving the distribution.

3.9     <u>Withdrawal Upon</u>

## 4     ALLOCATIONS

4.1     <u>Intent of Allocations; Cash Savings Provision</u>.  The Partners intend the following allocation provisions to produce final Capital Account balances of the General Partner and Unit Holders that will permit liquidating distributions that are made in accordance with final Capital Account balances to be identical to the distributions required under Section 10.3 and Section 3, which will control the amount of distributions irrespective of the final Capital Account balances.  To the extent that the tax allocation provisions of this Section 4 would fail to produce such final Capital Account balances, then (a) such provisions shall be amended by the General Partner to the extent necessary to produce such result and (b) taxable income and taxable loss of the Partnership for prior open years (or items of gross income and deduction or loss for such years) shall be reallocated as permitted by law by the General Partner among the General Partner and Unit Holders to the extent it is not possible to achieve such result with allocations of items of income (including gross income) deduction and loss for the current and future Allocation Periods.  This Section 4.1 shall control notwithstanding any reallocation or adjustment of taxable income, taxable loss, or items thereof by the Internal Revenue Service or any taxing authority.  The General Partner may amend this Agreement without the consent of the Unit Holders, as it reasonably considers advisable in consultation with the Partnership's professional tax advisers, to make the allocations and adjustments described in this Section 4.1.  To the extent that the allocations and adjustments described in this Section 4.1 result in a reduction in the distributions that the General Partner or any Unit Holder will receive, when compared to the amount of the distributions that Person would receive if all such distributions were made in accordance with

Section 10.3 and Section 3, then the Partnership may make a guaranteed payment (within the meaning of Code Section 707(c)) to that Person (at such time as that Person would otherwise receive the distributions that have been reduced) or take such other action as may be reasonably determined by the General Partner to offset such reduction.

4.2    Definitions.

4.2.1    "Partially Adjusted Capital Account" means, with respect to any General Partner or Unit Holder as of the close of business on the last day of any Allocation Period (an "**Adjustment Date**"), the Capital Account of such Person as of the beginning of the period ending on such Adjustment Date, after giving effect to all allocations of items of income, gain, loss, or deduction not included in Profits and Losses and all Capital Contributions and distributions during such Allocation Period (but before giving effect to any allocations of Profits and Losses for such Allocation Period under Section 4.3), increased by (i) such Person's share of Partnership Minimum Gain, as determined under Regulations Section 1.704-2(d), as of the end of such Allocation Period, and (ii) such Person's share of Partner Nonrecourse Debt Minimum Gain, as determined under Regulations Section 1.704-2(i), as of the end of such Allocation Period.

4.2.2    "Target Capital Account" means, with respect to any General Partner or Unit Holder as of any Adjustment Date, an amount (which may be either a positive or a deficit balance) equal to the amount such Person would receive as a distribution if all assets of the Partnership as of such Adjustment Date were sold for cash equal to the Gross Asset Value of such assets, all Partnership liabilities were satisfied to the extent required by then terms, and the net proceeds were distributed under Section 10.3 as if they were Liquidation Proceeds.

4.3    Allocation of Profits and Losses.  After application of Sections 4.4 and 4.5, Profits and Losses for each Allocation Period shall be allocated among the General Partner and Unit Holders so as to reduce, proportionately, in the case of any Profits, the excess (if any) of their respective Target Capital Accounts over their respective Partially Adjusted Capital Accounts as of the Adjustment Date and, in the case of Losses, the excess (if any) of their respective Partially Adjusted Capital Accounts over their respective Target Capital Accounts as of the Adjustment Date.  No portion of Profits for any Allocation Period shall be allocated to a General Partner or Unit Holder whose Partially Adjusted Capital Account is greater than its Target Capital Account on the Adjustment Date, and no portion of Losses for any Allocation Period shall be allocated to a General Partner or Unit Holder whose Target Capital Account is greater than or equal to its Partially Adjusted Capital Account as of such Adjustment Date.

4.4    Special Allocations.  The following special allocations will be made in the following order and priority before allocations of Profits and Losses:

4.4.1    Partnership Minimum Gain Chargeback.  If there is a net decrease in Partnership Minimum Gain during any Allocation Period, before any other allocation under this Agreement, each General Partner and Unit Holder will be specially allocated items of Partnership income and gain for that Allocation Period (and, if necessary, subsequent Allocation Periods) in proportion to, and to the extent of, an amount equal to such Person's share of the net decrease in Partnership Minimum Gain during such year determined in accordance with Regulations Section 1.704-2(g)(2).  The items to be allocated will be determined in accordance with Regulations Section 1.704-(g).  This Section 4.4.1 is intended to comply with the Partnership Minimum Gain chargeback requirements of the Regulations, will be

interpreted consistently with the Regulations, and will be subject to all exceptions provided therein.

4.4.2    <u>Partner Nonrecourse Debt Minimum Gain Chargeback</u>.  Notwithstanding any other provision of this <u>Section 4.4</u> (other than <u>Section 4.4.1</u>, which shall be applied first), if there is a net decrease in Partner Nonrecourse Debt Minimum Gain with respect to a Partner Nonrecourse Debt during any Allocation Period, any General Partner or Unit Holder with a share of such Partner Nonrecourse Debt Minimum Gain (determined under Regulations Section 1.704-2(i)(5)) as of the beginning of the Allocation Period will be specially allocated items of Partnership income and gain for that Allocation Period (and, if necessary, subsequent Allocation Periods) in an amount equal to such Person's share of the net decrease in the Partner Nonrecourse Debt Minimum Gain during such year determined in accordance with Regulations Section 1.704-2(g)(2).  The items to be so allocated will be determined in accordance with Regulations Section 1.704-2(g).  This <u>Section.4.4.2</u> is intended to comply with the Partner Nonrecourse Debt Minimum Gain chargeback requirements of the Regulations, will be interpreted consistently with the Regulations, and will be subject to all exceptions provided therein.

4.4.3    <u>Qualified Income Offset</u>.  A General Partner or Unit Holder who unexpectedly receives any adjustment, allocation or distribution described in Regulations Sections 1.704-l(b)(2)(ii)(d)(4), (5) or (6) will be specially allocated items of Partnership income and gain in an amount and manner sufficient to eliminate, to the extent required by the Regulations, such Person's Adjusted Capital Account Deficit, if any, as quickly as possible.  This <u>Section 4.4.3</u> is intended to qualify and be construed as a "qualified income offset" within the meaning of Regulation § 1.704-l(6)(2)(ii)(d), will be interpreted consistently with the Regulations, and will be subject to all exceptions provided therein.

4.4.4    <u>Gross Income Allocation</u>.  If any General Partner or Unit Holder has a Capital Account deficit at the end of any Allocation Period, which is in excess of the sum of the amounts such Person is obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.704-2(g)(l) and 1.704-2(i)(5), then such Person shall be specially allocated items of Partnership income and gain in the amount of such excess as quickly as possible, provided, that an allocation under this <u>Section 4.4.4</u> shall be made only if and to the extent that such Person would have a Capital Account deficit in excess of such sum after all other allocations provided for in this Section 4 have been made as if <u>Section 4.4.3</u> and this <u>Section 4.4.4</u> were not in this Agreement.

4.4.5    <u>Nonrecourse Deductions</u>.  Nonrecourse Deductions for any Allocation Period will be allocated, to the extent allowable by law, among the General Partner and Unit Holders pro rata in accordance with their respective Partnership Interests.

4.4.6    <u>Partner Nonrecourse Deductions</u>.  Notwithstanding anything to the contrary in this Agreement, any Partner Nonrecourse Deductions for any Allocation Period will be allocated to the General Partner or Unit Holder who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which the Partner Nonrecourse Deductions are attributable in accordance with Regulations Section 1.704- 2(i).

4.4.7    <u>Code Section 754 Adjustments</u>.  To the extent an adjustment to the adjusted tax basis of any Partnership asset under Code Section 734(b) or 743(b) is required to be taken into account in determining Capital Accounts under Regulations Section 1.704-1 (b)(2)(iv)(m), the amount of the adjustment to the Capital Accounts will be treated as an item of gain (if the adjustment

DocuSign Envelope ID: D82C1BA336A2F-47AE-8556-63CCE7A691E9

increases the basis of the asset) or loss (if the adjustment decreases the basis), and the gain or loss will be specially allocated, to the extent permitted by law, solely to the General Partner, or otherwise, among the General Partner and Unit Holders in a manner consistent with the manner in which their Capital Accounts are required to be adjusted under Regulations Section 1.704-1 (b)(2)(iv)(m).

4.5    <u>Other Special Allocations</u>.  After making the special allocations in <u>Section 4.4</u> for the Allocation Period, and prior to making the allocations of Profits and Losses in <u>Section 4.3</u> for such Allocation Period, the following special allocations shall be made:

4.5.1    If the Partnership has Profits for such Allocation Period (determined prior to giving effect to this <u>Section 4.5.1</u>) and the balance of any General Partner or Unit Holder's Partially Adjusted Capital Account is greater than the balance of its Target Capital Account (after making the allocations required by <u>Section 4.4</u>), then each such Person shall be specially allocated items of Partnership deduction or loss (to the extent available) equal to the difference between its Partially Adjusted Capital Account and its Target Capital Account (or, if there are insufficient items of Partnership deduction or loss to eliminate the aggregate difference for all such Persons, then those items shall be allocated among them in proportion to then shares of the aggregate difference).

4.5.2    If the Partnership has Losses for any Allocation Period (determined prior to giving effect to this <u>Section 4.5.2</u>) and the balance of any General Partner or Unit Holder's Partially Adjusted Capital Account is less than the balance of its Target Capital Account (after making the allocations required by <u>Section 4.4</u>), then each such Person shall be specially allocated items of Partnership income or gain for such Allocation Period (to the extent available) equal to the difference between its Partially Adjusted Capital Account and its Target Capital Account.

4.5.3    If the Partnership has neither Profits nor Losses for any Allocation Period (determined prior to giving effect to this <u>Section 4.5.3</u>) and the balance of any General Partner or Unit Holder's Partially Adjusted Capital Account differs from the balance of its Target Capital Account (after making the allocations required by <u>Section 4.4</u>), then each such Person shall be specially allocated items of Partnership deduction or loss or income or gain, as the case may be, for such Allocation Period (to the extent such items are available) to eliminate the difference between its Partially Adjusted Capital Account and its Target Capital Account; provided, that no General Partner or Unit Holder shall be allocated any Losses or items in the nature of deduction or loss under <u>Section 4.5.2</u> or this <u>Section 4.5.3</u> to the extent that such allocation would cause such Person to have (or increase) an Adjusted Capital Account Deficit; and allocations of Losses that otherwise would be made such a Person shall be made to the General Partner and Unit Holders to the extent not inconsistent with this proviso.

4.6    <u>Tax Allocations:  Code Section 704(c)</u>.  For federal, state, and local income tax purposes, Partnership income, gain, loss, deduction, or expense (or any item thereof) for each Allocation Period shall be allocated to and among the General Partner and Unit Holders to reflect the allocations made pursuant to the provisions of this <u>Section 4.6</u> for such Allocation Period.  In accordance with Code Section 704(c) and the Regulations, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company, solely for tax purposes, will be allocated, to the extent permitted by law, solely to the General Partner, or otherwise, among the General Partner and Unit Holders as required by law to take account of any variation between the adjusted basis to the Partnership of the property for federal and income tax purposes and the initial Gross Asset Value of the property.  If the Gross Asset Value of any Partnership asset is adjusted as provided in the definition of Gross Asset Value, then subsequent allocations of

LEGAL_US_E # 130074023.7

income, gain, loss and deduction with respect to that asset will take account of any variation between the adjusted basis of the asset for federal income tax purposes and its Gross Asset Value in the same manner as required under Code Section 704(c) and the Regulations. Any elections or other decisions relating to allocations under this <u>Section 4.6</u> will be made in any manner that the General Partner determines reasonably reflects the purpose and intention of this Agreement. Allocations under this <u>Section 4.6</u> are solely for purposes of federal, state and local taxes and will not affect, or in any way be taken into account in computing, any General Partner or Unit Holder's Capital Account or share of Profits, Losses or other items or distributions under any provision of this Agreement. The General Partner and the other Unit Holders shall be bound by this <u>Section 4.6</u> in reporting their shares of Partnership income, gain, loss, deduction or expense (or any item thereof) for tax purposes.

## 5    ACCOUNTING AND RECORDS

5.1    <u>Books and Records</u>. The Partnership shall maintain at its principal place of business separate books of account for the Partnership, which shall show a true and accurate record of the invested capital of Limited Partners as segregated and designated towards the funding of the EB-5 Loans, all costs and expenses incurred, all charges made, all credits made and received, and all income derived in connection with the operation of the Partnership's business. The Partnership's books of account shall be maintained on the cash or accrual basis, as determined by the General Partner from time to time, in accordance with GAAP. In addition, the Partnership shall maintain at its principal place of business all "Required Information" as defined by the Act.

5.2    <u>Reports</u>. The General Partner shall be responsible for the preparation of financial reports of the Partnership and the coordination of financial matters of the Partnership with the Partnership's accountants and other professionals. Within one hundred eighty days after the end of each Fiscal Year, the General Partner shall cause each Limited Partner to be furnished with a copy of the balance sheet of the Partnership as of the last day of the Fiscal Year.

5.3    [Reserved]

5.4    <u>Tax Returns</u>. The General Partner, as Tax Matters Partner, shall cause all income and other tax returns of the Partnership to be prepared and filed in a timely manner. The General Partner shall furnish to each General Partner and Unit Holder the necessary tax information (with respect to the Partnership) for the preparation of United States federal income tax returns on an annual basis.

5.5    <u>Tax and Accounting Decisions</u>. The General Partner, as Tax Matters Partner, shall make all tax and accounting decisions and elections, whether for book or tax purposes, and in this regard shall be entitled to rely upon advice of the Partnership's accountants and other professionals.

5.6    <u>Special Basis Adjustment</u>. In connection with any Permitted Transfer, the General Partner may in the exercise of its sole discretion cause the Partnership at the time and in the manner provided in Regulations Section 1.754-l(b), to make an election to adjust the basis of the Partnership's property in the manner provided in Sections 734(b) and 743(b) of the Code, and such Transferee shall pay all costs incurred by the Partnership in connection therewith, including a reasonable sum as attorneys' and accountants' fees.

5.7    <u>Tax Matters Partner</u>. By joining this Agreement, each Limited Partner appoints and designates the General Partner as Tax Matters Partner of the Partnership, as provided in Regulations under Code Section 6231 and as the Partnership Representative under the provisions of the Bipartisan Budget Act of 2015 (P.L. 114-74) and any similar provisions under any other state or local or

non-U.S. laws, and agrees that upon the request of the General Partner it will execute, certify, acknowledge, swear to, file and record at the appropriate public offices such documents as may be necessary or appropriate to evidence such consent.

5.7.1    Any action taken by the General Partner in connection with audits of the Partnership under the Code will, to the extent permitted by law, be binding upon the Unit Holders.  To the extent permitted by law no Unit Holder may treat any Partnership item inconsistently on such Unit Holder's income tax return with the treatment of the item on the Partnership's tax return and may not independently act with respect to tax audits or tax litigation affecting the Partnership, unless previously authorized to do so in writing by the General Partner, which authorization may be withheld in the discretion of the General Partner.

5.7.2    As Tax Matters Partner, the General Partner may cause the Partnership to make all elections required or permitted to be made by the Partnership under the Code (including an election under Section 754 or Section 743(e) of the Code and the safe harbor election provided for by the Proposed Revenue Procedure included in Notice 2005-43, or any similar election provided in a final revenue procedure relating to the compensatory transfer of partnership interests (the latter election, a "**Safe Harbor Election**")) and not otherwise expressly provided for in this Agreement, in the manner that the General Partner determines will be most advantageous to all Partners.  The Partnership and each Unit Holder will comply with all requirements of the Proposed Revenue Procedure included in Notice 2005-43, or any similar final revenue procedure relating to the compensatory transfer of partnership interests, if a Safe Harbor Election is made.  The General Partner may make any required changes to the maintenance of the General Partner's and other Limited Partners' Capital Accounts and the allocations of items of income, gain, deduction and loss as may be required in any final regulations issued in connection with such Revenue Procedure.  The General Partner shall be reimbursed for all reasonable and customary expenses incurred by it on behalf of the Partnership in its capacity of Tax Matters Partner or Partnership Representative.

5.8    <u>Financial Accounts</u>.  The General Partner shall have fiduciary responsibility for the safekeeping and use of all funds and assets of the Partnership, whether or not in its immediate possession or control.  The funds of the Partnership shall not be commingled with the funds of any other Person and the General Partner shall not employ, or permit any other Person to employ, such funds in any manner except for the benefit of the Partnership.  The funds of the Partnership shall be maintained with such financial institutions as are approved by the General Partner.

5.9    <u>Audits</u>.  The General Partner shall have the authority to obtain an audit of the books and records of the Partnership, if the General Partner deems such audit to be necessary or prudent.  The cost of such audit shall be borne by the Partnership.

# 6    MANAGEMENT

6.1    <u>Day-to-Day Management by General Partner</u>.  The General Partner shall conduct the affairs of the Partnership in the best interests of the Partnership.  Subject to the limitations and restrictions set forth in this Agreement, the General Partner shall have the sole and exclusive right and authority to manage and control the business of the Partnership and shall have all of the rights and powers which may be possessed by a general partner under the Act, including the right and authority to make all decisions affecting the operation of the Partnership's business.  In particular, to the fullest extent allowable by law, the General Partner, in its discretion, shall have the full right, power and authority, from time to time and at any time, on behalf of the Partnership to:

LEGAL_US_E # 130074023.7

6.1.1     Originate, purchase, acquire, hold, invest in, reinvest in, modify, sell or otherwise dispose of Phase I Target Investments in accordance with and subject to this Agreement;

6.1.2     Expend the capital and income of the Partnership in furtherance of the business of the Partnership;

6.1.3     Negotiate, enter into on behalf of the Partnership, and supervise the performance of contracts or agreements with lenders, architects, engineers, surveyors, attorneys, accountants, managers, lobbyists, contractors, subcontractors, and other Persons whose services, labor, or materials may be necessary or appropriate in furtherance of the purposes of the Partnership;

6.1.4     Perform any and all acts necessary or appropriate to acquire, expand, improve, maintain, repair, operate, and manage the Partnership's business;

6.1.5     Take and hold real property and personal property of the Partnership in the Partnership name or in the name of a nominee or trustee for the benefit of the Partnership;

6.1.6     Execute and deliver, on behalf of and in the name of the Partnership, or in the name of a nominee of the Partnership, deeds, bills of sales, deeds of trust, mortgages, notes, leases, ground leases, subleases, licenses, rental agreements, occupancy agreements, and/or use agreements of or with respect to all or a portion of the Partnership's assets, and any and all other instruments necessary or incidental to the conduct of the Partnership's business;

6.1.7     Agree to modifications to the terms of the Phase II/III EB-5 Loan, including, without limitation, changes in the interest and payment terms, or changes in the rights to collateral, if the General Partner determines, in the exercise of its discretion, that such modifications are in the best interests of the Partners and do not adversely affect the ability of the Limited Partners to obtain EB-5 visas;

6.1.8     Control and manage the Partnership's assets and arrange for construction, repair, financing, refinancing, collections, disbursements, maintenance, leasing, and other matters necessary or desirable in connection with the operation of the Partnership's business;

6.1.9     Obtain in the name of the Partnership or in the name and on behalf of the Developer any governmental, zoning and utility approvals, consents, permits, or certifications which may be necessary or advisable in connection with the development and construction of the Project and the operation of the Partnership's business;

6.1.10    Employ and/or dismiss from employment, retain, or otherwise secure the services of employees, independent contractors, agents, and other personnel necessary to carry out the purpose of the Partnership, including the hiring of Persons employed by the General Partner or its Affiliates, on such terms and for such compensation as the General Partner may determine in its reasonable judgment, subject to Section 1.11.2;

6.1.11    Delegate all or any of its rights and duties hereunder, and in furtherance of any such delegation, appoint, employ, or contract with any Persons the General Partner may, in its sole discretion, deem necessary or desirable, including Affiliates of the General Partner or any Limited Partner; such Persons may, under the supervision of the General Partner, perform any of the following or other acts or services for the Partnership as the General Partner may approve or permit:  act as managers, consultants, correspondents, brokers, architects, contractors, subcontractors, engineers, escrow agents, or in any other capacity deemed by the

DocuSign Envelope ID: D82C1BA336A2E-47AE-8556-63CCE7A691E9

General Partner necessary or desirable; investigate, select, and conduct relations with Persons acting in such capacities and pay appropriate fees to, and enter into appropriate contracts with, or employ, or retain any of them to render services in connection with the Partnership's business; and perform or assist in the performance of administrative or managerial functions necessary in the management of the Partnership, all subject to Section 1.11.2;

6.1.12 Ask for, collect, and receive any rents, issues, and profits or income from the Partnership's business, and disburse Partnership funds for Partnership purposes to those Persons entitled to receive them;

6.1.13 Purchase contracts of liability, casualty, or other insurance for the protection of the assets and business of the Partnership or the Partners, or for any purpose deemed by the General Partner to be convenient or beneficial to the Partnership;

6.1.14 Pay all taxes, licenses, or assessments of whatever kind or nature imposed upon or against the Partnership, and for such purposes make such returns and do all other such acts or things as may be deemed necessary and advisable by the Partnership;

6.1.15 Establish, maintain, and supervise the deposit of any cash or securities of the Partnership in accounts in the name of the Partnership, and invest them in the discretion of the General Partner;

6.1.16 Institute, prosecute, defend, settle, compromise, and dismiss lawsuits or other judicial or administrative proceedings brought on behalf of, or against, the Partnership or the Partners in connection with activities arising out of, connected with, or incidental to this Agreement and the affairs of the Partnership, and engage counsel or others in connection therewith;

6.1.17 Take any action necessary or appropriate for the continuation of the Partnership's valid existence as a limited partnership under the laws of the State of Florida;

6.1.18 Release, compromise, assign or transfer any claims, rights or benefits of the Partnership;

6.1.19 Pay, extend, renew, confess, modify, adjust, submit to arbitration, prosecute, defend or compromise, upon such terms as they may determine and upon such evidence as the General Partner may deem sufficient, any obligation, suit, liability, cause of action or claim, including taxes, either in favor of or against the Partnership;

6.1.20 Negotiate, execute, deliver, consent to, or approve any contract, document, request or instrument in connection with the Partnership's business;

6.1.21 Borrow money on behalf of the Partnership from banks, insurance companies, or any other lending institutions in accordance with the Partnership's purposes; and, in connection therewith, issue notes, debentures and other debt securities and hypothecate the assets of the Partnership to secure repayment of such funds;

6.1.22 Amend the Agreement or the certificate of limited partnership of the Partnership, including any statement changing the status of the Partnership to a limited liability partnership;

6.1.23 Admit a Limited Partner and/or admit a General Partner; and

6.1.24 Require a Unit Holder to return an improper distribution.

The foregoing provisions of this Section 6.1 shall be construed both as objects and as powers, and the foregoing enumeration of specific powers shall not be held to limit or restrict in any manner the general powers of the General Partner.  To the fullest extent permitted by applicable law, in construing the provisions of this Agreement, the presumption shall be in favor of a grant of power to the General Partner.  Such powers of the General Partner may be exercised without order of or resort to any court.

6.2    <u>Investment Restrictions</u>. Notwithstanding the foregoing provisions of Section 6.1, the General Partner shall adhere to the following restrictions in connection with the exercise of its right and authority to manage and control the Partnership's business:

6.2.1    The Partnership shall not borrow to finance Phase I Target Investments or otherwise employ any form of direct leverage that encumbers Phase I Target Investments.

6.2.2    The Partnership shall invest only in Phase I Target Investments that finance and/or are collateralized by commercial real estate located in the United States.

6.2.3    Following the expiration of the Phase I Investment Period, the Partnership may not make any new Phase I Target Investments.

6.3    <u>Co-Investments</u>. The General Partner may, in its sole discretion, co-invest in Phase I Target Investments (each, a "**Co-Investment**") with other pooled investment vehicles and/or accounts sponsored, managed or serviced by Affiliates of the General Partner (each, a "**Co-Investor**"), including through the establishment of partnerships, limited liability companies or other "pass-through" entities formed to make such Co-Investments in which Co-Investors would have interests and jointly control decisions with respect to the Phase I Target Investments (each, a "**Co-Investment Vehicle**"). The General Partner will cause the terms of any such Co-Investment to provide for the Partnership and the Co-Investor to (i) invest on a pro rata basis based upon the relative capital invested by the Partnership and the Co-Investor into the investment, (ii) participate on a pari passu basis in the returns earned on the Co-Investment and (iii) make decisions jointly with respect to the investment and the management of any Co-Investment Vehicle. The General Partner will also cause the expenses associated with establishing and maintaining any such Co-Investment Vehicle to be borne on a pro rata basis (based upon the relative capital invested by the Partnership and the Co-Investor).

6.4    <u>General Partner's Activities</u>.  The General Partner shall devote so much of its time and effort to the Partnership's business as it deems to be necessary and advisable for the proper management and supervision of the Partnership's business, but the General Partner shall have no obligation to manage the Partnership as its sole and exclusive business.  The General Partner and/or any of its Affiliates may have other businesses and may engage in activities other than those relating to the Partnership, regardless of whether such businesses may be competitive with the business of the Partnership to the fullest extent permitted by the Act.  Nothing in this Agreement shall create in the Partnership or any Limited Partner any right, title or interest in or to such independent ventures of the General Partner and/or any of its Affiliates, or in the income or proceeds derived therefrom, or create any other obligations or liabilities on the part of the General Partner to the Partnership or to the Limited Partners by reason thereof.

6.5    <u>General Partner's Duties</u>.  The General Partner's administrative duties shall include bookkeeping, record keeping, and preparation and filing of tax returns and tax elections, as may be required or advisable from time to time.  In addition, the General Partner shall timely file all other forms, documents or writings with respect to the business and operations of the Partnership that shall be

required by any governmental agency or authority having apparent jurisdiction to require such forms, documents or other writings.  The General Partner may employ attorneys, accountants and other agents to perform all such duties.  To the extent that services are provided to the Partnership directly by the General Partner or its Affiliates, the Partnership shall pay reasonable compensation therefor subject to Section 1.11.2.

6.6     Engagement of Investment Adviser.  Following the repayment of the Phase II/III EB-5 Loan, the General Partner is authorized to retain a registered investment adviser selected by it in its discretion (the "**Adviser**") to manage all or part of the Company's funds; provided that the Adviser has been instructed to invest the Partnership's funds obtained from the repayment of the Phase II/III EB-5 Loan for preservation of capital and other highly liquid investment grade securities. To the fullest extent permitted by applicable law, the General Partner shall not be liable to the Partnership or any Limited Partner or Unit Holder for any mistake, negligence, misconduct or bad faith of any Adviser retained by the General Partner.

6.7     Management and Control of Partnership.  Except as otherwise expressly provided under this Agreement or as specifically provided for under the non-waivable provisions of the Act or any law:

6.7.1     The Limited Partners shall not participate in the conduct, management or control of the Partnership business and shall have no right or authority to act for or bind the Partnership, which powers shall be vested solely and exclusively in the General Partner;

6.7.2     The Limited Partners shall have the right to vote only on the matters expressly reserved for their approval or consent under this Agreement, and Limited Partners shall not have the right to vote on any other matters of any nature; and

6.7.3     In any circumstances requiring the approval or consent of the Limited Partners as specified in this Agreement, such approval or consent shall, except as expressly provided to the contrary in this Agreement, be conveyed in writing to the General Partner not later than ten days after such approval or consent is requested by the General Partner; provided, that the General Partner may require a response within a shorter time, but not less than five days; provided further, that a failure to respond in any such time period shall constitute a vote which is consistent with the General Partner's recommendation with respect to the proposal and; provided further, that if the General Partner receives the actual and/or deemed approval or consent of the Limited Partners to such action, the General Partner shall be authorized and empowered to implement such action without further authorization of the Limited Partners.

6.8     Role of the Limited Partners.  Except as otherwise expressly provided under this Agreement or as specifically provided for under the non-waivable provisions of the Act or any law, no Limited Partner shall participate in or have any control over the Partnership's business or any authority or right to act for or bind the Partnership.

6.9     Compensation to the General Partner and its Affiliates.  The General Partner and any of its Affiliates shall be entitled to receive reasonable compensation for services rendered by or on behalf of the Partnership, subject to Section 1.11.2.  Without limiting the generality of the foregoing, the General Partner shall be entitled to receive the Phase I Management Fee and the Phase II/III Management Fee payable in accordance with Section 3.

6.10     Reimbursement of Expenses.  If the General Partner advances the payment of expenses on behalf of the Partnership, the General Partner shall reimburse itself for such expenses from the funds of

the Partnership. Such expenses shall include, but are not limited to, (a) expenses incurred in connection with the organization of the Partnership, including legal and accounting fees for the preparation of this Agreement and the materials provided to Limited Partners in connection with the purchase of Units, (b) compensation for goods, services and materials used for or by the Partnership, and (c) all other reasonable out-of-pocket expenses that are incurred by the General Partner for or on behalf of the Partnership in connection with the Partnership's business; provided, that Operating Expenses and any other monies payable under this <u>Section 6.9</u>, and amounts, if any, required to create reasonable reserves, with respect to a Limited Partner, shall be paid first from income of the Partnership allocable to such Limited Partner's Capital Account and, to the extent such income is insufficient to pay the full amount due, thereafter from such Limited Partner's Capital Account, but only to the extent of the excess, if any, of such Limited Partner's Capital Contributions over the Subscription Amount of such Limited Partner. Any amount that may not be timely payable as a result of this <u>Section 6.9</u> shall be treated and subject to the same terms and conditions as a loan made by the General Partner under <u>Section 2.2</u>.

6.11  <u>Right to Rely on Authority of General Partner</u>. No Person dealing with the General Partner shall be required to determine its authority to make any undertaking on behalf of the Partnership, or to determine any fact or circumstance bearing upon the existence of its authority. Every contract, agreement, lease, promissory note, deed, mortgage and other instrument or document executed by the General Partner on behalf of the Partnership shall be conclusive evidence in favor of any and every Person relying on it that:

6.11.1  At the time of the execution or delivery, the Partnership was in good standing;

6.11.2  Such instrument or document was duly executed in accordance with this Agreement and is binding upon the Partnership and all of the respective Partners (provided, that no liability of the Limited Partners may be created thereby); and

6.11.3  The General Partner was duly authorized and empowered to execute and deliver every such instrument or document for and on behalf of the Partnership.

**7      REPRESENTATIONS AND WARRANTIES**

7.1  <u>Representations and Warranties of the General Partner</u>. As of the date of this Agreement, the General Partner represents and warrants to each of the Limited Partners that the General Partner is a duly organized and validly existing limited liability company in good standing under the laws of the State of Florida, with full power and authority to enter into and perform its obligations under this Agreement; and that this Agreement constitutes the legal, valid, and binding obligation of the General Partner.

7.2  <u>Representations and Warranties of the Limited Partners</u>. As of the date of this Agreement, each Limited Partner hereby represents and warrants to each of the other Partners that:

7.2.1  The Limited Partner has the authority to execute and deliver this Agreement and perform its obligations under this Agreement, and this Agreement constitutes the legal, valid, and binding obligation of such Limited Partner;

7.2.2  Such Limited Partner has acquired or is acquiring each Unit for such Limited Partner's own account for investment only and not for the purpose of, or with a view to, the resale or distribution of all any part thereof, nor with a view to selling or otherwise distributing such Unit or any part thereof at any particular time or under any pre-determined circumstances;

DocuSign Envelope ID: D82C1BA336A25-47AE-8556-63CCE7A691E9

7.2.3 Such Limited Partner is a sophisticated investor, able and accustomed to evaluating and accessing financial matters, and that such Limited Partner has a sufficient net worth so that such Limited Partner does not anticipate a need for the funds to be invested, such Limited Partner understands investment in Units to be a speculative and illiquid investment;

7.2.4 Such Limited Partner is a bona-fide resident of the jurisdiction referenced in his or her signature page to this Agreement; and

7.2.5 Such Limited Partner has been given access to all information regarding the Partnership that such Limited Partner considers necessary or relevant to his or her investment decision.

## 8 TRANSFER RESTRICTIONS

8.1 <u>Restrictions on Transfers by Unit Holders</u>.  Until such time as a Unit Holder's I-829 Petition has been adjudicated and then except in accordance with this <u>Section 8</u> and with the prior written consent of the General Partner (a "**Permitted Transfer**", and such permitted transferee, a "**Permitted Transferee**"), no Unit Holder may Transfer all or any portion of any Unit held by such Unit Holder.  Any Transfer or attempted Transfer by any Unit Holder in violation of the preceding sentence shall be null and void and of no force or effect whatsoever.

8.1.1 The securities represented by Units have not been registered under the Securities Act of 1933, as amended, and may not be Transferred in the absence of an effective registration statement under the Securities Act of 1933, as amended, or an opinion of counsel satisfactory to the General Partner that such registration is not required.  Without limiting the generality of the foregoing, hedging transactions involving such securities may not be conducted unless in compliance with such requirements.

8.1.2 In addition to all other remedies available at law or in equity for a breach of this Agreement, each Partner acknowledges the reasonableness of the restrictions on Transfer imposed by this Agreement in view of the Partnership's purposes and the relationship of the Partners.  Accordingly, the restrictions on Transfer contained herein shall be specifically enforceable.

8.1.3 Each Unit Holder hereby further agrees to indemnify, defend, and hold the Partnership and each Partner (and each Partner's successors and assigns) wholly and completely harmless from and against any cost, liability, or damage (including attorneys' fees and costs) incurred by any of such indemnified Persons as a result of a Transfer or an attempted Transfer in violation of this Agreement and efforts to enforce the indemnity granted hereby.

8.2 <u>Permitted Transfers</u>.

8.2.1 A Permitted Transferee shall become a Limited Partner on the first day of the calendar month following his or her acceptance into the Partnership by the General Partner in accordance with <u>Section 8.1</u>.  Each Limited Partner hereby consents to the admission of Permitted Transferees as Limited Partners pursuant to the terms and conditions of this Agreement.

8.2.2 The rights of a Transferee who is not admitted as a Limited Partner shall be limited to those of an assignee of the Transferred Units under the Act.  The Transferee shall not be a Partner and shall not have the right to inspect the Partnership's books, act for or bind the Partnership, or otherwise interfere in its operations.  Any allocations and distributions to which the Transferee is entitled by law shall be subject to offset (without limiting any other legal or equitable rights

of the Partnership) to satisfy any debts, obligations, or liabilities for damages that the Transferor or Transferee may have to the Partnership.

8.3     <u>General Partner's Interest</u>.  Upon a Transfer of the General Partner's entire Partnership Interest, the General Partner shall be deemed to have dissociated from the Partnership and the Transferee shall become successor general partner hereunder.  Such Transfer shall be effective only after giving at least thirty (30) days' prior written notice to the Limited Partners, or as otherwise provided under the Act.  The rights of a Transferee of less than the General Partner's entire Partnership Interest shall be limited to those of an assignee under the Act.

8.4     <u>Transferor/Transferee Allocations and Distributions</u>.  If a Transfer occurs during any Allocation Period, then Profits, Losses, each item thereof, and all other items attributable to the Transferred Interest for such Allocation Period shall be divided and allocated between the Transferor and the Transferee by taking into account their varying Partnership Interests during the period in accordance with Code Section 706(d), using any conventions permitted by law and selected by the General Partner.  Solely for purposes of making such allocations and distributions, the Partnership shall recognize a Permitted Transfer, and amend its records accordingly, not later than the end of the calendar month in which the General Partner accepts such Transfer in accordance with <u>Section 8.1</u>.

# 9     LIMITATION OF LIABILITY; INDEMNIFICATION

9.1     <u>Limitation of Liability; Indemnification</u>.

9.1.1     To the extent permitted by law, none of the General Partner, nor any of its direct and indirect officers, directors, agents, stockholders, members, managers, employees or partners, or any other Person who serves at the request of the General Partner on behalf of the Partnership as an officer, director, member, manger, partner, employee or agent of any other entity, (each, an "**Indemnified Party**") shall be liable to the Partnership or to any Unit Holder for (i) any act or omission taken or suffered by any Indemnified Party in connection with the conduct of the affairs of the Partnership or otherwise in connection with this Agreement or the matters contemplated herein, unless it is determined in each case by any court or governmental body of competent jurisdiction in a final judgment or admitted by such Indemnified Party in a settlement of any lawsuit (other than in the context of a temporary, preliminary or similar injunction) that such act or omission resulted from fraud, bad, faith, willful misconduct, gross negligence, a material violation of applicable U.S. federal securities laws or a willful and material breach of this Agreement, which breach shall not have been cured within thirty days after such breach, in each case, on the part of such Indemnified Party, and except that nothing herein shall constitute a waiver or limitation of any rights which a Limited Partner or the Partnership may have under applicable securities laws or other laws and which may not be waived, (ii) any mistake, negligence, dishonesty or bad faith of any broker, advisor or other agent of the Partnership selected by the General Partner with reasonable care, or (iii) any act or omission taken or suffered in good faith by an Indemnified Party pursuant to a contract or transaction under <u>Section 1.11.2</u>.  This <u>Section 9.1.1</u> shall not affect the General Partner's obligation to correct any distributions under <u>Section 3</u>, or allocations under <u>Section 4</u>, if such distributions or allocations were not made in accordance with this Agreement.

9.1.2     The General Partner shall not be liable to the Partnership or to any Unit Holder for breach of fiduciary duty for its good faith reliance on the provisions of this Agreement.  The provisions of this Agreement, to the extent that they expand, restrict or eliminate the duties and liabilities

of the General Partner otherwise existing at law or in equity, or otherwise, are agreed by the Partners to modify to those duties and liabilities of the General Partner to that extent.

9.1.3    The General Partner may consult with legal counsel and accountants selected by the General Partner and any act or omission suffered or taken by the General Partner on behalf of the Partnership or in furtherance of the interests of the Partnership in good faith and in reasonable reliance upon and in accordance with the advice of such legal counsel or accountants shall be fully justified, and the General Partner shall be fully protected in so acting or omitting to act, provided, that such legal counsel or accountants were selected with reasonable care.

9.1.4    To the fullest extent permitted by law, the Partnership shall indemnify, defend, and hold harmless each of the Indemnified Parties from and against all claims, liabilities, damages, losses, costs and expenses (including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and reasonable expenses of investigating or defending against any claim or alleged claim) of any nature whatsoever, known or unknown, liquated or unliquidated, that are incurred by any Indemnified Party and/or to which such Indemnified Party may be subject by reason of its activities on behalf of the Partnership or in furtherance of the interest of the Partnership or otherwise arising out of or in connection with the affairs of the Partnership, including the performance by such Indemnified Party of any of the General Partner's duties or responsibilities under this Agreement, or otherwise in connection with the matters contemplated by this Agreement; provided, that:  (i) an Indemnified Party shall be entitled to indemnification under this Section 9.1.4 only to the extent that such Indemnified Party's conduct did not constitute (as determined in each case by any court or government body or competent jurisdiction or admitted by such Indemnified Party in a settlement of any lawsuit (other than in the context of a temporary, preliminary or similar injunction)) fraud, bad faith, willful misconduct, gross negligence, a material violation of applicable U.S. federal securities laws or a willful and material breach of this Agreement, which breach shall not have been cured within thirty days after such breach; (ii) nothing in this Agreement shall constitute a waiver or limitation of any rights which a Unit Holder or the Partnership may have under applicable securities laws or other laws and which may not be waived; and (iii) the Partnership's obligations under this Section 9.1.4 shall not apply with respect to (A) economic losses or tax obligations incurred by any Indemnified Party as a result of such Indemnified Party's ownership of a Partnership Interest or (B) expenses of the Partnership that an Indemnified Party has agreed to bear.  Except to the extent that a General Partner or Unit Holder is obligated to return any amounts distributed to it (or its predecessor-in-interest) in order to fund any deficiency in the Partnership's indemnity obligations as provided in Section 9.2, the satisfaction of any obligation of indemnity or defense under this Section 9.1.4 shall be from and limited to Partnership assets, no such Person shall have any obligation to make Capital Contributions to fund its share of any indemnification obligations under this Section 9.1.4, and no such Person shall have any personal liability on account thereof.

9.1.5    Expenses reasonably incurred by an Indemnified Party in defense or settlement of any claim that may be subject to a right of indemnification, whether granted under this Agreement or otherwise, shall be advanced by the Partnership prior to the final disposition thereof upon receipt of an undertaking by or on behalf of the Indemnified Party to repay such amount to the extent that it shall be determined ultimately that such Indemnified Party is not entitled to be indemnified.  No advances shall be made by the Partnership under this Section 9.1.5 without prior written approval of the General Partner.

DocuSign Envelope ID: D82C1BA336A2E-47AE-8556-63CCE7A691E9

9.1.6    The right of any Indemnified Party to the indemnification provided in this Section 9.1 or elsewhere in this Agreement shall be cumulative of, and in addition to, any and all rights to which such Indemnified Party may otherwise be entitled by contract or as a matter of law or equity and shall extend to such Indemnified Party's successors, assigns and legal representatives.

9.1.7    Any Indemnified Party shall be deemed to be a creditor of the Partnership and shall be entitled to enforce the obligations of Unit Holders to return distributions pursuant to Section 9.2 and the Act following the termination of the Partnership.

9.1.8    Each General Partner and each Unit Holder shall indemnify, defend, and hold harmless each other Partner against any taxes (including withholding taxes) imposed upon the income of or distributions to such General Partner or Unit Holder, as well as interest, penalties or additions to tax with respect thereto and additional losses, claims, damages or liabilities arising therefrom or incidental thereto. Each General Partner and Unit Holder hereby further agrees to reimburse the Partnership on demand for the amount of any properly distributed to such Person (or its predecessor-in-interest) in excess of the amounts distributable to such Person under Section 10.3 and Section 3.

9.1.9    The General Partner may, in its sole discretion cause the Partnership to purchase, at the Partnership's expense, insurance to insure the General Partner or any other Indemnified Party against liability for any breach or alleged breach of their responsibilities under this Agreement or otherwise in connection with the Partnership or the General Partner.

9.1.10   The provisions of this Section 9.1 shall survive for a period of four years from the date of dissolution of the Partnership, provided, that, if at the end of such period, there are any proceedings then pending or any other liability (whether contingent or otherwise) or claim then outstanding, the General Partner shall so notify the Unit Holders at such time, and the provisions of this Section 9.1 shall thereafter survive in accordance with the notice provisions set forth in Section 9.2.1.

9.1.11   The foregoing provisions of this Section 9.1 shall continue to afford protection to each Indemnified Party regardless of whether such Indemnified Party remains in the position or capacity pursuant to which such Indemnified Party became entitled to indemnification under this Section 9.1 and regardless of any subsequent amendment to this Agreement, and no amendment to this Agreement shall reduce or restrict the extent to which these indemnification provisions apply to actions taken or omissions made prior to the date of such amendment.

9.2      Return of Distributions.

9.2.1    Notwithstanding anything else contained in this Agreement, if any indemnity obligation or other liability arises under Section 9.1 or otherwise and the amount of reserves, if any, specifically identified by the General Partner with respect to such obligations or liability is less than the amount of such obligation or liability (a "**Section 9.2 Liability**"), the General Partner may require the General Partner and Unit Holders to make a contribution to the Partnership, at any time or from time to time, whether before or after dissolution and termination of the Partnership or before or after such Person's withdrawal from the Partnership, of all or any portion of the amount of the distributions previously made by the Partnership to such Person (or its predecessor-in- interest); provided, that no such Person shall at any time be required to contribute under this Section 9.2 any amount that was distributed to

such Person (or its predecessor-in- interest) more than two (2) years prior to such time (except that if, at the end of such period, there are any proceedings then pending, or any other liability (whether contingent or otherwise) or claim then outstanding, the General Partner shall so notify the Unit Holders at such time (which notice shall include a brief description of each such proceedings (and of the liabilities asserted in such proceeding) or of such liabilities and claims) and the obligation of the General Partner and the Unit Holders to contribute under this Section 9.2 shall survive with respect to each such proceeding, liability, or claim set forth in such notice (or any related proceeding, liability, or claim based upon the same or a similar claim) until the date that such proceeding, liability, or claim is ultimately resolved and satisfied).

9.2.2       In the case of any required contribution to fund a Section 9.2 Liability, each General Partner and Unit Holder will make a contribution to the Partnership in such amounts as shall result in each General Partner and Unit Holder retaining cumulative distributions from the Partnership (net of any prior returns of distributions under this Section 9.2) equal to the cumulative amount that would have been distributed to such Person (or its predecessor-in-interest) had the amount of distributions previously made been reduced by the amount of such Section 9.2 Liability, as equitably determined by the General Partner (but taking into account the actual timing of the relevant prior distributions and such contributions for purposes of recalculating the Phase I Allocated LP Return or Phase II/III Preferred Return, as applicable).

9.2.3       Upon any determination (at any time and from time to time) by the General Partner that a Section 9.2 Liability will be or has been incurred for which a Capital Contribution will be required pursuant to this Section 9.2, the General Partner will promptly provide written notification thereof to each Unit Holder.  Such notification shall include a reasonable description of such Section 9.2 Liability, the amount of the required contribution by each Person, and the date by which contribution or payment must be made.  Prior to the contribution deadline, each such Person will deliver to the General Partner (or the Person or Persons specified by the General Partner) the amount of the required contribution.  If a Person makes a contribution pursuant to this Section 9.2 with respect to a distribution previously received by that Person (or its predecessor-in- interest), the distribution will be treated as if it had not been made for purposes of thereafter applying Section 3 (other than for purposes of computing the Phase I Allocated LP Return or Phase II/III Preferred Return, if applicable, which shall be computed based on actual contributions made and distributions received).

## 10       DISSOLUTION AND WINDING UP

10.1       Liquidating Events.  The Partnership shall dissolve and commence winding up and liquidation upon the first to occur of the following events (each a "**Liquidating Event**"):

10.1.1       The realization, sale or other disposition of all or substantially all of the Partnership's Phase I Target Investments following the expiration of the Phase I Investment Period or if later, the realization, sale or other disposition of the Phase II/III EB-5 Loan;

10.1.2       The decision of the General Partner, with the consent of the Limited Partners, both occurring after the adjudication of all Limited Partner I-829 Petitions, to dissolve, wind up and liquidate the Partnership;

10.1.3       The happening of any other event that makes it unlawful, impossible, or impractical to carry on the business of the Partnership;

10.1.4    The termination by legal action of the Partnership's authority to transact business; provided, that the automatic suspension of such authority by operation of law or action of the Department of State shall not cause a dissolution under this subsection until such time, if any, as reinstatement of such authority would be barred by the Act; or

10.1.5    The happening of any event that causes dissolution of a Florida limited partnership under the Act.

10.2    <u>Limitation</u>.  Notwithstanding the provisions of <u>Section 10.1</u>:

10.2.1    If the Liquidating Event is the dissociation of a general partner, then the Partnership shall not be dissolved if (A) at the time of such event, there is at least one remaining general partner, or (B) there is no other general partner, but, within 90 days after such event, the Limited Partners agree in writing to continue the Partnership and to the appointment of a substitute general partner.  If the Limited Partners agree to continue the Partnership, then a substitute General Partner shall be elected by the Limited Partners and such Person shall take all necessary action to continue the Partnership.  Such election shall be accomplished in the following manner: (i) promptly after the agreement to continue, any one or more of the Limited Partners may nominate a Person for the election as the substitute General Partner; (ii) such nominee shall not become the General Partner unless elected by Limited Partners holding a majority of the Units; and (iii) if that nominee is not elected, then as soon as practicable any one or more of the Limited Partners may nominate another substitute General Partner, and such procedure shall continue until a substitute General Partner is elected.  If a substitute General Partner is nominated and elected timely, then it shall succeed to all of the powers, privileges and obligations the former General Partner held in the Partnership except for the Partnership Interest of the former General Partner.  If a Person ceases to be a General Partner under the terms of this Agreement or the Act, such Person's Partnership Interest shall be converted to that of an assignee, but shall be entitled to the same share of distributions and allocations to which it was entitled prior to the conversion.

10.2.2    If the Liquidating Event is the dissociation of the last remaining Limited Partner, then the Partnership shall not be dissolved if the General Partner admits at least one Limited Partner to the Partnership within 90 days after such event.  For the avoidance of doubt, the General Partner may admit at least one additional Limited Partner to the Partnership at any time prior to the dissociation of what, but for the admission of such additional Limited Partner, would have been the last remaining Limited Partner.

10.3    <u>Winding Up</u>.  Upon the occurrence of a Liquidating Event, the Partnership shall continue solely for the purposes of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors and Partners.  No Partner shall take any action that is inconsistent with, or not necessary to or appropriate for, winding up the Partnership's business and affairs.  The General Partner shall be responsible for overseeing the winding up and liquidation of the Partnership and shall take full account of the Partnership's liabilities and assets, the Partnership's assets shall be liquidated as promptly as is consistent with obtaining the fair market value thereof, and the Liquidation Proceeds shall be applied and distributed to the extent Unrecovered Capital Contributions have not been previously distributed), as applicable, in the order of priority set forth in <u>Section 3.3</u> and <u>Section 3.6</u>.

10.4    <u>Alternate Form of Liquidating Distributions</u>.  In the discretion of the General Partner, a pro rata portion of the distributions that would otherwise be made to the General Partner and Unit Holders pursuant to <u>Section 10.3</u> may be:

DocuSign Envelope ID: D82C1BA336A2E-47CE-8556-63CCE7A691E9

10.4.1   Distributed to a trust established for the benefit of the General Partner and Unit Holders solely for the purposes of liquidating Partnership assets, collecting amounts owed to the Partnership, and paying any contingent or unforeseen liabilities or obligations of the Partnership or of the General Partner arising out of or in connection with the Partnership; and the assets of any such trust shall be distributed to the General Partner and Unit Holders from time to time, in the reasonable discretion of the General Partner, in the same proportions as the amount distributed to such trust by the Partnership would otherwise have been distributed to them pursuant to Section 10.3; or

10.4.2   Withheld to provide a reasonable reserve for Partnership liabilities (contingent or otherwise) and to allow for the collection of the unrealized portion of any installment obligations owed to the Partnership, provided, that such withheld amount shall be distributed to the General Partner and Unit Holders as soon as practicable.

10.5   <u>Deemed Distribution and Liquidation</u>.  If the Partnership is liquidated within the meaning of Regulations Section 1.704-1 (b)(2)(ii)(g), but no Liquidating Event has occurred, the Partnership shall not be liquidated, the Partnership's liabilities shall not be paid or discharged, and the Partnership's affairs shall not be wound up.  Instead, solely for federal income tax purposes, the Partnership shall be deemed to have contributed all Partnership property and liabilities to a new limited partnership in exchange for an interest in such new limited partnership and, immediately thereafter, the Partnership will be deemed to liquidate by distributing interests in the new limited partnership to the Partners.

10.6   <u>Rights of Partners; No Obligation to Restore Deficit Capital Account Balance</u>.  Except as otherwise provided in this Agreement, each General Partner and Unit Holder shall look solely to the assets of the Partnership for the return of its Capital Contributions and shall have no right or power to demand or receive property other than cash from the Partnership.  Except as otherwise provided in this Agreement, no General Partner or Unit Holder shall have priority over any other General Partner or Unit Holder as to the return of its Capital Contributions, distributions, or allocations.  If a General Partner or Unit Holder has a deficit balance in its Capital Account (after giving effect to all contributions, distributions and allocations for all taxable years, including the taxable year during which such liquidation occurs), then such General Partner or Unit Holder shall have no obligation to make any contribution to the capital of the Partnership with respect to such deficit, and such deficit shall not be considered a debt owed to the Partnership or to any other Person for any purpose whatsoever.

## 11   ARBITRATION.

11.1.1   <u>Mandatory Arbitration</u>.  Any and all disputes or controversies, whether of law or fact and of any nature whatsoever arising from or respecting this Agreement, shall, with the consent of the General Partner (which must be given, if at all, in writing and within ten days of the date such matter matures), be decided by binding arbitration in the State of Florida in accordance with the Commercial Arbitration Rules of the American Arbitration Association (the "**<u>Association</u>**").  If the parties are unable to agree upon a single arbitrator, the arbitrator shall be a single, independent arbitrator selected by the Association.  The Partners also agree that the Association Optional Rules for Emergency Measures of Protection shall apply to the proceedings.

11.1.2   <u>Location; Decision; Fees</u>.  Arbitration shall take place in Palm Beach County, Florida or any other location mutually agreeable to the parties.  The decision of the arbitrator shall be final and binding upon all parties hereto and all persons claiming under and through them, and a judgment thereon may be entered in the highest court of the forum, state or federal, having jurisdiction.

DocuSign Envelope ID: D82C1BA336A2F-47FE-8556-63CCE7A691E9

The expenses of the arbitration shall be borne equally by the parties thereto provided that each party shall pay for and bear the cost of its own experts, gathering of evidence and counsel's fees, except that in the discretion of the arbitrator, any award may include the cost of the party's counsel fees if the arbitrator expressly determines that the party against whom such award is entered has caused the dispute, controversy or claim to be submitted to arbitration as a dilatory tactic or that such matter is frivolous.

11.1.3   <u>Additional Procedures</u>.  Notwithstanding anything to the contrary which may now or hereafter be contained in the rules of the Association, the procedures set out in this <u>Section 11.1.3</u> shall apply.

11.1.4   A notice (the "**Notice**") of arbitration shall set out a clear and plain statement of the matter that the party sending the notice (the "**Instituting Party**") believes to be a breach or is in dispute. The receiving party (the "**Other Party**") shall, within thirty (30) days of receipt of the Notice, provide to the Instituting Party and to the arbitrator a response (the "**Answer**"), referencing provisions of this Agreement that the Other Party views as controlling, and shall attach copies of all pertinent documents and other things (other than those attached to the Notice) then in its possession which it views as having direct bearing to support the contentions of the Answer.

11.1.4.1   All necessary and appropriate discovery shall be allowed by the arbitrator subject, however, to such limitations as the arbitrator determines to be appropriate under the circumstances to have a prompt and efficient arbitration.

11.1.4.2   The arbitrator shall endeavor to promptly schedule the hearings, and to hold the hearings (on consecutive days if practicable), and shall have authority to award relief under legal or equitable principles, including interim or preliminary relief.

11.1.4.3   The arbitrator shall, upon the request of either party, promptly (and in all events within thirty (30) days of the conclusion of the hearing) issue a proposed written opinion of their findings of fact and conclusions of law which shall become final and binding in accordance with the terms thereof unless either or both parties seek reconsideration in accordance with subparagraph <u>11.1.4.4</u> below.

11.1.4.4   Either party shall have the right, within twenty (20) days of receipt of the arbitrator's proposed opinion, to file with the arbitrator a motion to reconsider (accompanied by a reasoned memorandum), and the other party shall have twenty (20) days to respond to that memorandum.  After receipt of such memorandum and response, if any, the arbitrator thereupon shall reconsider the issues raised by said motion and, promptly, either confirm or change their majority decision which shall then be final and conclusive upon both parties.

**12   MISCELLANEOUS**

12.1   <u>Waiver of Partition</u>.  No Partner shall, either directly or indirectly, take any action to require partition or appraisement of the Partnership or of any of its assets or properties or compel the sale of any Partnership property, and notwithstanding any provisions of applicable law to the contrary, each Partner (and its legal representatives, successors, or assigns) hereby irrevocably waives any and all rights to maintain any action for partition or to compel any sale with respect to its Partnership Interest, or with respect to any assets or properties of the Partnership, unless otherwise expressly provided in this Agreement.

LEGAL_US_E # 130074023.7

12.2   <u>Dissociation of Limited Partner</u>.  A Limited Partner may not withdraw or dissociate from the Partnership prior to the dissolution and winding up of the Partnership in accordance with <u>Section 10 unless approved by the General Partner in its sole discretion</u>; provided, however, that upon  reduction of a Limited Partner's Unrecovered Capital Contribution to zero in accordance with <u>Section 3.3.5 or 3.6.5, as applicable,</u> or otherwise, such Limited Partner shall be deemed to have dissociated from the Partnership under §620.1601(2)(b) of the Act.

12.3   <u>Notices</u>.  Any notice, payment, demand, or communication required or permitted to be given by any provision of this Agreement shall be in writing and shall be deemed to have been delivered, given, and received for all purposes (a) if delivered personally to the Person to whom it is directed, (b) if sent electronically by email (including through the use of USIF's portal), (c) if sent by confirmed facsimile transmission  or (d) if sent by registered or certified mail, postage and charges prepaid, addressed as follows:  if to the Partnership, at the address set forth in <u>Section 1.4</u>, or to such other address as the General Partner may from time to time specify by notice to the Limited Partners; and if to a Limited Partner, to the address  and email address set forth in the Partnership's books and records or such other address as the Limited Partner shall supply for such purpose to the General Partner by a notice meeting the requirements of this <u>Section 11.3</u>.

12.4   <u>Amendment</u>.  Subject to the following remaining provisions of this Section 12.4, this Agreement may be amended in writing by the General Partner with the consent of the Limited Partners. Amendments to this Agreement that would adversely affect the rights, preferences and privileges of the Phase I Limited Partners as a class require only the consent of the Phase I Limited Partners. Amendments to this Agreement that would adversely affect the rights, preferences and privileges of the Phase II Limited Partners as a class require only the consent of the Phase II Limited Partners. This Agreement may also be amended in writing by the General Partner without prior notice to or consent from any Limited Partner (provided, that the General Partner shall notify the Limited Partners of the full details of any such amendment within 20 Business Day of the effective date of such amendment):

12.4.1   for the purpose of adding to the Agreement (or amending existing provisions) any provisions which, in the written opinion of counsel to the Partnership, are for the protection of the Limited Partners, and

12.4.2   to cure any ambiguity or to correct or supplement any provisions which, in the written opinion of counsel to the Partnership, are defective or inconsistent with any other provision of the Agreement, provided that, in the written opinion of such counsel, the cure, correction or supplemental provision does not and will not adversely affect the interests of any Limited Partner.  Notwithstanding any provision of this Agreement, no amendment to this Agreement shall be effective without the prior written approval of the General Partner and, in the event that the proposed amendment will, or is likely to, cause a Limited Partner to suffer an adverse economic effect, the written consent of such Limited Partner;

12.4.3   Unless otherwise stated in this Agreement or provided by law, the approval or consent of the Limited Partners or the Unit Holders shall mean the approval or consent of the holders of a majority of the Units held by all Limited Partners or Unit Holders, as the case may be.  Unless otherwise stated in the Agreement or provided by law, the approval or consent of any class Limited Partners (i.e. the Phase I Limited Partners or the Phase II/III Limited Partners) or any class of Unit Holders (i.e. the Phase I Unit Holders or the Phase II/III Unit Holders) shall mean the approval or consent of the holders of a majority of the Units held by all Limited

DocuSign Envelope ID: D82C1BA336A2E-47CE-8556-63CCE7A691E9

Partners or Unit Holders, as the case may be, within such class of Limited Partners or Unit Holders.

12.4.4 Upon obtaining such consent or approval required by this Agreement and without any further action or execution by any other Person, including any Partner, (i) any amendment, restatement, modification or waiver of this Agreement may be implemented and reflected in a writing executed solely by the General Partner and (ii) the Partners, and any other party to this Agreement, shall be deemed a party to and bound by such amendment, restatement, modification or waiver of this Agreement.

12.5 Binding Effect. Except as otherwise provided in this Agreement, and subject to the restrictions on Transfer of Units, every covenant, term, and provision of this Agreement shall be binding upon and inure to the benefit of the Partners and their respective heirs, legatees, legal representatives, successors, transferees, and assigns. Subject to the terms and conditions of this Agreement, any Person succeeding to a General Partner's or Unit Holder's Partnership Interest shall also succeed to all of such General Partner's or Unit Holder's rights and obligations.

12.6 Time. Time is of the essence with respect to this Agreement.

12.7 Severability. To the extent that any provision of this Agreement may be deemed or determined to be invalid or unenforceable for any reason, such invalidity or unenforceability will not impair or affect any other provision, and that provision to the extent possible and this Agreement will be interpreted so as to most fully give effect to its terms and still be valid and enforceable.

12.8 Incorporation by Reference. Every exhibit, schedule, and other appendix attached to this Agreement and referred to herein is hereby incorporated in this Agreement by reference.

12.9 Further Assurances. Each Partner agrees to perform all further acts and execute, acknowledge, and deliver any additional instruments and documents which may be reasonably necessary, appropriate, or desirable to carry out the provisions of this Agreement.

12.10 Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and, all of which when taken together, shall be deemed to constitute one and the same instrument. Counterparts delivered by facsimile shall in all cases be deemed originals. It shall not be necessary in making proof of this Agreement to produce more than one counterpart.

12.11 Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Florida and the federal laws of the United States applicable therein (excluding any conflict of laws rule or principle that might refer such construction to the laws of another jurisdiction).

12.12 No Third-Party Rights. Except for Section 9, the provisions of this Agreement are for the exclusive benefit of the Partnership and the Partners and no other party (including without limitation, any creditor of the Partnership or any Partner, and, except to the extent required by non-waivable provisions of the Act, any Unit Holder who has not been admitted as a Partner) shall have any right or claim against the Partnership or any Partner by reason of those provisions or be entitled to enforce any of those provision against the Partnership or any Partner.

12.13 Integration. This Agreement and any other documents executed by the Partners and/or their Affiliates contemporaneously with the execution of this Agreement is the entire agreement

LEGAL_US_E # 130074023.7

between the parties with respect to the subject hereof and supersede any prior agreement or understanding between the Partners.  Except as otherwise provided in this Agreement, no alteration, modification, amendment, restatement or interpretation hereof shall be binding unless in writing and signed by the Partners.

12.14   <u>Remedies</u>.  Each Partner acknowledges and agrees that the remedy at law for any breach of any of the terms of this Agreement would be inadequate, and agrees and consents that temporary and permanent injunctive and other equitable relief may be granted in any proceeding which may be brought to enforce any provision of this Agreement, including within such other equitable relief, specific performance, without the necessity of proof of actual damage or inadequacy of any legal remedy.  Any right or remedy provided for in this Agreement shall be cumulative of any other right, power, or remedy provided for by law or in equity.

12.15   <u>No Waiver</u>.  One or more waivers of a breach of any provision of this Agreement by any Person shall not be construed as a waiver of a subsequent breach of the same or any other provisions, nor shall any delay or omission by a Partner to seek a remedy for any breach of this Agreement or to exercise the rights accruing to such Partner by reason of a breach by another Person be deemed a waiver by the Partner of its remedies and rights with respect to such breach.

12.16   <u>Additional Partners</u>.  Each Limited Partner and any additional or successor Limited Partner shall become a signatory hereof by signing a counterpart of this Agreement and such other instrument or instruments and in such manner as the General Partner may determine.  By so signing, each Limited Partner shall be deemed to have adopted and to have agreed to be bound by all of the provisions of this Agreement.

12.17   <u>Power of Attorney</u>.  Each Partner, other than the General Partner, hereby makes, constitutes and appoints the General Partner its true and lawful attorney for it and in its name, place and stead and for its use and benefit, to sign, execute, certify, acknowledge, file and record any instruments necessary or appropriate for the Partnership or Partners in any jurisdiction.  The foregoing grant of authority shall be irrevocable and shall constitute a power coupled with an interest, except that each Partner may revoke this power by an instrument in writing executed and delivered to the General Partner after (a) the dissolution and winding-up of the Partnership, or (b) following the Permitted Transfer of such Partner's entire Partnership Interest and admission of the Transferee as a Partner.

12.18   <u>Jurisdiction and Venue</u>.  The parties acknowledge that a substantial portion of negotiations, anticipated performance and execution of this Agreement occurred or shall occur in Palm Beach County, Florida, and that, therefore, each of the parties irrevocably and unconditionally (a) agrees that any suit, action or legal proceeding arising out of or relating to this Agreement shall be brought in the federal or state courts seated in Palm Beach County, Florida; (b) consents to the jurisdiction of such court in any such suit, action or proceeding; and (c) waives any objection which it may have to the laying of venue of any such suit, action or proceeding in such court.

12.19   <u>Enforcement Costs</u>.  If any legal action or other proceeding is brought for the enforcement of this Agreement, or because of an alleged dispute, breach, default or misrepresentation in connection with any provisions of this Agreement, each party shall pay its own fees of attorneys, paralegals, and legal assistants, court costs and all expenses even if not taxable as court costs (including, without limitation, all such fees, costs and expenses incident to appeals), together with any sales tax thereon, incurred in that action or proceeding.

LEGAL_US_E # 130074023.7

12.20   Confidentiality.  Each Limited Partner will maintain the confidentiality of information which is, to the knowledge of such Limited Partner, non-public information furnished by the General Partner regarding the General Partner and the Partnership received by such Limited Partner pursuant to this Agreement in accordance with such procedures as it applies generally to information of this kind (including procedures relating to information sharing with Affiliates), except (1) to the extent that such information is or becomes generally available to the public other than as a result of disclosure of a Partner, (2) to the extent such information was made or becomes available to a Partner on a non-confidential basis from a source which is not known to the Partner to be subject to any confidentiality obligation with respect to such information, (3) as otherwise required by governmental regulatory agencies, self-regulating bodies, law, legal process (including oral examination), or litigation in which such Limited Partner is a defendant, plaintiff or other named party and (4) as such Limited Partner furnishes to its Affiliates or advisors; provided that such Limited Partner shall be liable to the Partnership and the General Partner for any such Affiliate's or advisor's failure to comply with the terms of this Section 11.20.

12.21   Additional Documents and Acts.  In connection with this Agreement, each Limited Partner agrees to execute and deliver such additional documents and instruments, and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions and conditions of this Agreement, and all such transactions.

[*Signature Pages to Follow*]

DocuSign Envelope ID: D82C1BA336A2E-474E-8556-63CCE7A691E9

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first-mentioned above

**GENERAL PARTNER:**

**U.S. IMMIGRATION FUND GP - MIZNER, LLC**


By _____
Name:   Nicholas A. Mastroianni
Title:    Authorized Signatory

DocuSign Envelope ID: D82C1BA336A2E-47CE-8556-63CCE7A694E9

**Limited Partner Signature Page**

**(To be attached to and made part of the Amended and Restated Limited Partnership Agreement of Via Mizner Funding, LP)**

The undersigned hereby acknowledges that the undersigned has received a copy of the Amended and Restated Limited Partnership Agreement of VIA MIZNER FUNDING, LP (the "**Partnership**") dated as of October 16, 2017 (the "**Agreement**").

The undersigned hereby execute(s) the Agreement as a Limited Partner by adoption of this Signature Page and consents to be bound by all of the terms and conditions of the Agreement as a Limited Partner having the number of Units subscribed for by the undersigned as set forth below upon acceptance of the Subscription Agreement of the undersigned by the General Partner of the Partnership as provided therein. By executing this document, the undersigned hereby confirms those representations set forth in the Agreement and the Subscription Agreement.

**LIMITED PARTNER:**

_____
[Signature]

_____
[Print or Type Name]

_____
[Street Address]

_____
[City, Mailing Code, Country]

_____
[Telephone No.]

_____
[Facsimile No.]

_____
[Private E-mail Address]

UNITS PURCHASED:  1

SUBSCRIPTION AMOUNT:  US$500,000

Date:  _____

**ACCEPTED:**

U.S. IMMIGRATION FUND GP - MIZNER, LLC

By _____
Name:
Title:  Authorized Representative

Date:  _____

-32-

## SCHEDULE OF EXHIBITS

EXHIBIT A    -    Schedule of Partners and Partnership Interests

EXHIBIT B    -    Definitions and Interpretation

EXHIBIT C    -    Certificate of Limited Partnership

75

## EXHIBIT A

## SCHEDULE OF PARTNERS AND PARTNERSHIP INTERESTS

### (to be updated by the General Partner upon admission of each new Limited Partner)

| Name | Units | Capital Contribution |
|------|-------|----------------------|
| **GENERAL PARTNER:** | | |
| U.S. IMMIGRATION FUND GP – MIZNER, LLC | N/A | Upon Formation $100 |
| **LIMITED PARTNERS:** | | |
| See attached schedule of Limited Partners for respective Partnership Interests, Class of Limited Partner and Capital Contributions. | 278 | Per Unit Subscription Amount $500,000 |
| | | $139,000,000 |
| TOTAL (Less General Partner and Initial Limited Partner Contributions): | | $139,000,000 |

DocuSign Envelope ID: D82C1BA336A2E-47AE-8556-63CCE7A691E9

**EXHIBIT B**

**DEFINITIONS AND INTERPRETATION**

1. **Definitions**.  For the purposes of this Agreement (including the Recitals hereto), the following terms shall have the respective meanings set out below and grammatical variations of such terms shall have corresponding meanings:

"**Accountants**" means such firm of certified public accountants as the General Partner shall retain on behalf of the Partnership.

"**Act**" means the Florida Revised Uniform Limited Partnership Act.

"**Adjusted Capital Account**" means, with respect to any General Partner or other Unit Holder, such Person's Capital Account as of the end of any Fiscal Year, after giving effect to the following adjustments:  (i) Credit to the Capital Account the sum of (1) any amount that the Person is obligated to restore to its Capital Account under the provisions of this Agreement, plus (2) any amount the Person is deemed to be obligated to restore to its Capital Account under Sections 1.704-l(b)(2)(ii)(c) of the Regulations, and the penultimate sentence of Sections 1.704-2(g)(l) and 1.704-2(i)(5) of the Regulations; and (ii) Debit to the Capital Account the items described in Sections 1.704-l(b)(2)(ii)(d)(4), (5), and (6) of the Regulations.

"**Adjusted Capital Account Deficit**" means, with respect to any General Partner or other Unit Holder, the deficit balance, if any, in that Person's Adjusted Capital Account.

"**Affiliate**" means, with respect to any Person, (a) any Person directly or indirectly controlling, controlled by or under common control with such Person, (b) any Person owning or controlling ten percent or more of the outstanding voting interests of such Person, (c) any officer, director, member (if such Person is a member-managed entity), manager (if such Person is a manager-managed entity), or general partner of such Person, (d) any Person who is an officer, director, member (if such Person is a member-managed entity), manager (if such Person is a manager-managed entity), general partner, trustee, or holder of ten percent or more of the voting interests of any Person described in clauses (a) through (c) of this sentence; or (e) any Person who is related by marriage to, or is an ancestor or descendant of, such Person.  The terms "controls", "controlled by" and "under common control with" mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of an entity or individual, whether through the ownership of voting securities, by contract, or otherwise.

"**Agreement**" means this Amended and Restated Limited Partnership Agreement, as amended from time to time.

"**Allocation Period**" means any period for which Profits and Losses and other items of Partnership income, gain, loss or deduction are required to be allocated among the Partners for federal income tax purposes.

"**Business Day**" means a day other than a Saturday, a Sunday or a statutory holiday in the State of Florida.

"**Capital Account**" means, with respect to any General Partner or other Unit Holder, the Capital Account maintained for such Person in accordance with the following provisions:

LEGAL_US_E # 130074023.7

DocuSign Envelope ID: D82C1BA336A2E-47AE-8556-63CCE7A691E9

1.1.1.   Each such Person's Capital Account shall be credited with such Person's Capital Contributions (as and when such Capital Contributions are made), such Person's distributive share of Profits and any items in the nature of income or gain that are specially allocated to such Person under Section 4, and the amount of any Partnership liabilities assumed by such Person or which are secured by any property distributed to such Person;

1.1.2.   Each such Person's Capital Account shall be debited with the amount of cash and the Gross Asset Value of any property distributed to such Person under any provision of this Agreement, such Person's distributive share of Losses and any items in the nature of expenses or losses that are specially allocated to such Person under Section 4, and the amount of any liabilities of such Person assumed by the Partnership or which are secured by any property contributed by such Person to the Partnership;

1.1.3.   If any Partnership Interest is transferred in accordance with this Agreement, then the Transferee shall succeed to (i) the Capital Account applicable to the Transferor to the extent it relates to the Transferred Interest; (ii) if the Transferred Interest includes a General Partner's Partnership Interest, all other accounts maintained with respect that Partnership Interest; and (iii) if the Partnership Interest includes any Units, all other accounts maintained with respect those Units;

1.1.4.   In determining the amount of any liability for purposes of Sections 1.9.1 and 1.9.2, there shall be taken into account Code Section 752(c) and the applicable Regulations; and

1.1.5.   The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Regulations. If the General Partner shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including debits or credits relating to liabilities that are secured by contributed or distributed property or that are assumed by the Partnership or the General Partner or any of the Unit Holders), are computed in order to comply with such Regulations, the General Partner may make such modification, provided, that it is not likely to have a material effect on the amount distributable to any General Partner or other Unit Holder under Section 10 upon the dissolution of the Partnership. The General Partner also shall (i) make any adjustments that are necessary or appropriate to maintain equality between the Capital Accounts of the Partners and the amount of Partnership capital reflected on the Partnership's balance sheet, as computed for book purposes, in accordance with Regulations Section 1.704-1(b)(2)(iv)(g), and (ii) make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Regulations Section 1.704-1(b).

"**Capital Contribution**" means, in respect of each Partner at any time, the amount of money and the agreed fair market value of any property other than money contributed by a Partner to the Partnership pursuant to Section 2.1.

"**Class Percentage**" means for a particular class of Limited Partner, the percentage obtained by dividing the number of Units held by the Limited Partners within such class by the number of Units held by all Limited Partners.

"**Code**" means the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of succeeding law).

LEGAL_US_E # 130074023.7

"**EB-5 Loans**" means the Phase I EB-5 Loan and the Phase II/III EB-5 Loan.

"**Debt Service**" means, for any Allocation Period, the total amount of all required payments of interest and principal (excluding interest that is advanced and paid from loan proceeds and balloon principal payments required to be made at maturity) that are payable by the Partnership during such period under any loan secured by the Partnership's assets, or any other loan to the Partnership, whether secured or unsecured.

"**Depreciation**" means, for each Allocation Period, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such period, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such period, then Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such period bears to such beginning adjusted tax basis; provided, that if the federal income tax depreciation, amortization, or other cost recovery deduction for such period is zero, then Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the General Partner.

"**Florida Regional Center**" means the area in Palm Beach County, Florida, for which Florida Regional Center, LLC has obtained designation from USCIS as a "Regional Center," pursuant to Section 610 of the U.S. Appropriations Act and the Immigration Act. The Florida Regional Center includes the Property within its boundaries.

"**GAAP**" means accounting principles generally accepted in the United States applicable to commercial real estate consistently applied, as recommended in the handbook of the governing professional organization.

"**General Partner**" means U.S. Immigration Fund GP - Mizner, LLC and any successor general partner of the Partnership.

"**Gross Asset Value**" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

1.1.6.  The initial Gross Asset Value of any asset contributed by a Partner to the Partnership shall be the agreed gross fair market value of such asset, as determined by the General Partner and the contributing Partner;

1.1.7.  The Gross Asset Values of all Partnership assets shall be adjusted to equal their respective gross fair market values, as determined by the General Partner, as of the following times: (i) the acquisition of an additional Partnership Interest in the Partnership by any new or existing Partner in exchange for more than a de minimis Capital Contribution; (ii) the distribution by the Partnership to a Partner of more than a de minimis amount of Partnership property in consideration for a Partnership Interest; and (iii) the liquidation of the Partnership within the meaning of Regulations Section 1.704-1 (b)(2)(ii)(g); provided, that adjustments pursuant to clauses (i) and (ii) above shall be made only if the General Partner reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Partners in the Partnership;

1.1.8.  The Gross Asset Value of any Partnership asset distributed to any Partner shall be the gross fair market value of such asset on the date of distribution as determined by the

distributee Partner and the General Partner, provided, that if the distributee is the General Partner, the determination of the fair market value of the distributed asset shall require the consent of the Limited Partners;

1.1.9.  The Gross Asset Value of the Partnership assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts under Regulations Section 1.704-l(b)(2)(iv)(m) and Section 5.5; provided, that Gross Asset Values shall not be adjusted pursuant to this paragraph (d) to the extent the General Partner determines that an adjustment under Section 1.21.2 above is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this Section 1.21.4; and

1.1.10. If the Gross Asset Value has been determined or adjusted pursuant this Agreement, such Gross Asset Value shall thereafter be reduced by any Depreciation taken into account with respect to such asset in computing Profits and Losses.

"**I-829 Petition**" means a Limited Partner's I-829 Petition by Entrepreneur to Remove Conditions.

"**Immigration Act**" means 8 U.S.C. §1101, *et seq.*, together with regulations published at 8 C.F.R. § 1.1, *et seq.*, as the same may be amended from time to time.

"**Limited Partner**" means each Unit Holder admitted to the Partnership as a Limited Partner in accordance with this Agreement.

"**Liquidation Proceeds**" means all of the cash and other property held by the Partnership at the time of the happening of an event causing dissolution of the Partnership, and all cash and property received by the Partnership thereafter.

"**Net Operating Income**" means, for any Allocation Period, the amount by which Operating Revenues exceed Operating Expenses for such Allocation Period.

"**Nonrecourse Deductions**" has the meaning set forth in Regulations Section 1.704- 2(b)(1).  The amount of Nonrecourse Deductions for an Allocation Period equals the excess, if any, of the net increase, if any, in the amount of Partnership Minimum Gain during that Allocation Period over the aggregate amount of any distributions during that Allocation Period of proceeds of a Nonrecourse Liability that are allocable to an increase in Partnership Minimum Gain, determined according to the provisions of Regulations Section 1.704-2(c).

"**Nonrecourse Liability**" has the meaning set forth in Regulations Section 1.704-2(b)(3).

"**Partners**" means the General Partner and each of the Limited Partners, where no distinction is required by the context in which the term is used; and "Partner" means any one of the Partners.

"**Partnership**" means the limited partnership formed under the name "Via Mizner Funding, LP" and registered as a limited partnership pursuant to the Act.

"**Partner Nonrecourse Debt**" has the meaning set forth in Regulations Section 1.704- 2(b)(4).

"**Partner Nonrecourse Debt Minimum Gain**" means an amount, with respect to each Partner Nonrecourse Debt, equal to the Partnership Minimum Gain that would result if such Partner Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Regulations Section 1.704-2(i)(3).

"**Partner Nonrecourse Deductions**" has the meaning set forth in Regulations Section 1.704-2(i)(2).  The amount of Partner Nonrecourse Deductions with respect to a Partner Nonrecourse Debt for an Allocation Period equals the excess, if any, of the net increase, if any, in the amount of Partner Nonrecourse Debt Minimum Gain attributable to such Partner Nonrecourse Debt during that Allocation Period over the aggregate amount of any distributions during that Allocation Period to the Partner that bears the economic risk of loss for such Partner Nonrecourse Debt and are allocable to an increase in Partner Nonrecourse Debt Minimum Gain attributable to such Partner Nonrecourse Debt, determined in accordance with Regulations Section 1.704-2(i)(2).

"**Partnership Interest**" means the interest of a Partner in the Partnership and its rights in the capital, profits, losses, gains, distributions or other economic interests of any type in or from the Partnership including such Partner's right:  (a) to allocations of items of income, gain, loss, deduction, and credit of the Partnership; (b) to distributions of Available Cash, and Liquidation Proceeds; (c) to inspect the books and records of the Partnership; and (d) if a General Partner, to manage the Partnership, all as provided in this Agreement and, to the extent not inconsistent with this Agreement or the Act.

"**Partnership Class Percentage**" means with respect to any Limited Partner within a class of Limited Partners, the percentage obtained by dividing the number of Units held by such Limited Partner by the total number of Units held by all Limited Partner within such class.

"**Partnership Minimum Gain**" has the meaning set forth in Regulations Sections 1.704- 2(d)(1).

"**Partnership Nonrecourse Debt**" has the meaning set forth in Regulations Section 1.704-2(b)(3).

"**Person**" shall be broadly construed and means, without limitation, any individual, partnership, limited partnership, corporation, limited liability company, unincorporated organization or association, trust (including the trustees thereof, in their capacity as such), government (or agency or political subdivision thereof) or other legal or business entity or enterprise.

"**Phase I Allocated LP Return**" means a percentage return equal to two percent (2%) per annum payable from the current return actually earned and received from current interest and/or preferred or other current distributions on the Partnership's Phase I Target Investments.

"**Phase I Available Cash**" means all Phase I Operating Revenues and investment, realization or disposition proceeds of the Partnership from Phase I Target Investments, less Phase I Operating Expenses.

"**Phase I EB-5 Loan**" means that certain mortgage loan to the Developer in the principal amount of $59,000,000 for the first phase of construction of the Project.

"**Phase I I-829 Trigger Date**" means the date upon which the General Partner receives notice of the final adjudication of the I-829 Petitions of all Phase I Limited Partners.

"**Phase I Investment Period**" means the period beginning on the date hereof and ending on the later of fourth anniversary of the date hereof, subject to two one year extensions in the discretion or the General Partner, or the Phase I I-829 Trigger Date.

DocuSign Envelope ID: D82C1BA326A2F-47FE-8556-63CCE7A694E9

"**Phase I Limited Partners**" means the class of Limited Partners whose invested capital was segregated and designated towards the funding of the Phase I EB-5 Loan.

"**Phase I Management Fee**" means a management fee for services rendered by the General Partner to the Partnership in respect of the Phase I Target Investments equal to the percentage return earned from current interest and/or preferred or other current distributions on the Partnership's Phase I Target Investments minus the Phase I Allocated LP Return.

"**Phase I Operating Expenses**" means, with respect to the Partnership and for any Allocation Period, the current obligations of the Partnership allocable to Phase I Limited Partners based their Class Percentage for such Allocation Period, determined in accordance with GAAP, for general and administrative expenses incurred in respect of administering of the Partnership generally, including, without limitation, auditing and tax preparation fees and expenses, ongoing legal and audit expenses, governmental fees and taxes, the legal and accounting costs incurred in connection with an audit of the Company's tax return, and associated legal fees, insurance premiums and costs of litigation relating to the Partnership generally, plus the specific expenses incurred with respect to the originating ongoing management, disposition or other realization of Phase I Target Investments.

"**Phase I Operating Revenues**" means, with respect to the Partnership and any for Allocation Period, cash revenues of the Partnership, including without limitation, current interest and/or preferred or other current distributions and realization or disposition proceeds generated by the Partnership's Phase I Target Investments, received during such Allocation Period, including accruals, reserves and other deductions in respect thereof, as the General Partner shall determine in its sole and absolute discretion.

"**Phase I Target Investments**" means commercial real estate real estate mortgage loans, including whole loans and A note and B note participations ("**Mortgage Loans**"), commercial real estate mezzanine loans, including commercial real estate mezzanine loan participations ("**Mezzanine Loans**"); commercial real estate preferred or other equity interest reflecting an interest in a property owning entity or in its direct or indirect controlling equity owner with a stated current preferred or other return and a specified repayment date requiring repayment of the amount invested ("**Preferred Equity Interests**") and commercial real estate joint venture equity interest in the property owning entity or in its direct or indirect controlling equity owner subordinate to more senior capital in the underlying property's capital structure ("**Joint Venture Interests**").

"**Phase I Unit Holder**" means a Person who owns one or more Units and is admitted to the Partnership as a Phase I Limited Partner.

"**Phase II/III Available Cash**" means all Phase II/III Operating Revenues and investment, realization or disposition proceeds of the Partnership from the Phase II/III EB-5 Loan, less Phase II/III Operating Expenses.

"**Phase II/III I-829 Trigger Date**" means the date upon which the General Partner receives notice of the final adjudication of the I-829 Petitions of all Phase II/III Limited Partners.

"**Phase II/III EB-5 Loan**" means that certain mortgage loan to the Developer in the principal amount of $80,000,000 for the second and third phases of construction of the Project.

"**Phase II/III Limited Partners**" means the class of Limited Partners whose invested capital was segregated and designated towards the funding of the Phase I EB-5 Loan.

LEGAL_US_E # 130074023.7

DocuSign Envelope ID: D82C1BA336A2E-47CE-8556-63CCE7A691E9

"**Phase II/III Management Fee**" means a management fee for services rendered by the General Partner to the Partnership in respect of the Phase I EB-5 Loan equal to the percentage return earned from current interest on the Partnership's Phase II/III EB-5 Loan minus the Phase II/III Preferred Return.

"**Phase I Operating Expenses**" means, with respect to the Partnership and for any Allocation Period, the current obligations of the Partnership allocable to Phase II/III Limited Partners based their Class Percentage for such Allocation Period, determined in accordance with GAAP, for general and administrative expenses incurred in respect of administering of the Partnership generally, including, without limitation, auditing and tax preparation fees and expenses, ongoing legal and audit expenses, governmental fees and taxes, the legal and accounting costs incurred in connection with an audit of the Company's tax return, and associated legal fees, insurance premiums and costs of litigation relating to the Partnership generally, plus the specific expenses incurred with respect to the originating ongoing management, disposition or other realization of Phase II/III EB-5 Loan.

"**Phase II/III Operating Revenues**" means, with respect to the Partnership and any for Allocation Period, cash revenues of the Partnership, including without limitation, current interest and/or preferred or other current distributions and realization or disposition proceeds generated by the Partnership's Phase II/III EB-5 Loan, received during such Allocation Period,  including accruals, reserves and other deductions in respect thereof, as the General Partner shall determine in its sole and absolute discretion.

"**Phase II/III Preferred Return**" means, with respect to each Phase II/III Limited Partner, a sum equal to one-half of one percent of the average daily balance of such Phase II/III Limited Partner's Unrecovered Capital Contribution during the period to which the Phase II/III Preferred Return relates, cumulative but not compounded, determined on the basis of a 365/366 day year, as the case may be, for the actual number of days in the period for which the Phase II/III Preferred Return is being determined.

"**Phase II/III Unit Holder**" means a Person who owns one or more Units and is admitted to the Partnership as a Phase II/III Limited Partner.

 "**Pilot Program**" means the EB-5 immigrant investment program established pursuant to the Immigration Act.

"**Prime Rate**" means the prime rate announced as such from time to time by Citibank, N.A., or its successor.  Any interest payable under this Agreement with reference to the Prime Rate shall be adjusted on a daily basis, based upon the Prime Rate in effect from time to time, and shall be calculated on the basis of 365/366 day year, as the case may be, for the actual number of days in the period.

"**Profits**" and "**Losses**" means, for each Allocation Period, an amount equal to the Partnership's taxable income or loss for such period, determined in accordance with Code Section 703(a)(for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

1.1.11.  Any income of the Partnership that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses shall be added to such taxable income or loss;

1.1.12.  Any expenditures of the Partnership described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-l(b)(2)(iv)(7), and not otherwise taken into account in computing Profits or Losses pursuant to this definition, shall be subtracted from such taxable income or loss;

1.1.13. If the Gross Asset Value of any Partnership asset is adjusted in accordance with paragraph (b) or (c) of the definition of Gross Asset Value, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

1.1.14. Gain or loss resulting from any disposition of any Partnership asset with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of such asset, notwithstanding that the adjusted tax basis of such asset differs from its Gross Asset Value;

1.1.15. In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, Depreciation for such Allocation Period shall be computed in accordance with the definition of Depreciation;

1.1.16. To the extent an adjustment to the adjusted tax basis of any Partnership asset that was made under Internal Revenue Code Section 734(b) or Internal Revenue Code Section 743(b) is required, under Regulations Section 1.704-l(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts, as a result of a distribution other than in complete liquidation of the Partnership Interest of a General Partner or other Unit Holder, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from a disposition of the asset and shall be taken into account for purposes of computing Profits and Losses; and

1.1.17. Notwithstanding any other provision of this definition of Profits and Losses, any items which are specially allocated pursuant to <u>Section 4</u> shall not be taken into account in computing Profits or Losses.

"**Project**" means the development, construction and operation on the Property of the mixed use real estate development known as Via Mizner.

"**Property**" means approximately 6.8 acres of real property located on the northeast corner of the intersection of South Federal Highway and East Camino Real in Boca Raton, Florida.

"**Regulations**" means the United States income tax regulations, including Treasury Regulations and Temporary Regulations, promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

"**Subscription Agreement**" means a subscription agreement between the Partnership and a Limited Partner pursuant to which the Limited Partner subscribes for Units in a form acceptable to the General Partner.

"**Subscription Amount**" means the minimum amount of money necessary for a Limited Partner at the time he or she is admitted to the Partnership to meet the investment requirement of the Pilot Program, currently US$500,000.

"**Targeted Employment Area**" means the high unemployment area within the Florida Regional Center, as designated pursuant to the Immigration Act.

"**Tax Matters Partner**" means the General Partner, as provided in Regulations under Code Section 6231.

DocuSign Envelope ID: D82C1BA336A2F-47AE-8556-63CCE7A691E9

"**Transfer**" means, as a noun, any voluntary or involuntary transfer, sale, pledge, hypothecation, or other disposition, that conveys any portion of a Partnership Interest to any Person other than the present owner, including a disposition by will or intestacy, a distribution from a trust, the filing of a petition, whether voluntary or involuntary, in bankruptcy or any other proceeding for relief from debt, a disposition effected by property settlement agreement or decree of divorce, and the imposition of a charging order on the Partnership Interest; and means, as a verb, to make a Transfer, either voluntarily or involuntarily.

"**Transferee**" means a Person who obtains an economic interest in a Partnership Interest, or who obtains the rights and powers of a Unit Holder, from a Transferor, including the estate of a deceased Unit Holder, the successor-in-interest to a Unit Holder that has dissolved, liquidated or terminated, the estate of a bankrupt Unit Holder and a distributee from a trust.

"**Transferor**" means a Person who makes a Transfer.

"**Unit**" means a unit of Partnership Interest in the Partnership held by a Limited Partner (other than the Initial Limited Partner) or a Unit Holder and issued by the Partnership upon admission of a Limited Partner to the Partnership following receipt from such Limited Partner of the Subscription Amount.

"**Unit Holder**" means a Person who owns one or more Units, whether or not such Person has been admitted to the Partnership as a Partner.

"**Unrecovered Capital Contribution**" means an amount equal to the excess, if any, of the Capital Contribution made by a Unit Holder (or that Unit Holder's predecessor in interest) or the General Partner over, in the case of a Unit Holder, the aggregate amount of distributions under Section 3.3.6 or Section 3.6.6, as applicable, received by that Unit Holder (or that Unit Holder's predecessor in interest), or in the case of a General Partner, the aggregate amount of distributions under Section 3.3.7 or Section 3.6.7, as applicable, determined as of the date required under this Agreement.

"**USCIS**" means United States Citizenship and Immigration Services, an agency of the Department of Homeland Security of the United States of America.

2. **Interpretation Not Affected by Headings, etc**. The division of this Agreement into Sections and the insertion of headings are for reference purposes only and shall not affect the interpretation of this Agreement. Unless otherwise indicated, any reference in this Agreement to a Section refers to the specified Section of this Agreement.

3. **Construction**. Every covenant, term, and provision of this Agreement shall be construed simply according to its fair meaning and not strictly for or against any such Partner. This Agreement shall be interpreted without regard to any presumption or rule requiring construction against the party causing this Agreement to be drafted. Further, words such as "herein," "hereinafter," "hereof," "hereto," and "hereunder" refer to this Agreement as a whole, unless the context otherwise requires; and the term "including", when following any statement, will not be construed to limit such statement to the specific items or matters as provided immediately following the term "including" (whether or not non-limiting language such as "without limitation" or "but not limited to" or words of similar import are also used), but rather will be deemed to refer to all items or matters that could reasonably fall within the broader scope of the statement.

4. **Number and Gender**. In this Agreement, words importing the singular number include the plural and vice versa and words importing any gender include all genders and the neutral gender.

LEGAL_US_E # 130074023.7

DocuSign Envelope ID: D82C1BA336A2E-474E-8556-63CCE7A694E9

5. **Date for Any Action**.  If any date on which any action is required to be taken under this Agreement is not a Business Day, that action shall be required to be taken on the next immediately following Business Day.

6. **Accounting Terms**.  In this Agreement, accounting terms that are not defined herein shall be construed in accordance with GAAP.

7. **Currency**.  In this Agreement, all dollar amounts are expressed in United States dollars.

LEGAL_US_E # 130074023.7

DocuSign Envelope ID: D8261BA3-6A2E-474E-8556-63CCE7A694F9

**VIA MIZNER FUNDING, LP**

**转交：佛罗里达州区域中心有限责任公司**

**佛罗里达州朱庇特滨海大道 115 号＃300 单位，邮编：33477**

**2017 年 10 月 16 日**

亲爱的第一期有限合伙人：

我们来信旨在向您提供有关 Via Mizner 项目的最新信息，并在您等待 I-829 申请批准时，为您提供大幅增加投资本金收益的机会。第一期 EB-5 贷款由开发商在[日期]偿还，第二/三期 EB-5 贷款将在[日期]偿还。Via Mizner Funding，LP 保留了该等资金，符合公司经营协议（和 USCIS 准则）的规定，在有限合伙人收到 I-829 申请裁决之前，禁止本公司分配公司偿还第一期 EB-5 贷款所得款项。

内附为要求您授权管理成员重新投资您投资本金的"有限合伙人同意函"，以及描述有关新投资机会重要信息的同意征求声明。我们鼓励您仔细阅读"有限合伙人同意函"和"同意征求声明"，并在 2017 年 10 月 31 日之前告知我们您的最终决定。

如果您选择"我同意"，您的投资本金将获得每年 2%的优先回报，您的投资本金将在偿还最终新目标投资后偿还（取决于您的 I-829 申请裁决）。这相当于您当前项目年回报的 400%。

如果您不同意，您将无法获得此类目标投资所增加的收益。因此，您的投资资本将继续留在本公司，并通过注册投资顾问进行投资，直到在您的 I-829 申请裁决之前分配给您，而无法获得任何额外的回报。

此外，管理成员认为，USCIS 涉及 EB-5 计划的资本投资政策要求每名有限合伙人的资本投资均维持在本公司，并承担"风险"，直至有限合伙人 I-829 申请获得最终裁决。因此，管理成员认为，拟议的再投资将有助于确定您的合资格投资按照 USCIS 的准则保留在本公司中。内附为专业移民顾问提供的法律意见，其对此分析进行了确认。

本文件中采用且未定义的大写术语应具有附件"同意征求声明"中所赋予的含义。

诚挚

VIA MIZNER FUNDING, LP

签字人：＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿

姓名：Nicholas A，Mastroianni，II

授权签字人

DocuSign Envelope ID: D8261BA3-6A3F-474E-8556-63CCE7A694F9

**VIA MIZNER FUNDING, LP**

**转交：佛罗里达州区域中心有限责任公司**

**佛罗里达州朱庇特滨海大道 115 号♯300 单位，邮编：33477**

**2017 年 10 月 16 日**

亲爱的第二期和第三期有限合伙人：

　　我们来信旨在向您提供有关 Via Mizner 项目的最新信息。第一期 EB-5 贷款已经由开发商在[日期]偿还，第二/三期 EB-5 贷款将在[日期]偿还。我们高兴地宣布第一期贷款的偿还以及所有 I-526 申请裁决结果（277 份批准）。我们认为，从移民和经济角度而言，项目取得了巨大的成功。我们期待开发商在您的投资本金所分配的第二/三期贷款方面取得同样的成果。

　　内附为要求您授权管理成员允许第二/三期有限合伙人独立于第一期有限合伙人进行投票并继续参与直至提供第二期/三期 EB-5 贷款偿还的额外信息以及同意征求声明。我们鼓励您尽快阅读"有限合伙人同意函"和"同意征求声明"，并在 2017 年 10 月 31 日之前通知我们您的决定。

　　如果您选择"我同意"，您和其他第二/三期有限合伙人将有能力在提交给合伙公司的事项方面作为同一类别进行投票，并能就第二/三期贷款偿还的任何决定独立于第一期有限合伙人进行单独投票。

　　如果您不同意，合伙公司将继续作为一个整体在所有事务上进行投票，您和其他第二/三期有限合伙人以及关于第二期/三期贷款偿还的决定，还将包括第一期有限合伙人的票数。

　　普通合伙人建议您选择"我同意"。

　　本文件中采用且未定义的大写术语应具有附件"同意征求声明"中所赋予的含义。

诚挚

VIA MIZNER FUNDING, LP

签字人：＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿

姓名：Nicholas A，Mastroianni，II

授权签字人

DocuSign Envelope ID: D8261BA3-6A3F-474E-8556-63CCE7A694F9

**VIA MIZNER FUNDING, LP**

**转交：佛罗里达州区域中心有限责任公司**

**佛罗里达州朱庇特滨海大道 115 号＃300 单位，邮编：33477**

<u>**有限合伙人同意函**</u>

正在向您发送有关同意征求声明（定义参见下文）的有限合伙人同意函。

正在向您发送"有限合伙人同意函"，征求 Via Mizner Funding, LP（"合伙公司"）的有限合伙人（"投资者"）关于再投资提案（"再投资提案"）的同意。您的投资资本用于为开发商贷款提供资金，本金金额为 59,000,000 美元，用于为项目第一期提供资金（"第一期 EB-5 贷款"）或向开发商提供贷款,本金金额为 8,000万美元，为项目第二/三期的施工提供资金（"第二/三期 EB-5 贷款"），其中 5700万美元已经拨付，而 2300 万美元将在近期提供。其投资资本用于为第一期 EB-5贷款提供资金的有限合伙人被称为"第一期有限合伙人"，其投资资本用于为第二/三期 EB-5 贷款提供资金的有限合伙人被称为"第二/三期有限合伙人"。

U.S Immigration Fund GP - Mizner，LLC，作为合伙公司的普通合伙人（"普通合伙人"），正在根据条款以及所附同意征求声明（可能不时修订或补充，"同意征求声明"）中载列的条件征求有关修改提案的同意。本文中未定义的大写术语应具有同意征求声明中赋予该等术语的涵义。

普通合伙人寻求有限合伙人的同意，以便修订和重述版合伙协议，规定：

- 设立有限合伙人的分类结构，按照有限合伙人投资资本用于或重新用于的 EB-5 项目各阶段施工对有限合伙人进行分类并区分他们的投资资本。

- 关于第一期有限合伙人：

  o 合伙公司作为酌情商业房地产债务基金经营，涉及第一期 EB-5 贷款偿还所得款项对于一个或多个商业房地产抵押贷款、夹层贷款、优先权益投资和/或合资企业权益的再投资（"目标投资"）；以及

  o 合伙公司每年支付相当于应从目标投资再投资本资本中获得的当前利息或优先或其他回报 2％的当前分配。

- 关于第二/三期有限合伙人以及从第二/三期 EB-5 贷款偿还所得的款项：

  o 合伙公司继续经营，第二/三期有限合伙人继续按照合伙协议的现有条款参与现有和清算分配（修订和重述版合伙协议的建议以下简称"修改提案"）。

我们正在要求您同意修改提案，详细说明参见同意征求声明。

修改提案的批准得到持有至少大部分未偿股份的有限合伙人的同意。

在仔细审查此有限合伙人同意函和同意征求声明后，我们要求您尽快填妥并退还有限合伙人同意函。如果在 2017 年 10 月 31 日（纽约时间）下午 5 点之前，我们还没有收到您已填妥的有限合伙人同意函（除非延长日期和时间），您将被视为已同意修改提案。

若合伙公司未收到所需的多数同意，则有限合伙人的等级结构及相关的资本分配将不予执行，合伙公司将保留第一期 EB-5 贷款的还款款项。为保存资金，普通合伙人随后将通过注册的投资顾问将收益投资于投资级的投资项目，旨在遵守 USCIS 的准则，而不调整应付给有限合伙人的现行分配。

请注意，在填妥和退还此有限合伙人同意函后，除非您通知普通合伙人，否则您将被视为确认您为不时修订的 1933 年《证券法》条例 D 第 501(a)条所述的"认可投资者"。[1]

[签名页如下]

_____

[1]要符合"认可投资者"的要求，您必须符合以下条件之一：

•有限合伙人的个人净资产（或与配偶的共同净资产）超过 100 万美元；或

•最近两年中的任意一年的个人收入超过 20 万美元并合理预期现年的收入将超过 20 万美元，或者与配偶在最近两年中的任意一年的共同收入超过 30 万美元并合理预期现年的共同收入将超过 30 万美元。

就满足上述标准而言，"净资产"不包括截至本文件日期该人士主要住宅资产以及不超过住房公平市场价值的住房抵押贷款债务，除非则超出量在计算时应被视为债务。除非在本文件日期未偿还的债务金额超过在本文件日期之前 60 天内的未偿还金额，而非由于购买主要住所，此类负债金额超过主要住宅的公平市场价值应作为债务。

为满足上述标准，"个人收入"是指用于上报美国联邦所得税的调整后总收入，减去属于配偶或受配偶拥有的财产收入，加上以下款项（但不包括归属于配偶或受配偶拥有的财产金额）：（1）不时修订的 1986 年美国内部收入法（"法规"）第 103 节规定的免税利息收入，（2）有限合伙企业中有限合伙人索赔的损失金额（如表格 1040 附表 E 所报告），（3）法规第 611 等节声称的扣减，及（4）减去长期资本收益的收入金额后等于 1986 年税制改革法案废除之前，法规第 1202 节规定的调整后总收入。

为满足上述标准，"共同收入"是指用于上报美国联邦所得税的调整后总收入，包括属于配偶或受配偶拥有的财产收入，加上以下款项（包括归属于配偶或受配偶拥有的财产金额）：（1）法规第 103 节规定的免税利息收入，（2）有限合伙企业中有限合伙人索赔的损失金额（如表格 1040 附表 E 所报告），（3）法规第 611 等节声称的扣减，及（4）减去长期资本收益的收入金额后等于 1986 年税制改革法案废除之前，法规第 1202 节规定的调整后总收入。

DocuSign Envelope ID: D8261BA3-6A2F-474E-8556-63CCE7A694F9

签署人特此声明自愿同意修改提案（请勾选）

        □我同意         □我不同意

_____

（请输入或打印签字人姓名）

签字人_____

签名

_____

（请输入或打印签字人姓名）

职务_____

---

请通过电子邮件、传真或邮件尽快寄回本投资者同意函，并且不得迟于 2017 年
10 月 15 日，地址为：

佛罗里达区域中心有限公司

电子邮件：InvestorRelations@FLRegionalCenter.com

传真号码：＋001.561.799.0061

地址：佛罗里达州朱庇特滨海大道 115 号＃300 单位，邮编：33477


您不需要交还原始签名副本。扫描和传真文件即可。



**I.A. DONOSO & ASSOCIATES, LLC**
移民律师所

机密信息

## 备忘录

收件人：佛罗里达区域中心（Florida Regional center,LLC ）

寄件人：I.A. Donoso & Associates 律师事务所

回复：有关在投资者 I-829 申请最终审批前偿还资本出资的移民风险

日期：2017 年 9 月 14 日

　　佛罗里达区域中心——Florida Regional center, LLC（称为"区域中心"）已委托我律师事务所编制《美国移民和国籍法》第 203（b）（5）节下 EB-5 移民投资者签证计划（"EB-5 计划"）下有关 EB-5 投资者（定义如下）的潜在移民法风险分析，以便在即将脱离国籍的创业家提交的 I-829 申请表格（"I-829 申请表格"）最终审批前偿还所有或部分资本投资金额给投资者。

　　因此，根据下列限制，本人得出以下结论，在此类 EB-5 投资者 I-829 申请表格最终审批前由新商业企业（NCE）（定义如下）偿还投资者资本出资会对此类 EB-5 投资者成功移民构成更大风险。在 I-829 申请表格最终审批前偿还资本出资增加 EB-5 投资者移民法风险表现在以下方面：（1）随后移民程序中，质疑否决，（2）如存在增加就业岗位的任何证据性问题，或（3）美国公民及移民服务局（"USCIS"）之后改变或重新解释其指南，此类风险可能随时发生，见最新政策备忘录。

马里兰州贝塞斯达蒙哥马利巷第 4800 号（邮编：20814）

（301）276-0653

www.donosolaw.com

机密信息

## 1. 背景

### （a）EB-5 计划

EB-5 计划向外国投资者（"EB-5 投资者"）提供其可以为自身、其配偶和未满 21 岁的未婚子女取得美国合法永久居民身份（"绿卡"）的方法。EB-5 计划要求 EB-5 投资者在失业率高的区域或农村地区的美国新商业企业（"NEC"）中进行至少 500,000 美元的合法资本投资，或在美国任何地方进行至少 1,000,000 美元的合法资本投资。除资本出资外，EB-5 投资者同样需要支付新商业企业收取的任何企业联合或行政费用。投资于新商业企业中的资本出资必须为每位 EB-5 投资者直接或间接创造至少 10 个新的全职工作岗位。

EB-5 投资者可通过 3 个步骤取得绿卡。首先，EB-5 投资者在美国公民及移民服务局处填写外国投资者 I-526 移民申请表格（"I-526 申请表格"），获得 2 年有条件绿卡身份。之后，EB-5 投资者及其家庭与美国领事馆预约，以便获得 2 年有条件绿卡（或通过在美国的身份调整获得 2 年有条件绿卡）。之后，EB-5 投资者需要在 2 年有条件绿卡到期前 90 天内填写 I-829 申请表格。

### （b）EB-5 等候名单

在过去 10 年里，EB-5 计划十分流行。2008 年，EB-5 投资者填写了近 1,000 份新 EB-5 签证申请。2010 年，新 EB-5 签证申请数量增加到近 6000 份。到 2014 年，每年填写的新 EB-5 签证申请数量超过 10,000 份。根据 EB-5 计划，每财年可发行近 10,000 份新 EB-5 签证。

自 2010 年来，中华人民共和国（"PRC"）境内出生的 EB-5 投资人已经占到 EB-5 计划所有申请人的 80%。2015 年 5 月，由于 EB-5 计划在中国申请人之间十分流行，针对出生于中国境内投资者的 EB-5 签证等候名单首次出现。基于 EB-5 投资者填写 I-526 申请表格日期的（"优先日期"）先后顺序，确定等候名单先后顺序。

等候名单意味着已经获得美国公民及移民服务局对 I-526 申请表格批准并出生在中国境内的 EB-5 投资者必须等待，直至其优先日期，以便在美国领事馆或通过美国身份调整获得为期 2 年的有条件绿卡。目前，出生在中国的投资者 EB-5 签证等候名单大约为 5 年，预计等候名单可增加到 7 到 10 年。目前，除中国外，其他国家均未出现 EB-5 签证等候名单。

DocuSign Envelope ID: D8261BA3-6A2F-474E-8556-63CCE7A694F9

机密信息

## 2. 分析

### （a）维持 EB-5 投资存在风险

根据美国公民及移民服务局目前的法律和政策，每位 EB-5 投资者需要保持其在新商业企业中的资本出资"面临风险"，意味着投资会遭遇风险或盈亏。EB-5 投资面临风险要求一般在《美国联邦法规》第 8 篇第 204.6（j）（2）款美国公民及移民服务局规定中列出。面临风险要求解释为 Matter of Izummi，22 I&N Dec.169（1998）美国公民及移民服务局有约束力的先决判例，根据判例，"面临风险"要求禁止新商业企业担保向 EB-5 投资者偿还资本出资，或担保向 EB-5 投资者支付投资利润率（即，利息）。然而，美国公民及移民服务局规定，只要新商业企业处于面临风险的商业运营中，新商业企业可向 EB-5 投资者分配利润。

最近，美国公民及移民服务局澄清了 EB-5 投资需遵守面临风险要求的时长这一关键问题的政策指南。根据 2017 年 6 月 14 日其修订版 EB-5 政策手册（"2017 年 6 月 14 日政策手册"）， 美国公民及移民服务局声明，EB-5 投资者需保持在新商业企业中投资资本支出并让其资本出资面临风险的时间为自资本出资原始投资日期至 2 年有条件绿卡身份到期。对于 EB-5 投资者资本出资而言，这一时间段称为"保持期"。

2017 年 6 月 14 日政策手册规定，在保持后，即使是在美国公民及移民服务局对 EB-5 投资者 I-829 申请表格进行审批之前，新商业企业可返还资本出资给 EB-5 投资者。美国公民及移民服务局明确在脚注中声明，"投资者无需在保持期后维持其投资"。

### （b）风险说明

新美国公民及移民服务局 2017 年 6 月 14 日在政策手册中解释的首项风险为，在不了解美国公民及移民服务局对其 I-829 申请表格（为的是取消其合法永久居民身份的条件限制）最终审批结果前，授权 EB-5 投资者得到其资本出资偿还。一旦新商业企业偿还资本出资偿还给 EB-5 投资者，EB-5 投资者维持投资中断。因此，如在资本出资偿还后，EB-5 投资者 I-829 申请表格被拒，EB-5 投资者可能无法在移民法院去除诉讼中证明其投资维持情况。

第 3 页

DocuSign Envelope ID: D8261BA3-6A2F-474E-8556-63CCE7A694F9

机密信息

根据美国公民及移民服务局指南，EB-5 投资者有机会在移民法院见证下更新 I-829 申请表格，以便为脱离美国国籍抗辩。参见《美国联邦法律》第 8 篇第 216.6（d）（2）款。在移民法院诉讼中，EB-5 投资者有机会在最开始时呈交其中请，并提供新证据，包括专家证词。举证责任由政府承担，诉讼具有对抗性质。然而，如 EB-5 投资者不再维持新商业企业中的投资，尚不清楚 2017 年 6 月 14 日政策手册是否足以给予 EB-5 投资人在移民法庭上更新 I-829 申请资格的能力。这一风险原因在于 2017 年 6 月 14 日政策手册未声明保持的新解释将如何影响后续移民诉讼。

我们发现的第二个风险在于，在 I-829 表格最终审批前 EB-5 投资者是否得到资本出资偿还与 EB-5 计划的创造就业岗位要求有关。如果由于减少创造的就业岗位而导致 I-829 申请表格被拒，则新商业企业偿还 EB-5 投资者资本出资可能会导致后续移民诉讼中的一些问题。在资本出资偿还给 EB-5 投资者后，断开投资维持意味着资本出资无法保证在未来创造就业岗位，这是在创造就业岗位中需要克服的一个缺点。这一问题可能会影响新商业企业中的剩余 EB-5 投资者，因为偿还一位 EB-5 投资者的资本出资可能会影响新商业企业中为所有 EB-5 投资者创造就业岗位，如所有其资本均需创造所需的额外新工作。

我们认为的第三个相关风险是美国公民及移民服务局可能会更改 2017 年 6 月 14 日政策手册中的指南。美国公民及移民服务局已经改变了对《美国移民和国籍法》及其自身规定（参见《美国最高法院判例汇编》（1984 年）第 467 卷第 837 页"谢弗朗诉自然资源保护委员会"一案的高级法院判决）和自身政策（参见《美国最高法院判例汇编》（1944 年）第 323 卷第 134 页"斯基默诉斯威夫特公司"案高级法院判决）的解读。美国公民及移民服务局在过去已经作出过此类更改。例如，美国公民及移民服务局意外地改变了"资本"一词在《美国联邦法律》第 8 篇第 204.6（e）节规定中的定义解释。美国公民及移民服务局可能会在未来改变其对保持的解释。美国公民及移民服务局拥有修改 2017 年 6 月 14 日政策手册的唯一权利，符合现行规定以及谢弗朗和斯基默案件。美国公民及移民服务局可能会重新解释或更改有关保持的指南。如发生这种情况，已经获得资本出资偿还的 EB-5 投资者可能无法证明其符合保持的新解释。



第 4 页

DocuSign Envelope ID: D8261BA3-6A3F-474E-8556-63CCE7A694F9

机密信息

**3. 结论和分析范围**

　　本备忘录列出的分析基于我们对适用美国移民法律和政策以及美国公民及移民服务局实践的研究和分析。除因疏忽造成的错误外，我们认为其真实准确，并试图说明有关 EB-5 计划的新情况所带来的潜在风险。分析仅限移民法律分析，非业务或商业建议。各投资者均应分析自身情况。

顺颂商祺

I.A. Donoso & Associates 律师事务所

I.A. Donoso & Associates, LLC

签名人：Ignacio Donoso

职位：代理律师

DocuSign Envelope ID: D8261BA3-6A3E-474E-8556-63CCE7A694F9

**VIA MIZNER FUNDING, LP**

转交：佛罗里达州区域中心有限责任公司

佛罗里达州朱庇特滨海大道 115 号＃300 单位，邮编：33477

**2017 年 10 月 16 日**

致 VIA MIZNER FUNDING, LP 有限合伙人

　　U.S Immigration Fund GP - Mizner，LLC（"普通合伙人"）正在要求 Via Mizner Funding, LP（"合伙公司"）有限合伙人（"有限合伙人"）同意修改和重述普通合伙人和有限合伙人于 2012 年 7 月 20 日的有限合伙协议。普通合伙人正在要求所有有限合伙人的同意，包括其投资资本用于(a)为第一期 EB-5 贷款提供资金的有限合伙人（"第一期有限合伙人"），和（b）其投资资本用于为第二/三期 EB-5 贷款提供资金的有限合伙人（"第二/三期有限合伙人"）。

　　修订和重述版合伙公司协议（"修订和重述合伙协议"）将规定：

- 设立有限合伙人的分类结构，按照有限合伙人投资资本用于或重新用于的 EB-5 项目各阶段施工对有限合伙人进行分类并区分他们的投资资本。

- 关于第一期有限合伙人：

  o 合伙公司作为酌情商业房地产债务基金经营，涉及第一期 EB-5 贷款偿还所得款项对于一个或多个商业房地产抵押贷款、夹层贷款、优先权益投资和/或合资企业权益的再投资（"目标投资"）；以及

  o 合伙公司每年支付相当于应从目标投资再资本资本中获得的当前利息或优先或其他回报 2％的当前分配。

- 关于第二/三期有限合伙人以及从第二/三期 EB-5 贷款偿还所获得的款项：

  o 合伙公司继续经营，第二/三期有限合伙人继续按照合伙协议的现有条款参与现有和清算分配（修订和重述版合伙协议的建议以下简称"修改提案"）。

　　将执行修改提案的修订和重述版合伙协议的副本载列于附件 A。

　　合伙公司在 2012 年 4 月 16 日根据其机密发售备忘录所发售合伙公司权益份额（"份额"）共计募集 139,000,000 美元的款项。发售所得款项用于向 Camino Investments Holdings 有限合伙公司（"开发商"）提供两笔总额为 139,000,000 美元的贷款（"EB-5 贷款"），用于支付 Via Mizner 商业不动产开发项目的部分施工和开发成本，6.8 英亩的不动产归开发商拥有，位于佛罗里达州博卡拉顿市南联邦高速公路和 East Camino Real 交汇处东北角（"EB-5 项目"）。合伙公司为第一期施工（"第一期 EB-5 贷款"）筹集了金额为 59,000,000 美元的 EB-5 贷款。合伙公司还为第二和第三期施工筹集了 57,000,000 美元 EB-5 贷款（"第二/三期 EB-5 贷款"），并且预计短期内将筹集 23,000,000 美元的余额。

EB-5 贷款旨在作为美国 EB-5 移民投资者计划（"EB-5 计划"）下的合格投资，并允许每位投资者根据美国移民与国籍法案（"移民法"）申请美国合法的永久居民。普通合伙人所作出的重新指定，使得后来认可的有限合伙人能够受益于项目前期阶段的施工，合伙公司将 118 名第一期有限合伙人的投资资本用于筹集第一期 EB-5 贷款，以及 160 名第二/三期有限合伙人的投资资本用于筹集第二/三期 EB-5 贷款。

第一期 EB-5 贷款由借款人于 2017 年[日期] 全额偿还。合伙协议条款禁止分配 EB-5 贷款偿还的所得款项，直至有限合伙人获得美国公民及移民局的 I-829 申请批准为止。因此，合伙公司将保留从开发商获得的 59,000,000 美元第一期 EB-5 贷款所得款项。在修改提案获得批准后，合伙公司拟将第一期 EB-5 贷款的还款再投资于普通合伙人酌情决定的一项或多项目标投资。

修改提案的批准需要持有至少大部分未偿股份的有限合伙人的同意。我们邀请您在 2017 年 10 月 31 日（纽约时间）下午 5:00 铅同意或拒绝修提案（如随附同意征求声明所述）。如果在 2017 年 10 月 31 日（纽约时间）下午 5 点之前未收到您填写的有限合伙人同意函（除非延长日期和时间），有限合伙人将被视为已同意修改提案。

若合伙公司未收到所需的多数同意，则有限合伙人的等级结构及相关的资本分配将不予执行，合伙公司将保留第一期 EB-5 贷款的还款款项。为保存资金，普通合伙人随后将通过注册的投资顾问将收益投资于投资级的投资项目，旨在遵守 USCIS 的准则，而不调整应付给有限合伙人的现行分配。

此类通知和随附同意征求声明将于 2017 年 10 月 16 日起邮寄给有限合伙人。

佛罗里达区域中心有限责任公司

Nicholas A. Mastroianni, II

首席执行官

同意征求声明

**VIA MIZNER FUNDING, LP**

**转交：佛罗里达州区域中心有限责任公司**

**佛罗里达州朱庇特滨海大道 115 号＃300 单位，邮编：33477**

**2017 年 10 月 16 日**

U.S Immigration Fund GP - Mizner，LLC（"普通合伙人"）正在根据本同意征求声明（可能不时修订或补充，"同意征求声明"）以及所附同意函（"同意函"）中载列的条件征求 Via Mizner Funding, LP（"合伙公司"）有限合伙人有关修改提案（定义见下文）的同意。普通合伙人正在要求所有有限合伙人的同意，包括其投资资本用于(a)为第一期 EB-5 贷款提供资金的有限合伙人（"第一期有限合伙人"），和(b)其投资资本用于为第二/三期 EB-5 贷款提供资金的有限合伙人（"第二/三期有限合伙人"）。

普通合伙人拟定了相关提案，用于修订和重述普通合伙人和有限合伙人之间于 2012 年 7 月 20 日订立的有限合伙协议（"合伙协议"）。合伙公司的的修订和重述合伙协议（"修订和重述合伙协议"）将规定：

- 设立有限合伙人的分类结构，按照有限合伙人投资资本用于或重新用于的 EB-5 项目各阶段施工对有限合伙人进行分类并区分他们的投资资本。

- 关于第一期有限合伙人：

  o 合伙公司作为酌情商业房地产债务基金经营，涉及第一期 EB-5 贷款偿还所得款项对于一个或多个商业房地产抵押贷款、夹层贷款、优先权益投资和/或合资企业权益的再投资（"目标投资"）；以及

  o 合伙公司每年支付相当于应从目标投资再资本资本中获得的当前利息或优先或其他回报 2％的当前分配。

- 关于第二/三期有限合伙人以及从第二/三期 EB-5 贷款偿还所获得的款项：

  o 合伙公司继续经营，第二/三期有限合伙人继续按照合伙协议的现有条款参与现有和清算分配（修订和重述版合伙协议的建议以下简称"修改提案"）。

将执行修改提案的修订和重述版合伙协议的副本载列于附件 A。

合伙公司在 2012 年 4 月 16 日根据其机密发售备忘录所发售合伙公司权益份额（"份额"）共计筹集 139,000,000 美元的款项。发售所得项用于向 Camino Investments Holdings 有限合伙公司（"开发商"）提供两笔总额为 139,000,000 美元的贷款（"EB-5 贷款"），用于支付 Via Mizner 商业不动产开发项目的部分施工

DocuSign Envelope ID: D82C1BA3-6A2E-4745-85E6-63CCE7A694F9

和开发成本，6.8 英亩的不动产归开发商拥有，位于佛罗里达州博卡拉顿市南联邦高速公路和 East Camino Real 交汇处东北角（"EB-5 项目"）。合伙公司为第一期施工（"第一期 EB-5 贷款"）筹了金额为 59,000,000 美元的 EB-5 贷款。合伙公司还为第二和第三期施工筹集了 57,000,000 美元EB-5 贷款（"第二/三期EB-5 贷款"），并且预计短期内将筹集 23,000,000 美元的余额。EB-5 贷款旨在作为美国 EB-5 移民投资者计划（"EB-5 计划"）下的合格投资，并允许每位投资者根据美国移民与国籍法案（"移民法"）申请美国合法的永久居民。普通合伙人所作出的重新指定，使得后来认可的有限合伙人能够受益于项目前期阶段的施工，合伙公司将 118 名第一期有限合伙人的投资资本用于筹集第一期 EB-5 贷款，以及 160 名第二/三期有限合伙人的投资资本用于筹集第二/三期 EB-5 贷款。

第一期 EB-5 贷款由借款人于 2017 年[日期] 全额偿还。合伙协议条款禁止分配 EB-5 贷款偿还的所得款项，直至有限合伙人获得美国公民及移民局的 I-829 申请批准为止。因此，合伙公司将保留从开发商获得的 59,000,000 美元第一期 EB-5 贷款所得款项。在修改提案获得批准后，合伙公司拟将第一期 EB-5 贷款的还款再投资于普通合伙人酌情决定的一项或多项目标投资。

普通合伙人建议修改提案，并敦促您同意，以便第一期 EB-5 贷款还款所得款项可再投资于一项或多项目标投资并且第一期有限合伙人可获得每年相当于投资资本利息或优先或其他回报 2%的当前分配。除非有限合伙人授予所需的同意，否则有限合伙人的等级结构及相关的资本分配将不予执行，合伙公司将保留 EB-5 贷款的还款款项。第一期有限合伙人也无法获得所述的新目标投资所获回报的分配。因此，合伙公司将保留第一期 EB-5 贷款还款收益，为了保护资本，普通合伙人随后通过注册的投资顾问对所得款项进行投资，旨在符合 USCIS 的准则。因此，在所有有限合伙人的 I-829 申请获得裁定之后，第一期有限合伙人投资资本将由合伙公司持有，而不调整应付给第一期有限合伙人的现行分配。

普通合伙人认为，USCIS 有关 EB-5 计划下资本投资的政策要求每位有限合伙人的资本投资保留在合伙公司中，并保持一定风险，直至获得有限合伙人 I-829 申请的最终裁定。因此，普通合伙人认为，在修改提案通过后对目标投资进行再投资将有助于确定您的有限合伙人的合格投资保留在合伙公司中并保持相关风险。

**修改提案的批准需要持有至少大部分未偿股份的有限合伙人的同意。**

同意征求声明将于 2017 年 10 月 31 日（纽约时间）下午 5:00（可延长或提前终止该等日期和时间）到期。合伙公司有权酌情决定终止或延长同意征求声明。如果在 2017 年 10 月 31 日（纽约时间）下午 5 点之前，有限合伙人未提交签署的同意函（除非延长日期和时间），有限合伙人将被视为已同意修改提案。

关于此同意征求声明的问题可采用书面形式寄送至合伙公司，转交：佛罗里达区域中心有限责任公司，佛罗里达州朱庇特滨海大道 115 号＃300 单位，邮编：33477；电子邮件：USIFInvestors @ usifund.com。

我们将支付征求同意和其他费用，将征集材料转发给份额的实益所有人。除了使用邮件外，我们的一些董事、高级职员和正式员工也可通过电话、传真、电

LEGAL_US_E # 130011651.7

子邮件和亲自拜访的方式征求同意，无需额外的补偿。

此类征求材料将于 2017 年 10 月 16 日起邮寄或以其他方式交付给有限合伙人。

**重要通知**

正在向每名有限合伙人提供此同意征求声明，征求对于修改提案的同意。有限合伙人在同意修改提案之前，应仔细阅读并理解同意征求声明及相关同意函中的资料。

同意征求声明的目的在于为有限合伙人提供关于合伙公司同意请求及其所承担风险的特定信息。本同意征求声明中包含的所有信息均基于普通合伙人和合伙公司截至本协议日期并认为正确的信息。

在修改提案获得批准后，同意的有限合伙人将继续拥有涉及高风险份额的投机性投资。有限合伙人应仔细考虑"风险因素"一节中载列的信息。同意的有限合伙人必须准备在无限期内承担投资的经济风险，并能够承受投资的全部损失。

该份额为不时修订的 1933 年《证券法》（"证券法"）和适用州证券法规定的限制性证券。因此，在没有根据《证券法》和适用州证券法发布的有效注册声明或者合伙公司及其法律顾问可接受的律师有关不需要注册的意见之情况下，此份额不得出售、转让或抵押。

另外，根据修订和重述版有限协议，限制份额的转让。因此，有限合伙人必须无限期持有该份额。

在任何情况下，同意征求声明或同意请求的提交不得视为自本文件日期起，合伙公司的事务未发生任何变更，或者在此同意征求声明日期后的任何时间，本协议的信息正确。同意征求声明取代合伙公司或其代表在本文件日期之前提交或提供的任何和所有信息。

就该份额或该同意征求声明而言，只有普通合伙人及合伙公司有权作出任何陈述或提供本文所载以外的任何资料；如普通合伙人及合伙公司提供上述内容，除非由普通合伙人及合伙公司通过书面通知给予，否则，不得依赖该等陈述及资料。除本同意征求声明以及由普通合伙人和合伙公司根据有限合伙人要求提供的任何其他书面资料外，均不得依赖于任何与本发售相关的招揽文献或广告。任何其他经纪人、经销商、代理人、销售人员或其他人均无权提供任何信息或作出任何同意征求声明中不包含的任何声明（不论口头或书面），并且如果报价或给予此类信息或声明，不得视为普通合伙人或合伙公司授权的信息或声明。

普通合伙人或合伙公司应书面要求，向有限合伙人及其顾问提供与该同意征求声明有关的所有文件，以及普通合伙人或合伙公司拥有或可合理或免费获取的有关合伙公司及同意征求声明的任何额外信息。有关此类文件或信息的要求应以书面形式向合伙公司提供，佛罗里达州区域中心有限责任公司，佛罗里达州朱庇特滨海大道 115 号＃300 单位，邮编：33477；电子邮件：USIFInvestors @ usifund.com。

接收同意征求声明和相关同意函的接收不得将本文件内容视为法律、商业或税务建议。有限合伙人应就有关同意征求声明的法律、商业、税务和相关事宜，咨询自己的律师、业务顾问和税务顾问。

## 前瞻性陈述 – 重要因素及相关风险

本同意征求声明包含美国联邦证券法第 27A 节及 1934 年美国证券交易法第 21E 节定义下的某些前瞻性声明，公司认为该等前瞻性声明受制于本备忘录创造的安全港规定。这些前瞻性声明包括日后经营管理的计划和目标，包括日后项目所有人经济绩效相关的计划和目标。同意征求声明中包含的前瞻性声明和相关风险包括或涉及到目标投资的成功进行。

前瞻性声明基于当前对大量风险和不确定因素的预测。这些前瞻性声明基于对合伙公司和预期运营情况的各种假设。该假设包含对（除其它方面外）未来经济、竞争和市场的环境和未来商业决策的判定，而所有这些都很难或不可能准确预测，且大多不受合伙公司和普通合伙人的控制。

尽管合伙公司相信，前瞻性声明下的假设是合理的，但是任何假设都可能被证明是不正确的，因此不能确保前瞻性信息预测的结果能够被实现。此外，根据其他地方及"风险因素"所述，公司和业主的业务和运作存在重大风险，因此增加了前瞻性声明中固有的不确定性。鉴于本同意征求声明中所含前瞻性中的重大固有不确定性，这些信息所包含的内容不代表合伙公司、普通合伙人或其各自的高管、董事、成员、经理、员工或代理声明合伙公司的目标或计划能够实现。

"估计"、"计划"、"打算"、"预期"、"拟议"等词汇及其他类似表述旨在明确表述前瞻性声明。这些前瞻性声明包含未知和已知的风险、不确定因素和其他因素，并受这些因素的制约，同时这些因素带来的合伙公司实际结果、表现（财务或运营）或成就可能与此类前瞻性声明或其中的预测所明示或默示的成果存在巨大差异。潜在投资者应谨慎避免过分依赖于这些截至本备忘录签订日所做的前瞻性声明。合伙公司和普通合伙人明确无任何义务修改这些用以反映本同意征求书签订日期之后的事件或情况，或反映未预料事件的后果的前瞻性声明。

DocuSign Envelope ID: D82C1BA3-6A2F-4745-85E6-63CCE7A69459

# 目录

页面

修改提案 ...................................................................................................1

美国移民基金有限责任公司团队 ...........................................4

风险因素 ...............................................................................5

税务 ........................................................................................13

同意程序 .............................................................................20

附录

    附录 A - 修订和重述版合伙协议

LEGAL_US_E # 130011651.7

# 修改提案

## 概述

第一期 EB-5 贷款由借款人在 2017 年[日期] 全额偿还。除非在修改提案批准后进行再投资，合伙公司将按照合伙协议条款保留 59,000,000 美元的还款收益。普通合伙人认为，修改提案的实施为合伙公司保留贷款还款收益的优越替代方案，因为将贷款还款收益再投资到目标投资将为有限合伙人提供根据 EB-5 计划获得更多收益的机会，并将减少涉及美国合法永久居留身份的有限合伙人风险。

有限合伙人类型结构的实施和投资资本的相关分类将允许第一期有限合伙人和第二/三期有限合伙人将根据其投资性质区别对待。第一期 EB-5 贷款的偿还所得款项将分配给第一期有限合伙人，再投资于目标投资，此等有限合伙人将受益于修改提案所规定的更高现金回报。第二/三期有限合伙人将继续按照原合同协议规定的条款参与分配，并将第二/三期 EB-5 贷款的还款收益分配给他们。

## 类别结构

修订和重述版合伙协议将实施有限合伙人类别结构，其中将有两类有限合伙人，第一期有限合伙人和第二/三期有限合伙人。根据有限合伙人投资资本投资或再投资的 EB-5 项目施工阶段，类别结构区分有限合伙人并对其投资资本进行分类。在修订和重述版合伙协议生效后，合伙公司将有 118 名第一期有限合伙人和 160 名第二/三期有限合伙人。各类有限合伙人将对合伙公司今后可能对该类有限合伙人的权利、偏好和特权产生不利影响的修订进行单独投票。修订和重述合伙协议还将包含分离投资资本和载列第一期 EB-5 贷款和第二/三期 EB-5 贷款资金分配规定以及还款款项处理。

## 目标投资

在修改提案获得批准后，修订和重述版合伙协议将授权合伙公司将第一期 EB-5 贷款还款所得款项投资于普通合伙人酌情决定的目标投资中。合伙公司可能投资的目标投资包括以下内容：

- 抵押贷款：此类投资包括由商业房地产提供担保的高级和初级抵押贷款，可为施工或重建提供资金，提供临时或过桥融资或提供替代融资。他们支付当前利息，并具有指定的到期日。作为抵押贷款，此类投资将由抵押贷款进行抵押。如果违约，合伙公司的补救措施包括对该财产进行抵押。

- 夹层贷款：此类投资采用抵押贷款的形式，贷款属于商业房地产的第一留置权抵押贷款。此类不动产特定的贷款通常由直接或间接拥有不动产所有权益实体的全部股权的实体所有权权益进行抵押担保。他们支付当前利息，并具有指定的到期日。如果发生违约，合伙公司的补救措施包括取消质押权益的赎回权，并获得该不动产的间接所有权，但须承担任何限制该财产的高级债务

- 优先股权：此类投资采用财产所有权实体或其直接或间接控制权益所有人优先股权形式。他们支付类似于利息支付的当前优先或其他回报，并

1

DocuSign Envelope ID: D82C1B43-6A2E-4745-85E6-63CCE7A69459

且具有类似贷款到期日的指定还款日期。在违约的情况下，合伙公司的
补救措施有条件或无条件地包括控制财产所有权实体或其直接或间接控
制权益所有人。

- 合资企业权益：此类投资采取合资企业权益的形式，即拥有该资产的实
  体或其从属于相关财产资本结构中的较高级别资本并且一般不会获得指定
  的当前优先或其他回报或要求在指定还款日期偿还的直接或间接控制权
  益所有人；相反，所实现的回报将根据相关财产的业绩以及出售时不动
  产价值的升值而有所不同。

普通合伙人预计，目标投资一般期限相对较短（通常为 3 至 5 年），延期期
权视为适当，一般会在到期时支付本金。普通合伙人有权在未经第一期有限合伙
人同意或批准的情况下，酌情决定是否提出一项或多项目标投资。普通合伙人投
资合伙公司资本的权力将在修订和重述版合伙协议生效之日起四周年后终止，可
根据普通合伙人的酌情决定延长一年，总共可延长两年，或在普通合伙人收到所
有第一期有限合伙人的 I-829 申请最终裁决通知之日终止。

修订和重述版合伙协议将允许合伙公司投资于为普通合伙人及其控股所有
人 Nicholas A. Mastroianni II 拥有股权和其他利益的商业不动产项目提供资金的
目标投资。合伙公司将能够共同投资在目标投资中，采用 Mastroianni 先生拥有
的普通合伙人子公司 U.S. Immigration Find，LLC 在 EB-5 计划下发起的其他投
资载体；但是，此类共同投资条款规定在共同投资者之间按比例分配回报和还款。
参见"风险因素 - 修改提案相关风险 - 6.合伙公司可能存在其他特定的潜在利
益冲突。

普通合伙人可能会从开发商收到与目标投资发起相关的发起和其他费用和
其他赔偿。此类费用由普通合伙人保留。

普通合伙人的合伙公司权益结构旨在确保合伙公司合伙公司为发售份额所
委托的授权移民机构运营商 Vivian Ding 的关联方（"共同所有人"）根据修订和
重述版合伙协议参与向普通合伙人提供的分派。参与程度将在投资时确定，但预
计不低于向普通合伙人支付的净分配的 50％。

在合伙公司投资结构方面，普通合伙人可就投资条款进行协商，允许全部或
部分投资构成直接或间接拥有资产所有实体的普通股权和/或优先股权，可向合
资公司（或其附属公司）或普通合伙人的关联方提供结转权益。如果合伙公司收
到持有的利息，其经济收益将专门分配给普通合伙人的附属公司。此外，该等股
权投资的结构应确保该资产的折旧或其他税收优惠分配给普通合伙人的关联方
或合伙公司（或其附属公司），在此情况下，此类折旧扣除或其他税收优惠将仅
分配给普通合伙人的关联方。

根据原合伙协议的条款，普通合伙人不得将第一期 EB-5 贷款偿还的资金用
于再投资。因此，合伙协议必须修改，规定再投资贷款偿还所得款项的权力。如
果修改提案未经批准，合伙公司将持有投资级投资中的贷款还款款项，根据 EB-5
计划不得视为风险投资。普通合伙人认为，如果有限合伙人投资的资本没有投资
于风险投资，例如修改提案所涵盖的目标投资，则符合合法永久居民身份的有限
合伙人存在重大风险。因此，普通合伙人认为，修改提案批准后，将资本再投资
于目标投资将有助于确定合伙公司中每名第一期有限合伙人的合资格投资保留

LEGAL_US_E # 130011651.7

在合伙公司中并存在风险。

## 投资资本的分配和分派

在批准修改提案后，修订和重述版合伙协议将进行修改，规定投资资本用于为第一期 EB-5 贷款提供资金，分配给第一期有限合伙人。任何目标投资相关的利息和优先或其他回报或实现款项的分配条款将按有限合伙人的类别进行确定。修改将规定，第一期有限合伙人每年将获得相当于从目标投资资本中获得的利息或优先或其他回报 2%的当前分配。超过分配给第一期有限合伙人部分的利息或优先或其他回报金额将分配给普通合伙人。例如，如果合伙公司每年赚取按揭贷款利息的百分之六（6%），第一期有限合伙人将分配 2%，普通合伙人将分配 4%。

修订和重述版合伙协议将进行修改，规定用于为第二/三期 EB-5 贷款提供资金的资本将分配给第二/三期有限合伙人。第二/三期有限合伙人分配规定的实质内容将保持不变，但是，涉及第二/三期 EB-5 贷款相关利息分配和时间安排及实现过程有关的条款将按照类别进行确定。

## 同意征求声明的目的

作为合伙公司的有限合伙人，您将收到同意征求声明。为了实施有限合伙人的类别结构和相关的投资资本分配，以及合伙公司将第一期 EB-5 贷款还款款项重新投资于目标投资，合伙公司必须得到所需的有限合伙人同意。在所有有限合伙人所持有的多数份额的持有人之实际或视同同意后，修订和重述版合伙协议将具有法律效力，实施有限合伙人类别结构和投资资本分隔，普通合伙人随后将有权将第一期 EB-5 贷款所收回的资金再投资到一个或多个目标投资中。

## 美国移民基金有限责任公司团队

普通合伙人将利用美国移民基金有限责任公司（"USIF"）的资源，用于识别和承销目标投资。USIF 是一家经验丰富的商业房地产贷款人和投资者。自 2009 年成立以来，USIF 成功地承销了近 30 亿美元的抵押贷款、夹层贷款和优先权益投资，为纽约、新泽西州、佛罗里达州和加利福尼亚州的 25 个发展项目提供资金。管理机构和 USIF 的主要成员包括：

**Nicholas A Mastroianni, II，创办人兼经理**

Mastroianni 先生是美国移民基金有限责任公司和佛罗里达区域中心的创办人。他同时也是佛罗里达区域中心的经理。

Mastroianni 先生是南佛罗里达联合资本开发有限公司的经理，该公司成立于 2004 年，是一家位于朱庇特的房地产开发公司，并且是佛罗里达区域中心有限公司的经理，该公司自 2010 年 9 月起被批推成为 USCIS 区域中心。他的卓越贡献获得了建筑承包商协会（ABC）的认可，并获得 1998 年建筑奖卓越成就奖；曾经担任美国建筑商和承包商协会 Rhode Island Chapter 的执行副总裁，还是总承包商协会的会员。企业会员资格包括总承包商协会、建筑商和承包商协会以及警察体育联盟。

**Brian Friedman, CPA－首席财务官**

Friedman 先生是美国移民基金有限责任公司、佛罗里达区域中心以及普通合伙人的首席财务官。

Friedman 先生是一名注册会计师，拥有 25 年的建筑界从业经验，担任美国建筑业财务管理协会的财务主管，也曾是一名州委员会成员，并且是美国分包商协会前任本地总裁，现在美国注册会计师协会和佛罗里达州注册会计师协会的成员。

从 1986 年至 2012 年，Friedman 先生曾在各类建筑相关的公司担任首席财务官、首席运营官以及其他财务和运营职务。他曾经是毕马威会计事务所的雇用审计师，德勒会计事务所的会计师。Friedman 先生于 1986 年取得佛罗里达大学会计学理学学士学位。

**Nicholas A. Mastroianni, III－总裁**

Mastroianni 先生是美国移民基金有限责任公司、佛罗里达区域中心以及普通合伙人的总裁。Mastroianni 先生拥有诺斯伍德大学的工商管理学学士学位。他是国际购物中心协会的一名会员。

**Mark Giresi－首席运营官**

Giresi 先生是美国移民基金、佛罗里达区域中心以及普通合伙人首席运营官。Giresi 先生是是新泽西州的执业律师。他曾担任各类法律和行政职务，包括汉堡王公司的高级副总裁和总顾问，Limited Brands, Inc.的零售运营执行副总裁，以及 NXT Nutritionals Holdings, Inc.控股有限公司的首席运营官和总顾问。Giresi 先生拥有维拉诺瓦大学的会计学理学学士学位以及塞顿霍尔大学法学院的法学博士学位。

**Ashley Flucas - 总顾问**

Flucas 女士是 USIF、佛罗里达州区域中心有限责任公司和普通合伙人的总顾问。Flucas 女士曾在英国伦敦戴维斯·波尔克和沃德威尔律师事务所资本市场部门工作，曾在欧洲、非洲和亚洲担任承销商和/或发行人的律师，涉及国际股权和债务发行。Flucas 女士还担任 Greenberg Traurig 公司和证券集团的助理。Flucas 女士获得杜克大学政治学学士学位和哈佛法学院的法学博士学位。

## 风险因素

修改提案的实施涉及较高的风险。除了本同意征求声明中的所有其他信息外，包括附录在内，有限合伙人应仔细考虑以下风险，并应咨询其法律、税务、房地产和财务顾问，再决定是否同意修改提案。下列风险的顺序不代表其风险大小。所列举的风险因素不能视为此类风险为与投资相关的唯一的风险因素，并且仅涉及本投资的风险类型。

A.  修改提案相关风险

1.  修改提案将导致投资资本的合同分隔，但是合伙公司的所有资产将仍然可满足债权人或判定债权人的要求。根据 EB-5 贷款的指定和投资，投资资本的分隔不影响债权人的权利。因此，合伙公司的所有资产都可满足债权人和判定债权人的要求。

2.  合伙公司再投资的成功将取决于有吸引力投资的可用性和竞争程度。合伙公司的再投资业绩将取决于普通合伙人是否有能力确定、完善、管理和实现适当的商业房地产债务投资机会。合伙公司可能需要相当长的时间才能确定和完善适当的投资。一般而言，商业房地产债务投资机会的提供将受到金融市场和总体经济条件下利率水平和波动的影响。无法保证普通合伙人能够成功识别、承销，然后完成再投资，或者此类投资一旦完成，将按预期执行。

3.  有限合伙人将承担重大财务风险。如果多数有限合伙人同意修改提案，第一期有限合伙人在合伙公司投资的资本将再投资于目标投资，为当前未确认的商业房地产开发融资，并将承担偿还风险。投资决定将由普通合伙人自行决定，恕不另行通知第一期有限合伙人。

4.  合伙公司将依赖于普通合伙人和 USIF 及其关键人员。普通合伙人成功将合伙公司资本重新投资于目标投资的能力目前取决于 USIF 的组织及其专业人员识别、建立和管理投资的能力。普通合伙人将在很大程度上依赖 USIF 关键人员的经验、关系和专长。不能保证此类人将继续雇用 USIF，否则，将继续在合伙公司任期内继续履行其现任职责。USIF 组织或任何此类人员服务的丧失可能对合伙公司的业务产生重大不利影响。

5.  第一期有限合伙人不参加合伙公司的管理。有限合伙人在修改提案投票前不会有机会对具体投资进行评估或批准。合伙公司的管理决定将继续由普通合伙人做出。除修改和重述版合伙协议规定的某些事项外，有限合伙人无权参与合伙公司的管理。另外，有限合伙人不会收到合伙公司投资项目开发商发布的详细财务信息，其将提供给普通合伙人。

6.  与资本结构不同层次投资相关的利益冲突。合伙公司再投资可能涉及开发项目的融资，其中 USIF 的关联方和普通合伙人担任为该项目提供融资的投资工具经理，为此，关联方可管理在项目资本结构不同层次上进行的投资，此类投资可能与合伙公司的投资有所不同，具有不同的权益。关联方的利益可能与普通合伙人的利益发生冲突，如果合伙公司或关联方的投资发生违约或重组，可能会加剧利益冲突。任何此类利益冲突的

解决将涉及合伙公司和关联方不一致的考虑。虽然普通合伙人及其关联方将寻求以酌情决定的公平合理的方式解决任何此类冲突，但该关联方作为借款人行使补救措施或重组关联方投资的决定不必获得第一期有限合伙人批准，不能保证任何冲突将有利于合伙公司和第一期有限合伙人的方式获得解决。

7. **合伙公司可能会面临某些其他潜在利益冲突。** 将来可能会出现普通合伙人、USIF 及其关联方的利益与合伙公司和/或第一期有限合伙人的利益发生冲突的情况。 USIF 参与其他商业房地产融资和投资活动，包括 EB-5 计划，其独立于并且可能不时与合伙公司利益发生冲突。此类活动可能涉及与合伙公司类似的投资目标和政策，并可能与合伙公司竞争投资机会。如果合资公司与 USIF 发起的其他 EB-5 计划投资载体开展共同投资，USIF 关联方将担任普通合伙人或该等投资载体的管理机构，并负责共同投资的决定。合伙公司及其共同投资者在共同投资方面的利益可能无法保持一致，并且如果发生利益冲突，合伙公司依靠普通合伙人管理利益冲突，符合合伙公司的最大利益，可能对共同投资者的利益造成不利影响。如果合伙公司对普通合伙人关联方作为开发商或拥有所有人权益的项目提供融资，也可能产生利益冲突。关联方和第一期有限合伙人在相关项目最终成功方面保持相互一致，关联方和第一期有限合伙人对项目具有不同的利益，在某些情况下，可能会产生利益冲突。例如，如果关联方不履行其在投资条款项下的义务，其利益可能与合伙公司和第一期有限合伙人的利益发生冲突。在这种情况下，第一期有限合伙人将需依靠普通合伙人代表合伙公司开展相关投资。因此，如果发生此类冲突，合伙公司将依靠普通合伙人代表合伙公司的最大利益管理利益冲突，这可能对普通合伙人已收到合伙公司投资的关联方利益造成不利影响。不能保证任何冲突将按照有利于合伙公司和第一期有限合伙人的方式解决。

8. **普通合伙人依靠 USIF 关键人员处理其他事项。** 普通合伙人期望 USIF 关键人员积极参与合伙公司的管理。但是，USIF 的某些关键人员在合伙公司以及其他投资载体和企业中分配工作时间和精力时可能会发生冲突。因此，虽然 USIF 关键人员会按照普通合伙人认为合适的时间投入到合伙公司的管理中，但 USIF 的某些关键人员可能不得不将大量时间用于处理合伙公司以外的事务。

9. **普通合伙人可寻求向关联方提供不与有限合伙人分享的经济利益和税收优惠。** 可能会鼓励普通合伙人寻求再投资机会，使关联方能够获得附加利益，并可从项目升值中获利，并受益于可用于抵销税应税收入的分配折旧。普通合伙人没有义务与合伙公司或任何有限合伙人分享此类权益。普通合伙人可能会赞同此类再投资机会，从而排除在开发商财务稳定性和还款风险方面可能更有利于合伙公司的其他投资机会。

10. **合伙公司可能无法通过再投资实现多元化。** 合伙公司可将其资本投资于目标投资，因此合伙公司资本的再投资不一定会满足第一期有限合伙人的多元化需求。即使合伙公司投资于多项投资，也不一定会在地域和财产类型上实现多元化投资。未分类投资组合存在更高的风险。

11. **合伙公司的投资可能缺乏流动性**。房地产债务投资相对缺乏流动性。此类流动性不足可能会限制合伙公司为应对经济状况和其他条件变化所开展清算的能力。流动性不足的原因可能是缺乏既定的投资市场以及有关转售的法律或合同限制。此外，流动性不足可能是由于为合伙公司投资提供抵押的不动产价值下降所致。不能保证任何作为担保的不动产公允市价在未来不会下降，导致合伙公司的投资存在抵押或不存在抵押。

12. **不能保证合伙公司的分配**。支付给第一期有限合伙人的分配及其金额取决于合伙公司通过再投资于目标投资所获得的回报。不能保证合伙公司将成功再投资并产生利息、优先或其他回报，以便向第一期有限合伙人支付任何分配。此外，不能保证第一期有限合伙人获得其再投资于目标投资的任何或全部合伙公司投资本金的返还。

13. **修订和重述版合伙协议确定的投资期限将允许普通合伙人进行将在所有第一期有限合伙人 I-829 申请获得最终裁决后到期的投资**。在实现所有目标投资之前，第一期有限合伙人将无法获得全部资本回报。某些目标投资在所有第一期有限合伙人 I-829 申请的最终裁定后的几年内可能都不会到期，而资本只能作为到期的目标投资进行退还。

B. **与目标投资相关的特殊风险**

1. **房地产风险**。历史上房地产经历了巨大的波动和价值周期，可能导致房地产相关投资的减值。合伙公司的投资业绩将取决于超出合伙公司合理控制范围的许多因素。合伙公司投资的最终业绩通常将受到不动产所有权和经营方面不同程度风险的制约。合伙公司对潜在不动产投资的最终业绩取决于不动产所有人是否能够在运营不动产时维持超过营业费用和偿债金额的收入水平，或者当不动产租赁给单一承租人时，承租人支付租金的能力。收入可能受到国家或国际经济状况变化的不利影响；一般或当地经济条件及邻近地区特征的变化导致当地市场状况的变化；不动产租户和买卖双方的财务状况；提供相同或类似服务的其他不动产的竞争；利率变动以及按揭资金可用性、成本和条件；当前或将来的环境立法及环境法律合规性的影响；资本改进的持续需要（特别是较老的结构）；房地产税率和经营费用变动；政府法规和财政政策的不利变化；内乱；天灾，包括地震、飓风等自然灾害；战争；恐怖主义行为（任何一种都可能没有保险损失）；分区法律的不利变化；以及其他超出不动产所有人和合伙公司控制范围的因素。如果合伙公司投资所涉及的任何财产发生任何上述事件，则此类投资的价值和回报将受到负面影响。酒店不动产也可能受到一般或当地经济条件的不利影响，酒店开放过多导致供过于求；特定类型设施对顾客、客户和供应商的相对吸引力；降低竞争业务的经营成本下降；就业减少，招待需求下降。

2. **分区认证**。第一期有限合伙人将面临不能根据承销预期获得所需分区批准的风险。不能保证项目的业务计划不需要进行相应修改，或者需要获得额外的或修改的分区批准。

3. **完工时间不确定**。第一期有限合伙人将面临相关风险，即使用目标投资融资的项目可能错过完工时间表。不能保证可满足时间表，如果项目发

展完工时间表出现延迟，则开发成本可能会增加，获得还款收益的时间可能会延迟。

4. **成本超支可能损害目标投资。**目标投资将面临成本超支的风险。由于存在许多因素，可能会遇到此类成本超支，其中不仅包括发展进程的延误，也包括某些相关方未能根据合同金额完成工作，需要替换分包商以及定价的可能增加。此外，可能会遇到不可预见的问题，否则，需要增加应急基金中未另外保留的开发预算。成本超支可能损害项目，减少和消除开发商在项目中的权益，损害合伙公司全额偿还的能力。

5. **投资可能存在杠杆风险。**开发商可获得合伙公司筹集的第一按揭融资，其优先于合伙公司的投资。有可能超出普通合伙人承销的债务与总账面资本化比率。如果项目的建设或运营严重偏离预计的结果，项目可能没有足够的现金流量偿付所需的债务。如果项目因任何原因不能实现该目标，合伙公司可能面临不动产或高级贷款人所持有的不动产所有权的止赎，结果是如果开发商不具备足够的资产可能导致合伙公司对目标投资的全部损失，此类资产是以初级夹层贷款或附属于优先贷款的优先股权之形式，以为资产提供抵押，可能损失第一期有限合伙人在合伙公司的全部或部分投资。

6. **次级债务风险。**合伙公司的投资可能附属于抵押该项目的高级债务。合伙公司相关的补救措施，包括抵押担保此类投资的抵押物，将受高级贷款人权利的影响，在许多情况下，将受合同性债权人间条款的约束。高级债务违约可能导致为此类高级债务提供抵押的抵押留置权取消，导致合伙公司的附属投资没有经济价值。

7. **建筑贷款活动涉及较大的风险。**合伙公司的目标投资可以提供建设融资，由于各种因素，通常被认为涉及比其他类型贷款更高的风险。此类因素包括成功完成新开发项目的依赖性和估算建设成本的困难性。如果开发商的估计不足，开发商可能需要追加额外的融资。对于开发商来说，获取此类额外融资的条款可能比合伙公司的目标投资更好或更差，并且可能导致随后的贷款人或投资者拥有优先于合伙公司的权利。不能保证开发商能够及时或按照经济上可行的财务条款结构获得任何额外融资，如果无法获得，开发商可能无法偿还合伙公司的目标投资本金，可能导致第一期有限合伙人在合伙公司中的大量或全部亏损。

8. **开发商的破产或资不抵债可能会损害合伙公司确保投资于目标投资的资本的还款或回报能力。**不能保证从合伙公司获得融资的开发商不会破产或者可能是联邦破产法规定的自愿或非自愿破产程序的主体。根据联邦破产法，破产法院可降低破产财产债务的适用利率和/或减少或延迟债务的偿还。此外，破产财产的受托人或作为债务人持有资产的财产本身，拥有特殊权利可避免、从属或不承担债务。在某些情况下，股权和债权人的债权可能从属于持有资产的债务人在其破产后获得的融资。此类破产事件可能导致合伙公司目标投资的完全丧失。

9. **项目将面临保险风险。**开发商可能无法为其开发项目获得和维持足够的保险，因此不能保证在特定财产发生灾难性损失的情况下可以获得足够

的保险赔偿。

10. **合伙公司资助的项目可能存在技术风险。**项目可能会面临技术风险，包括设计错误、施工和材料缺陷、机械故障、未按照设计规格执行以及其他不可预见的事件，对运营、健康、安全和其他设备和/或工厂设施造成不利影响。虽然该项目预计将进行投保，预计第三方将承担大部分风险，但不能保证任何或所有此类风险都可获得缓解，或者相关方将履行其义务。对于酒店而言，系统销售点处理、供应链管理、现金收取、债务支付和其他运作流程的失败、维护、升级或转换到替代系统所出现的问题，或违反此类系统的安全规定可能产生有害影响，并导致客户服务的延迟并降低运营效率。任何此类失败、问题或安全漏洞可能需要额外的资本投资，这可能会增加经营费用、降低利润并削弱开发商偿还合伙公司债务的能力。

C. **涉及在修改提案实施后份额所有权的其他相关风险**

1. **修订和重述版合伙协议未进行公平磋商。**普通合伙人制定了修改提案，并确定了修订和重述版合伙协议的条款，这并非公平磋商的结果。建议参与合伙公司再投资所产生利息或优先收益将由普通合伙人确定，不以现行市场调查或其他独立准则为依据。此外，合伙公司和普通合伙人的法律顾问并没有作为有限合伙人与修改提案有关的顾问并代表其利益。有限合伙人应在同意修改提案前咨询其法律顾问。

2. **修订和重述版合伙协议将继续限制份额的可转让性。**根据修订和重述版合伙协议，份额不得转让，除非转让人向普通合伙人提交令合伙公司满意的律师意见，证明转让不会产生不利的税收后果，也不会违反联邦或州的证券法，否则不得转让分额。获得有关证券法的此类意见通常要求该份额根据法律进行注册，或者存在注册豁免，不能保证可获得豁免。

3. **份额不会有公开市场，份额的可转让性仍然受到重大限制。**份额不具备公共市场，我们不认为在可预见的未来是否会存在公共市场。份额依据证券法豁免条款在没有在证券法和适用州证券法注册的情况下进行发售，包括第4(a)(2)节私募发售豁免以及根据证券法颁布的条例D和条例S以及根据适用的州证券法可获得的豁免。此类联邦和州证券法严格限制了在此提供份额的可转让性。因此，对该份额的投资将缺乏流动性。该份额被视为证券法和适用州证券法下的"限制性证券"，除非根据证券法和任何适用的州证券法进行注册，或通过豁免注册要求的交易进行转让，否则不得转售或转让。因此，份额持有人可能无法清算其投资，每名有限合伙人控制其在合伙公司内投资清算时间的能力将受到限制。有限合伙人应准备无限期持有其份额。此外，有限合伙人应能承受损失其在合伙公司内全部投资的风险。

4. **前瞻性声明的重要因素和相关风险。** 本同意征求声明包含美国联邦证券法第 27A 节及 1934 年美国证券交易法第 21E 节定义下的某些前瞻性声明，公司认为该等前瞻性声明受制于本备忘录创造的安全港规定。这些前瞻性声明包括日后经营管理的计划和目标，包括涉及再投资活动和目标投资绩效的计划和目标。前瞻性声明基于当前对大量风险和不确定因素的预测。该假设包含对（除其它方面外）未来经济、竞争和市场的环境和未来商业决策的判定，而所有这些都很难或不可能准确预测，且大多不受合伙公司和普通合伙人的控制。不能确保前瞻性信息中所包含的结果能够实现。

5. **第一期有限合伙人回报。** 合伙公司不能保证合伙公司将获得合伙公司发起的目标投资所产生的利息或优先或其他应付款，或合伙公司将在到期时偿还其本金。分配给第一期有限合伙人的利息部分或优先收益的分派及第一期有限合伙人投资本金的最终返还将直接取决于基础项目的执行情况和开发商的财务状况。开发商应使用可使用现金、出售资产或再融资高级和夹层债务偿还本金。不能保证可实现这一点，特别是如果信贷市场出现衰退，再融资可能无法偿还合伙公司的投资资本。

6. **公司存在其可能被视为《1940 年投资公司法》下的证券公司的风险。** 修订版《1940 年投资公司法》（"1940 年法案"）规定任何被视为"投资公司"的公司必须在 SEC 注册成为投资公司，且需要遵守《1940 年法案》下的大量法规。对于公司来说，注册成为投资公司是不现实的。因此，如公司被视为投资公司，公司将解散。公司旨在根据 1940 年法案第 3（c）（5）（c）条规定的豁免而避免成为投资公司，该法适用于主要从事购买或以其他方式获得不动产其他抵押和留置权的业务。如果公司至少 55%的资产包括合格资产，至少 80%的资产由合格资产和房地产相关资产组成，则适用豁免。为此，根据 SEC 的指导，合格资产一般包括抵押贷款和其他与抵押贷款功能相当的其他资产以及其他不动产权益。任何不符合豁免资格的情况可能对合伙公司产生重大不利影响。

7. **普通合伙人不受监管监督。** 根据《顾问法》第 203（b）（3）条的注册豁免规定，普通合伙人并没有根据《1940 年投资顾问法》（"顾问法"）注册为投资顾问。因此，普通合伙人一般不受《顾问法》的限制，尽管普通合伙人将来可能会受到这种限制。

8. **法律注意事项。** 合伙公司和普通合伙人的法律顾问不得参与保护有限合伙人的权益，并且不应被视为代表任何有限合伙人。有限合伙人在同意修改提案之前，应该与其顾问进行协商，包括但不限于与合伙公司任何投资有关的其他问题及其他相关交易。此同意征求声明仅以英文书写，任何问题应以英语为准。除了英文之外的任何其他语言版本的同意征求声明均未获授权。

**D. 税收风险**

1. **投资份额面临各种联邦所得税风险。** 投资者应注意以下税收事项中载列的涉及修改提案相关的各种联邦所得税风险。某些税务后果将对有限合伙人的影响在某种程度上取决于有限合伙人特定的个人税务状况。本备忘录未进一步讨论或评估州或地方税务对有限合伙人的影响。每位有限合伙人应咨询其自己的税收顾问，了解联邦、州和地方所得税法对份额投资的影响，以及在实施修改提案后对有限合伙人个人税务情况的影响。普通合伙人或其关联方或合伙公司顾问均未向份额持有人或有限合伙人提供任何税务（或其他法律）建议。以下讨论并非税务建议。对于可能会对合伙公司投资产生影响的各种旨在更改法规的建议，本摘要不作讨论。

2. **就联邦所得税而言，合伙公司的纳税身份存在相关风险。** 合伙公司是依据佛罗里达州法律注册成立的有限责任公司。合伙公司不会申请美国国家税务局（"IRS"）的裁定，否则，其将被视为应缴纳联邦所得税的合伙公司，但期望以合伙公司身份提交联邦所得税纳税申报单。有限合伙人应认识到，投资份额的很多优势和经济利益取决于合伙公司能否被划分为适用联邦所得税的合伙公司（而非像公司一样的纳税组织）。如果种类划分出现变动，将导致公司需缴纳企业水平的所得税，从而会减少用于分配给有限合伙人的可用资金，阻止了供有限合伙人个人纳税申报使用的税收利益的流通（如有的话），且变动可能会需要将所分配的资金视为股息，从而大大减少投资于合伙公司产生的收益。此外，在合伙公司的经营期限内，如公司纳税身份发生此类变动，则 IRS 视该变动为课税事件，且在该事件中，有限合伙人有纳税义务，且不会收到合伙公司分配的用于承担纳税义务的现金。

   以下讨论基于公司始终被视为适用于联邦税务的合伙公司之假设。公司继续被视为合伙公司取决于现有法律和法规。虽然这些法律法规有可能发生变化。

3. **有限合伙人的联邦所得税负债可能超过现金分配。** 每位有限合伙人应对合伙公司分配给有限合伙人的应纳税收入纳税，不管合伙公司是否向有限合伙人分配现金。有限合伙人应知道，有限合伙人来自合伙公司应纳税所得的可分配份额所缴纳的联邦所得税可能会超出该有有限合伙人所分配到的金额。只有在分配金额在分配时超出有限合伙人在其份额中的课税基础时，有限合伙人来自合伙公司现金分配的可分配份额需要缴纳联邦所得税。此外，如果资金分配超出了有限合伙人被视为面临"风险"的金额，则这部分资金分配可以收回先前的损失（如有的话）。有限合伙人的课税基础或"风险"资金可能不足以使所分配的金额免于纳税。在美国联邦所得税中，特定成员分配到的各类公司支出的课税减免程度存在各种限制。公司或公司特别活动的损失可能会超过该年公司的收益。任何此类损失均为被动损失，会令有限合伙人在减免亏损课税上遭受限制。此外，资本亏损的课税减免程度同样存在限制。对于来自合伙公司亏损和支出项目的可分配份额的减税限制情况，有限合伙人应咨询各自的税务顾问。对于纳税年度有限合伙人来自公司收入、损益、减税、抵

税等项目的份额（不论是分配给该有限合伙人的现金抑或财产），有限合伙人都需要上报各自的美国联邦所得税纳税申报表。

4.  **合伙公司向有限合伙人提供信息报告。**合伙公司纳税年度结束时，合伙公司应提交美国国税局 1065 表，并向每位有限合伙人提交 K-1 税表。如合伙公司从其持有权益的实体收到必要税务信息的时间出现延迟，合伙公司向成员发送以上信息的时间也会延迟。因此，有限合伙人可能需要在任何纳税年度申请延迟其纳税申报时间。

5.  **税务审核程序将由普通合伙人控制。**合伙公司收入、损益或税收抵免的审计由合伙公司方面进行管理。普通合伙人将依据其向合伙公司和有限合伙人所承担的义务对此类问题上做出决定，但是这些决定可能会对有限合伙人的纳税义务产生不利影响。

6.  **联邦和州所得税法律和政策的变化可能会对有限合伙人产生不利影响。**不能确保与本同意征求声明中所述所得税后果有关的美国联邦和州所得税法律和美国国税局行政方针的变化不会对有限合伙人的利益产生不利影响。

有关上述事宜，每名有限合伙人应就法律、税务、会计及其他同意修改提案的结果咨询其律师、会计师及其他专业顾问。

## 税务事项

### 概述

以下摘要是对决定同意修改提案的某些联邦所得税后果所进行的一般性讨论。本摘要基于 1986 年《国内税法》（"法规"），适用的财务条例、行政裁决、惯例和程序以及截至本文件日期的司法权限。所有上述内容均可能发生变更，任何此类更改均可能影响本摘要的持续准确性。有关目标投资税务后果的讨论涉及第一期有限合伙人，因此在此方面提及的有限合伙人应视为第一期有限合伙人。本摘要并不涉及根据有限合伙人具体情况可能与特定有限合伙人有关的联邦所得税的所有内容，或根据联邦所得税法受特殊待遇的特定类型的有限合伙人，也不讨论任何州、地方、外国或其他的税法。对于在同意本同意征求声明中拟议的修改提案后投资、拥有和处置份额的特定税务后果，每名有限合伙人应咨询他或她的非美国和美国税务顾问，以便成为美利坚合众国常住居民以及所有其他与目标投资相关的税收后果。

### 以下讨论并非税务建议。强烈建议有限合伙人向其税务顾问咨询投资于合伙公司的税收后果。

在同意修改提案后，合伙公司将有权再投资于目标投资。经过此类再投资，有限合伙人将间接投资于目标投资。就目标投资中修改相关的收入、遗产或其他税务后果，不需要获得 IRS 或任何其他税务机关的税务裁定。因此，在审计后，很可能会拒绝全部或部分扣除项目，或由基础实体进行资本化。每名有限合伙人将负责准备并提交涉及目标投资权益的所有适当的报税表。强烈建议每位投资者就是否同意本修改提案的问题咨询其税务顾问和法律顾问。

### 美国税务状况

在大多数情况下，合伙公司将会将目标投资中的再投资视为可获得利息收入的债务工具，并以普通收入税率进行征税。但是，合伙公司的某些特定投资可能会被视为实体（拥有不动产实体之财产或权益）的普通股或优先股权。在同意修改提案后，有限合伙人同意提交与普通合伙人确定的合伙公司报告一致的纳税申报单。不能保证 IRS 会同意该状况，并且不会提出质疑。除另有说明的股权外，本次讨论的其余内容假设目标投资将被视为债务工具投资。

本摘要不讨论受联邦所得税法律特殊对待的一位或多位特定有限合伙人的税务后果，包括金融机构、保险公司、免税投资者或非美国籍成员。此外，本概述不讨论购买、持有、处理或撤回合伙公司投资相关的美国遗产税和赠与税或替代最低税等方面的税收后果。

### 美国有限合伙人的注意事项

下文概述了满足以下条件的有限合伙人某些重要的美国联邦所得税后果：（a）不论收入来源如何，都需缴纳美国联邦所得税的美国公民或居民、国内公司或房

DocuSign Envelope ID: D82C1BA3-6A2E-4745-85E6-63CCE7A69459

地产，或美国法院有权监督其管理且一名或多名美国人有权控制其所有决策的信托（以上术语的定义是就美国联邦所得税而言）；和（b）非免税。

### 目标投资的收入和损益征税

就美国联邦所得税而言，一般将目标投资视为债务工具。这是目前适用于合伙公司投资的税收待遇。定期利息收入以及在归属于借款人所使用合伙公司资金的债务工具到期时支付并由合伙公司就此类债务工具获得款项将按照普通收入进行征税。合伙公司将根据合伙协议规定的合伙公司各自权益将其所有应纳税所得额分配给有限合伙人。某些目标投资可能具有原折扣，其构成合伙公司的应税收入，因此将在年度 IRS 表 K-1 上分配给有限合伙人，同时还包括现金支付利息。合伙公司收购目标投资还包括累计折扣或债券溢价。合伙公司将通知有限合伙人各纳税年度内的该等金额。有限合伙人应咨询自己的税务顾问，了解对其与目标投资有关的此类项目个人税务情况的影响。

目标投资将被视为合伙公司持有的资本资产。如果在借款人全部偿还之前，被视为债务工具出售或处置的目标投资（例如：美国税收裁定下被视为重大修改的目标投资重组），合伙公司可实现此类资本交易的收益或损失。任何此类损益将根据其在年度 IRS 表格 K-1 上合伙公司各自权益分配给有限合伙人。

### 权益投资的收入和损益征税

分类为合伙公司的从属相关实体将不承担美国联邦所得税，但每位有限合伙人必须报告其所占的实体收入、收益、损失、扣除和抵免额的可分配股份（无论是否分配）。有限合伙人可能承担税务责任，而不从合伙公司、相关实体或中间实体收到足够的现金分配，以便支付纳税义务。每名有限合伙人在计算其联邦所得税责任时必须考虑到，并在其联邦所得税申报表中单独报告，相关实体在合伙公司纳税年的收入、收益、损失、扣除额和信用。

根据相关实体的合伙公司或经营协议，实体的应纳税所得额、利得、损失、扣除和信用项目的分配应考虑其合伙人或成员的可变权益。合伙公司或经营协议将包含旨在严格遵守 IRS 条例的规定，说明合伙将被视为具有"实质性经济效应"的公司分配，因此适用于美国联邦税务。但是，此类规定的适用可能不确定，不能保证根据合伙公司或经营协议为税收进行的收入、扣除、损失和收益分配将在 IRS 的考虑范围内。IRS 可能会质疑合伙公司或相关实体的分配不符合此类财务条例。所有税项的重新分配可能对有限合伙人产生不利的税收和财务后果。

如果合伙公司的再投资计入股本权益，如优先股权投资，则不能保证 IRS 不会将优先股权投资视为合伙公司的实体负债。在这种情况下，有限合伙人的美国联邦税收影响将如上述"目标投资的收入和损益征税"所述。敦促有关合伙人就被视为美国联邦所得税债务的优先权益投资咨询其自己的税务顾问。

### 调整后的税基

有限合伙人利益的调整后税基通常等于有限合伙人向实体出资的财产现金金额和调整后的税基，加上有限合伙人按比例分配的收入份额以及任何实体债务并减去有限合伙人的现金分配、损失和任何负债减少的份额。预计合伙公司对修改提案拟议的目标投资不会改变有限合伙人的税基，但在目标投资和任何相关的股权投资过程中可能会进一步进行税基调整。

### 非美国上层合伙人的不动产权益征税

合伙公司以股权形式再投资的相关实体业务可构成美国贸易或业务。在这种情况下，为非美国公民或居民（"非美国合伙人"）的非美国上层合伙人可能被视为从事美国贸易或业务。非美国合伙人通常将按照与美国贸易或业务（定义参见美国税法）相关的实体可分配应税份额征收美国联邦所得税，如同他们为美国公民或居民，即：适用于美国公民的正常毕业所得税税率，无论该实体是否进行现金分配。一般情况下，投资股权的非美国合伙人将需要就其可分配相关实体收入的可分配份额提交美国联邦所得税申报单，其涉及实体或其子公司在美国所经营的贸易或业务。任何此类美国投资的收入和收益，包括出售或赎回实体投资收益的一部分，可能被视为与美国贸易或业务有实际联系的行为，因此应缴纳美国联邦所得税，无论该实体是否进行现金分配。一般而言，实体应按照适当的最高税率扣除从可用分配给非美国合伙人的扣除（或在适用情况下，有关非公司、非美国合伙人的较低利得税率）。此外，此类非美国合伙人也会单独提交美国联邦所得税申报单。任何此类非美国公司的非美国合伙人也可能会就其与收益和利润相关的份额而收取 30%的美国联邦利润税，尽管可根据适用的税收条约减免税率。

如果相关实体产生任何源自美国的并与美国贸易或业务无关的"固定或可确定年度或定期"收益、利润或收入，例如：利息、股息或租金，非美国合伙人的可分配收入份额（无论是否分配）将按照 30%的税率缴纳美国预扣税。除非根据适用的例外或税务协定进行扣减或免除。

此外，无论该实体的活动是否构成美国贸易或业务，非美国合伙人将对"美国不动产利益"处置所产生的任何收益征税，视同于此类收益与收入相关。该税根据不动产税法规定的外国投资，也称为 FIRPTA。美国不动产权益包括美国房地产和持有美国房地产投资的主要美国公司的权益，包括不动产、建筑物和发展项目的其他改善。一般而言，持有此类不动产权益的实体将必须按照最高适用联邦税率就美国不动产处置权益征收税费（或适用情况下，非公司和非美国合伙人的较低税率）。30%的分支利润税也适用于非美国投资者。此外，如果除其他要求外，实体的总资产至少包括美国不动产权益的 50%，买方可要求在出售该实体权益时扣除购买价格的 10%。

合伙公司以股权形式再投资的实体视为从事美国贸易或业务。在这种情况下，非美国合伙人在该实体的收入和收益中所占份额可能被视为与该实体的美国贸易或业务（包括实体的营业收入）相关，并将按照正常的美国联邦所得税率进行征税。非美国合伙人通常需要就非美国合伙人的有效关联收入提交美国联邦所得税申报单。如果实体被视为从事美国贸易或业务，则该实体将被要求扣除涉及非美国合伙人实体收入份额的美国联邦所得税。

预计在接受有限合伙人 I-526 申请及签发临时居留签证后，该有限合伙人可能成为美国纳税人，因此不再承担非居民的税务待遇。

**投资利息和被动活动限制**

"投资利息"（即，"可适当分配到用于投资的财产的债务所产生的利息"）的减税存在限制。一般来说，只有来源于纳税人"净投资收益"的投资利息才可减税。在这种情况下，"净投资收益"通常包括来自公司的净收入和来自用于投资的财产的其他收入（而非被视为被动营业收入的收入）。但是，长期资本收益不在净投资收益的定义范围之内，除非纳税人特别指定将该收益视为普通收入，而非长期资本收益。当年产生的由于投资利息限制而不可减税的利息可被结转，直至纳税人有足够投资收入。合伙公司将分别向每位有限合伙人汇报其所分配的公司投资利息支出，而每位有限合伙人必须明确在纳税申报单上扣除的费用金额。

非法人投资者（以及某些封闭式个人服务和 S 型公司）在以被动商业活动产生的亏损抵消积极商业活动收入、报酬收入和投资组合收入（即，来自组合投资、版税等方面的利息、股息、资本收益）上存在限制。实体分配的收入或亏损份额通常被视为被动活动收入或亏损。相应地，有限合伙人在使用任何免税实体损失和可分配费用时将受到被动活动损失的限制。

**公司投资支出和某些其他支出的扣税程度**

人、信托或房地产的投资支出只有在超过特定纳税年度内纳税人调整后的总收益的 2%后方可用于减税。此外，《国内税收法规》进一步对个人能力做了限制，以超过特定金额的调整后总收益扣除该投资开支。另外，此类投资开支是各类分项扣减额，是非法人纳税人计算该纳税人代用最低税义务时不可扣除的。

可抵扣程度的限制可适用于有限合伙人所占的公司贸易或经营支出份额。合伙公司可在其不同活动中分配费用。不能确保任何该等支出将被视为贸易或经营支出，或者保证 IRS 将同意合伙公司所进行的任何分配。

该等限制条件的影响具体取决于每位纳税人的特定纳税情况。因此，有限合伙人应就该等限制条件是否适用及其所占合伙公司亏损和支出份额的扣税程度咨询其税务顾问。

**课税基础的适用情况和扣税的"风险"限制**

有限合伙人有权在其所得税纳税申报单中扣除的任何公司亏损额仅限于截至发生该亏损的公司纳税年度结束时该投资者份额经调整课税基础。通常情况下，有限合伙人份额经调整后的课税基础等于购买该份额所支付的金额，加上（i）就联邦所得税而言，确定的该有限合伙人所占的合伙公司债务份额，以及（ii）该有限合伙人所分配的合伙公司已实现收入和收益，再减去（但不会少于零）（a）公司对该有限合伙人的分配（包括该有限合伙人所占合伙公司债务分配的减少）以及（b）该有限合伙人所分配的合伙公司损失和支出。

存在"风险"限制的有限合伙人（通常指非法人纳税人和封闭式企业）可能无法在合伙公司损失上扣税，乃至超过该年有限合伙人在其份额上的"风险"金额。有限合伙人所拥有的"风险"金额一般与该有限合伙人如上所述调整后的课税基础相同，除了一般不包含任何因公司债务引起的金额（而非某些由房地产担保的投资）或有限合伙人在无追索权基础上的借款。

课税基础下或"风险"限制下不可扣税的损失为未决项，可能被结转至后续纳税年度，具体取决于各种适用的限制条件。

外国投资者的特定美国税收注意事项

作为有限合伙人投资于合伙公司并间接投资于目标投资或股权权益的非美国居民的联邦所得税征收办法相当复杂，并且随有限合伙人和合伙公司环境和活动而变化。建议每位非美国籍有限合伙人就合伙公司目标投资或股权再投资应缴纳的美国联邦、州、地方和国外所得税、遗产税和其他税收后果咨询其投资顾问。以下讨论内容假设因有限合伙人在美国停留或活动并非作为合伙公司的有限合伙人，从而非美国籍有限合伙人无需缴纳美国联邦所得税。

扣缴税款

通常情况下，非美国籍有限合伙人需就其所占的公司股息收入（而非构成《国内税收法规》定义下的投资组合利息的利息）和其他收入份额缴纳30%（或根据适用实收协定，低于30%）的美国联邦预扣税。除非美国籍有限合伙人满足某些例外规定，非美国籍有限合伙人还需对上文所述的应计利息和原始发行折价缴纳预扣税。根据特定的目标投资，合伙公司可从此类来源中获得大量的收入。

备查扣缴

当前的美国税收备查扣缴税率为28%，适用于未能向公司提供特定识别信息（如有限合伙人的纳税人识别号）的有限合伙人所分配的全部或部分金额。为此，美国有限合伙人应向公司提供填妥的 IRS 表格 W-9"纳税人识别号与证明请求表"。非美国籍有限合伙人应向公司提供填妥的 IRS 表格 W-8BEN 或其他恰当的 IRS 表格 W-8。

外汇账户纳税合规法

通常被称为《海外账户纳税法案》（或"FATCA"）的美国综合管理规定对某些外国金融和投资实体增加了认证和信息报告要求。所有有限合伙人应提供合伙公司要求的任何信息，以便满足此类要求。如果不符合认证要求，可以对某些付款（包括利息、股息）和处置股权或其他资产的总收益征收 30%的预扣税，从 2019 年 1 月 1 日起生效。有限合伙人应根据具体情况，向自己的税务顾问咨询 FATCA 规则的适用性。

## 遗产税

此外，每位非美国籍成员都要为其在合伙公司中的权益缴纳遗产税。有限合伙人应根据各自情况寻求其各自遗产税专业人员的建议。

根据全球收入，美国对所有美国公民和永久居民征收收入和遗产税。税务条约和各种豁免措施消除了某些但不是全部的双重征税风险。美国各州都有自己独立的所得税制度。大多数州通过州所得税来增加收入。有限合伙人在同意修改提案之前，应考虑成为美国居民的税收影响。成为美国永久居民的外国人（非美国人）通常以与美国公民相同的方式受美国联邦所得税的全球收入约束。在同意修改提案之前，非美国有限合伙人应就成为美国合法永久居民的后果咨询美国和非美国税务顾问。

该同意征求声明并不涉及合伙公司对目标投资及相关优先和普通股权益再投资对有限合伙人所有美国联邦所得税的影响，也不涉及任何有限合伙人此类投资的州或地方税收后果，或该等投资对任何非美国有限合伙人的税务后果。每名有限合伙人应就修改提案及合伙公司对目标投资的再投资及适用的州、地方和外国税咨询自己的税务顾问。对于非美国公民或居民的有限合伙人，应特殊考虑，并且有限合伙人应就修改提案的美国联邦、州、地方和外国税务后果咨询他/她自己的税务顾问。

## 州和地方税收

有限合伙人应考虑修改提案及在目标投资和相关优先和普通股权直接投资的潜在州和地方税收后果。除在自身所在州或居住地纳税外，有限合伙人需要在公司开展运营的司法管辖区承担纳税申报义务、缴纳所得税、特许权税和其他课税。有限合伙人应向其税务顾问咨询修改提案以及目标投资和相关优先和普通股权直接投资的州和地方税收后果。

## 份额的处理和其他股权

合伙公司份额的转让、分配或处理存在限制。总的来说，美国有限合伙人有权重组目标投资和相关优先和普通股权销售、赎回、交易或其他应纳税处理的资本损益，但不包括美国有限合伙人先前未将应计利息包含在内的情况下利息产生的金额（该部分被确认为普通利息收益）。个人长期资本利得（持有超过一年的投资）可按照优惠联邦税率征收。资本损失的可抵扣性可能存在限制。限制的后果因每个纳税人税务情况的不同而不同。因此，每位有限合伙人应向各自的税务顾问咨询这些限制问题。

非美国籍合伙人销售或处理份额的所得，无论是通过合伙公司销售或有限合伙人合伙公司权益，通常被视为与在美国境内发生的贸易或业务切实相关的损益，且需要缴纳联邦净所得税。因此，每位非美国籍投资者在销售或处理其在公司的权益前应向其税务顾问咨询。

**可能发生的 IRS 挑战；税收审计**

有限合伙人应明白，IRS 可能会对合伙公司对收入、损益、课税减免和税收抵免等项目的处理，以及合伙公司对其交易的描述产生质疑，且任何此类质疑（如成功）可能会导致征收额外税款、罚款和利息费用。管理机构负责决定如何上报合伙公司纳税申报单上的此类款项。如出现合伙公司的所得税申报表被国税局稽查的情况，公司收入和扣除项的课征方式一般由合伙公司的单独程序决定，而非由有限合伙人的个人审计决定。但是，如果国税局对公司的纳税申报表进行审计，则有限合伙人要对自身的纳税申报单进行审计。管理机构是指定的"税项合伙人"，在制定影响所有有限合伙人的税务处理和程序权力相关的决策的上有重大权力。此外，税项合伙人有权使某些合伙人受到调解协议的约束，且有权代表所有有限合伙人在有限合伙人履行与公司款项有关的纳税义务上延长诉讼时效。根据 IRS 颁布的规则，上述程序将自 2018 年起更改，导致合伙公司的税收将在合伙公司而非各成员水平上进行结算和支付。合伙公司纳税申报表的任何审计所产生的法律和会计成本由合伙公司承担，但每位有限合伙人承担自身纳税申报单审计的费用。

**可能影响税收的立法或其他行动**

上述讨论仅仅只是一份总结，且建立在现有美国联邦所得税法律的基础上。有限合伙人应意识到投资份额的美国联邦所得税待遇可能会被法律、司法或行政裁定更改。任何此类变动在现有交易和投资方面具有追溯效力，且可能改变上述声明。处理美国联邦所得问题的规则不时接受法律程序相关个人、美国国税局和财政部的审查，从而造成财政部法规的修改，既定概念的解释的更改，以及法律的变动。美国联邦税务法律及其解释的变化可能会对投资于公司的税务方面造成不利影响。不能确保不会颁布对有限合伙人投资公司产生不利影响的法律。

有限合伙人应就修改提案的美国联邦、州、地方和外国税务后果咨询自己的税务顾问。

DocuSign Envelope ID: D82C1BA3-6A2E-4745-85E6-63CCE7A694E9

## 同意程序

普通合伙人已批准修改提案，并敦促您同意，以便 EB-5 贷款还款收益可投资于目标投资。每名有限合伙人应签署同意函并通过电子邮件或传真方式尽快发送至合伙公司的以下电子邮件地址和传真号码：

电子邮件：USIFInvestors @ usifund.com

传真号码：+ 001.561.799.0061

除非您同意，否则您将无法从目标投资的再投资中获益以及此类投资所产生的回报，并减少 EB-5 计划所面临的风险。

修改提案的批准需要持有至少大部分未偿股份有限合伙人的同意。同意征求将于 2017 年 10 月 31 日（纽约时间）下午 5:00（该等日期和时间可延长或提前终止）到期。合伙公司有权酌情终止或延长同意征求。如有限合伙人在 2017 年 10 月 31 日（星期五）下午 5 点前未提交签署的同意函（除非该等日期及时间获得延长），有限合伙人将被视为已同意修改提案。

有关该同意征求声明或修改提案的问题可采用书面形式发送给合伙公司，转交：佛罗里达州区域中心有限责任公司，佛罗里达州朱庇特滨海大道 115 号＃300 单位，邮编：33477 电子邮件：USIFInvestor@ usifund.com。

根据合伙公司为同意征求所制定的同意程序，如果在有限合伙人收到该同意征求声明的 10 个营业日内未收到有限合伙人的答复，我们将向有限合伙人发出通知（"提醒通知"），再次邀请有限合伙人同意或拒绝修改提案。

如该等有限合伙人未能就该提醒通知作出答复（按照提醒通知规定的方式以及在收到该提醒通知后的 3 个营业日内），则视为该有限合伙人拒绝修改提案。

如合伙公司未收到所需多数同意，将不会实施有限合伙人类别结构和相关的资本分隔，合伙公司将保留 EB-5 贷款的还款所得款项，普通合伙人之后将通过注册投资顾问将资金投资于符合 USCIS 准则的投资级投资，保留资本，而不调整应付给有限合伙人的现行分配。

<u>**附录 A**</u>

**修订和重述版合伙协议**

本协议最初采用英文编写；在原英文版本与任何其他语言译本之间发生任何冲突的情况下，应以原英文版为准。

VIA MIZNER FUNDING，LP

修订和重述版有限合伙协议

2017 年 10 月 1 日

# 目录

1   合伙公司的组织 ....................................................................... 2

2   投资本金；合伙公司贷款 ......................................................4

3   分派 ............................................................................................ 5

4   分配 ............................................................................................8

5   会计和记录 ..............................................................................12

6   管理 .......................................................................................... 13

7   声明和保证 ..............................................................................18

8   转让限制 ..................................................................................19

9   责任限制；补偿 ......................................................................20

10  解散和清算 ..............................................................................23

11  仲裁 .......................................................................................... 25

12  杂项 ..........................................................................................26

本协议最初采用英文编写；在原英文版本与任何其他语言译本之间发生任何冲突的情况下，应以原英文版为准。

## VIA MIZNER FUNDING，LP

### 修订和重述版有限合伙协议

Via Mizner Funding, LP（"合伙公司"）的本修订和有限合伙协议（"协议"）由以下双方于 2017___订立，U.S. Immigration Fund, GP – Mizner, LLC，一家位于佛罗里达的有限责任公司，作为唯一普通合伙人（"普通合伙人"），以及按照本协议条款（以下简称"有限合伙人，统称为"各有限合伙人"）不时被认可为"有限合伙人"的各人士。其名称和地址载列于附录 A，作为有限合伙人，附录 A 将根据本协议的条款不时更新。有关本协议所采用术语的定义，参见附录 B。

### 序言：

（A）合伙公司成立于 2012 年，并接受普通合伙人（佛罗里达区域中心有限责任公司）（"初始有限合伙人"）及有限合伙人方（"先前协议"）于 2012 年 7 月 20 日所签订有限合伙协议的约束。

（B）成立合伙公司向 Camino Investments Holdings 有限合伙公司（"开发商"）提供 EB-5 贷款，该公司成立的目的旨在拥有该不动产并开发及经营该项目。合伙公司先前根据普通合伙人所接受的订阅向投资者出售份额，并将该等投资者作为接纳为合伙公司的有限合伙人。

（C）根据先前协议的条款，初始有限合伙人的份额已被取消，合伙公司已不再是合伙公司的有限合伙人。

（D）普通合伙人及有限合伙人现时希望根据本协议第 11.4 节修订及重述该之前协议。

（E）在本协议日期之前接纳的有限合伙人的投资资本由普通合伙人分隔并规定用于两笔单独的 EB-5 贷款提供资金。

（F）普通合伙人和有限合伙人希望对有限合伙人进行分类，并根据其投资资本为指定 EB-5 贷款提供融资的项目建设阶段分隔其投资资本。

（G）正在签署本协议，规定适用于合伙人之间关系及开展合伙公司相关活动的条款。

**协议：**

考虑到本协议双方各自的约定和协议以及其他有价值的对价（其确认充分收讫），双方约定如下：

**1    合伙公司的组织**

1.1    <u>解释</u>。本协议附录 B 载列了用于本协议解释条款和规则的定义。附录 B 中未另行定义的任何大写术语均具有本协议其他内容所述的含义。

1.2    组建；吸纳新的有限合伙人。合伙公司是根据法案的规定在初始有限合伙人和普通合伙人之间组建。每名有限合伙人的合伙公司利益由签发给各人士的份额代表，该人士应在普通合伙人收到各自的最低投资本金及其签署的副本签名页之日起加入合伙公司，所有文件作为参考附加于附录 A。就本协议而言，有限合伙人应按照第 2.1 节划分为第一期有限合伙人或第二/三期有限合伙人。除本协议另有规定外，合伙人的权利和义务应符合本法案的规定。

1.3    名称。合伙公司按照普通合伙人不时决定的适用法律，继续以"Via Mizner Funding, LP"的名义开展活动。普通合伙人须在合伙公司开展业务所采用的名称发生变更后的 10 个营业日内通知每名有限合伙人。

1.4    注册办公室和主要营业地址。合伙公司的主要营业地址位于佛罗里达州朱庇特滨海大道 115 号＃300 单位，邮编：33477，或普通合伙人按照适用法律不时决定的其他地点。普通合伙人应在合伙公司主要营业地址发生变更后的十个营业日内通知各有限合伙人。

1.5    年度报告。按照法律规定，普通合伙人应当按照国务院规定的形式，向国务院递交合伙公司年度报告。普通合伙人应促使合伙公司按照法律规定将合伙公司向国务院提交的最近年度报告的副本一并存放在其主要办公室内。

1.6    合伙人的名称和地址。普通及有限合伙人的姓名及地址载于附录A，该附录将不时进行更新。

1.7    合伙公司目的。合伙公司性质为商业营利性实体，主要从事本法允许的任何合法目的，包括但不限于（i）购买或以其他方式获得对房地产权益的抵押和其他留置权，（ii）向开发商提供贷款，以便在目标就业区内开发、

建设和运营项目，(iii) 向试点计划下的合格人员提供和销售份额，(iv) 所有与上述相关的活动；(v) 以及偿还第一期 EB-5 贷款，投资于第一期目标投资。合伙公司应具有执行合伙公司活动所必需的任何及所有必要事项的权力。

1.8　财年。合伙公司的财年（"财年"）应为历年。财年应包括有效期开始和结束时的部分历年。

1.9　有效期。合伙公司的有效期（"有效期"）自按照法案向国务院递交的有限合伙公司证书中规定的日期开始，直至合伙公司及其业务在清盘后完成清算，具体如第 10.1 节规定。

1.10　组织声明和其他文件。根据普通合伙人的要求，有限合伙人应迅速执行符合本协议条款的所有申报、证明和其他文件，以便普通合伙人合理完成所有备案、记录、出版等行为，履行以下所有要求：(i) 根据佛罗里达州法律组建和运营有限合伙公司；(ii) 如果普通合伙人认为合理，在合伙公司拟营运的所有司法管辖区内或有限合伙人在合伙公司中记录的地址；合理地经营合伙公司的业务，作为有限合伙人具有有限责任的实体或合伙公司；和 (iii) 普通合伙人所决定的所有其他文件均须由合伙公司提出或建议作出。

1.11　独立活动；关联方交易。

1.11.1　在适用法律允许的范围内，普通合伙人（代表本人），每名有限合伙人（代表本人）及其任何关联方可以自己的名义参与其他各类型的商业机构或持有利益。合伙公司或任何合伙人均不得凭借本协议拥有此类商业机构或其所产生利润。

1.11.2　普通合伙人可代表合伙公司、任何合伙人，包括普通合伙人或该合伙人的任何关联方，出售或购买商品或执行服务，包括管理服务、会计服务、经纪服务和其他与房地产有关的服务，或向合伙公司提供贷款；但是，合伙公司与普通合伙人或普通合伙人任何关联方之间的任何合约之条款必须符合合伙公司的利益，该合约按照本地专业人士或其他提供商可比服务的惯常费率厘定。合伙公司及任何合伙人均无权享有普通合伙人或任何该等关联方从任何该等合约中获得的任何收入或利益。

1.11.3　本协议中的任何内容不得 (i) 阻止普通合伙人任何关联方及其高级职员、董事和员工向其他合并投资载体和账户提供任何形式的服务，包括合并投

资载体和/或具有与合伙公司大致相似或相同或重叠的投资目标、策略和政策的账户，(ii) 以任何方式约束或限制普通合伙人的关联方及其高级职员、董事和员工发起或获得关联方合并投资载体和/或有资格作为第一期目标投资账户的投资，而不向合伙公司和有限合伙人承担任何义务，或(iii) 防止普通合伙人的任何关联方及其高级职员、董事和员工就第 1.11.3 节所述的此类获得收取任何费用或其他补偿或利益，其应为关联方的唯一利益。合伙人知悉：(a) 普通合伙人及其关联方可能会及时收到借款人、开发商和业主以及/或其关联方有关第一期目标投资的发起或者收购的费用、补偿和税款及其他利益，包括但不限于发起费、服务费和行政费用和折旧分配，而此类费用、补偿和税费等利益可能引起利益冲突，合伙公司或有限合伙人将有权获得或收到任何此类费用和赔偿，(b) 其他合并投资载体和/或由普通合伙人关联方及其高级职员、董事及雇员（包括涉及合伙人的经济、报告及其他权利）提供、管理或服务的帐户之管理协议的条款和条件可能与本协议的条款和条件存在显著差异，合伙公司和有限合伙人（在其职责范围内）均无权因在合伙公司或其他实体内的投资而获得其他合并投资载体和/或账户中投资者不同不同条款的利益。

## 2    投资本金；合伙公司贷款

2.1    合伙人投资本金；有限合伙人分类。

2.1.1    合伙人已执行附录 A 中载列的投资本金。除本协议另有规定外，合伙人无义务向合伙公司提供供款或垫款或借出款项。普通合伙人不负责向任何份额持有人偿还投资本金。

2.1.2    有限合伙人应分为第一期有限合伙人或第二/三期有限合伙人，附录 A 应根据其所属类别载列有限合伙人的姓名。

2.2    额外资金。如果在期限内的任何时间，普通合伙人根据合理商业判断，确定合伙公司需要更多的资金用于开展其业务或履行其任何义务、费用、成本、负债或支出（不包括为第一期目标投资提供贷款或进行融资），普通合伙人可以但没有义务：

2.2.1    促使合伙公司从商业贷款人或任何其他人士借取所需的额外资金；但是，任何该等贷款均不得向有限合伙人及普通合伙人提出追索；或

2.2.2    如果无法借取所需的额外资金，或对于合伙公司而言，普通合伙人的贷款条件至少与非关联贷方向合伙公司提供的贷款具有一致的条件，则普通合

伙人或关联方可向合伙公司贷款，按普通合伙人在合理商业判断中确定的条件支付，包括对合伙公司财产的留置权。

2.3　　有限合伙人的有限责任。除根据本协议或本法另有明确规定外，有限合伙人仅应按照第 2.1 节规定投资本金，不得向合伙公司提供任何其他资金，或在已经支付投资本金后，向合伙公司提供任何其他额外的投资本金。除非本协议另有规定或法律规定，否则有限合伙人不对合伙公司的债务、负债、合同或任何其他义务负责，即使有限合伙人参与合伙公司的管理、控制和/或经营。除非本协议或法案另有规定，普通合伙人无义务偿还有限合伙人的任何投资本金。

2.4　　无资本利息。除非本协议另有明确规定，否则普通合伙人或份额持有人不得就其投资本金、其资本账户以及代表合伙公司提供的服务或以普通合伙人或份额持有人的身份收取任何利息、薪金或提款。

2.5　　资本回收与退还。除非本协议另有规定，否则普通合伙人或份额持有人无权在有效期结束前要求合伙公司退还任何投资本金。在需要退还任何投资本金的情况下，除本协议另有规定外，合伙人无权获得现金以外的财产。

2.6　　有限合伙人的强制撤销和解散。若有限合伙人的 I-526 申请未获得 USCIS 的批准，并且已经用尽所有上诉权利，合伙公司有义务在拥有足够资金时退还或者归还该有限合伙人的认购金额（"退出有限合伙人"）。认购金额的退款不计利息或扣除。退出投资者的任何资金将通过电汇方式发送给退出有限合伙人提供资金的账户。如果有多位退出有限合伙人有权收回其认购金额，则在这种情况下，合伙公司有义务首先退还上诉权利用完的退出有限合伙人的认购金额。完全退回或退还有限合伙人的认购金额后，（i）该退出投资者应被视为已退出并与合资公司分离，以及（ii）合伙公司与退出投资者之间的认购协议应终止，除非根据第 9 节（保密）和第 10 节（赔偿）。

2.7　　限制。尽管存在第 2.6 条的规定，合伙公司无义务退还任何以下有限合伙人的认购金额，（i）在成为退出有限合伙人后，在合伙公司内提出书面请求，要求继续作为合伙公司的有限合伙人，（ii）在提交后，并在 USCIS 裁决之前，撤销其 I-526 申请，或（iii）普适合伙人合理认为其未能积极寻求 USCIS 批准其 I-526 申请。未根据第 2.7 节退还认购金额的有限合伙人不得视为退出或离开合伙公司。

**3    分派**

3.1    第一期一般分布。 在 I-829 触发日之前，普通合伙人应在第一期可用现金允许的情况下，促使合伙公司按季度向普通合伙人分发第一期份额持有人按照第 3.2 节分派第一期可用现金。在第一期 I-829 触发日后，普通合伙人应在第一期可用现金的范围内，促使合伙公司每季度或其他酌情确定的间隔按照第 3.3 节向第一期份额持有人分派可用现金。

3.2    在第一期 I-829 触发日前分派可用现金。根据第 3.1 节规定，第一期可用现金应分配给普通合伙人和第一期份额持有人：

3.2.1    首先，按照各自合伙公司类别的百分比，按比例分配给份额持有人，不超过在其分配日期前的日历季度最后一天应计的第一期分配有限合伙回报；

3.2.2    其次，向普通合伙人分派截至该分派日前日历季度最后一天累积的未付第一期管理费（如有）；和

3.2.3    然后，余额分派给普通合伙人。

3.3    第一期 I-829 触发日期后第一期可用现金的分配。根据第 3.1 节和第 10 节的规定，第一期可用现金分配如下：

3.3.1    首先，支付分配给第一期份额持有人并应支付给除普通合伙人及份额持有人之外的债权人的合伙公司债务和负债；

3.3.2    其次，支付分配给第一期份额持有人并应支付给除普通合伙人及份额持有人的合伙公司债务和负债，不包括支付给普通合伙人的第一期未付管理费；

3.3.3    然后，按照普通合伙人的决定，向第一期份额持有人分派合伙公司的合理准备金；

3.3.4    然后，按照各自合伙公司的类别百分比，按比例分派给第一期有限合伙人，不超过其未付的第一期分派有限合伙人回报；

3.3.5    然后，向普通合伙人分派，不超过其第一期管理费；

3.3.6    然后，按照各自合伙公司的类别百分比，按比例分派给第一期有限合伙人，不超过在所有第一期有限合伙人的未收回投资本金减至零前的未收回投资本金；

3.3.7    向普通合伙人支付其未收回的投资本金，直到其未收回投资本金降为零；和

3.3.8　然后，余额分派给普通合伙人。

3.4　第二/三期一般分配。在 I-829 触发日之前，普通合伙人应在第二/三期可用现金允许的情况下，促使合伙公司按季度向普通合伙人分发第二/三期份额持有人按照第 3.5 节分派第二/三期可用现金。在第二/三期 I-829 触发日后，普通合伙人应在第二/三期可用现金的范围内，促使合伙公司每季度或其他酌情确定的间隔按照第 3.6 节向普通合伙人和第二/三期份额持有人分派可用现金。

3.5　在第二/三期 I-829 触发日前分派可用现金。根据第 3.4 节规定，第二/三期可用现金应分配给普通合伙人和第二/三期份额持有人：

3.5.1　首先，向普通合伙人分派截至该分派日前日历季度最后一天累积的未付第二/三期管理费；

3.5.2　其次，按照各自合伙公司类别的百分比，按比例分配给第二/三期份额持有人，不超过在其分配日期前的日历季度最后一天应计的第二/三期优先回报；

3.5.3　然后，余额分派给普通合伙人。

3.6　第二/三期 I-829 触发日期后第二/三期可用现金的分配。根据第 3.4 节和第 10 节的规定，第二/三期可用现金分配如下：

3.6.1　首先，支付分配给第二/三期份额持有人并应支付给除普通合伙人及份额持有人之外的债权人的合伙公司债务和负债；

3.6.2　其次，支付分配给第二/三期份额持有人并应支付给除普通合伙人及份额持有人的合伙公司债务和负债，不包括支付给普通合伙人的第二/三期未付管理费；

3.6.3　然后，按照普通合伙人的决定，向第二/三期份额持有人分派合伙公司的合理准备金；

3.6.4　然后，按照各自合伙公司的类别百分比，按比例分派第二/三期有限合伙人，不超过其未付的第二/三期分派优先回报；

3.6.5　然后，按照各自合伙公司的类别百分比，按比例分派给第二/三期份额持有人，不超过在所有第二/三期有限合伙人的未收回投资本金减至零前的未收回投资本金；

3.6.6　然后，向普通合伙人支付其未收回的投资本金，直到其未收回投资本金降为零；和

3.6.7　然后，余额分派给普通合伙人。

3.7　扣留金额。除非被视为纳税贷款（定义参见下文），否则合伙公司就任何普通合伙人或份额持有人（或其利益前身）因收入、收益、利润或分配根据法案、条例或任何州或本地法规、法例或规定（统称为"扣缴税法"）所支付的任何预扣税或其他应纳税款项应被视为按照本协议分派给该人士的分派，并符合产生付款或扣缴义务的收入、利润或现金的性质或来源。如果合伙公司根据扣缴税法规定支付的金额超过其他可分配给该人（或其利益继承人）的金额，则超额部分应构成合伙公司向该人士提供的贷款（"纳税贷款"），其应按要求支付，并从合伙公司向相关税务机关支付利息之日起计息，利率为优惠利率加1%。只要任何纳税贷款或其利息仍未支付，合伙公司将通过支付任何未付利息的分配以及此人的所有纳税贷款向该人提供未来的分派（或其利益继承人）。普通合伙人有权采取一切必要行动，使合伙公司遵守适用于合伙公司的扣缴税法的规定，并执行第3.4节的规定。第3.4节中的任何内容均不构成普通合伙人向合伙公司或任何有限合伙人或份额持有人提供预付款项或促使合伙公司从第三方借款以便根据扣缴税法规定支付合伙公司债务的义务。

3.8　分派限制。合伙公司在实施分配后，不得向合伙人提供分配：

3.8.1　分派将违反本协议；

3.8.2　合伙公司在其正常经营活动中将无法偿还到期债务；或

3.8.3　合伙公司的总资产将低于其总负债加上所需金额的总和，如果合伙公司在分派时解散、清盘并终止，则在解散、清盘和终止时满足合伙人的优先权，其优先权优于获得分派的其他人。

3.9　撤销

**4　分配**

4.1　分配意向；现金储蓄准备金。合伙人拟按照以下分配条款，生成普通合伙人和份额持有人的最终资本账户余额，此类余额将允许根据最终资本账户余额进行清算和分配，与第10.3节和第3节要求的分派相同，这将控制分派金额，不论最终资本账户余额为多少。如果第4节所述的税款分配规定未能产生最终资本账户余额，则（a）此类条款应由普通合伙人在必要

范围内进行修改，以便获得理想的结果，及（b）合伙公司在以前年度内的应纳税所得额（或该等年度的总收入和扣除或损失项目）应由普通合伙人在法律允许的范围内对普通合伙人和份额持有人进行重新分配，不可能通过当前和未来收入扣减分配项目（包括总收入）扣除和当前和未来分配阶段的损失。尽管国税局或任何税务机关对应纳税所得额、应纳税损失或其他项目，仍应以第 4.1 节为准。普通合伙人可在未经份额持有人同意的情况下修改本协议，只要其在与合伙公司专业税务顾问协商后，合理认为可作出第 4.1 节所述的分配和调整。如果第 4.1 节所述的分配和调整导致普通合伙人或任何份额持有人将收到的分配减少，如果此类分配根据第 10.3 节和第 3 节做出，合伙公司可向该人士作出保证付款（法案第 707（c）节所述）或采取普通合伙人可合理确定的其他行动来抵销此类减少。

4.2   定义

4.2.1   "部分调整后资本账户"是指任何分配期末（"调整日"）最后一天，任何普通合伙人或份额持有人在营业结束时，该人士的资本账户自调整日期开始时，并在实施损益中未包括的收入、损失或扣除项目以及所有投资本金和分配期间分配（但在第 4.3 节所述的分配期间任何损益分配生效之前），加上（i）根据条例第 1.704-2（d）节确定的合伙公司截至分配期限结束时的合伙公司最低收益份额，以及（ii）根据条例第 1.704-2（i）节确定的合伙公司截至分配期限结束时的合伙人最低收益非追溯性债务份额。

4.2.2   "目标资本账户"是指任何普通合伙人或份额持有人截至调整日期等于（可以是正余额或负余额）该人将收到的分派金额，如果合伙公司截至调整日期的全部资产以等于该资产总资产价值的现金出售，则所有合伙公司的负债均按照当时的条款进行偿还，所得款项净额按第 10.3 节视同于清算所得进行分配。

4.3   损益分配。在应用第 4.4 和 4.5 节后，各分配期间的利润和亏损应在普通合伙人和份额持有人之间进行分配，如果是利润，按比例减少其相应目标资本账户超过（如有）截至调整日期的部分调整资本项目，如果是亏损，则减少其部分调整资本项目超过截至调整日期相应目标资本账户的金额。任何分配期间的利润均不得分配给调整资金账户超过调整日期的目标资本账户的普通合伙人或份额持有人，且任何分配期的损失部分不得分配给其目标资本账户大于或等于调整日期的部分调整资本账户的普通合伙人或份额持有人。

4.4    特别分配。在分配损益前，将按以下顺序和优先顺序进行下列特别分配：

4.4.1    合伙公司最低收益退款。如果在本协议任何其他分配前，合伙公司的最低
收益减少，每名普通合伙人和份额持有人将特别分配合伙公司在该分配期
间的收入和收益（在必要时，可为随后的分配期间），金额等于该人在该
年度内根据条例第 1.704-2（g）（2）节确定的合伙公司最低收益的净减少，
所分配的项目将按照条例第 1.704-（g）节确定。第 4.4.1 节旨在符合合伙
公司最低收益退款规定，将根据条例进行解释，并遵守规定的一切例外。

4.4.2    合伙人非追溯债务最低收益退款。尽管第 4.4 节另有规定（第 4.4.1 节除
外，应首先适用），如果在任何分配期间合伙人的非追溯债务最低收益存
在净下降，截至分配期限开始时，持有该合伙人非追索债务最低收益（根
据条例第 1.704-2（i）（5）节确定）的普通合伙人或份额持有人将获得合
伙公司在该期限内的收入和收益的特殊分配（在必要时，可为随后的分配
期间），金额等于该人在该年度内根据条例第 1.704-2（g）（2）节确定的
合伙公司最低收益的净减少。所分配的项目将按照条例第 1.704-（g）节
确定。第 4.4.2 节旨在符合合伙公司最低收益退款规定，将根据条例进行
解释，并遵守规定的一切例外。

4.4.3    合格收入抵消。普通合伙人或份额持有人意外收到条例 1.704-1（b）（2）
（ii）（d）（4）、（5）或（6）节所述的任何调整、分配或分派，将获得特
别分配的合伙公司收入和收益，其金额和方式将足以按照条例的规定消除
该人士的调整资本账户赤字（如有）。第 4.4.3 节旨在限定并被解释为条例
第 1.704-1（6）（2）（ii）（d）节所定义的合格收入抵消，将按照条例进行
相应解释，且遵守本协议所述的任何例外情况。

4.4.4    总收入分配。如果任何普通合伙人或份额持有人在任何分配期结束时都存
在资本项目赤字，且超过根据第 1.704-2（g）（1）和 1.704-2（i）（5）节
倒数第二句所述该人士有义务恢复的总金额，则该人应尽可能快地获得合
伙公司收入和收益的特别分配，其金额应等于超出的部分，但是第 4.4.4
节所述的分配仅在第 4 节中规定的所有其他分配视同于本协议不存在第
4.4.3 节和第 4.4.4 节规定的情况下进行之后才能开展。

4.4.5    非追溯扣除。在普通合伙人和份额持有人按照各自的合伙公司权益按比例
分配在分配期限内的任何非追溯扣除额。

4.4.6    合伙人非追溯扣除。尽管本协议存在任何相反规定，任何分配期内的合伙
人非追溯扣除额将分配给普通合伙人或份额持有人，该合伙人或份额持有

人承担合伙人非追溯债务的损失风险，合伙人非追溯债务根据条例第 1.704-2（i）条归属于该债务。

4.4.7   法案第 754 节所述调整。在根据条例第 1.704-1（b）（2）（iv）（m）节确定资本账户时，如果需要调整法案第 734（b）或 743（b）节规定的任何合伙公司资产的调整税基，资本账户的调整额将被视为收益项目（如果调整增加了资产税基）或损失项目（如果调整减少了税基），将在法律允许的范围内，仅向普通合伙人或在普通合伙人或份额持有人中进行分配，其资本账户需要根据条例第 1.704-1（b）（2）（iv）（m）节进行调整。

4.5   其他特殊分配。在分配器进行第 4.4 节所述特殊分配后，并且在进行第 4.3 节所述利润和亏损分配前，应进行以下特殊分配：

4.5.1   如果合伙公司在分配期具有利润（在实施第 4.5.1 节前确定）并且任何普通合伙人或份额持有人的资本项目余额大于其目标资本账户余额（在作出第 4.4 节所述分配后），每名此类人员应特别分配等于其部分调整资本账户与其目标资本账户之间差额的合伙公司扣除或损失项目（或如果合伙公司的扣除或损失项目不足以消除所有此类人的总差额，则应按照总差额按比例分配此类项目）。

4.5.2   如果合伙公司在分配期具有亏损（在实施第 4.5.2 节前确定）并且任何普通合伙人或份额持有人的资本项目余额小于其目标资本账户余额（在作出第 4.4 节所述分配后），每名此类人员应特别分配等于其部分调整资本账户与其目标资本账户之间差额的合伙公司收入或收益项目。

4.5.3   如果合伙公司在分配期间没有任何利润和损失（在实施第 4.5.3 节之前确定），而普通合伙人或份额持有人的部分调整资本项目余额与其目标资本账户不同（在进行第 4.4 节所述分配后），则每名此类人员应特别分配合伙公司的扣除额或损失或收入或收益项目（视具体情况而定），以消除其部分调整资本账户与其目标资本账户之间的差额；但是，如果此类分配会导致该人士产生经调整资本账户赤字，则不能分配第 4.5.2 节或第 4.5.3 节所规定的任何损失或扣除项目；以及在符合本规定的情况下向普通合伙人和份额持有人作出的损失分配。

4.6   税收分配：法案第 704（c）节。对于联邦、州和地方所得税目的，合伙公司在各分配期间内的收入、收益、损失、扣除或费用（或其任何项目）应分配给普通合伙人和份额持有人，以充分反映出按照第 4.6 节规定所作出的分配。根据法案第 704（c）节及条例的规定，仅出于税目的而向

公司出资的任何财产的收益、损益和扣除额将在法律允许的范围内仅分配给普通合伙人或者普通合伙人与份额持有人，充分考虑合伙公司联邦和所得税的调整税基以及不动产的初始总资产价值的变动。如果任何合伙公司资产的总资产价值按照总资产价值定义进行调整，则该资产的收入、收益、损失和扣除额随后进行的分配将考虑到联邦和所得税的调整税基以及总资产价值的任何变动，并遵守法案第 704（c）节和条例的规定。任何涉及第 4.6 节分配的选择或其他决定将以普通合伙人认为可合理反映本协议目的和意图的方式进行。第 4.6 节所述的分配仅用于联邦、州和地方税目的，不会影响或以任何方式计算任何普通合伙人或份额持有人的资本账户或利润、损失或其他项目的份额或本协议任何条款所述的分配。普通合伙人及其他份额持有人应受第 4.6 节的约束，就税收目的，报告其合伙公司的收入、损益、扣除或费用（或其任何项目）份额。

## 5    会计和记录

5.1    账簿和记录。合伙公司应在其主要营业地点存放合伙公司的账簿，其将真实准确地记录有限合伙人作为 EB-5 贷款融资的投资资本、所有费用和开支、所有支出、所有接收的信用以及就合伙公司业务有关的所有收入。合伙公司的账簿应按照普通合伙人不定期确定现金或权责发生制以及公认会计原则保存。此外，合伙公司应在其主要营业地点保留法案规定的所有"所需资料"。

5.2    报告。普通合伙人应负责编制合伙公司财务报告，以及与合伙公司会计师及其他专业人员就合伙公司财务事项进行协调。在各财年结束后的一百八十天内，普通合伙人应促使向有限合伙人提交合伙公司截至该财年最后一天的资产负债表副本。

5.3    [保留]

5.4    退税。普通合伙人作为税务合伙人，应当及时准备和提交合伙公司的所有收入和其他报税表。普通合伙人应每年向各普通合伙人和份额持有人提供必要的税收资料（关于合伙公司），以便每年编制美国联邦所得税报税表。

5.5    税务和会计决策。普通合伙人作为税务合伙人，不论是出于账簿还是税务目的，均应进行所有税务和会计决策和选择，并有权依靠合伙公司会计师和其他专业人员的意见。

5.6    特殊税基调整。就任何许可转让而言，普通合伙人可自行决定由合资公司

按照条例第 1.754-1（b）节规定的时间及方式选择调整合伙公司的财产税基，应符合法案第 734（b）和 743（b）节的规定，该受让方应支付合伙公司所涉及的所有费用，包括律师和会计师的合理费用。

5.7　　税务合伙人。通过加入本协议，每位有限合伙人指定普通合伙人作为合伙公司的税务合伙人，根据发案第 6231 节的规定，作为合伙公司在《2015 年双年度预算案》（PL 114-74）以及任何其他州或地方或非美国法律下的任何类似条款规定的代表人，并同意根据普通合伙人的要求，在适当的公共办事处签署、认证、确认、发誓、提交和记录为证明该同意所需的适当文件。

5.7.1　普通合伙人就合伙公司审计根据法案所采取的任何行动，将在法律允许的范围内，对份额持有人具有约束力。在法律允许的范围内，份额持有人可对份额持有人所得税申报表上与合伙公司的纳税申报表不同的项目进行处理，而不得单独对影响合伙公司的税务审计或税务诉讼采取行动，除非经普通合伙人书面授权，普通合伙人可酌情拒绝该授权。

5.7.2　作为税务合伙人，普通合伙人可促使合伙公司开展法案规定或准许合伙公司开展的所有选举（包括根据法案第 754 节或第 743（e）节进行的选举以及 2005-43 号通知所载拟议收入程序所提供的安全港选举，或在合伙公司利益补偿性转让相关的最终收入程序中规定的类似选举（后者称为"安全港选举"）），并且本协议未另行明确规定，并按照普通合伙人认为对所有合伙人最有利的方式进行。合伙公司及各份额持有人将遵守 2005-43 号通知中所载的拟议收入程序的所有要求，或者如果进行安全港选举，则与合伙公司利益的补偿转移有关的任何类似的最终收入程序。普通合伙人可对普通合伙人及其他有限合伙人资本帐户的维护以及根据收入程序所发布的任何最终规定中可能要求的收入、收益、扣除和损失项目的分配进行任何必要的更改。普通合伙人应就其自身或代表合伙公司履行税务合伙人或合伙公司代表人时所发生的一切合理和惯常费用提供报销。

5.8　　财务会计。对于合伙公司所有资金和资产的保管和使用，不管是否立即占有或控制，普通合伙人均应承担信托责任。合伙公司的资金不得与任何其他人的资金混合，普通合伙人不得为维护合伙公司的利益而以任何方式使用或允许任何其他人以任何方式使用该等资金。合伙公司的资金应由普通合伙人批准的金融机构管理。

5.9　　审计。如果普通合伙人认为此类审计是必要的或审慎的，其有权对合伙公

DocuSign Envelope ID: D82C1BA3-6A2E-4745-85E6-63CCE7A69459

司的账簿和记录进行审计。此类审计费用由合伙公司承担。

**6　管理**

6.1　普通合伙人的日常管理。普通合伙人应为维护合伙公司的最佳利益开展相关事务。根据本协议规定的限制和约束，普通合伙人应具有管理和控制合伙公司业务的唯一和排他的权利和权力，并具有法案规定的普通合伙人应拥有的一切权利和权力，包括对影响合伙公司业务的所有决定的权利和权力。特别是在法律允许的最大范围内，普通合伙人有权酌情不时及随时代表合伙公司：

6.1.1　按照本协议的规定，发起、购买、收购、持有、投资、再投资、修改、出售或以其他方式处置第一期目标投资；

6.1.2　将合伙公司的资本和收益用于促进合伙公司的业务发展；

6.1.3　代表合伙公司协商、订立并与贷款人、建筑师、工程师、测量师、律师、会计师、经理、游说者、承包商、分包商和为促进合伙公司发展有必要提供其服务、劳动或材料的其他人员共同监督合同或协议的履行情况；

6.1.4　履行任何及所有为获得、扩大、改进、维护、维修、经营和管理合伙公司业务所必要或适当的一切行为；

6.1.5　以合伙公司的名称或以代理人或受托人的名义持有合伙公司的不动产和个人财产；6.1.6　以合伙公司的名义或以合伙公司代名人的名义签署和提交契据、销售条款、信托契约、抵押、票据、契约、地面租赁、分租、许可、租赁协议、占用协议和/或涉及全部或部分合伙公司财产的使用协议，以及为开展合伙公司业务所必需或附带的任何和所有其他文书；

6.1.7　同意调整第二/三期 EB-5 贷款的条款，包括但不限于利息和付款条件的变化或抵押权利的变更，只要普通合伙人行使酌情权，决定此类修改符合合伙人的最佳利益，不影响有限合伙人获得 EB-5 签证的能力；

6.1.8　控制和管理合伙公司资产，并安排与合伙公司业务有关的建设、维修、融资、再融资、收款、支付、维护、租赁等事务；

6.1.9　以合伙公司的名义或以开发商的名义获得为开发和建造项目和合伙公司业务的经营所必要的任何政府、分区和公共设施的批准、同意、许可或证明；

6.1.10　雇用和/或解雇或保留员工、独立承包商、代理人和履行合伙公司目的所

需的其他人员，包括聘用普通合伙人或其关联方根据普通合伙人根据第 1.11.2 节合理判断确定的条款和补偿所雇佣的人员；

6.1.11  代表本协议项下的全部或任何权利和义务，并促进普通合伙人认为必要或理想的任何人选的指定、任用、雇用或签约，包括普通合伙人的关联方或任何有限合伙人；普通合伙人可在普通合伙人的监督下，为合伙公司执行以下普通合伙人批准或允许的任何其他行为或服务：担任经理、顾问、通讯员、经纪人、建筑师、承包商、分包商、工程师、代管人或普通合伙人认为或视为必要或可取的其他人；调查、选择和执行与其他人员的相互关系，并向合伙公司业务提供相关费用，并与其合作签订适当的合同，雇用或保留任何与合伙公司有关的业务；和执行或协助执行合伙公司管理所需的行政或管理职能，应满足地 1.11.2 节的规定；

6.1.12  征收、收取和索取有关合伙公司业务的任何租金、事项和利润或收入，并将合伙公司的资金支付给有资格接收的人员；

6.1.13  为保护合伙公司或合伙人的资产和业务，或为普通合伙人认为有利于合伙公司的任何目的，购买责任、伤亡或其他保险；

6.1.14  支付对合伙公司施加的任何种类或性质的税款、许可或评估费用，并为此作出相关回报并进行合伙公司认为必要和建议的所有其他行为或事项；

6.1.15  以合伙公司的名义建立、维护和监督合伙公司以其名义开立的账户中的现金或证券存款，并按照普通合伙人的酌情决定进行投资；

6.1.16  就本协议及合伙公司相关事务引起或与之相关的活动或附带活动，代表合伙公司或合伙人或针对其提及、起诉、辩护、妥协和解除诉讼或其他司法或行政诉讼，并聘请律师或与之有关的其他人员；

6.1.17  根据佛罗里达州法律，采取必要或适当的措施保持合伙公司作为有限合伙公司的有效存在；

6.1.18  解除、妥协、转让或让与合伙公司的任何索赔、权利或利益；

6.1.19  按普通合伙人确定的条款及认为足够的证据支付、延期、续期、承认、修改、调整、提交仲裁、起诉、辩护或妥协任何义务、诉讼、责任、诉因或索赔，包括有利于或不利于合伙公司的税款；

6.1.20  协商、执行、交付、同意或批准与合伙公司业务有关的任何合同、文件、要求或文书；

6.1.21 根据合伙公司的经营目的，代表合伙公司从银行、保险公司或任何其他贷款机构借款；并签发票据、债权证及其他债务证券，并抵押合伙公司的资产确保偿还该等资金；

6.1.22 修改合伙公司的有限合伙协议或证书，包括将合伙公司的状态更改为合伙公司有限责任公司的任何声明；

6.1.23 接纳有限合伙人和/或普通合伙人；和

6.1.24 要求份额持有人退还不适当的分配。

第 6.1 节所述的条款应被解释为对象和权力，上述列明的具体权力不得以任何方式限制或约束普通合伙人的一般权力。在适用法律允许的最大范围内，在解释本协议条款时，应有利于向普通合伙人授予权力。普通合伙人的此类权力可在没有任何法院命令或诉诸任何法院的情况下行使。

6.2    投资限制。尽管存在上述第 6.1 节的规定，普通合伙人在行使其管理和控制合伙公司业务的权利和授权时应遵守以下限制：

6.2.1  合伙公司不得借款以便为第一期目标投资筹款或以其他方式采用任何形式的直接杠杆，妨碍第一期目标投资。

6.2.2  合伙公司仅投资于为美国商业地产资产提供融资和/或进行抵押的第一期目标投资。

6.2.3  在第一期投资期届满后，合伙公司不得再进行任何新的第一期目标投资。

6.3    共同投资。普通合伙人可自行酌情与其他合并投资载体和/或由普通合伙人关联方提供、管理或服务的账户共同投资于第一期目标投资（各自称为"共同投资者"），包括通过设立合伙公司、有限责任公司或其他"通行"实体进行共同投资，并共同控制有关第一期目标投资的决定（各自称为"共同投资载体"）。普通合伙人将使此类共同投资的条款规定合伙公司和共同投资者，（i）根据合伙公司和共同投资者的投资按比例进行投资，（ii）按比例参与共同投资的回报，和（iii）共同做出有关任何共同投资载体投资和管理的决定。普通合伙人也将促使与建立和维护任何此类共同投资载体相关的费用按比例承担（按合伙公司和共同有限合伙人投资的相对资本）。

6.4    普通合伙人的活动。普通合伙人在合伙公司业务上投入大量的时间和精力，以便进行必要的合伙公司业务管理和监督，但普通合伙人无义务作为唯一业务管理合伙公司。普通合伙人和/或任何关联方可能还会有其他的业务，

并可从事与合伙公司有关业务以外的活动，不论该等业务是否可能与合伙公司的业务发生竞争。本协议中的任何内容均不得视为在合伙公司或任何有限合伙人之间创造有关普通合伙人和/或其任何关联方的独立企业或其中衍生的收入或收益的任何权利、所有权或权益，或创建普通合伙人向合伙公司或有限合伙人承担的任何其他义务或责任。

6.5　普通合伙人的职责。普通合伙人的行政职责应当包括簿记、保存记录以及不时根据需要编制和提交纳税申报和税务选择。此外，普通合伙人应按照具有明确管辖权的政府机构或当局要求及时提交有关合伙公司业务和经营的所有其他表格、文件或作品。普通合伙人可聘请律师、会计师和其他代理人履行所有此类职责。根据普通合伙人或其关联方直接向合伙公司提供的服务，合伙公司应按照第 1.11.2 节的规定支付合理补偿。

6.6　聘用投资顾问。在偿还第二/三期 EB-5 贷款后，普通合伙人有权保留由其选择的注册投资顾问（"顾问"），管理公司全部或部分资金；但是，必须指示顾问将合伙公司来自第二/三期贷款的资金用于保存资本和其他高流动性投资级证券。在适用法律允许的最大范围内，普通合伙人不得对普通合伙人聘用的任何顾问的任何错误、疏忽、不当行为或恶意行为向合伙公司或任何有限合伙人或份额持有人的承担任何责任。

6.7　合伙公司管理与控制。除非根据本协议另有明确规定或根据法案或任何法律不可豁免条款的具体规定：

6.7.1　有限合伙人不得参与合伙公司业务的开展、管理或控制，没有权力或授权对合伙公司采取行动或约束，该等权力将全部归普通合伙人所有；

6.7.2　有限合伙人有权仅就本协议明确规定由其批准或同意的事项进行投票，有限合伙人无权对任何其他事项进行表决；和

6.7.3　在任何需要本协议规定的有限合伙人批准或同意的情况下，除本协议明确规定外，此类批准或同意应以书面形式向普通合伙人转达在，不得晚于普通合伙人要求批准或同意后的十天内；但是，普通合伙人可在短时间内要求回覆，但不得少于 5 天；进一步规定，在任何时间内未能作出答复，将构成与普通合伙人对该提案建议一致的表决；进一步规定，如果普通合伙人收到有限合伙人有关该行动的实际和/或视同批准或同意，则普通合伙人应有权在未获得有限合伙人授权的情况下予以执行。

6.8　有限合伙人的作用。除非本协议另有明确规定或根据法案或任何法律不可

豁免条款的具体规定,有限合伙人不得参与或控制合伙公司的业务或代表合伙公司行事或约束合伙公司。

6.9　普通合伙人及其关联方的补偿。普通合伙人及其任何关联方有权收取合伙公司或代表合伙公司提供的服务的合理补偿,但应符合第 1.11.2 节的规定。在不限制上述规定一般性的前提下,普通合伙人有权按照第 3 节的规定收取第一期管理费和第二/三期管理费。

6.10　费用报销。如果普通合伙人代表合伙公司支付费用,普通合伙人应通过合伙公司的资金偿还此类费用。这些费用包括但不限于(a)与合伙公司的组织有关的费用,包括就份额的购买所编制并提交给有限合伙人的本协议和材料的法律和会计费用,(b)合伙公司所用货物、服务和材料的补偿,和(c)普通合伙人代表合伙公司招致的所有其他合理的自费支出;但是,根据第 6.9 节应付的经营费用和任何其他应付款以及为有限合伙人创造合理储备所需的金额(如有)应首先从合伙公司可分配给该有限合伙人资本账户中的收入支付,并且如果该等收入不足以支付应付的全部金额,由该有限合伙人的资本账户支付,但仅限于该等有限合伙人的投资本金超过认购金额的款项。根据第 6.9 节可能无法及时支付的任何金额应按照普通合伙人根据第 2.2 节所作出的贷款相同的条款和条件处置。

6.11　依赖普通合伙人授权的权力。任何与普通合伙人有交易的人士,均须代表合伙公司确定其作出承诺的权力,或确定任何支持其权利的事实或情况。普通合伙人代表合伙公司签订的每份合同、协议、租赁、承付票据、契据、抵押和其他文书或文件均应为任何依靠该等文件的合伙人之确凿证据,以证明:

6.11.1　在签署或交付时,合伙公司具有良好的信誉;

6.11.2　此类文书或文件按照本协议妥为签立,对合伙公司及其所有合伙人均具有约束力(但不得因此而产生有限合伙人的责任);和

6.11.3　普通合伙人已获正式授权代表合伙公司签署并交付文书或文件。

**7　声明和保证**

7.1　普通合伙人的声明和保证。截至本协议日期,普通合伙人向有限合伙人声明和保证,普通合伙人是根据佛罗里达州法律注册成立并具有良好信誉的有限责任公司,具有履行本协议义务的全部权力和授权;本协议构成普通合伙人的合法、有效和具有约束力的义务。

DocuSign Envelope ID: D82C1BA3-6A2E-4745-85E6-63CCE7A69459

7.2　　有限合伙人的声明和保证。截至本协议日期，每名有限合伙人特此向其他合伙人声明并保证：

7.2.1　有限合伙人有权签署和交付本协议并履行本协议项下的义务，本协议构成该有限合伙人的合法、有效及具约束力的义务；

7.2.2　该有限合伙人已经或正在为该有限合伙人自己的帐户取得或收购各份额，而非为了转让或分发全部或部分份额，也不是为了在任何特定时间或任何预先确定的情况下出售或以其他方式分配该份额或其任何部分；

7.2.3　该有限合伙人为成熟的投资者，有能力和习惯于评估和获取财务相关事项，而该有限合伙人具有足够的净资产，该有限合伙人预期将不需要使用投资资金，有限合伙人知悉份额投资为投机性和流动性不足的投资；

7.2.4　有限合伙人是本协议签名页所引用的司法管辖区内的真正居民；及

7.2.5　该有限合伙人可访问该有限合伙人认为有关其投资决定的必要或相关的合伙公司的所有资料。

## 8　　转让限制

8.1　　份额持有人的转让限制。直到份额持有人的 I-829 申请获得裁定，除非按照第 8 节的规定并经普通合伙人的事先书面同意（"许可转让"，并且允许受让人称为"许可受让人"），份额持有人可转让该份额持有人持有的任何份额的全部或部分。任何份额持有人违反该条款的任何转让或企图转让均无效。

8.1.1　份额代表的证券未在修订版 1933 年《证券法》下注册，未经修订版 1933 年《证券法》所述的有效注册声明，或者令普通合伙人满意的律师所提供的不需要注册的意见下，不得进行转让。在不限制前述规定一般性的前提下，涉及此类证券的对冲交易不得进行，除非符合此类要求。

8.1.2　除了违反本协议依据普通法或衡平法可获得的所有其他补救措施外，每名合伙人都承认，就合伙公司的宗旨和合伙人关系而言，本协议施加的转让限制合理。因此，本文所载的转让限制应具体执行。

8.1.3　每名份额持有人特此进一步同意就违反本协议的转让或企图转让而导致受偿方的任何费用、责任或损失（包括律师费用和其他费用）对合伙公司和每位合伙人（各合伙人的继任人和受让人）进行补偿并确保其免受损害。

LEGAL_US_E # 130074023.7

8.2    允许转让。

8.2.1  许可受让人应在普通合伙人根据第 8.1 节将其接纳为合伙公司后的日历月的第一天成为有限合伙人。每名有限合伙人特此同意根据本协议的条款和条件接纳许可受让人作为有限合伙人。

8.2.2  未被接纳为有限合伙人的受让人的权利应限于根据法案授予的转让份额的受让人权利。受让人不得作为合伙人，无权检查合伙公司的账簿，代表合伙公司行事或约束合伙公司，或以其他方式干涉其经营。受让方根据法律规定享有的任何分配和分派应当抵消（不限制合伙公司的任何其他合法或公平权利），满足转让人或受让人针对合伙公司所拥有的任何债务、义务或损害赔偿责任。

8.3    普通合伙人的权益。在普通合伙人的全部合伙公司利益转让后，普通合伙人将被视为与合伙公司分离，受让人将成为本合同的继任合伙人。该转让仅在向有限合伙人发出至少三十（30）天的书面通知后生效，或根据法案规定生效。小于普通合伙人全部合伙公司利益的受让人的权益仅限于根据法案授予的受让人权利。

8.4    转让方/受让方的分配和分派。如果在任何分配期间发生转让，则归于该分配期间内转让利益的利润、损失、各项目以及所有其他项目，应在转让方与受让方之间进行分配，并按照法案第 706（d）条的规定考虑在期间内的合伙公司权益的变更，并利用法律许可和普通合伙人选择的任何惯例规定。仅为分配和分派之规定，合伙公司应认可允许转让，并在不迟于普通合伙人根据第 8.1 节接受转让的日历月末进行相应修改。

**9     责任限制；赔偿**

9.1    责任限制；赔偿。

9.1.1  在法律允许的范围内，普通合伙人及其任何直接和间接高级职员、董事、代理人、股东、成员、经理、雇员或合伙人，或任何其他根据普通合伙人请求代表合伙公司作为其他实体的高级职员、董事、成员、经理、合伙人、雇员或代理人的其他人（各自称为"受偿方"），应就以下事项向合伙公司或任何份额持有人负责：（i）受偿方就开展合伙公司事务或与本协议或其拟议活动相关而做出或遭受的任何作为或不作为，除非由任何具有司法管辖权的任何法院或政府机构作出最终判决，或该受偿方在任何诉讼中承认（而非临时、初步或类似的强制令），此类作为或不作为源自欺诈、恶意

行为、故意不当行为、重大过失、严重违反适用的美国联邦证券法，或故意和严重违反本协议且违约行为未在三十天内得到解决，除了本协议中的任何内容并不构成对有限合伙人或合伙公司根据适用证券法或其他法律可能享有的任何权利的放弃或限制，(ii)由普通合伙人选择的合伙公司的任何经纪人、顾问或其他代理人的疏忽、欺诈或恶意行为，或（iii）受偿方根据合约或第 1.11.2 节所采取或遭受的任何作为或不作为。第 9.1.1 节不得影响普通合伙人纠正第 3 节所述分派或第 4 节所述分配的义务，只要此类分派或分配未按照本协议进行。

9.1.2 普通合伙人对合伙公司或任何份额持有人因诚信依赖本协议条款而违反信托义务概不负责。本协议扩大、限制或消除普通合伙人依据普通法或衡平法享有的义务或责任获得合伙人的同意，并用于修订普通合伙人在该方面的义务和责任。

9.1.3 普通合伙人可咨询由普通合伙人选定的法律顾问和会计师，普通合伙人代表合伙公司或为促进合伙公司的利益及合理依赖和依照法律顾问或会计师的意见遭受或承担的任何作为或不作为应充分证明正当，普通合伙人应在此类作为或不作为中受到充分保护，除非法律顾问或会计师为合理谨慎选择的结果。

9.1.4 在法律允许的最大范围内，合伙公司应就合伙公司代表或促进合伙公司利益或因合伙公司事务产生或相关的行为所导致受偿方承担的任何性质、已知或未知、清偿或未清偿的所有索赔、责任、损害赔偿、损失、费用和开支（包括为执行判决、妥协和和解而支付的赔偿金额，调查或辩护任何索赔或潜在索赔所产生的罚款和处罚以及法律或其他费用以及合理开支向受偿方提供补偿并确保其免受损害，包括受偿方履行普通合伙人在本协议项下或与本协议有关的任何义务或责任；但是：(i)受偿方有权根据第 9.1.4 节享有赔偿，只要此类受偿方的行为不构成（在每种情况下，由任何具有司法管辖权的任何法院或政府机构作出最终判决，或该受偿方在任何诉讼中承认（而非临时、初步或类似的强制令）欺诈、恶意行为、故意不当行为、重大过失、严重违反适用的美国联邦证券法，或故意和严重违反本协议且违约行为未在三十天内得到解决；（ii），本协议中的任何内容并不构成对有限合伙人或合伙公司根据适用证券法或其他法律可能享有的任何权利的放弃或限制；(iii)合伙公司根据第 9.1.4 节承担的义务不适用于（A）由于该受偿方拥有合伙公司权益而导致的荆棘损失或税收义务，或（B）受偿方同意承担的合伙公司开支。除普通合伙人或份额持有人有义

-21-

务退还其分发的任何金额（或前利益持有人），以便为第 9.2 节所规定的合伙公司赔偿义务的任何不足，根据第 9.1.4 节满足任何赔偿责任义务应限于合伙公司资产，此类人员无义务将投资本金纳入第 9.1.4 条规定的任何弥偿义务，任何此类个人不必因此而承担任何个人责任。

9.1.5　任何受偿方在对任何索赔提出抗辩或结算时合理招致的费用，无论是根据本协议还是其他原则授予的赔偿权利应由合伙公司在其收到受偿方或其代表承诺之前预付，偿还受偿方最终可获得的补偿金额。未经普通合伙人事先书面批准，合伙公司不得根据第 9.1.5 节支付预付款。

9.1.6　任何受偿方对第 9.1 节或本协议其他条款所规定的赔偿的权利应可累积并对受偿方根据合同或普通法或衡平法所享有权利的补充，并应延及该受偿方的继承人、受让人和法定代表人。

9.1.7　任何受偿方应被视为合伙公司的债权人，并有权在合伙公司终止后，按照第 9.2 节和法案执行份额持有人偿还分配的义务。

9.1.8　每名普通合伙人和份额持有人应补偿并确保其他合伙人免受（包括预扣税）针对普通合伙人或份额持有人收入或分配施加的任何税款，以及有关的罚款或增值税，以及由此引起的附带损失、索赔、损害赔偿或责任。每名普通合伙人和份额持有人特此进一步同意按要求向合伙公司偿还任何按照第 10.3 节和第 3 节适当分配给该人士（或其前利益持有人）的金额。

9.1.9　普通合伙人可自行决定安排合伙公司以合伙公司的费用购买保险，为普通合伙人或任何其他受偿方提供有关合伙公司或普通合伙人在本协议项下任何违约或涉嫌违约行为的保障。

9.1.10　第 9.1 节的条款应自合伙公司解散之日起四年内存续，但是，如果在该期限结束时，有任何诉讼程序尚未决或任何其他责任或索赔（或有或其他），普通合伙人应在此时通知份额持有人，第 9.1 节的规定此后应按照第 9.2.1 节规定的通知条款存续。

9.1.11　第 9.1 节的前述规定将继续为每名受偿方提供保护，不论该受偿方是否仍然具有根据第 9.1 节接受赔偿的职位或能力，并且无论本协议后续修订如何，本协议的任何修订不得减少或限制此类适用于在修订日期之前作为或不作为的赔偿条款。

9.2　分派偿还。

9.2.1　尽管本协议另有规定，如果根据第 9.1 节或其他原因产生任何赔偿责任或

其他责任，并且普通合伙人为该义务或责任设定的准备金（如有）小于该等债务的金额（"第 9.2 节债务"），普通合伙人可要求普通合伙人和份额持有人在任何时间或不定期采用合伙公司向该人士（或其前利益持有人）分配的全部或部分金额向合伙公司提供出资，无论是在合伙公司解散和终止后，还是在该人士退出合伙公司前后；但是，在任何时候，不得要求任何人在该时间之前两（2）年（除非在该期间结束时有任何待决法律程序，或任何其他责任（或有或其他）或尚未偿还的索赔时按照第9.2节分配给该人士（或其前利益持有人），则普通合伙人应在此时通知份额持有人（该通知应包括有关程序（以及在该程序中所述的负债）以及负债和索赔的简要描述），以及普通合伙人和份额持有人根据第 9.2 节支付的义务应对于此类通知载列的程序、责任或索赔存续（或基于相同或类似索赔的相关程序、责任或索赔），直到该等程序、责任或索赔最终解决）。

9.2.2    如果为9.2节所述债务提供任何必要的出资，每名普通合伙人和份额持有人将向合伙公司出资，其金额应导致每名普通合伙人和份额持有人保留合伙公司的累积分配（扣除第9.2节任何先前分派回报）等于以前分配的金额减去第9.2节所述的债务金额后将分配给该人（或其前利益持有人）的累计金额，由普通合伙人公平厘定（但考虑到相关先前分配的实际时间，以及为重新计算第一期分配有限合伙人回报或第二/三期优先回报而进行的出资）。

9.2.3    当普通合伙人确定（无论何时及不时），第9.2节规定将要或已招致第9.2节所述的债务，将需要按照第9.2节提供投资本金，普通合伙人将立即向每名份额持有人提供书面通知。此类通知应包括对9.2节债务的合理描述，每个人所需的缴款金额以及必须缴纳或付款的日期。在缴款截止日期前，每名该等人士将向普通合伙人交付（或普通合伙人指明的人士）所需缴款额。如果某人根据本第9.2节对该人先前收到的分配（或其前利益持有人）作出供款，则该分配将被视为未做出（除用于计算第一期分配的有限合伙人回报或第二/三期优先回报，如适用，其应根据所收到的实际供款和分配进行计算）。

## 10    解散和清算

10.1    清算事件。合伙公司在首次发生以下事件（各自称为"清盘事件"）时，解散并开始清盘和清算：

10.1.1    在第一期投资期届满后，所有或大体上所有合伙公司的第一期目标投资兑

现、出售或按其他方式处置，第二/三期 EB-5 贷款兑现、出售或按其他方式处置；

10.1.2 在获得有限合伙人的同意后，并且所有有限合伙人的 I-829 申请获得裁决之后，普通合伙人的决定同意解散、结清和清算合伙公司；

10.1.3 发生任何其他导致合伙公司经营非法和无法进行的事件；

10.1.4 合伙公司授权终止交易；但是，法律规定或国务院决定导致的此类授权终止不能导致根据本款解散，直到法案禁止该授权的恢复；或

10.1.5 任何导致佛罗里达有限合伙公司解散的事件。

10.2 限制。尽管存在第 10.1 节的规定：

10.2.1 如果清算事件是普通合伙人解散，则合伙公司不得解散，若（A）在发生该等事件时，至少有一名普通合伙人或（B）无其他普通合伙人，但在该事件发生后 90 天内，有限合伙人以书面形式同意继续合伙公司及委任替代普通合伙人。如果有限合伙人同意继续合伙公司，则有限合伙人应选举代替普通合伙人，并须采取一切必要措施继续合伙公司的经营。该选举须按以下方式完成：（i）在同意继续合伙公司后进行，任何一名或多名有限合伙人可提名替代普通合伙人；（ii）除非获得持有多数份额的有限合伙人的同意，否则，该提名人不得成为普通合伙人；和（iii）如该提名人未当选，则在切实可行的范围内，任何一名或多名有限合伙人可提名另一名替代普通合伙人，在替代普通合伙人当选前，应重复该过程。如果替代普通合伙人得到及时提名和选举，则除前普通合伙人所持有的合伙公司权益之外，替代普通合伙人将持有所有权力、特权和义务。如果根据本协议或法案的规定，某人不再作为普通合伙人，则该人的合伙公司权益将转换为受让人的利益，但有权享有在转换之前享有的分派和分配份额。

10.2.2 如果清算活动是最后剩余有限合伙人解散，则如果在事件发生后的 90 天内，普通合伙人至少吸纳一名有限合伙人加入合伙公司，则合伙公司不得解散。为免生疑义，普通合伙人可于任何时间向合伙公司吸纳至少一名额外合伙人，但在接纳该等额外合伙人时，应至少存在一名剩余的有限合伙人。

10.3 清算。发生清盘事件后，合伙公司将继续以有秩序的方式，进行资产清盘，并满足其债权人和合伙人的要求而继续履行事务。合伙人不得采取与合伙公司的业务和事务相抵触或不必要或不适当的行为。普通合伙人负责监督

合伙公司的清盘和清算工作，并应充分考虑合伙公司的负债和资产，合伙公司资产应及时清算，符合公平市场准入价值，清算所得应按照第 3.3 节和第 3.6 节中规定的优先顺序，分配用于支付先前未收回的投资本金。

10.4 清算分配的替代形式。根据普通合伙人的酌情决定，根据第 10.3 节将按比例分配给普通合伙人和份额持有人的分派可能：

10.4.1 分配给既定的信托，并以普通合伙人和份额持有人为受益人，仅用于清算合伙公司资产，收取拖欠合伙公司的款项，并支付合伙公司或普通合伙人因合伙公司而产生的任何或有或不可预见的负债或债务；而该等信托的资产应按普通合伙人的合理酌情权分配给普通合伙人及份额持有人，其金额与合伙公司分配予该等信托的款额相同，比例应与合伙公司根据第 10.3 节分配给他们的相同；或

10.4.2 保留为合伙公司债务（或有或其他）提供合理准备金，并允许收取合伙公司欠下的任何分期付款的未兑现部分，但是，该等扣留金额应尽快分配给普通合伙人及份额持有人。

10.5 视同分配和清算。如果合伙公司按照条例第 1.704-1（b）（2）（ii）（g）节的规定进行清算，但没有发生清算事项，合伙公司不得进行清算，不得支付或解除合伙公司的债务，合伙公司的事务不得清盘。相反，仅对联邦所得税而言，合伙公司将被视为向新的有限合伙公司提供所有合伙公司财产和债务，以换取该新建有限合伙公司的权益，此后，合伙公司将被视为通过向新合伙人分配新的有限合伙公司权益进行清算。

10.6 合伙人的权利；没有义务恢复赤字资本账户余额。除本协议另有规定外，普通合伙人和份额持有人应仅查看合伙公司的资产，以获得其投资本金的退款，且无权要求或接受现金以外的其他合伙公司财产。除本协议另有规定外，普通合伙人或份额持有人不得优先于其他普通合伙人或份额持有人获得其投资本金的退还、分派或分配。如果普通合伙人或份额持有人的资本项目中存在赤字余额（在实施所有应纳税年度的所有缴款、分派和分配后，包括发生清算事件的应纳税年度在内），则普通合伙人或份额持有人无义务就合资公司的资本向该合资公司提供任何出资，而且此类赤字不得视为合伙公司或任何其他人为了任何目的而拖欠的债务。

**11    仲裁**

11.1.1 强制仲裁。就本协议产生的任何和所有争议或纠纷，无论是依据法律或事

DocuSign Envelope ID: D82C1BA3-6A2F-4745-85E6-63CCE7A69459

实,经普通合伙人（必须在相关事件成立之日后的十天内以书面形式提供）同意后，应根据美国仲裁协会商业仲裁规则（以下简称"协会"）在佛罗里达州通过有约束力的仲裁裁决进行解决。如果双方无法就单一仲裁员达成协议，仲裁员应为协会选定的单一独立仲裁员。合作伙伴还同意，协会应急措施备选规则适用于诉讼。

11.1.2 地点；决定；费用。仲裁应在佛罗里达州棕榈滩县或双方同意的任何其他地点进行。仲裁员的决定是最终的，对所有当事人和所有根据和通过他们提出要求的人均具有约束力，裁决可在有管辖权的法庭、州或联邦最高法院强制执行。仲裁费用由当事人平等承担，但双方应支付并承担自己的专家费用、收集证据和律师费用，但仲裁员可酌情决定任何裁决均可包括该仲裁员的律师费用，只要仲裁员明确地确定裁决的对象导致争议、纠纷或索赔提交仲裁作为延诉策略或过于轻率。

11.1.3 附加程序。尽管协会规则中现在或以后可能存在任何相反的规定，第11.1.3节中规定的程序同样适用。

11.1.4 仲裁通知（"通知"）应当明确载明发出通知的一方（"提起方"）认为存在违约或有争议的事项。接收方（"其他方"）应在收到通知后的三十（30）天内向提起方和仲裁员提供答复（"答复"），提及另一方认为具有控制权的本协议条款，并附上其持有的并且支持其回答的所有相关文件和其他事项（非通知附件）的副本。

11.1.4.1 所有必要和适当的发现应由仲裁员允许，但应符合仲裁员在此情况下确定为适当的限制条件，以便迅速有效地进行仲裁。

11.1.4.2 仲裁员应尽快安排听证会，并在可行的情况下连续举行听证会，并有权根据法律或公平原则（包括临时或初步救济）作出裁决。

11.1.4.3 仲裁员应根据任何一方的要求，在听证会结束后三十（30）天内迅速发布其对事实和结论的书面意见，并将根据本协议成为最终裁决并具有约束性，除非一方或双方根据第11.1.4.4节要求重新审查。

11.1.4.4 在收到仲裁员建议意见后的二十（20）天内，任何一方有权向仲裁员提出重新考虑（附有合理备忘录）的动议，另一方应有二十（20）天的时间回应该备忘录。在收到此类备忘录和答复后，仲裁员应重新考虑上述动议提出的问题，并及时确认或更

改其多数决定，其将对双方均为终局的且具有约束性。

## 12 杂项

12.1 放弃分割。任何合伙人不得直接或间接采取任何行动，要求对合伙公司或其任何资产或财产进行分类或评估，或强制出售任何合伙公司财产，尽管适用法律存在任何相关规定。每名合伙人（及其法律代表、继承人和受让人）谨此不可撤销地放弃任何及所有维持任何分割或强迫出售合伙公司任何资产或财产的权利，除非本协议另有明确规定。

12.2 有限合伙人解散。除非经普通合伙人酌情决定，有限合伙人不得在合伙公司按照第 10 节解散和清盘之前退出或离开合伙公司；但是，在有限合伙人的未收回投资本金根据第 3.3.5 或 3.6.5 节（如适用）降为零时，该有限合伙人应被视为根据法案第 620.1601（2）（b）节离开合伙公司。

12.3 通知。本协议规定或准许发出的任何通知、付款、要求或通信均为书面形式，并在以下情况下被视为妥为交付、给予和收到：（a）亲自交付收件人；（b）通过电子邮件（包括通过使用 USIF 门户网站）发送，（c）通过确认的传真发送；或（d）如果通过已注册或认证且邮资和费用预付的邮件；如果发送给合伙公司，第 1.4 节所述的地址，或普通合伙人可能不时通知有限合伙人指明的其他地址；如发送给有限合伙人，在合伙公司簿册和纪录中所载的地址及电子邮件地址，或有限合伙人为该目的而向普通合伙人提供的第 11.3 节要求的其他地址。

12.4 修正案。根据第 12.4 节的其余条款，本协议可由普通合伙人在获得有限合伙人同意的情况下进行书面修改。对第一期有限合伙人的权利、优惠和特权产生不利影响的本协议修订案仅须获得第一期有限合伙人的同意。对第二期有限合伙人的权利、优惠和特权产生不利影响的本协议修订案仅须获得第二期有限合伙人的同意。本协议也可由普通合伙人在未事先通知有限合伙人并且未获得同意的情况下以书面形式修订（但普通合伙人应在该修订生效后的 20 个营业日内通知有限合伙人有关该等修订的全部详情）：

12.4.1 为增加至本协议（或修改现有条款），合伙公司律师认为保护有限合伙人的任何条款；和

12.4.2 解决任何歧义，或纠正或补充合伙公司律师书面意见中认为存在缺陷或与本协议的任何其他条款不一致的规定，但是，在该律师的书面意见中，纠正、更正或补充规定没有并且也不会对任何有限合伙人的利益产生不利影

-27-

响。尽管本协议存在任何规定，未经普通合伙人事先书面同意，本协议的修改不得生效，如果拟议修正案将或有可能导致有限合伙人遭受不利影响经济效益，则必须获得此类有限合伙人的书面同意；

12.4.3 除非本协议另有规定或法律规定，否则有限合伙人或份额持有人的批准或同意意味着有限合伙人或份额持有人持有的多数份额的批准（视具体情况而定）。除非协议另有规定或法律规定，否则任何类别有限合伙人（即第一期有限合伙人或第二/三期有限合伙人）或任何类别的份额持有人（即第一期份额持有人或第二/三期份额持有人）的批准或同意意味着该类有限合伙人或份额持有人持有的多数份额的批准或同意（视情况而定）。

12.4.4 获得本协议所规定的同意或批准后，未经任何其他人的进一步行动或执行，包括任何合伙人在内，（i）本协议的任何修改、重述、修订或放弃可能会通过普通合伙人的书面通知实施，和（ii）合伙人以及本协议的任何其他方应被视为受到本协议任何修改、重述、修订或放弃的约束。

12.5 约束效应。除本协议另有规定外，并受限于转让份额的限制，本协议的任何约定、条款和规定应维护合伙人及其继承人、遗产受赠人、法定代表人、继任人、转让人和受让人的利益。根据本协议条款和条件，任何普通合伙人或份额持有人的合伙公司利益继承人也应继续遵守普通合伙人或份额持有人的所有权利和义务。

12.6 时间。时间是本协议的本质所在。

12.7 可分割性。如果本协议的任何条款被视为或确定为无效或由于任何原因无法执行，则此类无效或不可执行性将不会影响任何其他条款，且该条款和本协议应被解释为在最大程度上实施其条款，并仍然是有效和可执行。

12.8 通过引用合并。本协议附带的各附表、附件和其他附录均在此通过引用并入本协议。

12.9 进一步保证。各合作伙伴同意采用所有进一步的行动，签署、确认和交付为执行本协议规定而可能合理需要、适当或可取的任何附加文书和文件。

12.10 <u>副本</u>。本协议可签署一式多份，其中每份应被视为原件，并且所有此类协议共同构成同一文书。通过传真交付的副本在所有情况下应被视为原件。没有必要为提供本协议证明而制作额外的副本。

12.11 准据法。本协议应接受佛罗里达州法律和美国联邦法律的管辖并据其进行解释（不包括任何与其他管辖区内法律解释存在冲突的原则或规则）。

-28-

12.12　无第三方权利。除第 9 节另有规定外，本协议条款仅用于维护合伙公司及合伙人的利益，其他相关方（包括但不限于合伙公司或任何合伙人的任何债权人，除非法案不可放弃条款要求，任何未被接纳为合伙人的份额持有人）应就此类条款拥有针对合伙公司或任何合伙人的权利或索赔，或有权对合伙公司或任何合伙人强制执行此类条款。

12.13　整合。本协议及合伙人和/或其关联方同时签署的其他文件构成本协议双方之间有关主题事项的完整协议，并取代合伙人之间任何先前的协议或谅解。除本协议另有规定外，本协议项下的任何变更、修订、修改、重述或者解释均不具有约束力，除非以书面形式并由合伙人签署。

12.14　补救措施。每名合伙人都承认并同意，任何违反本协议条款的法律补救措施将不足够，并同意在可能被强制执行的任何诉讼中给予临时和永久的禁令和其他公平补救措施，包括在此类其他公平补救措施中具体履行，无需证明存在实质损害或任何法律补救措施存在不足。本协议规定的任何权利或补救措施应累积法律或权益规定的任何其他权利、权力或补救措施。

12.15　不放弃。任何人对于违反本协议任何条款的一次或多次行为免于追责不得被解释为放弃对随后违反相同或任何其他规定的行为追责，合伙人延迟或未就违反本协议寻求任何补救措施或行使应计权利不得被视为合伙人放弃对该违约行为的补救措施和权利。

12.16　额外合伙人。每名有限合伙人及任何额外或继承有限合伙人须通过签署本协议副本及其他文书或文件并以普通合伙人决定的方式成为本协议的签字人，在签署之后，每名有限合伙人均被视为已经采用并同意接受本协议全部规定的约束。

12.17　委托书。普通合伙人以外的其他合伙人特此委任普通合伙人为其正式及合法代理人，并采用其名称和地点，代表其签署、执行、认证、确认、提交和记录任何管辖范围内的合伙公司或合伙人所需或适当的任何文书。上述授权不可撤销，并构成权力与利益，除非每名合伙人可在（a）合伙公司解散和清盘以后，或（b）遵守该合伙人的全部合伙公司利益的许可转让和接纳受让人为合伙人后，以书面形式签署的文书并提交普通合伙人撤销该授权。

12.18　管辖权及地点。双方承认，大部分的谈判，预期履行和执行均发生或将发生在佛罗里达州棕榈滩县，因此，各方不可撤销和无条件地（a）同意本协议产生或与本协议有关的任何起诉、诉讼或法律程序应提交位于佛罗里

达州棕榈滩县的联邦或州法院；（b）同意接收该法庭有关任何此类诉讼、起诉或法律程序的管辖权；和（c）放弃对任何此类诉讼、起诉或法律程序地点提出异议的权利。

12.19 执行费用。如果就本协议执行提出任何法律诉讼或其他程序，或因本协议任何规定引起的所谓争议、违反、违约或失实陈述，各方应自行支付律师、法律助理和法律助理费用、法庭费用以及法庭费用（包括但不限于所有此类上诉费用、成本和开支），以及该诉讼或法律程序产生的任何销售税。

12.20 保密。每名有限合伙人将按照适用的程序保护有限合伙人所知悉的由普通合伙人提供及有限合伙人接收的关于本协议的保密信息（包括与关联方信息共享有关的程序），但不包括（1）并非由于合伙人的披露而公开的信息，（2）由合伙人据信不承担保密义务的来源在非保密的基础上提供的此类信息，（3）政府监管机构、自律机构、法律、法律程序（包括口头检查）或有限合伙人为被告人、原告人或其他指定人之诉讼所要求，和（4）有限合伙人向其关联方或顾问提供；但是，该等有限合伙人应就该关联方或顾问未遵守第 11.20 节规定的行为承担责任。

12.21 附加文件和法案。就本协议而言，每名有限合伙人同意签署和交付此类额外文件和文书，并执行必要或适当的附加行为，以签署、执行和履行本协议的所有条款和条件和所有此类交易。

[以下为签名页]

兹证明，双方已在上述日期之前正式签署本协议。

普通合伙人：

US IMMIGRATION FUND GP - MIZNER，LLC

签字_____

姓名：Nicholas A. Mastroianni

职务：授权签字人

DocuSign Envelope ID: D82C1BA3-6A2F-4745-85E6-63CCE7A69459

### 有限合伙人签名页

#### （附于修订和重述版有限合伙协议）

签字人特此承认下列签署人已收到截至 2017 年 10 月 1 日的 Mizner Funding, LP （"合伙公司"）的修订和重述版有限合伙协议的复本（"协议"）。

以下签署人特此签署本签字页作为有限合伙人，并同意接受本协议所有条款和条件的约束，并在合伙公司普通合伙人接受下列签署人的认购协议时，认购下列数量的份额。

有限合伙人：

_____

[签名]

_____

[打印或键入姓名]

_____

[街道地址]

_____

[城市、邮编和国家]

_____

[电话号码]

_____

[传真号码]

_____

[私人电子邮件地址]


购买份额：1

认购金额：500,000 美元

日期：_____

接受人：

US IMMIGRATION FUND GP - MIZNER，LLC


签名

_____

姓名：

职务：授权代表人

日期：

_____

LEGAL_US_E # 130074023.7

## 目录

附录 A – 合伙人和合伙公司权益

附录 B – 定义和解释

附录 C – 有限合伙公司证书

**附录 A**

**合伙人和合伙公司权益**

（由普通合伙人在接纳新有限合伙人时更新）

| 名称 | 份额 | 投资本金 |
|---|---|---|
| **普通合伙人** | | |
| US IMMIGRATION FUND GP - MIZNER，LLC | 无 | 组件时 500 美元 |
| **有限合伙人** | | |
| 合伙公司权益、有限合伙人类别及投资本金，参见有限合伙人附录 | 278 | 每份额认购金额 500,000 美元 |
| | | 139,000,000 美元 |
| 总计（减去普通合伙人和初始有限合伙人的投资） | | 139,000,000 美元 |

**附录 B**

**定义及解释**

1.  定义。就本协议（包括本协议序言）而言，以下术语应具有以下含义，并且术语的语法变体应具有相应含义：

"会计师"是指普通合伙人代表合伙公司保留的注册会计师事务所。

"法案"是指佛罗里达经修订统一有限合伙公司法。

"调整资本账户"是指就任何普通合伙人或其他份额持有人而言，在进行以下调整后的截至任何财年的资本账户：（i）向资本账户贷记（1）根据本协议的规定，该人有义务恢复其资本账户的任何金额，加上（2）根据条例第 1.704-1（b）（2）（ii）（c）节、第 1.704-2（g）（1）节倒数第二句和 1.704-2（i）（5）节，该人有义务恢复其资本账户的金额；和（ii）在资本账户借记条例第 1.704-1（b）（2）（ii）（d）（4）、（5）和（6）节所述的项目。

"调整资本账户赤字"是指相对于任何普通合伙人或其他份额持有人而言，该人经调整资本账户中的赤字余额（如有）。

"关联方"是指相对于任何人而言，（a）直接或间接控制，或由该人控制或共同控制的任何人，（b）拥有或控制该人百分之十以上未决表决权的任何人，（c）任何高级职员、董事、成员（如该人为成员管理实体）、经理（如该人为经理管理实体）或该人的普通合伙人，（d）为高级职员、董事、成员（如该人为成员管理实体）、经理（如该人为经理管理实体）、普通合伙人、受托人或本款第（a）至（c）项所述的持有 10%或更多投票权益的任何人；或（e）任何与该人结婚或为该人前辈或后裔的人。"控制"、"受控制"和"共同控制"是指直接或间接拥有或指导实体或个人管理和政策的权力，无论是通过表决证券、合同或其他方式获得的所有权。

"协议"是指修订和重述版有限合伙协议。

"分配期"是指在合伙公司的收入、损益或扣除额的损益及其他项目应在合伙人之间进行分配的任何期限。

"营业日"是指除星期六、星期天或佛罗里达州法定假日之外的任何一天。

"资本账户"是指按照以下规定为普通合伙人或其他份额持有人开设的资

本账户：

1.1.1. 每名此类人员的资本账户应记入该人的投资本金（在提供此类投资本金时），该人的利润分配份额以及按照第 4 节特别分配给该人的收入或收益性质的任何项目，以及该人承担的任何合伙公司债务或由分配给该人的任何财产提供担保的金额；

1.1.2. 每名此类人士的资本账户应借记本协议任何条款规定的向该人分配的任何财产总资产价值，该人的可分配损失份额，以及按照第 4 节特别分配给该人的收入或收益性质的任何项目，以及合伙公司承担的该人的债务或由分配给该人的任何财产提供担保的金额；

1.1.3. 如果任何合伙公司利息按照本协议转让，则受让方应继承（i）适用于转让方并且涉及转让利息的资本账户；（ii）如果转让利息包括普通合伙人的合伙公司权益，所有其他关于合伙公司利息的账户；（iii）如果合伙公司权益包括任何份额及就此类份额保持的所有其他账户；

1.1.4. 在确定第 1.9.1 和 1.9.2 节所述任何债务的金额，应考虑到法案第 752（c）节和适用的条例；和

1.1.5. 本协议上述条款和涉及资本账户维护的其他条款旨在符合条例第 1.704-1（b）节，并应按照与条例一致的方式进行解释和应用。如果普通合伙人决定修改资本项目或其任何借方或贷方的计算方式（包括由出资或分配财产担保或由合伙公司、普通合伙人或任何份额持有人承担的借项或贷项），以便遵循相关条例，普通合伙人可作出修订，但是，不可能对可分配给任何普通合伙人或其他份额持有人的数额产生重大影响。普通合伙人也可（i）作出任何必要或适当的调整，维持合伙人资本账户与根据条例第 1.704-1（b）（2）（iv）（g）节计算的合伙公司资产负债表所反映合伙公司资本金额的平等，和（ii）在发生意外事件可能导致本协议不符合条例第 1.704-1（b）节时作出任何适当的修改。

"投资本金"是指除合伙人按照第 2.1 节向合伙公司提供的资金外，合伙人资产的现金金额及约定的资产公平市场价值。

 "类百分比"是指特定类别的有限合伙人，有限合伙人持有的份额数量除以所有有限合伙人所持有的份数所获得的百分比。

"法案"是指不时修订（或后续法律的任何相应规定）的 1986 年《国内税收法》。

"EB-5 贷款"是指第一期 EB-5 贷款和第二/三期 EB-5 贷款。

"债务偿还"是指，对于任何分配期间，合伙人应在该期间支付的由合伙公司资产担保的任何贷款所有必需的利息和本金总额(不包括到期时需要支付的贷款收益和"气球"本金预付和支付的利息)，或合伙公司的任何担保或无担保的其他贷款。

"折旧"是指在每个分配期间等于该期间资产允许折旧、摊销或其他成本回收扣除额的金额，但如果资产的总资产价值不同于其调整后的联邦所得税税基，则折旧应为联邦所得税折旧、摊销或其他成本回收扣除在期间开始时具备的相同比例；如果联邦所得税在该期间的折旧、摊销或其他成本回收扣除为零，则该折旧应采用普通合伙人选择的任何合理的方法参照总资产价值进行确定。

"佛罗里达州区域中心"是指佛罗里达州棕榈滩县，佛罗里达州区域中心有限责任公司根据美国《拨款法》第 610 节和《移民法》从 USCIS 获得"区域中心"的任命。物业位于佛罗里达州区域中心的边界内。

"公认会计准则"是指在美国境内适用于商业房地产的普遍接受的会计原则，并在治理专业组织手册中推荐使用。

"普通合伙人"是指 U.S. Immigration Fund GP - Mizner，LLC 及合伙公司的任何继任普通合伙人。

"资产总值"是指相对于任何资产而言，该资产有关联邦所得税的调整税基，以下内容除外：

1.1.6.　合伙人向合伙公司出资的资产的初始总价值为普通合伙人及出资合伙人确定的该等资产的公允总价值；

1.1.7.　所有合伙公司资产的总资产价值应进行调整，等于普通合伙人截至下列时间确定的公允市价值：（i）任何新的或现有合伙人收购合伙公司的附加合伙权益，交换超过一项最低限度的投资本金；（ii）合伙公司为合伙公司的利益而向合伙人分配合伙公司超过一项最低限度合伙公司资金；（iii）条例第 1.704-1（b）（2）（ii）（g）节所述的清算；但是，上述第（i）和（ii）款的调整仅在普通合伙人合理确定此类调整必要或适当时才进行，以便反映合伙人在

-B-3-

合伙公司内的相对经济利益；

1.1.8. 分派给任何合伙人的任何合伙公司资产的总价值应为该等资产截至分配日期由分派合伙人和普通合伙人确定的总公允价值，但是，如果分派方是普通合伙人，则分配资产的公平市场价值的确定须经有限合伙人同意；

1.1.9. 合伙公司资产的总资产价值应增加（或减少），以反映根据法案第 734（b）节或第 743（b）节对该等资产税基进行的调整，但仅限于根据法案第 1.704-1（b）（2）（iv）（m）节和第 5.5 节确定资本账户时所考虑的调整；但是，资产总值不得根据第（d）节进行调整，如果普通合伙人决定对于可能导致第 1.21.4 节所述调整的交易应进行第 1.21.2 节的调整；和

1.1.10. 如果根据本协议确定或调整了总资产价值，则资产总值将在计算损益中应计入折旧。

"I-829 申请"是指企业家移除条件的有限合伙人 I-829 申请。

"移民法"是指 8 U.S.C. §1101 及在 8 C.F.R.§1.1 颁布的规定，可能会不时进行修改。

"有限合伙人"是指根据本协议向合伙公司接纳为有限合伙人的份额持有人。

"清算所得"是指在发生任何合伙公司解散事件时由合伙公司持有的所有现金及其他财产，以及合伙公司收到的所有现金和财产。

"营业净收入"是指在任何分配期间，营业收入超过此类分配期的营业费用。

"非追溯扣除"定义参见条例第 1.704-2（b）（1）节。分配期间的非追溯扣除额等于合伙公司在该分配期间的最终净收益的净增加额（如有）超过根据条例第 1.704-2（c）节确定的由于合伙公司最低收益产生的该分配期内任何分配总额。

"非追溯债务"定义参见条例第 1.704-2（b）（3）节。

"合伙人"是指普通合伙人及每名有限合伙人，不须对采用该术语的上下文进行区分；而"合伙人"是指任何一名合伙人。

"合伙公司"是指根据法案以"Via Mizner Funding，LP"的名义成立的有限

合伙公司，并注册为有限合伙人。

"合伙人非追溯性债务"定义参见条例第 1.704-2（b）（4）节。

"合伙人非追溯性债务最低收益"是指每名合伙人非追溯性债务等于合伙公司最低收益的金额，如果合伙人非追溯性债务被视为非追溯责任，则按照条例第 1.704-2（i）（3）节确定。

"合伙人非追溯性扣除"定义参见第 1.704-2（i）（2）节。合伙人非追溯性扣除金额涉及合伙人在分配期内的非追溯债务，金额等于在该分配期间合伙人非追溯性债务最低收益的净增加额（如果有）超出该合伙人在该期间的总分派金额，该合伙人非追溯性债务存在损失风险，并且可分配至合伙人非追溯性债务最低收益，金额按照条例第 1.704-2（i）（2）节确定。

"合伙公司权益"是指合伙公司的合伙人权益及其在合伙公司中任何类型的资本、利润、损失、收益、分配或其他经济利益，包括合伙人的权利：（a）合伙公司的收入、收益、损失、扣除和信贷项目分配；（b）可用现金和清算所得的分配；（c）检查合伙公司的账簿和记录；（d）如果普通合伙人按照本协议规定管理合伙公司，且在不违反本协议或法律规定。

"合伙公司类别百分比"是指特定类别的有限合伙人，有限合伙人持有的份额数量除以所有有限合伙人所持有的份数所获得的百分比。

"合伙公司最低收益"定义参见条例第 1.704-2（d）（1）节。

"合伙公司非追溯性债务"定义参见条例第 1.704-2（b）（3）节。

"人"应做广益解释，并且是指但不限于任何个人、合伙公司、有限合伙公司、法人团体、有限责任公司、非法人组织或协会、信托（包括其受托人）、政府（或其代理机构或政治分区）或其他法律或商业实体或企业。

"第一期分配有限合伙人回报"是指合伙公司第一期目标投资的当期权益和/或优先或其他当前分派中实际获得和收到的现行报酬中每年应付百分之二（2%）。

"第一期可用现金"是指第一期经营收入和第一期目标投资的投资、兑现或处置收益减去第一期经营费用。

"第一期EB-5贷款"是指为项目第一期建设向开发商提供的5900万美元的抵押贷款。

"第一期 I-829 触发日期"是指普通合伙人收到所有第一期有限合伙人的 I-829 申请的最终裁决通知日期。

"第一期投资期"是指自本协议日期起计, 并于本协议日期后四周或第一期 I- 829 触发日期结束的期间, 普通合伙人可酌情续期两次, 每次一年。

"第一期有限合伙人"是指其投资资本被分类并指定为第一期 EB-5 贷款资金的有限合伙人。

"第一期管理费"是指普通合伙人向合伙公司就第一期目标投资所提供服务的管理费, 金额等于从当期权益和/或优先或其他当期分配中获得的第一期目标投资回报减去第一期分配的有限合伙人回报。

"第一期经营费用"是指相对于合伙公司和任何分配期间而言, 根据公认会计准则确定的可分配给第一期有限合伙人的合伙公司当期责任, 涉及管理合伙公司的一般管理费用, 包括但不限于审计和税收筹划费用、持续的法律和审计费用、政府费用和税费、涉及公司纳税申报审计的法律和会计费用、相关法律费用、保险费和诉讼费用, 加上第一期目标投资的原始持续管理、处置或其他兑现措施所产生的具体费用。

"第一营业收入"是指合伙公司和分配期间而言, 合伙公司的现金收入, 包括但不限于合伙公司第一期目标投资产生的当前利息和/或优先或其他现行分配以及实现或处置收益, 包括应计利润、准备金和其他扣除额, 由普通合伙人酌情自行决定。

"第一期目标投资"是指商业房地产抵押贷款, 包括全部贷款及 A 票和 B 票参与 ("抵押贷款"), 商业房地产夹层贷款, 包括商业房地产夹层贷款参与 ("夹层贷款"); 商业房地产优先或其他股权, 反映资产所有实体或其直接或间接控制实体, 具有指定的当前优先或其他回报 ("优先股权")和商业房地产合资企业在股权所有人实体或其直属或间接控股所有人中的权益, 从属于相关财产资本结构的优先资本 ("合资企业权益")。

"第一期份额持有人"是指拥有一个或多个份额的人, 并作为第一期有限合伙人参与合伙公司。

"第二/三期可用现金"是指第二/三期 EB-5 贷款的合伙公司第二/三期营业收入和投资、实现或处置收益减去第二/三期经营费用。

"第二/三期 I-829 触发日期"是指普通合伙人收到所有第二/三期有限合伙人的 I-829 申请的最终裁决通知日期。

-B-6-

"第二/三期 EB-5 贷款"是指本项目第二期和第三期建设开发商的本金额为 80,000,000 美元的抵押贷款。

"第二/三期有限合伙人"是指其投资资本划分并指定为第一期 EB-5 贷款提供融资的有限合伙人。

"第二/三期管理费"是指普通合伙人向合伙公司就第一期 EB-5 贷款提供的服务管理费，金额等于所赚取的合伙公司第二/三期 EB-5 贷款所赚取的回报中减去第二/三期优先收益。

"第二/三期营业费用" 是指相对于合伙公司和任何分配期间而言，根据公认会计准则确定的可分配给第二/三期有限合伙人的合伙公司当期责任，涉及管理合伙公司的一般管理费用，包括但不限于审计和税收筹划费用、持续的法律和审计费用、政府费用和税费、涉及公司纳税申报审计的法律和会计费用、相关法律费用、保险费和诉讼费用，加上第二/三期目标投资的原始持续管理、处置或其他兑现措施所产生的具体费用。

"第二/三期经营收入" 是指合伙公司和分配期间而言，合伙公司的现金收入，包括但不限于合伙公司第二/三期目标投资产生的当前利息和/或优先或其他现行分配以及实现或处置收益，包括应计利润、准备金和其他扣除额，由普通合伙人酌情自行决定。

"第二/三期优先回报"是指相对与第二/三期有限合伙人而言，相当于第二/三期有限合伙人在第二/三期优先回报期间内未收回投资本金平均日余额的百分之一点五，累积但不复合，根据每年 365/366 天（视情况而定）确定，第二/三期优先回报的实际天数正在确定。

"第二/三期份额持有人"是指拥有一个或多个份额的人，并作为第二/三期有限合伙人参与合伙公司。

"试点计划"是指根据《移民法》设立的 EB-5 移民投资计划。

"最优惠利率"是指花旗银行（N.A.）或其继任者不时宣布的最优惠利率。根据本协议规定的优惠利率应根据不时生效的优惠利率进行调整，该期限实际天数按每年 365/366 天计算（视情况而定）。

"利润"和"损失"是指各分配期间，等于合同公司的应纳税所得或损失的金额，按照《法案》第 703（a）节确定（为此目的，所有收入、损益或扣除金额根据法案第 703（a）（1）条另行确定，包括在应纳税所得或损失），并作以下调整：

1.1.11. 合伙公司的任何收入免收联邦所得税并且在计算利润或损失时不考虑，应计入当期损；

1.1.12 法案第 705（a）（2）（B）节所述的合伙公司支出，或根据条例第 1.704-1（b）（2）（iv）（7）节确定为法案第 705（a）（2）（B），并且在计算利润或亏损时未考虑在内，应从应税所得或损失中扣除；

1.1.13. 如果合伙公司资产的总资产价值按照总资产价值定义的第（b）或（c）节进行调整，则调整金额应作为收益或损失计入该等资产处置，用于计算利润或亏损；

1.1.14. 联邦所得税计算的损益相关的合伙公司资产处置损益应参考总资产价值进行计算，即使该资产的调整税基不同于其总资产值；

1.1.15. 与在计算该等应纳税所得额或损失时考虑的折旧、摊销和其他费用扣减不同，该分配期的折旧应按照折旧的定义计算；

1.1.16. 如果根据条例第 1.704-1（b）（2）（iv）（m）（4）节，要求调整《国内税收法》第 734（b）节或《国内税收法》第 743（b）节规定对任何合伙公司资产的调整税基，由于不是在普通合伙人或其他份额持有人的合伙公司权益完全清算的分配，在确定资本账户时应考虑在内，此类调整金额应视为收益项目（如果调整增加资产税基）或损失（如果调整减少资产税基），在计算损益时应考虑在内；和

1.1.17. 尽管本损益定义另有规定，根据第 4 条特别分配的任何项目在计算利润或损失时应予以考虑。

"项目"是指名为 Via Mizner 的混合用途房地产开发项目的开发、建设和运营。

"物业"是指位于佛罗里达州博卡拉顿市南联邦高速公路和 East Camino Real 交汇处东北角约 6.8 英亩的不动产。

"条例"是指美国国内所得税法规，包括根据法案颁布的财务条例和暂行条例，该条例可以不时修订（包括后续条款的相应规定）。

"认购协议"是指合伙公司与有限合伙人之间签署的认购协议，据此有限合伙人以普通合伙人可接受的形式认购份额。

"认购金额"是指有限合伙人在加入合伙公司时所需的最低金额，以便符合试点计划的投资要求，目前为 50 万美元。

"目标就业区"是指根据《移民法》指定的佛罗里达州区域中心内的高失业率地区。

"税务合伙人"是指法案第 6231 节规定的普通合伙人。

"转让"是指任何自愿或非自愿的转让、出售、质押、抵押或其他处置，将合伙公司的权益转交给现任所有人以外的任何人，包括以遗嘱或无遗嘱作出的处置、信托分配、自愿或非自愿提出呈请、破产或任何解除债务的其他诉讼、财产清算协议或离婚令实施的处置及对合伙公司利益施加收费指令；自愿或非自愿进行转让。

"受让人"是指从转让人获得合伙公司经济利益或获得份额持有人的权利和权力的人，包括过世份额持有人的遗产、已解散、清算或终止的份额持有人的利益继承人、破产份额持有人的财产和信托受益人。

"转让人"是指进行转让的人。

"份额"是指有限合伙人（"初始有限合伙人"除外）或份额持有人所持有的合伙公司权益份额，以及在收到有限合伙人认购金额后，接纳有限合伙人时合伙公司签发的份额。

"份额持有人"是指拥有一个或多个份额的人，不论该人是否已被纳入合伙公司作为合伙人。

"未收回投资本金"是指份额持有人（或份额持有人的前利益持有人）或普通合伙人的投资本金超过份额持有人（或份额持有人的前利益持有人）收到的总出资金额（参见第 3.3.6 节或第 3.6.6 节）或在本协议日期确定的普通合伙人分派金额（参见第 3.3.7 或第 3.6.7 节）的金额。

"USCIS"是指美国公民及移民服务局，美国国土安全部的一个机构。

2. 不受标题等影响的解释。本协议分为不同的章节，插入的标题仅供参考，不影响本协议的解释。除非另有说明，本协议中对本部分的任何引用均指本协议的具体章节。

3. 解释。本协议的每条立约、条款和规定均应根据其公允意义进行解释，而不是严格依据或依靠任何此类合伙人。本协议的解释不涉及任何推定或规则，要求按照要求起草本协议的一方进行解释。此外，除文义另有规定外，

-B-9-

DocuSign Envelope ID: D82C1843-6A2E-4745-85E6-63CCE7A69459

"本协议"、"以下"、"本文件"、"本文"、"下文"等是指本协议整体；"包括"一词不能被解释为限制之前提及的具体事项（不论是否采用非限制性语言，如"不限于"或"但不限于"等），而是被认为是指合理处于声明范围内的所有项目或事项。

4. 数字和性别。在本协议中，单数词汇包括复数，反之亦然，性别均包括所有性别和中性。

5. 任何行动日期。如果根据本协议需要采取任何行动的日期不是营业日，则必须在下一个营业日采取该行动。

6. 会计条款。在本协议中，本文未定义的会计条款应按照 GAAP 进行解释。

7. 货币。在本协议中，所有金额以美元表示。

DocuSign Envelope ID: 7680 7B89 422 47F 9908 9CCD7064419

BOCA RATON

# VIA MIZNER



DocuSign Envelope ID: 7E8E7B33422-477B-9D65-CC9D0640

# "恭喜大家!"

**所有 I-526 全部获批,131 I-829 已经递件,项目一期完成还款**



174

DocuSign Envelope ID: 37B35A2-47A-4906-9CC7-E40A49



# 项目情况

## 项目一期 奢华租赁公寓



DocuSign Envelope ID: 580CFB3D4422-447F-9906-96CCC7A654D



DocuSign Envelope ID: 96296d6ca47d85ca...

# 53% 完成租赁，100% 客户满意度





DocuSign Envelope ID: ... Case 9:25-cv-80227-AMC Document 1-2 Entered on FLSD Docket 01/28/2025 Page 179 of 203



The apartments are part of the Via Mizner complex, which will include The Shoppes at Via Mizner, the five-star Mandarin Oriental Hotel and Residences and Via Mizner Golf & City Club.



# 101 VIA MIZNER



# 101 VIA MIZNER

## luxury apartment tower welcomes first residents



DocuSign Envelope ID: 5D8DY B0C422 477E 9D68 8CCC E70049

# 顶级设施

- 24 小时全天候礼宾部和安保

- 高级健身中心

- 奢华全景泳池，日光浴吧

- 智能包裹收发中心

- 日落酒廊，私人厨师服务

- 私密俱乐部会员制度



179

DocuSign Envelope ID: 7B604AA2-477F-4666-8CCC-D706448589AE

# 超现代设计公寓

- 露台拥有高尔夫球场，海景或者城市最佳景观

- 欧式大理石地板

- 定制德国橱柜

- 节能窗户和门

- 智能开锁系统，无需钥匙






180

DocuSign Envelope ID: 57E85F1A-B094-422F-477E-9D60-89CC47D64449



# 101
## VIA MIZNER
### LUXURY APARTMENTS

# 项目一期本金已经返还



Via Mizner Funding, LP
115 Front Street
Jupiter, Florida 33477

September 29, 2017

Mr. Mark Gensheimer
Via Mizner Mezz 1, LLC
1515 N Federal Highway
Suite 306
Boca Raton, Florida 33432

RE: Loan Pay-off  - Phase I

Mr. Gensheimer:

Please be advised that the pay-off for the above referenced loan as of September 29, 2017 is as follows:

| | |
|---|---|
| Principal: | $59,000,000.00 |
| TOTAL DUE: | $59,000,000.00 |

The funds should be wired to the following:

Via Mizner Funding LP
Floridian Community Bank
Routing #067015313
Account # 22 0000 2067

Sincerely,

John M Oliver
Sr. Vice President

# 项目情况

## 项目二期 文化东方酒店



DocuSign Envelope ID: 5E83CCB6-9422-477F-905F-6CCED70D4F49



DocuSign Envelope ID: ...

BOCA RATON

文 华 东 方 酒 店





184

# THE REAL DEAL
## SOUTH FLORIDA REAL ESTATE NEWS

# Mandarin hotel groundbreaking in Boca Raton set for early 2017

*Hotel will be the second phase of the Via Mizner development after completing 366 apartments*

By Mike Seemuth | November 16, 2016 03:00PM



*Rendering of Via Mizner*

The company behind Via Mizner, a mixed-use development in Boca Raton anchored by a Mandarin Oriental hotel, will break ground early next year on the hotel and will open the sales center for a Mandarin-branded luxury

## news release

Mandarin Oriental Hotel Group Limited
281 Gloucester Road, Causeway Bay, Hong Kong
Telephone +852 2895 9288  Facsimile +852 2837 3500
www.mandarinoriental.com



**MANDARIN ORIENTAL ANNOUNCES NEW HOTEL AND RESIDENCES**

**IN BOCA RATON, FLORIDA**

**Hong Kong, 10 November 2015** — Mandarin Oriental Hotel Group has announced that it will manage a new luxury hotel and branded residences currently under development by Penn-Florida Companies in Boca Raton. Scheduled to open in late 2017, the project provides the Group with a unique opportunity to further extend its reach in this key tourism and business destination in southern Florida.

The project comprises two adjacent towers located in downtown Boca Raton, surrounded by the city's most affluent, residential neighbourhoods and a short walk from miles of pristine beaches. The buildings will form part of an upscale mixed-use development that will include 65,000 square feet of luxury lifestyle retail as well as a world-class private club offering social, fitness and championship golf amenities.

## Mandarin Oriental 'urban resort' coming to downtown



A rendering, from left, the future The Residences at Mandarin Oriental, Boca Raton, Mandarin Oriental hotel, and 101 Via Mizner apartments. Via Mizner is built and leasing. (Pinnacle Advertising/Courtesy)

DocuSign Envelope ID: 8580F860-422F-477F-888B-9CCC7DB049

# THE REAL DEAL

SOUTH FLORIDA REAL ESTATE NEWS



## Jack Nicklaus to design Via Mizner country club golf course in Boca

Golf course is part of Via Mizner mixed-use project
November 03, 2016 12:00PM

« PREVIOUS   NEXT »



Jack Nicklaus

Golf champion Jack Nicklaus will design a country club golf course as part of the planned Mandarin Oriental residences project in Boca Raton.

Nicklaus and his design firm are working on site analysis, landscaping and routing plans for the golf course at 6200 Boca Del Mar Drive, with a planned construction start date of the second quarter of next year and a fall completion date, according to a press release.

The Via Mizner Golf and City Club project is part of Via Mizner, a mixed-use project with luxury apartments, retail, restaurants, a private club, gym and golf amenities and the Residences at Mandarin Oriental in Boca Raton. Penn-Florida Companies, which purchased the property in 2011, is the developer.

The Nicklaus-designed course will include practice and teaching facilities, a new clubhouse with a fitness center, Har-Tru tennis courts, a pool, children's playground, locker rooms and dining venues. Penn-Florida will launch sales for the golf and city club in the next few weeks, according to a release.

The city club portion, which will be part of the Mandarin, will have a private clubroom, two resort-style pools, spa and athletic club. The Mandarin residences, with prices starting at $1.8 million, is slated to be completed by the end of 2018. – Katherine Kallergis

# The Coastal Star

All Blog Posts   My Blog   + Add

Welcome to
The Coastal Star

**Sign Up**
or Sign In

## Boca Raton: Billion-dollar Via Mizner changing the face of south Boca

Posted by The Coastal Star on January 4, 2017 at 11:47am
View Blog



An artist's rendering shows the buildings in the Via Mizner complex at Federal Highway and Camino Real.
From left are the Mandarin Oriental Residences and Hotel and the recently completed luxury apartment building.
Rendering provided by Penn-Florida

**By Mary Hladky**

While downtown Boca Raton is seeing a huge building boom, no project yet rivals the scope of Via Mizner.

The ultra-luxury project, developed by Boca Raton-based Penn-Florida Cos. at an estimated cost of just under $1 billion, encompasses a Mandarin Oriental hotel, condos, a private club, rentals, shops and restaurants at Federal Highway and Camino Real.

101 Via Mizner, a 366-unit apartment building, is the first phase to be completed and began renting in August. Construction will begin this spring on the 165-room Mandarin Oriental and the 84 condos in The Residences at Mandarin Oriental, both directly north of the rentals.

Those wanting to snap up a condo could make pre-construction reservations even before the sales center opens this month at 10 E. Boca Raton Road. Douglas Elliman Real Estate is the sales and marketing agent.

In all, nearly 1,500 spaces will be available in two floors of below-ground parking under the hotel and condo buildings, and on the second and third levels. Parking for the apartment building is in its first four floors.

The Via Mizner Golf & City Club will include an 18-hole golf course, located about 3 miles away, between Palmetto Park Road and Camino Real just west of Military Trail.

Golf legend Jack Nicklaus will redesign the course, which will be completed by the end of year, beginning in the spring. Once work at the site at 6200 Boca Del Mar Drive is completed, facilities will include six Har-Tru tennis courts, a fitness center, a clubhouse, a resort-style pool and restaurants.

The city club will be in the Mandarin Oriental. Members also will have access to the hotel's rooftop pools, spa, restaurants and other amenities.

DocuSign Envelope ID: E5B4422-47F-4096-8CCC-70454

# 计划开业时间为2020年



187

DocuSign Envelope ID: 7E837CB3-A2A2-4271-9D08-9CCE7064E948

# 项目情况

## 项目三期 文华东方超奢华公寓



188

DocuSign Envelope ID: 5A63F88A-A77E-4606-8CCE-D06449

*The eighty-five magnificent homes within The Residences represent an architectural showcase of contemporary, luxury styling. Each one is a breezy, light-filled environment that celebrates Boca Raton's elite, Gold Coast lifestyle.*

85套独家定制的现代超奢华公寓，每一间都可以专享清风拂面的博卡拉顿黄金海岸的精英生活品质。



Sections ⌄



# Via Mizner development closes $400M in financing

*Deal includes $318M from Mack Real Estate Credit Strategies, $80M from US Immigration Fund*

By Katherine Kallergis | October 05, 2017 03:05PM



*Via Mizner, Frank Weed and Faisal Ashraf*

Penn-Florida Companies just closed on nearly $400 million in financing for Via Mizner, a mixed-use project in Boca Raton.

New York-based Mack Real Estate Credit Strategies is the lead lender, providing $318 million for the development, said Faisal Ashraf, founder and CEO of Lotus Capital Partners. Lotus arranged the financing package, a deal that took about six months. The remaining $80 million was provided by the U.S. Immigration Fund, an EB-5 lender.

Overall, Via Mizner will span 2 million square feet with a 366-unit luxury apartment building, an 88-unit condo, a 164-key Mandarin Oriental Hotel & Resort and 60,000 square feet of retail in downtown Boca Raton.

The financing deal, which marks the largest in South Florida so far this year, includes a refinance of the rentals, 101 Via Mizner Luxury Apartments, a construction loan for the hotel, and a bridge loan for the condo site. Lotus will go to market for a separate construction loan for the condos later this year in the low $100 million range, Frank Weed, vice president of development for Penn-Florida, said.

Ashraf arranged the financing with Lotus' Arvind Pai, Jesse Blieberg and Spencer Correnti. Lotus and Penn-Florida declined to discuss terms of the deal, but Ashraf said Lotus received interest from banks, debt funds and money management firms, including three offers from qualified lenders with about $1 billion of capital.

Mack, a New York-based lending firm, offered bank-style financing with great terms, Ashraf said. "Our challenge was to

提前完成4亿美金再融资



190

# 其中20%已被预定



DocuSign Envelope ID: 7B3D7A32-4271-490B-8CC7-0B349...

# 其中20%已被预定



192

DocuSign Envelope ID: 7B3D4422-47F-9509-9CCE7064849

# 其中20%已被预定



DocuSign Envelope ID: 6BCA4227-477F-4905-8CC1-70204AC70049



194

DocuSign Envelope ID: 7B894A27-477E-4906-8CCE-D0649...



DocuSign Envelope ID: ...



197

DocuSign Envelope ID: 0782D7B0D422-477E-8985-9CCA7D8449...

# 投资人项目资金在I-829获批之前必须要处于风险状态



197

# 项目一期投资人

- 移民局虽然于2017年6月14日出具了新政策，但是根据律师专家建议，投资人在829获批之前资金仍然应该处于风险状态



Confidential Information

# Memorandum

To: Florida Regional Center, LLC

From: I.A. Donoso & Associates, LLC

Re: Immigration Risks Associated with Repayment of Capital Contribution Before the Final Adjudication of an Investor's I-829 Petition

Date: September 14, 2017

Florida Regional Center, LLC ("Regional Center") has asked our law firm to prepare an analysis of the potential immigration law risks to EB-5 Investors (as defined below) under the EB-5 Immigrant Investor Visa Program under Section 203(b)(5) of the Immigration and Nationality Act ("EB-5 Program") who are repaid all or part of the capital investment amount before the final adjudication of their Form I-829 Petition by Entrepreneur to Remove Conditions ("Form I-829 Petition").

For the reasons, and subject to the limitations, set out below, I conclude that repayment by the NCE (as defined below) of an investor's Capital Contribution (as defined below) prior to the final adjudication of such EB-5 Investor's Form I-829 Petition increases risks to the success of the immigration process of such EB-5 Investors. Repayment of the Capital Contribution prior to the adjudication of the Form I-829 Petition increases the immigration law risks of EB-5 Investors: (1) in subsequent immigration proceedings to contest a denial, (2) if there are any evidentiary issues concerning job creation, or (3) if the United States Citizenship and Immigration Services ("USCIS") hereafter exercises its discretion to change or reinterpret its guidance, which may occur at any time, as shown by the latest policy memorandum.

4800 Montgomery Lane
Suite 640
Bethesda MD 20814
(301) 276-0653
www.donosolaw.com

DocuSign Envelope ID: CF95B404-4276-4686-9CCC-7U6D49...

## JAY PEAK 案例进一步说明投资人I-829获批之前资金必须处于风险状态

- 该项目遭遇欺诈

- 其中83人获得了条件绿卡，律师建议投资人必须将资金投资到一个新的项目中才能够确保其I-829永久绿卡的获批，并且保证其优先日



Bill Stenger at podium, and Dr.Ike Lee, AnC Bio CEO, at the groundbreaking ceremony for the new biotech facility in Newport. The project was caught up in an alleged fraud and never got underway. (Photo: Courtesy)

In the case of AnC Bio, the project was never built, leaving no assets with which to repay investors. The settlement with Raymond James solved that problem.

As Goldberg explains in his letter to the AnC Bio investors, the 83 investors who had not yet received their conditional cards can get their $500,000 investments back. The 83 investors who do have their conditional green cards can choose between getting their money back, or having it "redeployed" into a new EB-5 project, and remain eligible for a permanent green card.

Goldberg advises the investors who have a conditional green card that if they choose to get their money back. It is his belief that they will "lose any EB-5 priority and eligibility to obtain permanent residence status that you may have."

Goldberg said he is in the process of finding one EB-5 project for those seeking a visa to re-invest in; investors can not choose the project.



http://www.burlingtonfreepress.com/story/news/2017/08/18/eb-5-investors-failed-newport-project-can-get-money-back/581007001/          Page 2 of 3

199

DocuSign Envelope ID: 52CEB99A-E177-4888-98CC-C70846...

# 项目一期投资人签署同意书

- I-829可以确保安全

- 侨外和美国移民基金每年支付投资人2%的利息

- 投资周期为4年，直到项目中最后一名投资人的I-829获批



200

DocuSign Envelope ID: 7880FB20A221-477F-9B86-8CCE7089DB49

# 项目二期和三期投资人签署同意书



- 资金仍然放在项目中用来创造就业机会

- 等待I-829获批

- 每年可以从项目公司获得0.5%的利息回报

DocuSign Envelope ID: 96296D6C-A47D-85CC-...

谢谢！



202